# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |
|---|---|
| OHIO TELECOM ASSOCIATION and USTELECOM – THE BROADBAND ASSOCIATION,<br><br>*Petitioners*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | No. 24-3449 |
| OHIO CABLE TELECOMMUNICATIONS ASSOCIATION,<br><br>*Petitioner*,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>*Respondents*. | No. 24-3450 |

On Petitions for Review of an Order of
the Federal Communications Commission

## RESPONDENTS' MOTION TO TRANSFER TO THE D.C. CIRCUIT

These cases challenge the latest in a series of interrelated agency orders concerning the Federal Communications Commission's "Open Internet rules" for broadband internet access providers—a matter

sometimes referred to as "net neutrality."  Pursuant to 28 U.S.C.
§ 2112(a)(5), Respondents—the Federal Communications Commission
(FCC or Commission) and the United States of America—respectfully
move to transfer this matter to the D.C. Circuit.[1]

In a series of orders beginning in 2005, the FCC has acted to
promote the widespread deployment of broadband networks that are
open, affordable, and accessible to all.  Four of these previous orders have
been reviewed by the D.C. Circuit; the challenge to a fifth order is
currently pending (but in abeyance) there as well.  The D.C. Circuit has
approved aspects of the Commission's orders but disagreed with others—
on several occasions remanding to the FCC for further action or
additional deliberation.  *See, e.g.*, *Mozilla Corp. v. FCC*, 940 F.3d 1, 18,
59–63, 65–70, 86 (D.C. Cir. 2019) (per curiam) (directing the agency to
address several unresolved issues, which are now part of the order
challenged here).

---

[1]  The cases originally docketed in this Court are *Ohio Telecom Ass'n v. FCC*, No. 24-3449, and *Ohio Cable Telecommunications Ass'n v. FCC*, No. 24-3450.  As explained below, several cases challenging the same underlying agency order in other circuits are due to be transferred to and consolidated in this Court.

Thus, for more than a decade, the D.C. Circuit has repeatedly engaged with the FCC concerning the lawful contours of the agency's Open Internet rules. Respondents submit that it would be most efficient, and in the interest of justice, to transfer this latest round of follow-on litigation to the D.C. Circuit under 28 U.S.C. § 2112(a)(5), just as was done in the most recent previous round of Open Internet litigation.[2]

## BACKGROUND

**1.** The Communications Act of 1934 ("Act"), 47 U.S.C. §§ 151 *et seq.*, as amended by Telecommunications Act of 1996 ("1996 Act"), Pub. L. No. 104-104, 110 Stat. 56, distinguishes between two different categories of communications services: Title II "telecommunications services"[3] and Title I "information services."[4] Following passage of the

---

[2] The petitioners have informed the agency that they may seek a judicial stay of the order. Respondents therefore request that the Court act on this motion expeditiously.

[3] The Act defines "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information." 47 U.S.C. § 153(50). "Telecommunications service," in turn, is defined as "the offering of telecommunications for a fee directly to the public * * * regardless of the facilities used." *Id.* § 153(53).

[4] "Information service" is generally defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via
(cont'd)

1996 Act, the FCC took varying positions on whether broadband should be regulated as a telecommunications service or an information service.[5]

In 2005, the Supreme Court held that the Commission's then-prevailing view that broadband internet access was best viewed as a Title I information service was "a permissible reading of the Communications Act under the *Chevron* framework." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986–1000 (2005); *see also id.* at 1003 (Breyer, J., concurring) (Title I approach was permissible, "though perhaps just barely"). But the Court remarked that the Commission could "impose special regulatory duties on" internet service providers even under Title I, using "ancillary jurisdiction." *Id.* at 996; *see id.* at 976.

---

telecommunications," 47 U.S.C. § 153(24), but excludes "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service," *ibid.*

[5] *Compare*, *e.g.*, *Deployment of Wireline Servs. Offering Advanced Telecomms. Capability*, 13 FCC Rcd. 24012 (1998) (*Advanced Services Order*) (holding that the facilities-based transmission component of wireline DSL broadband service is a Title II telecommunications service), *with Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities*, 17 FCC Rcd. 4798 (2002) (*Cable Broadband Order*) (holding that the provision of broadband service over cable facilities is a Title I information service); *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82, 1000–02 (2005) (recognizing the FCC's changes in position).

**2.** Soon after the Supreme Court's decision, the Commission unanimously adopted the 2005 *Internet Policy Statement*, the precursor to today's Open Internet rules.[6] The *Internet Policy Statement* enshrined several principles "to ensure that broadband networks are widely deployed, open, affordable, and accessible to all consumers." 20 FCC Rcd. at 14988 ¶ 4. Specifically, the Commission recognized that consumers are entitled (1) "to access the lawful Internet content of their choice"; (2) "to run applications and use services of their choice"; (3) "to connect their choice of legal devices that do not harm the network"; and (4) "to [enjoy] competition among network providers, application and service providers, and content providers." *Ibid.*

The Commission's efforts to carry through on the promises of the *Internet Policy Statement* in the ensuing years would enmesh the agency in an ongoing conversation with the D.C. Circuit for the better part of two decades, culminating most recently in the order challenged here.

---

[6] *Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, 20 FCC Rcd. 14986 (2005) (*Internet Policy Statement*).

**a.** In 2008, the FCC found that Comcast was secretly interfering with its subscribers' use of peer-to-peer file-sharing applications.[7] This interference deprived subscribers of their right to use lawful applications and services of their choice. 23 FCC Rcd. at 13052 ¶ 43. Equally significant, in light of evidence that these applications had "become a competitive threat" to Comcast because they could be used "to view high-quality video * * * that [consumers] might otherwise watch (and pay for) on cable television," *id.* at 13030 ¶ 5, 13037 ¶ 16, Comcast's behavior deprived consumers of the fruits of a competitive marketplace and "squelch[ed] the dynamic benefits of an open and accessible Internet," *id.* at 13028 ¶ 1; *see also id.* at 13052–53 n.201 (Comcast's practices "impede competition" and "erect barriers to entry for entrepreneurs"). The Commission ordered Comcast to terminate the offending practices and submit a compliance plan. *Id.* at 13058–59 ¶ 54.

Comcast petitioned for review in the D.C. Circuit. The D.C. Circuit granted the petition and vacated the order, holding that the Commission could not rely on its Title I "ancillary authority" because the agency had

---

[7]  *See Formal Compl. of Free Press & Pub. Knowledge Against Comcast Corp. for Secretly Degrading Peer-to-Peer App'ns*, 23 FCC Rcd. 13028 (2008) (*Comcast Order*), *pet. for review granted*, *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010).

not properly identified any affirmative statutory authority that covered Comcast's practices. *Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010). The court acknowledged that Section 706 of the 1996 Act, 47 U.S.C. § 1302, could "arguably be read to delegate [the requisite] regulatory authority to the Commission," but explained that the Commission could not rely on that provision without first overruling agency precedent disavowing that reading of Section 706. *Id.* at 658–59.

**b.** The Commission responded to the *Comcast* decision by adopting the *2010 Open Internet Order*.[8] Tracing the path set out in the D.C. Circuit's decision, the Commission disavowed the prior approach to Section 706 and embraced the full authority conferred by that provision to "encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans * * * by utilizing * * * price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods." 47 U.S.C. § 1302(a); *see 2010 Order*, 25 FCC Rcd. at 17968–72 ¶¶ 117–123.

---

[8] *Preserving the Open Internet*, 25 FCC Rcd. 17905 (2010) (*2010 Order*), *pet. for review granted in part, denied in part, and remanded*, *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).

The *2010 Order* also formally codified three Open Internet rules: (1) a "no blocking" rule prohibiting fixed and mobile broadband providers from blocking lawful internet content or applications, 25 FCC Rcd. at 17941–44 ¶¶ 67; (2) a "no unreasonable discrimination" rule prohibiting fixed broadband providers from unreasonably discriminating in their treatment of internet traffic, *id.* at 17944–51 ¶¶ 68–79; and (3) a "transparency rule" requiring fixed and mobile broadband providers to disclose accurate information about their network management practices and the commercial terms and performance characteristics of their services, *id.* at 17936–41 ¶¶ 53–61.

The *2010 Order* was again challenged in the D.C. Circuit. In *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014), the court vacated the *2010 Order* in part, upheld it in part, and remanded the matter to Commission for further proceedings consistent with the court's opinion.

The *Verizon* court first held that the Commission had "adequately supported and explained its conclusion" that broadband providers "have the technical and economic ability"—and "powerful incentives"—to "discriminate against and among" producers of internet content and services (referred to as "edge providers"). *Id.* at 645–46. The court accordingly upheld the Commission's finding that, without Open Internet

rules, broadband providers "could act in ways that would ultimately inhibit the speed and extent of future broadband deployment." *Id.* at 645. The D.C. Circuit also agreed with the Commission that Section 706 gave the agency "the requisite affirmative authority to adopt the regulations" in the *2010 Order*, *id.* at 635–42, and that the 2010 Open Internet rules were reasonably designed to advance the aims of Section 706, *id.* at 642–49.

Nevertheless, the D.C. Circuit held that the "no blocking" and "no unreasonable discrimination" rules were impermissible "[g]iven the Commission's [then-prevailing] decision to classify broadband providers not as providers of 'telecommunications services' but instead as providers of 'information services.'" *Id.* at 650; *see id.* at 649–59. Under 47 U.S.C. § 153(51), a communications provider "shall be treated as a common carrier * * * only to the extent that it is engaged in providing telecommunications services," so the Commission could not impose common-carriage obligations on broadband providers so long as broadband was classified as an information service. Because these two rules amounted to *per se* common-carriage requirements, *id.* at 655–59, the D.C. Circuit explained that the Commission could not maintain these rules under its then-existing Title I framework. That court accordingly

"remand[ed] the case to the Commission for further proceedings consistent with this opinion." *Id.* at 659.

c.    The Commission responded to the D.C. Circuit's remand with the *2015 Open Internet Order*.[9]  "Taking the *Verizon* decision's implicit invitation," the *2015 Order* "revisit[ed] the Commission's classification of the retail broadband Internet access service" and, "[b]ased on [an] updated record, * * * conclude[d] that retail broadband Internet access service is best understood today as an offering of a 'telecommunications service'" subject to Title II.  30 FCC Rcd. at 5734 ¶ 308; *see id.* at 5733–804  ¶¶ 306–433.    In so doing, the Commission "addresse[d] any limitations that past classification decisions placed on the ability to adopt strong [O]pen Internet rules, as interpreted by the D.C. Circuit in the *Verizon* case." *Id.* at 5615 ¶ 49.

Having dutifully addressed the obstacle identified by the D.C. Circuit in *Verizon*, the *2015 Order* promulgated a new set of Open Internet rules for both fixed and mobile broadband providers.  These

---

[9]    *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) (*2015 Order*), *pets. for review denied*, *U.S. Telecom Ass'n v. FCC*, 825 F.3d 675 (D.C. Cir. 2016), *reh'g denied*, 855 F.3d 381 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 454 (2018).

included "bright-line" prohibitions against (1) blocking of lawful content, applications, or services; (2) throttling (*i.e.*, impairing or degrading) particular internet content, applications, or services; or (3) engaging in "paid prioritization" —that is, "favor[ing] some traffic over other traffic * * * either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *2015 Order*, 30 FCC Rcd. at 5647–58 ¶¶ 110–132. The bright-line rules were supplemented by a case-by-case general conduct standard providing that broadband providers "shall not unreasonably interfere with or unreasonably disadvantage (i) end users' ability to select, access, and use * * * the lawful Internet content, applications, services, or devices of their choice, or (ii) edge providers' ability to make lawful content, applications, services, or devices available to end users." *Id.* at 5659–64 ¶¶ 133–145. Finally, the Commission adopted an enhanced version of its transparency rule requiring broadband providers to publicly disclose accurate information about their network management practices and the commercial terms and performance characteristics of their services. *Id.* at 5669–82 ¶¶ 154–185.

The *2015 Order* again faced judicial review in the D.C. Circuit. In *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), the D.C. Circuit upheld the *2015 Order* in full as a well-supported and well-reasoned construction of the Communications Act. The full D.C. Circuit debated and denied rehearing en banc, 855 F.3d 381 (D.C. Cir. 2017), and the Supreme Court denied review, 139 S. Ct. 454 (2018).

**d.** In 2018, following a change in administration, the Commission reversed the *2015 Order*, repealed the Open Internet rules (except for portions of the transparency rule), and reverted to treating broadband as a Title I information service.[10] Numerous parties sought judicial review of that order, and the challenges were initially consolidated in the Ninth Circuit. Following that initial consolidation, the parties in that litigation filed a joint motion to transfer the litigation to the D.C. Circuit under 28 U.S.C. § 2112(a)(5). *See* Motion to Transfer, *Cnty. of Santa Clara v. FCC*, No. 18-70506 (9th Cir. filed Mar. 16, 2018) (attached as Exhibit A). The parties recognized that the *2018 Order* was "the fourth[] 'follow-on' phase"

---

[10] *Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) (*2018 Order*), *pets. for review granted in part, denied in part, and remanded*, *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam) , *on remand*, 35 FCC Rcd. 12328 (2020) (*Remand Order*), *pet. for review pending*, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir.).

in the back-and-forth between the FCC and the D.C. Circuit over the agency's effort to enact appropriate Open Internet rules, and that "all prior phases [had] been adjudicated by the D.C. Circuit." *Id.* at 2. Because the D.C. Circuit had "considered virtually identical issues in inter-related proceedings," *ibid.*, the parties agreed that the D.C. Circuit was "thoroughly familiar with the 'background of the controversy,' making transfer appropriate." *Id.* at 7–8 (quoting *Eastern Air Lines, Inc. v. Civil Aeronautics Bd.*, 354 F.2d 507, 510 (D.C. Cir. 1965)). The Ninth Circuit granted the motion and transferred the litigation to the D.C. Circuit.

In *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam), the D.C. Circuit held that—"view[ing] *Brand X* as binding precedent"— the Communications Act allowed the Commission to reclassify broadband as a Title I information service. *Id.* at 18–19. But two of the three judges on the panel wrote separately to express doubts about whether *Brand X*'s holding remained correct in light of how contemporary broadband service is offered and used. *See id.* at 86–87 (Millett, J., concurring) (voicing "substantial reservation" because the analysis upheld in *Brand X* "is unhinged from the realities of modern broadband service"); *id.* at 94–95 (Wilkins, J., concurring) (opining that "critical aspects of broadband Internet technology and marketing

underpinning the Court's decision [in *Brand X*] have drastically changed since 2005" and may call for "revisiting *Brand X*").

The D.C. Circuit also found that, in large measure, the agency had adequately explained its decision to restore a Title I classification and repeal the Commission's earlier rules. However, the court held that the Commission had erred in three important respects requiring a remand:[11]

- First, the D.C. Circuit faulted the Commission for having "fail[ed] to consider the implications for public safety of [the] changed regulatory posture." *Id.* at 59. "[P]ublic safety officials explained at some length," the court observed, how the repudiation of FCC oversight "could imperil the ability of first responders, providers of critical infrastructure, and members of the public to communicate during a crisis." *Id.* at 60. But the *2018 Order* did not engage with those concerns. The D.C. Circuit held that this "disregard of * * * the impact of the *2018 Order* on public safety * * * warrants a remand with direction to address the issues raised." *Id.* at 63.

---

[11] The court also held that the Commission had failed to identify a valid source of legal authority for its preemption of state law, and accordingly vacated that portion of the order. 940 F.3d at 74–86.

- Second, the D.C. Circuit opined that the Commission had, "without reasoned consideration, [taken] broadband outside the current statutory scheme governing [utility] pole attachments" needed for reliable, timely, and affordable deployment of broadband service. *Id.* at 65. "Because the Commission did not adequately address how the reclassification of broadband would affect the regulation of pole attachments," the D.C. Circuit "remand[ed] for the Commission to do so." *Ibid.*

- Third, the D.C. Circuit rebuked the Commission for inappropriately "brush[ing] off the concern" that its actions "would eliminate the statutory basis for broadband's inclusion in" the Lifeline subsidy program for low-income households. *Id.* at 68. The court determined that the agency "backhanded the issue" in its order and had "proven unable to explain itself in this litigation either." *Id.* at 69. The D.C. Circuit therefore "remand[ed] this portion of the *2018 Order* for the Commission to address the issue" anew. *Id.* at 70.

Despite determining that the agency had failed to adequately address these matters, the D.C. Circuit "remand[ed] without vacatur" for further Commission action consistent with its decision. *Id.* at 86.

**e.**  In October 2020, the Commission issued a *Remand Order* providing further analysis in response to the D.C. Circuit's remand.[12] The *Remand Order* was promptly challenged—once again in the D.C. Circuit.  Around the same time, the Commission received multiple petitions for agency reconsideration based upon alleged deficiencies in the *Remand Order*.  At the Commission's request, the court ordered the litigation held in abeyance pending further agency proceedings on the petitions for reconsideration.  Order, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir. Apr. 8, 2021).  As of this filing, that litigation over the *Remand Order* remains pending in the D.C. Circuit.

**3.**  In the *Order* challenged here, the Commission completed its reassessment of the proper regulatory classification of broadband in the aftermath of *Mozilla*, informed by full notice and comment and an updated record.[13]  The Commission determined that the best reading of the text, structure, and context of the Communications Act—in light of the particulars of how broadband technology operates and is understood

---

[12]  *Restoring Internet Freedom*, 35 FCC Rcd. 12328 (2020) (*Remand Order*), *pet. for review pending*, *Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir.).

[13]  *Safeguarding & Securing the Open Internet*, FCC 24-52, 39 FCC Rcd. --- (rel. May 7, 2024) (*2024 Order* or *Order*).

today—is that broadband constitutes a Title II telecommunications service. *Order* ¶¶ 106–153. The FCC further concluded that recognizing broadband as a Title II service "will enhance the Commission's ability to ensure Internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to [broadband service], and improve disability access." *Id.* ¶ 27; *see id.* ¶¶ 25–105. To further those goals, and guided by the D.C. Circuit's findings in *Verizon*, the Commission reinstated the full Open Internet rules that the agency had instituted in 2015. *Id.* ¶¶ 443–648. Finally, the Commission granted reconsideration in part of the *Remand Order* that the agency had issued pursuant to the D.C. Circuit's remand in *Mozilla. Id.* ¶¶ 683–691.

4. Under 28 U.S.C. § 2112(a), when qualifying petitions for review of an FCC order are filed in multiple circuits within ten days after issuance of the order, the Judicial Panel on Multidistrict Litigation conducts a multicircuit lottery to designate one court of appeals in which the agency must file the record; all challenges to the order are then initially consolidated in that circuit. Here, lottery-eligible petitions for

review of the *Order* were filed in the First, Fifth, Sixth, Eighth, Ninth, Eleventh, and D.C. Circuits.  The Judicial Panel then randomly selected this Circuit as the court in which the record is initially to be filed and the proceedings initially consolidated.

## ARGUMENT

Under the second sentence of Section 2112(a)(5), "[f]or the convenience of the parties in the interest of justice, the court in which the record is filed may thereafter transfer all the proceedings with respect to that order to any other court of appeals."  28 U.S.C. § 2112(a)(5); *see BASF Wyandotte Corp. v. Costle*, 582 F.2d 108, 112 (1st Cir. 1978) ("Once all the proceedings have been transferred to one court, then that court, in its discretion, can determine whether a second transfer is appropriate."). The statute thus contemplates that the initial court selected by the multicircuit lottery can and should transfer the matter to another circuit for good cause.

The courts of appeals have also widely recognized a preexisting "inherent discretionary power to transfer [a] proceeding to another circuit in the interest of justice and sound judicial administration" that may be exercised independent of, and in addition to, Section 2112. *Eastern Air Lines, Inc. v. Civil Aeronautics Bd.*, 354 F.2d 507, 510 (D.C.

Cir. 1965); *see AT&T v. FCC*, 519 F.2d 322, 325 (2d Cir. 1975) ("[W]e need not decide whether section 2112(a) authorizes transfer here because we believe we have the inherent power to order it in the interest of justice and sound judicial administration."); *Pearce v. Dir., Off. of Workers' Comp. Progs.*, 603 F.2d 763, 771 n.3 (9th Cir. 1979) (collecting cases).

"Transfer of a case is appropriate where the same or interrelated proceeding was previously under review in a court of appeals, and is now brought for review of an order entered after remand, or in a follow-on phase, where continuance of the same appellate tribunal is necessary to maintain continuity in the total proceeding." *Eschelon Telecom, Inc. v. FCC*, 345 F.3d 682, 682 (8th Cir. 2003) (per curiam) (internal quotation marks omitted); *cf. Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 272 F.2d 510, 511 (D.C. Cir. 1958) (per curiam) ("to maintain continuity," the courts of appeals have "inherent power based on sound principles of judicial administration to transfer" a case to another circuit where "[a] prior order is involved").

These principles strongly counsel in favor of transferring this matter to the D.C. Circuit. As all parties agreed in the previous round of litigation over the *2018 Order*, *see* Exhibit A, it would serve the interest of justice, sound judicial administration, and the convenience of the

parties to transfer these cases to the D.C. Circuit.  This is the latest in a series of interrelated orders in which the Commission has grappled with a complicated set of statutory and regulatory commands in an effort to promulgate lawful and enforceable Open Internet rules, taking into account—with each iteration of the rules—the D.C. Circuit's holdings and directives from earlier rounds of litigation.  Indeed, the *Order* challenged here was issued in part in direct response to the D.C. Circuit's remand in *Mozilla*, in which the court directed the Commission to further address specific deficiencies in the *2018 Order*.

The present litigation is likely to turn significantly on the details of the D.C. Circuit's decisions in *Comcast*, *Verizon*, *U.S. Telecom*, and *Mozilla*.  If litigation were to proceed in this Court, instead of the D.C. Circuit, the Court and the parties would need to expend considerable effort to walk the same ground paved by the past 16 years of litigation in the D.C. Circuit.

"[T]here is a significant interest in transferring a case to a court that has already ruled on an identical or related case." *ITT World Commc'ns, Inc. v. FCC*, 621 F.2d 1201, 1208 (2d Cir. 1980).  Transfer allows for review by "judges * * * familiar with the background of the controversy through review of the same or related proceedings." *Eastern*

*Air Lines*, 354 F.2d at 510.  That is the case here, where this litigation generally "involve[s] the same parties, the same statutory provision, and the same essential issue" as the multiple previous rounds of litigation before the D.C. Circuit.  *ITT World*, 621 F.2d at 1208; *cf. Am. Civil Liberties Union v. FCC*, 486 F.2d 411, 414 (D.C. Cir. 1973) (transfer warranted where orders "represent the staggered implementation of a single, multi-faceted agency undertaking").

Transfer to the D.C. Circuit is especially appropriate here because the challenged *Order* was issued in part on reconsideration of a remand order directed by the D.C. Circuit in *Mozilla.  See Dayton Power & Light Co. v. EPA*, 520 F.3d 703, 708 (6th Cir. 1975) ("[T]he regulations were promulgated in response to an order affirmed by the District of Columbia Circuit.  Clearly that court is in the best position to determine whether the regulations are consistent with its order."); *Eschelon Telecom*, 345 F.3d at 682 ("[T]he FCC's Order on Remand was entered, in part, on remand from the D.C. Circuit.  It is therefore appropriate for the D.C. Circuit to hear the petitions for review."); *Ark. Midland R.R. Co. v. Surface Transp. Bd.*, 2000 WL 1093266 (D.C. Cir. 2000) (per curiam) ("[P]etitioner is now seeking review of an order entered, in part, on remand from the Eighth Circuit.  Transfer to the Eighth Circuit, therefore,

is appropriate '[f]or the convenience of the parties in the interest of justice.'"). What is more, litigation concerning the *Remand Order* remains pending in abeyance before the D.C. Circuit.

Finally, the D.C. Circuit is "obviously a convenient forum." *United Steelworkers of Am. v. Marshall*, 592 F.2d 693, 698 (3d Cir. 1979). "The only significant convenience factor which affects petitioners seeking review of rulemaking on an agency record is the convenience of counsel who will brief and argue the petitions." *Id.* at 697 (noting that review is confined to the agency record and the parties themselves need not appear in court). Here, all of the petitioners are represented principally (and in nearly every case entirely) by counsel based in Washington, D.C. *See Eschelon Telecom*, 345 F.3d at 683 n.1 (transferring a case to the D.C. Circuit in part because "most of the parties have D.C. counsel of record"). The respondent federal agencies and their counsel are likewise located in D.C. To the extent the identity of the parties is relevant, the petitioners are primarily national trade associations based in D.C. or local affiliates of the national associations.[14] And in any event, for any parties or counsel

---

[14] Petitioner Ohio Telecom Association appears to be a local affiliate of its co-petitioner USTelecom, a national trade association for wireline

(cont'd)

not local to where argument will be heard in this Court, "[a]s between Washington and [this Court] there is no measurable difference in convenience." *United Steelworkers*, 592 F.2d at 698.

---

carriers. Petitioners Ohio Cable Telecommunications Association, Texas Cable Association, Florida Internet & Television Association, and MCTA—The Missouri Internet & Television Association appear to be local affiliates of petitioner NCTA—The Internet & Television Association (which is Texas Cable Association's co-petitioner), a national trade association for cable operators. Petitioners CTIA, Wireless Internet Service Providers Association, and ACA Connects are each national trade associations (for wireless carriers, fixed-wireless providers, and small cable and telecommunications providers, respectively) that have each sought review in the D.C. Circuit. Petitioner Benton Institute for Broadband & Society is a policy foundation based in D.C. and has sought review in the D.C. Circuit. Petitioner National Consumer Law Center is a policy and advocacy group that operates nationwide and petitioner Media Alliance likewise advocates on media issues of nationwide scope, and both are represented here solely by D.C.-based counsel.

## CONCLUSION

The motion should be granted, and these cases and all related proceedings should be transferred to the D.C. Circuit under 28 U.S.C. § 2112(a)(5).

Dated:  June 7, 2024

Respectfully submitted,

/s/  *Scott M. Noveck*

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Daniel E. Haar
Nickolai G. Levin
Robert B. Nicholson
Andrew W. Chang
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent
  United States of America*

Scott M. Noveck
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal
  Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App.
    P. 27(d)(2) because, excluding the parts of the document exempted
    by Fed. R. App. P. 32(f):

    ☒    this document contains 4,676 words, *or*

    ☐    this document uses a monospaced typeface and contains ____
         lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    ☒    this document has been prepared in a proportionally spaced
         typeface using Microsoft Word for Office 365 in 14-point
         Century Schoolbook, *or*

    ☐    this document has been prepared in a monospaced spaced
         typeface using _____ with _____.


/s/ *Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondent*
*Federal Communications Commission*

- 25 -