**Nos. 24-3449, 24-3450, 24-3497, 24-3508 (and cases to be consolidated)**

# In the United States Court of Appeals for the Sixth Circuit

OHIO TELECOM ASSOCIATION, ET AL.,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,
*Respondents*.

On Petition for Review from the
Federal Communications Commission
(WC Docket No. 23-320, FCC 24-52)

**JOINT MOTION FOR STAY OF OHIO TELECOM ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, WIRELESS INTERNET SERVICE PROVIDERS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, AND TEXAS CABLE ASSOCIATION**

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless
Association*

*(Additional counsel on next page)*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association,
USTelecom – The Broadband
Association, and NCTA – The Internet &
Television Association*

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable
Telecommunications Association,
NCTA – The Internet & Television
Association, Florida Internet &
Television Association, MCTA – The
Missouri Internet & Television
Association, and Texas Cable
Association*


JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
MOLOLAMKEN LLP
600 New Hampshire Avenue NW,
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects –
America's Communications
Association*

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom
Association, USTelecom – The
Broadband Association, and
NCTA – The Internet & Television
Association*


THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The
Association for Broadband Without
Boundaries*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, movants make the following disclosures:

ACA Connects – America's Communications Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

CTIA – The Wireless Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Florida Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

MCTA – The Missouri Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

NCTA – The Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Ohio Cable Telecommunications Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

The Ohio Telecom Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Texas Cable Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

USTelecom – The Broadband Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

WISPA – The Association For Broadband Without Boundaries has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ................................................. i

INTRODUCTION ............................................................................. 1

BACKGROUND ............................................................................. 4

ARGUMENT ................................................................................. 8

I.   PETITIONERS ARE LIKELY TO PREVAIL ON THE
     MERITS ............................................................................... 9

     A.   Reclassifying Broadband Under Title II Is A Major
          Question ..................................................................... 10

     B.   The Commission Lacks Clear Congressional
          Authorization ............................................................. 13

          1.   The plain text makes broadband an "information
               service." ............................................................. 14

          2.   The statutory structure confirms that broadband
               must be an "information service." ........................... 17

          3.   Other statutory provisions confirm that broadband is
               an "information service." ....................................... 19

II.  THE EQUITIES SUPPORT A STAY ....................................... 19

     A.   The Commission's Order Will Cause Irreparable Harm ............. 19

          1.   Petitioners' members will incur atypical and non-
               recoverable compliance costs ................................. 20

          2.   Petitioners' members will be forced to delay or forgo
               new offerings and expansion plans ........................ 21

          3.   Petitioners' members will face increased capital costs ...... 23

          4.   Petitioners' members will be disadvantaged in
               interconnection negotiations ................................. 23

     B.     The Public Interest Supports A Stay ...............................................24

III.   IN THE ALTERNATIVE, THE COURT SHOULD
      EXPEDITE BRIEFING AND ARGUMENT ......................................26

CONCLUSION.......................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Basicomputer Corp.* v. *Scott,*
　　973 F.2d 507 (6th Cir. 1992) .................................................................22

*Biden* v. *Nebraska,*
　　143 S. Ct. 2355 (2023) ...................................................................11, 12

*Chamber of Commerce* v. *SEC,*
　　85 F.4th 760 (5th Cir. 2023) ...........................................................20

*Gonzales* v. *Oregon,*
　　546 U.S. 243 (2006)...........................................................................13

*Iowa Utilities. Board* v. *FCC,*
　　109 F.3d 418 (8th Cir. 1996)........................................................22, 23

*Kentucky* v. *Biden,*
　　23 F.4th 585 (6th Cir. 2022) .............................................................24

*Kentucky* v. *Biden,*
　　57 F.4th 545 (6th Cir. 2023) ........................................................20, 23

*Labrador* v. *Poe,*
　　144 S. Ct. 921 (2024) ........................................................................22

*Mozilla Corporation* v. *FCC,*
　　940 F.3d 1 (D.C. Cir. 2019) .........................................................7, 13

*National Cable & Telecomm. Ass'n* v. *Brand X Internet Servs.,*
　　545 U.S. 967 (2005)....................................................................*passim*

*Ohio* v. *Becerra,*
　　87 F.4th 759 (6th Cir. 2023) ......................................................20, 23

*Tennessee* v. *Becerra,*
　　No. 24-5220 (6th Cir. Mar. 18, 2024)...............................................26

*U.S. Telecom Ass'n* v. *FCC,*
  825 F.3d 674 (D.C. Cir. 2016) ............................................................... 6

*U.S. Telecom Ass'n* v. *FCC,*
  855 F.3d 381 (D.C. Cir. 2017) (en banc) .................................. *passim*

*Utility Air Regulatory Group* v. *EPA,*
  573 U.S. 302 (2014) ..................................................................... 10, 17

*West Virginia* v. *EPA,*
  597 U.S. 697 (2022) ............................................................... *passim*

**Statutes and Legislative History**

28 U.S.C. § 1657 ........................................................................... 26

47 U.S.C.
  § 153 ........................................................................ 4, 5, 14, 15
  § 160 .................................................................................... 8
  § 201 ........................................................................... 10, 20
  § 202 ........................................................................... 10, 20
  § 214 ................................................................................ 10
  § 227 ................................................................................ 17
  § 228 ................................................................................ 17
  § 230 ................................................................................ 19
  § 231 ................................................................................ 19
  § 273 ................................................................................ 17
  § 332 ................................................................................ 18
  § 1422 .............................................................................. 18

Pub. L. No. 104-104, 110 Stat. 56 (1996) .............................................. 4

H.R. Rep. No. 103-213 (1993) ........................................................... 18

**Rules and Regulatory Materials**

6th Cir. R. 27 .............................................................................. 26

Fed. R. App. P. 18 ......................................................................... 8

*Federal-State Joint Board on Universal Service,*
13 FCC Rcd. 11501 (1998) ............................................................. 5, 12

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities,*
17 FCC Rcd. 4798 (2002) .................................................................... 5

*Protecting and Promoting the Open Internet,*
30 FCC Rcd. 5601 (2015) .................................................................... 6

*Restoring Internet Freedom,*
33 FCC Rcd. 311 (2018) .......................................................... 6, 18, 25

**Other Authorities**

James K. Willcox, *How You'll Know Net Neutrality Is Really Gone*, Consumer Reports (June 11, 2018),
https://www.consumerreports.org/net-neutrality/end-of-net-neutrality-what-to-watch-for/ ............................................................. 25

Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine,*
76 Fed. Commc'ns L.J. 321 (2024) ................................................. 9, 11

## INTRODUCTION

In its "Open Internet" Order, the Federal Communications Commission has asserted total authority over how Americans access the Internet. That is not hyperbole. The Commission claims the power to regulate Internet service providers, or ISPs, as common carriers under the 90-year-old regime built for the old Ma Bell telephone monopoly. That regime, called "Title II" as shorthand for Title II of the Communications Act of 1934, includes the power to set prices, dictate terms and conditions, require or prohibit investment or divestment, and more. As the dissenting Commissioners explained, the Order subjects ISPs to "one of the most comprehensive suites of regulatory authority known to any agency in this country," Simington Dissent, App. 508-509, and covers "virtually every aspect of how an ISP does business," Carr Dissent, App. 484.

The Order is only the latest jolt in a decade of regulatory whiplash for ISPs. After nearly 20 years of applying a light-touch approach to the Internet—an approach the Supreme Court blessed in *National Cable & Telecomm. Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967 (2005)—the Commission reversed course in 2015. For the first time, it asserted plenary authority to regulate high-speed Internet access service (called "broadband")

under Title II, and used that authority to impose so-called "net neutrality" rules. Before the Supreme Court could weigh in, a new Administration reverted to the traditional light-touch approach. Now, after another change in Administration, the Commission is back to a heavy hand, promising to make even more aggressive use of its claimed powers.

This Court should stay the Commission's latest flip-flop pending judicial review. Petitioners are overwhelmingly likely to succeed on the merits.[1] Under the major-questions doctrine, a "decision of such magnitude and consequences" as public-utility-style regulation of the Internet "rests with Congress itself, or an agency acting pursuant to a clear delegation." *West Virginia* v. *EPA*, 597 U.S. 697, 735 (2022). It should be "indisputable" that the major-questions doctrine applies here. *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 422 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). And because the Commission cannot point to clear congressional authorization for applying common-carrier regulation to the Internet, the Order is unlawful. Indeed, the Order fails even an ordinary plain-text analysis of the Telecommunications Act of 1996.

---

[1] Some of the movants filed petitions for review that are pending transfer to this Court pursuant to the multi-circuit lottery.

The Order's consequences are as stark as its legal shortcomings. Far more than in the typical administrative challenge, we know that the Order will impose significant, unrecoverable costs on petitioners' members. That is exactly what happened from 2015 to 2017, when the Commission last claimed plenary authority over Internet access under Title II. Just like last time, the Order will force ISPs to incur atypical compliance costs, delay or forgo services and expansions, pay more to raise money, and negotiate on worse terms.

The public interest also favors a stay. When the Commission repealed the 2015 "net neutrality" rules, opponents predicted the end of the Internet as we know it. That did not happen. *See* Carr Dissent, App. 479. So this time, the Commission defends the Order as prophylaxis: it could not "wait for the flood to arrive before we start to build the levee." Gomez Statement, App. 511. That vague concern cannot justify diminishing investment in broadband and saddling a critical sector of the economy with sweeping new costs, while a flawed Order awaits judicial review.

The Order's effective date is July 22; petitioners respectfully request a ruling on this motion by July 15. If the Court cannot rule by then, petitioners

request an administrative stay.   At the very least, petitioners request
expedited briefing and argument.

## BACKGROUND

1.      Congress passed the Telecommunications Act of 1996 "to promote
competition and reduce regulation" in the communications industry.  Pub. L.
No. 104-104, 110 Stat. 56.   The Act established two mutually exclusive
categories of interstate communications services:   "information service[s],"
which are subject to limited oversight, and "telecommunications service[s],"
which are subject to the onerous common-carrier regulations found in Title II.
47 U.S.C. § 153(24), (53).    Title II gives the Commission near-plenary
authority to require preapproval for new services, dictate where providers can
deploy their services, and even regulate prices based on the Commission's
view of what is "just and reasonable." *See*, *e.g.*, *id.* §§ 201(b), 202, 214.

The 1996 Act defines "telecommunications service" as "the offering of
telecommunications for a fee directly to the public."  47 U.S.C. § 153(53).
"Telecommunications" means "transmission, between or among points
specified by the user, of information of the user's choosing, without change in
the form or content." *Id.* § 153(50).  An "information service," by contrast, is
"the offering of a capability for generating, acquiring, storing, transforming,

processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(24). In a nutshell, a telecommunications service offers pure data transmission, like a dumb pipe; an information service offers the capability to process, store, and manipulate information.

2. For nearly the entire history of the Internet, the Commission has recognized that services providing Internet access are "information services." In a report issued shortly after the 1996 Act, the Commission explained that the key statutory question was "whether Internet access providers merely offer transmission" of data, like a telephone service. *Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11536 (1998). The Commission easily answered no. It explained that "Internet access" does not "merely offer transmission" of data but "gives users a variety of advanced capabilities" to manipulate information. *Id.* at 11536-11539.

A few years later, the Commission confirmed that cable broadband is an information service. *See Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, 17 FCC Rcd. 4798, 4802 (2002). The Supreme Court upheld that classification in *Brand X*, 545 U.S. 967. The Commission likewise found that other forms of broadband are information

5

services, and treated them accordingly for the next decade.  *See* Carr Dissent, App. 447.

In 2015, the Commission reversed course, reclassifying broadband as a telecommunications service subject to Title II utility regulation.  *See Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601, 5647-5658 (2015).  As it does today, the Commission claimed that it needed Title II to promulgate "net neutrality" rules—that is, rules forbidding ISPs from blocking content, slowing access to content, or allowing content providers to pay for preferential treatment.  *See id.* at 5626-5645.  A divided panel of the D.C. Circuit upheld the order, deferring to it under *Chevron* as a reasonable construction of an ambiguous statute.  *See U.S. Telecom Ass'n* v. *FCC*, 825 F.3d 674, 704-706 (2016).  Then-Judge Kavanaugh dissented from the denial of rehearing en banc.  In his view, the rule triggered—and flunked— the major-questions doctrine.  855 F.3d 381, 417-418 (2017).

While a petition for Supreme Court review was pending, the Commission restored broadband's information-service classification and accompanying light-touch regulatory framework.  *See Restoring Internet Freedom*, 33 FCC Rcd. 311, 312 (2018) (RIF Order).  The D.C. Circuit largely

upheld that order, too, under the same *Chevron* framework.  *See Mozilla Corp.*
v. *FCC*, 940 F.3d 1, 35 (2019).

At the time, opponents lamented "the end of the Internet as we know it,"
and speculated that without "net neutrality" rules, ISPs would interfere with
online content in harmful ways.  Carr Dissent, App. 452.  But the past six years
disproved those claims.  *See* NCTA et al. Letter, App. 1585-1587.  Meanwhile,
investment in broadband has flourished.  *See* NCTA Comments, App. 912-917;
Israel Decl., ¶¶ 27-28, 31-35, 61-62, App. 943-944, 947-951, 962-963; USTelecom
Comments, App. 1141-1150; CTIA Comments, App. 657-669.

3.    Now, after another change in Administration, the Commission has
reversed itself again.  In the challenged Order, the Commission voted 3-2 to
classify broadband as a telecommunications service subject to Title II.
*Safeguarding and Securing the Open Internet*, Docket Nos. 23-320 & 17-108,
FCC 24-52 (released May 7, 2024), App. 1-512.

Invoking the same debunked rationales from 2015, the Commission
revived its previous "net neutrality" rules, which ban ISPs from blocking,
throttling, or paid prioritization.  Order ¶ 492.  The Commission also readopted
a general conduct standard prohibiting practices "that unreasonably interfere
with the ability of consumers or [content providers] to select, access, and use"

broadband. *Id.* ¶ 513. In contrast to 2015, the Order further claims—for the first time—that Title II is necessary for reasons unrelated to "net neutrality," such as defending national security and combatting cybersecurity threats. *Id.* ¶¶ 30, 42. The Order thus sets out a laundry list of new areas in which the Commission intends to regulate using its claimed Title II powers. *Id.* ¶¶ 26-105.

For now, the Commission has also forborne from—that is, declared it will not enforce—many Title II powers. Order ¶ 383; *see* 47 U.S.C. § 160. Of course, this Commission or a future one may attempt to reactivate those powers at any time. And although the Order forbears from the power to directly set ISPs' rates, it admits that the Commission can indirectly regulate prices under the general conduct standard. *See* Order ¶ 368.

4. On May 31, petitioners sought a stay from the Commission. *See* Fed. R. App. P. 18(a)(1). On June 7, the Commission denied relief.

## ARGUMENT

After years of light-touch regulation of the Internet, across Administrations of both parties, the Commission under President Obama claimed a broad new Title II authority over the Internet. Litigation ensued, but before it could be resolved, the Commission under President Trump

reverted to its original position. Now, in the Order challenged here, the Commission under President Biden has flipped back to Title II. This destabilizing pattern is untenable for a critical American industry. The Order should be stayed until courts can confirm, once and for all, that Congress never contemplated common-carrier regulation for broadband.

Petitioners readily satisfy the stay criteria. They are likely to succeed on the merits, their members will be irreparably injured if the Order takes effect, and the public interest favors the status quo over yet another agency change in position. At a minimum, the Court should expedite briefing and argument to ensure prompt resolution of this case.

## I. PETITIONERS ARE LIKELY TO PREVAIL ON THE MERITS.

Under "any conceivable test for what makes a rule major," this one qualifies. *U.S. Telecom*, 855 F.3d at 423 (Kavanaugh, J., dissenting); *see* Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, 76 Fed. Comm'ns L.J. 321, 330 (2024) ("no doubt" that the Order triggers the major-questions doctrine). When an agency asserts such a power, it must identify "clear congressional authorization." *West Virginia*, 597 U.S. at 723 (quoting

*Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)).  The Commission does not have it.

### A.    Reclassifying Broadband Under Title II Is A Major Question.

The Order is "major" across several dimensions.  It is economically and politically significant, it reverses the agency's original and longstanding interpretation, and it invokes policy concerns beyond the Commission's expertise.

1.    Subjecting broadband to Title II would "bring about an enormous and transformative expansion" in the Commission's "regulatory authority." *Utility Air*, 573 U.S. at 324.  Under the longstanding light-touch regime, ISPs make business decisions in response to market forces.  Under Title II, by contrast, the Commission has plenary authority over nearly every aspect of Internet access—including the power to dictate "just and reasonable" prices, 47 U.S.C. §§ 201, 202; to order ISPs to deploy new infrastructure, *id.* § 214; and to require preclearance for services, *id.* §§ 201, 214.  Although the Commission emphasizes that it has thus far forborne from exercising some of these authorities, Order ¶ 257, the major-questions doctrine asks about the full implications of the power claimed, not how the agency has acted to date.  *West Virginia*, 597 U.S. at 728-729.

The "economic and political significance" of the Commission's claimed authority "is staggering by any measure." *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023) (citation omitted).  The broadband industry generates about $150 billion in annual revenue.  *See* U.S. Chamber Comments, App. 1156-1157.  One recent study found that even the "prospect of Title II policy reduced investment" in that industry by $8 billion annually from 2011 to 2020, with a $145-billion annual impact on GDP.  Ford Paper, App. 800-801; *see* Israel Decl. ¶¶ 20-22, App. 939-940.  And the significance of Internet access to Americans and American businesses far exceeds any price tag.  As the Commission declared, broadband is "indispensable to every aspect of our daily lives, from work, education, and healthcare, to commerce, community, communication, and free expression."  Order ¶ 1.  There can be no "serious dispute that [the Commission] claims the authority to exercise control over a significant portion"—indeed, one of *the most* significant portions—"of the American economy."  *Biden*, 143 S. Ct. at 2373 (citation omitted); *see* Verrilli & Gershengorn, *supra*, at 330-331.

Politically, the Commission's authority has "been the subject of an earnest and profound debate across the country."  *West Virginia*, 597 U.S. at 732.  The Commission's position now flips—each time to great fanfare—

whenever it changes political control. Meanwhile, "Congress has been studying and debating net neutrality regulation for years," and "considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers." *U.S. Telecom*, 855 F.3d at 423 (Kavanaugh, J., dissenting); *see* USTelecom Comments, App. 1136-1137 (cataloging rejected bills).

2.      Other "telltale sign[s]" confirm that the decision to regulate broadband providers as common carriers implicates a major question. *Biden*, 143 S. Ct. at 2382 (Barrett, J., concurring). First, the Commission's own "post-enactment conduct" is "particularly probative." *Id.* at 2383; *see West Virginia*, 597 U.S. at 724-725. Just two years after the 1996 Act, the Commission concluded that "Internet access services are appropriately classed as information, rather than telecommunications, services." *Federal-State Joint Board on Universal Service* ¶ 73. That conclusion tracked regulatory distinctions that predated the 1996 Act, and it held for nearly two decades.

3.      The Order also strays into areas outside the Commission's "comparative expertise." *West Virginia*, 597 U.S. 729-730. For example, the Commission contends that it needs Title II to address "national security risks"

12

from the Chinese government. Order ¶¶ 4, 33. "There is little reason to think Congress assigned such decisions" to the Commission, *West Virginia*, 597 U.S. at 729, which has no "historical familiarity [or] policymaking expertise" in addressing threats from geopolitical rivals. *Gonzales* v. *Oregon*, 546 U.S. 243, 266 (2006); *see* CTIA Comments, App. 674-679. Indeed, bipartisan experts have confirmed that the Commission's concerns are better left to national-security experts. Grotto Paper, App. 1544-1547, 1551-1553; Scott Comments, App. 1423-1424.

### B.    The Commission Lacks Clear Congressional Authorization.

The 1996 Act does not provide clear congressional authorization for the Order. The Supreme Court in *Brand X* held that it is at least permissible to classify Internet access as an "information service." 545 U.S. at 1000. The D.C. Circuit reached the same conclusion in *Mozilla*. 940 F.3d at 23. Such "finding[s] of ambiguity" "by definition mean[] that Congress has not clearly authorized the FCC" to treat broadband providers as common carriers. *U.S. Telecom*, 855 F.3d at 426 (Kavanaugh, J., dissenting). And even putting aside the major-questions doctrine, the better reading of the text, structure, and nearby statutory provisions is that broadband is an "information service."

### 1. The plain text makes broadband an "information service."

The statutory "definition of 'information service' fits broadband Internet access like a glove." *U.S. Telecom*, 855 F.3d at 395 (Brown, J., dissenting from denial of rehearing en banc). That is true both because broadband offers the capability for users to manipulate information online, and because broadband itself includes necessary components that process and manipulate information.

a. First, broadband provides users with the capability to engage with information on websites and applications. It is thus an "offering of [the] capability" to do all of the actions set forth in the statutory definition: "generating" and "making available information" by posting on social media; "acquiring" or "retrieving" information from websites; "storing" information online; and "transforming," "processing," and "utilizing" information in limitless ways, from editing photos to playing video games. *See* 47 U.S.C. § 153(24).

*Brand X* confirms that conclusion. There, the Supreme Court upheld the Commission's classification of cable broadband as an "information service," explaining that "Internet service" "provides consumers with a comprehensive capability for manipulating information," "enabl[ing] users, for

example, to browse the World Wide Web, to transfer files," "and to access e-mail." 545 U.S. at 987.  Even the dissent did not dispute that point.  *See id.* at 1009.  The dissent disagreed only with the majority's conclusion that cable providers' *additional* provision of transmission services could not be disentangled from their information-services offering.  *Id.*

The Commission wrongly contends that broadband is nothing more than a "telecommunications service"—that is, "the offering of" pure data transmission.  47 U.S.C. §§ 153(50), (53).  To be sure, broadband *includes* the transmission of data between computers.  But ISPs do not "offer" pure transmission, as *Brand X* interpreted that term.  In "common usage," "what a company 'offers' to a consumer" turns on "what the consumer perceives" she is buying.  *Brand X*, 545 U.S. at 990.  And consumers who buy broadband purchase the capability to post on social media or store photos in the cloud, not to send IP data packets to and from servers.  If that were not common sense, multiple surveys confirm that the vast majority of consumers (80-90%) perceive broadband as providing such information-service capabilities.  USTelecom Letter, App. 1588.

b.    Second, even under the Commission's strained reading of the text, broadband is still an "information service" because broadband itself has

15

information-service capabilities.  One key example is Domain Name System (DNS) service, which uses computer processing to translate the name of a website into the relevant IP address for each user, sparing users from inputting a long series of digits for each website they visit.  *Brand X* recognized that DNS involves information processing that fits the definition of "information service," and that "part of the information service cable companies provide[d] [was] access to DNS service."  545 U.S. at 999.  That remains true today:  92% of broadband subscribers use the pre-configured DNS service that comes with their provider's broadband service.  *See* Recon Analytics Paper, App. 1561.  The typical user thus perceives the broadband "offering" to include the information-processing capabilities of DNS, without which the included transmission capability would be useless.  *See* Carr Dissent, App. 465-466.

Another example is caching, which "work[s] hand-in-hand with the ISP's DNS servers."  Rysavy Decl. ¶ 18, App. 773.  Caching involves storing popular content on local servers so consumers are able to access that content more quickly.  *See* CTIA Comments, App. 700-703.  *Brand X* recognized that caching, like DNS, is part of "the Internet service provided by cable

companies." 545 U.S. at 999. That remains true of broadband today. *See* Rysavy Decl. ¶¶ 17-21, App. 773-775.

> **2.    The statutory structure confirms that broadband must be an "information service."**

Treating broadband as a "telecommunications service" subject to Title II also conflicts with the broader statutory structure. Indeed, reclassification makes a mess of the statute, requiring the Commission both to forbear from applying much of Title II and to twist in knots to address mobile broadband.

a.    The first clear sign that reclassification is incompatible with the statutory structure is the Commission's broad forbearance. As in 2015, the Commission has declined to apply to broadband over a quarter of Title II's provisions and hundreds of regulations. It had no real choice: many of those provisions are, "at most, tangentially related" to the provision of broadband and would not make any sense as applied to broadband. Order ¶¶ 425, 427.[2] The need to forbear from so much of the common-carrier regime strongly suggests that the Commission "ha[s] taken a wrong interpretive turn." *Utility Air*, 573 U.S. at 328; *see* Carr Dissent, App. 470-472.

---

[2]  *See, e.g.*, 47 U.S.C. § 273(c) (protocols for "telephone exchange service facilities"); *id.* § 227(e) (caller ID); *id.* § 228 (pay-per-call services).

b.   The Commission's treatment of mobile broadband is even more convoluted.  Mobile broadband, which is a subset of broadband, is also subject to a separate statutory regime that limits Title II to "commercial mobile service[s]."  *See* 47 U.S.C. § 332(c)(1)-(2), (d).  As a result, once the Commission reclassified broadband as a "telecommunications service," it also had to reclassify mobile broadband as a "commercial mobile service."  *See* Order ¶¶ 214-236.  But that separate statutory move, which the Commission admits is *necessary* to avoid a "statutory contradiction," Order ¶ 230, does not work and is itself unlawful.  *See* CTIA Comments, App. 715-724.

Mobile broadband does not fit the definition of a "commercial mobile service."  A "commercial mobile service" is a mobile service "that is interconnected with the public switched network."  47 U.S.C. §§ 332(d)(1), (2).  "The public switched network," in turn, is a term of art that refers to the 10-digit telephone network.  *See* H.R. Rep. No. 103-213, at 495-496 (1993) (Conf. Rep.); RIF Order, 33 FCC Rcd. at 355 (citing six Commission orders using the term that way).  Mobile broadband is not "interconnected with" the 10-digit telephone network.  Instead, it interconnects users of a distinct network:  the Internet, which uses IP addresses, not phone numbers.  *See* 47 U.S.C. § 1422(b)(1) (distinguishing the "public switched network" from the

"public Internet"). That is why one cannot reach www.supremecourt.gov with a phone number, or call a smart TV using a landline telephone. This statutory mismatch underscores that jamming broadband into Title II does violence to Congress's entire statutory scheme.

### 3. Other statutory provisions confirm that broadband is an "information service."

Finally, both the 1996 Act and contemporaneous statutes confirm that Congress conceived of Internet access service as an information service. For example, elsewhere in the 1996 Act, Congress defined the term "interactive computer service" to include "any *information service* . . . that provides *access to the Internet*." 47 U.S.C. § 230(f)(2) (emphasis added). And in 1998, Congress reaffirmed its understanding that an "internet access service" "does not include telecommunications services." *Id.* § 231(e)(4). It is implausible that Congress would have used the same term differently here.

## II. THE EQUITIES SUPPORT A STAY.

### A. The Commission's Order Will Cause Irreparable Harm.

If the Order is allowed to take effect, petitioners' members will imminently incur prohibitive compliance costs, delay or forgo new services and expansions, pay more to obtain capital, and negotiate interconnection agreements at a disadvantage. There is no need to speculate: petitioners'

members know all too well the harms they suffered after the Commission's last experiment with Title II.  Because "economic injuries caused by federal agency action are generally unrecoverable," each of these injuries constitutes "irreparable harm."  *Ohio* v. *Becerra*, 87 F.4th 759, 782-783 (6th Cir. 2023) (citation omitted).

### 1.    Petitioners' members will incur atypical and non-recoverable compliance costs.

If the Order goes into effect, petitioners' members will immediately begin to suffer irreparable harm in the form of compliance costs that are qualitatively and quantitatively unusual.  *See Kentucky* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (recognizing "unrecoverable compliance costs" as irreparable injury).

These costs stem from the Order's wide-ranging, indeterminate rules.  *See Chamber of Com.* v. *SEC*, 85 F.4th 760, 778 (5th Cir. 2023) (finding that rule would impose heightened compliance costs because "its requirements are clear as mud").  Most significantly, on top of Title II's prohibitions on "discrimination" and "unjust or unreasonable" business practices, 47 U.S.C. §§ 201, 202, the Order imposes the vague general conduct standard.  *See supra*, pp. 7-8.  The Commission promises to apply that standard using a "non-exhaustive list of factors" under a "case-by-case" approach that even it

characterizes as "difficult to predict." Order ¶¶ 513, 517. In addition to Commission investigations, *id.* ¶ 581, the Order invites a flood of public complaints, to be handled under burdensome procedures, *id.* ¶¶ 589-590. It even authorizes private actions for injunctive relief and damages. *Id.* ¶ 330.

In response, and as experience with the 2015 Order showed, ISPs will need to spend considerable resources both preemptively assessing business practices for compliance and defending against investigations and complaints. *See* Morris Decl. ¶¶ 5-10, 22-27, App. 1631-1633, 1639-1643; Power Decl. ¶¶ 10, 19-23, App. 1653, 1659-1662. One provider's outside-counsel costs related to compliance with the 2015 Order totaled $2.5 million, *more than 20 times* the usual amount for new FCC regulations. Buono Decl. ¶¶ 6-16, App. 1600-1603. Another provider was forced to assemble an "unprecedented" 20-person in-house team. Heimann Decl. ¶¶ 10-20, App. 1612-1616. For smaller ISPs with more limited resources, these costs will be particularly burdensome. *See, e.g.*, Luthman Decl. ¶¶ 6-8, App. 1623-1625 (Order will "double Imagine's legal budget"); Sjoberg Decl. ¶ 11, App. 612 (noting "disproportionate" burden).

### 2. Petitioners' members will be forced to delay or forgo new offerings and expansion plans.

The same enforcement risks will also cause ISPs to delay or forgo potential new offerings and expansions. *See* Morris Decl. ¶¶ 4, 11-16, 26, App.

1631, 1633-1637, 1642 ("Charter and Cox will have to reconsider whether to roll out new and innovative offerings," such as higher speeds for popular events like Thursday Night Football, as will "Midco and Mediacom, two mid-sized cable operators"); Heimann Decl. ¶¶ 7, 23, 26-28, App. 1611-1612, 1617-1620 (discussing uncertainty about Order's application to 5G-related technologies); Power Decl. ¶¶ 7-12, App. 1651-1655 (CTIA members will reassess the use of "network slicing," a next-generation 5G technology). Again, that is precisely what happened in 2015. *See, e.g.*, Buono Decl. ¶¶ 18-20, App. 1604-1605 (describing "18-month delay" in launching Comcast's "Stream TV" product); Stooke Decl. ¶ 8, App. 1668 (noting that planned acquisition fell through "due to the legal uncertainty" from the 2015 Order).

This new constraint on ISPs' ability to innovate and expand will cause "irreparable losses in customers, goodwill, and revenue." *Iowa Utils. Bd.* v. *FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *see Basicomputer Corp.* v. *Scott*, 973 F.2d 507, 512 (6th Cir. 1992) ("competitive injury and loss of customer goodwill" are irreparable injuries); *see also Labrador* v. *Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring) (company forced to "alter" its "policies" or "restructure [its] operations" suffers irreparable harm). Again, smaller ISPs will suffer most acutely, as they will need to divert scarce resources that

would otherwise go toward growing their businesses. *See* Luthman Decl. ¶ 11, App. 1626-1627 (Order will "likely prevent Imagine [ISP] from deploying at least one mile of fiber [per] year"); Stooke Decl. ¶ 19, App. 1672-1673; Gleason Decl. ¶¶ 3, 6, App. 591-593.

### 3. Petitioners' members will face increased capital costs.

The Order will inflict yet more harm on ISPs by raising their capital costs. *See Becerra*, 87 F.4th at 782-783; *Biden*, 57 F.4th at 556. As in 2015, the "pervasive" rules already adopted by the Order send the "direct message that investment returns risk being cutoff." Israel Decl. ¶¶ 17-19, App. 937-939; *see* Stooke Decl. ¶ 6, App. 1667 ("Wisper [ISP] could not access nearly as much private capital" after the 2015 Order). And the prospect of further "regulatory creep"—that at any time the Commission will *un*-forbear from certain authorities—"increase[s] the risks associated with investment," which in turn "increases the cost of capital." Israel Decl. ¶ 18, App. 938; *see* Sjoberg Decl. ¶ 12, App. 612; Stooke Decl. ¶¶ 13, 18, App. 1670-1672.

### 4. Petitioners' members will be disadvantaged in interconnection negotiations.

Finally, the Order will harm ISPs' ability "to effectively negotiate" Internet interconnection agreements. *Iowa Utils.*, 109 F.3d at 425. Such agreements govern the terms on which networks share traffic. *See* Order

23

¶¶ 576-579.  The Order requires ISPs—and only ISPs—to refrain from "unjust or unreasonable practices" in negotiating interconnection with other entities that send them traffic.  *Id.* ¶ 577.  Counterparties, including major content providers, are likely to "leverage this asymmetric regulatory regime to obtain preferential terms."  Morris Decl. ¶ 19, App. 1638.  The proof is once more in the pudding:  ISPs received demands to renegotiate existing interconnection agreements immediately after the 2015 Order went into effect.  *Id.* ¶ 20.

### B.    The Public Interest Supports A Stay.

As an initial matter, the public interest weighs in favor of a stay because "the public's true interest lies in the correct application of the law."  *Kentucky* v. *Biden*, 23 F.4th 585, 612 (6th Cir. 2022).

In any event, a stay would also promote the public interest by ensuring that ISPs continue to invest in network improvement and innovative offerings that benefit consumers.  Under the Commission's light-touch approach, investment and innovation flourished.  *See* Israel White Paper, App. 1576-1582.  That is no coincidence.  ISPs large and small relied on that framework to build and improve their networks and develop new technologies, such as 5G.  Their investment means greater access, faster speeds, and lower costs for consumers.  *See* AT&T Comments, App. 626-629; Verizon Comments,

App. 1215-1218; WISPA Comments, App. 1252.  It also helps make the Nation a leader in global innovation, including on 6G mobile services.  Power Decl. ¶ 18, App. 1658.  Title II classification threatens all of that.  *See* Ford Paper, App. 800.

By contrast, the public would suffer minimal harm from putting the Order on hold.  Six years ago, opponents of reversing the 2015 Order warned that ISPs would "block websites, throttle services, and censor online content." RIF Order, 33 FCC Rcd. at 846-847 (Rosenworcel Dissent).  Others claimed that broadband prices would increase and paid prioritization would become mainstream.  James K. Willcox, *How You'll Know Net Neutrality Is Really Gone*, Consumer Reports (June 11, 2018), https://www.consumerreports.org/net-neutrality/end-of-net-neutrality-what-to-watch-for/.

But the sky did not fall.  Since 2018, broadband prices have held steady or fallen while speeds have increased.  And over the same period, the Commission cannot point to a single clear example of the kind of manipulation many feared would become commonplace.  *See supra*, p. 7.  Simply put, ISPs do not block, throttle, or discriminate among lawful content.  *See, e.g.*, NCTA Comments, App. 878; USTelecom Comments, App. 1110; ACA Connects Comments, App. 537-538 & nn.29-31; WISPA Comments, App. 1275.  Nor does

the existing legal regime pose any substantial threat to data security or consumer privacy. *See* NCTA Comments, App. 899-905. Indeed, even the Order's defenders now admit that it mostly addresses a problem that does not exist. *See* Gomez Statement, App. 511.

## III.  IN THE ALTERNATIVE, THE COURT SHOULD EXPEDITE BRIEFING AND ARGUMENT.

If the Court does not grant a stay, it should expedite briefing and argument. The Court may expedite a case for "good cause." 28 U.S.C. § 1657(a); 6th Cir. R. 27(f); *see, e.g.*, *Tennessee* v. *Becerra*, No. 24-5220 (6th Cir. Mar. 18, 2024), ECF No. 12. Expedition would reduce the irreparable harm the Order will inflict on petitioners.

Petitioners propose the following briefing schedule: petitioners will file opening briefs by September 5, 45 days from the close of the period for filing petitions for review; respondents will file 45 days later; and petitioners will file reply briefs 30 days later. Briefs of amici or intervenors will be due one week after the corresponding merits brief. Petitioners also request that the Court grant oral argument at the first available sitting after briefing is complete.

# CONCLUSION

The Court should stay the Order, or at least expedite briefing and argument. If the Court does not rule by July 15, petitioners request an administrative stay pending disposition of this motion.

Respectfully submitted,

 s/ Helgi C. Walker
HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

 s/ Matthew A. Brill
MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television*

 s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

<div style="display:flex">
<div>

*Association, and Texas Cable Association*

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*

JUNE 10, 2024

</div>
<div>

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

</div>
</div>

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Appellate Procedure 27(d) because it contains 5,192 words.

This brief also complies with the requirements of Federal Rules of Appellate Procedure 27(d) and 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JUNE 10, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024, I electronically filed the foregoing motion with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JUNE 10, 2024