**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3504, 24-3507, 24-3508, 24-3510, 24-3511, 24-3517, 24-3519, and 24-3538**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

IN RE: MCP NO. 185; OPEN INTERNET RULE (FCC 24-52)

OHIO TELECOM ASSOCIATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

---

On Petitions for Review of an Order of
the Federal Communications Commission

---

## RESPONDENTS' OPPOSITION
## TO MOTION FOR STAY PENDING REVIEW

---

Petitioners' motion to stay the *Order* under review attempts to replay the same legal challenges they ran unsuccessfully in 2015. The *Order* reinstates a carefully considered regulatory regime for broadband internet access providers materially identical to the regime the Federal Communications Commission adopted in 2015. A largely identical group of petitioners challenged that 2015 order in the D.C. Circuit, and the D.C. Circuit upheld the order in full. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), *cert. denied*, 139 S.Ct. 454 (2018); *see also* 855 F.3d 381,

382-93 (D.C. Cir. 2017) (*U.S. Telecom II*) (Srinivasan, J., concurring in denial of rehearing).  In 2015, too, petitioners sought a stay pending review, proclaiming (much as they do here) that dire consequences would ensue if the order took effect.  The D.C. Circuit rebuffed those claims—and no dire consequences followed.  On the contrary, the internet economy flourished when the rules were previously in effect.

Against this backdrop, petitioners cannot come close to meeting their heavy burden to justify a stay pending appeal.  Petitioners cannot establish they are likely to prevail on the merits when, in a virtually identical posture nine years ago, a sister circuit held that their claims lacked merit.  Likewise, petitioners' claims of irreparable harm must be viewed skeptically when the dire consequences they warn of did not materialize the last time the rules were in effect.  And the public interest weighs strongly in favor of allowing the rules to take effect to protect other participants in the internet economy, including consumers and edge providers.  The motion for stay pending review should be denied.[1]

---

[1]    Respondents have no objection to reasonably expedited briefing. However, given the complexities and need for intragovernmental review and coordination, respondents would request 60 days for their brief.

## BACKGROUND

**1.** The Communications Act of 1934 ("Act"), 47 U.S.C. §§151 *et seq.*, as amended by Telecommunications Act of 1996 ("1996 Act"), distinguishes between two categories of communications services: Title II "telecommunications services" and Title I "information services."

"Telecommunications" is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information." 47 U.S.C. §153(50). "Telecommunications service," in turn, is "the offering of telecommunications for a fee directly to the public … regardless of the facilities used." *Id.* §153(53).

"Information service," by contrast, is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. §153(24). But it excludes "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service," *ibid.*—a carve-out known as the "telecommunications-management exception."

By default, Title II confers various duties on telecommunications services. But the Act gives the Commission broad authority to "forbear from applying any regulation or any provision" that it finds unnecessary for a particular telecommunications service. 47 U.S.C. §160. Through this forbearance authority, Congress empowered the Commission to appropriately tailor the Title II framework to the developing needs of emerging communications technologies.

**2.** Petitioners wrongly assert that "[f]or nearly the entire history of the Internet, the Commission has recognized that services providing internet access are 'information services'" (Mot. 5). On the contrary, soon after passage of the 1996 Act, the Commission classified early forms of DSL (digital subscriber line) broadband—*i.e.*, broadband over telephone lines—as Title II telecommunications services. *Advanced Services Order*, 13 FCC Rcd. 24012 (1998). These "advanced services are telecommunications services," the Commission explained, because they "transport information of the user's choosing between or among user-specified points, without change in the form or content of the information as sent and received, [as] 'telecommunications' [is] defined by the Act." *Id.* ¶35.

The Commission distinguished between broadband and a related set of offerings being marketed then as "Internet access." *Id.* ¶36. As described in a contemporaneous report to Congress, typical "Internet access service" at that time revolved around a suite of provider-supplied applications—like an email account, personal website hosting, a curated selection of newsgroup discussion forums, and proprietary news and information sources—operating on the provider's own computer systems. *Universal Service Report*, 13 FCC Rcd. 11501 ¶¶73-82 (1998); *see Order* ¶175. And unlike today's "facilities-based" providers, which provide the physical transmission facilities connecting customers to the internet, at that time providers "typically[] own[ed] no telecommunications facilities" and instead required a separate physical connection like a phone line. *Universal Service Report* ¶81; *see also id.* ¶60 (observing, without deciding, "more complicated" issues "when it comes to offerings by facilities-based providers").

Recognizing that emerging broadband providers "utilize a telecommunications service [*i.e.*, broadband] together with an information service [*i.e.*, the suite of provider-operated applications]," the *Advanced Services Order* ruled that the Commission would "treat the two

separately" by regulating the broadband service as a telecommunications service, while treating the bundled applications that defined the "internet access" products then in the marketplace as separate information services. *Advanced Services Order* ¶36&n.60.

Two years later, the Ninth Circuit likewise concluded that cable broadband "consists of two elements," broadband transmission service and a suite of provider-operated applications, and that in "provid[ing] its subscribers Internet transmission over its cable broadband facility, [a broadband provider] is providing a telecommunications service," *AT&T Corp. v. City of Portland*, 216 F.3d 871, 878 (9th Cir. 2000)—independently reaching the same conclusion as the *Advanced Services Order*.

**3.** In 2002, the Commission reversed course and declared cable broadband an information service. *Cable Broadband Order*, 17 FCC Rcd. 4798 (2002); *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82, 1000-02 (2005) (recognizing the FCC's change in position). Rather than treat broadband transmission and the accompanying provider-operated applications as separate services, the Commission declared them a single integrated offering to be regulated under Title I.

In *Brand X*, the Supreme Court held that this approach was "a permissible reading of the Communications Act under the *Chevron* framework." 545 U.S. at 986-1000. It reasoned that courts must defer to the agency's reasonable construction "to fill statutory gaps." *Id.* at 980-86, 1002-03. "This leaves federal telecommunications policy in this technical and complex area to be set by the Commission, not by warring analogies." *Id.* at 992; *see also id.* at 1002-03. But the Court assumed that the Commission could still "impose special regulatory duties on" broadband providers even under Title I. *Id.* at 996; *see id.* at 976.

**4.** Following *Brand X*, the Commission repeatedly pursued action to prevent broadband providers from engaging in harmful conduct.

In 2005, the Commission unanimously adopted the *Internet Policy Statement*, which enshrined four principles "to ensure that broadband networks are widely deployed, open, affordable, and accessible to all consumers." 20 FCC Rcd. 14986 (2005).

In 2008, the Commission brought an enforcement action against Comcast for secretly interfering with subscribers' use of certain applications. *Comcast Order*, 23 FCC Rcd. 13028 (2008). It ordered Comcast to terminate the offending practices, but the D.C. Circuit overturned that order because the Commission had not sufficiently tied

its action to a statutory provision. *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010).

In 2010, the Commission addressed that deficiency and then codified three "Open Internet" rules. *2010 Order*, 25 FCC Rcd. 17905 (2010). In *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014), the court affirmed the *2010 Order* in part and vacated it in part.

*Verizon* affirmed that the Commission "adequately supported and explained its conclusion" that broadband providers "have the technical and economic ability"—and "powerful incentives"—to "discriminate against and among" producers of internet content and services, referred to as "edge providers." *Id.* at 645-46. Without Open Internet rules, broadband providers "could act in ways that would ultimately inhibit the speed and extent of future broadband deployment." *Id.* at 645.

Nevertheless, the court invalidated the principal requirements of the Open Internet rules "[g]iven the Commission's [then-prevailing] decision to classify broadband providers not as providers of 'telecommunications services' but instead as providers of 'information services.'" *Id.* at 650; *see id.* at 649-59. Under 47 U.S.C. §153(51), a communications provider "shall be treated as a common carrier … only to the extent that it is engaged in providing telecommunications services." The court held

that the Commission could not impose common-carrier obligations on broadband providers so long as the agency classified broadband as an information service.

**5.**    In response to *Verizon*'s "implicit invitation," the Commission in 2015 "revisit[ed]" its analysis of broadband and, "[b]ased on [an] updated record, … conclude[d] that retail broadband Internet access service is best understood today as an offering of a 'telecommunications service'" subject to Title II. *2015 Order*, 30 FCC Rcd. 5601 ¶¶306-433 (2015).

The Commission promulgated a carefully crafted set of Open Internet rules.  It adopted "bright-line" rules against (1) blocking of lawful content or applications; (2) throttling (*i.e.*, impairing or degrading) particular internet content or applications; or (3) engaging in "paid prioritization"—that is, "favor[ing] some traffic over other traffic … either (a) in exchange for consideration (monetary or otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶¶110-132.  These were supplemented by a case-by-case general conduct standard providing that broadband providers shall not "unreasonably interfere with or unreasonably disadvantage" consumers' and edge-providers' ability to reach one another.  *Id.* ¶¶133-145.  And the Commission updated its

transparency rule requiring broadband providers to disclose accurate information about their commercial terms, practices, and the performance characteristics of their services. *Id.* ¶¶154-185. The Commission otherwise forbore from the bulk of Title II's requirements.

In *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), the D.C. Circuit upheld the *2015 Order* in full. The court later denied rehearing en banc, 855 F.3d 381 (D.C. Cir. 2017), and the Supreme Court denied review, 139 S.Ct. 454 (2018).

**6.** In 2018, following a change in administration, the Commission reversed the *2015 Order*, repealed the Open Internet rules (except for portions of the transparency rule), and reverted to treating broadband as an information service. *2018 Order*, 33 FCC Rcd. 311 (2018). In *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam), the D.C. Circuit upheld most of the *2018 Order*. But it vacated the order's preemption of state law, *id.* at 74-86, and it remanded with direction for the agency to consider three other specific deficiencies it identified, *id.* at 59-63, 65-70.

**7.** In the *Order* challenged here, the Commission completed its reassessment of the proper regulatory classification of broadband in response to *Mozilla*. Informed by full notice-and-comment and an updated

record, it determined that the best reading of the text, structure, and context of the Communications Act, in light of the particulars of how broadband technology operates and is offered today, is that broadband constitutes a Title II telecommunications service. *Order* ¶¶106-153. Recognizing the importance of an open internet for an array of public-interest goals, *id.* ¶¶25-105, the Commission then reinstated the same Open Internet rules that successfully governed from 2015 to 2018. *Id.* ¶¶443-648.

**8.** Petitioners filed petitions for judicial review, then sought an administrative stay from the Commission, which the agency denied. *See Stay Denial* (App. 1590-97).

## ARGUMENT

Interim relief such as a stay "'is an extraordinary and drastic remedy,' one that should 'only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citations omitted). To obtain a stay, petitioners must show that (1) they are likely to prevail on the merits, (2) they will suffer irreparable harm without a stay, (3) a stay will not harm others, and (4) the public interest favors a

stay. *Ohio State Conf. of the NAACP v. Husted*, 769 F.3d 385, 387 (6th Cir. 2014). Petitioners have not satisfied those demanding requirements.

## I.    PETITIONERS FAIL TO DEMONSTRATE THEY ARE LIKELY TO PREVAIL ON THE MERITS.

### A.    Broadband Is A Telecommunications Service Under The Best Reading Of The Statutory Text.

**1.** The statutory text is most naturally read to treat broadband as a telecommunications service. Broadband providers offer telecommunications—*i.e.*, "transmission, between or among points specified by the user, of information of the user's choosing, without change in [its] form or content"—"for a fee to the public." 47 U.S.C. §153(50)&(53); *see Order* ¶¶116-122. Broadband thus squarely fits within the statute's definition of a telecommunications service.

Consider *Brand X*'s emphasis on the word "offering." *See* 545 U.S. at 989-92. "It is common usage to describe what a company 'offers' to a consumer as what the consumer perceives" the product to be. *Id.* at 990. Here, the *Order* reviewed abundant evidence that "consumers today perceive [broadband] to be … primarily a transmission conduit"—"in the words of one commenter, a 'dumb pipe'"—"through which they may transmit information of their choosing." *Order* ¶123. The D.C. Circuit previously affirmed an identical finding. *U.S. Telecom*, 825 F.3d at 697-

99.  Consumers neither expect nor want broadband providers to alter their transmissions.[2]

**2.**  By contrast, broadband does not comfortably fit within the statutory definition of an information service.

**a.**  Petitioners contend (Mot. 14) that broadband provides information-processing capabilities because it can be used "to engage with information on websites and applications" where these capabilities are provided by third parties.  *Cf. Order* ¶130.  That argument proves too much:  By that logic, traditional telephone service would be an information service because customers could use it to, for example, make a train reservation or check the weather forecast.  *Order* ¶131; *Mozilla*, 940 F.3d at 93 (concurring opinion).  To "impute[] the capabilities of … third-party information services to the telecommunications services that provide access to them" would swallow the statutory dichotomy between telecommunications and information services.  *Order* ¶¶131-132; *Mozilla*, 940 F.3d at 93-94 (concurring opinion).

---

[2]  Broadband providers' marketing today likewise emphasizes the speed and reliability of their transmission, not their bundled applications or information-processing.  *Order* ¶124; *U.S. Telecom*, 825 F.3d at 699.

In the *Cable Broadband Order* upheld in *Brand X*, the Commission reasoned that consumers in that era purchased broadband for the provider-operated applications that "providers typically include[d] in their service, including e-mail, newsgroups, and the ability to create a web page." *Cable Broadband Order* ¶37; *cf. Mozilla*, 940 F.3d at 87, 89-90 (concurring opinion).  Today, however, consumers principally rely on third-party applications, rather than their provider's own offerings, for those things.  Consumers understand the difference between the third-party applications they use "to post on social media or store photos in the cloud" (Mot. 15) and the broadband provider they employ to take them to whichever third-party services they prefer.  *Order* ¶132, ¶144.

**b.**  Petitioners also attempt to support their contrary reading by pointing (Mot. 15-17) to two other provider-operated services: DNS (domain name service) and caching.  But as the *Order* explains, the presence of DNS and caching do not transform broadband into an information service.

*First*, DNS and caching do not play the same role in broadband service today as was once assumed.  *Order* ¶¶146-151; *see Mozilla*, 940 F.3d at 90-91 (concurring opinion).

- 14 -

Whereas subscribers once needed DNS service from their broadband provider, today consumers can use a host of third-party DNS services instead. *Order* ¶147; *Mozilla*, 940 F.3d at 90-91 (concurring opinion). DNS thus is not an integral part of the broadband offering, but instead a separable, bundled service today (like an email account) that does not change the character of the core transmission service. *Order* ¶142, ¶¶146-148.

Likewise, the caching by internet providers that featured in the early days of the internet has become vestigial today. Broadband-provider caching is incompatible with now-common features like encryption. *Order* ¶151; *Mozilla*, 940 F.3d at 91 (concurring opinion). And besides, no one browsing the web today wants to see outdated news or content that their provider cached from a previous user's visit. Even more so than DNS, the role once played by caching has been overtaken by third-party content delivery networks (CDNs) that, due to technical differences, do not have these limitations. *Order* ¶151.

*Second*, even if DNS and caching were an integral part of broadband service today, they would fall within the statutory "telecommunications-management exception"—an issue on which *Brand X* "t[ook] no view" and left to the Commission, 545 U.S. at 999n.3. That exception

provides that information service "does not include any use of any [information-processing] capability for the management, control, or operation of" a telecommunications service.  47 U.S.C. §153(24); *see Order* ¶¶133-136.

To the extent DNS and caching might be thought intertwined with broadband service, it is precisely because they are used to *manage and facilitate* the transmission service.  *U.S. Telecom*, 825 F.3d at 705.  "DNS 'allows more efficient use of the telecommunications network by facilitating accurate and efficient routing from the end user to the receiving party.'" *Order* ¶137 (quoting *U.S. Telecom*, 825 F.3d at 705).  As Justice Scalia put it, DNS "is scarcely more than routing information, which [under the telecommunications-management exception] is expressly excluded from the definition of 'information service.'"  *Brand X*, 545 U.S. at 1012-13 (Scalia, J., dissenting).  Similarly, caching is a tool for broadband providers to make their transmission service operate faster and more efficiently.  *Order* ¶139; *U.S. Telecom*, 825 F.3d at 705.  Though the *Brand X* majority ruled that the Commission with the benefit of *Chevron* could permissibly take a different view, the Court did not hold that this would be the best or most natural reading absent *Chevron* or that the Commission could not reasonably agree with Justice Scalia's reading.

**3.**   That broadband is best understood as a telecommunications service is reinforced by Section 706 of the 1996 Act, which directs the Commission to encourage deployment of broadband ("advanced telecommunications capability") by "utilizing … price cap regulation, regulatory forbearance," and certain other tools.  47 U.S.C. §1302.  Those regulatory tools apply only to telecommunications services, so Section 706 presupposes that broadband is a telecommunications service.  *Order* ¶245.

This result would not have been unnatural to the Congress that passed the 1996 Act.  At that time, a regulatory regime matching the *Advanced Services Order* (which treated DSL broadband as a telecommunications service) governed the progenitors of today's broadband service.  *See Advanced Services Order* ¶35&n.57 (citing the 1995 *Frame Relay Order*).  As the D.C. Circuit put it, "one might [think], as the Commission originally concluded [in the] *Advanced Services Order*, that Congress clearly contemplated that the Commission would continue regulating Internet providers in the manner it had previously." *Verizon*, 740 F.3d at 638-39 (citation omitted).

**4.**   Petitioners contend (Mot. 17) that the fact that the Commission chose to tailor its regulation by exercising its forbearance power undermines its classification decision.  But the Commission's forbearance

authority is "part and parcel" of the regulatory scheme enacted for telecommunications carriers in the 1996 Act, and Congress clearly "contemplated" that authority would be used when the statutory criteria were met. *Order* ¶319&n.1275; *U.S. Telecom*, 825 F.3d at 706.

Nor does the statute's definition of a "commercial mobile service" as one that is interconnected with the public switched network, 47 U.S.C. §332(d)(1)-(2), foreclose the Commission's reclassification of mobile broadband (Mot. 18-19), since Congress expressly gave the Commission the power to define the terms "interconnected" and "public switched network." 47 U.S.C. §332(d)(1)-(2); *see Order* ¶¶214-236; *U.S. Telecom*, 825 F.3d at 714-17.

Petitioners point (Mot. 19) to two other statutory provisions, 47 U.S.C. §230(f)(2) and §231(e)(4), as supposedly embodying Congress's "understanding" that an "internet access service" cannot be a "telecommunications service." But those "narrow-purpose" sections discuss the terms "internet access service" and "interactive computer service" only as applied to their respective sections. *Order* ¶249. It is "'unlikely that Congress would attempt to settle the regulatory status'" of broadband "'in such an oblique and indirect manner.'" *U.S. Telecom*, 825 F.3d at 703.

**B.    The Major-Questions Doctrine Does Not Countermand The Best Reading Of The Statute.**

Because the *Order* simply follows the best reading of the statute, the major-questions doctrine does not come into play.   *Order* ¶253. Unlike major-questions cases, moreover, the Commission was not claiming to discover any "novel," "unheralded," or "surprising" power, given its long history of classifying communications services even predating the 1996 Act and its past application of Title II; the issues here "fall[] squarely within the Commission's wheelhouse" and its "technical and policy expertise."  *Id.* ¶¶258-261.

At the outset, because *Brand X* squarely held that the Act empowers the FCC to determine the proper classification of broadband, petitioners' major-questions argument is foreclosed unless *Brand X* is directly overruled on that point.   *Order* ¶264&n.1105; *see Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application … yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *cf. Ohio v. Becerra*, 87 F.4th 759, 765, 771-72 (6th Cir. 2023).

Petitioners' contention that "the economic and political significance of the Commission's claimed authority is staggering" (Mot. 11) is exaggerated.  Their claims about economic consequences are based on general statements about the broadband industry's economic value and the importance of the internet, rather than specific claims about the effect of the *Order*.  *Order* ¶257&n.1077.  Petitioners cite only a single study purporting to describe the effect of Title II—by an author whose methodologically flawed work was found to have "no probative value" whatsoever.  *Compare* Mot. 20 (citing App. 800-01) *with Order* ¶¶289-295&n.1184 (discussing Dr. Ford's work, including the cited study).  As to political controversy, any "recent stalemate" in Congress does not "cast[] doubt on [the] regulatory authority" that Congress conferred in 1996.  *Order* ¶262; *see also id.* ¶255.

Petitioners also invoke (Mot. 10) policies like rate regulation that the Commission did *not* impose, and indeed has affirmatively forborne from.  *See Order* ¶¶383-432; *cf. Brand X*, 545 U.S. at 1011 (Scalia, J., dissenting) (forbearance makes Title II "not a worry").  "[A]ny changes to this framework or future rules" would require a new notice-and-comment proceeding and be subject to judicial review.  *Order* ¶641.  Petitioners

cannot invoke the major-questions doctrine based on the imagined burdens of obligations the *Order* does not impose.

In all events, "even if the economic and political significance of [the] order met the first prong of the major-questions doctrine, the other factors militate against applying it here." *Order* ¶258. There is "nothing novel" about the Commission classifying communications services, *id.* ¶259; "[r]egulating communications networks 'is what [the Commission] does,'" *id.* ¶260; and "the regulatory issues" addressed by the *Order* "fall squarely within the Commission's technical and policy expertise, *id.* ¶261.

Petitioners repeatedly invoke a dissent by then-Judge Kavanaugh opining that the *2015 Order* violated what he called the "major-rules doctrine." But Judge Kavanaugh's dissent was just that—a dissent— which simply underscores that all operative authority supports the Commission. And whereas that dissent conceived of a judicial thumb on the scale favoring deregulatory approaches, *U.S. Telecom II*, 855 F.3d at 425n.5, Supreme Court decisions now indicate "that the major-questions doctrine applies equally to agency actions that are regulatory or deregulatory"—Title I *or* Title II—so it "does not resolve this issue or … favor [any] one interpretation over the other." *Order* ¶254n.1062.

Finally, even if the major-questions doctrine did apply, an agency is empowered to act on major questions when clearly authorized by Congress. Here, as the Supreme Court has recognized, the Commission is clearly authorized to classify and regulate communications services such as broadband under the Communications Act. *Order* ¶264&nn.106-111; *see City of Arlington v. FCC*, 569 U.S. 290, 307 (2013) ("It suffices" that "Congress has unambiguously vested the FCC with general authority to administer the Communications Act" and the agency must necessarily decide the issue "in the exercise of that authority."); *Gonzalez v. Oregon*, 546 U.S. 243, 258-59 (2006) (*Brand X* found the FCC's "authority is clear" here).

## II.    PETITIONERS FAIL TO SHOW THEY WILL SUFFER IRREPARABLE HARM.

Petitioners also fail to meet the "indispensable" requirement to show they will suffer irreparable harm before the Court can decide their appeal. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326-27 (6th Cir. 2019) (absent "imminent and irreparable" injury, "there's no need to grant relief *now* as opposed to at the end of the lawsuit"). To justify relief, "an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Id.* at 327.

**1.** Petitioners claim (Mot. 20-21) that the new *Order* creates newfound "indetermina[cy]" that might lead them to incur "atypical" compliance costs. But the existing *2018 Order* largely just shifted regulatory oversight of broadband providers from the FCC to the Federal Trade Commission and its wide-ranging Section 5 authority to police "[u]nfair methods of competition" and "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. §45(a)(1); *see Order* ¶¶487-489. The FTC's elaboration of that authority and case-by-case *ex post* approach are as open-textured and flexible as the rules petitioners object to here. *Order* ¶489, ¶640; *see FTC Policy Statement Regarding Unfair Methods of Competition*, FTC File No. P221202 (Nov. 10, 2022), https://perma.cc/K9MW-RFK3; *FTC Policy Statement on Deception*, 103 F.T.C. 110, 174 (1984).

The *Order* reverts regulatory authority over broadband service to the FCC, *see* 15 U.S.C. §45(a)(2) (common-carrier exception to the FTC Act), restoring oversight by a sector-specific regulator that, if anything, can provide greater specificity on broadband-specific legal issues. *Cf. Order* ¶491, ¶640 ("a single expert agency will achieve timelier and more consistent outcomes and reduce the costs of uncertainty for all interest holders").

In addition, after *Mozilla* invalidated the *2018 Order*'s "Preemption Directive," individual states like California began subjecting broadband providers to their own rules, including the same duties petitioners complain of here. *See*, *e.g.*, Cal. Civ. Code §3101(a)(7)(A) (prohibiting broadband providers from "unreasonably interfering" with or "unreasonably disadvantaging" internet content or services). Petitioners cannot claim greater uncertainty or compliance costs under the *Order* than under this existing regime, in which they could face many separate state regulators. On the contrary, Title II allows the Commission to preempt state and local regulations, which will "reduce regulatory uncertainty" and "reduce the costs on [broadband] providers." *Order* ¶648; *see id.* ¶271 ("[S]hould California … seek to interpret or enforce [its] requirements in a manner inconsistent with" the *Order*, the Commission "will consider whether appropriately tailored preemption is needed").

In its cost-benefit analysis, the Commission accordingly found that claimed compliance costs were unlikely to be significant, and—as the D.C. Circuit found in *U.S. Telecom*, 825 F.3d at 736-38—effectively mitigated by the Commission's extensive guidance and the opportunity

to seek advisory opinions.  *Order* ¶¶638-640, ¶645.[3]

2.    Petitioners' statements that they might "delay or forgo potential new offerings and expansions" (Mot. 21) are likewise unpersuasive. Tellingly, petitioners do not identify *any* existing offering that they would need to halt when the *Order* takes effect on July 22.  Nor do they identify any specific future plans that will be affected in the near term.  Vague gestures at "next-generation 5G technology" (Mot. 22), without any specific plans for when and how they will deploy and use those concededly "nascent" technologies (App. 1611, 1653) during the pendency of this appeal, do not satisfy petitioners' burden.  *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) (interim relief requires a showing that petitioners "will likely suffer harm *before* final judgment").  And a stay pending review would have no bearing on longer-term plans, which will instead depend (if at all) on the ultimate outcome of this appeal.

---

[3]    Petitioners accompany their judicial stay motion with new declarations they never presented to the agency, either during the proceeding below or when they sought an agency stay.  That new material improperly seeks to bypass the statute's prohibition on judicial consideration of "questions of fact … upon which the Commission … has been afforded no opportunity to pass."  47 U.S.C. §405(a); *Cellnet Commcn's, Inc. v. FCC*, 149 F.3d 429, 442-43 (6th Cir. 1998). Regardless, those untested declarations are unpersuasive for the reasons outlined here and in the *Order*.

**3.** Concerns about "increased capital costs" (Mot. 23) likewise would not be relieved by a stay pending review. If the *Order* is really a disincentive for investors, petitioners cannot claim that a temporary stay will relieve that concern when the *Order* may later be upheld on full review. And in any event, the Commission found similar claims of a substantial effect on broadband investment to be unsubstantiated. *Order* ¶¶276-302, ¶¶635-637. In fact, the economics literature reflects that tele-communications regulation can foster market conditions that *promote* (rather than depress) investment. *Id.* ¶¶279-282, ¶¶448-449, ¶636; *U.S. Telecom*, 825 F.3d at 707.

**4.** Petitioners' arguments about interconnection (Mot. 23-24) are equally unpersuasive. The *Order* does not impose any new interconnection rules; it merely states the Commission will "monitor" interconnection practices and can receive any complaints on a case-by-case basis. *Order* ¶¶576-579. Any "hypothetical threat of [enforcement action] is not an 'immediate,' 'irreparable' injury that warrants the 'extraordinary remedy'" of a stay. *D.T.*, 942 F.3d at 327. If petitioners do face enforcement action before this case is resolved, they can raise any objections then. *Fischer*, 78 F.4th at 868. And the Commission explained

that petitioners' claims of asymmetry are wrong because the agency would consider the practices of *both* interconnecting parties. *Order* ¶577.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A STAY.

"The parties and the public, while entitled to both careful review and a meaningful decision, are also generally entitled to the prompt execution of" duly adopted orders. *Nken v. Holder*, 556 U.S. 418, 427 (2009). "Accordingly," a stay "'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Ibid.*

Here, the public interest weighs heavily against a stay because it would leave other participants in the internet economy—including consumers and edge providers—exposed to harmful practices. *See*, *e.g.*, *Stay Denial* ¶18, ¶20. Petitioners' contention that "the Commission cannot point to a single clear example" of attempted harm (Mot. 25) is wrong. For example, the *Order* explains that just three years ago, AT&T sought to exempt traffic of its affiliated video provider, DirecTV, from its data caps to confer an advantage over competitors—and was stopped only when California adopted state-level open-internet rules. *Order* ¶478. That protection is needed nationwide. Moreover, as the D.C. Circuit has observed, harmful practices by broadband providers can happen

undetected.  *Verizon*, 740 F.3d at 646; *U.S. Telecom II*, 855 F.3d at 389 (Srinivasan, J., concurring in denial of rehearing); *see Order* ¶490&n.1948.

Petitioners contend (Mot. 25) that rules are not needed right now because they currently don't intend to violate them.  Even if the petitioners here could claim to speak for all the 2,201 fixed broadband providers and scores of mobile providers in the United States, *see Order* ¶291, the Court should not accept petitioners' representation that they will remain on good behavior (perhaps only for so long as their case is pending) as a substitute for enforceable rules.

Finally, petitioners suggest (Mot. 9) that the *Order* should not go into effect because it might be overturned later.  This Court has rebuffed identical arguments in the past.  *See Ohio State Conf.*, 769 F.3d at 388. Petitioners are not entitled to extraordinary relief when they have not otherwise met the stringent requirements for a stay.

## CONCLUSION

The motion for stay pending review should be denied.

Dated:  June 18, 2024

Respectfully submitted,

/s/  *Scott M. Noveck*

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Sarah E. Citrin
   *Deputy Associate General Counsel*

/s/  *Andrew W. Chang*

Daniel E. Haar
Nickolai G. Levin
Robert B. Nicholson
Andrew W. Chang
   *Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
   *United States of America*

Scott M. Noveck
   *Counsel*

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
   *Communications Commission*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains 5,200 words, *or*

    ☐   this document uses a monospaced typeface and contains ____ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using _____ with _____.

/s/ *Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondents*