**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, and 24-3538**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

---

IN RE: MCP NO. 185; OPEN INTERNET RULE (FCC 24-52)

OHIO TELECOM ASSOCIATION, et al.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petitions for Review of an Order of the Federal Communications Commission

---

# RESPONDENTS' SUPPLEMENTAL BRIEF REGARDING *LOPER BRIGHT ENTERPRISES v. RAIMONDO*

---

In accordance with the Court's June 28 order, respondents submit this supplemental brief addressing the relevance to petitioners' stay motion of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, No. 22-451 (U.S. June 28, 2024), which overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

*Loper Bright* has no direct relevance here because the *Order* under review does not turn or rely on *Chevron*. Instead, the *Order* consistently focuses on ascertaining the best reading of the Communications Act using the traditional tools of statutory construction—exactly as *Loper Bright* instructs. And insofar as *Loper Bright* recognizes that a court's legal interpretations may properly be informed by an agency's expert assessment of predicate factual and technical issues within the agency's specialized knowledge and expertise, as well as by roughly contemporaneous understandings of a statute by those closely familiar with it, *Loper Bright* only reinforces the arguments set forth in our stay opposition. In all events, *Loper Bright* does not address petitioners' failure to establish that they will suffer imminent and irreparable harm during the time it takes to decide this appeal, which independently forecloses their request for a stay pending review.

**1.** The *Order* under review does not turn or rely on *Chevron*. The *Order* noted that commenters "t[ook] various positions about possible judicial deference regimes that might (or might not) apply," but then explained that the Commission "need not linger over these disputes given that * * * our classification of [broadband] reflects the best reading of the Act irrespective of such considerations." *Order* ¶ 106 n.402. Though the

*Order* observed that the principles set forth in *Chevron* would appear to "further support[]" the *Order*, the Commission was clear that *Chevron* is "not necessary to our conclusion that treating [broadband] as a telecommunications service is the best reading of the Act based on the statutory text, structure, and context." *Ibid.*

Instead, the *Order* sought to ascertain the best reading of the Act by employing the traditional tools of statutory interpretation—exactly as *Loper Bright* says to do. *Compare* slip op. at 22–23 *with*, *e,g,*, *Order* ¶ 6 ("classification of [broadband] as a telecommunications service represents the best reading of the text of the Act"); *id.* ¶ 25 (same); *id.* ¶ 27 ("our conclusion that classifying BIAS as a telecommunications service represents the best reading of the Act is itself sufficient grounds for our decision"); *id.* ¶ 106 (broadband "is best classified as telecommunications service based on the ordinary meaning of the statutory definitions"—that is, "the best reading of the statutory terms applying basic principles of textual analysis to the text, structure, and context of the Act"); *id.* ¶ 253 ("we are simply following the best reading of the Communications Act, as demonstrated by the statute's plain text, structure, and historical context; there is no call for deference to an interpretation that is not the statute's most natural reading"). Indeed,

the *Order* offers 48 paragraphs of analysis, spanning 43 single-spaced pages, discussing in meticulous detail the best reading of the Act under the traditional tools of statutory construction. *See id.* ¶¶ 106–153.

Our stay opposition likewise sets forth how the *Order* represents the best reading of the Communications Act irrespective of *Chevron*. It explains how the statutory text is most naturally read to treat broadband as a telecommunications service. Stay Opp. 12–13. It then explains why, in contrast, broadband does not fit within the statutory definition of an information service. *Id.* at 13–16. And it shows how other evidence of statutory text, structure, and context further supports the Commission's position. *Id.* at 17–18. Because none of this turns on *Chevron*, *Loper Bright* does not alter or undermine that analysis.

**2.** To the extent *Loper Bright* bears on this case, it only reinforces the points set forth in our stay opposition.

**a.** As our stay opposition explained (at 16), the Supreme Court's holding in *Brand X* that the Commission's prior treatment of broadband as a Title I information service was "a permissible reading of the Communications Act under the *Chevron* framework" was predicated on *Chevron*, which is now overruled, not an assessment of the best reading of the Act. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,

545 U.S. 967, 986–1000 (2005); *see also id.* at 1003 (Breyer, J., concurring) (agreeing that a Title I approach was permissible, "though perhaps just barely," under *Chevron*). Even if the determination that such an interpretation was *permissible* would be entitled to "statutory stare decisis" if challenged, *Loper Bright*, slip op. at 34, the majority expressly declined to say that it was the *best reading* of the Act. *See Brand X*, 545 U.S. at 985–86 ("[O]ur conclusion that it is *reasonable* * * * to classify cable modem service solely as an 'information service' leaves untouched [the court of appeals'] holding that the Commission's [Title I] interpretation is not the *best* reading of the statute.").

The three dissenting Justices who *did* opine on the best reading, however, agreed with our position here that the statute is most naturally read to treat broadband transmission as a Title II telecommunications service. *See id.* at 1005–14 (Scalia, J., dissenting, joined by Souter and Ginsburg, JJ.); *see also U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 385 (D.C. Cir. 2017) (*U.S. Telecom II*) (Srinivasan, J., concurring in denial of rehearing) ("All nine Justices [in *Brand X*] recognized the agency's statutory authority to institute 'common-carrier regulation of all ISPs,' with some Justices even concluding that the Act left the agency with no other choice.").

In reviewing the new *Order* at issue here, the pertinent question is not whether a Title I approach remains permissible (as *Brand X* held it to be under *Chevron*), but instead whether, in adopting a Title II approach, the Commission correctly determined that Title II represents the best reading of the Act. *Brand X* did not speak to the question of whether Title I or Title II represents the best reading of the Act, as set forth in *Loper Bright*. Rather than select freely from a menu of *permissible* constructions (as the agency had in *Brand X*), the *Order* sought to ascertain the single *best reading* of the Act using the traditional tools of statutory interpretation, as *Loper Bright* requires here. And applying those traditional tools of statutory interpretation, the most natural reading of the statute is that broadband should be treated as a Title II telecommunications service, not a Title I information service. *See* Stay Opp. 12–18.

**b.** Although *Loper Bright* overruled *Chevron*, making *Brand X*'s application of that framework inapposite to the Commission's new interpretation here, *Brand X* remains controlling as to other parts of the that decision which are directly applicable to this case.

In particular, *Brand X* continues to foreclose petitioners' effort to argue in this Court that the major-questions doctrine deprives the FCC of authority to classify and regulate broadband. *See* Stay Opp. 19 ("[B]ecause *Brand X* squarely held that the Act empowers the FCC to determine the proper classification of broadband, petitioners' major-questions argument is foreclosed unless *Brand X* is directly overruled on that point."). *Brand X* "is clear" that the Communications Act "gives [the] agency broad power to enforce all provisions of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 258–59 (2006) (applying the major-questions doctrine, *id.* at 267–68, yet distinguishing *Brand X*); *see U.S. Telecom II*, 855 F.3d at 383–88 (Srinivasan, J., concurring in denial of rehearing) (detailing how *Brand X* squarely forecloses any major-questions argument here); *Order* ¶ 264 & nn.1105–1111.[1]

Petitioners' reliance on the major-questions doctrine is impossible to reconcile with *Brand X*'s holding addressing the particular statutory scheme at issue here, which unambiguously vests the Commission with

---

[1] "Indeed," *Brand X* "recognized and upheld the Commission's authority to determine the proper classification of BIAS without identifying any concern over whether that classification presents a major question * * * even though several parties expressly raised the issue." *Order* ¶ 254 & n.1064.

expansive authority to execute and enforce the Communications Act, *see Order* ¶ 264 & nn.1105–1111. Petitioners' apparent view is that, if that interpretive question is fairly debatable, the Commission must adopt the reading that minimizes regulatory burdens on broadband providers (*i.e.*, that broadband is an information service). That expansive view of the major-questions doctrine has no support in Supreme Court precedent, *see id.* ¶¶ 253–254 & n.1062, and it would improperly supplant the best-reading analysis required by *Loper Bright*.

Absent any intervening decision that claims to expressly overrule *Brand X*, this Court remains bound to follow that decision. As the Supreme Court has admonished: "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Because neither *Loper Bright* nor any other intervening case has purported to overrule *Brand X*, *Brand X* continues to foreclose the major-questions argument that petitioners seek to press in this Court.

**c.** *Loper Bright* also emphasizes that a court appropriately may consider an agency's specialized knowledge and expertise on predicate factual and technical issues to inform the court's legal interpretations. "[A]lthough an agency's interpretation of a statute cannot bind a court, it may be especially informative to the extent it rests on factual premises within the agency's expertise. Such expertise has always been one of the factors which may give an Executive Branch interpretation particular power to persuade, if lacking power to control." Slip op. at 25 (citations, internal quotation marks, and brackets omitted).[2]

That is the situation here. *Brand X* reasoned that the proper statutory classification of broadband turns on the word "offering": whether the underlying transmission service and any applications offered with or through that service amount to separate bundled offerings or a single integrated offering. 545 U.S. at 991. "That question turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided," *ibid.*—an issue that appropriately calls for "use of [the Commission's] expert policy judgment

[2] *See also* slip op. at 35 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," but "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry.").

to resolve these difficult questions," *id.* at 1003. The Court further recognized that this "involve[s] a 'subject matter [that] is technical, complex, and dynamic,'" which "[t]he Commission is in a far better position to address * * * than we are." *Id.* at 1002–03.

Here, the Commission made detailed findings with respect to those predicate factual and technical issues on which *Brand X* specifically called for courts to take into account the agency's expert assessments. Among other things, the *Order* details how:

- Broadband service today is used and understood as "primarily a transmission conduit used as a means to send and receive information to and from third-party services"—"in the words of one commenter, a 'dumb pipe'[] through which they may transmit information of their choosing, between or among points they specify, without change in the form or content of the information as sent and received." *Order* ¶ 123 (internal quotation marks and footnote omitted); *accord U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 697–99 (D.C. Cir. 2016), *reh'g denied*, 855 F.3d 381 (D.C. Cir. 2017), *cert. denied*, 139 S. Ct. 454 (2018).

- Broadband providers' marketing today likewise emphasizes the speed and reliability of their transmission, not their bundled applications or information-processing. *Order* ¶ 124; *accord U.S. Telecom*, 825 F.3d at 699.
- DNS and caching are not, as a technical matter, functionally integrated with and integral to broadband service in a manner that transforms broadband into an inextricably integrated information service, *Order* ¶¶ 146–151; or alternatively, if they were thought so integral, it could only be because of their putative role in managing and facilitating the transmission service, which would fall within the telecommunications-management exception to the information-service definition, *id.* ¶¶ 136–139; *accord U.S. Telecom*, 825 F.3d at 705.

*See generally* Stay Opp. 12–16. Though ultimately the Court must determine the statute's meaning, these complicated predicate factual and technical issues present precisely the situation where "[c]areful attention to the judgment of the [expert agency] may help inform that inquiry." *Loper Bright*, slip op. at 35.

**d.** *Loper Bright* further teaches that, even in the absence of *Chevron*, an agency's roughly contemporaneous interpretation of a statute may still help to shed light on the statute's meaning. Slip op. at 8–9, 10, 13 n.3, 16–17. This comports with established statutory-interpretation principles, which "give such [contemporaneous] interpretations special consideration because they derive from a familiarity with the very circumstances which engendered the underlying enactment." 2B Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 49:7, at 108–09 (7th ed. 2007); *see*, *e.g.*, *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 549 (1940) (a "'contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion'" is "entitled to great weight"); *Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827) ("[T]he contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 418 (1821) (Marshall, C.J.) ("Great weight has always been attached, and very rightly attached, to contemporaneous exposition.").

As our stay opposition explains (at 4–6, 17), contemporaneous interpretations support treating broadband as a Title II telecommunications service. When first addressing broadband service in the wake of the 1996 Act, the Commission classified early forms of broadband over telephone lines (known as Digital Subscriber Line or "DSL" technology) as Title II telecommunications services. *See* Stay Opp. 4–6 (discussing the *Advanced Services Order*, 13 FCC Rcd. 24012 ¶¶ 35–36 (1998)).[3] Likewise, the first appellate decision to consider the Act's application to broadband independently construed the statute similarly for cable broadband. *AT&T Corp. v. City of Portland*, 216 F.3d 871, 878 (9th Cir. 2000); *see* Stay Opp. 6. (The *Brand X* majority expressly "le[ft] untouched *Portland*'s holding" in this respect. 545 U.S. at 985–86.) And a similar regulatory regime governed the progenitors of today's broadband service when Congress enacted the 1996 Act and generally adopted the Commission's existing regulatory framework. *See* Stay Opp. 17 (citing *Advanced Services Order* ¶ 35 & n.57, in turn citing the 1995 *Frame Relay Order*, 10 FCC Rcd. 13717 ¶¶ 40–46 (Com. Car. Bur. 1995)).

3 Petitioners' stay motion looks to statements in a nonbinding FCC report to Congress that same year, known as the *Universal Service Report*, but overlooks how the same FCC explained and distinguished those statements in the *Advanced Services Order*. *See* Stay Opp. 5–6.

**e.** In the end, while disapproving *Chevron* deference, *Loper Bright* reaffirms that courts still "may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes." Slip op. at 16; *see also id.* at 21 (affirming "the 'respect' historically given to Executive Branch interpretations" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)); *id.* at 25 ("In an agency case in particular, the court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal."). The Commission's actions here are due the respect that should be afforded determinations that are firmly grounded in the "body of experience and informed judgment" the agency has gained in the administration of the Communications Act. *Skidmore*, 323 U.S. at 140; *see Order* ¶ 106 n.402.

**3.** Separate and apart from the merits, nothing in *Loper Bright* changes the fact that petitioners have not made the concrete showing of imminent and irreparable harm that is independently required to support a stay pending review. The irreparable-harm requirement is "indispensable," because "[i]f the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schs.*, 942

F.3d 324, 327 (6th Cir. 2019); *see also id.* at 326–27 ("[T]he existence of an irreparable injury is mandatory," so "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement.") (internal quotation marks and emphasis omitted).

Petitioners have not made that showing. They gesture vaguely at "compliance costs," but have not at any point been able to comprehensibly explain what specific costs they must incur to comply with the *Order* or why those costs are any greater than those they face under the current regulatory regime. Stay Opp. 23–25. They likewise gesture at "uncertainty," but the *Order* if anything *reduces* uncertainty compared to the current regime. *Id.* at 23–24. And their other scattershot claims of irreparable harm likewise do not hold up to scrutiny. *See id.* at 25–27.

* * *

For the foregoing reasons, and those stated in our stay opposition, the motion for stay pending review should be denied.

Dated: July 8, 2024

Respectfully submitted,

/s/ *Scott M. Noveck*

P. Michele Ellison
*General Counsel*

Jacob M. Lewis
*Deputy General Counsel*

Sarah E. Citrin
*Deputy Associate General Counsel*

Scott M. Noveck
*Counsel*

FEDERAL COMMUNICATIONS COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal Communications Commission*

/s/ *Andrew W. Chang*

Daniel E. Haar
Nickolai G. Levin
Robert B. Nicholson
Andrew W. Chang
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent United States of America*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1. With respect to the type-volume limit of Fed. R. App. P. 27(d)(2) and this Court's order of June 28, 2024, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

   ☒ this document contains 2,879 words, *or*

   ☐ this document uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook, *or*

   ☐ this document has been prepared in a monospaced spaced typeface using __________________ with ______________________.

/s/ *Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondents*