# In the United States Court of Appeals for the Sixth Circuit

In re: MCP No. 185: Federal Communications Commission,
In the Matter of Safeguarding and Securing the Open
Internet, Declaratory Ruling, Order, Report and Order,
and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404,
Published May 22, 2024

On Petitions for Review

## SUPPLEMENTAL BRIEF OF OHIO TELECOM ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, WIRELESS INTERNET SERVICE PROVIDERS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, AND TEXAS CABLE ASSOCIATION

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*


*(Additional counsel on next page)*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

Matthew A. Brill
Matthew T. Murchison
Latham & Watkins LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*


Jeffrey A. Lamken
Rayiner I. Hashem
Jennifer E. Fischell
Jackson A. Myers
MoloLamken LLP
600 New Hampshire Avenue NW, Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*


Maxwell F. Gottschall
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*


Thomas M. Johnson, Jr.
Joshua S. Turner
Jeremy J. Broggi
Boyd Garriott
Wiley Rein LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

Stephen E. Coran
Lerman Senter PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................2

I. *LOPER BRIGHT* REINFORCES PETITIONERS' MAJOR-QUESTIONS ARGUMENT ..............................................................2

II. *LOPER BRIGHT* ELIMINATES ANY POSSIBILITY OF DEFERENCE TO THE COMMISSION'S ORDER ...........................3

    A. The Commission Is Not Entitled To *Chevron* Deference ............................................................................4

    B. The Commission's Current Views Warrant No Special Weight ...................................................................................4

III. AFTER *LOPER BRIGHT*, THE STATUTORY HOLDING OF *BRAND X* IS ENTITLED TO *STARE DECISIS* EFFECT ..............13

CONCLUSION...................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chevron U.S.A. Inc.* v. *NRDC*,
    467 U.S. 837 (1984).................................................................*passim*

*Loper Bright Enterprises* v. *Raimondo*,
    603 U.S. ___ (2024) .............................................................*passim*

*Mozilla* v. *FCC*,
    940 F.3d 1 (D.C. Cir. 2019) .............................................12

*National Cable & Telecom. Ass'n* v. *Brand X Internet Servs.*,
    545 U.S. 967 (2005).............................................................*passim*

*OfficeMax, Inc.* v. *United States*,
    428 F.3d 583 (6th Cir. 2005)...............................................4

*Skidmore* v. *Swift & Co.*,
    323 U.S. 134 (1944)..............................................................5

*U.S. Telecom Ass'n* v. *FCC*,
    855 F.3d 381 (D.C. Cir. 2017) (en banc).............................3

*United States* v. *American Tel. & Tel. Co.*,
    552 F. Supp. 131 (D.D.C. 1982) ........................................8

**Statutes**

47 U.S.C. § 332 ........................................................................5

**Other Authorities**

*Appropriate Framework for Broadband Access to the Internet
    over Wireline Facilities*,
    20 FCC Rcd. 14853 (2005)................................................10

*Appropriate Regulatory Treatment for Broadband Access to the
      Internet over Wireless Networks,*
      22 FCC Rcd. 5901 (2007)...................................................................11

*Deployment of Wireline Services Offering Advanced
      Telecommunications Capability,*
      13 FCC Rcd. 24012 (1998).................................................................8

*Federal-State Joint Board on Universal Service,*
      13 FCC Rcd. 11501 (1998)..........................................................7, 8, 11

*Restoring Internet Freedom,*
      33 FCC Rcd. 311 (2018)....................................................................11

*Second Computer Inquiry,*
      77 F.C.C.2d 384 (1980) .....................................................................8

*United Power Line Council's Petition for Declaratory Ruling
      Regarding the Classification of Broadband over Power Line
      Internet Access Service as an Information Service,*
      21 FCC Rcd. 13281 (2006)...............................................................10

**INTRODUCTION**

Before the Supreme Court's decision in *Loper Bright Enterprises* v. *Raimondo*, 603 U.S. ___ (2024), petitioners were likely to succeed on the merits of their challenge to the Commission's reclassification of broadband as a public utility. After *Loper Bright*, that likelihood of success is even clearer.

*Loper Bright* did four things relevant here. First, the Supreme Court reaffirmed the viability of the major-questions doctrine, under which Congress must speak clearly to make extraordinary grants of regulatory authority to agencies. Slip op. 27-28. Applying the major-questions doctrine here is fatal to the Commission's Order. *See* Stay Mot. 9-19.

Second, the Supreme Court overruled *Chevron U.S.A. Inc.* v. *NRDC*, 467 U.S. 837 (1984). Slip op. 35. Although the Commission has barely invoked *Chevron* deference, Order ¶ 106 n.402, *Loper Bright* established that such deference is unavailable.

Third, the Supreme Court outlined the considerations that should now guide courts in determining the "appropriate weight" to be given to an agency's views. Slip. op. 11. Most importantly, the Court emphasized that respect may be due to "contemporaneous[]" and "consistent" agency interpretations, *id.* at 17—and the Commission's recent and repeated flip-

flopping here is anything but.  Indeed, a concurrence described the Commission's back-and-forth on this very issue as the prototypical agency action to which courts should afford no weight.  603 U.S. at ___ (Gorsuch, J., concurring) (slip op. 23).

Fourth, *Loper Bright* directed courts to give *stare decisis* effect even to cases decided at *Chevron*'s second step.  Slip op. 34-35.  Applied here, that means treating the Supreme Court's prior decision in *National Cable & Telecommunications Association* v. *Brand X Internet Services*, 545 U.S. 967, 982 (2005)—which approved the classification of cable broadband as an "information service"—as a binding statutory precedent.

*Loper Bright* thus confirms that this Court should stay the challenged Order pending judicial review.

## ARGUMENT

### I. *LOPER BRIGHT* REINFORCES PETITIONERS' MAJOR-QUESTIONS ARGUMENT.

*Loper Bright* confirms petitioners' core merits argument:  that the Commission's Order triggers and flunks the major-questions doctrine.  *Loper Bright* makes clear that the major-questions doctrine is not merely an exception to *Chevron*; it is an enduring principle of statutory interpretation. In overruling *Chevron*, the Court expressly reaffirmed that it expects

Congress to delegate authority of "deep 'economic and political significance'" "'*expressly*' if at all." Slip op. 27 (emphasis added) (quoting *King* v. *Burwell*, 576 U.S. 473, 486 (2015)). The Court further reiterated that "extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* (quoting *West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022)) (brackets and quotation marks omitted). The major-questions doctrine is thus alive and well after *Loper Bright*.

That doctrine remains fatal to the Order. As then-Judge Kavanaugh explained in *U.S. Telecom Association* v. *FCC*, whether the Commission may regulate broadband as a public utility is a major question by any measure. 855 F.3d 381, 423 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). And Congress never authorized the Commission to exercise that kind of authority, let alone clearly. *See* Stay Mot. 10-19.

## II. *LOPER BRIGHT* ELIMINATES ANY POSSIBILITY OF DEFERENCE TO THE COMMISSION'S ORDER.

Putting aside the major-questions doctrine, *Loper Bright* confirms that the Commission's position here receives no special respect. First, and most obviously, *Loper Bright* puts to rest any possibility of *Chevron* deference here. Second, *Loper Bright* makes clear that the Commission's current view that broadband is a Title II telecommunications service—which is inconsistent with

its contemporaneous and long-held view that Internet access is an information service—receives no special weight.

## A. The Commission Is Not Entitled To *Chevron* Deference.

Even before the Supreme Court decided *Loper Bright*, *Chevron* was not the appropriate framework to decide this case because the major-questions doctrine took it off the table. *See* Stay Reply 1. *Loper Bright* removes any doubt on that score. The Commission's Order invoked *Chevron* in a footnote, in "further support[]" of its latest interpretation of the Telecommunications Act of 1996. Order ¶ 106 n.402. That halfhearted argument fails anyway because *Chevron* is no longer good law.

## B. The Commission's Current Views Warrant No Special Weight.

*Loper Bright* also confirms that the Commission's latest Order should receive no other weight. *Loper Bright* contemplates two ways in which agency interpretations may warrant judicial respect. First, a statute may specifically authorize an agency to "exercise a degree of discretion" by "*expressly* delegat[ing] to an agency the authority to give meaning to a particular statutory term" or using "a term or phrase that leaves agencies with flexibility." Slip op. 17 (emphasis added) (internal quotation marks omitted). Second, an agency may still be entitled to "*Skidmore* respect," *OfficeMax, Inc.*

v. *United States*, 428 F.3d 583, 595 (6th Cir. 2005), under which its view may inform a court's independent interpretive judgment depending on its "power to persuade." *Loper Bright*, slip op. 25 (citing *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944)). Neither possibility applies here.

1. First, the 1996 Act does not specifically confer a relevant "degree of discretion" on the Commission. *Loper Bright*, slip op. 17. By that, the Court was referring to statutes that require an agency to "define[] and delimit[]" the meaning of certain statutory terms. *Id.* at 17 n.5 (citing 29 U.S.C. § 213(a)(15)). Here, however, Congress did not expressly delegate to the Commission the power to "give meaning to [the] particular statutory term[s]" at issue— "information service" and "telecommunications service." *Id.* at 17.[1]

---

[1] In other places in the statute, by contrast, Congress did confer express definitional authority on the Commission. *See, e.g.*, 47 U.S.C. § 332(d)(2) ("the term 'interconnected service' means service that is interconnected with the public switched network (*as such terms are defined by regulation by the Commission*)") (emphasis added). But *Loper Bright* makes clear that even that kind of delegation is not *carte blanche*. *See* slip op. 17. Instead, a court must still "independently interpret the statute" in order to "fix[] the boundaries of" the delegation and "ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* at 18 (citation omitted); *see id.* at 26 (same). Here, as petitioners have explained, the Commission's redefinition of "the public switched network" is flatly unreasonable and thus exceeds its delegated authority. *See* Stay Mot. 18-19; Stay Reply 9.

Nor did Congress give the Commission a "flexib[le]" mandate. *Loper Bright*, slip op. 17. To illustrate, the Court gave the example of statutes that direct EPA to regulate certain sources of pollutants after a finding that "such regulation is appropriate and necessary." *Id.* at 17 n.6 (citing 42 U.S.C. § 7412(n)(1)(A)). This case, by contrast, comes down to a threshold definitional determination that dictates how much regulatory authority the Commission has in the first place.

2. *Loper Bright* also confirms that the Commission's views are not entitled to *Skidmore* respect. As the Supreme Court explained, the historical tradition of giving "due respect to Executive Branch interpretations of federal statutes" has limits. Slip op. 8. That respect is most owed "when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id.* The Court reiterated those twin characteristics over and over, emphasizing that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," merit meaningful weight. *Id.* at 16-17; *see id.* at 10, 13 n.3, 21. The Commission's shifting position on the proper classification of broadband does not check either box.

a.   Starting with contemporaneousness, the Commission's latest view is a complete reversal from its original interpretation of the 1996 Act. *See* Stay Mot. 5-6; Stay Reply 5.  That history is worth recounting.

After the 1996 Act, the Commission first classified Internet access service in the Stevens Report, issued in 1998.  *See Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11536 (1998).  As the Commission saw it, the key statutory question was "whether Internet access providers merely offer transmission" of data, like a telephone service, "or whether they go beyond the provision of a transparent transmission path to offer end users the capabilit[ies]" set out in the definition of "information service."  *Id.* at 11536.  The Commission easily concluded the latter: "the service that Internet access providers offer to members of the public is Internet access," which "gives users a variety of advanced capabilities." *Id.* at 11539.  In language that applies equally today, the Commission explained that users "can retrieve files from the World Wide Web, and browse their contents, because their service provider offers the 'capability for . . . acquiring, . . . retrieving [and] utilizing . . . information.'" *Id.* at 11538.  Thus, ISPs offer an information service. *Id.* at 11540; *see id.* at 11536 ("Internet access providers do not offer a pure

transmission path; they combine computer processing, information provision, and other computer-mediated offerings with data transport.").[2]

That same year, the Commission's first foray into regulating broadband continued to reflect the distinction between (i) the Internet access service itself and (ii) the pure data-transmission capability over which Internet access service was provided. The Commission dealt with DSL Internet access service, which ISPs offered over the transmission capacity of telephone wires. *See Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd. 24012 (1998). To level the playing field between the ISP telephone companies that owned the wires and the competing ISPs that sought to lease them, the Commission required

---

[2] The Stevens Report also explained that the 1996 Act's definition of "information service" tracked earlier regulatory categories that covered services that were precursors to Internet access. *See* 13 FCC Rcd. at 11540. The Commission's 1980 *Computer II* regulation drew a distinction between regulated "basic services" and unregulated "enhanced services." An offering was an "enhanced service" if it "involve[d] subscriber interaction with stored information." *Second Computer Inquiry*, 77 F.C.C.2d 384, 387 (1980). Two years later, an order resolving the antitrust case against AT&T created essentially the same dichotomy, this time between regulated "telecommunications services" and unregulated "information services." *United States* v. *American Tel. & Tel. Co.*, 552 F. Supp. 131, 228-229 (D.D.C. 1982). So-called "gateway services"—that is, services that allowed users to access third-party databases, much like Internet access services do—were "enhanced services" and "information services" under *Computer II* and the AT&T order, respectively. *See* NCTA Comments 33, Stay App. 859.

telephone companies to sell separately the "last mile" connection—the line connecting a user's house to the companies' offices—as a distinct telecommunications service. *See Brand X*, 545 U.S. at 1000. But critically, the Commission did *not* regulate the retail Internet access service offered over those wires as a telecommunications service. As the Commission explained, it saw an "end-user" of DSL "Internet access" as utilizing two distinct services: "the first service is a telecommunications service (*e.g.*, the []DSL-enabled transmission path), and the second service is an information service, in this case Internet access." 13 FCC Rcd. at 24030.[3]

The Commission's 2002 classification of cable broadband, which was upheld in *Brand X*, reflects the same distinction, handled in a different way. By that time, Internet access services offered over cable television lines had

---

[3] The Commission misleadingly claims that it classified "DSL . . . broadband over telephone lines" as a Title II service. Stay Opp. 4. But as the Commission's 2005 briefing in *Brand X* explained, "[a]lthough the term 'DSL' is commonly associated with Internet access, it also refers to the underlying transmission technology that increases the capacity of telephone lines." Federal Pet. Reply Brief, *Brand X*, 545 U.S. 967 (Nos. 04-277, 04-281), at 14 n.7. The Commission deemed DSL in the latter sense (the transmission technology) a Title II service, *not* DSL in the former sense (the Internet access). *See id.* at 14-15 ("The historical treatment of DSL technology flows from the Commission's historical treatment of telephone company monopolists when they offer new information services over their traditional telephone networks.").

come to compete with DSL. *See Brand X*, 545 U.S. at 975. But unlike telephone companies, cable companies had never been required to lease their last-mile connections to competitors. Despite the requests of competitor ISPs, the Commission chose not to treat that last-mile connection as a separate Title II service. Instead, it concluded that cable broadband providers offered "a single, integrated service that enables the subscriber to utilize Internet access service." *Id.* at 978. And "because Internet access provide[d] a capability for manipulating and storing information," that integrated service could only be an "information service," under exactly the same interpretation that the Commission had adopted in 1998. *Id.* Not even the dissenting Justices in *Brand X* contested that understanding of the term "information service"; the only dispute was whether cable broadband providers *also* offered a separate, pure-transmission service, as the Commission had previously said for DSL. *Id.* at 991; *see* Stay Mot. 14-15; Stay Reply 2-3.

A short time later, the Commission adopted the same approach for DSL, and then for other forms of broadband. *See Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd. 14853 (2005); *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access*

*Service as an Information Service*, 21 FCC Rcd. 13281 (2006); *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd. 5901 (2007).

None of this history remotely supports the Commission's current (or 2015) interpretation of the 1996 Act—despite the Commission's misleading attempt to suggest otherwise. *See* Stay Opp. 4-6. The Commission's current position is that the *entire* service that ISPs offer is a telecommunications service, without any information-service component. Order ¶¶ 109-128. The Order thus flatly repudiates the Commission's original view: that Internet access service is an information service because it provides users the ability to retrieve, store, and interact with information. *Compare Stevens Report*, 13 FCC Rcd. at 11539 ("Internet access service" is an information service "precisely because of the enhanced functionality" and "advanced capabilities" the service "gives users"), *and Restoring Internet Freedom*, 33 FCC Rcd. 311, 324-325 (2018) (explaining that this was the Commission's "long-standing view"), *with* Order ¶ 130 (rejecting the argument that broadband is an information service because it "offers subscribers the ability to process information in the ways prescribed by Congress's information service definition"). In short, the Commission's current interpretation of the 1996 Act

is not the reading of the statute that it reached "roughly contemporaneously." *Loper Bright*, slip op. 8.

b.     Nor, of course, has the Commission's position "remained consistent over time." *Loper Bright*, slip op. 8.  The only consistent thing about the Commission's view of broadband—since 2015, anyway—has been its change with each new Presidential Administration. *See* Stay Mot. 6-7.  Indeed, the Commission's repeated flip-flops on Title II have become the poster child for *inconsistency*, and the antithesis of the sort of durable agency action that merits the Judiciary's respect. *See Loper Bright*, 603 U.S. at ___ (Gorsuch, J., concurring) (slip op. 23) (noting that the Commission here has "reverse[d] course for yet a fourth time").

Nor are the Commission's repeated reversals even limited to the main statutory terms ("information service" and "telecommunications service") at issue.  To make its interpretation work, the Commission has also ping-ponged between interpretations of related statutory terms, including "the public switched network," Stay Reply 9, and the so-called "telecommunications-management exception," *id.* at 8. *See Mozilla Corp.* v. *FCC*, 940 F.3d 1, 23-24, 36 (D.C. Cir. 2019).  All of this is cause for skepticism, not deference.

\*     \*     \*

Because the Commission's interpretation in the current Order is anything but contemporaneous and consistent, this Court should not give it even a feather's weight. If anything, the Commission's original, longstanding, and contrary view that Internet access service is an "information service" should be treated as "especially useful in determining the statute's meaning." *Loper Bright*, slip op. 17.

## III. AFTER *LOPER BRIGHT*, THE STATUTORY HOLDING OF *BRAND X* IS ENTITLED TO *STARE DECISIS* EFFECT.

*Loper Bright* did not just inter *Chevron*; it also instructed courts how to handle cases decided under that now-defunct regime. The Court explained that *Loper Bright* does *not* "call into question prior cases that relied on the *Chevron* framework," because "[t]he holdings of those cases that specific agency actions are lawful" are "subject to statutory *stare decisis* despite our change in interpretive methodology." Slip op. 34; *see* Oral Arg. Tr. 21-22, *Loper Bright*, 603 U.S. ___ (2024) (No. 22-451) (counsel for Loper Bright explaining that giving "stare decisis effect" to prior Step Two rulings would "giv[e] new stability to the law").

*Loper Bright*'s *stare decisis* analysis applies to the Supreme Court's decision in *Brand X*. There, the Court upheld the Commission's declaratory

ruling "that cable companies that sell broadband Internet service do not provide 'telecommunications servic[e]' as the Communications Act defines that term." 545 U.S. at 973-974. After *Loper Bright*, *Brand X*'s determination that it was "lawful" for the Commission to conclude that broadband Internet service is *not* a "telecommunications service" under the 1996 Act, *id.*, is binding under statutory *stare decisis*.

But here, the FCC is arguing that broadband Internet access service *is* a telecommunications service. Order ¶ 25. That argument necessarily implies that the statutory construction deemed lawful by the Supreme Court in *Brand X* is incorrect. The Order, however, provides no basis for overcoming *stare decisis*.

## CONCLUSION

The Court should stay the Order pending judicial review.

Respectfully submitted,

  s/ Helgi C. Walker
HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

  s/ Matthew A. Brill
MATTHEW A. BRILL
MATTHEW T. MURCHISON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

  s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

  s/ Thomas M. Johnson, Jr.
THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

*Counsel for WISPA – The Association for Broadband Without Boundaries*

  s/ Jeffrey A. Lamken
JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects –
America's Communications
Association*

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The
Association for Broadband
Without Boundaries*

JULY 8, 2024

## CERTIFICATE OF COMPLIANCE

The Court's Order of June 28, 2024 did not impose a word limit for this supplemental brief. The brief contains 2,877 words.

This brief complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall

JEFFREY B. WALL

JULY 8, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2024, I electronically filed the foregoing supplemental brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

JULY 8, 2024