**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, 24-3538**

# In the United States Court of Appeals for the Sixth Circuit

---

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

---

On Petitions for Review

---

**OPENING BRIEF OF PETITIONERS OHIO TELECOM ASSOCIATION, USTELECOM – THE BROADBAND ASSOCIATION, OHIO CABLE TELECOMMUNICATIONS ASSOCIATION, NCTA – THE INTERNET & TELEVISION ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION, WIRELESS INTERNET SERVICE PROVIDERS ASSOCIATION, ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FLORIDA INTERNET & TELEVISION ASSOCIATION, MCTA – THE MISSOURI INTERNET & TELEVISION ASSOCIATION, AND TEXAS CABLE ASSOCIATION**

---

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

*(Additional counsel on next page)*

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable
Telecommunications Association,
NCTA – The Internet & Television
Association, Florida Internet &
Television Association, MCTA – The
Missouri Internet & Television
Association, and Texas Cable
Association*


JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW,
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects –
America's Communications
Association*


MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom
Association, USTelecom – The
Broadband Association, and
NCTA – The Internet & Television
Association*


THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The
Association for Broadband Without
Boundaries*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1, petitioners make the following disclosures:

ACA Connects – America's Communications Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

CTIA – The Wireless Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Florida Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

MCTA – The Missouri Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

NCTA – The Internet & Television Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Ohio Cable Telecommunications Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

The Ohio Telecom Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

Texas Cable Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

USTelecom – The Broadband Association has no parent company, and no publicly held corporation owns 10% or more of its stock.

WISPA – The Association For Broadband Without Boundaries has no parent company, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................i

STATEMENT REGARDING ORAL ARGUMENT .......................................x

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ..........................................................5

STATEMENT OF THE ISSUES ..............................................................5

STATEMENT OF THE CASE ..................................................................6

      A.    Statutory Background..................................................6

      B.    Regulatory Background................................................8

            1.    Historical classification of internet-access services ........................................................8

            2.    The challenged Order ................................................12

      C.    Procedural Background ..........................................14

SUMMARY OF ARGUMENT..................................................................15

STANDARD OF REVIEW ......................................................................19

ARGUMENT ..........................................................................................19

    I.    THE COMMISSION LACKS STATUTORY AUTHORITY  TO RECLASSIFY BROADBAND AS A TITLE II TELECOMMUNICATIONS SERVICE ..............19

      A.    The Order Is Unlawful Under The Major-Questions Doctrine ..................................................................20

            1.    Reclassifying broadband under Title II is a major question ..........................................................20

2.    The Commission lacks clear congressional authorization ..................................................30

B.    Under The 1996 Act, Broadband Is An Information Service .......................................................32

1.    Under the plain text, broadband is an information service ............................................32

2.    The relevant history confirms that broadband is an information service ...............................39

3.    Statutory structure further confirms that broadband is an information service ..........................42

4.    Principles of constitutional avoidance counsel against the Commission's interpretation...................47

II.   THE COMMISSION LACKS STATUTORY AUTHORITY TO RECLASSIFY MOBILE BROADBAND AS A COMMERCIAL MOBILE SERVICE SUBJECT TO TITLE II ...............................................48

A.    Mobile Broadband Is Not "Interconnected With The Public Switched Network." ......................................49

B.    The Commission's Attempts To Rewrite Section 332 Lack Merit ................................................51

III.  THE ORDER IS ARBITRARY AND CAPRICIOUS................55

A.    The Commission Distorted The Costs And Benefits Of Reclassifying Broadband And Mobile Broadband ........56

B.    At A Minimum, The Commission's General Conduct Standard Inflicts High Costs For No Apparent Benefit ................................................................63

CONCLUSION................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aegerter* v. *City of Delafield,*
    174 F.3d 886 (7th Cir. 1999)............................................................54

*Azar* v. *Allina Health Servs.,*
    587 U.S. 566 (2019).......................................................................44

*Biden* v. *Nebraska,*
    143 S. Ct. 2355 (2023) ...........................................................*passim*

*FCC* v. *Fox Television Stations, Inc.,*
    556 U.S. 502 (2009)........................................................18, 55, 56

*George* v. *McDonough,*
    596 U.S. 740 (2022).......................................................................41

*Gonzales* v. *Oregon,*
    546 U.S. 243 (2006).......................................................................27

*Loper Bright Enterprises* v. *Raimondo,*
    144 S. Ct. 2244 (2024) .........................................................29, 31, 52

*Moody* v. *NetChoice, LLC,*
    144 S. Ct. 2383 (2024) ..................................................................47

*Mozilla Corp.* v. *FCC,*
    940 F.3d 1 (2019) ...............................................................11, 31, 53

*National Ass'n of Home Builders* v. *EPA,*
    682 F.3d 1032 (D.C. Cir. 2012)......................................................55

*National Cable & Telecommunications Ass'n* v. *Brand X
Internet Services,*
    545 U.S. 967 (2005)...............................................................*passim*

*New York Stock Exch. LLC* v. *SEC,*
    962 F.3d 541 (D.C. Cir. 2020)........................................................58

*NFIB* v. *OSHA*,
595 U.S. 109 (2022)................................................................28

*Norwegian Nitrogen Prods. Co.* v. *United States*,
288 U.S. 294 (1933)................................................................42

*Public Util. Comm'n* v. *FCC*,
886 F.2d 1325 (D.C. Cir. 1989)................................................50

*Sorenson Commc'ns Inc.* v. *FCC*,
755 F.3d 702 (D.C. Cir. 2014)..................................................60

*U.S. Telecom Ass'n* v. *FCC*,
825 F.3d 674 (D.C. Cir. 2016)............................................10, 31

*U.S. Telecom Ass'n* v. *FCC*,
855 F.3d 381 (D.C. Cir. 2017)............................................*passim*

*United States* v. *American Tel. & Tel. Co.*,
552 F. Supp. 131 (D.D.C. 1982) .........................................40, 41

*United States* v. *Perry*,
360 F.3d 519 (6th Cir. 2004)...................................................47

*United States* v. *Western Elec. Co.*,
907 F.2d 160 (D.C. Cir. 1990)..................................................40

*Utility Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014)..............................................20, 21, 25, 45

*West Virginia* v. *EPA*,
597 U.S. 697 (2022)...........................................................*passim*

*WorldCom, Inc.* v. *FCC*,
246 F.3d 690 (D.C. Cir. 2001)..................................................50

**Statutes**

5 U.S.C. § 706 ................................................................19, 55

28 U.S.C.
§ 2342 .................................................................................5
§ 2344 .................................................................................5

47 U.S.C.
§ 153 ..........................................................................*passim*
§ 160 ...............................................................................13
§ 201 ......................................................6, 21, 24, 47
§ 202 ..........................................................................*passim*
§ 214 ...........................................................................6, 21
§ 223 ...............................................................................43
§ 227 ........................................................................45, 62
§ 230 ...............................................................43, 44, 45
§ 231 ...............................................................................43
§ 273 ...............................................................................45
§ 332 ..........................................................................*passim*
§ 402 .................................................................................5
§ 405 .................................................................................5
§ 551 ...............................................................................62
§ 617 ...............................................................................62
§ 1422 .............................................................................50

Communications Act of 1934,
   Pub. L. No. 73-416, 48 Stat. 1064 .........................................6

Pub. L. No. 103-66, 107 Stat. 379 (1993)....................................6

Secure and Trusted Communications Networks Act,
   Pub. L. No. 116-124, 133 Stat. 158 (2020).........................62

Secure Equipment Act,
   Pub. L. No. 117-55, 135 Stat. 423 (2021)............................62

Telecommunications Act of 1996,
   Pub. L. No. 104-104, 110 Stat. 56 .......................................7

**Legislative History**

H.R. 2666, 114th Cong. (2016) ...............................................23

H.R. 3458, 111th Cong. (2009) ...............................................23

H.R. 5252, 109th Cong. (2006) ........................................................23

H.R. 5273, 109th Cong. (2006) ........................................................23

H.R. 5353, 110th Cong. (2008) ........................................................23

H.R. 5417, 109th Cong. (2006) ........................................................23

H.R. 5994, 110th Cong. (2008) ........................................................23

H.R. Rep. No. 103-213 (1993) (Conf. Rep.) ................................49

S. 74, 112th Cong. (2011) ..................................................................23

S. 215, 110th Cong. (2007) ................................................................23

S. 2360, 109th Cong. (2006) ..............................................................23

S. 2686, 109th Cong. (2006) ..............................................................23

S. 2917, 109th Cong. (2006) ..............................................................23

S. 3703, 112th Cong. (2012) ..............................................................23

S. 4676, 117th Cong. (2022) ..............................................................23

## Regulatory Materials

47 C.F.R. § 1.4(b)(1) ..............................................................................5

*Appropriate Framework for Broadband Access to the Internet*
*over Wireline Facilities,*
20 FCC Rcd. 14853 (2005) ...............................................................10

*Appropriate Regulatory Treatment for Broadband Access to the*
*Internet over Wireless Networks,*
22 FCC Rcd. 5901 (2007) ...........................................................10, 51

*Bell Atl. Tel. Cos.,*
3 FCC Rcd. 6045 (1988) ....................................................................41

*Bell Operating Companies' Joint Petition for Waiver of*
  Computer II *Rules*,
  10 FCC Rcd. 1724 (1995)..................................................................42

*Classification of Broadband over Power Line Internet Access*
  *Service as an Information Service*,
  21 FCC Rcd. 13281 (2006)..............................................................10

*Deployment of Wireline Services Offering Advanced*
  *Telecommunications Capability*,
  13 FCC Rcd. 24011 (1998)..................................................................9

*Federal-State Joint Board on Universal Service*,
  13 FCC Rcd. 11501 (1998)..................................................................8

*Implementation of Sections 3(n) and 332 of the*
  *Communications Act*,
  9 FCC Rcd. 1411 (1994)..............................................................50, 54

*Inquiry Concerning High-Speed Access to the Internet over*
  *Cable and Other Facilities*,
  17 FCC Rcd. 4798 (2002)....................................................................9

*Protecting and Promoting the Open Internet*,
  30 FCC Rcd. 5601 (2015)............................................................10, 58

*Restoring Internet Freedom*,
  33 FCC Rcd. 311 (2018)............................................................*passim*

*Second Computer Inquiry*,
  77 F.C.C.2d 384 (1980) ..............................................................40, 42

## Other Authorities

Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality"*
  *Broadband Rules Would Breach Major Questions Doctrine*,
  76 Fed. Commc'ns L.J. 321 (2024)....................................19, 22, 45

Fed. R. App. P. 18(a)(1)........................................................................14

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) ..................50, 52, 54

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Sixth Circuit Rule 34(a), petitioners Ohio Telecom Association, USTelecom – The Broadband Association, Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, CTIA – The Wireless Association, WISPA – The Association for Broadband Without Boundaries, ACA Connects – America's Communications Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association (Industry Petitioners) request oral argument. A three-judge panel of this Court has already determined that oral argument is warranted: after granting a stay, *see* Stay Op., App. 544-556, the panel calendared the case for the Court's fall sitting during the week of October 28, 2024.

## INTRODUCTION

In its "Open Internet" Order, the Federal Communications Commission has asserted total authority over how Americans access the internet. That is not hyperbole. The Commission claims the power to regulate providers of high-speed internet-access service (called "broadband") like a public utility, under the 90-year-old regime built for the old Ma Bell telephone monopoly. That regime, called "Title II" as shorthand for Title II of the Communications Act of 1934, includes the power to set prices, dictate terms and conditions, require or prohibit investment or divestment, and more. As the dissenting Commissioners explained, the Order subjects internet service providers (ISPs) to "one of the most comprehensive suites of regulatory authority known to any agency in this country," Simington Dissent, App. 508-509, and covers "virtually every aspect of how an ISP does business," Carr Dissent, App. 484.

The Order is only the latest jolt in a decade of regulatory whiplash for ISPs. After nearly 20 years of applying a light-touch approach to the internet—an approach the Supreme Court blessed in *National Cable & Telecommunications Ass'n* v. *Brand X Internet Services*, 545 U.S. 967 (2005)—the Commission reversed course in 2015. For the first time, it asserted plenary authority under the Telecommunications Act of 1996 to

regulate broadband as a Title II service, and used that authority to impose so-called "net neutrality" rules. Before the Supreme Court could weigh in, in 2018 a new Administration reverted to the traditional light-touch approach. Now, after another change in Administration, the Commission is back to a heavy hand, promising to make even more aggressive use of Title II.

A panel of this Court (Chief Judge Sutton, Judge Clay, and Judge Davis) already unanimously concluded, applying the major-questions doctrine, that the Commission's power grab is likely unlawful. *See* Stay Op., App. 544-552. Rightly so. After decades of reading the 1996 Act to rule out public-utility-style regulation of the internet, the Commission has discovered that it possesses that previously "unheralded power representing a transformative expansion in its regulatory authority." *West Virginia* v. *EPA*, 597 U.S. 697, 724 (2022) (internal quotation marks omitted). The Commission's "sweeping" assertion of Title II authority implicates "a question of vast economic and political significance." Stay Op., App. 549-550 (internal quotation marks omitted). It is thus "indisputable," as then-Judge Kavanaugh put it the last time around, that applying Title II to broadband presents a major question. *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 422 (D.C. Cir. 2017) (Kavanaugh, J.,

dissenting from denial of rehearing en banc). So the Commission must point to clear congressional authorization for that claim of authority. It cannot do so.

Even setting aside the major-questions doctrine, the best reading of the federal communications laws forecloses the Commission's reclassification. *See* Stay Op., App. 553 (Sutton, C.J., concurring). In the 1996 Act, Congress created a dichotomy between two types of services: "telecommunications services" and "information services." For the Commission to have the power to regulate broadband under Title II, broadband must be a "telecommunications service," meaning the "offering" of pure "transmission, between or among points specified by the user." 47 U.S.C. § 153(50), (53). That does not describe broadband. Instead, broadband is an "information service"—"the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information." *Id.* § 153(24). Users subscribe to the service their ISPs offer to acquire the capability to do all of those things.

Other tools of construction support that straightforward interpretation of the statutory text. Congress borrowed the dichotomy between "telecommunications services" and "information services" from earlier Commission regulations, under which broadband's precursors fell outside

Title II.  The Commission's original and longstanding interpretation of the 1996 Act, which is entitled to persuasive weight, was thus that broadband is an information service.  Treating broadband as a common-carrier service would also make a mess of the structure of the Communications Act, and set the stage for serious First Amendment concerns.  All of these indicators confirm what the major-questions doctrine tells us to expect:  Congress did not empower the Commission to regulate ISPs like public utilities.

The Commission's Order is also unlawful in two other ways.  First, to regulate broadband as a common-carrier service, the Commission had to reclassify a particular form of broadband—mobile broadband—as a common-carrier service as well, under a different part of the Communications Act.  But the Act forecloses that separate move.

Second, even if Congress had authorized the Commission to regulate broadband as a public utility, the Order would fail for the independent reason that it is arbitrary and capricious under the Administrative Procedure Act. The Order is the paradigmatic solution in search of a problem.  When the Commission repealed its last attempt at Title II treatment, its current supporters foretold that the sky would fall.  But the opposite happened:  under Title I's light-touch regime, the broadband industry has thrived, reaching

more consumers at faster speeds and lower prices than ever before. Against that backdrop, the Commission has no good explanation for departing from its prior view that the heavy costs of Title II for growth and innovation vastly outweigh any meager benefits of reclassification.

The Commission's Order should be set aside.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over these petitions for review under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The Order was released on May 7, 2024, and published in the Federal Register on May 22. Industry Petitioners timely filed their petitions "within 60 days after its entry," on May 28, 29, and 31. 28 U.S.C. § 2344; *see* 47 U.S.C. § 405(a); 47 C.F.R. § 1.4(b)(1).

## STATEMENT OF THE ISSUES

1.    Whether the Commission lacks statutory authority to reclassify broadband as a "telecommunications service" subject to Title II of the Communications Act.

2.    Whether the Commission lacks statutory authority to reclassify mobile broadband as a "commercial mobile service" subject to Title II of the Communications Act.

3.    Whether the Order is arbitrary and capricious because the Commission misjudged the costs and benefits of reclassifying broadband, and of imposing a vague general conduct standard.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Communications Act of 1934 created a comprehensive federal regulatory scheme for interstate wire and radio communications.  Pub. L. No. 73-416, 48 Stat. 1064.  Title I of the statute established the Commission as the federal regulator of the communications sector.  *Id.* at 1064-1070.  Title II created a common-carriage regime for the primary providers of wire communication at that time: telephone companies.  *Id.* at 1070-1081.  Modeled on a nineteenth-century statute for railroad monopolies, Title II gives the Commission extensive powers.  Among other things, the Commission may require pre-approval for new services, dictate where providers can deploy infrastructure, and even regulate prices based on the Commission's view of what is "just and reasonable."  *See, e.g.*, 47 U.S.C. §§ 201(b), 202, 214.

Over the years, Congress has updated the Communications Act in light of technological developments.  In 1993, Congress created two mutually exclusive categories of mobile services.  *See* Pub. L. No. 103-66, § 60001, 107 Stat. 379.  "Commercial mobile services" are regulated as common

6

carriers under Title II.  47 U.S.C. § 332(c)(1)(A), (d)(1).  By contrast, "private mobile services," which are defined as mobile services that are neither commercial mobile services nor their "functional equivalent," cannot be regulated under Title II.  *Id.* § 332(c)(2), (d)(3).

In 1996, Congress again updated the Communications Act, enacting the Telecommunications Act of 1996 "to promote competition and reduce regulation" in the communications industry and to "encourage the rapid deployment of new telecommunications technologies."  Pub. L. No. 104-104, 110 Stat. 56.  Congress again distinguished between two mutually exclusive categories of interstate communications services:  "telecommunications service[s]," which like "commercial mobile services" are subject to the onerous common-carrier regulations in Title II, and "information service[s]," which like "private mobile services" are subject to limited oversight under Title I.  47 U.S.C. § 153(24), (53).

The 1996 Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public."  47 U.S.C. § 153(53).  "Telecommunications" means "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content."  *Id.* § 153(50).  The quintessential example of a

"telecommunications service" is a telephone call, which carries the caller's voice to the recipient. An "information service," by contrast, is "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(24). In a nutshell, a telecommunications service offers pure transmission, like a dumb pipe; an information service offers the capability to retrieve, store, or utilize information.

## B. Regulatory Background

### 1. Historical classification of internet-access services

For nearly the entire history of the internet, the Commission has recognized that services providing internet access to consumers are "information services" under the 1996 Act. The Commission first considered the question in a report issued shortly after the 1996 Act, known as the Stevens Report. *Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501 (1998). The Stevens Report concluded—with unanimity on this point—that "Internet access services are appropriately classed as information, rather than telecommunications, services." *Id.* at 11536. In language that applies equally today, the Commission explained that users "can retrieve files from the World Wide Web, and browse their contents, because their service provider offers the 'capability for . . . acquiring, . . . retrieving [and] utilizing . . . information.'"

*Id.* at 11538-11540.  The Commission also noted that "classifying Internet access services as telecommunications services could have significant consequences for the global development of the Internet," and would be inconsistent with the 1996 Act's "goals of competition and deregulation."  *Id.* at 11508, 11540.

Later that year, the Commission addressed the first major form of broadband:  internet-access service offered over high-speed Digital Subscriber Line (DSL) telephone wires.  *Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd. 24011 (1998) (DSL Order).  Adhering to the Stevens Report, the Commission concluded that DSL-based "Internet access" is an "information service."  *Id.* at 24030.  A few years later, the Commission concluded that cable broadband—that is, broadband offered over cable television lines—is likewise an information service.  *See Inquiry Concerning High-Speed Access to the Internet over Cable and Other Facilities*, 17 FCC Rcd. 4798, 4802 (2002).  The Supreme Court upheld that classification in *Brand X*, 545 U.S. 967.

In the decade after *Brand X*, the Commission continued to find that other forms of broadband are information services, and to treat them accordingly.  *See Appropriate Framework for Broadband Access to the*

*Internet over Wireline Facilities,* 20 FCC Rcd. 14853, 14856 (2005) (broadband over wireline facilities); *Classification of Broadband over Power Line Internet Access Service as an Information Service,* 21 FCC Rcd. 13281, 13285 (2006) (broadband over power lines); *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks,* 22 FCC Rcd. 5901, 5901 (2007) (broadband over wireless networks). Over and over, the Commission reaffirmed that broadband is a Title I information service.

In 2015, for the first time, the Commission classified broadband as a telecommunications service subject to Title II utility-style regulation. *See Protecting and Promoting the Open Internet,* 30 FCC Rcd. 5601, 5647-5658 (2015). Using that authority, it promulgated "net neutrality" rules forbidding ISPs from blocking online content, slowing access to content, or charging content providers for preferential treatment. *Id.* at 5626-5645. Also for the first time, the Commission classified mobile broadband as a "commercial mobile service" subject to Title II. *Id.* at 5778. A divided panel of the D.C. Circuit upheld the order, "apply[ing] *Chevron*'s two-step analysis" and deferring to what it found were reasonable constructions of an ambiguous statute. *See U.S. Telecom Ass'n* v. *FCC,* 825 F.3d 674, 701, 704-706 (2016).

Then-Judge Kavanaugh dissented from the denial of rehearing en banc, explaining that in his view the 2015 order triggered—and flunked—the major-questions doctrine.  855 F.3d 381, 417-418 (2017).

While petitions for Supreme Court review were pending, the Commission restored broadband's original Title I classification (and mobile broadband's corresponding classification).  *See Restoring Internet Freedom*, 33 FCC Rcd. 311, 312 (2018) (RIF Order).  The D.C. Circuit, again applying *Chevron*, determined once more that the Commission had advanced "reasonable" interpretations.  *Mozilla Corp.* v. *FCC*, 940 F.3d 1, 19-20, 35 (2019).  As a result, since 1996 the Commission has treated broadband as an information service under Title I for all but the three-year period from 2015 to 2018.  *See* Stay Op., App. 553 (Sutton, C.J., concurring).

After the RIF Order, some Title II proponents predicted "the end of the Internet as we know it," and speculated that without "net neutrality" rules, ISPs would interfere with online content in harmful ways.  *See* Carr Dissent, App. 452.  The past six years disproved those claims.  Although Title II proponents have attempted to gin up examples of harmful behavior by ISPs, they have not identified any evidence of actual misconduct.  *See id.* at 478; NCTA et al. Letter, App. 1608-1610.

11

Meanwhile, investment in broadband has flourished.  Between 1996 and 2022, ISPs spent more than $2 trillion to build and enhance broadband networks.  *See* NCTA Comments, App. 912-917; Israel Decl., ¶¶ 27-28, 31-35, 61-62, App. 943-944, 947-951, 962-963.  Coverage, speed, competition, innovation, investment, and affordability have all improved dramatically under the Commission's light-touch approach.  USTelecom Comments, App. 1141-1150.

### 2.     The challenged Order

Now, after another change in Administration, the Commission has reversed itself yet again, voting 3-2 to classify broadband as a Title II telecommunications service.  *Safeguarding and Securing the Open Internet*, Docket Nos. 23-320 & 17-108, FCC 24-52 (released May 7, 2024) (App. 1-512).  The Commission also classified mobile broadband as a "commercial mobile service," so that it may regulate mobile broadband under Title II as well.  Order ¶ 214.

The Order is a blend of old and new.  Invoking the same debunked rationales, the Commission revived its 2015 "net neutrality" rules, which ban ISPs from blocking, throttling, or paid prioritization.  Order ¶ 492.  The Commission also readopted a general conduct standard prohibiting practices

"that unreasonably interfere with the ability of consumers or [content providers] to select, access, and use" broadband. *Id.* ¶ 513. But in contrast to 2015, the Order claims—for the first time—that Title II classification is necessary for other reasons as well, such as defending national security and combatting cybersecurity threats. *Id.* ¶¶ 30, 42. The Order thus lists several new areas in which the Commission intends to regulate using its claimed Title II powers. *Id.* ¶¶ 26-105.

For now, the Commission has forborne from many Title II powers—that is, declared they do not apply to broadband. Order ¶ 383. Under 47 U.S.C. § 160, the Commission must forbear from applying Title II provisions if it determines that enforcement is unnecessary and that forbearance is in the public interest. The Commission has exercised that authority for around a quarter of Title II's statutory provisions and hundreds of regulations. Of particular note, the Commission will, for now, forbear from directly setting ISPs' rates. But the Order recognizes that the Commission can still indirectly regulate prices under the general conduct standard. *See* Order ¶ 386. And this Commission or a future one may attempt to reactivate its direct ratemaking authority, or any other forborne Title II powers, at any time.

### C.     Procedural Background

Industry Petitioners filed petitions for review of the Commission's Order, *see* App. 513-539, and promptly sought a stay from the Commission pending judicial review. *See* Fed. R. App. P. 18(a)(1). After the Commission denied relief, Industry Petitioners sought a stay from this Court. ECF No. 5.[1]

On August 1, the Court granted Industry Petitioners' stay motion in a per curiam opinion. Stay Op., App. 544. The Court concluded that Industry Petitioners "are likely to succeed on the merits because the final rule implicates a major question, and the Commission has failed to satisfy the high bar for imposing such regulations." *Id.* at 548. The Court identified a major question in light of "broadband's importance" to many aspects of "modern day life" and the "decades of debate" in Congress over the regulation of broadband. *Id.* at 549 (citation omitted). And the Court concluded that Congress did not "clearly grant the Commission the discretion to classify broadband providers as common carriers," *id*. at 549-550, rejecting the Commission's contrary arguments, *id.* at 550-552.

Chief Judge Sutton concurred in full and wrote separately to add that the "best reading of the statute, and the one in place for all but three of the

---

[1]  ECF citations are to the docket in Case No. 24-7000.

last twenty-eight years, shows that Congress likely did not view broadband providers as common carriers under Title II of the Telecommunications Act." Stay Op., App. 553. He noted that this was the "accepted premise of *Brand X*," with which "[a]ll nine [J]ustices . . . agreed." *Id.* And he explained that the "history of the relevant statutory terms," as well as "[o]ther sections of the Telecommunications Act[,] confirm that Congress meant to exclude broadband from Title II." *Id.* at 554.

## SUMMARY OF ARGUMENT

I.      The Commission lacks statutory authority to classify broadband as a Title II service. A unanimous panel of this Court correctly found Industry Petitioners likely to succeed on that question.

A.      The Order triggers and fails the major-questions doctrine. Subjecting broadband to public-utility-style regulation under Title II is a quintessential major question. The Commission claims authority of "vast economic and political significance," Stay Op., App. 549 (internal quotation marks omitted)—the power to regulate "virtually every aspect" of one of the Nation's largest and most essential industries. Carr Dissent, App. 484. It locates that authority in a definitional provision of the 1996 Act that for decades the Commission interpreted to exclude broadband, and that for

15

decades Congress has debated changing. *See* Order ¶ 10. And the Commission justifies its recent reversal in part by claiming a need to regulate on subjects, like geopolitical risk, outside its typical orbit. *See id.* ¶ 4.

The Commission cannot point to a "clear mandate to treat broadband as a common carrier." Stay Op., App. 550. As Chief Judge Sutton explained in his stay concurrence, "the accepted premise" of all nine Supreme Court Justices in *Brand X* was that broadband is an information service rather than a telecommunications service. *Id.* at 553. Courts since *Brand X* have found the statute ambiguous on that question. Given these precedents, it is indisputable that the statute does not *clearly* authorize application of Title II.

B.    Indeed, major-questions doctrine aside, the best reading of the 1996 Act is that broadband is an information service. Broadband satisfies the statutory definition of information service in two independent ways. First, broadband "offer[s] . . . a capability" for users to acquire, store, and interact with information online, in conjunction with websites, apps, and the like. 47 U.S.C. § 153(24). Second, even in isolation, broadband includes necessary components that process and manipulate information.

Many other interpretive tools support the conclusion that broadband is an information service. First, the regulatory history makes clear that

Congress "enshrined" the Commission's pre-1996 classifications, under which broadband precursors were not common carriers. Stay Op., App. 554 (Sutton, C.J., concurring). Second, whereas treating broadband as a Title I information service coheres with the rest of the 1996 Act and the broader Communications Act, jamming it into Title II causes a host of textual and structural problems. Third, Title II classification raises serious First Amendment concerns. *See U.S. Telecom*, 855 F.3d at 435 (Kavanaugh, J., dissenting).

II.    The Commission lacks authority to regulate *mobile* broadband providers under Title II for an additional reason. The statute separately immunizes mobile services from Title II regulation unless they are "commercial mobile service[s]." 47 U.S.C. § 332(c)(1)-(2), (d). A "commercial mobile service" is a mobile service "that is interconnected with the public switched network," *id.* §§ 332(d)(1), (2)—a term of art that refers to the 10-digit telephone network. Mobile broadband is not "interconnected with" the 10-digit telephone network; devices that use it are interconnected with the internet. That inescapable conclusion not only dooms the Commission's reclassification of mobile broadband, but also underscores that the broader Title II reclassification of broadband does violence to the statutory scheme.

After all, mobile broadband cannot be both subject to and immune from Title II at the same time.

III.    Even if the Order were authorized by statute, the Commission's decision to reclassify broadband is arbitrary and capricious.

A.    First, the Commission fails to "show that there are good reasons" for reversing its longstanding policy view, most recently articulated in 2018, that Title II treatment of broadband would threaten innovation and investment in exchange for no real upside. *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Commission praises "net neutrality" rules, but ISPs have operated without those rules for the last six years—without a single real-world example of any problem the Commission seeks to solve. And while the Commission now invokes other policy goals like national security and cybersecurity, the new rules it contemplates provide no demonstrable value compared to the status quo. Given the past three decades of experience, it is irrational to jettison the light-touch regulatory regime that has made the modern internet possible in exchange for purely speculative benefits.

B.    At a minimum, the costs of the Commission's vague general conduct standard—which outlaws ISP practices that "unreasonably interfere" with the open internet—vastly outweigh any asserted upside. Order ¶ 513.

Because the standard is so vague, it will inflict high compliance costs, undermine investment incentives, and deter innovation. Yet the Commission never explains why those costs are warranted in light of the bright-line rules that the Order already imposes.

## STANDARD OF REVIEW

Under the APA, this Court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

## ARGUMENT

### I. THE COMMISSION LACKS STATUTORY AUTHORITY TO RECLASSIFY BROADBAND AS A TITLE II TELECOMMUNICATIONS SERVICE.

As a panel of this Court unanimously recognized, reclassifying broadband as a Title II service "implicates a major question." Stay Op., App. 548. The panel has good company. Last time the Commission attempted to treat internet access like a public utility, then-Judge Kavanaugh explained that under "any conceivable test for what makes a rule major," this one qualifies. *U.S. Telecom*, 855 F.3d at 423 (Kavanaugh, J., dissenting). Two former heads of the Office of the Solicitor General recently reached the same conclusion. Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net*

19

*Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, 76 Fed. Comm'ns L.J. 321, 330 (2024) (expressing "no doubt" that the Commission's Order triggers the major-questions doctrine).

When an agency asserts such a significant power, it must identify "clear congressional authorization." *West Virginia*, 597 U.S. at 723 (quoting *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)). As the stay panel noted, the Commission does not have it: "[n]owhere does Congress clearly grant the Commission the discretion to classify broadband providers as common carriers." Stay Op., App. 549-550.

Indeed, as Chief Judge Sutton explained in his stay concurrence, even setting aside the major-questions doctrine, "[t]he best reading of the statute" is that Congress did not "view broadband providers as common carriers under Title II of the Telecommunications Act." Stay Op., App. 553. No matter which approach this Court takes, the Order exceeds the Commission's statutory authority and must be set aside.

**A.    The Order Is Unlawful Under The Major-Questions Doctrine.**

    **1.    Reclassifying broadband under Title II is a major question.**

The Commission's Order is "major" across several dimensions. It "decides a question of vast economic and political significance" by claiming the

20

"sweeping power" to "treat broadband as a common carrier."  Stay Op., App. 549-550 (internal quotation marks omitted).  It reverses the position "the Commission for many years took" "[a]fter passage of the 1996 Act."  *Id.* at 546. And it invokes policy concerns far beyond the Commission's expertise.

a.    Subjecting broadband to Title II "would bring about an enormous and transformative expansion" in the Commission's "regulatory authority." *Utility Air*, 573 U.S. at 324.  Under the longstanding light-touch regime, ISPs made business decisions in response to market forces.  Under Title II, by contrast, the Commission has sweeping authority over nearly every aspect of internet access—including the power to dictate "just and reasonable" prices, 47 U.S.C. § 201; to forbid any "practice" that it finds "unjust or unreasonable," *id.* § 201(b), or "unreasonabl[y] discriminat[ory]," *id.* § 202(a); to order ISPs to deploy new infrastructure, *id.* § 214; and to require agency preclearance to start or stop services, *id.* §§ 201, 214.

The "economic and political significance" of that claimed authority "is staggering by any measure."  *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2373 (2023) (citation omitted).  The broadband industry generates about $150 billion in annual revenue.  *See* U.S. Chamber Comments, App. 1084.  One recent study found that even the "prospect of Title II policy reduced investment" in that

industry by $8 billion annually from 2011 to 2020, with a $145 billion annual impact on GDP. Ford Paper, App. 800-801; *see* Israel Decl. ¶¶ 20-22, App. 939-940.[2] And the significance of internet access to American consumers and businesses far exceeds any price tag. Broadband is "absolutely essential to modern day life, facilitating employment, education, healthcare, commerce, community-building, communication, and free expression." Stay Op., App. 549 (citing Order ¶ 26). There can thus be no "serious dispute that [the Commission] claims the authority to exercise control over a significant portion"—indeed, one of *the most* significant portions—"of the American economy." *Biden*, 143 S. Ct. at 2373 (internal quotation marks omitted); *see* Verrilli & Gershengorn, *supra*, at 330-331.

Politically, the Commission's authority over broadband has "been the subject of an earnest and profound debate across the country." *West Virginia*, 597 U.S. at 732 (citation omitted). The Commission's position now flips—each time to great fanfare and copious public comments—whenever a new

---

[2] The Commission has criticized that finding. *See* ECF No. 38 at 20. But the study's author refuted the Commission's methodological criticisms, and explained that when he re-ran his study with revised data in response, he still found "large and negative investment effects" of the same magnitude. Ford Response, App. 1590. Nor does the precise figure matter; the point holds no matter how many billions are lost each year. *See* Israel Decl. ¶¶ 87-99, App. 978-986.

Administration takes control.  Meanwhile, "Congress has been studying and debating net neutrality regulation for years," and has "considered (but never passed) a variety of bills relating to net neutrality and the imposition of common-carrier regulations on Internet service providers."  *U.S. Telecom*, 855 F.3d at 423 (Kavanaugh, J., dissenting); *see* Stay Op., App. 549 (emphasizing "decades of debates" on the subject).[3]  With its most recent Order, the Commission once again asserts authority that "'conveniently enable[s it] to enact a program' that Congress has chosen not to enact itself." *Biden*, 143 S. Ct. at 2373 (citation omitted).

The Commission denies that its rule has "extraordinary economic and political effect," because it has forborne from imposing some of the most "onerous requirements under Title II."  Order ¶ 257.  That argument is both wrong and irrelevant.  It is wrong because the Commission has *not* forborne from all of its most significant Title II powers.  For example, the Commission generally refused to forbear from Sections 201 and 202, *id.* ¶¶ 323-329, which

---

[3]  *See, e.g.*, S. 4676, 117th Cong. § 2 (2022); H.R. 2666, 114th Cong. (2016); S. 3703, 112th Cong. (2012); S. 74, 112th Cong. (2011); H.R. 3458, 111th Cong. (2009); H.R. 5994, 110th Cong. (2008); H.R. 5353, 110th Cong. (2008); S. 215, 110th Cong. (2007); H.R. 5417, 109th Cong. (2006); H.R. 5273, 109th Cong. (2006); H.R. 5252, 109th Cong. (2006); S. 2917, 109th Cong. (2006); S. 2686, 109th Cong. (2006); S. 2360, 109th Cong. (2006).

enable it to micromanage practices it finds unjust or unreasonable, *see* 47 U.S.C. §§ 201, 202. And it relied on that authority to impose a vague general conduct standard under which it can police behavior and even indirectly set prices. Order ¶ 386.

In any event, the major-questions doctrine asks about the full implications of "the Government's claimed authority," not how the agency has used that authority to date. *West Virginia*, 597 U.S. at 728-729. Here, the Commission claims the "sweeping power" "to treat broadband as a common carrier" under Title II, Stay Op., App. 550, which is "one of the most comprehensive suites of regulatory authority known to any agency in this country," Simington Dissent, App. 508. The Commission cannot forbear its way out of the reality that public-utility regulation of broadband is a paradigmatic "question of vast economic and political significance." Stay Op., App. 549 (internal quotation marks omitted).

b.    Other "telltale sign[s]" confirm that the decision to regulate broadband providers as common carriers implicates a major question. *Biden*, 143 S. Ct. at 2382 (Barrett, J., concurring). In particular, the Commission's own "post-enactment conduct" is "particularly probative," *id.* at 2383, since it

24

"claims to discover in a long-extant statute an unheralded" and significant power, *Utility Air*, 573 U.S. at 324.

As this Court already observed, "[a]fter passage of the 1996 Act, the Commission for many years took the view that broadband internet access services were information services, not telecommunication services." Stay Op., App. 546. In the 1998 Stevens Report, the Commission explained that the key statutory question was "whether Internet access providers merely offer transmission," like a telephone service, "or whether they go beyond the provision of a transparent transmission path to offer end users the 'capabilit[ies]'" set out in the statutory definition of "information service." 13 FCC Rcd. at 11536. The Commission easily concluded the latter: the "service that Internet access providers offer to members of the public is Internet access," and the "very core of the Internet and its associated services is the ability to 'retrieve' and 'utilize' information." *Id.* at 11539-11540, n.165 (citation omitted). As explained above (at 8-10), the Commission retained, and repeatedly applied, that interpretation through 2015.

Trying to muddy the waters, the Commission claims that the very same year it released the Stevens Report, it also "classified early forms of DSL" internet-access service, the earliest form of broadband, as a Title II

25

telecommunications service.  ECF No. 38 at 4; Order ¶ 259.  That is highly misleading.  In fact, the Commission did *not* regulate the DSL internet-access service offered to retail consumers as a telecommunications service, as the Order attempts to do now for all broadband internet-access services.  Instead, the Commission regulated DSL internet-access service as an information service, and separately regulated a competitor-facing component of DSL as a telecommunications service.

To add a little more detail:  at the time, DSL internet-access service— which is offered to consumers over telephone wires—was sold by both the telephone-company ISPs that owned those wires and other ISPs that did not.  The non-owning ISPs wanted to lease access to telephone wires from the telephone companies, in order to sell competing services.  To facilitate that competition, the Commission required the telephone companies to sell separately the "last mile" connection (the line connecting a user's house to a company's office) on a common-carrier basis.  *See Brand X*, 545 U.S. at 1000.  The Commission thus regulated that "last-mile" DSL transmission as a distinct telecommunications service, subject to Title II regulation.  *See* DSL Order, 13 FCC Rcd. at 24029-24030.  But as the Commission explained, the "Internet access" service that ISPs *offered to subscribers* remained "an

information service," even if the last-mile transmission path *offered to competing ISPs* was not. *Id.* at 24030. That is consistent with the Stevens Report and flatly inconsistent with the Commission's current view that broadband subscribers are buying a telecommunications service from ISPs. *See* Order ¶¶ 109-127.

c. The Order also strays into areas outside the Commission's "comparative expertise." *West Virginia*, 597 U.S. 729-730 (citation omitted). For example, the Commission now contends that it needs Title II to address "national security risks" from the Chinese government. Order ¶¶ 4, 33. But "[t]here is little reason to think Congress assigned such decisions" to the Commission, without specifically saying so. *West Virginia*, 597 U.S. at 729. The Commission, after all, has no "historical familiarity [or] policymaking expertise" in addressing security threats from geopolitical rivals. *Gonzales* v. *Oregon*, 546 U.S. 243, 266 (2006) (citation omitted); *see* CTIA Comments, App. 674-679. Indeed, bipartisan experts have confirmed that the Commission's concerns are better left to federal agencies with national-security expertise. Grotto Paper, App. 1544-1547, 1551-1553; Scott Comments, App. 1423-1424.

27

d.    The Commission has repeatedly argued that the major-questions doctrine does not apply, but it misunderstands the doctrine.  For starters, the Commission insists that doctrine "does not come into play" if the Commission has "the best reading of the statute."  ECF No. 38 at 19.  But the Supreme Court has described the doctrine more forcefully, as requiring a clear statement, *West Virginia*, 597 U.S. at 723-724; *NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022), or at a minimum as informing the best reading of the text, *Biden*, 143 S. Ct. at 2376-2377 (Barrett, J., concurring).  It is not a mere tiebreaker for lingering ambiguity.

The Commission also has argued that *Brand X* forecloses application of the major-questions doctrine for two different reasons.  First, it argues, the Supreme Court "squarely held that the [1996] Act empowers the FCC to determine the proper classification of broadband."  ECF No. 38 at 19; Order ¶ 254.  *Brand X* held no such thing.  The only dispute there was whether the 1996 Act required the Commission to treat cable broadband the same way it had treated DSL—that is, to order cable ISPs to sell the last-mile transmission over their cable lines to competing ISPs on a common-carrier basis.  No Justice argued that the actual internet-access service offered over the cable lines, like the internet-access service offered over the DSL telephone lines,

was a telecommunications service.  On the contrary, *every* Justice agreed that the "Internet access service" sold to consumers was an "information service." *Brand X*, 545 U.S. at 987; *see id.* at 1010 (Scalia, J., dissenting).  And no Justice embraced the Commission's current view that providers of internet-access service exclusively offer a telecommunications service.  *See* Stay Op., App. 553 (Sutton, C.J., concurring).

Moreover, *Brand X*'s discussion of the Commission's authority relied on the now-defunct *Chevron* framework, which transformed statutory ambiguities into implicit delegations of interpretive authority to federal agencies.  *See* 545 U.S. at 980.  In *Loper Bright Enterprises* v. *Raimondo*, 144 S. Ct. 2244 (2024), the Supreme Court eliminated the discretion the Commission claims; indeed, that discretion was part of the reason for the Court's decision to overrule *Chevron*.  *See id.* at 2267-2268.  The Commission can no longer credibly assert that *Brand X* gives it the power to flip-flop in its treatment of broadband, each time "claim[ing] its new rule [is] just as 'reasonable' as the last."  *Id.* at 2288 (Gorsuch, J., concurring).

Second, the Commission contends, "[i]f the major-questions doctrine were an obstacle to reclassification [of broadband] here, then it also should have applied to the earlier reclassification . . . from Title II to Title I" at issue

29

in *Brand X*.  Order ¶ 254.  That is wrong for at least three reasons.  For starters, as just discussed, the rule at issue in *Brand X* did not reclassify broadband from Title II to Title I; internet-access services had *never* been classified under Title II.  Moreover, whatever its doctrinal roots in earlier cases, at the time of *Brand X*, the major-questions doctrine had not emerged as the "identifiable body of law" that it is today.  *West Virginia*, 597 U.S. at 723-724.  And finally, even if it had, there is a fundamental difference between *disclaiming* sweeping regulatory authority under Title II and *claiming* that power.  The former does not implicate the major-questions doctrine.  The latter does.  *See* Stay Op., App. 549; *U.S. Telecom*, 855 F.3d at 426 n.5 (Kavanaugh, J., dissenting).

### 2. The Commission lacks clear congressional authorization.

The 1996 Act does not provide the requisite clear congressional authorization for the Order, as the stay panel correctly concluded.  *See* Stay Op., App. 548-550.  In particular, the Supreme Court in *Brand X* upheld as reasonable the Commission's classification of internet access as a single, integrated "information service."  545 U.S. at 1000.  Again, as Chief Judge Sutton noted in his concurrence, "the accepted premise" of that decision was "that broadband providers are not common carriers" under Title II.  Stay Op.,

30

App. 553. Given that unanimous understanding, it "would be odd for [this] lower court to look the other way," let alone conclude that the 1996 Act *clearly* requires it to reach the opposite conclusion. *Id.*[4]

Judicial decisions since *Brand X* likewise preclude the conclusion that the 1996 Act *clearly* authorizes treatment of broadband as a telecommunications service. The D.C. Circuit upheld both the 2015 Order and 2018 Order, which took diametrically opposed positions on that question, as reasonable interpretations of an ambiguous statute under *Chevron*. *See U.S. Telecom*, 825 F.3d at 704-706; *Mozilla*, 940 F.3d at 19, 35. Those "finding[s] of ambiguity by definition mean[] that Congress has not clearly authorized the FCC" to treat broadband providers as common carriers. *U.S. Telecom*, 855 F.3d at 426 (Kavanaugh, J., dissenting). Under the major-questions doctrine, that is fatal to the Order.

And even if it were not, the traditional tools of statutory interpretation lead to the same conclusion. As shown below, applying those tools, the "best

---

[4] As petitioners explained in supplemental briefing before the stay panel, *see* ECF No. 70 at 7-14, the Supreme Court's decision in *Loper Bright* gives the bottom-line holding of *Brand X*—that it was a "lawful construction of the Communications Act" for the Commission to conclude that the whole broadband offering is an integrated information service, 545 U.S. at 974—the force of "statutory *stare decisis*." *Loper Bright*, 144 S. Ct. at 2273.

reading of the statute" is that broadband is an "information service," not a "telecommunications service." Stay Op., App. 553 (Sutton, C.J., concurring).

### B.     Under The 1996 Act, Broadband Is An Information Service.

Even setting aside the major-questions doctrine, the plain text of the 1996 Act, its relevant history, the larger statutory structure, and principles of constitutional avoidance all lead to the same conclusion: broadband is an information service.

### 1.     Under the plain text, broadband is an information service.

The statutory "definition of 'information service' fits broadband Internet access like a glove." *U.S. Telecom*, 855 F.3d at 395 (Brown, J., dissenting from denial of rehearing en banc). That is true for two independent reasons. First, broadband service itself is "the offering of a capability" for users to acquire, store, and utilize information online. Second, broadband also includes necessary components that process and manipulate information, which are part and parcel of the "offering" ISPs make to consumers.

a.     Broadband provides users with the capability to engage with information on websites and applications. For that simple reason, broadband is an "offering of a capability" to do each of the actions set forth in the statutory definition: "generating" and "making available information" by posting on

social media; "acquiring" or "retrieving" information from websites; "storing" information in the cloud; and "transforming," "processing," and "utilizing" information in limitless ways, from editing photos to playing video games. 47 U.S.C. § 153(24).

*Brand X* confirms that conclusion. Echoing the Commission's original and "long-standing view," RIF Order, 33 FCC Rcd. at 324-325, the Supreme Court explained that "Internet service" "is an information service . . . because it provides consumers with a comprehensive capability for manipulating information," "enab[ling] users, for example, to browse the World Wide Web, to transfer files from file archives," "and to access e-mail." 545 U.S. at 987. The majority then reasoned that the Commission had permissibly concluded that cable broadband providers offered just one, all-encompassing service facilitating internet access, and thus offered a single "information service." *Id.* at 990. The dissent disagreed, analogizing cable broadband to a pizza shop that both offers pizza (an information service—internet access) and separately offers to deliver it (a telecommunications service—last-mile transmission). *Id.* at 1007 (Scalia, J., dissenting). Critically, no Justice suggested that providers of internet access offer *only* pure transmission, without any information

service involved.  Or, to use the dissent's analogy, nobody thought that ISPs offer *only* delivery, and no pizza.

Yet that is what the Commission now implausibly argues.  It contends that broadband is nothing more than a "telecommunications service"—that is, "the offering of" pure transmission.  47 U.S.C. §§ 153(50), (53).  To be sure, broadband *includes* the transmission of data between computers.  But all "information service[s]," by the statutory definition, are offered "via telecommunications."  *Id.* § 153(24).  What matters is that ISPs do not "offer" pure transmission; they offer consumers the ability to interact with information online.  In "common usage," "what a company 'offers' to a consumer" turns on "what the consumer perceives" she is buying.  *Brand X*, 545 U.S. at 990.  And consumers who buy broadband purchase the capability to access websites, post on social media, or store photos in the cloud, not to send IP data packets to and from servers.  If that were not common sense, surveys confirm that the vast majority of consumers (80-90%) perceive broadband as providing such information-service capabilities, USTelecom Letter, App. 1611.  The Commission has never offered competing evidence of consumer perception.

The Commission also asserts that broadband is not an "information service" because a "consumer with a [broadband] connection could not generate, acquire, store, transform, process, retrieve, utilize, or make available information using that connection if" other applications on the internet, "such as websites" and "streaming services," "did not exist." Order ¶¶ 129-130. Thus, the Commission contends, it is the third-party services that physically do the information storage (think a cloud-storage site) or utilization (think an online video game) that are the information services, whereas broadband itself is not. But as a matter of ordinary language, it is natural to describe *both* as information services, even if broadband offers the statutory capabilities in conjunction with other entities. A library, for example, offers the capability to learn a new subject, even though members must check out books written by others. A travel agency offers the capability to see the world, even if a third-party airline transports the passenger. And so on.

The Commission responds that if broadband is an information service because it can be used to access information, then so is a traditional telephone service. It points to the possibility of "interacting with a call menu," such as Amtrak's train-reservation menu. Order ¶ 131. But that is too clever by half. Broadband is not an information service because it can incidentally be used to

access information on remote computers; it is an information service because it *always* entails doing that—that capability is the core of what ISPs "offer." The fact that a telephone service can, in unusual circumstances, be used to access stored information does not mean that consumers likewise perceive telephone service as "offering" that capability. Instead, consumers perceive it as offering the transmission of unaltered conversations to an endpoint of the user's choosing—the definition of a "telecommunications service." *See* 47 U.S.C. §§ 153(50), (53).

b.    Even under the Commission's cramped reading of the text, broadband is still an "information service" because broadband itself includes integrated information-service components. Two key examples are Domain Name System (DNS) and caching. *See* Stay Op., App. 545. DNS uses computer processing to translate the name of a website into the relevant IP address for each user, sparing users from inputting a long series of digits for each website they visit. *Brand X* recognized that DNS involves information processing that fits the definition of "information service," and that "part of the information service cable companies provide[d] [was] access to DNS service." 545 U.S. at 999. That remains true today: 92% of broadband subscribers use the pre-configured DNS service that comes with their

provider's broadband service. *See* Recon Analytics Paper, App. 1561. The typical user thus perceives the broadband "offering" to include the information-processing capabilities of DNS, which is "essential to providing Internet access" that is recognizable to users. *Brand X*, 545 U.S. at 990; *see* Carr Dissent, App. 465-466.

Caching, meanwhile, "work[s] hand-in-hand with the ISP's DNS servers." Rysavy Decl. ¶ 18, App. 773. Caching uses complex algorithms to store popular content on servers geographically close to consumers, so that it will load more quickly. *See* CTIA Comments, App. 700-703. *Brand X* recognized that caching, like DNS, is part of "the Internet service provided by cable companies." 545 U.S. at 999. That also remains true of broadband today. *See* Rysavy Decl. ¶¶ 17-21, App. 773-775.

The Order offers two responses, neither of which works. First, the Commission contends that even though DNS and caching are information services when offered by non-ISP entities, both are "separable information services not inextricably intertwined with" the internet-access service ISPs offer. Order ¶ 128. On DNS, the Commission argues that because tech-savvy consumers can replace their ISPs' pre-configured DNS service, ISPs offer DNS as a separate service that happens to come bundled with internet-access

service. *Id.* ¶¶ 146-147. But what matters is consumer perception. A sophisticated buyer can replace his car's engine, but it would be "odd to describe a car dealership as 'offering'" engines bundled with a car. *Brand X*, 545 U.S. at 990. So too with DNS and broadband. Meanwhile, the Commission attempts to portray caching as "vestigial," ECF No. 38 at 15 (citing Order ¶ 151), but changes in the caching mechanism do not make caching any less integral to broadband. Rysavy Decl. ¶¶ 17-25, App. 773-776; USTelecom & CTIA Letter, App. 1575-1576.

Second, the Commission argues that even if DNS and caching are integrated with broadband, they fall under the so-called "telecommunications systems management exception." Order ¶ 133. The statutory definition of "information service" excludes the "use of any [information generating, retrieving, etc.] capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24). That exception focuses on *inward-facing* controls. But ISPs do not use DNS or caching to "manage[], control, or operat[e]" their own purported "telecommunications system" or "telecommunications service." *Id.* Both DNS and caching provide a *user-facing* functionality. DNS translates "www.ca6.uscourts.gov" into the right IP

address so that the page will load on the user's computer; caching improves the user's experience by making large files download more quickly.  *See* USTelecom Comments, App. 1125-1127.

The Commission's argument that DNS and caching fall within the telecommunications-management exception is also at odds with its insistence that entities other than ISPs provide those services.  The Commission argues that subscribers can replace their ISP-provided DNS with a third-party service, and that "third-party caching," offered by companies that partner with ISPs, "is now dominant."  Order ¶ 151.  But if that is right, then it makes little sense to say that either service is "use[d]" *by ISPs* "for the management, control, or operation" of their supposed telecommunications systems. 47 U.S.C. § 153(24).  No ISP would allow unsupervised third parties to "manage[], control, or operat[e]" its system.  *See* RIF Order, 33 FCC Rcd. at 328-330.

> **2.    The relevant history confirms that broadband is an information service.**

a.    The 1996 Act is best understood as codifying a pre-existing regulatory dichotomy between two types of services.  Offerings like internet-access services fell on the information-services side of that line.

The Commission first created the dichotomy in 1980, in its *Computer II* regulation. *Second Computer Inquiry*, 77 F.C.C.2d 384 (1980). As this Court explained in granting a stay, the Commission was concerned that the "[c]ommon carrier rules designed for telephone-wire monopolies" "could inhibit the development" of promising new data services. Stay Op., App. 545-546. So *Computer II* differentiated between "basic services," which would remain heavily regulated, and "enhanced services," which would be largely unregulated. An offering was an "enhanced service" if it "involve[d] subscriber interaction with stored information," including information stored by a third party. 77 F.C.C.2d at 387 (1980). Internet-access services obviously meet that definition.

Two years later, an order resolving the antitrust case against AT&T adopted essentially the same dichotomy, this time between regulated "telecommunications services" and unregulated "information services." *United States* v. *American Tel. & Tel. Co.*, 552 F. Supp. 131, 228-229 (D.D.C. 1982), *aff'd sub nom. Maryland* v. *United States*, 460 U.S. 1001 (1983). Services that provided a gateway to access third-party databases were "information services" under the antitrust order, *United States* v. *Western Elec. Co.*, 907 F.2d 160, 163 (D.C. Cir. 1990), just as they were "enhanced

services" under the *Computer II* regime. *See Bell Atl. Tel. Cos.*, 3 FCC Rcd. 6045 ¶¶ 3, 7 & n.8 (1988) (discussing services that "facilitate[d] access to databases providing business, financial, medical, investment, educational, and entertainment information"). Again, internet-access services provide essentially the same functionality, offering access both to third-party databases and the websites and applications that make up the internet today.

The 1996 Act "brings th[is] old soil with it." *George* v. *McDonough*, 596 U.S. 740, 746 (2022) (citation omitted). As the Stevens Report recognized, "Congress intended the categories of 'telecommunications service' and 'information service'" in the 1996 Act "to parallel the definitions" developed in *Computer II* and the AT&T antitrust order. 13 FCC Rcd. at 11511. The 1996 Act takes the two terms directly from the antitrust order and defines them using nearly identical language. *Compare* 47 U.S.C. § 153(50), *with* 552 F. Supp. at 229. Since "Congress passed the definitions in the [1996 Act] against the background of this regulatory history," "we may assume that" it "substantially incorporated" the predecessor categories. *Brand X*, 545 U.S. at 992; *see* Stay Op., App. 554 (Sutton, C.J., concurring). By doing so, Congress codified the Commission's longstanding approach of light-touch regulation for services—like internet-access services—that enable "subscriber interaction

41

with stored information," 77 F.C.C.2d at 387, and act as "gateways to online databases" provided by other entities, *Bell Operating Companies' Joint Petition for Waiver of* Computer II *Rules*, 10 FCC Rcd. 1724, ¶ 1 n.3 (1995).

b.    Reflecting that backdrop, the Commission's "contemporaneous interpretation of the Act, the one in place for nearly two decades, refused to treat broadband internet access services as the offering of telecommunication services."  Stay Op., App. 555 (Sutton, C.J., concurring); *see* pp. 8-10, *supra*. An agency determination of that kind is entitled to "peculiar weight," as "it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion."  *Norwegian Nitrogen Prods. Co.* v. *United States*, 288 U.S. 294, 315 (1933).  Put another way, as Chief Judge Sutton concluded, it is the "Commission's first interpretation, not its recent one," that has the "power to persuade" here.  Stay Op., App. 555-556 (citing *Skidmore* v. *Swift & Co.*, 323 U.S. 134 (1944)).

### 3.    Statutory structure further confirms that broadband is an information service.

Broadband can be (and long has been) regulated under Title I without upsetting the broader statutory scheme.  By contrast, treating broadband as a "telecommunications service" would make a mess of both the 1996 Act and the larger Communications Act framework.

a.    Title II classification clashes with numerous other provisions in the 1996 Act that presuppose that internet-access services are information services.  To start, Congress defined the "term 'interactive computer service'" to mean "any *information service*" "that provides or enables computer access by multiple users to a computer server, including specifically a service . . . that provides *access to the Internet*."   47 U.S.C. § 230(f)(2) (emphasis added). Section 230's definition thus makes clear that a service that provides access to the internet, as broadband does, is an information service.  Other definitions in the 1996 Act likewise confirm that "interactive computer services"—which, through a series of statutory cross-references, again include services "that provide access to the Internet"—should not be treated "as common carriers or telecommunications carriers." *Id.* § 223(e)(6); *see id.* §§ 223(h)(2), 230(f)(2); *see also id.* § 231(e)(4) (provision added in 1998 defining the term "internet access service" to "not include telecommunications services").   Congress would not have classified internet-access services as information services for purposes of these provisions, yet defined internet-access services as telecommunications services under Section 153.   After all, courts do not "lightly assume that Congress silently attaches different meanings to the same

term in the same or related statutes." *Azar* v. *Allina Health Servs.*, 587 U.S. 566, 574 (2019).

The substance of Section 230 points the same way as its definitions. Section 230(c) dictates that "no provider" of "an interactive computer service" (including internet-access services) may be held liable for restricting access to "material that the provider . . . considers to be obscene," "excessively violent," "harassing," and so on.  47 U.S.C. § 230(c)(2).  It is difficult to square that protection with the Title II common-carrier framework, which would generally require ISPs not to engage in content moderation.  The Commission responds that Section 230 "merely immunizes providers against civil liability, such as damages," and that Title II regulation may be enforced by "other means," including "criminal sanctions."  Order ¶ 248 (citing 47 U.S.C. § 501).  But no rational Congress would have made ISPs civilly immune with one hand *and* criminally liable with the other.

Congress's additional findings and policy statements in the 1996 Act likewise show that it viewed ISPs as information-service providers.  Congress made a factual finding that the "Internet and other interactive computer services have flourished . . . with a minimum of government regulation," 47 U.S.C. § 230(a)(4), and declared it the "policy of the United States" to

"preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation," *id.* § 230(b)(2). "Only a two-faced Congress would bolster deregulation as the best means to promote the internet economy and then treat broadband providers as heavily regulated common carriers." Stay Op., App. 554 (Sutton, C.J., concurring).

b. Another structural problem with the Commission's interpretation is that it requires the Commission to forbear from applying much of Title II. As in 2015, the Commission has declined to apply to broadband over a quarter of Title II's provisions and hundreds of regulations. It had no real choice: many of those provisions are, "at most, tangentially related" to the provision of broadband and would not make any sense as applied to broadband. Order ¶¶ 425, 427; *see, e.g.*, 47 U.S.C. § 273(c) (requiring carriers to report protocols for using "telephone exchange service facilities"); *id.* § 227(c)(3) (imposing obligations under the Telephone Consumer Protection Act); *id.* § 227(e) (regulating caller ID); *id.* § 228 (regulating pay-per-call services). The need to forbear from so much of the common-carrier regime strongly suggests that the Commission "ha[s] taken a wrong interpretive turn." *Utility Air*, 573 U.S. at 328; *see* Verrilli & Gershengorn, *supra*, at 332-333 & n.66.

45

c.    The Commission's treatment of mobile broadband is yet another sign that its interpretation does not fit with the statutory scheme. Mobile broadband, a form of broadband that the Order subjects to Title II (¶ 190), is also governed by a separate statutory regime that limits Title II to "commercial mobile service[s]." 47 U.S.C. § 332(c)(1)-(2), (d). As a result, once the Commission reclassified broadband as a "telecommunications service," it also had to separately reclassify mobile broadband as a "commercial mobile service." *See* Order ¶¶ 214-236. Otherwise, as the Commission itself recognized, there would be a "statutory contradiction": mobile broadband would be both a Title II service (by virtue of being a "telecommunications service") and not a Title II service (by virtue of *not* being a "commercial mobile service"). *Id.* ¶ 230.

But that separate statutory move does not work, providing further evidence that treating broadband as a Title II service does violence to the larger statutory scheme. As explained in more detail below, *infra*, pp. 48-55, mobile broadband does not fit the statutory definition of a "commercial mobile service"—a mobile service "interconnected with the public switched network," 47 U.S.C. §§ 332(d)(1), (2)—because "the public switched network" is a term of art that means the 10-digit telephone network. Mobile broadband is not

"interconnected with" the telephone network. Instead, mobile broadband interconnects users of a distinct network: the internet, which uses IP addresses, not phone numbers. *See infra*, pp. 50-51.

### 4. Principles of constitutional avoidance counsel against the Commission's interpretation.

If there were any lingering ambiguity here, this Court should reject the Commission's interpretation because it raises "grave and doubtful constitutional questions." *United States* v. *Perry*, 360 F.3d 519, 525 (6th Cir. 2004).

The First Amendment protects not only speakers who convey original speech, but also entities that exercise editorial discretion in distributing the speech of others. *Moody* v. *NetChoice, LLC*, 144 S. Ct. 2383, 2401-2402 (2024). In *Turner Broadcasting System, Inc.* v. *FCC*, for example, the Supreme Court held that cable operators exercise such editorial discretion when they decide what television programming to transmit. 512 U.S. 622, 636 (1994). Reclassifying broadband under Title II sets up constitutional clashes whenever the Commission attempts to exercise control over ISPs' editorial discretion, including what content ISPs transmit and how. *See, e.g.*, 47 U.S.C. § 201(b) (forbidding practices the Commission deems "unjust or unreasonable"); *id.* § 202(a) (forbidding common carriers from "mak[ing] or

47

giv[ing] any undue or unreasonable preference or advantage to any particular person" in providing communication services).

To take just one example, "net neutrality" regulations promulgated under Title II, including those adopted in the Order here, prevent ISPs from blocking, throttling, or prioritizing certain lawful content. Then-Judge Kavanaugh concluded in *U.S. Telecom* that such restrictions on ISPs' transmission of content violate the First Amendment, even when ISPs voluntarily refrain from those covered practices. *See U.S. Telecom*, 855 F.3d at 429 (Kavanaugh, J., dissenting). Holding that the 1996 Act does not empower the Commission to reclassify broadband under Title II would foreclose that type of content regulation, and avoid grave First Amendment concerns.

## II. THE COMMISSION LACKS STATUTORY AUTHORITY TO RECLASSIFY MOBILE BROADBAND AS A COMMERCIAL MOBILE SERVICE SUBJECT TO TITLE II.

As part of its effort to subject broadband to Title II regulation, the Order also reclassifies a specific form of broadband—mobile broadband—as a "commercial mobile service" under Section 332 of the Communications Act. Order ¶ 214. That reclassification of mobile broadband exceeds the Commission's statutory authority.

**A.    Mobile Broadband Is Not "Interconnected With The Public Switched Network."**

Section 332 of the Communications Act governs the regulatory treatment of mobile services. 47 U.S.C. § 332. Like the 1996 Act, it sets up a dichotomy between two types of services. A provider of a "commercial mobile service" must be "treated as a common carrier." *Id.* § 332(c)(1)(A). A provider of a "private mobile service," by contrast, "shall not . . . be treated as a common carrier for any purpose." *Id.* § 332(c)(2). Section 332 defines a "private mobile service" as any mobile service that is "not a commercial mobile service or the functional equivalent." *Id.* § 332(d)(3). A "commercial mobile service" is a mobile service—like voice service on a mobile phone—that makes publicly available "service that is interconnected with the public switched network." *Id.* § 332(d)(1)-(2).

Mobile broadband is not a commercial mobile service because it does not make available "service that is interconnected with the public switched network." "The public switched network" is a term of art with a clear meaning: the 10-digit telephone network. All three branches of the federal government used the term that way contemporaneous with Section 332's enactment. *See, e.g.*, H.R. Rep. No. 103-213, at 495-496 (1993) (Conf. Rep.) (using "[p]ublic switched telephone network" and "public switched network"

interchangeably); *Public Util. Comm'n* v. *FCC*, 886 F.2d 1325, 1327, 1330 (D.C. Cir. 1989) (same); RIF Order, 33 FCC Rcd. at 355 (citing four Commission orders). The Commission's inaugural Section 332 regulations thus defined "the public switched network" as a network "that use[s] the [ten-digit] North American Numbering Plan." *Implementation of Sections 3(n) and 332 of the Communications Act*, 9 FCC Rcd. 1411, 1517 (1994).

Mobile broadband is not "interconnected with" the 10-digit telephone network. The plain meaning of "interconnected" is "having internal connections between the parts and elements." *Merriam-Webster's Collegiate Dictionary* 609 (10th ed. 1993). There are no internal connections between the elements of the internet and the elements of the telephone network. They are "two fundamentally different networks, using different architectures and protocols," that "are completely incompatible with each other." Rysavy Decl. ¶¶ 39, 41, App. 784-785; *see* 47 U.S.C. § 1422(b)(1) (2012 statute distinguishing the "public switched network" from the "public Internet"); *WorldCom, Inc.* v. *FCC*, 246 F.3d 690, 692 (D.C. Cir. 2001) (same). That is why one cannot dial a phone number to reach www.ca6.uscourts.gov, or call a smart TV using a telephone.

Services like mobile broadband that offer access to the internet therefore do not offer a service that is "interconnected with" the telephone network. That was the Commission's original view in 2007: mobile broadband was not a "commercial mobile service" because it does "not use the North American Numbering Plan," "which limits subscribers' ability to communicate to or receive communications from all users in the public switched network." *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd. 5901, 5917 (2007) (emphasis omitted). And it remains equally true today.

## B.  The Commission's Attempts To Rewrite Section 332 Lack Merit.

The Commission reverses that straightforward interpretation of Section 332 in favor of the opposite view that "mobile [broadband] is an interconnected service." Order ¶ 216-219. But its attempts to make that reading work require interpretive gymnastics.

First, the Order redefines "the public switched network" as one big network that comprises *both* the 10-digit "North American Numbering Plan" *and* "public IP addresses" (that is, the internet). *Id.* ¶ 219. But the Commission cannot simply decree that "two fundamentally different networks," Rysavy Decl. ¶¶ 39, App. 784, are now mere "components of a

single public switched network," Order ¶ 224. A "network" is "an interconnected or interrelated chain, group, or system," or "a system of computers, terminals, and databases connected by communications lines." *Merriam-Webster's Collegiate Dictionary* 780 (10th ed. 1993). The 10-digit telephone network is a network because it connects all phone numbers to one another, and the internet is a network because it connects all public IP addresses to one another. Those endpoints, however, are not all connected with one another, so they are not all part of one overarching super-network. Although Section 332 states that "public switched network" may be "defined by regulation by the Commission," 47 U.S.C. § 332(d)(2), that does not authorize the Commission to adopt a definition flatly at odds with the term to be defined. *See Loper Bright*, 144 S. Ct. at 2263.

Next, the Commission argues that "even if 'public switched network' were understood as limited to the public switched *telephone* network," mobile broadband "is interconnected with [that] network by virtue of VoIP [Voice Over IP] applications." Order ¶ 220 n.925 (emphasis added); *see id.* ¶ 226. That move also does not work. True, VoIP providers like Vonage offer apps that can make calls to telephone numbers using a mobile-broadband connection. *Id.* ¶ 226. But that does not make mobile broadband *itself* a

"service that is interconnected with the public switched network," 47 U.S.C. § 332(d)(2), because mobile broadband itself does not accomplish the interconnection; the VoIP provider does.[5]

Regardless, VoIP still would not make mobile broadband an "interconnected service." To provide "interconnected" service, a mobile service must enable "communicat[ion] to . . . and from *all* other users of the public switched network." RIF Order, 33 FCC Rcd. at 356. After all, "[u]sers who cannot communicate with each other are simply not 'interconnected' in any plausible sense." *Mozilla*, 940 F.3d at 43. Yet VoIP applications do not allow users of *all* internet-connected devices to communicate with *all* phone numbers: a landline telephone cannot call a smart appliance. *See Mozilla*, 940 F.3d at 39. The Order attempts to address that further problem with another just-so definitional change: it "remove[s] the requirement . . . that [an interconnected] service provide the ability to communicate with *all* other users

---

[5] In this respect, the definition of "commercial mobile service" differs from the definition of "information service." The latter does not focus on the technological features of the service in itself, but instead asks whether the service "offer[s]" certain "capabilities." As discussed above, it is natural to describe a service as offering a capability in connection with another entity. *See supra*, p. 35. By contrast, the definition of "commercial mobile service" asks whether *the service itself* "is," or is not, "an interconnected service." Order ¶¶ 225-226.

of the public switched network." Order ¶ 229. But the Commission revealingly makes no attempt to square that approach with the plain meaning of "interconnected"—"having internal connections between the parts and elements." *See supra*, p. 50.

Finally, the Commission argues (Order ¶ 230) that even if mobile broadband is not itself a "commercial mobile service," it is the "functional equivalent" of one and thus is not a "private mobile service." *See* 47 U.S.C. § 332(d)(3). According to the Commission, mobile broadband is a functional equivalent of "mobile voice service" (think standard cellphone service) because, like mobile voice, mobile broadband is "widely available" and allows users "to send and receive communications on their mobile device to and from the public." *Id.* ¶ 233.

That test again ignores the statutory language. To qualify as "functional equivalents," two things must be "corresponding or virtually identical" in function, *see Merriam-Webster's Collegiate Dictionary* 392-393 (10th ed. 1993), not merely similar in some cherry-picked respect. The Commission recognized as much for the statute's first two decades, defining "functional equivalent" sensibly to mean "a close substitute." 9 FCC Rcd. at 1448; *see* RIF Order, 33 FCC Rcd. at 361-362; *see also Aegerter* v. *City of Delafield*, 174 F.3d

886, 891 (7th Cir. 1999) (interpreting the relevant language to require "direct substitutes"). Mobile broadband service and mobile voice service are not close substitutes, let alone virtually identical. The Order does not argue otherwise.

## III.   THE ORDER IS ARBITRARY AND CAPRICIOUS.

Even if the Commission's Order were authorized by statute, it should be set aside because it is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Under the APA, when an "agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." *National Ass'n of Home Builders* v. *EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). And when an agency changes positions, it must "show that there are good reasons for the new policy." *Fox*, 556 U.S. at 515.

Both principles converge here. The Commission has not just "change[d] position" on applying Title II to broadband—it has categorically repudiated its prior cost-benefit analysis. In the RIF Order, the Commission concluded that Title II classification would cause "considerable social cost, in terms of forgone investment and innovation," without any "discernable incremental benefit relative to Title I classification." 33 FCC Rcd. at 363. The Commission now says the exact opposite, asserting that the benefits of its Order "outweigh the costs." Order ¶¶ 632-648. The Commission has not provided "good

55

reasons" for that abrupt reversal, *Fox*, 566 U.S. at 515, either with respect to the reclassification of broadband under Title II or the general conduct standard that the Commission has imposed using its newfound authority. Instead, the Order upends the regulatory approach that has fostered the modern internet in exchange for near-zero appreciable benefit.

### A.    The Commission Distorted The Costs And Benefits Of Reclassifying Broadband And Mobile Broadband.

The Commission's cost-benefit analysis undergirding the imposition of Title II regulation on broadband is flawed on both sides of the ledger.

1.    On the cost side, the Commission vastly discounts the harms to ISPs of reclassification under Title II. The broadband industry and internet have excelled under Title I light-touch regulation. *See* Israel White Paper, App. 1599-1605. That performance was no coincidence. ISPs large and small relied on the Title I framework to build and improve their networks and deploy new technologies, such as fiber and 5G. Their investment has led to greater access, faster speeds, and lower costs for consumers. *See* AT&T Comments, App. 626-629; Verizon Comments, App. 1215-1218; WISPA Comments, App. 1252. That became clear in 2020, when ISPs brought much of American life and work online essentially overnight in response to a sudden global pandemic. American broadband thrived in the face of extraordinary spikes in traffic, and

vastly outperformed broadband in countries with more heavy-handed regulation. *See* CTIA Comments, App. 657-669.

Record evidence here confirms the commonsense intuition that reclassification under Title II would massively depress investment in ISPs. *See* Ford Paper, App. 800-801 (finding that the mere "prospect of Title II policy reduced investment" by *billions* of dollars per year). Yet the Commission refused to acknowledge the obvious. It dismissed the ISPs' record evidence based on an inaccurate methodological critique. *See supra*, pp. 22 n.2. And it implausibly insisted that there is no causal link between heavy-handed Title II regulation and reduced investment in the broadband industry. *See* Order ¶ 637. That assessment of costs was unreasonable. *See* Stay Op., App. 550 (finding that ISPs "will incur 'unrecoverable compliance costs'" and face "delays in product rollouts").

2.    On the other side, the Commission failed to identify any genuine benefits of reclassification under Title II that could justify its heavy costs. The Commission asserted that reclassification would improve internet openness and advance a host of other interests, from national security to cybersecurity. Order ¶ 634. But none of the harms the Commission seeks to forestall actually came to pass under a Title I framework, either before 2015 or after 2018. It is

not a "benefit" to fix problems that do not exist.  *New York Stock Exch. LLC* v. *SEC*, 962 F.3d 541, 556-557 (D.C. Cir. 2020) ("Rules are not adopted in search of regulatory problems to solve.").

*Internet Openness.*    In 2015, the Commission insisted that Title II authority was necessary to ensure that the internet remained open—that is, that ISPs were not permitted to block or improperly restrict access to lawful content.  30 FCC Rcd. at 5643-5645.  The Commission leads with that same rationale here.  Order ¶ 634.  Ensuring an open internet, however, is not a legitimate "benefit" of reclassification under Title II, because ISPs across the board voluntarily ensure internet openness and have made public commitments to continue doing so.  NCTA Comments, App. 878; USTelecom Comments, App. 1110; ACA Connects Comments, App. 574-575 & nn.29-31.  The broadband market is more competitive than ever, which gives ISPs every incentive not to undermine the value of their services by restricting access to content that users want.  NCTA Comments, App. 878-880; *see* Israel White Paper, App. 1602-1607.

Unsurprisingly then, the Commission fails to identify *any* evidence of actual "net neutrality"-related misconduct.  The handful of its scattered "examples" that even have anything to do with internet openness all fall apart

58

upon closer inspection. *See* NCTA et al. Letter, App. 1608-1610. Indeed, the best the Commission could do in opposing a stay was point to one program adopted by AT&T a decade ago (and later discontinued) that allowed customers to stream video on DirecTV without counting against their monthly data allowance—a transparent offering that gave consumers more data for free. *See* ECF No. 38 at 27.

The Commission responds that if there has been little harmful ISP behavior, that is only because some *States* have open-internet requirements. Thus, "the perceived lack of examples" of harmful conduct actually establishes "the effectiveness of open Internet regulation." Order ¶ 478. That argument is simply wrong. ISPs nationwide adhered to open-internet principles long before any state mandates were in place. *See* NCTA Comments, App. 877. Industry Petitioners represent many ISPs that do not provide services in the few States the Commission invokes, yet have never taken action to harm the open internet. *Id.* Market-based incentives, not federal or state regulation, ensure that ISPs do not block, throttle, or engage in paid prioritization.

Finally, the Commission resorts to guesswork. According to the Commission, it remains possible that ISPs *might* engage in harmful behavior without a Title II framework in place. *See* Order ¶¶ 464-468. But an agency's

predictive judgments "must be based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc.* v. *FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). After three decades of open internet without Title II, speculation is all the Commission has left.

*Other Policy Objectives.* The Commission also contends that reclassification will serve a grab-bag of other policy objectives. Tellingly, the Commission did not point to any such areas when it reclassified broadband in 2015. Its invocation of them now—after six years of lived experience that prescriptive Title II rules are unnecessary—should be greeted with skepticism. Indeed, none of the Commission's new contemplated regulations would provide any appreciable public benefit compared to a Title I world.

The Commission argues, for example, that it needs Title II to better respond to national-security and law-enforcement risks. Order ¶¶ 30-41. But Congress has entrusted oversight in this area to other agencies with more expertise, such as the Committee on Foreign Investment in the United States. *See* Grotto Paper, App. 1544-1547, 1551-1553; Scott Comments, App. 1423-1424; WISPA Comments, App. 1329-1331. Moreover, the Commission has some existing tools to address any national-security threats appropriately within its purview. For example, it has already revoked

authorizations for several Chinese companies operating as telecommunications carriers in the United States. *See* Order ¶ 33. The Commission claims that without Title II, it would be powerless to stop those Chinese companies from offering broadband. *Id.* ¶ 34. But those companies can pose similar risks by offering private carrier services and participating in IP traffic exchange regardless of Title II. *See* NCTA Comments, App. 894-895. Congress nevertheless has not granted the Commission the general national-security powers it now claims.

Next, the Commission contends that reclassifying broadband under Title II will promote network resilience and reliability. Order ¶¶ 59-66. But ISPs already have strong competitive incentives to maintain reliable networks for their customers. *See* NCTA Comments, App. 898-899; USTelecom Comments, App. 1186. The Commission focuses specifically on the possibility that first responders might lose access to broadband. Order ¶¶ 51-58. But as the Commission recognizes, public agencies typically purchase special, dedicated internet-access services, not the mass-market broadband that the Order covers. *See id.* ¶ 52.

The Commission's concerns about cybersecurity and privacy ring just as hollow. *See* Order ¶¶ 42-50, 67-68. The Commission does not have a roving

mandate to address cybersecurity. Instead, when Congress has asked the agency to step into that area, it has done so pursuant to specific delegations, such as the Secure and Trusted Communications Networks Act, Pub. L. No. 116-124, 133 Stat. 158 (2020), or the Secure Equipment Act, Pub. L. No. 117-55, 135 Stat. 423 (2021). The Commission also has some circumscribed authority over privacy, including under the Telephone Consumer Protection Act and the Cable Privacy Act. *See* 47 U.S.C. §§ 227, 551(a)(1). To the extent gaps remain, other (more expert) agencies fill them: the Cybersecurity and Infrastructure Security Agency, among others, manages cybersecurity, and the Federal Trade Commission oversees data security and consumer privacy. *See* NCTA Comments, App. 901-903.

Finally, the Commission insists that reclassification will increase broadband accessibility, including to individuals with disabilities. Order ¶¶ 102-105. But the Commission already has authority to ensure that "advanced communications services," including broadband-enabled video, voice, and text-based services, are accessible. 47 U.S.C. § 617. The Commission asserts that Title II would "complement" that authority, Order ¶ 105, but it does not explain how.

**B.    At A Minimum, The Commission's General Conduct Standard Inflicts High Costs For No Apparent Benefit.**

Even if the Commission had some reasonable basis for reclassifying broadband under Title II, its adoption of a vague general conduct standard under that newfound authority was arbitrary and capricious.  The costs to ISPs of such a vague and open-ended standard vastly outweigh the benefits, and the Commission's contrary conclusion was *ipse dixit*.

Starting with costs, the Commission downplayed the expense to ISPs of compliance.  The general conduct standard prohibits practices "that unreasonably interfere with the ability of consumers or [content providers] to select, access, and use" broadband.  Order ¶ 513.  The Commission promises to apply that standard using a "non-exhaustive" list of factors, under a "case-by-case" approach that even it characterizes as "difficult to predict."  *Id.* ¶¶ 513, 517.[6]  And to make matters worse for ISPs, the Order also invites a flood of public complaints, to be handled under burdensome complaint procedures.  *Id.* ¶¶ 589-590.  The Order even authorizes private actions for injunctive relief and money damages.  *Id.* ¶ 330.

---

[6]  Many of those factors are also open-ended:  for example, whether a practice "allows end-user control and enables consumer choice" or "threatens free expression."  Order ¶ 519.

63

Because the standard is so open-ended, ISPs will have to spend significant resources analyzing existing business practices and new offerings for compliance—placing particular burdens on small providers. *See* WISPA Comments, App. 1264-1273. The specter of enforcement will inhibit innovation and undercut incentives for broadband investment. *See* Israel Decl. ¶¶ 20-22, App. 939-940. The Commission effectively ignored these costs.

Turning to benefits, the Commission again insists that the general conduct standard would guard against the possibility of harmful behavior by ISPs. Order ¶ 645. As Industry Petitioners have already explained, there has been no such harmful behavior. *See supra*, pp. 59-60. But even if there were a real risk, the Commission has not reasonably explained why its bright-line "net neutrality" rules are inadequate for the job. It repeatedly insists that a general conduct standard will close "loopholes" and "address conduct that is not covered by the bright-line rules." Order ¶ 645. But it offers no insight into what conduct it is worried about, or why it requires an additional freewheeling authority to deem ISPs' practices "unreasonabl[e]." Without that explanation, the Commission has failed to justify the heavy costs of the general conduct standard on the broadband industry.

64

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful and set aside the Commission's Order.

Respectfully submitted,

 s/ Helgi C. Walker

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

 s/ Matthew A. Brill

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

 s/ Jeffrey B. Wall

JEFFREY B. WALL
MORGAN L. RATNER
ZOE A. JACOBY
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

65

<div style="display:flex">
<div>

 s/ Jeffrey A. Lamken

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects –
America's Communications
Association*

</div>
<div>

 s/ Thomas M. Johnson, Jr.

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The
Association for Broadband
Without Boundaries*

</div>
</div>

AUGUST 12, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a) because it contains 12,997 words.

This brief further complies with the requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 12, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

AUGUST 12, 2024

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM
# TABLE OF CONTENTS

47 U.S.C. § 153 (excerpt)................................................................1a

47 U.S.C. § 160 ........................................................................2a

47 U.S.C. § 201 ........................................................................4a

47 U.S.C. § 202 ........................................................................5a

47 U.S.C. § 223 (excerpt)................................................................6a

47 U.S.C. § 230 (excerpt)................................................................7a

47 U.S.C. § 231 (excerpt)................................................................9a

47 U.S.C. § 332 (excerpt)...............................................................10a

47 U.S.C. § 153 provides, in relevant part:

**Definitions**

For the purposes of this chapter, unless the context otherwise requires—

*       *       *

**(24) Information service**

The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

*       *       *

**(50) Telecommunications**

The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

*       *       *

**(53) Telecommunications service**

The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

*       *       *

47 U.S.C. § 160 provides:

**Competition in provision of telecommunications service**

**(a) Regulatory flexibility**

Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

> (1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

> (2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

> (3) forbearance from applying such provision or regulation is consistent with the public interest.

**(b) Competitive effect to be weighed**

In making the determination under subsection (a)(3), the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

**(c) Petition for forbearance**

Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a). The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

**(d) Limitation**

Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

**(e) State enforcement after Commission forbearance**

A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a).

47 U.S.C. § 201 provides:

**Service and charges**

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: Provided further, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

47 U.S.C. § 202 provides:

**Discriminations and preferences**

**(a) Charges, services, etc.**

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

**(b) Charges or services included**

Charges or services, whenever referred to in this chapter, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

**(c) Penalty**

Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

47 U.S.C. § 223 provides (in relevant part):

**Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications**

\*    \*    \*

**(e) Defenses**

\*    \*    \*

(6) The Commission may describe measures which are reasonable, effective, and appropriate to restrict access to prohibited communications under subsection (d). Nothing in this section authorizes the Commission to enforce, or is intended to provide the Commission with the authority to approve, sanction, or permit, the use of such measures. The Commission shall have no enforcement authority over the failure to utilize such measures. The Commission shall not endorse specific products relating to such measures. The use of such measures shall be admitted as evidence of good faith efforts for purposes of paragraph (5) in any action arising under subsection (d). Nothing in this section shall be construed to treat interactive computer services as common carriers or telecommunications carriers.

**(f) Definitions**

\*    \*    \*

(2) The term "interactive computer service" has the meaning provided in section 230(f)(2) of this title.

\*    \*    \*

47 U.S.C. § 230 provides, in relevant part:

**Protection for private blocking and screening of offensive material**

**(a) Findings**

The Congress finds the following:

\*       \*       \*

> (4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

\*       \*       \*

**(b) Policy**

It is the policy of the United States—

\*       \*       \*

> (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

\*       \*       \*

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

\*       \*       \*

> **(2) Civil liability**
>
> No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

\*     \*     \*

**(f) Definitions**

As used in this section:

\*     \*     \*

**(2) Interactive computer service**

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

\*     \*     \*

47 U.S.C. § 231 provides, in relevant part:

**Restriction of access by minors to materials commercially distributed by means of World Wide Web that are harmful to minors**

\*       \*       \*

**(e) Definitions**

For purposes of this subsection, the following definitions shall apply:

\*       \*       \*

> **(4) Internet access service**
>
> The term "Internet access service" means a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. Such term does not include telecommunications services.

\*       \*       \*

9a

47 U.S.C. § 332 provides, in relevant part:

**Mobile services**

\*      \*      \*

**(c) Regulatory treatment of mobile services**

    **(1) Common carrier treatment of commercial mobile services**

        (A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II as the Commission may specify by regulation as inapplicable to that service or person.  In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

            (i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

            (ii) enforcement of such provision is not necessary for the protection of consumers; and

            (iii) specifying such provision is consistent with the public interest.

        (B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title.  Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion

10a

of the Commission's authority to order interconnection pursuant to this chapter.

(C) As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

## (2) Non-common carrier treatment of private mobile services

A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

**(3) State preemption**

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services.  Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition.  If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just

and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

**(4) Regulatory treatment of communications satellite corporation**

Nothing in this subsection shall be construed to alter or affect the regulatory treatment required by title IV of the Communications

Satellite Act of 1962 [47 U.S.C. 741 et seq.] of the corporation authorized by title III of such Act [47 U.S.C. 731 et seq.].

**(5) Space segment capacity**

Nothing in this section shall prohibit the Commission from continuing to determine whether the provision of space segment capacity by satellite systems to providers of commercial mobile services shall be treated as common carriage.

**(6) Foreign ownership**

The Commission, upon a petition for waiver filed within 6 months after August 10, 1993, may waive the application of section 310(b) of this title to any foreign ownership that lawfully existed before May 24, 1993, of any provider of a private land mobile service that will be treated as a common carrier as a result of the enactment of the Omnibus Budget Reconciliation Act of 1993, but only upon the following conditions:

(A) The extent of foreign ownership interest shall not be increased above the extent which existed on May 24, 1993.

(B) Such waiver shall not permit the subsequent transfer of ownership to any other person in violation of section 310(b) of this title.

**(7) Preservation of local zoning authority**

**(A) General authority**

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

**(B) Limitations**

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on

15a

an expedited basis.  Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

**(C) Definitions**

For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

**(8) Mobile services access**

A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services.  If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

**(d) Definitions**

For purposes of this section—

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B); and

(3) the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.