Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

# In the United States Court of Appeals
for the Sixth Circuit

———————————————

In re: MCP No. 185: Federal Communications Commission, In the Matter of Safeguarding and Securing the Open Internet, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404, Published May 22, 2024

———————————————

BRIEF OF *AMICI CURIAE* TECHFREEDOM AND
WASHINGTON LEGAL FOUNDATION
IN SUPPORT OF INDUSTRY PETITIONERS

———————————————

On Petitions for Review

———————————————

Corbin K. Barthold
Berin Szóka
James E. Dunstan
TechFreedom
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amici Curiae*

## DISCLOSURE OF CORPORATION AFFILIATIONS
## AND FINANCIAL INTEREST

TechFreedom and Washington Legal Foundation make the following disclosures under Sixth Circuit Rule 26.1:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If yes, list below the identity of the parent corporation or affiliate and relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest.

None.

/s/ Corbin K. Barthold

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE .................................................................1

INTRODUCTION & SUMMARY OF ARGUMENT ............................2

ARGUMENT ...........................................................................................6

I.    The New Title II Order Triggers the Major Questions Rule .............................................................................................8

    A.    Economic Significance ..........................................................9

    B.    Political Significance ...........................................................12

    C.    The FCC's Efforts to Duck the Major Questions Rule Fail .......................................................................16

II.    The New Title II Order Is Not Clearly Authorized by Any Statutory Authority ..............................................................18

    A.    Under a Plain Reading of the Statutory Text, Broadband Is a Title I Service.........................................18

    B.    The FCC, the D.C. Circuit, and the Supreme Court Have Confirmed That Broadband Is Not Clearly a Title II Service .................................................22

    C.    The FCC Can Cram Broadband into Title II Only by Abusing Its Forbearance Power ..................................25

    D.    Constitutional Avoidance .................................................26

CONCLUSION........................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) ...................................................... 8, 12, 16, 17

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ...................................................... 8, 15, 17, 27

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ................................................................ 27, 28

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..................................................................... 7, 16

*Gundy v. United States,*
  588 U.S. 128 (2019) ........................................................... 27, 28, 30

*ICC v. Cincinnati, N. O. & T. P. R. Co.,*
  167 U.S. 479 (1897) ............................................................................ 6

*Indus. Union Dep't v. Am. Petroleum Inst.,*
  448 U.S. 607 (1980) ............................................................................ 6

*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) ..................................................................... 24

*MCI Telecomms. Corp. v. AT&T,*
  512 U.S. 218 (1994) .......................................................... 7, 11, 26

*Mistretta v. United States,*
  488 U.S. 361 (1989) ..................................................................... 27, 30

*Mozilla Corp. v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) .................................................. 2, 20, 23

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*NCTA v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ............................................................ passim

*NCTA v. United States*,
415 U.S. 336 (1974) ........................................................... 27

*NFIB v. OSHA*,
595 U.S. 109 (2022) ........................................................... 8

*Paul v. United States*,
140 S. Ct. 342 (2019) ........................................................ 30

*U.S. Telecom Ass'n v. FCC*,
855 F.3d 381 (D.C. Cir. 2017)....................................... passim

*Util. Air Reg. Group v. EPA*,
573 U.S. 302 (2014) .......................................... 7, 10, 16

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014)....................................... 11

*W. Va. v. EPA*,
597 U.S. 697 (2022) ........................................................ passim

## Statutes and Regulations

47 U.S.C. § 153(24) ........................................................ 19

47 U.S.C. § 160(a) ......................................................... 29

47 U.S.C. § 201(b) ......................................................... 9

47 U.S.C. § 202(a) ......................................................... 21

47 U.S.C. § 206.............................................................. 9

## TABLE OF AUTHORITIES
### (Cont.)

**Page(s)**

47 U.S.C. § 207.................................................................9

47 U.S.C. § 208.................................................................9

47 U.S.C. § 209.................................................................9

47 U.S.C. § 230(b)(2) ......................................................21

47 U.S.C. § 230(c)(2)(A) .................................................21

47 U.S.C. § 230(f)(2).......................................................21

## Other Authorities

Amy Coney Barrett, *Suspension and Delegation*, 99
    Cornell L. Rev. 251 (2014).............................................30

Robert Bork, *The Goals of Antitrust Policy*, 57 Am. Econ.
    Rev. 242 (1967) ...............................................................6

Stephen G. Breyer, *Judicial Review of Questions of Law
    and Policy*, 38 Admin. L. Rev. 363 (1986).......................7

Jon Brodkin, *Bomb Threat Temporarily Disrupts FCC
    Vote to Kill Net Neutrality Rules*, Ars Technica (Dec.
    14, 2017) ........................................................................14

Steven Calabresi, *Separation of Powers and the Rehnquist
    Court: The Centrality of* Clinton v. City of New York,
    99 Nw. U. L. Rev. 77 (2004) ..........................................28

*In re Federal-State Joint Bd. on Univ. Serv. (Stevens
    Report)*, 13 FCC Rcd. 11501 (1998)...................20, 22, 23

H.R. 1644, 116th Cong. (2019)..........................................15

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

Steven F. Huefner, *The Supreme Court's Avoidance of the
Nondelegation Doctrine in* Clinton v. City of New York*:
More than 'A Dime's Worth of Difference,'* 49 Cath. U.
L. Rev. 337 (2000) ........................................................................... 28

Cecilia Kang, *Man Charged with Threatening to Kill Ajit
Pai's Family*, N.Y. Times (June 29, 2018) ..................................... 14

Amelia Holowaty Krales & Michael Zelenko, *Photos from
Inside the Protect Net Neutrality Protests*, The Verge
(Dec. 8, 2017) ................................................................................. 14

Last Week Tonight with John Oliver, *Net Neutrality II*,
YouTube (May 7, 2017) .................................................................. 13

Alyssa Milano (@Alyssa_Milano), Twitter (Nov. 29, 2017) ............... 13

"November 2014: The President's message on net
neutrality," in *Net Neutrality*, Obama White House
(Nov. 10, 2014) ............................................................................... 12

*In re Petitions for Decl'y Ruling on Reg'y Status of
Wireless Messaging Serv.*, 33 FCC Rcd. 12075 (2018) ................... 22

*In re Protecting and Promoting the Open Internet (Open
Internet I)*, 30 FCC Rcd. 5601 (2015) ............................................ 26

*In re Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018) ...................................................... 13, 19, 20

Kaleigh Rogers, *Democrats Officially Introduce Bills to
Restore Net Neutrality*, Vice (Feb. 27, 2018) ................................. 13

*Safeguarding and Securing the Open Internet (Open
Internet II)*, FCC-24-52, 89 Fed. Reg. 45404 (May 7,
2024) ..................................................................................... passim

# TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

S. 4676, 117th Cong. (2022) ................................................................ 15

Jonathan Spalter, *America's Broadband Providers Invested $86 B in Networks in 2021*, US Telecom (July 18, 2022) ....................................................................... 11

Statement of Chairwoman Jessica Rosenworcel, FCC (Oct. 19, 2023) .................................................................. 15

## INTEREST OF AMICI CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. TechFreedom has been a prominent voice in all aspects of the debate over broadband regulation. See, e.g., *In re Restoring Internet Freedom (RIFO)*, 33 FCC Rcd. 311 (2018) (citing TechFreedom's comments 29 times); Pet. for Rehearing En Banc of Intervenors TechFreedom, et al., *U.S. Telecom Ass'n v. FCC*, No. 15-1063 (D.C. Cir., July 29, 2016) (raising at-the-time novel "major questions rule" argument). In the Order under review, the FCC directly addresses TechFreedom's arguments several times, erroneously rejecting them, but tacitly acknowledging TechFreedom's expertise, in this area, in the process. *Safeguarding and Securing the Open Internet (Open Internet II)*, FCC-24-52, 89 Fed. Reg. 45404 (May 7, 2024).

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It

---

* No party's counsel authored any part of this brief. No one, apart from amici and their counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

often appears as an amicus curiae in important administrative law cases, urging the judiciary not to allow executive agencies to rewrite federal law. See, e.g., *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302 (2014); *Merck & Co. v. HHS*, 962 F.3d 531 (D.C. Cir. 2020).

## INTRODUCTION & SUMMARY OF ARGUMENT

With its Order reimposing Title II common-carrier status on broadband, the FCC has "once again … switched its tack" in the "long-running debate regarding the regulation of the Internet." *Mozilla Corp. v. FCC*, 940 F.3d 1, 17 (D.C. Cir. 2019). The FCC is vacillating over how to regulate broadband (mass-market, uncurated, retail Internet access by wire or radio, other than dial-up service, that can send and receive data from all or nearly all Internet endpoints). This second Title II Order—*Safeguarding and Securing the Open Internet* (*Open Internet II*)—marks the FCC's fourth about-face on whether broadband is a Title I "information service" (subject to light-touch regulation), or a Title II "telecommunications service" (subject to invasive common-carrier rules), under the Telecommunications Act of 1996. In recent years, a flip has come with each change of administration. The Biden FCC is striving to undo the Trump FCC's undoing of what the Obama FCC did.

It's astonishing that the FCC is once again seeking to impose heavy-handed regulation on Internet access. Broadband coverage and performance are consistently improving, 5G networks are growing, and Starlink satellites are proliferating. During the Covid-19 pandemic, it was the highly regulated European Internet, not the lightly regulated American one, that needed rationing. To reintroduce Title II regulation makes no sense. The revival of the Title II debate at the FCC is policymaking as backward-looking political grudge match, bureaucratic make-work and agency self-aggrandizement, and state control as an end in itself. It's broken government in action.

The only question for this Court, of course, is whether the FCC has the statutory authority to act. But the history and magnitude of the Title I/Title II controversy inform that question. They help show that this is no ordinary matter of statutory interpretation. The FCC is seeking to answer a major policy question—but it lacks clear authority to do so. As we will explain, *Open Internet II* triggers, but cannot satisfy, the major questions rule.

That rule ensures that the people's representatives in Congress make all important policy decisions themselves. The rule has two steps: A court determines (1) whether an agency is seeking to resolve a major policy question, and, if so, (2) whether Congress has clearly stated that

the question should be resolved by the agency. After a brief discussion of the history of the major questions rule, we will show that, here, the answers are easy. Does the FCC's Title II plan tackle a major policy question? Yes. Has Congress clearly granted the FCC the authority to act? No.

**I.** The FCC's new Title II Order triggers the major questions rule twice over:

**A.** With its "reasonable[ness]" requirements and its "general conduct" standard, *Open Internet II* allows for minute inspection, critique, and punishment, by the FCC, of almost everything broadband providers do. The agency could stifle innovation, engage in de facto rate regulation, and generally regulate broadband firms as though each one were a monopoly. Such thorough—but vague and unpredictable—oversight will likely add up to a many-billion-dollar impact, in lost investment, altered practices, changed prices, and more, on the broadband industry.

**B.** Not only is *Open Internet II* politically significant; it is the latest entry in one of the most politically significant debates in the history of administrative law. The debate over broadband's Title I/Title II status has given rise to extensive national media attention, street protests,

hysterical claims in Congress about "digital serfdom," credible death threats toward an FCC Chair and his family, and more.

**II.** Congress has not granted the FCC clear authority to place broadband under Title II:

**A.** If anything, Congress has clearly stated that broadband belongs under *Title I*. That's the import of the 1996 Act, a deregulatory statute, with its Title I treatment of services that "process" information—as broadband undoubtedly does, and must do, in numerous ways.

**B.** The FCC loses even if it runs merely into a *lack* of clarity as to broadband's Title I/Title II status. Yet the Supreme Court, the D.C. Circuit, and even the FCC itself have found that broadband's status under the 1996 Act is not clear but ambiguous.

**C.** As part of its deregulatory push, Congress placed in the 1996 Act a power by which the FCC may forbear from enforcing all Title II requirements on a Title II service. This provision was supposed to enable the FCC to *lessen* burdens on Title II common carriers (services akin to the AT&T telephone monopoly), not *increase* burdens on Title I entities by bumping them *up* to Title II and then recrafting the statute to make a Title II designation fit. Yet that is what the FCC has tried to do, as to broadband. This square peg, round hole approach confirms that the FCC lacks clear authority for its Title II Order.

**D.** If the FCC *could* abuse its forbearance power in this way, that would raise a constitutional problem. Under the nondelegation rule, Congress must obey the Constitution's demand that it wield "all legislative powers" itself—and not hand that power to others. If the FCC could use its forbearance power in the sweeping fashion it proposes—as a pick-and-choose statutory buffet for regulating entities—that would violate the nondelegation rule. It would make the FCC the legislator, rather than Congress.

## ARGUMENT

Though its name may be new, the major questions rule is deeply rooted. The rule's presence in Supreme Court jurisprudence "can be traced to at least 1897." *W. Va. v. EPA*, 597 U.S. 697, 740 (2022) (Gorsuch, J., concurring) (discussing *ICC v. Cincinnati, N. O. & T. P. R. Co.*, 167 U.S. 479 (1897)). The rule reflects a fundamental constitutional principle: that "the hard [policy] choices … must be made by the elected representatives of the people." *Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring). The major questions rule exists because it is "an important function of the courts" to "ensur[e] … that major policy decisions by the legislature are deliberately and openly made." Robert Bork, *The Goals of Antitrust Policy*, 57 Am. Econ.

Rev. 242, 244 (1967). See Stephen G. Breyer, *Judicial Review of Questions of Law and Policy*, 38 Admin. L. Rev. 363, 370, 376 (1986) (courts should assume Congress "focused upon, and answered, major questions").

If the major questions rule has grown in prominence lately, that is simply a side effect of "the explosive growth of the administrative state since 1970." *W. Va.*, 597 U.S. at 741 (Gorsuch, J., concurring). As Congress has increasingly passed open-ended power to agencies, the Supreme Court has increasingly had occasion to remind Congress to do its job properly (and agencies not to creatively abuse what power they've been given). See, e.g., *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994).

The Court has repeatedly made clear that it will not find "extraordinary grants of regulatory authority" in a statute's "modest words, vague terms, or subtle devices." *W. Va.*, 597 U.S. at 723 (cleaned up). In the past few years alone, the Court has invoked the major questions rule when:

- Blocking the Environmental Protection Agency's attempt to use an obscure provision of the Clean Air Act to shut down coal-fired power plants, *W. Va.*, 597 U.S. 697;

- Striking down the Centers for Disease Control's push to restrict evictions during the Covid-19 pandemic, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021);

- Rebuffing the Occupational Safety and Health Administration's effort to force the American workforce to get Covid-19 vaccines (or comply with a strict test-and-mask regiment), *NFIB v. OSHA*, 595 U.S. 109 (2022);

- Rejecting the Department of Education's attempt to implement a sweeping "emergency" (yet post-pandemic) federal student-loan forgiveness program, *Biden v. Nebraska*, 600 U.S. 477 (2023).

It is in this light that we must consider the FCC's drive to take control of the Internet's physical infrastructure.

## I.    The New Title II Order Triggers the Major Questions Rule

The new Title II Order triggers the major questions rule twice over. First, the Order is economically significant, in that it empowers the FCC to investigate and second-guess almost everything broadband providers do. Second, the Order is politically significant—a point that, given the highly fraught, even outlandish, "net neutrality" debates of the last ten years, should be beyond question.

Nothing the FCC says in its Order reverses this double triggering of the major questions test. Having elected to tackle issues of major economic and political significance, the agency cannot argue the toothpaste back into the tube.

## A.     Economic Significance

At the core of Title II regulation is a requirement that "all" of an entity's "practices" and "discrimination" be "just and reasonable." 47 U.S.C. § 201(b). Private parties may complain to the FCC about any supposed departure from this nebulous requirement, and they may sue in court for damages. *Id.* §§ 206-209. When a service is regulated under Title II, in other words, "anyone" may "complain about almost anything." Dissenting Statement of Commissioner Brendan Carr (Carr Dissent), *Open Internet II* at 478. The FCC has vast discretion to act on these complaints—or not—or to act on its own initiative. Under the FCC's new Title II Order, "ISPs [are] potentially liable for everything they do." *Id.* at 458.

The short of it is that the FCC wants to investigate and punish ISPs under a standard that grants the FCC virtually boundless discretion. "We know it when we see it," will be the unofficial slogan. As if to drive this point home, the Order also adopts a "general conduct standard," under

which the FCC will police ISPs' practices "on a case-by-case basis, applying a non-exclusive list of factors," in an open-ended effort to "prohibit [practices] that harm the open Internet." *Open Internet II*, ¶ 513. The Order mentions various practices—e.g., data caps, *id*. ¶ 542—that may or may not violate the general conduct standard, depending on how the spirit moves the FCC on a given day.

This "mother may I" approach could fundamentally alter how broadband firms function. Carr Dissent at 487. After all, the effect of "extending monopoly regulation to a competitive sector," *id*. at 470, as the Title II Order does, is to obstruct competition and introduce monopoly characteristics—slow growth, delayed innovation, indifferent service, lack of initiative, general malaise. The new Title II Order empowers the FCC to remold the broadband industry, replacing market forces with *dirigisme*. The Order "would force an aggressive transformation" of an industry that is large and "link[ed] to every other sector" of the economy. *W. Va.*, 597 U.S. at 745 (Gorsuch, J., concurring) (quotation omitted). Cf. *Util. Air Reg. Group*, 573 U.S. at 324 (stating that great economic significance is implicated when an agency seeks to regulate "a significant portion of the American economy").

The economic impact of such a transformation will be large indeed. Telecom firms have invested more than $2 trillion in Internet

- 10 -

infrastructure since 1996. Jonathan Spalter, *America's Broadband Providers Invested $86 B in Networks in 2021*, US Telecom (July 18, 2022), https://perma.cc/AN3Y-SCEM. They invested $86 billion in 2021 alone. *Id*. Even a mere dent in that investment, because of new government regulation, would qualify as the sort of "economic significance" that triggers the major questions rule. See *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014) (observing that "the question of net neutrality"—rules against blocking or throttling Internet traffic that fell far short of the current Title II Order's rules—"implicates serious policy questions"). But to expect *Open Internet II* to put only a *dent* in such investment is wishful thinking. In reality, Title II regulation could cut broadband capital spending by as much as 20 percent. Carr Dissent at 460. (One study suggests that even *the prospect* of Title II regulation could reduce broadband investment by around $8 billion a year. *Id*. at 482.)

What's more, because the "general conduct" standard can be used to dictate how ISPs "price their data and capacity," it is plainly "a backdoor form of *ex post* rate regulation." *Id*. at 484. Rate regulation is by itself a matter of great economic significance. *MCI Telecomms.*, 512 U.S. at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even

substantially, rate-regulated to agency discretion."). Rate regulation of an industry as large and important as the broadband industry is of greater significance still.

In any case, the major questions rule considers not merely an agency's action, but *the scope* of the authority that the agency asserts. In *Alabama Association of Realtors*, the CDC read the pertinent statute in a way that would permit it not only to block evictions, but also to mandate free grocery delivery. That, the Court said, created a major-questions issue. 594 U.S. at 765. Though the FCC wants to impose only some Title II common-carrier rules, it reads the Telecommunications Act of 1996 in a way that would permit it to impose all Title II common-carrier rules, right down to explicit price controls. The economic significance of letting the government set broadband prices would be staggering.

## B.    Political Significance

The debate over whether to regulate broadband under Title II has been one of the most politically fraught—and, thus, politically significant—disputes in the history of administrative law.

In 2014, President Obama made an unprecedented public statement urging the FCC to "reclassify consumer broadband service under Title II." See "November 2014: The President's message on net

neutrality," in *Net Neutrality*, Obama White House (Nov. 10, 2014), https://perma.cc/YNQ7-MG5Y. The FCC complied by issuing its 2015 *Open Internet* Order—*Open Internet I*—which imposed on broadband a Title II designation. During that process, the FCC received almost four million comments—at the time a record. See *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 423 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

It was a short-lived benchmark. The FCC switched course in 2017, issuing the *Restoring Internet Freedom* Order, and that proceeding received over 22 million comments. *RIFO*, 33 FCC Rcd. 311, ¶ 19. And that wasn't the half of it. Other signs of the proceeding's political contentiousness include:

- The FCC officials who repealed *Open Internet I* attracted the attention of, and were ridiculed on, late-night television. Last Week Tonight with John Oliver, *Net Neutrality II*, YouTube (May 7, 2017), https://tinyurl.com/4rj49je3.

- Prominent celebrities equated those officials with Nazis. Alyssa Milano (@Alyssa_Milano), Twitter (Nov. 29, 2017), http://tinyurl .com/3zcv2nbr.

- Politicians accused them of wanting online censorship and "digital serfdom." Kaleigh Rogers, *Democrats Officially Introduce Bills to*

*Restore Net Neutrality*, Vice (Feb. 27, 2018), https://perma.cc/BVS7-
M4ZS.

- There were street protests denouncing them. Amelia Holowaty
  Krales & Michael Zelenko, *Photos from Inside the Protect Net
  Neutrality Protests*, The Verge (Dec. 8, 2017), https://tinyurl.com/
  4667zcmz.

- A man was sentenced to prison for vowing to kill then-FCC Chair
  Ajit Pai and his family. Cecilia Kang, *Man Charged with
  Threatening to Kill Ajit Pai's Family*, N.Y. Times (June 29, 2018),
  https://tinyurl.com/5n7zkksv.

- A bomb threat interrupted an FCC vote on the repeal. Jon Brodkin,
  *Bomb Threat Temporarily Disrupts FCC Vote to Kill Net Neutrality
  Rules*, Ars Technica (Dec. 14, 2017), https://tinyurl.com/mwkuceu2.

If this isn't a "politically significant" issue, hardly anything could be.

Even apart from this history (which, to be clear, cannot be ignored),
*Open Internet II* is incredibly politically significant. Government
regulation of how people communicate—and, in particular, of a means of
communication as pervasive and powerful as the modern Internet—is
self-evidently a matter of deep political importance. See Order on Mot. to
Stay at 6 (Aug. 1, 2024). FCC Chair Jessica Rosenworcel, for her part,

agrees that broadband is "essential" to modern discourse. Statement of Chairwoman Jessica Rosenworcel, FCC (Oct. 19, 2023), https://tinyurl .com/4n4f34rj.

A further sign of "political significance" arises "when Congress has considered and rejected bills authorizing something akin to the agency's course of action." *W. Va.*, 597 U.S. at 743 (Gorsuch, J., concurring). "That too," after all, "may be a sign that an agency is attempting to work around the legislative process[.]" *Id*. By 2017, around when the FCC repealed *Open Internet I*, there had been at least 13 failed congressional bills related to broadband regulation. *U.S. Telecom*, 855 F.3d at 423 (Kavanaugh, J., dissenting). After that, several bills tried, and failed, to revive *Open Internet I* through legislation. See, e.g., H.R. 1644, 116th Cong. (2019), https://perma.cc/PF34-EKXJ; S. 4676, 117th Cong. (2022), https://perma.cc/XZT9-GMHZ.

A related point is that the FCC is trying to use an uncontroversial law to ram through a controversial policy. In *Biden v. Nebraska*, the Supreme Court remarked the "stark contrast" between the "sharp debates" around the Biden administration's student loan-forgiveness program and the "unanimity with which Congress passed" the law that served as the program's statutory hook. 600 U.S. at 503. A similar dynamic is at play here. The current debate hinges on whether

broadband is a Title I information service, or instead a Title II telecommunications service (i.e., common carriage), under the Telecommunications Act of 1996. That statute passed the House by a vote of 414-16, and the Senate by a vote of 91-5. The dispute over where broadband fits in that statutory scheme, by contrast, has been marked by vicious arguments (even threats of violence), strict party-line votes, and seemingly endless rounds of litigation.

### C.   The FCC's Efforts to Duck the Major Questions Rule Fail

The FCC claims that "economic and political significance" is just a "first prong" of a test for determining whether the major questions rule applies. *Open Internet II*, ¶ 258. That is incorrect. The Supreme Court's stance is unambiguous: "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast 'economic and political significance.'" *Ala. Ass'n of Realtors*, 594 U.S. at 764 (quoting *UARG*, 573 U.S. at 324, and *Brown & Williamson*, 529 U.S. at 160).

Wielding its improper "multi-prong" standard, the FCC mistakes factors that can *contribute* to triggering the major questions rule for factors that are *necessary* for triggering the rule. That an agency seeks a "novel" power—see *Open Internet II*, ¶ 259 (claiming, wrongly, that taking broadband Internet access out of Title I, where Internet access

more generally has resided for all but three years, is not "novel")—is just *one sign* that Congress did not intend to hand the agency the power it seeks. Cf. *Ala. Ass'n of Realtors*, 594 U.S. at 765 (discussing novelty only as an afterthought, after clearly framing the standard around economic and political significance). And that an agency seeks to regulate in an area where it lacks technical or policy expertise—see *Open Internet II*, ¶ 261 (claiming such expertise)—is just *another* such sign. Cf. *Nebraska*, 600 U.S. at 500-06 (applying major questions without discussing expertise).

Other "factors" the FCC raises have nothing to do with major questions at all. That "regulating communications services" and "classif[ying] … broadband" "falls squarely within the Commission's wheelhouse" frames matters at too high a level of generality. *Open Internet II*, ¶ 260. Regardless of what is *normally* "in [an agency's] wheelhouse" in *ordinary* cases, when that agency seeks to take major policy action without clear authority, it is "more accurate to describe [its action] as being in the 'wheelhouse' of [Congress]." *Nebraska*, 600 U.S. at 504; see *W. Va.*, 597 U.S. at 730. Even less relevant is the notion that, because Congress didn't repeal *Open Internet I*, the "failed legislation" factor cuts both ways. *Open Internet II*, ¶¶ 255, 262. *Open Internet I* was still making its way through the courts when the FCC started the process

of repealing it. See *U.S. Telecom*, 855 F.3d at 382 (Srinivasan, J., concurring in the denial of rehearing en banc). The Order wasn't in effect long enough for anyone to gauge Congress's response to it.

## II.    The New Title II Order Is Not Clearly Authorized by Any Statutory Authority

Is broadband *clearly* a Title II service, as the FCC claims? No. Actually, it is *clearly* a Title I service. But at the very least, broadband's Title I/Title II status is ambiguous, as even the FCC itself has confirmed. Any lingering doubt on the point is resolved by the fact that the FCC can't place broadband under Title II without needing, via forbearance, to all but rewrite the Communications Act—a gambit that raises serious constitutional problems to boot.

### A.    Under a Plain Reading of the Statutory Text, Broadband Is a Title I Service

The Communications Act of 1934, as amended by the Telecommunications Act of 1996, "defines two categories of regulated entities relevant [here]: telecommunications carriers and information-service providers." *NCTA v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005). Telecommunications carriers are regulated under Title II, information-service-providers under Title I. Title II services, but not

Title I services, are treated as common carriers. Title II services, for example, must ordinarily "charge just and reasonable, nondiscriminatory rates to their customers." *Brand X*, 545 U.S. at 975. Title I services are subject only to light-touch regulation under the FCC's "ancillary jurisdiction." *Id*. at 976.

An "information service," under the 1996 Act, is a service that has the "capability" to "generat[e]," "acquir[e]," "stor[e]," "transform[]," "process[]," "retriev[e]," "utiliz[e]," or "mak[e] available" information "via telecommunications." 47 U.S.C. § 153(24). Broadband fits comfortably within this definition. Broadband consists of many "information processing functionalities," including Domain Name Service (DNS), caching, "email, speed test servers, backup and support services, geolocation-based advertising, data storage, parental controls, unique programming content, spam protection, pop-up blockers, instant messaging services, on-the-go access to Wi-Fi hotspots, and various widgets, toolbars, and applications." *RIFO*, 33 FCC Rcd. 311, ¶ 33 n.99; see also *id*. ¶ 30 (concluding that broadband "meet[s] the information service definition under a range of reasonable interpretations of that term").

DNS and caching, in particular, are information-processing services without which the Internet would be all but unusable. "A user

cannot reach a third party's Web site without DNS, which[,] among other things, matches the Web page addresses that end users type into their browsers (or 'click' on) with the Internet Protocol (IP) addresses of the servers containing the Web pages the users wish to access." *Mozilla Corp.*, 940 F.3d at 21 (quoting *Brand X*, 545 U.S. at 987). Nor can a user navigate the Internet without a caching function "for acquiring, storing, retrieving, and utilizing information." 940 F.3d at 21 (quoting *In re Federal-State Joint Bd. on Univ. Serv. (Stevens Report)*, 13 FCC Rcd. 11501, ¶ 76 (1998)); see also *id.* at 22 ("Operating a caching service entails running 'complex algorithms to determine what information to store where and in what format[.]'") (quoting *RIFO*, 33 FCC Rcd. 311, ¶ 41). Quite simply, "a consumer cannot purchase Internet service without also purchasing a connection to the Internet and the transmission always occurs in connection with information processing, in the form of (for example) DNS or caching." 940 F.3d at 21 (quoting *Brand X*, 545 U.S. at 970).

Broadband fits the definition of a Title I service for good reason. The 1996 Act is a deregulatory statute. In that spirit, it left the then-nascent Internet alone. "It is the policy of the United States," the 1996 Act declares, "to preserve the vibrant and competitive free market that presently exists for the Internet … , unfettered by Federal or State

regulation." 47 U.S.C. § 230(b)(2). Consistent with that policy, the 1996 Act *explicitly refers* to Internet access providers as "information service[s]"—"information service" being, recall, the type of service regulated under Title I. *Id.* § 230(f)(2) (defining "interactive computer service" to mean "any *information service*, … including specifically a service or system that *provides access to the Internet*" (emphasis added)). For good measure, the 1996 Act adds that such "information services" have a right to "restrict access to … material" they find objectionable— precisely *the opposite* of the nondiscrimination required of a Title II common carrier. Compare *id.* § 230(c)(2)(A) with *id.* § 202(a).

The FCC adhered to the proper, deregulatory reading of the 1996 Act from its enactment until 2015. The agency reversed course, issuing *Open Internet I*, only after President Obama called for Title II regulation of broadband. See Sec. I.B, supra. As that fact confirms, the FCC's on-again, off-again effort to move broadband out of Title I is driven by raw politics, rather than by any fealty to the text of the 1996 Act. When not dealing with the political hot potato of broadband regulation, the FCC has no trouble understanding what a Title I information service is.

In 1998, for instance, the FCC concluded that email service, with its (at the time) cutting-edge capacity to "store-and-forward," and thus allow "asynchronous" access to, data, qualified as an "information

service" needing "regulatory freedom" for "healthy and competitive development." *Stevens Report*, 13 FCC Rcd. 11501, ¶¶ 46, 78 & n.161. Similarly, and more recently, the FCC declared Short Message Service text messaging an information service, in part to encourage the fast and free-flowing development, by wireless providers, of "robotext-blocking, anti-spoofing measures, and other anti-spam features." *In re Petitions for Decl'y Ruling on Reg'y Status of Wireless Messaging Serv.*, 33 FCC Rcd. 12075, ¶ 2 (2018). Broadband involves far more information processing than email or text messaging. Had Title II regulation for broadband not become practically a blind commitment, the FCC would doubtless understand as much. See Stay Order at 12-13 (Sutton, C.J., concurring).

**B.    The FCC, the D.C. Circuit, and the Supreme Court Have Confirmed That Broadband Is Not Clearly a Title II Service**

To satisfy the major questions test, the FCC needs clear statutory authority for its new Title II Order. As just shown, any clarity runs the other way—toward broadband fitting under Title I, not Title II. But in any event, the FCC, the Supreme Court, and the D.C. Circuit have all at various times found an *absence* of clarity, as to broadband's Title I/Title II status—a fact that dooms the FCC's current bid to find *clear* statutory authority for a Title II designation.

Start with the FCC itself. Shortly after the Telecommunications Act of 1996 was enacted, the FCC concluded that "the proper interpretation of the terms 'telecommunications' and 'telecommunications service' … raises difficult issues that are the subject of heated debated." *Stevens Report*, 13 FCC Rcd. 11501, ¶ 33. Later, defending *Open Internet I*—its first effort to place broadband under Title II—the agency acknowledged that the 1996 Act is, at most, ambiguous on the question of broadband's regulatory status (Title I or Title II). That "admi[ssion]" should be "the end of the game" for the FCC's present effort to place broadband under Title II. *U.S. Telecom*, 855 F.3d at 386 (Kavanaugh, J., dissenting). Statutory ambiguity is the opposite of clear congressional permission to resolve a major question.

Next, the D.C. Circuit. In upholding the *Restoring Internet Freedom Order*—the agency's decision to move broadband back to Title I—the D.C. Circuit treated the 1996 Act's ambiguity about broadband as too obvious to require more than passing reference. *Mozilla*, 940 F.3d at 20.

But above all, there is the Supreme Court. In *Brand X*, the Court was asked whether the FCC could place cable-modem Internet under Title I. In answering that question, the Court bowed to the FCC's reading of the statute. Why? Because the Court granted the agency *Chevron* deference. And what was the crux of the *Chevron* rule? It was, of course,

that a court should defer to an agency's reasonable reading of a statute that is *un*clear. *Brand X* found that the definition of a Title II "telecommunications service" is unclear, deferred to the FCC, and thereby established that Congress has *not clearly stated* whether the FCC may regulate broadband under Title II. 545 U.S. at 970. Although the Supreme Court just overturned *Chevron*, see *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), that has no bearing on the point here. What matters is that the Court found statutory ambiguity—and thus no *clear* authority for regulating broadband under Title II. The route (i.e., application of the *Chevron* rule) by which the Court got to a finding of statutory ambiguity is irrelevant.

The FCC's claim that a major question arises when the agency classifies broadband *either way*—as a Title II *or* Title I service—has no bearing on *this case*. *Open Internet II*, ¶ 254. In any event, the two options are not symmetrical. See Stay Order at 8. Although we don't doubt that the major questions rule could in theory apply in a case of deregulation, see *Open Internet II*, ¶ 255 n.1062, the distinction here is not *just* between more regulation (Title II) and less (Title I). It's also between a deregulatory status quo (many years as an unquestioned Title I service) and a regulatory novelty (an abrupt and halting campaign, in 2015 and now, to take the "major new regulatory step" of putting broadband in a

legal category fit for the AT&T telephone monopoly, *U.S. Telecom*, 855 F.3d at 419 (Kavanaugh, J., dissenting)).

### C.    The FCC Can Cram Broadband into Title II Only by Abusing Its Forbearance Power

If broadband were clearly a Title II service, the FCC would not need (as it does) to abuse its forbearance power, ignoring so many core Title II requirements to practically write a new statute.

The utility-style rules in Title II pre-existed the Telecommunications Act of 1996. They were the rules that governed AT&T's telephone monopoly. Accordingly, many of the rules—especially the tariff rules, which required AT&T to file its rates with the FCC for approval—are wildly obsolete. In line with its goal of deregulation, the 1996 Act permits the FCC to "forbear" from imposing all the Title II rules on a Title II service. Specifically, the FCC "must forbear from applying" Title II rules to a Title II service when "it determines that the public interest requires" that it do so. *Brand X*, 545 U.S. at 976. "Logically," then, "forbearance is a tool for lessening common carrier regulation, not expanding it." *U.S. Telecom*, 855 F.3d at 396 (Brown, J., dissenting from denial of rehearing en banc).

That didn't stop the Obama FCC from trying to use forbearance to hike up broadband's regulatory status. When it shifted broadband to Title II in 2015, the agency elected to forbear from imposing 27 Title II provisions. It called this "Title II tailored for the 21st century"— "tailored," here, being a euphemism for "rewritten." *In re Protecting and Promoting the Open Internet (Open Internet I)*, 30 FCC Rcd. 5601, ¶ 5 (2015). The current FCC wants to pull the same move, imposing burdensome common-carrier rules while also adopting "broad forbearance" for things like tariffs. *Open Internet II*, ¶ 426. Granted, the forbearance power appears in the statute. But the way the FCC wants to use it—as a regulatory ratchet and a red sharpie—confirms that the agency is applying the 1996 Act in a manner not clearly intended by Congress.

"What we have here, in reality, is a fundamental revision of the statute." *MCI Telecomms.*, 512 U.S. at 231. If broadband were clearly a Title II service, the FCC wouldn't need to all but rewrite Title II to make it fit.

## D.    Constitutional Avoidance

"The [Supreme] Court has applied the major questions doctrine … to ensure that the government does not inadvertently cross constitutional

lines." *W. Va.*, 597 U.S. at 742 (Gorsuch, J., concurring). The main such "constitutional line" is the requirement that Congress "make the big-time policy calls itself, rather than pawning them off to another branch." *Nebraska*, 600 U.S. at 515 (Barrett, J., concurring). This is the bedrock Article I command that the legislature do the legislating. It is ultimately enforced not through the major questions rule, but through the nondelegation rule. See *Gundy v. United States*, 588 U.S. 128, 135 (2019).

These two rules plainly bleed together—as the Supreme Court has long understood. The Court has routinely enforced "the nondelegation doctrine" by "giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional." *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989); see, e.g., *NCTA v. United States*, 415 U.S. 336, 342 (1974). The major questions rule is one way to give a statute a comparatively narrow construction, the better to avoid striking the statute down as unconstitutional.

If the FCC's forbearance power were truly as unrestrained as the FCC makes it out to be, that would raise a serious nondelegation problem. Consider *Clinton v. City of New York*, 524 U.S. 417 (1998), in which the Supreme Court struck down the Line Item Veto Act. Under the Act, the President could "cancel" certain tax or spending provisions, in newly passed statutes, if he decided that doing so would (a) reduce the

federal budget deficit, (b) not impair any essential government function, and (c) not harm the national interest. *Id.* at 436. The Court struck the Act down, finding that it violated the Constitution's presentment clause. *Id.* at 439-40. In other words, the Act effectively gave the President power to repeal pieces of law—a power not granted to the President under the Constitution.

*Clinton* is "a non-delegation case masquerading as a bicameralism and presentment case." Steven Calabresi, *Separation of Powers and the Rehnquist Court: The Centrality of* Clinton v. City of New York, 99 Nw. U. L. Rev. 77, 85 (2004). Indeed, the "Act was ripe for invalidation under the nondelegation doctrine." Steven F. Huefner, *The Supreme Court's Avoidance of the Nondelegation Doctrine in* Clinton v. City of New York: *More than 'A Dime's Worth of Difference,'* 49 Cath. U. L. Rev. 337, 339 (2000). If the case had been decided by today's Court, that's almost certainly the route the Court would have taken (as we'll explain).

If, in exercising the classification-plus-forbearance authority, the FCC is merely "fill[ing] up the details" of the statutory scheme, then the FCC is not *making law* in defiance of the nondelegation rule. *Gundy*, 588 U.S. at 158 (Gorsuch, J., dissenting). But with *Open Internet II*, the FCC is instead claiming that, with sweeping use of the forbearance power, it

may, in effect, rewrite Title II. That immense assertion of power makes this case exactly like *Clinton*.

It's true—as the FCC noted, in response to TechFreedom's comments, *Open Internet II*, ¶ 254 n.1057—that the FCC, to forbear from enforcing a Title II provision, must find (1) that enforcement is not necessary to ensure reasonable prices, (2) that enforcement is not necessary to protect consumers, and (3) that forbearance is "consistent with the public interest," including the maintenance of competitive markets. 47 U.S.C. § 160(a), (b). But these requirements are no more rigorous than those placed on the President in the unconstitutional Line Item Veto Act. And in any event, even if these open-ended requirements might *in principle* scrape by the forgiving "intelligible principle" test— the current nondelegation rule, under which Congress must supply an "intelligible principle" by which an agency is to operate—that should not end the inquiry. For the FCC might still trigger a nondelegation problem by overusing the forbearance power, *in the aggregate*, in a fashion that amounts to statutory revision.

To see why, imagine a law that states: "The FCC shall draft a broadband rule that ensures reasonable prices, that protects consumers, and that serves the public interest, including the need for competitive markets." Such a "law" would, of course, amount to a complete failure, on

Congress's part, to (actually) legislate. "Our members of Congress could not … vote all power to [the FCC] and adjourn *sine die*." *Mistretta*, 488 U.S. at 415 (Scalia, J., dissenting). Yet the FCC assumes that Congress granted it the power to "fundamentally rewrite the 1996 Act by line-item vetoing … provisions central to Title II's legislative design." Oral Dissenting Statement of Commissioner Brendan Carr at 6 (Apr. 25, 2024), https://tinyurl.com/3abx7pd9. Like the imagined law, the FCC's expansive understanding of the forbearance power would relieve Congress from ever having to consider telecom policy again. If the nondelegation rule doesn't block that level of legislative abdication, it blocks nothing.

What's more, the intelligible principle test might be on its last legs. The Supreme Court is poised to strengthen the nondelegation rule. Three justices have urged the Court to end its "intelligible principle misadventure," *Gundy*, 588 U.S. at 166 (Gorsuch, J., joined by Roberts, C.J., and Thomas, J., dissenting); two more have called for the Court to reconsider the standard in an appropriate case, *id.* at 148-49 (Alito, J., concurring); *Paul v. United States*, 140 S. Ct. 342 (2019) (statement of Kavanaugh, J., respecting denial of certiorari); and a sixth has described the standard as "notoriously lax," Amy Coney Barrett, *Suspension and Delegation*, 99 Cornell L. Rev. 251, 318 (2014).

Accepting the FCC's interpretation of the forbearance power—which, obviously, the Court shouldn't do—would simply toss the FCC out of the major questions frying pan and into the nondelegation fire. Indeed, it could lead to a Supreme Court decision that bolsters the nondelegation rule and hampers the FCC's discretion across the board. The major questions rule exists, in part, to head off this kind of drastic constitutional result. It enables this Court to resolve this case on a narrow statutory ground, rather than a broad constitutional one.

## CONCLUSION

The Court should set aside the FCC's Order.

August 14, 2024

Respectfully submitted,

/s/ Corbin K. Barthold
Corbin K. Barthold
Berin Szóka
James E. Dunstan
TECHFREEDOM
1500 K Street NW
Washington, DC 20005
(771) 200-4997
cbarthold@techfreedom.org
*Attorneys for Amici Curiae*

CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 6,467 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ Corbin K. Barthold

CERTIFICATE OF SERVICE

On August 14, 2024, a copy of this brief was filed and served on all registered counsel through the Court's CM/ECF system.

/s/ Corbin K. Barthold