**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, and 24-3538**

# In the
# United States Court of Appeals
## for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

_____

On Petitions for Review of an Order of the Federal Communications Commission

### BRIEF OF *AMICUS CURIAE* RICHARD BENNETT
### IN SUPPORT OF PETITIONERS

Tara M. Corvo
MINTZ, LEVIN, COHN, FERRIS,
 GLOVSKY AND POPEO, P.C.
555 12th Street, N.W., Suite 1100
Washington, DC 20004
Telephone (202) 434-7300
Facsimile (202) 434-7400

*Counsel for Amicus Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule

26.1, amicus curiae Richard Bennett discloses that he is not a corporation and, as

such, has no parent company and no publicly held corporation owns 10% or more

of his stock.

# TABLE OF CONTENTS

                                                                    Page

CORPORATE DISCLOSURE STATEMENT ....................................................... i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF INTEREST ................................................................. vi

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ................................................................................... 8

I.  BROADBAND INTERNET ACCESS SERVICE IS AN
    INFORMATION SERVICE THAT INHERENTLY INTEGRATES
    TRANSMISSION WITH INFORMATION PROCESSING
    FUNCTIONS ............................................................................. 8

    A.  While Traffic On Telecommunications Service Networks Is
        Managed By The Network Provider, The BIAS Network Is
        Managed Collaboratively. ...................................................... 8

    B.  Broadband Internet Access Service Includes Information
        Processing Capabilities Unrelated To Transmission Or The
        Management Of Transmission. ............................................... 12

        1.  Domain Name Service is a vital function unrelated to
            transmission or the management of transmission. ................... 13

        2.  Caching is a vital function unrelated to transmission or
            the management of transmission. ..................................... 17

II. NEITHER THE INTERNET ARCHITECTURE NOR BIAS HAS
    CHANGED SIGNIFICANTLY SINCE THE *BRAND X* DECISION ......... 19

CONCLUSION ................................................................................ 22

CERTIFICATE OF COMPLIANCE ....................................................... 26

CERTIFICATE OF SERVICE ............................................................. 27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Mozilla Corp. v. FCC*,
　940 F.3d 1 (D.C. Cir. 2019)....................................................................i

*National Cable & Telecommunications Ass'n et al. v. Brand X
　Internet Services*,
　545 U.S. 967 (2005).......................................................................*passim*

**Federal Statutes**

47 U.S.C. § 153(24) ........................................................2, 10, 12, 14, 17

47 U.S.C. § 153(50) ...............................................................................5

**Regulatory Materials**

*Restoring Internet Freedom*,
　Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311
　(2017)...................................................................................................6

*Safeguarding and Securing the Open Internet*,
　Declaratory Ruling, Order, Report and Order, and Order on
　Reconsideration,WC Docket Nos. 23-320 and 17-108, FCC 24-52
　(rel. May 7, 2024) .........................................................................*passim*

*Safeguarding and Securing the Open Internet*,
　Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-
　83 (rel. Oct. 20, 2023).........................................................................17

**Other Authorities**

Akamai, *Annual Report 2005* (2005)........................................................7

*Binding Operational Directive 18-01*, *Enhance Email and Web
　Security*, DEP'T OF HOMELAND SECURITY (Oct. 16, 2017).
　Comments of Richard Bennett, WC Docket No. 23-320, at 6 (filed
　Dec. 14, 2023) ....................................................................................14

*CDNs*, YOUTUBE,
    https://www.youtube.com/watch?v=gxO73fH0VqM (streamed live
    on Feb. 28, 2024) ................................................................................4

CONSTELLIX (Apr. 19, 2021),
    https://support.constellix.com/support/solutions/articles/470008626
    23-what-is-dns-; ..................................................................................4

*Enterprise DNS Architectures and Best Practices*, GARTNER
    RESEARCH (June 22, 2007),
    https://www.gartner.com/en/documents/1467224 ................................4

Erik Nygren, *et al.*, *The Akamai Network: A Platform for High-*
    *Performance Internet Applications*, 44 *ACM SIGOPS Operating*
    *Systems Review* 3 (2010),
    https://doi.org/10.1145/1842733.1842736 .........................................3

Geoff Huston, *A Quick Look at QUIC*,
    https://www.ausnog.net/sites/default/files/ausnog-
    2023/presentations/ AusNOG2023-D1.2-Huston-APNIC-A_ ..........................20

Geoff Huston, *et al.*, *The Rise and Rise of CDNs*, YOUTUBE,
    https://www.youtube.com/watch?v=gxO73fH0VqM (streamed live
    on Feb. 28, 2024) ................................................................................4

Google, *DNS-over-HTTPS* (Sept. 4, 2018)...........................................15

*Internet Only Just Works*, 24 BT TECH. J. 119 (2006),
    https://doi.org/10.1007/s10550-006-0084-z .....................................21

Internet Society, *Policy Brief: Internet Interconnection* (2015),
    https://www.internetsociety.org/........................................................21

John Day, *et al.*, *Networking is IPC: A Guiding Principle to a Better*
    *Internet*, CoNEXT '08, PROCEEDINGS OF THE 2008 ACM CoNEXT
    CONFERENCE, 1-3 (2008) ....................................................................11

John Markoff, *The Team That Put the Net in Orbit*, N.Y. TIMES (Dec.
    9, 2007),
    https://www.nytimes.com/2007/12/09/business/09stream.html...........................3

Jorge Gasca, *Content Is King – Original Bill Gates Essay & How It Applies Today*, THREE STEPS BUSINESS (Mar. 11, 2014), https://threestepsbusiness.com/content-is-king-bill-gates/ ..................................3

Josh Catone, *Akamai Releases Internet Traffic Visualizations*, READWRITE (June 7, 2007), https://readwrite.com/akamai_visualizations/. ....................................................7

Kyler West, *What Is DNS?*, CONSTELLIX (Apr. 19, 2021), https://support.constellix.com/support/solutions/articles/470008626 23-what-is-dns-*?* ...................................................................................4

Mark Handley, *Why the Internet Only Just Works*, 24 BT TECH. J. 119 (2006), https://doi.org/10.1007/s10550-006-0084-z .........................................21

*Netflix Open Connect*, NETFLIX, INC. (2024), https://openconnect.netflix.com/en/...................................................................19

Paul Hoffman and Patrick McManus, *Internet Draft: DNS Queries over HTTPS*, THE INTERNET ENGINEERING TASK FORCE 2-9 (Aug. 2018) ...................................................................................................15

Petros Gigis, *et al.*, *Seven Years in the Life of Hypergiants' Off-Nets*, PROCEEDINGS OF THE 2021 ACM SIGCOMM 2021 CONFERENCE, 516-33, https://dl.acm.org/doi/pdf/10.1145/3452296.3472928.....................4, 19

RFC 791, Internet Protocol, Defense Advanced Research Projects Agency (1981), https://www.rfc-editor.org/rfc/rfc791.txt, Figure 1 .................21

*The Complete Guide to ARPANet: The Groundbreaking Computer Network That Led to the Internet*, HISTORY TOOLS (Nov. 19, 2023), https://www.historytools.org/concepts/arpanet-complete-guide.........................3

Van Jacobson and Michael Karel, *Congestion Avoidance and Control*, SYMPOSIUM PROCEEDINGS ON COMMUNICATIONS ARCHITECTURES AND PROTOCOLS, STANFORD, CA, 164 (1988) ......................................................9

## STATEMENT OF INTEREST

Richard Bennett is a 45-year veteran of network technology, standards, and product development, with a vested interest in the Internet's continued progress. His career spans:

- the development of the modern Ethernet architecture as vice-chairman of the Institute of Electrical and Electronics Engineers (IEEE) 802.3 1BASE5 (StarLAN) task force that devised the foundational hub-and-spoke Ethernet standard;

- the co-development of the initial Wireless Local Area Network system architecture and inter-access point routing protocols, and subsequent co-development of the now-mandatory Wi-Fi frame aggregation scheme;

- extensive contributions to Open System Interconnection and Internet protocols; and

- the development of leading-edge Local Area Network and Internet routing devices and systems.

Mr. Bennett participated as amicus curiae in *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019). He also participated in the Federal Communications Commission's underlying proceeding for the Order on review and, in 2008, provided testimony as an invited technical expert at the Commission's En Banc Public

Hearing on Broadband Network Management Practices in Cambridge, Massachusetts.

To the best of his knowledge, Mr. Bennett is the only amicus for the petitioners presenting information regarding the technical underpinnings of the software that controls the flow of information on the Internet and the details of how broadband Internet access service as an information service maps onto this architecture.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(e), amicus curiae states that no party's counsel has authored this brief either in whole or in part; that no party or its counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than amicus curiae and his counsel have contributed money intended to fund preparing or submitting the brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), all petitioners and respondents in this proceeding have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case revolves around the proper classification of broadband Internet access service ("BIAS") under the Communications Act of 1934 (the "Act") and, specifically, whether BIAS should be viewed as a "telecommunications service" or an "information service."  The technical underpinnings of the software that controls the flow of information on the Internet and the details of how BIAS maps onto this architecture provide the clear answer that BIAS is an information service.

The Federal Communications Commission asserts that the "best reading" of the Act requires it to reclassify BIAS as a telecommunications service, instead of maintaining its current classification as an information service.  *Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, WC Docket Nos. 23-320 and 17-108, FCC 24-52, ¶ 6 (rel. May 7, 2024) ("Order") (App. 4).  The Commission bases this conclusion on the technical premise that BIAS networks only facilitate the transmission of data, like a traditional telephone service, and that any BIAS provider's information processing capabilities are incidental features that either fall within the "telecommunications systems management" exception to the definition of "information service," or are separable information services not inextricably intertwined with BIAS, or both.  Order ¶ 128 (App. 77).

1

The Commission also asserts that BIAS has changed so much since the Supreme Court's decision in *National Cable & Telecommunications Ass'n et al. v. Brand X Internet Services*, 545 U.S. 967 (2005) ("*Brand X*") that it has become an entirely different service and that *Brand X*'s conclusion that BIAS is an information service no longer holds. *See, e.g.*, Order ¶ 143 (App. 89-90).

In each respect, the Commission is wrong.

With regard to how BIAS networks process data, the Commission's conclusions pay minimal attention to "the factual particulars of how the technology that enables the delivery of BIAS" actually functions. Order ¶ 106 (App. 60-61). Specifically, in considering whether BIAS is within the definition of an "information service," *i.e.*, the "offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," 47 U.S.C. § 153(24), the Commission vastly underestimates the collaborative management of BIAS delivery, as well as the critical role played by Content Delivery Networks ("CDNs"), the Domain Name System ("DNS"), and caching. As Petitioners note in their Opening Brief, the DNS and caching are information services intertwined with BIAS. *See* Opening Brief of Petitioners at 36-39, *In re MCP No. 185*, No. 24-7000, *et al.* (6th Cir., Aug. 12, 2024). CDNs, the DNS, and caching make clear that BIAS is an information service, and each function is key to and tightly integrated with the operation of BIAS, such

that they cannot be dismissed as "systems management" or a severable aspect of the service.

The original Internet was designed to connect researchers to remote super-computers, a low-cost alternative to the Public Switched Telephone Network.[1]  It was wholly walled off from and unsuitable for use by the general public.  Shortly after the Internet was opened to general public access in the mid-1990s,[2] a new technology known as the Content Delivery Network emerged that had the power to provide high performance access to websites and streaming audio and video services.[3]  When announcing a joint venture with NBC in 1996, Microsoft co-founder Bill Gates declared "Content is King," an observation that was not quite true then but is gospel today.[4]  BIAS plays in this new world while the Commission seems to hold onto a mental model of the Internet that hails from the walled garden era.

---

[1]    *The Complete Guide to ARPANet: The Groundbreaking Computer Network That Led to the Internet*, HISTORY TOOLS (Nov. 19, 2023), https://www.historytools.org/concepts/arpanet-complete-guide.

[2]    John Markoff, *The Team That Put the Net in Orbit*, N.Y. TIMES (Dec. 9, 2007), https://www.nytimes.com/2007/12/09/business/09stream.html.

[3]    Erik Nygren, *et al.*, *The Akamai Network: A Platform for High-Performance Internet Applications*, 44 *ACM SIGOPS Operating Systems Review* 3 (2010), https://doi.org/10.1145/1842733.1842736.

[4]    Jorge Gasca, *Content Is King – Original Bill Gates Essay & How It Applies Today*, THREE STEPS BUSINESS (Mar. 11, 2014), https://threestepsbusiness.com/content-is-king-bill-gates/.

Contrary to the Commission's view, today's Internet is more dominated and controlled by CDNs – a group of servers that store content close to end users – and by hyperscale private networks run by giants such as Amazon than by BIAS providers. As much as 90 percent of Internet traffic originates in third-party CDN servers, mostly located within BIAS provider facilities.[5] These private networks are held together by the dynamic behavior of the DNS, which turns domain names into Internet Protocol addresses that browsers then use to load Internet pages. The DNS has become much more sophisticated than its telephone book-like function in the 1980s – it is the backbone of the Internet and the glue that holds our modern Internet together.[6] There is no Internet service today without CDNs and the DNS. Comments of Richard Bennett, WC Docket No. 23-320, at 6 (filed Dec. 14, 2023).

Although the Commission claims that BIAS providers use the DNS only for purposes of load balancing and other "network management" functions, this argument fails because the resources BIAS operators manage include the network

---

[5] Geoff Huston, *et al.*, *The Rise and Rise of CDNs*, YOUTUBE, https://www.youtube.com/watch?v=gxO73fH0VqM (streamed live on Feb. 28, 2024); Petros Gigis, *et al.*, *Seven Years in the Life of Hypergiants' Off-Nets*, PROCEEDINGS OF THE 2021 ACM SIGCOMM 2021 CONFERENCE, 516-33, https://dl.acm.org/doi/pdf/10.1145/3452296.3472928.

[6] Kyler West, *What Is DNS?*, CONSTELLIX (Apr. 19, 2021), https://support.constellix.com/support/solutions/articles/47000862623-what-is-dns-; *Enterprise DNS Architectures and Best Practices*, GARTNER RESEARCH (June 22, 2007), https://www.gartner.com/en/documents/1467224.

servers that belong to the CDNs, not just the BIAS providers' wires and facilities. Thus, the DNS cannot be dismissed as "network management."

Nor can the DNS be dismissed as a severable information service. In the Order, the Commission attempts to conceal how consumers' BIAS learns which Internet Protocol address enables them to obtain the content they wish to receive. *See, e.g.*, Order ¶ 113 (App. 64-65). In fact, the CDN stores preferred Internet Protocol addresses in a BIAS provider's DNS at various locations, and the consumer retrieves them before the "telecommunications" (transmission) component of BIAS begins. These actions – storage and retrieval – are non-severable and are the hallmarks of an information service.

Nor does BIAS fit into the definition of a "telecommunications service." The definition of "telecommunications" – "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received," 47 U.S.C. § 153(50), is far too narrow to encompass the whole of what Internet access service is. That some transmission is involved is not determinative; by definition, it is impossible to provide an information service without telecommunications, so the mere fact that some telecommunications takes place when a consumer enjoys a Netflix movie, for example, does not suggest that the BIAS provider has used a telecommunications service, instead of an information service, to deliver it. Rather, the provision of

telecommunications and information services are completely intertwined on both sides of the interface between the BIAS network and the CDN, and there is no question of separability. The consumer cannot direct the BIAS provider to transmit the information from the endpoint of their choosing unless and until the CDN tells the consumer which Internet Protocol address corresponds to said endpoint. And the consumer cannot obtain this endpoint identity without the completion of an information service retrieval transaction.

That BIAS is an information service is also evidenced by its integral caching functions. DNS transactions are cached – stored closer – by the BIAS provider. The Commission argues that caching is a network management function, but BIAS providers that both provide and host CDNs within their own network facilities, using data center real estate, electricity, and Internet Protocol addresses that belong to the BIAS providers, are caching because it improves performance and reduces cost – an integral aspect of their service. Content originating outside BIAS provider facilities cannot compete with local data for low latency because of the physical effect of distance on signal propagation. Because local content has an inherent advantage over remote content in terms of latency, CDNs are beneficial fast lanes, boosting performance for all consumers. The Commission acknowledged this in its 2017 *Restoring Internet Freedom* Order, demonstrating that Internet transmission is "intertwined" or "integrated" with information service processing capabilities. *See*

*Restoring Internet Freedom*, Declaratory Ruling, Report and Order, and Order, 33 FCC Rcd 311, ¶¶ 34, 41-42 (2017).

Finally, the Commission's argument that today's Internet is too different from the Internet evaluated in *Brand X* for that decision's conclusion to be relevant is wrong. The Internet is always evolving, but what the Commission fails to appreciate is that by the time of *Brand X*, the Internet had *already* undergone massive transformation from its inception as a network of professors using remote supercomputers and was largely functioning as it does today. CDNs were embedded within BIAS facilities at the time of *Brand X* – then, Akamai alone transmitted 15 to 20 percent of all Internet traffic from thousands of servers in hundreds of BIAS facilities—as they are today.[7] In the early research era of the Internet, the National Science Foundation network was the Internet's backbone, but by the time of *Brand X*, the DNS was the backbone and that remains true today. There is no reason for the service to now be classified differently than it was when *Brand X* was decided. Despite its evolution, the Internet is functionally the same. BIAS should continue to be classified as an information service.

---

[7]     Josh Catone, *Akamai Releases Internet Traffic Visualizations*, READWRITE (June 7, 2007), https://readwrite.com/akamai_visualizations/; Akamai, *Annual Report 2005* (2005).

## ARGUMENT

### I. BROADBAND INTERNET ACCESS SERVICE IS AN INFORMATION SERVICE THAT INHERENTLY INTEGRATES TRANSMISSION WITH INFORMATION PROCESSING FUNCTIONS

The Commission's finding that BIAS is a telecommunications service ignores the technical proof that the Internet is best classified as an information service because it is managed collaboratively and the DNS, CDN, and other services are inherently integrated with information processing functions.

BIAS takes an entirely different approach to the management of information resources than do traditional telecommunications service networks. The differences in the way the two types of networks operate – for example, in the way they manage traffic, handle congestion avoidance, or offer the DNS, caching, or protection against viruses – are critical in placing BIAS squarely within the definition of "information service." At base, BIAS requires information-processing capabilities, as well as telecommunications (*i.e.*, transmission) to provide adequate service to consumers.

### A. While Traffic On Telecommunications Service Networks Is Managed By The Network Provider, The BIAS Network Is Managed Collaboratively.

One of the most important aspects of any network service is how traffic flows and how congestion is avoided and mitigated to protect the network from overload. On the Public Switched Telephone Network, *i.e.*, a telecommunications service, traffic congestion is prevented by the network's refusal to connect new calls unless

the network has sufficient unassigned resources to guarantee that it can transmit each bit of call information without undue delay. This is because, as a transport service, the Public Switched Telephone Network must immediately transmit the information without change.

The Internet approaches network traffic flow in an entirely different way, and this distinction makes all the difference in how the service is appropriately classified. Services using Internet Protocol, such as BIAS, do not have the concept of a "call" because IP is a "connectionless protocol" – it is "always on." As traffic flows over the network, the Internet's Transmission Control Protocol directs traffic and addresses congestion by responding to signals from a BIAS provider network. A BIAS network signals the Transmission Control Protocol to increase or reduce the rate at which packets of information are transmitted to a BIAS network when network loads change. *See* Van Jacobson and Michael Karel, *Congestion Avoidance and Control*, SYMPOSIUM PROCEEDINGS ON COMMUNICATIONS ARCHITECTURES AND PROTOCOLS, STANFORD, CA, 164 (1988). This signaling works best over short distances, and the path from CDN to user is shortest when content is hosted in BIAS provider facilities. Without this integration, BIAS – and Internet use – would be much less valuable.

These processes are seamlessly integrated with the Internet's transmission system by virtue of their dynamic qualities. There can be no transmission of data

over the Internet unless these signal processes occur. By dynamically managing the rate at which information enters and exits locally hosted CDNs, BIAS is offering a capability for "generating, acquiring, storing, transforming, processing, retrieving, utilizing and making available" information – a hallmark of an "information service." 47 U.S.C. § 153(24).

Delving more deeply into the relationship of Internet applications (commonly referred to as "apps") and transmission makes clear the integrated nature of transport (telecommunications) and information service functions on broadband networks. When BIAS users consume video entertainment from services such as Netflix, they interact directly with a portion of the Netflix system that they have allowed into their homes in the form of an application running on a streaming device (such as an Apple TV) or within a web browser. The application immediately interacts with a partner application running on a proprietary Netflix video server at a nearby BIAS provider location. The user tells the local Netflix application the content they wish to view, and Netflix provides the content to the user by verifying the user's account, locating an appropriate server, matching the resolution of the content to the user's device, and delivering content to BIAS over a local area Ethernet connection. Netflix retrieves the content from a BIAS-hosted local server using a BIAS-provided DNS, a BIAS-issued Internet Protocol address, a BIAS-provided local area Ethernet, and access to the BIAS wide-area network through a BIAS-provided local Ethernet

switch.  BIAS enables the pair of Netflix applications to cooperate with each other so closely that they are considered a single, unified, "distributed application" by computer scientists.  This same basic process takes place inside every Internet application we use, whether Facebook, Instagram, X, or World of Warcraft.  Content providers and BIAS work together to stream content to their common customers like partners in a joint venture.

The communication that takes place within computer operating systems and through the BIAS network's operating system is known as inter-process communication.  *See* John Day, *et al.*, *Networking is IPC: A Guiding Principle to a Better Internet*, CONEXT '08, PROCEEDINGS OF THE 2008 ACM CONEXT CONFERENCE, 1-3 (2008).  The distributed applications engaged in inter-process communication do not necessarily know whether their partner application is in the same device or across a network, because inter-process communication functions in the same way in either case:  it notifies the sending partner that its message has been sent, it delivers a signal when the message is received, and it delivers a correlated reply to the appropriate process.  Sophisticated inter-process communication systems prioritize signals and messages according to their relative urgency and tailor their behavior according to application needs.

Within this inter-process communication, BIAS's role is to analyze, interact with, and react to the information it receives, not just serve a transmission function.

11

Through its inherent packet multiplexing capability, BIAS supports multiple concurrent inter-process communication sessions to distinct Internet Protocol endpoints and even to distinct processes within the same endpoint; multiplexing is outside the user's control on the Public Switched Telephone Network. And just as inter-process communication is not a transmission service when it takes place within a single device, it does not become one when performed over a larger network. By hosting CDN services and reacting according to what it learns and perceives, BIAS engages in access, retrieval, storage, and processing of information that enables CDN services to freely function as they see fit and thereby facilitates the access, retrieval, storage, and processing of information. This can only be characterized as an "information service." 47 U.S.C. § 153(24).

### B. Broadband Internet Access Service Includes Information Processing Capabilities Unrelated To Transmission Or The Management Of Transmission.

BIAS providers also bundle functions with additional information-processing capabilities that enable and increase the value of the BIAS offering as a whole. These capabilities include not only the signals and reports about the Internet's congestion state discussed above, but also DNS for store-and-forward communication within BIAS, anti-virus software, and store-and-forward caching of third-party content.

### 1. Domain Name Service is a vital function unrelated to transmission or the management of transmission.

The DNS is a general purpose, distributed database managed jointly by BIAS providers and owners of Internet domains, such as bennett.com, for the benefit of users and applications. Domain owners store information in a wide variety of formats in the DNS database, and users and applications retrieve this information through database transactions. The DNS is used for many purposes, the best known of which is the mapping of domain names (such as google.com) to Internet Protocol addresses. Applications ask the DNS to translate a domain name, and they receive bespoke, location-dependent answers and place the answers inside the Internet Protocol data packets that they present to the BIAS provider for transmission to their partner applications.

Because of the DNS, the Internet Protocol address of the best and closest server is selected each time a consumer streams a video, loads a web page, or engages in a video call. The DNS does this because, unlike a telephone book or 411 directory assistance service, it can communicate multiple Internet Protocol addresses to a consumer depending on the current load state of the CDN, the locations of the content in the consumer's preferred format, licensing restrictions, the consumer's location, and other considerations. The DNS communicates the CDN's preferred server address to the consumer through an information service transaction carried out by the BIAS provider's DNS (or, in rare cases, by an alternative DNS made

available by the CDN or another large firm).  Thus, the DNS plays a vital role in enabling user applications to prepare packets for transmission and for consumers to enjoy content.

The DNS also enables CDN providers to manage the load within their networks and servers most efficiently.  CDN providers store content on multiple servers, including those located within BIAS provider facilities.  If a server is overloaded, the CDN provider stops advertising its Internet Protocol address, substituting the Internet Protocol address of a less loaded server.  BIAS providers enable third-party services to do this by supplying the dynamic database, the DNS.

The DNS also plays a vital role in email authentication.  The Sender Policy Framework and DomainKeys Authenticated Mail systems rely on the DNS for the storage and retrieval of domain identifiers and cryptographic keys to enhance security.  *See Binding Operational Directive 18-01*, *Enhance Email and Web Security*, DEP'T OF HOMELAND SECURITY (Oct. 16, 2017).

Each of these functions requires data processing or storage and retrieval of information from a distributed database – attributes that are the very essence of an "information service."  47 U.S.C. § 153(24).

The DNS is not, however, part of the transmission function, nor does it manage transmission.  An application's DNS translation transaction ends *before* the BIAS transmission begins.  The DNS enables CDN services to manage their own

networks of servers by providing them with a way to direct users to preferred servers. It allows CDN services to store a given piece of content on multiple servers and helps the user-side application determine which server is the best source for access to that content by virtue of its location or load status.  But the application's DNS transactions do not provide the BIAS provider with information about the best path to the destination.  The application's DNS transactions do not have the power to either optimize or impair the BIAS provider network.  For all of these reasons, the DNS does not manage the BIAS transmission function and is not part of managing a telecommunications service, and so the Commission's conclusion that DNS is within the telecommunications service management exception to the "information service" definition, Order ¶ 128 (App. 77), is incorrect.

That DNS is not a BIAS network management function is confirmed by the fact that, in some cases, BIAS providers are not even aware that the DNS transactions have taken place, because applications may use their own DNS instead of the one offered by the BIAS provider.  Google, IBM, and Cloudflare, for example, provide free DNS to anyone who wants it, and recent versions of the Google Chrome and the Mozilla browsers direct users toward these non-BIAS provider DNS systems by using the "DNS over HTTP" protocol.  *See* Google, *DNS-over-HTTPS* (Sept. 4, 2018); Paul Hoffman and Patrick McManus, *Internet Draft: DNS Queries over HTTPS*, THE INTERNET ENGINEERING TASK FORCE 2-9 (Aug. 2018).  Firms such as

Google provide the DNS to collect information about the behavior of Internet users and to prevent potential competitors for Internet advertising sales – the BIAS providers – from seeing this information.

While BIAS providers offer DNS functionality as part of their integrated service offering to consumers, and while the vast majority of end users use the DNS functionality offered by their BIAS provider, the fact that BIAS customers are free to use third-party DNS further demonstrates that DNS is in no way a BIAS network management function. It would be irrational for BIAS providers to delegate management of their networks to CDN services, and they do not. CDN services have no incentive to manage BIAS efficiently nor the best knowledge of how to do so.

Moreover, while the Commission seeks to dismiss the DNS as a "routing function" merely because it supplies information services with destination addresses, Order ¶ 137 (App. 85-86), the DNS does many other things that make clear its capabilities are neither related nor restricted to telecommunications network management. The DNS tells users the domain names of Internet addresses, such as 2607:f8b0:4009:80f::200e (google.com). It can advise on the identities and reputations of email senders through blacklists, whitelists, and cryptographic authentication systems, such as Domain-based Message Authentication, Reporting, and Conformance. And it does all of this not by interacting with Internet users

directly, but when users run information service applications that interact with the DNS database. DNS is so seamlessly integrated into broadband Internet service that users are not even aware they are using it. These are features of an information service.

### 2. Caching is a vital function unrelated to transmission or the management of transmission.

Caching's storage and retrieval capabilities are also an indispensable part of offering BIAS service, and its use further demonstrates why BIAS is an information service.

Caching – chiefly in the form of BIAS provider and hosted CDNs – makes bundled and proprietary information available to consumer applications at high quality. Caching is a service that adds value to IP networks by dynamically storing information closer to the point of consumption. When BIAS providers use caching, it is simply a part of how they store, process, and deliver service to end users; end users do not decide when or whether to accept cached content. And a data service offering "storage" capacity is clearly an "information service." 47 U.S.C. § 153(24). In the Notice of Proposed Rulemaking that the Commission released prior to adopting the Order, the Commission admitted that "*[CDNs] are integral to transmitting data and delivering communications to Internet endpoints.*" *Safeguarding and Securing the Open Internet*, Notice of Proposed Rulemaking, WC Docket No. 23-320, FCC 23-83, ¶ 67 (rel. Oct. 20, 2023) (emphasis added).

17

Moreover, caching cannot be dismissed as a telecommunications network management function, as the FCC seeks to do. *See* Order ¶ 139 n.546 (App. 87). Caching is indispensable to BIAS customers. Caching is a user-facing, latency-reducing, essential function, not an inward-looking network management activity. Caching is an integral part of the service because it is the only mechanism that can overcome latency. This is especially vital in rural areas, where latency as well as transmission costs are extremely high. The Transmission Control Protocol's dynamic load balancing feature penalizes far away sites. Regardless of the bits-per-second data rate of the transmission service, transit latency determines how quickly services can send data to clients. By storing popular content close to end users, caching reduces delay and increases performance. This is not a transmission management function: caching does not affect the transmission rate of bits on the network medium. It simply ensures that bits can be processed by network transmitters and receivers more expeditiously.

That caching is not a network management function is further demonstrated by the fact that caching is often done not by BIAS providers, but by third parties. Video streaming services, for example, offer caching devices to BIAS providers for placement inside the providers' networks. One well-known example is the Netflix Open Connect program, which Netflix describes in terms of *quality*, stating that "[t]he goal of the Netflix Open Connect program is to provide our millions of Netflix

subscribers the highest-quality viewing experience possible." *See Netflix Open Connect*, NETFLIX, INC. (2024), https://openconnect.netflix.com/en/.  Researchers have discovered that most Internet data is cached within BIAS networks.[8]  In every instance of caching, whether by BIAS providers, CDN providers, or other third parties, the DNS can work in concert with caching systems to determine which of several sources of a desired piece of content is likely to perform best at any given time.  Because caching is an integral part of BIAS itself, it further demonstrates that BIAS is an information service.

## II.  NEITHER THE INTERNET ARCHITECTURE NOR BIAS HAS CHANGED SIGNIFICANTLY SINCE THE *BRAND X* DECISION

The Commission asserts that the very nature of the Internet, as well as the broadband services that provide access to it, have changed significantly since the Supreme Court issued the *Brand X* decision in 2005, such that the *Brand X* conclusions are no longer relevant.  *See, e.g.*, Order ¶ 187 (App. 123).  This claim is based on a flawed understanding of both the Internet and BIAS.

The structure, organization, and distribution of functions within the Internet that make up its architecture have remained constant since the rise of the CDN in 1999.  Today, as in 2005, the fundamental elements of the Internet are protocols: Hypertext Transfer Protocol, Transmission Control Protocol, User Datagram

---

[8]     Gigis, *et al.*, *Seven Years in the Life of Hypergiants' Off-Nets*.

Protocol, and Internet Protocol.  The addition of a new transport protocol, QUIC, does not change this organization.  Geoff Huston, *A Quick Look at QUIC*, https://www.ausnog.net/sites/default/files/ausnog-2023/presentations/ AusNOG2023-D1.2-Huston-APNIC-A_Quick_look_at_QUIC.pdf.

Although BIAS provider CDNs, private CDNs (*e.g.*, Netflix), and third party CDNs (*e.g.*, Akamai) hosted within BIAS networks have become more prevalent since *Brand X*, the fundamental nature of the Internet has not changed.  At the time of *Brand X*, CDNs were the source of 15 to 20 percent of Internet traffic.  Today the figure is 75 to 90 percent.[9]  This is a difference of degree but not of kind.

Just as in 2005, the Internet's architectural elements are organized in modules or layers:  Hypertext Transfer Protocol at the application layer, QUIC, Transmission Control Protocol, and User Datagram Protocol at the transport layer, and Internet Protocol at the network layer.  The application layer controls the selection and presentation of data on output devices such as displays.  The transport layer ensures the end-to-end integrity of IP data packets and controls congestion in the Internet's internals.  The network layer routes packets and identifies congestion.  Internet Protocol information packets are carried by data link layer facilities outside the scope

---

[9]     Peter Judge, *How CDNs Quietly Took Over the Internet, with Mark de Jong*, DCD PODCAST (Feb. 9, 2024), https://www.datacenterdynamics.com/en/news/dcd-podcast-how-cdns-quietly-took-over-the-internet-with-mark-de-jong/;  Huston *et al.*, *The Rise and Rise of CDNs*.

of Internet architecture. *RFC 791, Internet Protocol*, DEFENSE ADVANCED RESEARCH PROJECTS AGENCY (1981), https://www.rfc-editor.org/rfc/rfc791.txt, Figure 1.

The predominant Internet application today, as it was in 2005, is the World-Wide Web, an application that uses the protocols described above. Today, the Internet consists of tens of thousands of networks around the world that interconnect with the Internet Protocol. While the number of networks has grown over time, the way those networks exchange routes – using Border Gateway Protocol – has not. Today, as in 2005, these networks meet in public facilities – Internet exchanges and peering centers – or at private facilities of their own choosing. Internet Society, *Policy Brief: Internet Interconnection* (2015), https://www.internetsociety.org/policybriefs/internetinterconnection/.

In fact, while some changes in emphasis have taken place since 2005, mainly as a consequence of there being more users, more applications, more bandwidth, more devices, and more mobility, the overall architecture of the Internet has remained constant. The Internet is as it has been since its privatization in the mid-1990s. This is for a very practical reason: the sheer scale of the Internet makes fundamental change extraordinarily impractical. Mark Handley, *Why the Internet Only Just Works*, 24 BT TECH. J. 119 (2006), https://doi.org/10.1007/s10550-006-0084-z.

The way BIAS providers interact with the Internet to offer their service from a technical perspective also has largely remained unchanged since 2005. BIAS providers interconnect with other networks in the same way, using the same protocols, and offering the same capabilities. BIAS providers continue to enable customers to join their home and office networks to the rest of the Internet, as both sources and consumers of information content and processing services. BIAS providers interconnect with other networks according to freely negotiated technical and business agreements, just as they always have. And, just as then, they continue to offer the capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information to end user customers. Over the last twenty years, the market for Internet edge services has become more concentrated, and new technologies, such as mobile LTE, have emerged, but Internet technology has not fundamentally changed. *Brand X*'s holdings remain as true today as then.

## CONCLUSION

The telecommunications network assigns limited resources in a very egalitarian way: everyone who is on a call gets the same bandwidth, even if they want more. And everyone who is not on a call gets no resources. This approach is egalitarian, but it is also rigid, arbitrary, and inefficient from the standpoint of distributed computing.

Broadband networks had to be created because distributed computing needs a different resource management strategy than the one devised for telephone calls with traditional Title II services. The Internet's purpose is to support distributed applications, and its theoretical origins are in operating systems research; BIAS is principally for information access, retrieval, storage, and processing, not for mere telecommunications. As the Internet continues to grow, its existence requires – and indeed, depends on – having the greatest possible freedom for experimentation with new resource allocation strategies.

Content providers have found that the most efficient way to deliver content to Internet users is to host servers within BIAS facilities that are local to their users. While the research Internet focused on access to expensive computers located hundreds and thousands of miles away, the consumer Internet of today delivers content over an average distance of less than 50 miles per packet. This is only possible because BIAS providers and CDN providers are free to contract with each other. The Commission desires Title II authority to prevent fast lanes, unreasonable discrimination, blocking, throttling, and paid prioritization. Interconnection contracts between BIAS providers and parties, such as CDN operators, typically include service level commitments that address such concerns in greater detail than does the Order.

BIAS providers invite CDN providers to join their services with those of BIAS providers to form a seamless whole.  BIAS providers give CDNs access to rack space within BIAS provider data centers, electricity to power CDN servers, Internet Protocol addresses owned by the BIAS provider, a distributed database to steer users to the servers that are best for the CDN providers, a local area network to enable communication between and among CDN servers, and a tool to manage CDN servers themselves, the DNS.  The close collaboration and cooperation between BIAS and CDN providers enable these parties to intertwine their services into the one rich, coherent, and uniform information service perceived by consumers as the Internet.  And the DNS, CDN, and other caching functions that are integral to BIAS further demonstrate that BIAS is an information service.

The Order is out of sync with the technical realities of the public Internet of today and with BIAS.  The Court should set aside the Order and hold that BIAS is an "information service" under the Communications Act.

Respectfully submitted,


/s/ Tara M. Corvo

Tara M. Corvo

Mintz, Levin, Cohn, Ferris,
  Glovsky and Popeo, P.C.

555 12th Street., N.W.

Suite 1100

Washington, DC 20004

*Telephone* (202) 434-7300

*Facsimile* (202) 434-7400

*Counsel for Amicus Curiae Richard Bennett*

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,319 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: August 19, 2024

*/s/ Tara M. Corvo*
Tara M. Corvo
Counsel for Amicus Curiae

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the Court's CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and service was accomplished by the Court's CM/ECF system.

*/s/ Tara M. Corvo*
Tara M. Corvo