### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Nos. No. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, 24-3538

———————

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

———————

On Petitions for Review of an Order of the Federal Communications Commission

———————

### BRIEF OF PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES AS AMICUS CURIAE IN SUPPORT OF PETITIONERS

LAWRENCE J. SPIWAK
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
(202) 274-0235
Counsel for Phoenix Center

August 19, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The undersigned attorney of record, in accordance with Federal Rule of Appellate Procedure 32, hereby certifies as follows:

### A. Petitioners

Parties appearing in this Court as Petitioners are the Ohio Telecom Association, USTelecom – The Broadband Association, the Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, CTIA – The Wireless Association, WISPA – The Association for Broadband Without Boundaries, ACA Connects – America's Communications Association, the Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and the Texas Cable Association.

### B.    Ruling Under Review

The Phoenix Center for Advanced Legal and Economic Public Policy Studies files this brief as *amicus curiae* in support of the Petitioners seeking review of the final order of the Federal Communications Commission captioned *In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* WC Docket No. 23-320; WC Docket No. 17-

108, FCC 24-52, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, 89 FED. REG. 45404 (published May 22, 2024) ("*2024 Order*").

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for the

Phoenix Center hereby certifies that all parties have consented to the filing of

this brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A) the Phoenix Center for Advanced Legal & Economic Public Policy Studies submits the following corporate disclosure statement:  The Phoenix Center is a non-profit 501(c)(3) non-stock corporation organized under the laws of Maryland.  As such, the Phoenix Center has no parent companies and no one holds an ownership interest in the Phoenix Center.

<u>s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## CERTIFICATE REGARDING AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 24(a)(4)(E), the Phoenix Center certifies that no party's counsel authored this brief, in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the Phoenix Center contributed money that was intended to fund preparing or submitting the brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

# TABLE OF CONTENTS:

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ............................................................... ii

CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE ........ iv

CORPORATE DISCLOSURE STATEMENTS ............................................v

CERTIFICATE REGARDING AUTHORSHIP .......................................... vi

TABLE OF AUTHORITIES ...................................................... ix

INTEREST OF AMICUS ..............................................................1

SUMMARY OF ARGUMENT ....................................................2

ARGUMENT ..........................................................................4

I.    The Court Was Correct to Conclude that Reclassification of Broadband
      Internet Access Services is a Major Question of Vast Economic and
      Political Significance ...........................................................4

      A.    *"Net Neutrality"* is the Ultimate Political Football ...................4

      B.    Reclassification has Significant Economic Consequences ...... 10

            1.    Empirical Questions Demanded Empirical Answers..... 14

            2.    The Commission Improperly Discounted Dr. Ford's Work
                  on Investment Effects in the *2024 Order* ....................... 17

            3.    The Commission Improperly Ignored Record Evidence
                  that Reclassification Deterred Deployment .................. 23

II.    The Commission is Improperly Trying to Re-Write the Communications Act ............................................................... 24

CONCLUSION ............................................................................ 34

CERTIFICATE OF COMPLIANCE ........................................... 35

CERTIFICATE OF SERVICE ..................................................... 36

## TABLE OF AUTHORITIES:

**Page(s):**

## CASES:

*Auer v. Robbins*, ........................................................................... 27
  519 U.S. 453 (1997).

*Biden v. Nebraska,* ...................................................................... 24
  600 U.S. 477 (2023).

*Loper Bright Enters. v. Raimondo* ........................................... 10, 27
  144 S.Ct. 2244 (2024).

*MCI Telecommunications Corp. v. AT&T,* ................................... 24
  512 U.S. 218 (1994).

*Util. Air Regul. Grp. v. EPA,* .......................................................4
  573 U.S. 302 (2014).

*West Virginia v. EPA,* ................................................................. 4
  142 S.Ct. 2587 (2022).

*In re MCP No. 185 (Stay Order),* ................................................ 4
  2024 U.S. App. LEXIS 19815 (6th Cir. August 1, 2024).

*Cincinnati Bell Telephone Company v. FCC,* ...................... 22, 29
  69 F.3d 752 (6th Cir. 1995).

*Farmers Union Central Exchange v. FERC,* .............................. 28
  734 F.2d 1486 (D.C. Cir.), *cert denied sub nom.,*
  469 U.S. 1034 (1984).

*Fed. Power Comm'n. v. Conway Corp.,* ..................................... 28
  426 U.S. 271, 278 (1976).

*Mozilla Corp. v. FCC,* ............................................................................ 8, 20
    940 F.3d 1 (D.C. Cir. 2019).

*Sw. Bell Telephone Co. v. FCC,* ................................................................. 29
    168 F.3d 1344 (D.C. Cir. 1999).

*Time Warner Entm't Co. v. FCC,* ............................................................... 29
    56 F.3d 151 (D.C. Cir. 1995).

*USTelecom v. FCC,* ................................................................. 7, 8, 11, 14
    825 F.3d 674 (D.C. Cir. 2016),
    *pet. reh'g en banc denied,* 855 F.3d 381 (2017).

*United States v. FCC,* ................................................................................ 29
    707 F.2d 610 (D.C. Cir. 1983).

*\*Verizon v. FCC,* ................................................................ 7, 10, 27, 28, 31
    740 F.3d 623 (D.C. Cir. 2014).

*WorldCom v. FCC,* .................................................................................... 28
    238 F.3d 449 (D.C. Cir. 2001).

*\*Authorities upon which we chiefly rely are marked with asterisks.*

## STATUTES:

U.S. CONST. amend. V. ................................................................................ 32

Administrative Procedure Act, 5 U.S.C. § 553(c) ....................................... 24

Preamble, Telecommunications Act of 1996, Public Law 104–104 ............... 5

47 U.S.C. § 160 ...................................................................................... 24, 25

47 U.S.C. § 201 ...................................................................................... 25, 27

47 U.S.C. § 203 ................................................................................ 25, 31, 32

47 U.S.C. § 230(b)(2) ......................................................................5

47 U.S.C. § 1302 ..................................................................... 7, 22

## ADMINISTRATIVE MATERIALS:

EXECUTIVE ORDER 14036 ..............................................................9
    PROMOTING COMPETITION IN THE AMERICAN ECONOMY, 86 FED. REG.
    36987 (July 14, 2021).

*2005 Internet Policy Statement* .................................................. 17
    *Appropriate Framework for Broadband Access to the Internet over*
    *Wireline Facilities,* FCC 05-157, POLICY STATEMENT, 20 FCC Rcd. 14986
    (rel. September 23, 2005).

*Cable Modem Reclassification Order* .............................................5
    *Inquiry Concerning High-Speed Access to the Internet Over Cable and*
    *Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate*
    *Regulatory Treatment for Broadband Access to the Internet Over Cable*
    *Facilities,* DECLARATORY RULING AND NOTICE OF PROPOSED
    RULEMAKING, 17 FCC Rcd. 4798 (2002), *aff'd, NCTA v. Brand X,* 545
    U.S. 967 (2005).

*Wireline Broadband Reclassification Order* ..................................6
    *Framework for Broadband Access to the Internet over Wireline Facilities;*
    *Universal Service Obligations of Broadband Providers,* REPORT AND
    ORDER AND NOTICE OF PROPOSED RULEMAKING, 20 FCC Rcd. 14853
    (2005), *aff'd sub nom. Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205
    (3rd Cir. 2007).

*Wireless Reclassification Order* ...................................................6
    *In re Appropriate Regulatory Treatment for Broadband Access to the*
    *Internet Over Wireless Networks,* DECLARATORY RULING, 22 FCC Rcd.
    5901 (Mar. 23, 2007).

*BPL Reclassification Order* ........................................................................6
*United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, 21 FCC Rcd. 13281 (2006).

*2010 Open Internet Order* ................................................................... 7, 15
*In the Matter of Preserving the Open Internet, Broadband Industry Practices,* FCC 10-201, 25 FCC Rcd 17905, REPORT AND ORDER (rel. December 23, 2010), *rev'd Verizon v. FCC,* 740 F.3d 623 (D.C. Cir. 2014).

*2015 Open Internet Order* ......................................... 8, 10, 11, 12, 13, 14, 25
In the Matter of Protecting and Promoting the Open Internet, FCC 15-24, REPORT AND ORDER ON REMAND, DECLARATORY RULING, AND ORDER, 30 FCC Rcd. 5601 (rel.  March 12, 2015), *aff'd United States Telecom Ass'n v. FCC,* 825 F.3d 674 (D.C.  Cir.  2016), *reh'g en banc denied* 855 F.3d 381 (2017).

*2018 Restoring Internet Freedom Order ("RIFO")* ............... 8, 11, 12, 17, 18
*In the Matter of Restoring Internet Freedom,* FCC 17-166, DECLARATORY RULING, REPORT AND ORDER, AND ORDER, 33 FCC Rcd. 311 (rel. Jan. 4, 2018), *aff'd by, in part, vac'd by, in part, rem'd by Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019).

*OEA Letter* ................................................................ 19, 20, 21, 22
April 11, 2024 Letter from Dr. Guilia McHenry of the Office of Economics and Analytics, *Safeguarding and Securing the Open Internet,* WC Docket No. 23-320.

*2024 Order* ............................................................................ *passim*
*In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* FCC 24-52, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, __ FCC Rcd. __ (rel. May 7, 2024).

*Fifth Access Charge Reform Order* ............................................................ 29
*In The Matter of Access Charge Reform; Price Cap Performance Review For Local Exchange Carriers; Interexchange Carrier Purchases Of Switched Access Services Offered By Competitive Local Exchange*

*Carriers; Petition Of U S West Communications, Inc. For Forbearance From Regulation As A Dominant Carrier In The Phoenix, Arizona MSA,* FCC 99-206, FIFTH REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING, 14 FCC Rcd 14221 (rel. August 27, 1999).

## **MISCELLANEOUS**

Brennan, T.,.................................................................... 13
*Is the Open Internet Order an "Economics-Free Zone"?* Free State Foundation (June 28, 2018).

*Broadband Insights Report* (OVBI), 4Q23, OpenVault (2024) .................. 29

Brown, Stephen and Sibley, David, .......................................... 29
    The THEORY OF PUBLIC UTILITY PRICING (1986).

Choi, Jay Pil and Kim, Byung-Cheol, ....................................... 30
*Net Neutrality and Investment Incentives*, 41 RAND J. OF ECONOMICS 446-465 (2010).

Eggerton, J., ...............................................................9
*FCC Nominee Anna Gomez Backs "Robust" Title II-Based Open Internet Authority,* MULTICHANNEL NEWS (June 22, 2023).

*Expression of Concern:* .............................................. 18
*Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY (June 2020).

Ford, G.S., ............................................................. 21
*Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment,* PHOENIX CENTER PERSPECTIVE NO. 09-04 (October 29, 2009).

Ford, G.S., ......................................................... 11, 12
*Bait-And-Switch—Or Why the FCC's Virtuous Circle Theory is Nonsense,* BLOOMBERG BNA (May 18, 2015).

Ford, G.S.,................................................................................ 16
*Is the FCC's Regulatory Revival Deterring Infrastructure Investment?*
BLOOMBERG BNA (November 13, 2015).

Ford, G.S., ................................................................................ 21
*Below the Belt: A Review of Free Press and the Internet Association's Investment Claims,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-06 (June 20, 2017).

Ford, G.S., ................................................................................ 21
*Reclassification and Investment: An Analysis of Free Press' "It's Working" Report,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-04 (May 22, 2017).

Ford, G.S., ................................................................................ 14
*Net Neutrality, Reclassification and Investment: A Counterfactual Analysis,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-02 (April 25, 2017) and subsequently published as *Regulation and Investment in the U.S. Telecommunications Industry,* APPLIED ECONOMICS 50:56 (2018).

Ford, G.S., ............................................................................. 14, 18
*Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175–205 (2019).

Ford, G.S., ................................................................................ 18
*Testing the Economics of the Net Neutrality Debate: A Comment,* 45 TELECOMMUNICATIONS POLICY (June 2021).

Ford, G.S., ................................................................................ 32
*Middle-Class Affordability of Broadband: An Empirical Look at the Threshold Question,* PHOENIX CENTER POLICY BULLETIN NO. 61 (October 2022).

Ford, G.S., .......................................................................... 9, 11, 13
*Investment in the Virtuous Circle: Theory and Empirics,* PHOENIX CENTER POLICY PAPER NO. 62 (December 2023).

Ford, G.S., .................................................................... 19, 20, 21
*In Response to the FCC...*, PHOENIX CENTER POLICY PERSPECTIVE NO. 24-04 (April 18, 2024).

Ford, G.S., ................................................................................. 23
*The Federal Communications Commission's Section 706 Problem*, PHOENIX CENTER POLICY PERSPECTIVE NO. 24-01 (January 17, 2024).

Ford, G.S., Spiwak, L.J. and Stern, M., ............................................. 6, 7, 15
*The Broadband Credibility Gap*, 19 COMMLAW CONSPECTUS 75 (2010).

Ford, G.S. and Spiwak, L.J., ......................................................... 24, 26, 27
*Section 10 Forbearance: Asking the Right Questions to Get the Right Answers*, 23 COMMLAW CONSPECTUS 126 (2014).

Ford, G.S. and Spiwak, L.J., .................................................................. 16
*The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment*, PHOENIX CENTER POLICY PERSPECTIVE NO. 14-05 (October 14, 2014).

Ford, G.S. and Spiwak, L.J., ............................................................... 26, 30
*Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service*, 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015).

Genachowski, J., ............................................................................. 6, 11
*The Third Way: A Narrowly Tailored Broadband Framework*, Federal Communications Commission (May 6, 2010).

Imbens, G.W. and Wooldridge, J.M., .......................................................... 15
*Recent Developments in the Econometrics of Program Evaluation*, 47 JOURNAL OF ECONOMIC LITERATURE 5-86 (2009).

Spiwak, L.J., ....................................................................................8
*The "Clicktivist" In Chief*, THE HILL (November 12, 2014).

Spiwak, L.J., ....................................................................................7
*What Are the Bounds of the FCC's Authority over Broadband Service Providers?—A Review of the Recent Case Law*, 18 JOURNAL OF INTERNET LAW 1 (2015).

Spiwak, L.J., ...................................................................... 8, 18, 32
    *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW
    JOURNAL 39 (2019).

Tummarello, K., .......................................................................... 16
    *FCC Revives Net Neutrality,* THE HILL (February 19, 2014).

Weyl, G.E., .................................................................................. 30
    *The Price Theory of Two-sided Markets* (2006).

Wheeler, T., ................................................................................. 11
    Remarks at Silicon Flatirons Center, Boulder, Colorado (February 9,
    2015).

## <u>INTERESTS OF AMICUS CURIAE:</u>

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. Over the past two decades, the Phoenix Center has authored numerous scholarly articles about the Open Internet debate—many of which have been published in academic journals[1]—and the veracity of several of those papers is a central issue of contention in the case at bar. The Phoenix Center, therefore, has an established interest in the outcome of this proceeding and believes that its perspective will assist the Court in resolving this case.

---

[1]   For a full list of the Phoenix Center's academic publications about "net neutrality," *see:* https://www.phoenix-center.org/rt1.html.

## SUMMARY OF ARGUMENT:

In its August 1, 2024 Order granting a stay, this Court held that subjecting the Internet to legacy Title II regulation "is likely a major question requiring clear congressional authorization" because the FCC's *2024 Order* decides a question of "vast 'economic and political significance'." The Court's instincts are correct.

First, the "net neutrality" debate is the ultimate political football. Ping-ponging from de-regulation to regulation to deregulation and, yet again, back to regulation depending on what political party is in power is no model of legal clarity. How broadband services are regulated is determined every four years in November. As Justice Gorsuch noted in his concurrence in *Loper Bright Enters. v. Raimondo,* rather than "promoting reliance by fixing the meaning of the law," the net neutrality debate has resulted in "constant uncertainty and convulsive change even when the statute at issue itself remains unchanged."

Second, the evidence is overwhelming that the decision to subject the Internet to legacy public utility regulation will have significant economic consequences—both in terms of network investment and network

deployment. The fact that the FCC attempts to sweep this evidence under the rug provides no solace.

Third, the FCC is unlawfully re-writing the Communications Act to achieve its political objectives by abusing its forbearance authority. For example, the FCC states that it is forbearing from the ratemaking provisions of the Communications Act because it is not engaging in rate regulation. Yet, as the D.C. Circuit found in *Verizon v. FCC*, the Commission's "no blocking" and "no paid prioritization" rules are *explicitly* "zero price" regulation for terminating access and that edge providers are broadband providers' customers. But the Commission believes it can impose price regulation without providing a rate methodology, conducting a cost study, or allowing firms to challenge this rate via the tariffing process. The Commission has forbearance authority, no doubt, but portions of the statute are inexorably linked; the Agency may not impose regulatory demands whilst simultaneously forbearing from the statute's due process protections attached to such demands. The Commission's actions therefore raise significant due process and takings concerns under the Fifth Amendment. It is Congress' job, not the FCC's job, to rewrite statutes.

## ARGUMENT:

### I.    The Court Was Correct to Conclude that Reclassification of Broadband Internet Access Services is a Major Question of Vast Economic and Political Significance

In its August 1, 2024 Order granting a stay, *In re MCP No. 185*, 2024 U.S. App. LEXIS 19815 (August 1, 2024) ("*Stay Order*"), this Court held that subjecting the Internet to legacy Title II regulation "is likely a major question requiring clear congressional authorization" because the FCC's *2024 Order, In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* FCC 24-52, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, __ FCC Rcd. __ (rel. May 7, 2024), decides a question of "vast 'economic and political significance'." *Stay Order* at 6, *citing Util. Air Regul. Grp. v. E.P.A.,* 573 U.S. 302, 324 (2014); *see also West Virginia v. EPA,* 142 S.Ct. 2587, 2608 (2022).  As demonstrated below, the Court's instincts are correct.

#### A.    *"Net Neutrality" is the Ultimate Political Football*

Recognizing that the heavy-handed common carrier regulations designed in the 1930's for the old "Ma Bell" monopoly under Title II of the Communications Act would be an impediment to the development and deployment of high-speed Internet services, Congress made clear in the

Telecommunications Act of 1996 that it wanted a light-touch approach for the Internet.  The preamble to the 1996 Act states that the purpose of the 1996 Act shall be to "reduce regulation in order to … encourage the rapid deployment of new telecommunications technologies…"  Preamble, Telecommunications Act of 1996, Public Law 104–104.  Congress codified this approach in Section 230(b)(2) of the Telecom Act, 47 U.S.C. § 230(b)(2), which provides that it is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."

And for nearly twenty years after the enactment of the 1996 Act, there was bi-partisan consensus at the Commission to adhere to Congress' wishes: Broadband Internet access—regardless of the delivery platform—was classified as a lightly-regulated "information" service under Title I of the Act. *See, e.g., Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities,* DECLARATORY RULING AND NOTICE OF PROPOSED RULEMAKING, 17 FCC Rcd. 4798 (2002) (*Cable Modem Reclassification Order*), *aff'd, NCTA v. Brand X,* 545 U.S. 967 (2005); *Framework for Broadband Access to the Internet over Wireline Facilities; Universal Service Obligations of*

- 5 -

*Broadband Providers,* REPORT AND ORDER AND NOTICE OF PROPOSED RULEMAKING, 20 FCC Rcd. 14853 (2005) (*Wireline Broadband Reclassification Order*), *aff'd sub nom. Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205 (3rd Cir. 2007); *In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,* DECLARATORY RULING, 22 FCC Rcd. 5901 (Mar. 23, 2007) (*Wireless Reclassification Order*); *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, 21 FCC Rcd. 13281 (2006) (*BPL Reclassification Order*).

Yet in 2010, this bipartisan consensus turned to partisan bickering. In search of a legal foundation for a more expansive regulatory agenda, FCC Chairman Julius Genachowski threatened to abandon bipartisan precedent by classifying broadband Internet access as a common carrier "telecommunications" service under Title II, despite acknowledging that such "[h]eavy-handed prescriptive regulation can chill investment." *See* J. Genachowski, *The Third Way: A Narrowly Tailored Broadband Framework,* Federal Communications Commission (May 6, 2010) at p. 2. Investors recoiled and the stock prices of the broadband providers plummeted. Financial analysts also warned of slowed investment in the sector. *See* G.S.

Ford, L.J. Spiwak and M. Stern, *The Broadband Credibility Gap,* 19 COMMLAW CONSPECTUS 75 (2010) and citations therein. Recognizing the seemingly inevitable consequences, the Commission relented, adopting instead its *2010 Order* under Section 706 (47 U.S.C. §1302)—rules which the D.C. Circuit ultimately struck down in *Verizon v. FCC,* 740 F.3d 623 (D.C. Cir. 2014), because the Commission improperly subjected information services to common carrier rate regulation in violation of the Communications Act. (*See* Section II *infra*.)

Notwithstanding, the D.C. Circuit in *Verizon* provided the Commission with a legal "roadmap" to formulate policies to protect the "open Internet" without resorting to Title II. *C.f.* L.J. Spiwak, *What Are the Bounds of the FCC's Authority over Broadband Service Providers?—A Review of the Recent Case Law,* 18 JOURNAL OF INTERNET LAW 1 (2015). Although the Commission contemplated this path, faced with substantial political pressure—including a very public goading from the White House—the Commission in 2015 chose the "nuclear" option and imposed legacy Title II common carrier regulation on the Internet. *See, e.g., USTelecom v. FCC,* 855 F3d 381, 394 (D.C. Cir. 2017) (Brown, J. *dissenting from denial of pet. for reh'g en banc*) ("When the FCC followed the *Verizon* 'roadmap' to implement 'net neutrality' principles without heavy-handed regulation of Internet access,

the Obama administration intervened.  Through covert and overt measures, FCC was pressured into rejecting this decades-long, light-touch consensus in favor of regulating the Internet like a public utility.") (citations omitted); L.J. Spiwak, *The "Clicktivist" In Chief,* THE HILL (November 12, 2014).  Despite this momentous about face, the D.C. Circuit granted the FCC's tortured interpretation of the Communications Act expansive discretion and upheld the FCC's *2015 Order* in *USTelecom v. FCC,* 825 F.3d 674 (D.C. Cir. 2016), *pet. reh'g en banc denied*, 855 F.3d 381 (2017).  In so doing, the statutory construct of Title II was left with "no meaning; it is some bizarre legal hybrid that the FCC made up and the D.C. Circuit has, albeit indirectly, sanctioned." L.J. Spiwak, *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW JOURNAL 39, 41 (2019).

The tide turned back to "light touch" regulation during the Trump Administration.  In 2018, with the benefit of data about the effects of the *2015 Order*, the Commission issued its *Restoring Internet Freedom Order* ("*RIFO*").  *In the Matter of Restoring Internet Freedom,* FCC 17-166, DECLARATORY RULING, REPORT AND ORDER, AND ORDER, 33 FCC Rcd. 311 (rel. Jan. 4, 2018), *aff'd by, in part, vac'd by, in part, rem'd by Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019).  Despite the hyperbole at the time, the Internet did not end; to the contrary, for the next seven years the Internet

operated without incident as Congress envisioned (although there were some residual harmful economic effects on investment and jobs from the FCC's failed reclassification experiment).  *See, e.g.,* G.S. Ford, *Investment in the Virtuous Circle:  Theory and Empirics*, PHOENIX CENTER POLICY PAPER NO. 62 (December 2023) (estimating that between 2011 and 2020, Title II regulation reduced investment by approximately $81.5 billion, reduced sector employment by 195,600 jobs and labor compensation by $18.5 billion annually).

But for certain political constituencies, the siren call of aggressive regulation was too strong to ignore.  Soon after taking office, President Biden issued an executive order explicitly calling upon the FCC to return the Internet to the yoke of Title II.  EXECUTIVE ORDER 14036: PROMOTING COMPETITION IN THE AMERICAN ECONOMY, 86 FED. REG. 36987 (July 14, 2021). Unfortunately for President Biden, the FCC was deadlocked for most of his term, making reclassification impossible.  Anna Gomez, President Biden's nominee for the third and tie-breaking commissioner at the FCC, openly testified at her confirmation hearing—before a formal proceeding had even begun—that she was going to vote for reclassification once the Commission returned to a full complement of five Commissioners, *see, e.g.,* J. Eggerton, *FCC Nominee Anna Gomez Backs "Robust" Title II-Based Open Internet*

*Authority,* MULTICHANNEL NEWS (June 22, 2023).  And, lo and behold, that is exactly what happened with the *2024 Order*.  As Justice Gorsuch noted in his concurrence in *Loper Bright Enters. v. Raimondo,* 144 S.Ct. 2244, 2288 (2024), rather than "promoting reliance by fixing the meaning of the law," the net neutrality debate has resulted in "constant uncertainty and convulsive change even when the statute at issue itself remains unchanged."

B.    *Reclassification has Significant Economic Consequences*

The FCC's primary economic justification for reclassification in 2015—as well as in 2024 (*see, e.g., 2024 Order* at ¶ 10)—was the "virtuous circle" theory of investment.  Under this hypothesis, "Internet openness ... spurs investment and development by edge providers, which leads to increased end-user demand for broadband access, which leads to increased investment in broadband network infrastructure and technologies, which in turns leads to further innovation and development by edge providers." *See USTelecom,* 825 F.3d at 694, *citing Verizon v. FCC,* 740 F.3d at 634.  Thus, reasoned the Commission (absent any evidence), the benefits of the "openness" would outweigh the purported costs of reclassification.  *See, e.g., 2015 Order* at ¶ 410.

As the threat to infrastructure investment posed by heavy-handed, prescriptive regulations was well-established—a threat conceded even by regulators, *see, e.g.,* Genachowski, *supra*; Remarks of FCC Chairman Tom Wheeler, Silicon Flatirons Center, Boulder, Colorado (February 9, 2015) at p. 5 (Title II would impair the ability of "network operators to receive a return on their investment")—on appeal of the *2015 Order* several parties challenged the rules on the grounds that the Commission's finding that reclassification would not suppress broadband investment was arbitrary and capricious. *See USTelecom,* 825 F.3d at 707. But as the *2015 Order* had only just gone into effect, the evidence on investment effects was preliminary and the D.C. Circuit granted deference to the FCC's prognostications.

Despite the D.C. Circuit's deference to the Commission's divinations in *USTelecom*, the FCC's *2015 Order* was based on pure speculation and was shown to have had neither theoretical nor empirical support. G.S Ford, *Bait-And-Switch—Or Why the FCC's Virtuous Circle Theory is Nonsense,* BLOOMBERG BNA (May 18, 2015); Ford, *Investment in the Virtuous Circle, supra*. It speaks volumes when the Agency's Chief Economist at the time the *2015 Order* was crafted, Professor Tim Brennan, publicly conceded that the *2015 Order* was constructed in an "economics-free zone." *See USTelecom,* 825 F.3d at 764 (Williams, J. concurring and dissenting) (citations omitted).

For this reason, after a lengthy opportunity for notice and comment, the Commission in the *2018 RIFO* recognized that the previous Commission's application of the "virtuous circle" in the *2015 Order* "was at best only loosely based on the existing economics literature, in some cases contradicted peer reviewed economics literature, and included virtually no empirical evidence." *See RIFO* at ¶ 118 (citations omitted).

The fact that broadband networks and the applications that run over them are complements provides no reasoned basis for regulatory intervention. Complementary products and services are ubiquitous in the economy, and the FCC's "virtuous circle" hypothesis contained no defect requiring a remedy. Indeed, the term "virtuous circle" belies the need for government intervention: after all, *what part of virtue needs to be regulated?*  Ford, *Bait-and-Switch, supra.*   Faced with this logical conundrum, the Commission turned to analytical gymnastics and factual sleight-of-hand to justify its heavy-handed regulation.

To square the circle, the Commission claimed that without regulatory control carriers will "disrupt[] the virtuous cycle" by "reducing consumer demand." *2015 Order* at ¶ 82.   This argument flouts the virtuous circle theory—demand and profits are positively related.   Profit-maximizing firms

don't take actions that reduce profits, including reducing the demand for their own products and services. Ford, *Bait-and-Switch, id.* Worse, the Commission swept pertinent facts under the rug. As even the FCC's Chief Economist at the time observed, the Commission's use of the "virtuous circle" was "unsupported" by the evidence because "broadband providers had already largely adopted net neutrality" and that fact "would have undermined the necessity of regulation." T. Brennan, *Is the Open Internet Order an "Economics-Free Zone"?* Free State Foundation (June 28, 2018).

Put simply, the virtuous circle theory implies nothing more than demand complementarity between the edge and core, a nearly uncontestable logic, but this self-reinforcing relationship between the two argues *against* regulatory intervention—not for it—as demonstrated by the stunning advancements in Internet technology and adoption under years of "light touch" Title I oversight. Both the *2015 Order* and the *2024 Order* effectively abandoned the "virtuous circle" theory by justifying regulation as protection from firms operating against their own interests. No such protection is needed. The virtuous circle theory, as laid out by the Commission, suggests, if anything, that regulatory intervention will itself disrupt the virtuous flow, thereby reducing investment incentives. Ford, *Investment in the Virtuous Circle, supra.* Given the Commission's disregard of the economics, it is little surprise

that the Government's proposed heavy-handed intervention into this otherwise "virtuous" circle beginning in 2010 reduced infrastructure investment. *See USTelecom,* 825 F.3d at 756 (Williams, J. concurring and dissenting) ("In short, the [2015] Order's probable direct effect on investment in broadband seems unambiguously negative.")  The question was by how much?

### 1. *Empirical Questions Demanded Empirical Answers*

When the Commission revisited the reclassification question in 2018, the investment effects question no longer required prognostication; the Commission had several years of data to consider.  The Commission was besieged with studies from both sides of the issue arguing that reclassification did (or did not) affect investment.  The Commission rejected most of them for lack of rigor.  (For a full review, *see* G.S. Ford, *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175–205 (2019).)

The Commission did find that the work of Phoenix Center Chief Economist Dr. George Ford—work subsequently published in a refereed academic journal—was rigorous:  Dr. Ford focused on the *"counterfactual"*—that is, *what would investment have been "but for"*

- 14 -

*reclassification?*  *2015 Order* at ¶ 93 (*citing* G.S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-02 (April 25, 2017) and subsequently published as *Regulation and Investment in the U.S. Telecommunications Industry,* APPLIED ECONOMICS 50:56 (2018).  The need for a counterfactual is obvious enough and a central feature of modern empirical analysis.  *See, e.g.,* G.W. Imbens and J.M. Wooldridge, *Recent Developments in the Econometrics of Program Evaluation,* 47 JOURNAL OF ECONOMIC LITERATURE 5-86 (2009).

Dr. Ford's findings were significant.  To quantify investment effects, Ford's first step was to establish a "treatment date."  Treatment dates are easily chosen for surprises, but not for the dreadfully long regulatory process.  As it turns out, empirical evidence provided a clear indicator as to when reclassification became embedded in the financial decisions of the industry and investors:  On May 6, 2010, Chairman Genachowski and his General Counsel Austin Schlick released statements outlining a path to reclassifying broadband as a Title II telecommunications service.  The announcement caught investors by surprise; a financial event study demonstrated that the stock prices of broadband providers fell by about 10% in the days following the announcement.  *See The Broadband Credibility Gap, supra.*  Despite its

actions in its *2010 Order*, the Commission nonetheless held open a regulatory proceeding proposing reclassification, leading then-Commissioner Ajit Pai to observe in 2014 (before the reclassification decision the next year) that "the specter of Title II reclassification hovers ominously in the background." K. Tummarello, *FCC Revives Net Neutrality,* THE HILL (February 19, 2014).

Between Chairman Genachowski's proposing reclassification in 2010 until the time Chairman Tom Wheeler formally made that change 2015, industry insiders knew reclassification was a probable policy outcome for Internet services. *See, e.g.,* G.S. Ford, *Is the FCC's Regulatory Revival Deterring Infrastructure Investment?* BLOOMBERG BNA (November 13, 2015); G.S. Ford and L.J. Spiwak, *The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment,* PHOENIX CENTER POLICY PERSPECTIVE NO. 14-05 (October 14, 2014). As Wall Street investment analysts acknowledged, by the time the FCC formally reclassified in 2015, Title II was already baked into network operators' investment decisions. *See Ford, Regulatory Revival, id.,* and citations therein.

With the treatment date of Title II established, using modern econometric methods and publicly-available data, Ford found sizable investment effects from reclassification. Between 2011 and 2016 (the last year data were

available), telecommunications investment was below from the counterfactual by between 20% and 30.  Ford also found no decline in investment following the release of the FCC's "Four Principles" to promote an Open Internet in 2005, *see Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* FCC 05-157, POLICY STATEMENT, 20 FCC Rcd. 14986 (rel. September 23, 2005), suggesting it was reclassification—not Net Neutrality principles—that reduced investment.  Ford, *Net Neutrality, Reclassification and Investment, supra*.

The Commission was impressed, concluding Ford's counterfactual analysis was a "reliable indicator of the direction of the change in investment" and, "[a]t the very least, the study suggests that news of impending Title II regulation is associated with a reduction in ISP investment over a multi-year period."  *RIFO* at ¶ 95.  If anything, noted the Commission, "Ford's negative result for investment was understated."  *Id.* at ¶ 96.

### 2.  *The Commission Improperly Discounted Dr. Ford's Work on Investment Effects in the 2024 Order*

As noted above, this Court was correct to conclude that reclassification is likely a major question of "vast 'economic and political significance'."  But

politics is a cut-throat business where the means often justify the ends. This case is no exception.

Dr. Ford is the only economist who has performed a competent (and peer reviewed) analysis to answer a central question in this proceeding: did reclassification in 2015 deter investment? *See* Ford, *A Review of Evidence, supra*; *see also Expression of Concern: Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY (June 2020) (Editors forced to describe a paper finding "no" investment effect by Chris Hooten post-publication as spurious after severe errors were discovered); G.S. Ford, *Testing the Economics of the Net Neutrality Debate: A Comment,* 45 TELECOMMUNICATIONS POLICY (June 2021). Dr. Ford's findings, naturally, were an impediment to the FCC's new efforts to re-regulate the Internet in a manner under consideration in this case.

Typically, administrative agencies will try to sluff inconvenient truths under the rug, either by a perfunctory footnote or by ignoring the evidence altogether, *see* Section I.B.3 *infra*, expecting deference from reviewing courts. *See, e.g., USTelecom and Its Aftermath, supra*. But as the Commission was so threatened by Dr. Ford's work in this case (which was good enough to

support the Commission's *RIFO*), the current Commission resorted to skullduggery.

On April 11, 2024—well after the public comment period ended and with just a little more than a week before the FCC's Sunshine Act provisions went into effect—Dr. Guilia McHenry, the head of the FCC's Office of Economics and Analytics, took the highly unusual step of entering into the docket a letter ("*OEA Letter*") providing several criticisms of Dr. Ford's peer reviewed paper. On April 18, 2024, Dr. Ford issued a detailed response, painstakingly responding to each one of the FCC's critiques and showing why the FCC's staff's analysis lacked merit. G.S. Ford, *In Response to the FCC…*, PHOENIX CENTER POLICY PERSPECTIVE NO. 24-04 (April 18, 2024). Yet when the final *2024 Order* was ultimately released, although the Commission described Dr. Ford's work as "rigorous," the Commission not only disparaged Dr. Ford's work, but unprofessionally engaged in *ad hominem* attacks and questioning his professional competency. *See 2024 Order* at ¶¶ 276-302.[2]

---

[2]    Indeed, at ¶ 288 the Commission states that Dr. Ford's work was one of only "a few studies cited in the present record and in the *RIF Order* record [which] attempt to perform any type of rigorous analysis of the effects on investment of open Internet regulations or Title II reclassification with forbearance," yet in ¶ 293 the Commission states that "Dr. Ford did not use a

(Footnote Continued….)

While we recognize that when "intricacies of econometric modeling are in dispute," courts "do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority," *see, e.g., Mozilla Corp. v. FCC,* 940 F.3d at 52, the Court should be aware of several points that reveal the analytical insincerity of the FCC's efforts:

First, even if the Court gives 100% deference to the Commission's attacks on Dr. Ford, the Court should note that the *OEA Letter* finds—based on the FCC Staff's analysis—that Title II reduced investment by about -6.2%, which, while smaller than what Dr. Ford reported in his 2018 paper (about -20%), nonetheless concedes the point that Title II reduced investment.  Ford, *In Response to the FCC, supra.*  Moreover, the *OEA Letter* established the fact that the FCC has investment data and the wherewithal to analyze them. Instead, the FCC devoted its efforts to clearing the record of peer-reviewed evidence conflicting with its pre-determined ends.

---

rigorous and principled methodology…."  As logic dictates that Dr. Ford's work cannot be both, such disparate descriptions reveal the Commission's analytical insincerity.

Second, the Commission produced no credible evidence that showed that Title II did not stymie investment.  Instead, *2024 Order* merely states that "[o]ther commenters argue that Title II reclassification would not reduce investment or innovation, and that there is no evidence that the *2015 Open Internet Order* reduced BIAS investment or that investment increased following the 2017 *RIF Order*." *2024 Order* at ¶ 278.  Who are these "other" commenters?  Two political interest groups—Free Press and the National Hispanic Media Coalition—neither of which has invested a dime in broadband infrastructure nor offered a "rigorous analysis" (by the *2024 Order*'s standards) of investment effects.  Indeed, the *OEA Letter* was necessitated by the fact that no party offered rigorous evidence to support the FCC's claim that their 2015 Title II regime did not affect investment, forcing the FCC to defend its ideology with nothing more than rumors.  *See, e.g.,* G.S. Ford, *Below the Belt: A Review of Free Press and the Internet Association's Investment Claims,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-06 (June 20, 2017); G.S. Ford, *Reclassification and Investment: An Analysis of Free Press' "It's Working" Report,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-04 (May 22, 2017); G.S. Ford, *Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment,* PHOENIX CENTER PERSPECTIVE NO. 09-04 (October 29, 2009).

Third, the Commission's preferred empirical methodology for quantifying investment effects is the method of Synthetic Counterfactuals. *See 2024 Order* at ¶ 290. However, the Commission refused to embrace the evidence based on that method submitted into the record in direct response to its instructions. Using the recommended empirical method, Dr. Ford reported negative investment effects consistent with his earlier study. *In Response to the FCC, supra*. Once again, the FCC's staff had the data and the capacity to conduct a serious analysis (as demonstrated by its *OEA Letter*) but chose not to do so, presumably because it produces a result incompatible with its regulatory intent.

Accordingly, the Commission is attempting to do in this case exactly what this Court chided the Agency for improperly doing in *Cincinnati Bell Tel. Co. v. FCC,* 69 F.3d 752, 763 (6th Cir. 1995) nearly thirty years ago: the "FCC, rather than showing that *it actually had some factual support for its conclusions*, uses the 'deference' standard of review as if it were an ink blotter waiting for this Court's rubber stamp to validate agency action." (emphasis in original).

3.    *The Commission Improperly Ignored Record Evidence that Reclassification Deterred Deployment*

But determining the effects on *investment* from reclassification is just one part of the "economic significance" inquiry.  With the FCC using Section 706 as independent authority for its regulatory intervention, it is sensible to look at the effects of reclassification on *deployment*.  *See* 47 U.S.C. §1302(b) (the "Commission shall determine whether advanced telecommunications capability *is being deployed to all Americans in a reasonable and timely fashion"*) (emphasis supplied).

The Phoenix Center's Dr. Ford also answered the deployment question (the only one to do so).  *See* G.S. Ford, *The Federal Communications Commission's Section 706 Problem,* PHOENIX CENTER POLICY PERSPECTIVE NO. 24-01 (January 17, 2024).  Section 706 is singular in its intent:  Congress wants the Commission to remove barriers to entry to promote broadband deployment to unserved areas.  No other purpose justifies the use of Section 706.  In its *2024 Order*, the Commission makes no claim that Title II regulation removes barriers to infrastructure investment in unserved areas; it is an implausible argument.  The Commission's justification for Title II regulation is to *reduce* broadband providers' degrees of freedom in

maximizing profit, so the regulations at best are neutral and are more likely a barrier to network deployment in unserved areas.

To demonstrate the point, Dr. Ford again conducted a counterfactual analysis of the Commission's broadband data, showing the application of Title II regulation during 2015 through 2017 did not improve the rate of broadband deployment to unserved areas and, in fact, may have slowed progress. Title II regulation, therefore, did not serve the sole aim of Section 706, and there is no reason to believe reimposing the regulation would do any better. *Id.*

But while the Commission directed all their fire to take down Dr. Ford's peer-reviewed paper demonstrating the harmful investment effects of Title II, the Commission *completely ignored* Dr. Ford's findings about the effects of Title II on deployment. This they may not do. The Commission is obligated to review and address the record evidence before it. *See* Administrative Procedure Act, 5 U.S.C. § 553(c). The Commission's failure to do so constitutes arbitrary and capricious decision-making.

## II.    The Commission is Improperly Trying to Re-Write the Communications Act

In response to the Supreme Court's ruling in *MCI Telecommunications Corp. v. AT&T,* 512 U.S. 218 (1994), in Section 10 of the 1996 Telecom Act

Congress provided the FCC with the authority to forbear from some statutory provisions in the Communications Act provided that certain conditions are met. 47 U.S.C. § 160. (For a detailed examination of this forbearance authority, *see* G.S. Ford and L.J. Spiwak, *Section 10 Forbearance: Asking the Right Questions to Get the Right Answers,* 23 COMMLAW CONSPECTUS 126 (2014).) However, this forbearance authority does not permit the Commission "to rewrite the statute from the ground up." *Biden v. Nebraska,* 600 U.S. 477, 494 (2023). Given the "history and breadth" of the power the FCC seeks to extend over the Internet, along with the "political and economic significance of that assertion," there are ample "reason[s] to hesitate before concluding that Congress meant to confer that authority." *Id.* at 501 (citations omitted).

The Commission proudly proclaims that its approach to common carrier regulation is not your parents' Title II. Instead, the Commission—using its authority under Section 10—states that it is forbearing from an assortment of statutory requirements, including, *inter alia*, the ratemaking requirements of Section 201 (47 U.S.C. § 201) and the tariffing requirements of Section 203 (47 U.S.C. § 203). *See 2024 Order* at ¶ 321. However, the criteria set forth in Section 10 do not jibe with the Commission's underlying theory of the case.

The Commission's central rationale for the *2015 Order* and the *2024 Order* rests on the same premise: the "Commission needs a mechanism to enable it to respond to attempts by BIAS providers to wield their gatekeeper power in ways that might otherwise compromise the open Internet…." *See 2024 Order* at ¶ 8. However, because a "gatekeeper"—under the Commission's own definition—has "both the incentives and ability to harm the open Internet," *2024 Order* at ¶ 16, Section 10's requirement that "enforcement of such regulation or provision is not necessary to ensure that the [carriers'] charges … are just and reasonable and are not unjustly or unreasonably discriminatory" cannot be satisfied. 47 U.S.C. § 160(a)(1); *see also* G.S. Ford and L.J. Spiwak, *Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service,* 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015).

The Commission responds that "persuasive evidence of competition is not a necessary prerequisite to granting forbearance under section 10 so long as the section 10 criteria otherwise are met." *2024 Order* at ¶ 314. In fact, the Commission argues, "[n]othing in the text of section 10 requires that forbearance be premised on a finding of sufficient competition where the Commission can conclude that the rules or provisions are not 'necessary' under section 10(a)(1) and (a)(2) and that forbearance is in the public interest

under section 10(a)(3) on other grounds." And, as a kicker, the Commission nonchalantly states in a footnote that to "the extent that commenters cite prior forbearance decisions relying on competition as sufficient to justify forbearance, that precedent does not persuade us that competition is inherently necessary to justify forbearance." *Id.* at fn. 1260.

Not so fast. Under the plain terms of Section 10, when listing the criteria required for forbearance, Congress deliberately used the conjunctive "and"— meaning that Congress clearly wanted *all*—and not just *some*—of the criteria satisfied before the Commission can forbear. *See Forbearance: Asking the Right Questions to Get the Right Answers, supra.* Moreover, the Commission cannot perfunctorily dismiss applicable precedent. To do so is a sordid "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer v. Robbins,* 519 U.S. 453, 462 (1997). This Court should grant no deference to the Commission's tortured interpretation of Section 10. *See Loper Bright, supra*.

The FCC's approach to forbearance from the ratemaking and tariffing requirements of Title II also drives home the point.

Throughout the *2024 Order*, the Commission takes great pains to argue that the ratemaking requirements of Section 201 are unnecessary because the

Commission is not engaged in rate regulation. *See, e.g., 2024 Order* at ¶ 6; *2024 Order* at fn. 2657 (the Commission [sic] strong commitment to not engage in rate regulation, despite speculative claims from some commenters that the Commission may someday decide to reverse course.")    The Commission's statement is patently false.

The D.C. Circuit in *Verizon v. FCC* explicitly recognized that the Commission's "no blocking" rule is "zero price" rate regulation for terminating access. *Verizon v. FCC*, 740 F.3d at 658. With intent, the FCC's rules are intended to "bar providers from charging edge providers for using their service, thus forcing them to sell this service to all who ask at a price of $0." *Verizon*, 740 F.3d at 657; *see also* Silberman J. Dissenting, 740 F.3d at 668 (with intent, the Commission's rule establishes "a regulated price of zero.")  Accordingly, the Commission's zero-price rule has the unambiguous effect of requiring carriers to terminate third-parties' traffic without any compensation. *See Verizon,* 740 F.3d at 654 (Commission seeks to "compel[] an entity to continue furnishing service at no cost.")

In reaching this "zero price," the Commission has violated every principle of Ratemaking 101. To wit, under Section 201, any rate must satisfy the "just and reasonable" ratemaking standard.    However, as the D.C. Circuit

recognized in *Farmers Union Central Exchange v. FERC,* 734 F.2d 1486, 1504 (D.C. Cir.), *cert denied sub nom.,* 469 U.S. 1034 (1984), the phrase "just and reasonable" is not "a mere vessel into which meaning must be poured." Rather, a "just and reasonable" rate must fall within a "zone of reasonableness"—i.e., a rate cannot be "confiscatory" (i.e., "below cost") on the bottom-end and "excessive" on the high-end.  *See Id*. at 1502.

Both the courts and the Commission have recognized that ratemaking is "far from an exact science".  *See, e.g., Fed. Power Comm'n. v. Conway Corp.,* 426 U.S. 271, 278 (1976*); WorldCom v. FCC,* 238 F.3d 449, 457 (D.C. Cir. 2001); *Sw. Bell Telephone Co. v. FCC,* 168 F.3d 1344, 1352 (D.C. Cir. 1999); *Time Warner Entm't Co. v. FCC,* 56 F.3d 151, 163 (D.C. Cir. 1995); *United States v. FCC,* 707 F.2d 610, 618 (D.C. Cir. 1983);*see also FCC Fifth Access Charge Reform Order,* 14 FCC Rcd. 14221 (rel. August 27, 1999) at ¶¶ 96, 144).  Even so, the Commission may not set a rate arbitrarily, but must provide its whys and wherefores on how it derived that rate.  *See, e.g. Century Communications Corp. v. FCC,* 835 F.2d 292, 300–02 (D.C. Cir. 1987) (rejecting FCC's judgment supported by "scant" evidence), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 2015, 100 L.Ed.2d 602 (1988); *Cincinnati Bell Telephone Company v. FCC*, *supra*.  The Commission provided no such analysis in the *2024 Order*.

Formulating termination rates is a complex and arduous task, but drudgery is no excuse for the Commission's avoidance of the requirements of its choice to apply Title II to the Internet.  Unquestionably, the cost of a service is not zero—there are no free lunches.  In fact, it could be argued that most of the costs of the broadband network are attributable to edge providers, since the bulk of traffic is downstream rather than upstream (a ratio of 15:1).  *Broadband Insights Report* (OVBI), 4Q23, OpenVault (2024) at p. 13.  Under a fully-distributed cost formula, it is feasible that much of the costs would be assigned to the edge providers.  Stephen Brown and David Sibley, THE THEORY OF PUBLIC UTILITY PRICING (1986) at pp. 44-9.  Under traditional ratemaking methods, it may be that the revenues from edge providers make up a lion's share of carriers' revenue from the sale of broadband service.  In such a world, the consumer would benefit greatly.  Economic theory predicts that as the edge providers' price rises, the end-users' price falls (the "waterbed" effect).  A more balanced rate structure across the two sides of the market may be beneficial to both network deployment and service adoption.  *See* Glen E. Weyl, *The Price Theory of Two-sided Markets* (2006) at p. 17-8; Jay Pil Choi and Byung-Cheol Kim, *Net Neutrality and Investment Incentives*, 41 RAND J. OF ECONOMICS 446-465 (2010) at pp. 453-7.

The Commission has failed to even consider such an inquiry in the case at bar. In fact, it has done nothing. What cost standard was used to establish this zero price? Historical cost? Forward-looking cost? Marginal cost? Average cost? Total Element Long Run Incremental Cost? We cannot know, because the Commission does not know. The Commission set a price of zero without a smidgen of analysis. In so doing, the Commission has arbitrarily established a "confiscatory" rate (a zero price) for terminating access. *See generally*, *Tariffing Internet Termination, supra.* The Commission is not free to regulate prices willy-nilly simply by forbearing from Section 201, as it aims to do. And, ironically, by forbearing from the tariffing requirements of Section 203, carriers now have no mechanism to challenge this rate.

In response, the Commission contends that because "our actions here merely regulate the commercial relationship between BIAS providers and their customers, they do not grant a right to physical occupation of the broadband providers' property and thus do not constitute a *per se* taking." *2024 Order* at ¶ 672. Instead, argues the Commission, because "we leave BIAS providers free to set market rates for the broadband Internet access services they offer end-users, we see no evidence that our regulatory approach 'threaten[s] an [ISP's] financial integrity' and is confiscatory." *2024 Order* at ¶ 681.

The Commission's argument is specious.

The *2024 Order* clearly sets a specific rate for terminating access—*zero*—without any form of analysis to back it up. Edge providers are "customers" because "broadband providers furnish a service to edge providers, thus undoubtedly functioning as edge providers' 'carriers'", *Verizon v. FCC,* 740 F.3d at 653). And, the providers are gatekeepers only with respect to edge providers. The Commission has not surrendered to the market the pricing of terminating access. *See Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003), *cert. denied,* 542 U.S. 937 (2004) (In the case of Section 203 forbearance, "[r]ates are determined by the market, not the Commission, as are the level of profits.") In detariffing, the Commission has not forborne from rate-setting, but has affirmatively set the rate at zero. What the Commission has done, or is attempting to do, is to ignore the explicit requirements of Title II of the Communications Act for setting a rate.

The Commission cannot have it both ways: Either the FCC properly regulates under the constraints of the Communications Act and its implementing caselaw or it lets the market govern firms' behavior. Despite the plain terms of the Communications Act, the Commission believes it is entitled to set the rates, terms and conditions of service of private firms

without regard to the due process and taking provisions of the Fifth Amendment. U.S. CONST. amend. V. Such a power grab cannot be condoned by this Court.[3]

---

[3]  Indeed, ever since the D.C. Circuit allowed the FCC to bypass basic ratemaking procedures in *USTelecom*, policymakers now believe they have a green light to arbitrarily set a rate whenever they please. *USTelecom and Its Aftermath, supra*; G.S. Ford, *Middle-Class Affordability of Broadband: An Empirical Look at the Threshold Question,* PHOENIX CENTER POLICY BULLETIN NO. 61 (October 2022).

**<u>CONCLUSION:</u>**

For the reasons set forth herein, the Phoenix Center joins Petitioners in urging this Court to find unlawful and, therefore, to vacate the Commission's *2024 Order.*

Respectfully submitted,

<u>s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

Dated:  August 19, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32, this brief contains 6446 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Office 365) used to prepare this brief.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak
August 19, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 19, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email: lspiwak@phoenix-center.org

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

Nos. No. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, 24-3538

————————

In Re: MCP No. 185: Federal Communications Commission, In the Matter of Safeguarding and Securing the Open Internet, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404, Published May 22, 2024.

————————

On Petitions for Review of an Order of the Federal Communications Commission

————————

## BRIEF OF PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES AS AMICUS CURIAE IN SUPPORT OF PETITIONERS

Lawrence J. Spiwak
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015
(202) 274-0235
Counsel for Phoenix Center

August 19, 2024

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The undersigned attorney of record, in accordance with Federal Rule of Appellate Procedure 32, hereby certifies as follows:

### A. Petitioners

Parties appearing in this Court as Petitioners are the Ohio Telecom Association, USTelecom – The Broadband Association, the Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, CTIA – The Wireless Association, WISPA – The Association for Broadband Without Boundaries, ACA Connects – America's Communications Association, the Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and the Texas Cable Association.

### B.    Ruling Under Review

The Phoenix Center for Advanced Legal and Economic Public Policy Studies files this brief as *amicus curiae* in support of the Petitioners seeking review of the final order of the Federal Communications Commission captioned *In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* WC Docket No. 23-320; WC Docket No. 17-

108, FCC 24-52, Declaratory Ruling, Order, Report And Order, And Order On Reconsideration, 89 Fed. Reg. 45404 (published May 22, 2024) ("*2024 Order*").

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for the

Phoenix Center hereby certifies that all parties have consented to the filing of

this brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A) the Phoenix Center for Advanced Legal & Economic Public Policy Studies submits the following corporate disclosure statement:  The Phoenix Center is a non-profit 501(c)(3) non-stock corporation organized under the laws of Maryland.  As such, the Phoenix Center has no parent companies and no one holds an ownership interest in the Phoenix Center.

<u>s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

# CERTIFICATE REGARDING AUTHORSHIP

Pursuant to Federal Rule of Appellate Procedure 24(a)(4)(E), the Phoenix Center certifies that no party's counsel authored this brief, in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and that no person other than the Phoenix Center contributed money that was intended to fund preparing or submitting the brief.

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic
Public Policy Studies
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

# TABLE OF CONTENTS:

**Page:**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ................................................................ ii

CERTIFICATE OF COUNSEL REGARDING CONSENT TO FILE ........ iv

CORPORATE DISCLOSURE STATEMENTS .............................................v

CERTIFICATE REGARDING AUTHORSHIP .......................................... vi

TABLE OF AUTHORITIES ....................................................... ix

INTEREST OF AMICUS ...............................................................1

SUMMARY OF ARGUMENT ....................................................2

ARGUMENT ...........................................................................4

I.    The Court Was Correct to Conclude that Reclassification of Broadband
Internet Access Services is a Major Question of Vast Economic and
Political Significance ...........................................................4

    A.    *"*Net Neutrality" is the Ultimate Political Football ...................4

    B.    Reclassification has Significant Economic Consequences...... 10

        1.    Empirical Questions Demanded Empirical Answers..... 14

        2.    The Commission Improperly Discounted Dr. Ford's Work
on Investment Effects in the *2024 Order*....................... 17

        3.    The Commission Improperly Ignored Record Evidence
that Reclassification Deterred Deployment.................. 23

II.     The Commission is Improperly Trying to Re-Write the Communications Act ................................................................ 24

CONCLUSION ............................................................................ 34

CERTIFICATE OF COMPLIANCE .......................................... 35

CERTIFICATE OF SERVICE ..................................................... 36

## <u>TABLE OF AUTHORITIES:</u>

**<u>Page(s):</u>**

## <u>CASES:</u>

*Auer v. Robbins*, ........................................................................... 27
   519 U.S. 453 (1997).

*Biden v. Nebraska,* ....................................................................... 24
   600 U.S. 477 (2023).

*Loper Bright Enters. v. Raimondo* ....................................... 10, 27
   144 S.Ct. 2244 (2024).

*MCI Telecommunications Corp. v. AT&T,* ................................ 24
   512 U.S. 218 (1994).

*Util. Air Regul. Grp. v. EPA,* ....................................................4
   573 U.S. 302 (2014).

*West Virginia v. EPA,* .................................................................. 4
   142 S.Ct. 2587 (2022).

*In re MCP No. 185 (Stay Order),* ................................................ 4
   2024 U.S. App. LEXIS 19815 (6th Cir. August 1, 2024).

*Cincinnati Bell Telephone Company v. FCC,* ....................... 22, 29
   69 F.3d 752 (6th Cir. 1995).

*Farmers Union Central Exchange v. FERC,* ............................. 28
   734 F.2d 1486 (D.C. Cir.), *cert denied sub nom.,*
   469 U.S. 1034 (1984).

*Fed. Power Comm'n. v. Conway Corp.,* .................................... 28
   426 U.S. 271, 278 (1976).

*Mozilla Corp. v. FCC,* ............................................................................ 8, 20
   940 F.3d 1 (D.C. Cir. 2019).

*Sw. Bell Telephone Co. v. FCC,* .................................................................. 29
   168 F.3d 1344 (D.C. Cir. 1999).

*Time Warner Entm't Co. v. FCC,* ................................................................ 29
   56 F.3d 151 (D.C. Cir. 1995).

*USTelecom v. FCC,* ................................................................... 7, 8, 11, 14
   825 F.3d 674 (D.C. Cir. 2016),
   *pet. reh'g en banc denied,* 855 F.3d 381 (2017).

*United States v. FCC,* .............................................................................. 29
   707 F.2d 610 (D.C. Cir. 1983).

*\*Verizon v. FCC,* ............................................................... 7, 10, 27, 28, 31
   740 F.3d 623 (D.C. Cir. 2014).

*WorldCom v. FCC,* ................................................................................ 28
   238 F.3d 449 (D.C. Cir. 2001).

*\*Authorities upon which we chiefly rely are marked with asterisks.*

## STATUTES:

U.S. CONST. amend. V. ............................................................................. 32

Administrative Procedure Act, 5 U.S.C. § 553(c) ........................................ 24

Preamble, Telecommunications Act of 1996, Public Law 104–104 .............. 5

47 U.S.C. § 160 ..................................................................................... 24, 25

47 U.S.C. § 201 ..................................................................................... 25, 27

47 U.S.C. § 203 ................................................................................. 25, 31, 32

47 U.S.C. § 230(b)(2) ........................................................................5

47 U.S.C. § 1302................................................................... 7, 22


## ADMINISTRATIVE MATERIALS:

EXECUTIVE ORDER 14036 ................................................................9
PROMOTING COMPETITION IN THE AMERICAN ECONOMY, 86 FED. REG. 36987 (July 14, 2021).

*2005 Internet Policy Statement* .................................................... 17
*Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* FCC 05-157, POLICY STATEMENT, 20 FCC Rcd. 14986 (rel. September 23, 2005).

*Cable Modem Reclassification Order* ...........................................5
*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities,* DECLARATORY RULING AND NOTICE OF PROPOSED RULEMAKING, 17 FCC Rcd. 4798 (2002), *aff'd, NCTA v. Brand X,* 545 U.S. 967 (2005).

*Wireline Broadband Reclassification Order* ..................................6
*Framework for Broadband Access to the Internet over Wireline Facilities; Universal Service Obligations of Broadband Providers,* REPORT AND ORDER AND NOTICE OF PROPOSED RULEMAKING, 20 FCC Rcd. 14853 (2005), *aff'd sub nom. Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205 (3rd Cir. 2007).

*Wireless Reclassification Order* ..................................................6
*In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,* DECLARATORY RULING, 22 FCC Rcd. 5901 (Mar. 23, 2007).

*BPL Reclassification Order* ........................................................................6
　*United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, 21 FCC Rcd. 13281 (2006).

*2010 Open Internet Order* ....................................................... 7, 15
　*In the Matter of Preserving the Open Internet, Broadband Industry Practices,* FCC 10-201, 25 FCC Rcd 17905, REPORT AND ORDER (rel. December 23, 2010), *rev'd Verizon v. FCC,* 740 F.3d 623 (D.C. Cir. 2014).

*2015 Open Internet Order* ......................................... 8, 10, 11, 12, 13, 14, 25
　In the Matter of Protecting and Promoting the Open Internet, FCC 15-24, REPORT AND ORDER ON REMAND, DECLARATORY RULING, AND ORDER, 30 FCC Rcd. 5601 (rel.  March 12, 2015), *aff'd United States Telecom Ass'n v. FCC,* 825 F.3d 674 (D.C.  Cir.  2016), *reh'g en banc denied* 855 F.3d 381 (2017).

*2018 Restoring Internet Freedom Order ("RIFO")*.............. 8, 11, 12, 17, 18
　*In the Matter of Restoring Internet Freedom,* FCC 17-166, DECLARATORY RULING, REPORT AND ORDER, AND ORDER, 33 FCC Rcd. 311 (rel. Jan. 4, 2018), *aff'd by, in part, vac'd by, in part, rem'd by Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019).

*OEA Letter* ................................................................ 19, 20, 21, 22
　April 11, 2024 Letter from Dr. Guilia McHenry of the Office of Economics and Analytics, *Safeguarding and Securing the Open Internet,* WC Docket No. 23-320.

*2024 Order*............................................................................ *passim*
　*In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* FCC 24-52, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, __ FCC Rcd. __ (rel. May 7, 2024).

*Fifth Access Charge Reform Order* ............................................. 29
　*In The Matter of Access Charge Reform; Price Cap Performance Review For Local Exchange Carriers; Interexchange Carrier Purchases Of Switched Access Services Offered By Competitive Local Exchange*

*Carriers; Petition Of U S West Communications, Inc. For Forbearance From Regulation As A Dominant Carrier In The Phoenix, Arizona MSA,* FCC 99-206, FIFTH REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING, 14 FCC Rcd 14221 (rel. August 27, 1999).

## **MISCELLANEOUS**

Brennan, T.,.................................................................................. 13
*Is the Open Internet Order an "Economics-Free Zone"?* Free State Foundation (June 28, 2018).

*Broadband Insights Report* (OVBI), 4Q23, OpenVault (2024).................. 29

Brown, Stephen and Sibley, David, ........................................... 29
The THEORY OF PUBLIC UTILITY PRICING (1986).

Choi, Jay Pil and Kim, Byung-Cheol, ........................................ 30
*Net Neutrality and Investment Incentives*, 41 RAND J. OF ECONOMICS 446-465 (2010).

Eggerton, J.,  ...............................................................................9
*FCC Nominee Anna Gomez Backs "Robust" Title II-Based Open Internet Authority,* MULTICHANNEL NEWS (June 22, 2023).

*Expression of Concern:*  ............................................................. 18
*Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY (June 2020).

Ford, G.S., ................................................................................ 21
*Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment,* PHOENIX CENTER PERSPECTIVE NO. 09-04 (October 29, 2009).

Ford, G.S., ........................................................................... 11, 12
*Bait-And-Switch—Or Why the FCC's Virtuous Circle Theory is Nonsense,* BLOOMBERG BNA (May 18, 2015).

Ford, G.S., .................................................................................. 16
*Is the FCC's Regulatory Revival Deterring Infrastructure Investment?*
BLOOMBERG BNA (November 13, 2015).

Ford, G.S., .................................................................................. 21
*Below the Belt: A Review of Free Press and the Internet Association's
Investment Claims,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-06
(June 20, 2017).

Ford, G.S., .................................................................................. 21
*Reclassification and Investment: An Analysis of Free Press' "It's
Working" Report,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-04 (May
22, 2017).

Ford, G.S., .................................................................................. 14
*Net Neutrality, Reclassification and Investment: A Counterfactual
Analysis,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-02 (April 25,
2017) and subsequently published as *Regulation and Investment in the U.S.
Telecommunications Industry,* APPLIED ECONOMICS 50:56 (2018).

Ford, G.S., .............................................................................. 14, 18
*Net Neutrality and Investment in the US: A Review of Evidence from the
2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK
ECONOMICS 175–205 (2019).

Ford, G.S., .................................................................................. 18
*Testing the Economics of the Net Neutrality Debate: A Comment,* 45
TELECOMMUNICATIONS POLICY (June 2021).

Ford, G.S., .................................................................................. 32
*Middle-Class Affordability of Broadband: An Empirical Look at the
Threshold Question,* PHOENIX CENTER POLICY BULLETIN NO. 61 (October
2022).

Ford, G.S., ........................................................................... 9, 11, 13
*Investment in the Virtuous Circle: Theory and Empirics,* PHOENIX CENTER
POLICY PAPER NO. 62 (December 2023).

Ford, G.S., ................................................................... 19, 20, 21
*In Response to the FCC…*, PHOENIX CENTER POLICY PERSPECTIVE NO. 24-04 (April 18, 2024).

Ford, G.S., ...................................................................... 23
*The Federal Communications Commission's Section 706 Problem,* PHOENIX CENTER POLICY PERSPECTIVE NO. 24-01 (January 17, 2024).

Ford, G.S., Spiwak, L.J. and Stern, M., ............................................... 6, 7, 15
*The Broadband Credibility Gap,* 19 COMMLAW CONSPECTUS 75 (2010).

Ford, G.S. and Spiwak, L.J., ......................................................... 24, 26, 27
*Section 10 Forbearance: Asking the Right Questions to Get the Right Answers,* 23 COMMLAW CONSPECTUS 126 (2014).

Ford, G.S. and Spiwak, L.J., ...................................................... 16
*The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment,* PHOENIX CENTER POLICY PERSPECTIVE NO. 14-05 (October 14, 2014).

Ford, G.S. and Spiwak, L.J., ................................................... 26, 30
*Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service,* 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015).

Genachowski, J., ...................................................... 6, 11
*The Third Way: A Narrowly Tailored Broadband Framework,* Federal Communications Commission (May 6, 2010).

Imbens, G.W. and Wooldridge, J.M., ........................................ 15
*Recent Developments in the Econometrics of Program Evaluation,* 47 JOURNAL OF ECONOMIC LITERATURE 5-86 (2009).

Spiwak, L.J., .................................................................8
*The "Clicktivist" In Chief,* THE HILL (November 12, 2014).

Spiwak, L.J., .................................................................7
*What Are the Bounds of the FCC's Authority over Broadband Service Providers?—A Review of the Recent Case Law,* 18 JOURNAL OF INTERNET LAW 1 (2015).

Spiwak, L.J., ...................................................................... 8, 18, 32
   *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW
   JOURNAL 39 (2019).

Tummarello, K., ......................................................................... 16
   *FCC Revives Net Neutrality,* THE HILL (February 19, 2014).

Weyl, G.E., ................................................................................ 30
   *The Price Theory of Two-sided Markets* (2006).

Wheeler, T., .............................................................................. 11
   Remarks at Silicon Flatirons Center, Boulder, Colorado (February 9,
   2015).

## <u>INTERESTS OF AMICUS CURIAE:</u>

The Phoenix Center is a non-profit 501(c)(3) research organization that studies the law and economics of the digital age. Over the past two decades, the Phoenix Center has authored numerous scholarly articles about the Open Internet debate—many of which have been published in academic journals[1]—and the veracity of several of those papers is a central issue of contention in the case at bar. The Phoenix Center, therefore, has an established interest in the outcome of this proceeding and believes that its perspective will assist the Court in resolving this case.

---

[1]  For a full list of the Phoenix Center's academic publications about "net neutrality," *see:* https://www.phoenix-center.org/rt1.html.

## SUMMARY OF ARGUMENT:

In its August 1, 2024 Order granting a stay, this Court held that subjecting the Internet to legacy Title II regulation "is likely a major question requiring clear congressional authorization" because the FCC's *2024 Order* decides a question of "vast 'economic and political significance'." The Court's instincts are correct.

First, the "net neutrality" debate is the ultimate political football. Ping-ponging from de-regulation to regulation to deregulation and, yet again, back to regulation depending on what political party is in power is no model of legal clarity. How broadband services are regulated is determined every four years in November. As Justice Gorsuch noted in his concurrence in *Loper Bright Enters. v. Raimondo,* rather than "promoting reliance by fixing the meaning of the law," the net neutrality debate has resulted in "constant uncertainty and convulsive change even when the statute at issue itself remains unchanged."

Second, the evidence is overwhelming that the decision to subject the Internet to legacy public utility regulation will have significant economic consequences—both in terms of network investment and network

deployment.  The fact that the FCC attempts to sweep this evidence under the rug provides no solace.

Third, the FCC is unlawfully re-writing the Communications Act to achieve its political objectives by abusing its forbearance authority.  For example, the FCC states that it is forbearing from the ratemaking provisions of the Communications Act because it is not engaging in rate regulation.  Yet, as the D.C. Circuit found in *Verizon v. FCC*, the Commission's "no blocking" and "no paid prioritization" rules are *explicitly* "zero price" regulation for terminating access and that edge providers are broadband providers' customers.  But the Commission believes it can impose price regulation without providing a rate methodology, conducting a cost study, or allowing firms to challenge this rate via the tariffing process.  The Commission has forbearance authority, no doubt, but portions of the statute are inexorably linked; the Agency may not impose regulatory demands whilst simultaneously forbearing from the statute's due process protections attached to such demands.  The Commission's actions therefore raise significant due process and takings concerns under the Fifth Amendment.  It is Congress' job, not the FCC's job, to rewrite statutes.

**ARGUMENT:**

**I.    The Court Was Correct to Conclude that Reclassification of Broadband Internet Access Services is a Major Question of Vast Economic and Political Significance**

In its August 1, 2024 Order granting a stay, *In re MCP No. 185*, 2024 U.S. App. LEXIS 19815 (August 1, 2024) ("*Stay Order*"), this Court held that subjecting the Internet to legacy Title II regulation "is likely a major question requiring clear congressional authorization" because the FCC's *2024 Order, In the Matter of Safeguarding and Securing the Open Internet, Restoring Internet Freedom,* FCC 24-52, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, __ FCC Rcd. __ (rel. May 7, 2024), decides a question of "vast 'economic and political significance'." *Stay Order* at 6, *citing Util. Air Regul. Grp. v. E.P.A.,* 573 U.S. 302, 324 (2014); *see also West Virginia v. EPA,* 142 S.Ct. 2587, 2608 (2022).  As demonstrated below, the Court's instincts are correct.

A.    *"Net Neutrality" is the Ultimate Political Football*

Recognizing that the heavy-handed common carrier regulations designed in the 1930's for the old "Ma Bell" monopoly under Title II of the Communications Act would be an impediment to the development and deployment of high-speed Internet services, Congress made clear in the

Telecommunications Act of 1996 that it wanted a light-touch approach for the Internet. The preamble to the 1996 Act states that the purpose of the 1996 Act shall be to "reduce regulation in order to … encourage the rapid deployment of new telecommunications technologies…" Preamble, Telecommunications Act of 1996, Public Law 104–104. Congress codified this approach in Section 230(b)(2) of the Telecom Act, 47 U.S.C. § 230(b)(2), which provides that it is the policy of the United States "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."

And for nearly twenty years after the enactment of the 1996 Act, there was bi-partisan consensus at the Commission to adhere to Congress' wishes: Broadband Internet access—regardless of the delivery platform—was classified as a lightly-regulated "information" service under Title I of the Act. *See, e.g., Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities; Internet Over Cable Declaratory Ruling; Appropriate Regulatory Treatment for Broadband Access to the Internet Over Cable Facilities,* DECLARATORY RULING AND NOTICE OF PROPOSED RULEMAKING, 17 FCC Rcd. 4798 (2002) (*Cable Modem Reclassification Order*), *aff'd, NCTA v. Brand X,* 545 U.S. 967 (2005); *Framework for Broadband Access to the Internet over Wireline Facilities; Universal Service Obligations of*

- 5 -

*Broadband Providers,* REPORT AND ORDER AND NOTICE OF PROPOSED RULEMAKING, 20 FCC Rcd. 14853 (2005) (*Wireline Broadband Reclassification Order*), *aff'd sub nom. Time Warner Telecom, Inc. v. FCC,* 507 F.3d 205 (3rd Cir. 2007); *In re Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks,* DECLARATORY RULING, 22 FCC Rcd. 5901 (Mar. 23, 2007) (*Wireless Reclassification Order*); *United Power Line Council's Petition for Declaratory Ruling Regarding the Classification of Broadband over Power Line Internet Access Service as an Information Service,* MEMORANDUM OPINION AND ORDER, 21 FCC Rcd. 13281 (2006) (*BPL Reclassification Order*).

Yet in 2010, this bipartisan consensus turned to partisan bickering. In search of a legal foundation for a more expansive regulatory agenda, FCC Chairman Julius Genachowski threatened to abandon bipartisan precedent by classifying broadband Internet access as a common carrier "telecommunications" service under Title II, despite acknowledging that such "[h]eavy-handed prescriptive regulation can chill investment." *See* J. Genachowski, *The Third Way: A Narrowly Tailored Broadband Framework,* Federal Communications Commission (May 6, 2010) at p. 2. Investors recoiled and the stock prices of the broadband providers plummeted. Financial analysts also warned of slowed investment in the sector. *See* G.S.

Ford, L.J. Spiwak and M. Stern, *The Broadband Credibility Gap,* 19 COMMLAW CONSPECTUS 75 (2010) and citations therein. Recognizing the seemingly inevitable consequences, the Commission relented, adopting instead its *2010 Order* under Section 706 (47 U.S.C. §1302)—rules which the D.C. Circuit ultimately struck down in *Verizon v. FCC,* 740 F.3d 623 (D.C. Cir. 2014), because the Commission improperly subjected information services to common carrier rate regulation in violation of the Communications Act. (*See* Section II *infra*.)

Notwithstanding, the D.C. Circuit in *Verizon* provided the Commission with a legal "roadmap" to formulate policies to protect the "open Internet" without resorting to Title II. *C.f.* L.J. Spiwak, *What Are the Bounds of the FCC's Authority over Broadband Service Providers?—A Review of the Recent Case Law,* 18 JOURNAL OF INTERNET LAW 1 (2015). Although the Commission contemplated this path, faced with substantial political pressure—including a very public goading from the White House—the Commission in 2015 chose the "nuclear" option and imposed legacy Title II common carrier regulation on the Internet. *See, e.g., USTelecom v. FCC,* 855 F3d 381, 394 (D.C. Cir. 2017) (Brown, J. *dissenting from denial of pet. for reh'g en banc*) ("When the FCC followed the *Verizon* 'roadmap' to implement 'net neutrality' principles without heavy-handed regulation of Internet access,

- 7 -

the Obama administration intervened. Through covert and overt measures, FCC was pressured into rejecting this decades-long, light-touch consensus in favor of regulating the Internet like a public utility.") (citations omitted); L.J. Spiwak, *The "Clicktivist" In Chief,* THE HILL (November 12, 2014). Despite this momentous about face, the D.C. Circuit granted the FCC's tortured interpretation of the Communications Act expansive discretion and upheld the FCC's *2015 Order* in *USTelecom v. FCC,* 825 F.3d 674 (D.C. Cir. 2016), *pet. reh'g en banc denied*, 855 F.3d 381 (2017). In so doing, the statutory construct of Title II was left with "no meaning; it is some bizarre legal hybrid that the FCC made up and the D.C. Circuit has, albeit indirectly, sanctioned." L.J. Spiwak, *USTelecom and its Aftermath,* 71 FEDERAL COMMUNICATIONS LAW JOURNAL 39, 41 (2019).

The tide turned back to "light touch" regulation during the Trump Administration. In 2018, with the benefit of data about the effects of the *2015 Order*, the Commission issued its *Restoring Internet Freedom Order* ("*RIFO*"). *In the Matter of Restoring Internet Freedom,* FCC 17-166, DECLARATORY RULING, REPORT AND ORDER, AND ORDER, 33 FCC Rcd. 311 (rel. Jan. 4, 2018), *aff'd by, in part, vac'd by, in part, rem'd by Mozilla Corp. v. FCC,* 940 F.3d 1 (D.C. Cir. 2019). Despite the hyperbole at the time, the Internet did not end; to the contrary, for the next seven years the Internet

operated without incident as Congress envisioned (although there were some residual harmful economic effects on investment and jobs from the FCC's failed reclassification experiment). *See, e.g.,* G.S. Ford, *Investment in the Virtuous Circle: Theory and Empirics*, PHOENIX CENTER POLICY PAPER NO. 62 (December 2023) (estimating that between 2011 and 2020, Title II regulation reduced investment by approximately $81.5 billion, reduced sector employment by 195,600 jobs and labor compensation by $18.5 billion annually).

But for certain political constituencies, the siren call of aggressive regulation was too strong to ignore. Soon after taking office, President Biden issued an executive order explicitly calling upon the FCC to return the Internet to the yoke of Title II. EXECUTIVE ORDER 14036: PROMOTING COMPETITION IN THE AMERICAN ECONOMY, 86 FED. REG. 36987 (July 14, 2021). Unfortunately for President Biden, the FCC was deadlocked for most of his term, making reclassification impossible. Anna Gomez, President Biden's nominee for the third and tie-breaking commissioner at the FCC, openly testified at her confirmation hearing—before a formal proceeding had even begun—that she was going to vote for reclassification once the Commission returned to a full complement of five Commissioners, *see, e.g.,* J. Eggerton, *FCC Nominee Anna Gomez Backs "Robust" Title II-Based Open Internet*

*Authority,* MULTICHANNEL NEWS (June 22, 2023).  And, lo and behold, that is exactly what happened with the *2024 Order*.  As Justice Gorsuch noted in his concurrence in *Loper Bright Enters. v. Raimondo,* 144 S.Ct. 2244, 2288 (2024), rather than "promoting reliance by fixing the meaning of the law," the net neutrality debate has resulted in "constant uncertainty and convulsive change even when the statute at issue itself remains unchanged."

B.     *Reclassification has Significant Economic Consequences*

The FCC's primary economic justification for reclassification in 2015—as well as in 2024 (*see, e.g., 2024 Order* at ¶ 10)—was the "virtuous circle" theory of investment.   Under this hypothesis, "Internet openness ... spurs investment and development by edge providers, which leads to increased end-user demand for broadband access, which leads to increased investment in broadband network infrastructure and technologies, which in turns leads to further innovation and development by edge providers." *See USTelecom,* 825 F.3d at 694, *citing Verizon v. FCC,* 740 F.3d at 634.  Thus, reasoned the Commission (absent any evidence), the benefits of the "openness" would outweigh the purported costs of reclassification.  *See, e.g., 2015 Order* at ¶ 410.

As the threat to infrastructure investment posed by heavy-handed, prescriptive regulations was well-established—a threat conceded even by regulators, *see, e.g.,* Genachowski, *supra*; Remarks of FCC Chairman Tom Wheeler, Silicon Flatirons Center, Boulder, Colorado (February 9, 2015) at p. 5 (Title II would impair the ability of "network operators to receive a return on their investment")—on appeal of the *2015 Order* several parties challenged the rules on the grounds that the Commission's finding that reclassification would not suppress broadband investment was arbitrary and capricious. *See USTelecom,* 825 F.3d at 707. But as the *2015 Order* had only just gone into effect, the evidence on investment effects was preliminary and the D.C. Circuit granted deference to the FCC's prognostications.

Despite the D.C. Circuit's deference to the Commission's divinations in *USTelecom*, the FCC's *2015 Order* was based on pure speculation and was shown to have had neither theoretical nor empirical support. G.S Ford, *Bait-And-Switch—Or Why the FCC's Virtuous Circle Theory is Nonsense,* BLOOMBERG BNA (May 18, 2015); Ford, *Investment in the Virtuous Circle, supra*. It speaks volumes when the Agency's Chief Economist at the time the *2015 Order* was crafted, Professor Tim Brennan, publicly conceded that the *2015 Order* was constructed in an "economics-free zone." *See USTelecom,* 825 F.3d at 764 (Williams, J. concurring and dissenting) (citations omitted).

For this reason, after a lengthy opportunity for notice and comment, the Commission in the *2018 RIFO* recognized that the previous Commission's application of the "virtuous circle" in the *2015 Order* "was at best only loosely based on the existing economics literature, in some cases contradicted peer reviewed economics literature, and included virtually no empirical evidence." *See RIFO* at ¶ 118 (citations omitted).

The fact that broadband networks and the applications that run over them are complements provides no reasoned basis for regulatory intervention. Complementary products and services are ubiquitous in the economy, and the FCC's "virtuous circle" hypothesis contained no defect requiring a remedy. Indeed, the term "virtuous circle" belies the need for government intervention: after all, *what part of virtue needs to be regulated?* Ford, *Bait-and-Switch, supra.* Faced with this logical conundrum, the Commission turned to analytical gymnastics and factual sleight-of-hand to justify its heavy-handed regulation.

To square the circle, the Commission claimed that without regulatory control carriers will "disrupt[] the virtuous cycle" by "reducing consumer demand." *2015 Order* at ¶ 82. This argument flouts the virtuous circle theory—demand and profits are positively related. Profit-maximizing firms

don't take actions that reduce profits, including reducing the demand for their own products and services. Ford, *Bait-and-Switch, id.* Worse, the Commission swept pertinent facts under the rug. As even the FCC's Chief Economist at the time observed, the Commission's use of the "virtuous circle" was "unsupported" by the evidence because "broadband providers had already largely adopted net neutrality" and that fact "would have undermined the necessity of regulation." T. Brennan, *Is the Open Internet Order an "Economics-Free Zone"?* Free State Foundation (June 28, 2018).

Put simply, the virtuous circle theory implies nothing more than demand complementarity between the edge and core, a nearly uncontestable logic, but this self-reinforcing relationship between the two argues *against* regulatory intervention—not for it—as demonstrated by the stunning advancements in Internet technology and adoption under years of "light touch" Title I oversight. Both the *2015 Order* and the *2024 Order* effectively abandoned the "virtuous circle" theory by justifying regulation as protection from firms operating against their own interests. No such protection is needed. The virtuous circle theory, as laid out by the Commission, suggests, if anything, that regulatory intervention will itself disrupt the virtuous flow, thereby reducing investment incentives. Ford, *Investment in the Virtuous Circle, supra.* Given the Commission's disregard of the economics, it is little surprise

that the Government's proposed heavy-handed intervention into this otherwise "virtuous" circle beginning in 2010 reduced infrastructure investment. *See USTelecom,* 825 F.3d at 756 (Williams, J. concurring and dissenting) ("In short, the [2015] Order's probable direct effect on investment in broadband seems unambiguously negative.") The question was by how much?

### 1.    *Empirical Questions Demanded Empirical Answers*

When the Commission revisited the reclassification question in 2018, the investment effects question no longer required prognostication; the Commission had several years of data to consider. The Commission was besieged with studies from both sides of the issue arguing that reclassification did (or did not) affect investment. The Commission rejected most of them for lack of rigor. (For a full review, *see* G.S. Ford, *Net Neutrality and Investment in the US: A Review of Evidence from the 2018 Restoring Internet Freedom Order*, 17 REVIEW OF NETWORK ECONOMICS 175–205 (2019).)

The Commission did find that the work of Phoenix Center Chief Economist Dr. George Ford—work subsequently published in a refereed academic journal—was rigorous: Dr. Ford focused on the "*counterfactual*"—that is, *what would investment have been "but for"*

*reclassification?   2015 Order* at ¶ 93 (*citing* G.S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis,* PHOENIX CENTER POLICY PERSPECTIVE NO. 17-02 (April 25, 2017) and subsequently published as *Regulation and Investment in the U.S. Telecommunications Industry,* APPLIED ECONOMICS 50:56 (2018).  The need for a counterfactual is obvious enough and a central feature of modern empirical analysis.  *See, e.g.,* G.W. Imbens and J.M. Wooldridge, *Recent Developments in the Econometrics of Program Evaluation,* 47 JOURNAL OF ECONOMIC LITERATURE 5-86 (2009).

Dr. Ford's findings were significant.  To quantify investment effects, Ford's first step was to establish a "treatment date."  Treatment dates are easily chosen for surprises, but not for the dreadfully long regulatory process.  As it turns out, empirical evidence provided a clear indicator as to when reclassification became embedded in the financial decisions of the industry and investors:  On May 6, 2010, Chairman Genachowski and his General Counsel Austin Schlick released statements outlining a path to reclassifying broadband as a Title II telecommunications service.  The announcement caught investors by surprise; a financial event study demonstrated that the stock prices of broadband providers fell by about 10% in the days following the announcement.  *See The Broadband Credibility Gap, supra.*  Despite its

actions in its *2010 Order*, the Commission nonetheless held open a regulatory proceeding proposing reclassification, leading then-Commissioner Ajit Pai to observe in 2014 (before the reclassification decision the next year) that "the specter of Title II reclassification hovers ominously in the background." K. Tummarello, *FCC Revives Net Neutrality,* THE HILL (February 19, 2014).

Between Chairman Genachowski's proposing reclassification in 2010 until the time Chairman Tom Wheeler formally made that change 2015, industry insiders knew reclassification was a probable policy outcome for Internet services. *See, e.g.,* G.S. Ford, *Is the FCC's Regulatory Revival Deterring Infrastructure Investment?* BLOOMBERG BNA (November 13, 2015); G.S. Ford and L.J. Spiwak, *The Unpredictable FCC: Politicizing Communications Policy and its Threat to Broadband Investment,* PHOENIX CENTER POLICY PERSPECTIVE NO. 14-05 (October 14, 2014). As Wall Street investment analysts acknowledged, by the time the FCC formally reclassified in 2015, Title II was already baked into network operators' investment decisions. *See Ford, Regulatory Revival, id.,* and citations therein.

With the treatment date of Title II established, using modern econometric methods and publicly-available data, Ford found sizable investment effects from reclassification. Between 2011 and 2016 (the last year data were

available), telecommunications investment was below from the counterfactual by between 20% and 30.  Ford also found no decline in investment following the release of the FCC's "Four Principles" to promote an Open Internet in 2005, *see Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* FCC 05-157, POLICY STATEMENT, 20 FCC Rcd. 14986 (rel. September 23, 2005), suggesting it was reclassification—not Net Neutrality principles—that reduced investment.  Ford, *Net Neutrality, Reclassification and Investment, supra*.

The Commission was impressed, concluding Ford's counterfactual analysis was a "reliable indicator of the direction of the change in investment" and, "[a]t the very least, the study suggests that news of impending Title II regulation is associated with a reduction in ISP investment over a multi-year period."  *RIFO* at ¶ 95.  If anything, noted the Commission, "Ford's negative result for investment was understated."  *Id.* at ¶ 96.

### 2. *The Commission Improperly Discounted Dr. Ford's Work on Investment Effects in the 2024 Order*

As noted above, this Court was correct to conclude that reclassification is likely a major question of "vast 'economic and political significance'."  But

politics is a cut-throat business where the means often justify the ends.  This case is no exception.

Dr. Ford is the only economist who has performed a competent (and peer reviewed) analysis to answer a central question in this proceeding:  did reclassification in 2015 deter investment?  *See* Ford, *A Review of Evidence, supra*; *see also Expression of Concern: Testing the Economics of the Net Neutrality Debate*, 44 TELECOMMUNICATIONS POLICY (June 2020) (Editors forced to describe a paper finding "no" investment effect by Chris Hooten post-publication as spurious after severe errors were discovered); G.S. Ford, *Testing the Economics of the Net Neutrality Debate: A Comment,* 45 TELECOMMUNICATIONS POLICY (June 2021).  Dr. Ford's findings, naturally, were an impediment to the FCC's new efforts to re-regulate the Internet in a manner under consideration in this case.

Typically, administrative agencies will try to sluff inconvenient truths under the rug, either by a perfunctory footnote or by ignoring the evidence altogether, *see* Section I.B.3 *infra*, expecting deference from reviewing courts. *See, e.g., USTelecom and Its Aftermath, supra*.  But as the Commission was so threatened by Dr. Ford's work in this case (which was good enough to

support the Commission's *RIFO*), the current Commission resorted to skullduggery.

On April 11, 2024—well after the public comment period ended and with just a little more than a week before the FCC's Sunshine Act provisions went into effect—Dr. Guilia McHenry, the head of the FCC's Office of Economics and Analytics, took the highly unusual step of entering into the docket a letter ("*OEA Letter*") providing several criticisms of Dr. Ford's peer reviewed paper. On April 18, 2024, Dr. Ford issued a detailed response, painstakingly responding to each one of the FCC's critiques and showing why the FCC's staff's analysis lacked merit. G.S. Ford, *In Response to the FCC...*, PHOENIX CENTER POLICY PERSPECTIVE NO. 24-04 (April 18, 2024). Yet when the final *2024 Order* was ultimately released, although the Commission described Dr. Ford's work as "rigorous," the Commission not only disparaged Dr. Ford's work, but unprofessionally engaged in *ad hominem* attacks and questioning his professional competency. *See 2024 Order* at ¶¶ 276-302.[2]

---

[2]    Indeed, at ¶ 288 the Commission states that Dr. Ford's work was one of only "a few studies cited in the present record and in the *RIF Order* record [which] attempt to perform any type of rigorous analysis of the effects on investment of open Internet regulations or Title II reclassification with forbearance," yet in ¶ 293 the Commission states that "Dr. Ford did not use a

(Footnote Continued….)

While we recognize that when "intricacies of econometric modeling are in dispute," courts "do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority," *see, e.g., Mozilla Corp. v. FCC,* 940 F.3d at 52, the Court should be aware of several points that reveal the analytical insincerity of the FCC's efforts:

First, even if the Court gives 100% deference to the Commission's attacks on Dr. Ford, the Court should note that the *OEA Letter* finds—based on the FCC Staff's analysis—that Title II reduced investment by about -6.2%, which, while smaller than what Dr. Ford reported in his 2018 paper (about -20%), nonetheless concedes the point that Title II reduced investment.  Ford, *In Response to the FCC, supra.*  Moreover, the *OEA Letter* established the fact that the FCC has investment data and the wherewithal to analyze them. Instead, the FCC devoted its efforts to clearing the record of peer-reviewed evidence conflicting with its pre-determined ends.

----

rigorous and principled methodology…."  As logic dictates that Dr. Ford's work cannot be both, such disparate descriptions reveal the Commission's analytical insincerity.

Second, the Commission produced no credible evidence that showed that Title II did not stymie investment. Instead, *2024 Order* merely states that "[o]ther commenters argue that Title II reclassification would not reduce investment or innovation, and that there is no evidence that the *2015 Open Internet Order* reduced BIAS investment or that investment increased following the 2017 *RIF Order*." *2024 Order* at ¶ 278. Who are these "other" commenters? Two political interest groups—Free Press and the National Hispanic Media Coalition—neither of which has invested a dime in broadband infrastructure nor offered a "rigorous analysis" (by the *2024 Order*'s standards) of investment effects. Indeed, the *OEA Letter* was necessitated by the fact that no party offered rigorous evidence to support the FCC's claim that their 2015 Title II regime did not affect investment, forcing the FCC to defend its ideology with nothing more than rumors. *See, e.g.,* G.S. Ford, *Below the Belt: A Review of Free Press and the Internet Association's Investment Claims,* Phoenix Center Policy Perspective No. 17-06 (June 20, 2017); G.S. Ford, *Reclassification and Investment: An Analysis of Free Press' "It's Working" Report,* Phoenix Center Policy Perspective No. 17-04 (May 22, 2017); G.S. Ford, *Finding the Bottom: A Review of Free Press's Analysis of Network Neutrality and Investment,* Phoenix Center Perspective No. 09-04 (October 29, 2009).

Third, the Commission's preferred empirical methodology for quantifying investment effects is the method of Synthetic Counterfactuals. *See 2024 Order* at ¶ 290. However, the Commission refused to embrace the evidence based on that method submitted into the record in direct response to its instructions. Using the recommended empirical method, Dr. Ford reported negative investment effects consistent with his earlier study. *In Response to the FCC, supra*. Once again, the FCC's staff had the data and the capacity to conduct a serious analysis (as demonstrated by its *OEA Letter*) but chose not to do so, presumably because it produces a result incompatible with its regulatory intent.

Accordingly, the Commission is attempting to do in this case exactly what this Court chided the Agency for improperly doing in *Cincinnati Bell Tel. Co. v. FCC,* 69 F.3d 752, 763 (6th Cir. 1995) nearly thirty years ago: the "FCC, rather than showing that *it actually had some factual support for its conclusions*, uses the 'deference' standard of review as if it were an ink blotter waiting for this Court's rubber stamp to validate agency action." (emphasis in original).

3.    *The Commission Improperly Ignored Record Evidence that Reclassification Deterred Deployment*

But determining the effects on *investment* from reclassification is just one part of the "economic significance" inquiry.  With the FCC using Section 706 as independent authority for its regulatory intervention, it is sensible to look at the effects of reclassification on *deployment*.  *See* 47 U.S.C. §1302(b) (the "Commission shall determine whether advanced telecommunications capability *is being deployed to all Americans in a reasonable and timely fashion"*) (emphasis supplied).

The Phoenix Center's Dr. Ford also answered the deployment question (the only one to do so).  *See* G.S. Ford, *The Federal Communications Commission's Section 706 Problem,* PHOENIX CENTER POLICY PERSPECTIVE NO. 24-01 (January 17, 2024).  Section 706 is singular in its intent:  Congress wants the Commission to remove barriers to entry to promote broadband deployment to unserved areas.  No other purpose justifies the use of Section 706.  In its *2024 Order*, the Commission makes no claim that Title II regulation removes barriers to infrastructure investment in unserved areas; it is an implausible argument.  The Commission's justification for Title II regulation is to *reduce* broadband providers' degrees of freedom in

- 23 -

maximizing profit, so the regulations at best are neutral and are more likely a barrier to network deployment in unserved areas.

To demonstrate the point, Dr. Ford again conducted a counterfactual analysis of the Commission's broadband data, showing the application of Title II regulation during 2015 through 2017 did not improve the rate of broadband deployment to unserved areas and, in fact, may have slowed progress. Title II regulation, therefore, did not serve the sole aim of Section 706, and there is no reason to believe reimposing the regulation would do any better. *Id.*

But while the Commission directed all their fire to take down Dr. Ford's peer-reviewed paper demonstrating the harmful investment effects of Title II, the Commission *completely ignored* Dr. Ford's findings about the effects of Title II on deployment. This they may not do. The Commission is obligated to review and address the record evidence before it. *See* Administrative Procedure Act, 5 U.S.C. § 553(c). The Commission's failure to do so constitutes arbitrary and capricious decision-making.

## II.    The Commission is Improperly Trying to Re-Write the Communications Act

In response to the Supreme Court's ruling in *MCI Telecommunications Corp. v. AT&T,* 512 U.S. 218 (1994), in Section 10 of the 1996 Telecom Act

Congress provided the FCC with the authority to forbear from some statutory provisions in the Communications Act provided that certain conditions are met.  47 U.S.C. § 160.  (For a detailed examination of this forbearance authority, *see* G.S. Ford and L.J. Spiwak, *Section 10 Forbearance: Asking the Right Questions to Get the Right Answers,* 23 COMMLAW CONSPECTUS 126 (2014).)  However, this forbearance authority does not permit the Commission "to rewrite the statute from the ground up."  *Biden v. Nebraska,* 600 U.S. 477, 494 (2023).  Given the "history and breadth" of the power the FCC seeks to extend over the Internet, along with the "political and economic significance of that assertion," there are ample "reason[s] to hesitate before concluding that Congress meant to confer that authority."  *Id.* at 501 (citations omitted).

The Commission proudly proclaims that its approach to common carrier regulation is not your parents' Title II.  Instead, the Commission—using its authority under Section 10—states that it is forbearing from an assortment of statutory requirements, including, *inter alia*, the ratemaking requirements of Section 201 (47 U.S.C. § 201) and the tariffing requirements of Section 203 (47 U.S.C. § 203).  *See 2024 Order* at ¶ 321.  However, the criteria set forth in Section 10 do not jibe with the Commission's underlying theory of the case.

The Commission's central rationale for the *2015 Order* and the *2024 Order* rests on the same premise: the "Commission needs a mechanism to enable it to respond to attempts by BIAS providers to wield their gatekeeper power in ways that might otherwise compromise the open Internet…." *See 2024 Order* at ¶ 8. However, because a "gatekeeper"—under the Commission's own definition—has "both the incentives and ability to harm the open Internet," *2024 Order* at ¶ 16, Section 10's requirement that "enforcement of such regulation or provision is not necessary to ensure that the [carriers'] charges … are just and reasonable and are not unjustly or unreasonably discriminatory" cannot be satisfied. 47 U.S.C. § 160(a)(1); *see also* G.S. Ford and L.J. Spiwak, *Tariffing Internet Termination: Pricing Implications of Classifying Broadband as a Title II Telecommunications Service,* 67 FEDERAL COMMUNICATIONS LAW JOURNAL 1 (2015).

The Commission responds that "persuasive evidence of competition is not a necessary prerequisite to granting forbearance under section 10 so long as the section 10 criteria otherwise are met." *2024 Order* at ¶ 314. In fact, the Commission argues, "[n]othing in the text of section 10 requires that forbearance be premised on a finding of sufficient competition where the Commission can conclude that the rules or provisions are not 'necessary' under section 10(a)(1) and (a)(2) and that forbearance is in the public interest

under section 10(a)(3) on other grounds." And, as a kicker, the Commission nonchalantly states in a footnote that to "the extent that commenters cite prior forbearance decisions relying on competition as sufficient to justify forbearance, that precedent does not persuade us that competition is inherently necessary to justify forbearance." *Id.* at fn. 1260.

Not so fast. Under the plain terms of Section 10, when listing the criteria required for forbearance, Congress deliberately used the conjunctive "and"—meaning that Congress clearly wanted *all*—and not just *some*—of the criteria satisfied before the Commission can forbear. *See Forbearance: Asking the Right Questions to Get the Right Answers, supra.* Moreover, the Commission cannot perfunctorily dismiss applicable precedent. To do so is a sordid "'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Auer v. Robbins,* 519 U.S. 453, 462 (1997). This Court should grant no deference to the Commission's tortured interpretation of Section 10. *See Loper Bright, supra*.

The FCC's approach to forbearance from the ratemaking and tariffing requirements of Title II also drives home the point.

Throughout the *2024 Order*, the Commission takes great pains to argue that the ratemaking requirements of Section 201 are unnecessary because the

- 27 -

Commission is not engaged in rate regulation. *See, e.g., 2024 Order* at ¶ 6; *2024 Order* at fn. 2657 (the Commission [sic] strong commitment to not engage in rate regulation, despite speculative claims from some commenters that the Commission may someday decide to reverse course.")   The Commission's statement is patently false.

The D.C. Circuit in *Verizon v. FCC* explicitly recognized that the Commission's "no blocking" rule is "zero price" rate regulation for terminating access. *Verizon v. FCC*, 740 F.3d at 658.  With intent, the FCC's rules are intended to "bar providers from charging edge providers for using their service, thus forcing them to sell this service to all who ask at a price of $0." *Verizon*, 740 F.3d at 657; *see also* Silberman J. Dissenting, 740 F.3d at 668 (with intent, the Commission's rule establishes "a regulated price of zero.")  Accordingly, the Commission's zero-price rule has the unambiguous effect of requiring carriers to terminate third-parties' traffic without any compensation. *See Verizon,* 740 F.3d at 654 (Commission seeks to "compel[] an entity to continue furnishing service at no cost.")

In reaching this "zero price," the Commission has violated every principle of Ratemaking 101.  To wit, under Section 201, any rate must satisfy the "just and reasonable" ratemaking standard.   However, as the D.C. Circuit

recognized in *Farmers Union Central Exchange v. FERC,* 734 F.2d 1486, 1504 (D.C. Cir.), *cert denied sub nom.,* 469 U.S. 1034 (1984), the phrase "just and reasonable" is not "a mere vessel into which meaning must be poured." Rather, a "just and reasonable" rate must fall within a "zone of reasonableness"—i.e., a rate cannot be "confiscatory" (i.e., "below cost") on the bottom-end and "excessive" on the high-end. *See Id*. at 1502.

Both the courts and the Commission have recognized that ratemaking is "far from an exact science". *See, e.g., Fed. Power Comm'n. v. Conway Corp.,* 426 U.S. 271, 278 (1976*); WorldCom v. FCC,* 238 F.3d 449, 457 (D.C. Cir. 2001); *Sw. Bell Telephone Co. v. FCC,* 168 F.3d 1344, 1352 (D.C. Cir. 1999); *Time Warner Entm't Co. v. FCC,* 56 F.3d 151, 163 (D.C. Cir. 1995); *United States v. FCC,* 707 F.2d 610, 618 (D.C. Cir. 1983); *see also FCC Fifth Access Charge Reform Order,* 14 FCC Rcd. 14221 (rel. August 27, 1999) at ¶¶ 96, 144). Even so, the Commission may not set a rate arbitrarily, but must provide its whys and wherefores on how it derived that rate. *See, e.g. Century Communications Corp. v. FCC,* 835 F.2d 292, 300–02 (D.C. Cir. 1987) (rejecting FCC's judgment supported by "scant" evidence), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 2015, 100 L.Ed.2d 602 (1988); *Cincinnati Bell Telephone Company v. FCC*, *supra*. The Commission provided no such analysis in the *2024 Order*.

Formulating termination rates is a complex and arduous task, but drudgery is no excuse for the Commission's avoidance of the requirements of its choice to apply Title II to the Internet. Unquestionably, the cost of a service is not zero—there are no free lunches. In fact, it could be argued that most of the costs of the broadband network are attributable to edge providers, since the bulk of traffic is downstream rather than upstream (a ratio of 15:1). *Broadband Insights Report* (OVBI), 4Q23, OpenVault (2024) at p. 13. Under a fully-distributed cost formula, it is feasible that much of the costs would be assigned to the edge providers. Stephen Brown and David Sibley, THE THEORY OF PUBLIC UTILITY PRICING (1986) at pp. 44-9. Under traditional ratemaking methods, it may be that the revenues from edge providers make up a lion's share of carriers' revenue from the sale of broadband service. In such a world, the consumer would benefit greatly. Economic theory predicts that as the edge providers' price rises, the end-users' price falls (the "waterbed" effect). A more balanced rate structure across the two sides of the market may be beneficial to both network deployment and service adoption. *See* Glen E. Weyl, *The Price Theory of Two-sided Markets* (2006) at p. 17-8; Jay Pil Choi and Byung-Cheol Kim, *Net Neutrality and Investment Incentives*, 41 RAND J. OF ECONOMICS 446-465 (2010) at pp. 453-7.

The Commission has failed to even consider such an inquiry in the case at bar.  In fact, it has done nothing.  What cost standard was used to establish this zero price?  Historical cost?  Forward-looking cost?  Marginal cost?  Average cost?  Total Element Long Run Incremental Cost?  We cannot know, because the Commission does not know.  The Commission set a price of zero without a smidgen of analysis.  In so doing, the Commission has arbitrarily established a "confiscatory" rate (a zero price) for terminating access.  *See generally*, *Tariffing Internet Termination, supra.*  The Commission is not free to regulate prices willy-nilly simply by forbearing from Section 201, as it aims to do.  And, ironically, by forbearing from the tariffing requirements of Section 203, carriers now have no mechanism to challenge this rate.

In response, the Commission contends that because "our actions here merely regulate the commercial relationship between BIAS providers and their customers, they do not grant a right to physical occupation of the broadband providers' property and thus do not constitute a *per se* taking." *2024 Order* at ¶ 672.  Instead, argues the Commission, because "we leave BIAS providers free to set market rates for the broadband Internet access services they offer end-users, we see no evidence that our regulatory approach 'threaten[s] an [ISP's] financial integrity' and is confiscatory." *2024 Order* at ¶ 681.

The Commission's argument is specious.

The *2024 Order* clearly sets a specific rate for terminating access—*zero*—without any form of analysis to back it up. Edge providers are "customers" because "broadband providers furnish a service to edge providers, thus undoubtedly functioning as edge providers' 'carriers'", *Verizon v. FCC,* 740 F.3d at 653). And, the providers are gatekeepers only with respect to edge providers. The Commission has not surrendered to the market the pricing of terminating access. *See Orloff v. FCC*, 352 F.3d 415, 420 (D.C. Cir. 2003), *cert. denied,* 542 U.S. 937 (2004) (In the case of Section 203 forbearance, "[r]ates are determined by the market, not the Commission, as are the level of profits.") In detariffing, the Commission has not forborne from rate-setting, but has affirmatively set the rate at zero. What the Commission has done, or is attempting to do, is to ignore the explicit requirements of Title II of the Communications Act for setting a rate.

The Commission cannot have it both ways: Either the FCC properly regulates under the constraints of the Communications Act and its implementing caselaw or it lets the market govern firms' behavior. Despite the plain terms of the Communications Act, the Commission believes it is entitled to set the rates, terms and conditions of service of private firms

without regard to the due process and taking provisions of the Fifth Amendment.  U.S. Const. amend. V.  Such a power grab cannot be condoned by this Court.[3]

---

[3]    Indeed, ever since the D.C. Circuit allowed the FCC to bypass basic ratemaking procedures in *USTelecom*, policymakers now believe they have a green light to arbitrarily set a rate whenever they please.  *USTelecom and Its Aftermath, supra*; G.S. Ford, *Middle-Class Affordability of Broadband: An Empirical Look at the Threshold Question,* Phoenix Center Policy Bulletin No. 61 (October 2022).

**CONCLUSION:**

For the reasons set forth herein, the Phoenix Center joins Petitioners in urging this Court to find unlawful and, therefore, to vacate the Commission's *2024 Order*.

Respectfully submitted,

s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235

Dated:  August 19, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32, the undersigned certifies that this brief complies with the applicable type-volume limitations. This brief was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32, this brief contains 6446 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Office 365) used to prepare this brief.

<u>/s/ *Lawrence J. Spiwak*</u>

Lawrence J. Spiwak
August 19, 2024

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 19, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Lawrence J. Spiwak*

Lawrence J. Spiwak, Esq.
President and General Counsel
Phoenix Center for Advanced Legal and Economic Public
Policy Studies
5335 Wisconsin Avenue, NW
Suite 440
Washington, D.C. 20015
Tel: (202) 274-0235
Email:  lspiwak@phoenix-center.org