Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET,
DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON
RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404,
PUBLISHED MAY 22, 2024

---

On Petitions for Review

---

BRIEF OF AMICI CURIAE INTERNATIONAL CENTER FOR LAW &
ECONOMICS and COMPETITIVE ENTERPRISE INSTITUTE
IN SUPPORT OF PETITIONER

---

Philip D. Williamson
TAFT STETTINIUS & HOLLISTER
LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
pwilliamson@taftlaw.com

Ben Sperry
Kristian Stout
Geoffrey Manne
INTERNATIONAL CENTER FOR LAW
& ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(609) 807-8688
bsperry@laweconcenter.org

Dan Greenberg
Devin Watkins
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L St. NW, 7th Floor

Washington, D.C. 20005
(202) 331-1010
Dan.Greenberg@cei.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 6 Cir. R. 26.1, the International Center for Law & Economics and the Competitive Enterprise Institute make the following disclosures:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?

No.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

No.

Dated: August 19, 2024

*/s/ Philip D. Williamson*
Philip D. Williamson

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………….……….. iv

INTEREST OF AMICI CURIAE …………………………………….…... viii

SUMMARY OF THE ARGUMENT …………………………….……..… 1

ARGUMENT ………………………………………………………..….. 5

I.    The Order Violates the Major Questions Doctrine ………..... 5

A. The Major Questions Doctrine Still Applies Post-
*Loper Bright* to Ambiguous Grants of Authority
Over Questions of Vast Economic and Political
Significance ……………………………………………. 5

B. Broadband Classification Under the Communications
Act is a Question of Vast Economic and Political
Significance …………………………………………..… 8

C. The Communications Act Does Not Give Clear
Authority to the FCC to Classify Broadband as a
Title II Telecommunications Service ……………………. 12

D. The Use of Forbearance to Rewrite the Communications
Act's Provisions Shows the FCC Took a Wrong
Interpretive Turn ………………………………………. 15

II.    The Order's Vagueness Creates Major Negative Effects…. 17

A. The Order's Vagueness Imposes Economic Uncertainty
on a Large Portion of the U.S. Economy………………… 17

B. The Order's Vagueness Gives the FCC Unbounded
Power Over Broadband …………………………………. 24

C. The Order Is Arbitrary and Capricious …………………. 27

CONCLUSION ………………………………………………………. 33

CERTIFICATE OF COMPLIANCE ............................................... 34

CERTIFICATE OF SERVICE ......................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.,*
  594 U.S. 758 (2021) ........................................................................ 12, 13

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*
  467 U.S. 837 (1984) ....................................................................... 5, 6, 7

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ............................................................................. 25

*Loper Bright Enterprises v. Raimondo,*
  144 S. Ct. 2244 (2024) ............................................................. 3, 5, 6, 7

*Mozilla Corp v. FCC,*
  940 F.3d 1 (D.C. Cir. 2019) ................................................................ 14

*Nat'l Ass'n of Home Builders v. EPA,*
  682 F.3d 1032 (D.C. Cir. 2012) .................................................... 27, 31

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet
  Servs.,*
  545 U.S. 967 (2005) ...................................................................... 13, 14

*NFIB v. OSHA,*
  595 U.S. 109 (2022) .......................................................... 8, 11, 12, 13

*Ohio v. EPA,*
  144 S. Ct. 2040 (2024) .................................................................. 27, 28

*Sackett v. EPA,*
  598 U.S. 651 (2023) ...................................................................... 26, 27

*US Telecom Ass'n v. FCC,*
  825 F.3d 674 (D.C. Cir. 2016) ............................................................ 14

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ....................................................... 5, 6, 8, 16, 17

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)................................................................26

*West Virginia v. EPA*,
    597 U.S. 697 (2022).......................................... 3, 5, 7, 8, 11

**Statutes**

5 U.S.C. § 706(2)(A) ..............................................................27

47 U.S.C. § 160(a) .................................................................15

47 U.S.C. § 214(a)-(d) ......................................................21, 23

Communications Act of 1934,
    Pub. L. No. 73-416, 48 Stat. 1064................................ 3, 12, 14, 17, 20

**Regulatory Materials**

47 CFR §§ 8.3...................................................................18, 19

47 CFR § 8.6(b)(3) .................................................................26

2024 706 Report, FCC 24-27, GN Docket No. 22-270
    (Mar. 18, 2024).................................................................2, 9

Comments of WISPA – Broadband Without Boundaries, In
    the Matter of Safeguarding and Securing the Open
    Internet, WC Docket No. 23-320 (Dec. 14, 2023)
    available at
    https://www.fcc.gov/ecfs/document/121440645853/1 .........................23

Comments of International Center for Law & Economics,
    WC Docket No. 23-320 (Dec. 14, 2023) .................................28, 29, 30

FCC Fact Sheet, *Safeguarding and Securing the Open
    Internet* (Sept. 28, 2023)........................................................15

*Federal-State Joint Board on Universal Service*,
    13 FCC Rcd. 11501 (1998) .......................................................1

*Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018) ................................................. 1, 11

## Other Authorities

Axel Gautier & Robert Somogyi, *Prioritization vs Zero-Rating: Discrimination on the Internet* .............................. 32

Edwin J. Elton & Martin J. Gruber, Modern Portfolio Theory and Investment Analysis (4th ed., 1991) .................... 29, 30

Eric Fruits, Geoffrey A. Manne, Ben Sperry, & Kristian Stout, *Dynamic Competition in Broadband Markets: A 2024 Update* (ICLE White Paper, Jun. 2024) https://laweconcenter.org/wp-content/uploads/2024/06/Broadband-Competition-2024-Update.pdf ..................................................................... 2, 9

International Telecommunication Union, *United States Fixed Broadband Subscriptions* (2023) https://datahub.itu.int/data/?e=USA&c=701&i=19303&u=count ........................................................................... 10

Internet Service Providers in the US - Market Size (2005–2030), IBISWORLD (June 9, 2024) https://www.ibisworld.com/industry-statistics/market-size/internet-service-providers-united-states/ .................... 10

*Markey Net Neutrality Resolution Reaches 40-Vote Milestone in the Senate* (Jan. 9, 2018) https://www.markey.senate.gov/news/press-releases/markey-net-neutrality-resolution-reaches-40-vote-milestone-in-the-senate. ................................ 11, 12

USTelecom, *2022 Broadband Capex Report* (Sept. 8, 2023) https://www.ustelecom.org/research/2022-broadband-capex/ ............................................................................. 10

Wolfgang Briglauer, Carlo Cambini, Klaus Gugler, & Volker
  Stocker, *Net Neutrality and High-Speed Broadband
  Networks: Evidence from OECD Countries,*
  55 EUR. J. LAW ECON. (2023) ....................................................... 29, 30

## INTEREST OF AMICI CURIAE*

The **International Center for Law & Economics** ("ICLE") is a nonprofit, non-partisan global research and policy center that builds intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies and economic learning to inform policy debates and has longstanding expertise in evaluating law and policy.

ICLE scholars have written extensively in the areas of telecommunications and broadband policy. This includes white papers, law journal articles, and amicus briefs touching on issues related to the provision and regulation of broadband Internet service.

The **Competitive Enterprise Institute** ("CEI") is a nonprofit organization headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since 1984, CEI has carried out its mission through policy analysis, commentary, and litigation. This case interests CEI due to the massive negative effects of arbitrary government enforcement over the internet.

---

* No party's counsel authored any part of this brief. No one, apart from amici and their counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented the brief's filing.

## SUMMARY OF THE ARGUMENT

Since the rise of the commercial internet in the nineties, the regulatory approach to broadband regulation in the United States has been relatively "hands-off." This was an intentional choice by Congress and regulators. After the Telecommunications Act of 1996, the Stevens Report concluded that "Internet access services are appropriately classed as information, rather than telecommunications, services." *Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11536 (1998). This approach was maintained by the FCC for all but 3 of the last 28 years, when, between 2015 and 2018, the Commission decided to reclassify broadband access as a telecommunications service. The FCC again returned to classifying broadband access as a Title I information service in 2018. *See Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018).

Under the current "light-touch" Title I approach to broadband regulation, the marketplace for broadband in the U.S. is competitive, dynamic, and generally serves consumers well. Since 2018, more households are connected to the internet; broadband speeds have increased, while prices have fallen; more households are served by multiple providers; and new technologies like satellite and 5G have

expanded internet access and intermodal competition among providers. *See* Eric Fruits, Geoffrey A. Manne, Ben Sperry, & Kristian Stout, *Dynamic Competition in Broadband Markets: A 2024 Update* (ICLE White Paper, Jun. 2024), https://laweconcenter.org/wp-content/uploads/2024/06/Broadband-Competition-2024-Update.pdf. The FCC's own data suggests that 91% of Americans have access to high-speed broadband under its new and faster definition adopted earlier this year. *See* 2024 706 Report, FCC 24-27, GN Docket No. 22-270, ¶¶ 20, 22 (Mar. 18, 2024). The evidence would suggest that continuing the current regulatory approach is the best path forward.

Instead, the FCC has decided again to reclassify broadband as a Title II telecommunications service. *See Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, 89 Fed. Reg. 45404 (May 22, 2024) [hereinafter "Order"]. While the FCC does use its forbearance authority to "tailor" its rules to broadband, the FCC retains significant regulatory authority that will dampen investment incentives and harm consumers. The rules themselves, particularly the general conduct rule and Section 214 authority over licenses, leave the FCC with nearly unbounded authority over commercial business decisions by broadband

providers. As a result, broadband providers are highly likely to avoid possible litigation by getting their business plans pre-approved by the FCC. This sets up the FCC to be a de facto central planner over broadband.

The Order fails in two important respects.

First, the Order violates the Major Questions Doctrine ("MQD") by claiming expansive authority to reclassify broadband as a Title II service while rewriting the statute to fit under its forbearance authority. The MQD is violated here because, even after the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), that doctrine's requirement of "clear congressional authorization" for major policy decisions remains in force. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). The question of broadband classification under the Communications Act is, almost undeniably, one of vast economic and political significance. The Communications Act does not clearly classify broadband as a Title II telecommunications service, as many courts have now ruled. In fact, the "tailoring" of the statute through a broad application of forbearance authority to many of its main provisions shows that this is the wrong interpretative turn.

Second, the Order's vague rules would give the FCC nearly unlimited authority over the business decisions of broadband providers—authority that would allow the FCC to engage in arbitrary and discriminatory enforcement. Despite forbearance, the FCC retains the ability to regulate broadband providers as they see fit under Title II. This is particularly the case under the general conduct rule as well as under the Section 214 authority over licenses for entry along with the associated advisory opinion process. The Order is arbitrary and capricious because it fails to justify its vague rules: those rules will result in regulatory uncertainty that will dampen investment incentives for broadband providers to extend, maintain, and upgrade their networks. Ultimately, that harms consumers.

The FCC's solution in search of a problem should be rejected. Title II reclassification is bad policy, but even worse law.

## ARGUMENT

I.  **The Order Violates the Major Questions Doctrine.**

    A.  **The Major Questions Doctrine Still Applies Post-*Loper Bright* to Ambiguous Grants of Authority Over Questions of Vast Economic and Political Significance.**

After the Supreme Court officially overruled *Chevron*, some argued that this ruling raised questions about the status of the MQD. Indeed, the FCC argued in its briefs that the MQD can't be read to "supplant the best-reading analysis required by *Loper Bright*." *See* Respondents Supp. Br. Regarding *Loper Bright*, at 8. However, this court's decision to apply the MQD and grant a stay in this case is entirely consistent with *Loper Bright*. Courts must presume that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quoting *United States Telecom Ass'n. v. FCC*, 855 F.3d 381, 419 (DC Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). When an agency's advocates argue that the agency has immense powers that are unspoken in statute, "both separation of powers principles and a practical understanding of legislative intent" should make judges " 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there." *Id.* (quoting *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014)

("*UARG*")). In such cases, "something more than a merely plausible textual basis for the agency action is necessary"; instead, the agency "must point to 'clear congressional authorization' for the power it claims." *Id.* In short, the MQD requires agencies to receive clear expressions of authority in order to regulate in areas of vast economic and political significance.

The application of the MQD is not contingent on the existence of *Chevron. Chevron* required deference to agency action when the statute was ambiguous. *Loper Bright*, 144 S. Ct. at 2254 ("Since our decision in *Chevron U.S.A. v. Natural Resources Defense Council, Inc...* we have sometimes required courts to defer to 'permissible' agency interpretations of statutes who agencies administer—even when a reviewing court reads the statute differently."). The MQD, on the other hand, requires clear and express delegation to agencies when they assert authority over areas of vast economic and political significance. Indeed, in the pre-*Loper Bright* world, the MQD had the effect of displacing *Chevron* deference in some circumstances, but that was not its primary doctrinal function. *Loper Bright* only overruled *Chevron* and its progeny that gave agencies

deference under ambiguous statutes. By and large, *Loper Bright* left the MQD alone.

Justice Gorsuch's concurrence in *West Virginia v. EPA* illuminates certain aspects of the MQD, and this court should give that concurrence appropriate weight. As Justice Gorsuch explained, the major questions doctrine is appropriately understood as a "clear statement rule"; he compared it to other canons of statutory construction that help avoid constitutional problems, such as canons guarding against retrospective application of laws and protecting sovereign immunity. *See West Virginia v. EPA*, 597 U.S. at 736-37 (Gorsuch, J., concurring). "The major questions doctrine works in much the same way to protect the Constitution's separation of powers." *Id.* at 737. As such, the MQD can be understood as a rule of statutory construction that applies to agency assertions of authority, not simply an exception to *Chevron* deference.

Nothing in *Loper Bright* changes this analysis. In *Loper Bright*, the Court overruled *Chevron*, finding that courts must determine what the law is. *Loper Bright*, 144 S. Ct at 2273. Animating the Court's concerns were separation of powers issues: "Courts must exercise their independent judgment in deciding whether an agency has acted within

its statutory authority…" *Id.* The separation-of-powers rationale operates identically for both the MQD and for the rejection of *Chevron*: Congress must do its job and clearly delegate authority to the executive branch. The MQD remains foundational for courts when dealing with agency rules that implicate questions of vast economic or political significance.

### B.    Broadband Classification Under the Communications Act is a Question of Vast Economic and Political Significance.

How do we identify what is, or what isn't, a major question? In his concurrence in *West Virginia v. EPA*, Justice Gorsuch suggested a set of "triggers," two of which are relevant here. *West Virginia v. EPA*, 597 at 744 (Gorsuch, J., concurring). The doctrine is triggered when an agency seeks to regulate "a significant portion of the American economy." *Id.* (quoting *UARG*, 573 U.S. at 324). The doctrine is also triggered when an "agency claims the power to resolve a matter of great 'political significance.'" *Id.* at 743 (quoting *NFIB v. OSHA*, 595 U.S. 109, 117 (2022)).[1]

---

[1] The MQD may also "apply when an agency seeks to 'intrude into an area that is the particular domain of state law,'" *id.* at 744, but that is not relevant here.

The FCC purports to offer several justifications for reclassifying broadband, but they all reduce to the same fundamental premise: The FCC (now) thinks broadband is an essential service and should be regulated as such. Order, ¶ 2 (broadband internet connections "are absolutely essential to modern day life" and "[i]t has therefore never been more important that the Commission have both the necessary authority to oversee this essential service"). In other words, the essential nature of broadband access points to both its economic and political significance.

Of course, many essentials of modern-day life—shelter, food, clothing—are provided by numerous suppliers in competitive markets. So is broadband internet. The present marketplace for broadband in the U.S. is competitive, dynamic, and generally serves consumers well. Since 2018, more households are connected to the internet; broadband speeds have increased, while prices have fallen; more households are served by multiple providers; and new technologies like satellite and 5G have expanded internet access and intermodal competition among providers. *See* Fruits, Manne, Sperry, & Stout, *supra*. The FCC's own data suggests that 91% of Americans have access to high-speed broadband under its new and faster definition adopted earlier this year. *See* 2024 706 Report,

FCC 24-27, GN Docket No. 22-270, ¶¶ 20, 22 (Mar. 18, 2024). The light-touch approach of Title I has served the United States well.

What is relevant here is that broadband access represents a substantial share of the U.S. economy:

- In 2023, broadband providers generated $140 billion in revenue. *See Internet Service Providers in the US - Market Size (2005–2030)*, IBISWORLD (June 9, 2024), https://www.ibisworld.com/industry-statistics/market-size/internet-service-providers-united-states/.

- Broadband providers have invested $2.1 trillion in building, maintaining, and improving their networks since 1996, including $102.4 billion in 2022 alone. *See* USTelecom, *2022 Broadband Capex Report* (Sept. 8, 2023), https://www.ustelecom.org/research/2022-broadband-capex/.

- In 2023, the U.S. had 131 million households subscribing to fixed broadband. *See* International Telecommunication Union, *United States Fixed Broadband Subscriptions* (2023), https://datahub.itu.int/data/?e=USA&c=701&i=19303&u=count.

Regulating broadband access is indisputably a "significant portion of the American economy" akin to "regulating tobacco products, eliminating rate regulation in the telecommunications industry, subjecting private homes to Clean Air Act restrictions, and suspending local housing laws and regulations." *See West Virginia v. EPA*, 597 U.S. at 744 (Gorsuch, J., concurring).

There is extensive—perhaps extraordinary—evidence of the political significance of classifying broadband as a Title II telecommunications service. Congress and state legislatures have debated for years about whether and how to regulate broadband access, including net neutrality. *Cf. NFIB v. OSHA*, 595 U.S. at 121-122 (Gorsuch, J., concurring) (noting the power over public policy, such as public health, largely resides with the states and localities who have employed "a variety of measures in response to the current pandemic"). In fact, politicians on both sides of the aisle have continued to debate whether it was appropriate to classify broadband as a Title II or Title I service. *See* Dissenting Statement of Brendan Carr 1-3. Members of Congress introduced a Congressional Review Act resolution to stop the *Restoring Internet Freedom* Order. *See Markey Net Neutrality*

*Resolution Reaches 40-Vote Milestone in the Senate* (Jan. 9, 2018), https://www.markey.senate.gov/news/press-releases/markey-net-neutrality-resolution-reaches-40-vote-milestone-in-the-senate. This all points not only to the major political ramifications of classification, but to the fact that even Congress has not yet spoken clearly on the classification question of broadband providers under the Communications Act.

### C.    The Communications Act Does Not Give Clear Authority to the FCC to Classify Broadband as a Title II Telecommunications Service.

The question then becomes whether the Communications Act gives the FCC express or clear authority to classify broadband as a Title II service. The Court has repeatedly noted that Congress must "speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *NFIB v. OSHA*, 595 U.S. at 117 (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021)). The authorization must be plain or clear so agencies can't "exploit some gap, ambiguity, or doubtful expression in Congress's statutes to assume responsibilities far beyond its initial assignment." *Id.* at 669.

For instance, in *Alabama Association of Realtors v. Department of Health & Human Services*, the Court rejected the Centers for Disease Control and Prevention's (CDC) attempt to impose a moratorium upon residential evictions due to COVID-19. The Court emphasized that "[e]ven if the text were ambiguous, the sheer scope of the CDC's claimed authority... would counsel against the Government's interpretation." 594 U.S. at 764. The Court was concerned that the government's reading of the statute would give them "a breathtaking amount of authority" with virtually "no limit... beyond the requirement that CDC deem a measure 'necessary.'" *Id.* at 764-65.

Much like the agency actions in *NFIB* and *Realtors*, the scope of authority claimed by the FCC through reclassification is staggering, allowing the Commission to regulate nearly the entire internet infrastructure through Title II's expansive regulatory provisions.

The FCC points to *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005) to argue that it has already been decided that the FCC has the authority to classify broadband as a Title II service. But this is a misunderstanding of what that case represents.

13

At most, in his *Brand X* dissent, Justice Scalia believed that it would be appropriate to apply a telecommunications classification to the access/delivery component of broadband internet service. *Brand X,* 545 U.S. at 1005-14 (Scalia, J., dissenting). If this was the Court's opinion, then there would be a strong argument that it is settled law that Congress spoke clearly to the issue. But it wasn't. The majority rejected Justice Scalia's arguments and found the statute ambiguous as to classifying cable-modem service. In other words, *Brand X* did *not* foreclose a challenge under the MQD.

On the contrary, *Brand X* and the D.C. Circuit's decisions upholding the 2015 and 2018 Orders stand for the proposition that the classification of broadband service under the Communications Act is ambiguous. *See US Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (2015 Order); *Mozilla Corp v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (2018 Order). That means the answer to the second part of the MQD inquiry, whether Congress clearly spoke to the issue, must be "no."

D.    **The Use of Forbearance to Rewrite the Communications Act's Provisions Shows the FCC Took a Wrong Interpretive Turn.**

The Commission is obligated to refrain from enforcing Title II provisions when it concludes that such enforcement is not necessary and that forbearance would serve the public interest. 47 U.S.C. § 160(a). However, in effect, the FCC has essentially reserved for itself the power to decide which provisions of Title II will apply—and to whom. This reservation of authority cannot be anything except arbitrary.

Further, the Order's attempt to nominally minimize the reach of its claimed authority under Title II through forbearance, much like the 2015 Order in which the Commission noted that it was "tailor[ing]" Title II "for the 21st Century," 2015 Order ¶ 5, amounts to rewriting the act to make it more palatable, including by forbearing from rate regulation, network-unbundling requirements, and Section 214 exit certification requirements. *See* Order ¶¶ 308, 413. *See also* FCC Fact Sheet, *Safeguarding and Securing the Open Internet* (Sept. 28, 2023) ("Propose to forbear from 26 Title II provisions, and clarify that the Commission will not regulate rates or require network unbundling."). The FCC's "tailored forbearance" is an attempt to rewrite the statute to make it

work. *See* Order ¶¶ 157, 265, 296, 297, 314, 332, 358, 370, 371, 372, 381, 382, 414, 418, 419, 430, 632.

This is very similar to the attempted "tailoring" by the EPA that the Court rejected in *UARG*, 573 U.S. at 328 ("We affirm the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."). There, the Tailoring Rule was an attempt to make it such that small entities with the potential to emit greenhouse gasses would not be subject to lawsuits that the Clean Air Act would otherwise allow. *See id.* at 326 ("The Tailoring Rule is not just an announcement of the EPA's refusal to enforce the statutory permitting requirements; it purports to alter those requirements and to establish with the force of law that otherwise-prohibited conduct will not violate the Act. This alteration of the statutory requirements was crucial to the EPA's 'tailoring' efforts. Without it, small entities with the potential to emit greenhouse gases in amounts exceeding the statutory thresholds would have remained subject to citizen suits—authorized by the Act."). The Court rejected this attempt to rewrite the statute, concluding that an agency "has no power to 'tailor' legislation to bureaucratic policy goals by rewriting

unambiguous statutory terms." *Id.* at 325. Much like the EPA in *UARG*, the FCC's "need to rewrite clear provisions" of the Communications Act "should have alerted" them "that it had taken a wrong interpretive turn." *Id.* at 328.

Moreover, the ability to forbear under Title II also gives the FCC the ability to stop forbearing once Title II reclassification is made. Thus, the decision to reclassify will have huge economic and political implications, as the public and those regulated will have to pay special attention to the forbearance and possible un-forbearance of the FCC's decisions going forward. Further, the fact of a "tailored" reclassification under Title II would always remain as a sword of Damocles hanging over providers' heads. Even forborne rules can be put into force, meaning that providers will always have to act in the shadow of this regulatory authority, and will, whether explicitly or implicitly, be guided by that knowledge.

## II.    The Order's Vagueness Creates Major Negative Effects.

### A.    The Order's Vagueness Imposes Economic Uncertainty on a Large Portion of the U.S. Economy.

The Commission claims that its Order is "the best mix of bright-line rules and case-by-case review." Order ¶ 390. The bright-line rules

prohibit blocking, throttling, and paid or affiliated prioritization, while case-by-case review will be applied under the Order's general conduct rule as well as provisions of Section 214. But, even the bright-line rules are not so bright, as the bans on blocking and throttling are subject to "reasonable network management" exceptions and the ban on paid prioritization may be waived if a provider can demonstrate the practice "provide[s] some significant public interest benefit and would not harm the open nature of the internet." 47 CFR §§ 8.3(a), (b), (c)(2). Under this framework, broadband providers can't be sure the FCC will accept that they are engaging in reasonable network management.

The uncertainty and costs of complying with the Order's general conduct rule are even greater than these "bright-line" rules. The Order describes the general conduct rule as "a backstop mechanism to respond to attempts by BIAS providers to wield their gatekeeper power in ways that do not violate the bright-line rules, but nevertheless may compromise the open internet." Order ¶ 636. Rather than a "backstop," the general conduct rule is a "catch-all", *see* Order ¶ 502, that would allow the Commission to intervene when it finds that a provider's conduct generally threatened end users or content providers under some principle

of net neutrality. *See* 47 CFR §§ 8.3(d). As "guidance," the Commission proposes a non-exhaustive list of factors that could possibly (but not necessarily) be used to prove a violation. Order ¶ 507. The factors comprise an uncertain mashup of competition law, consumer-protection law, and First Amendment law and include: effects on end-user control; competitive effects; effects on innovation, investment, or broadband deployment; effects on free expression; whether the conduct is application-agnostic; and whether the conduct conforms to standard industry practices. *Id.* That is to say, essentially any action implicating anyone or any firm interacting with any part of the internet.

When the FCC relies on a vast expansion of discretionary power based on a list of non-exhaustive factors, this creates enormous uncertainty for firms that must invest billions of dollars in infrastructure over the course of decades. Even on the relatively shorter timescale required to offer innovative new service packages to consumers, a tremendous volume of negotiations are required among the broadband networks, rights holders, and any other third parties. The only practical way to comply with the general conduct rule would be to involve the FCC in business decisions at every level. Indeed, the Commission anticipates

such involvement with its promised "creation of an advisory opinion process." Order ¶ 636. Both the general conduct rule and a time-consuming and costly advisory opinion process cannot help but chill innovation and ultimately harm consumers through higher prices, reduced quality, and limited choice.

As it did in the 2015 Open Internet Order, in the latest Order the Commission uses its authority under Section 10 of the Communications Act to "forbear" from applying a wide range of Title II regulations. In other words, the FCC selectively chose which common carrier-style requirements to apply, exempting broadband internet providers from many of the more burdensome regulations that traditional telecommunications companies must follow. *See* Order ¶ 265 (describing the rule as "carefully tailored to avoid the potential issues that commenters claim are problematic").

The ability to forbear under Title II, however, also gives the Commission the ability to stop forbearing once Title II reclassification is made. Order ¶ 372 ("Although we adopt firm forbearance from all direct rate regulation, with respect to other provisions from which we forbear here, we note that it also is within the Commission's discretion to proceed

incrementally, and we find that adopting an incremental approach here—by virtue of the forbearance granted here—guards against any unanticipated and undesired detrimental effects on broadband deployment that could arise.") Thus, the decision to reclassify will have huge economic and political implications, as the public and those regulated will have to pay special attention to the forbearance and possible un-forbearance of the FCC's decisions going forward.

Section 214 may be the biggest source of costly uncertainty. Section 214(a) of the Act prohibits any carrier from constructing, acquiring, or operating any line, and from engaging in transmission through any such line, without first obtaining a certificate from the Commission "that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such … line …." 47 U.S.C. § 214(a). Section 214(a) also prohibits any carrier from discontinuing, reducing, or impairing service to a community without first obtaining a certificate from the Commission "that neither the present nor future public convenience and necessity will be adversely affected …." *Id.* The Order describes these latter requirements as "exit certification requirements."

21

The Order forbears from Section 214 exit certification requirements regarding the discontinuance, reduction, or impairment of broadband internet access services as well as the Commission's implementing section 214(a)–(d) rules. Order ¶ 308. The Order, however, does not forbear from certification requirements regarding authority for entry, acquisitions (including transfers of control and assignments), and temporary or emergency service and related requirements, instead granting blanket authority to all current and future broadband providers (with the exception of five Chinese companies), "subject to the Commission's reserved power to revoke such authority." Order ¶¶ 308, 777. The Commission argues that granting blanket authority is superior to forbearance, in part, because it preserves the Commission's "ability to protect consumers and the public interest by withdrawing such grants on an individual basis." Order ¶ 10. Despite this blanket authority, the Commission reserves the right to "withdraw[] such grants on an individual basis." Order ¶ 10. Commentors made clear that this would

lead to considerable uncertainty and longer wait times for broadband providers seeking to maintain, upgrade, or expand their networks.[2]

Blanket authority will create more problems due to its ambiguous nature than either full regulation or forbearance: regrettably, blanket authority appears to be a compromise that failed. Blanket authority creates a gray area where broadband providers are neither fully regulated nor fully exempt. This can lead to confusion about which aspects of Section 214 still apply and to what extent, especially with the Commission's ability to "revoke" or "withdraw" such authority "on an individual basis." Thus, despite the Commission's assurances that blanket authority "removes barriers to entry," the specter of case-by-case

---

[2] *See, e.g.*, Comments of WISPA – Broadband Without Boundaries, In the Matter of Safeguarding and Securing the Open Internet, WC Docket No. 23-320, at (Dec. 14, 2023), *available at* https://www.fcc.gov/ecfs/document/121440645853/1 ("Broadband providers across the country who never needed to obtain prior consent when adding a General Partner, refinancing, or engaging in numerous other kinds of purely domestic transactions would now need to file for and obtain prior Commission consent to an assignment or transfer of control. This alone will result in many more applications filed under Section 214 each year than have ever been filed before. . . . Even assuming the majority of those applications are subject to streamlined treatment, this would constitute a huge administrative burden on Commission resources, likely leading to far longer processing times than are already faced by applicants.").

revocation of such authority will lurk behind every investment or acquisition subject to Section 214.

As such, providers will be unsure about the limits of their authority, leading to hesitation in making investment, merger, or acquisition decisions. Moreover, blanket authority may be applied differently to providers or providers might interpret the blanket authority differently, leading to uneven practices across the industry. In particular, the Order anticipates future rulemaking in which Section 214 may be applied differently to small providers. Order ¶ 329 ("The Commission expects to release a further notice of proposed rulemaking (FNPRM) at a future time to examine whether any section 214 rules specifically tailored to BIAS, including for small providers, are warranted.")

In short, the Commission cannot assert that its forbearance or granting of "blanket authority" under Section 214 allays vagueness concerns, because of the uncertainty that has been introduced  at every step in the process..

## A.    The Order's Vagueness Gives the FCC Unbounded Power Over Broadband.

The Order is vague because it does not have "sufficient definitiveness that ordinary people can understand what conduct is

24

prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). As a result, the FCC has claimed unbounded power to engage in "arbitrary and discriminatory enforcement." *Id.*

While a broadband provider could argue that they are engaging in reasonable network management, the case-by-case nature of enforcement outlined in the Order means that no one can be sure they are on the right side of the law. *See* Order ¶ 506 ("Consistent with our proposal, we adopt a case-by-case approach that will consider the totality of the circumstances when analyzing whether conduct satisfies the general conduct standard to protect the open internet.").

This problem is exacerbated by the slight guidance that is offered in the Order. For example, while the Order does not ban zero rating, data caps, and usage-based billing, the Order is clear that these practices will be scrutinized and evaluated on a case-by-case basis under the general conduct rule. *See* Order ¶¶ 521-30. In sum, the FCC retains nearly unlimited ability to punish a business for a practice it deems "unreasonable interference" or a "disadvantage" to end users or edge providers, while providers must operate in a legal gray area where some

practices are neither banned nor clearly permitted until they receive review by the FCC.

This vagueness is not cured by the presence of the Order's advisory opinion process because, even after issuing an opinion, the FCC retains the right to bring a subsequent enforcement action after reconsidering, rescinding, or revoking it. *See* 47 CFR § 8.6(b)(3) ("An advisory opinion states only the enforcement intention of the Enforcement Bureau as of the date of the opinion, and it is not binding on any party. Advisory opinions will be issued without prejudice to the Enforcement Bureau or the Commission to reconsider the questions involved, or to rescind or revoke the opinion"). In other words, there is no basis for concluding a covered entity has "the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). The FCC may engage in utterly arbitrary and discriminatory enforcement under the Order.

The FCC's proposal is similar to the EPA's rule in *Sackett v. EPA*, 598 U.S. 651, 669 (2023). There, the EPA rule "assesses the aggregate effect of that group based on a variety of open-ended factors." *Id.* at 681.

The regulated community is thus "left 'to feel their way on a case-by-case basis.'" *Id.* When asked how the regulated community was to know their own obligations, the "EPA recommends asking the Corps" for a "written decision," quite reminiscent of the FCC's proposed advisory opinions. *Id* at 670. The Court found that the "EPA's interpretation gives rise to serious vagueness concerns." *Id.* at 680.

## B. The Order Is Arbitrary and Capricious.

The Order's vagueness creates regulatory uncertainty that will dampen investment incentives for broadband providers, harming consumers in the process. This was not accounted for in the cost-benefit analysis, thus making the Order arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[When an] agency decides to rely on a cost-benefit analysis as part of its rulemaking a serious flaw undermining that analysis can render the rule unreasonable"). Moreover, in making this decision, the FCC failed to make a reasoned response to the evidence presented in the record. This is a further reason the Order is arbitrary and capricious. As the Supreme Court recently summarized the law in *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024):

> An agency action qualifies as "arbitrary" or
> "capricious" if it is not "reasonable and reasonably
> explained." *FCC v. Prometheus Radio Project*, 592
> U. S. 414, 423 (2021)... the agency must offer "a
> satisfactory explanation for its action[,] including
> a rational connection between the facts found and
> the choice made..." *Motor Vehicle Mfrs. Assn. of
> United States, Inc. v. State Farm Mut. Automobile
> Ins. Co.*, 463 U. S. 29, 43 (1983)... [and] cannot
> simply ignore "an important aspect of the
> problem." *Ibid.*

There is a growing body of evidence that Title II reclassification will hinder broadband investment due to regulatory uncertainty. The see-sawing between Title I and Title II regulation over the years has already injected regulatory uncertainty into the broadband market. But reimposing Title II regulations—particularly with the vast discretion in the new rules as noted above—will inject additional uncertainty as successive Commissions change objectives or identify new objectives under Title II.

In comments to the Commission, ICLE notes that firms' investment decisions can be thought of as an assembly line, where investment opportunities are investigated and evaluated. Opportunities with negative returns on investment are rejected and those with positive returns are further evaluated and ranked. Comments of International

Center for Law & Economics, WC Docket No. 23-320, at 25-26 (Dec. 14, 2023) ("ICLE Comments"). Because firms have limited resources, some of the investments with positive returns are rejected. Once a firm decides to pursue an investment opportunity, the project is further evaluated throughout the deployment timeframe. Just as a product can be pulled from the assembly line for defects, investments can be pulled for economic or technical defects. Generally speaking, the further down the assembly line the project goes, the less likely it is to be pulled. Thus, an interruption at the end of the assembly line is likely to be less disruptive than an interruption at the beginning. Similarly, a shift in the regulatory regime would be expected have little impact in the short-run for projects already underway, but have a larger impact in the long-run as firms plan out new investments.

Title II classification can turn projects with positive expected returns into projects with negative expected returns. In addition, the regulatory uncertainty that is endemic to Title II regulation reduces firms' confidence in the reliability of their return-on-investment projections. Because of the well-known and widely accepted risk-return tradeoff, firms facing increased uncertainty in investment returns will

demand higher expected returns from the investments they pursue. *See* EDWIN J. ELTON & MARTIN J. GRUBER, MODERN PORTFOLIO THEORY AND INVESTMENT ANALYSIS (4th ed., 1991). In this way, even if the return on a potential investment is unchanged, the increase in the uncertainty of those returns would discourage investment.

This is not mere theory. ICLE's comments to the Commission cite empirical research finding that net neutrality regulations have a significant negative impact on fiber-optic network investment by internet service providers. ICLE Comments, at 26-27 (citing Wolfgang Briglauer, Carlo Cambini, Klaus Gugler, & Volker Stocker, *Net Neutrality and High-Speed Broadband Networks: Evidence from OECD Countries*, 55 EUR. J. LAW ECON. 533–571 (2023)). The Commission notes, "the underlying data for this study were not available to us in our analysis," yet claims to make "corrections" to the paper to conclude "there is no empirical evidence in the record that Title II reclassification would have any significant negative impact on broadband investment." Order ¶ 628. The Commission provides no explanation of what "corrections" were necessary, how the corrections were made, or how those corrections could have been made without access to the underlying data. The Commission's

unexplained rejection of published peer-reviewed academic research has the hallmarks of "a serious flaw undermining that analysis" that "render[s] the rule unreasonable." *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d at 1040.

It is axiomatic that any increase in regulation must be associated with a cost of complying with the increased regulation. Although the Order acknowledges comments claiming the reclassification of broadband internet under Title II will result in higher regulatory compliance costs, it dismisses these concerns, noting "no commenter provided quantitative estimates of the magnitude of these potential compliance costs" and concluding "[i]n our predictive judgment, and based on qualitative analysis, however, we believe that these compliance costs are likely to be small and are outweighed by the benefits of reclassification." Order ¶ 629. The Order focuses solely on the "direct increase in compliance costs." Order ¶ 630. Even so, the Commission relies on "qualitative analysis," rather than the "quantitative estimates" it demands of its critics.

In practice, the direct costs of complying with the Order will be orders of magnitude smaller than the indirect costs borne by providers

and consumers. These indirect costs are unmeasurable at this time because the Order has provided only vague guidance on how the regulation will be applied and enforced, or how providers can comply. For example, research suggests that both ISPs and consumers benefit from paid prioritization "under severe congestion and high-value content." Axel Gautier & Robert Somogyi, *Prioritization vs Zero-Rating: Discrimination on the Internet*, 73 INT'L. J IND. ORG. 102662 (Dec. 2020). While the Order specifies a "bright-line" ban on paid prioritization, it also provides the Commission an option to waive the ban, if there is a "significant public interest benefit." The Order does not indicate, and ISPs can't know, however, whether the Commission will consider delivering any particular high-value content under severe congestion will be such a public interest benefit.

These are substantial costs. They need to be evaluated by the FCC and incorporated into the cost-benefit analysis. The failure to do so is arbitrary and capricious, because there was neither a substantive response to comments in this area nor any consideration of this important aspect of the problem.

## CONCLUSION

For the foregoing reasons, the Court should set aside the Order as unlawful.

Dated: August 19, 2024        Respectfully submitted,

*/s/ Philip D. Williamson*
Philip D. Williamson
TAFT STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
(513) 381-2838
pwilliamson@taftlaw.com
amcclellan@taftlaw.com

Ben Sperry
Kristian Stout
Geoffrey Manne
INTERNATIONAL CENTER FOR LAW & ECONOMICS
1104 NW 15th Ave., Ste. 300
Portland, OR 97207
(609) 807-8688
bsperry@laweconcenter.org

Dan Greenberg
Devin Watkins
COMPETITIVE ENTERPRISE INSTITUTE
1310 L St. NW, 7th Floor
Washington, D.C. 20005
(202) 331-1010
Dan.Greenberg@cei.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) and 6 Cir. R. 32 because it contains 6,230  words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

This Brief complies with the typeface requirements of Fed. R. App. P.  32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Century font.

Dated: August 19, 2024         */s/ Philip D. Williamson*
                               Philip D. Williamson

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on August 19, 2024 using the Court's CM/ECF system, which will serve notice of this filing on all counsel of record:

*/s/ Philip D. Williamson*
Philip D. Williamson