**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508,
24-3510, 24-3511, 24-3519, and 24-3538**

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

In Re: MCP No. 185: Federal Communications Commission, In The Matter of Safeguarding and Securing the Open Internet, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404, Published May 22, 2024

---

On Petitions for Review

---

## BRIEF OF U.S. SENATOR TED CRUZ, U.S. REPRESENTATIVE CATHY MCMORRIS RODGERS, AND SIX OTHER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS

---

William P. Barr
Paul M. Cappuccio
John V. Coghlan
Justin M. Romeo
TORRIDON LAW PLLC
801 17th Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
ecf@torridonlaw.com

*Counsel for* Amicus Curiae

August 19, 2024

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI CURIAE ................................................................................. 1

SUMMARY OF THE ARGUMENT ........................................................................... 3

ARGUMENT ............................................................................................................... 5

I.    Broadband Internet Access Is An "Information Service" Under The Plain
      Meaning Of The Telecommunications Act of 1996 ........................................ 5

II.   The Regulatory Background Leading Up To The 1996 Act Makes Clear That
      Congress Meant for "Information Services" To Cover Broadband Internet
      Access. .......................................................................................................... 10

III.  The 1996 Act's Goal Of Keeping the Internet Unregulated Makes Clear That
      Broadband Internet Access Is An "Information Service." ............................ 13

CONCLUSION ........................................................................................................ 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry),*
77 F.C.C.2d 384 ...................................................................................... 4, 10

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ................................................................................ 9

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ................................................................................... 12

*National Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
545 U.S. 967 (2005) ..........................................................................4, 6, 8, 11

**Statutes**

47 U.S.C. § 153(24) ...............................................................................5, 8, 12

47 U.S.C. § 153(50) .................................................................................. 7, 12

47 U.S.C. §§ 230(a)(1), (a)(4) .................................................................... 13

47 U.S.C. §§ 230(a)(4) ............................................................................. 3, 5

47 U.S.C. § 230(b)(2) ...........................................................................3, 5, 14

47 U.S.C. § 230(f)(2) ................................................................................... 9

Broadband Deployment Accuracy and Technological Availability Act,
Pub. L. No. 116-130, 134 Stat. 228 (2020) ................................................ 15

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat.
429 (2021) ............................................................................................... 15

Secure and Trusted Communications Networks Act of 2019, Pub. L.
No. 116-124, 133 Stat. 158 (2020) ........................................................... 15

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56,
("1996 Act") ............................................................................................. 3

Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010)...................................................... 15

**Other Authorities**

47 C.F.R. §§ 8, 20 ............................................................................................................ 3

Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine* (Sept. 20, 2023), https://aboutblaw.com/bazq ..................................................................... 11, 12

Letter from Senators John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden to the Honorable William E. Kennard, Chairman, FCC, at 1 (Mar. 23, 1998) (Five Senators Letter), http://apps.fcc.gov/ecfs/document/view?id=2038710001 .................................. 14

Net Neutrality and Broadband Justice Act of 2022, H.R. 8573, 117th Cong. § 2 (2022).............................................................................................. 15

Save the Internet Act of 2019, H.R. 1644, 116th Cong. § 2(b)-(c) (2019) .................... 15

## INTEREST OF AMICI CURIAE[1]

*Amici curiae* are United States Senator Ted Cruz, United States Representative Cathy McMorris Rodgers, and six other Members of Congress.  The full list is below. Senator Cruz is Ranking Member of the Senate Committee on Commerce, Science, & Transportation, which oversees matters relating to the Federal Communications Commission ("FCC").  Congresswoman Rodgers is Chair of the House Committee on Energy and Commerce.  These and other *amici* have an interest in ensuring that the FCC acts in accordance with the regulatory authority granted to it by Congress.  This interest is particularly significant where the FCC acts not only in a manner that is contrary to congressional design, but in a way that would inflict serious damage on the competitive U.S. broadband industry.

In addition, as Members of Congress, *amici* have a strong interest in ensuring that judicial interpretations preserve the legislative powers that Article I of the Constitution vests exclusively in Congress.  Where Congress speaks clearly in providing—or limiting—agency authority, agencies should not be able to act in ways that are at odds with that authority.  That concern is particularly acute where—as here—an agency seeks to take action that is directly at odds with not only Congress's objective but with the plain meaning of the words Congress chose in enacting legislation.

---

[1] No counsel for a party authored this brief in whole or in part.  No party or party's counsel and no other entity or person, aside from *amici curiae* or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).  All parties have consented to the filing of this amicus brief.

The following is the full list of *amici*:

### Members of the United States Senate

| | |
|---|---|
| Ted Cruz | Marsha Blackburn |
| Ted Budd | Eric Schmitt |
| Thom Tillis | Roger Wicker |

### Members of the United States House of Representatives

| | |
|---|---|
| Cathy McMorris Rodgers | Robert Latta |

## SUMMARY OF THE ARGUMENT

For decades, America has led the world with faster and more competitively priced internet service. That leadership was on full display during the pandemic, when U.S. networks thrived while heavily regulated European counterparts faltered.

America's success was no accident. It came as the result of a clear and explicit decision by Congress **not** to regulate an area in which free market principles had led to benefits for all. To that end, when passing the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, ("1996 Act"), Congress recognized that the internet had "flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. §§ 230(a)(4). And, when enacting the 1996 Act, Congress stated its goal was "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." *Id.* § 230(b)(2).

The FCC's Order at issue in this case takes the opposite approach. *See Safeguarding and Securing the Open Internet*, 89 Fed, Reg, 45404 (May 22, 2024) (to be codified at 47 C.F.R. §§ 8, 20). It empowers the agency to impose draconian new burdens on broadband internet providers, including new taxes and rate regulations that would stifle the continued development and advancement of technology that sets America apart from the rest of the world. For three reasons, the Court should not allow that to happen.

*First*, the Order is at odds with the plain language of the statute. By deciding that broadband internet providers offer "telecommunications services" (and subjecting them to the onerous Title II regulatory regime), the FCC ignores the plain language of the 1996 Act. That language makes clear that broadband providers offer "information services," not "telecommunications services," because those providers offer their customers the capability to generate, store, process, and otherwise use data. The statute's language defining those terms leaves no room for a contrary interpretation. Even if there were any doubt, references to those terms elsewhere in the statute drive home what the plain language says—broadband providers offer "information services."

*Second*, Congress's decision is made clear by the regulatory background at the time of the 1996 Act. The definitions of "telecommunications service" and "information service" mirror the FCC's own prior distinction between "basic services" and "enhanced services." The fundamental difference between these two definitions is that "basic" services did not provide consumers with additional computer processing of their data, while "enhanced" services did. As the Supreme Court recognized, the terms "telecommunications services" and "information services" adopted in the 1996 Act closely mirror the FCC's prior use of "basic" and "enhanced" services, showing that Congress sought to maintain those classifications. *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 977 (2005). Because broadband internet providers offer customers additional computer processing of data,

broadband internet fits neatly into the definition of "enhanced" services. By extension, it is an "information service."

**Third**, as previously noted, in enacting the 1996 Act, Congress made clear its objective was to keep the internet **unregulated**, allowing it to continue to "flourish,[] to the benefit of all Americans." 47 U.S.C. §§ 230(a)(4). An interpretation of the Act that would subject broadband internet providers to onerous Title II common carrier provisions would completely undermine Congress's attempt "to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation." *Id.* § 230(b)(2).

For these reasons, the Court should hold unlawful, vacate, enjoin, and set aside the Order.

## ARGUMENT

### I.    Broadband Internet Access Is An "Information Service" Under The Plain Meaning Of The Telecommunications Act of 1996.

As the FCC has recognized for nearly all of the internet's existence, broadband internet access is an information service. As defined by the 1996 Act, that term means "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(24). Broadband internet companies are in the business of "offering" their customers these very "capabilities." Their customers who edit photos, browse the web,

5

stream a video, or play a video game have the "capability" to do so only because of the internet access provided by broadband companies.

The recognition that broadband companies provide "information services" has long been uncontested. In *National Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), the Supreme Court recognized that no party was challenging the Commission's conclusion "that cable modem service is an 'information' service.'" *Id.* at 987. That is because cable modem service (a type of broadband internet access) "provides consumers with a comprehensive **capability** for manipulating information using the Internet via high-speed telecommunications." *Id.* (emphasis added). Even the dissent in *Brand X* recognized this was the case. It observed that cable-modem service providers gave their customers "***both*** computing functionality ***and*** the physical pipe by which that functionality comes to their computer." *Id.* at 1009 (Scalia, J., dissenting) (emphases added). In other words, the dissent in *Brand X* acknowledged that cable modem companies provided their customers with "information services," while questioning only whether the provision of the communications infrastructure necessary to use those "information services" was severable.[2] But everyone agreed that cable modem providers—like broadband providers today—offer their customers "information services."

---

[2] In the current order, the FCC does not attempt to "sever" the information services provided by broadband providers from whatever telecommunications are used to do so. Instead, it finds that broadband providers offer *only* telecommunications services.

It is equally clear that broadband internet access is not a "telecommunications service" as that term is defined in the statute.  A "telecommunications service" means "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  *Id.* § 153(53).  "Telecommunications," in turn, is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  47 U.S.C. § 153(50).  When these definitions are combined, a "telecommunications service" requires that "information of the user's choosing" be transmitted "without change in the form or content of the information as sent and received."

But broadband internet providers ***do*** "change . . . the form or content of the information as sent and received," something that must be done in order to turn that information into a format usable by consumers.  They must reconfigure packets of data retrieved from websites so that it shows up on the computer screens of the internet users who are requesting it.  Among other examples, broadband companies provide their customers with Domain Name System ("DNS") service, which uses computer processing to translate the name of a website into the relevant IP address for each user.

At the same time, broadband providers decide how to route internet content to and from their subscribers, meaning information is not sent "between or among points specified by the user."  47 U.S.C. § 153(50).  A broadband provider may utilize caching, a service that stores popular content on local servers so consumers are able to access

that information more quickly. Of course, ordinary users do not consciously decide whether or not to utilize caching—or "specify" the points at which the information will be retrieved. Instead, those users simply want to receive the requested information as efficiently as possible. Broadband providers' use of caching meets that need.

To be sure, broadband providers **make use** of telecommunications, as the definition of "information services" contemplates. *See* 47 U.S.C. § 153(24) ("[T]he offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information **via telecommunications**.") (emphasis added). But the **use** of telecommunications does not transform an "information services" provider into a "telecommunications services" provider. As the Supreme Court recognized in *Brand X*, "'[t]he service that Internet access providers offer to members of the public is Internet access,' not a transparent ability (from the end user's perspective) to transmit information." *Brand X*, 54 U.S. at 1000 (quoting *In the Matter of Fed.-State Joint Bd. on Universal Serv.*, 13 F.C.C. Rcd. 11501 ¶ 76 (1998)). In other words, in the 1996 Act, Congress made clear that "information service" providers were to be treated differently than "telecommunications service" providers, even though both kinds of providers may use telecommunications when delivering their services to customers.

Other portions of the Communications Act confirm that the words Congress chose mean what they say—broadband access is not an "information service." For example, Congress defines the term "interactive computer service" to mean "any

***information service*** … that provides or enables computer access by multiple users to a computer server, ***including specifically a service . . . that provides access to the Internet***." 47 U.S.C. § 230(f)(2) (emphases added).  As this definition makes clear, "a service" which "provides access to the Internet" is an "information service."  In the very next section, Congress explicitly distinguished between a "telecommunications carrier engaged in the provision of a telecommunication service" and a "person engaged in the business of providing an Internet access service."  *Id.* §§ 231(b)(1) & (2).  And in section 223(e)(6), Congress provided that "[n]othing in this section shall be construed to treat interactive computer services," which, as noted, includes services who provide access to the Internet, "as common carriers or telecommunications carriers."  *Id.* § 223(e)(6).

The FCC, itself, tacitly recognizes that treating broadband internet access as a telecommunications service is incompatible with the 1996 Act.  The agency highlights more than a dozen Title II provisions that it says it will forebear from enforcing against broadband providers.  *See, e.g.,* Order ¶ 414 (stating the FCC's intent to forbear from enforcing, among other things, provisions relating to caller ID and pay-per-call services).  The Supreme Court has repeatedly recognized that an agency's unrestrained application of forbearance is tantamount to rewriting a statute.  *See, e.g., Biden v. Nebraska*, 143 S. Ct. 2355, 2371 (2023) ("What the Secretary has actually done is draft a new section of the Education Act from scratch by 'waiving' provisions root and branch and then filling the empty space with radically new text.").

9

As all of these provisions show, Congress meant for broadband providers to come within the definition of information service providers, not telecommunications providers.  Any other interpretation would stretch the words of the statute far beyond their plain meaning.

## II.    The Regulatory Background Leading Up To The 1996 Act Makes Clear That Congress Meant for "Information Services" To Cover Broadband Internet Access.

Congress's decision to treat broadband internet as an "information service" is also made clear by the regulatory background leading up to the 1996 Act.  The 1996 Act was passed against the backdrop of regulations that distinguished between "basic" services and "enhanced" services, a distinction that clearly informed the 1996 Act's definitions of "telecommunications service" and "information service."  Because broadband access fits neatly into the FCC's own definition of an "enhanced service," it is clear that it similarly falls within the definition of "information service," which Congress crafted to track the existing category of "enhanced service."

The "basic services" and "enhanced services" terms came from FCC rules from the 1970s that were developed to regulate data-processing services offered over telephone wires.  Those rules, known as the "Computer II" rules, found that a carrier who offers a basic service "essentially offers a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer-supplied information."  *In re Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, 77 F.C.C.2d 384, 420, ¶ 96 ("*Computer II*

*Rules*"). This type of service was intended to cover "a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than the processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network—such as via a telephone or a facsimile." *Brand X*, 545 U.S. at 976. By contrast, an "enhanced service" is one in which "computer processing applications are used to act on the content, code, protocol, and other aspects of the subscriber's information." *Computer II Rules* ¶ 97.

Under these definitions, broadband internet providers easily fall into the category of "enhanced service" providers. Broadband providers do not offer "pure transmission capability over a communications path" like a basic service provider. Instead, they "act on the content, code, protocol, and other aspects of the subscriber's information," meaning they would be considered an "enhanced service." In other words, under the regulatory background predating the adoption of the 1996 Act, the FCC itself would not and could not have classified broadband providers as providing "basic services."

This regulatory background—and, specifically, its distinction between "basic" and "enhanced" services—informed the definitions Congress adopted in the 1996 Act. As the Supreme Court recognized in *Brand X*, "[t]he definitions of the terms 'telecommunications service' and 'information service' established by the 1996 Act are similar to the [FCC's] basic-and enhanced-service classifications." *Brand X*, 545 U.S. at 977; *see also* Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality"*

*Broadband Rules Would Breach Major Questions Doctrine* at 13 (Sept. 20, 2023), https://aboutblaw.com/bazq ("That [1996] act was passed against the backdrop of a regulatory history that distinguished between 'basic' services and 'enhanced' services, a distinction that roughly mirrors the current statutory distinction between 'telecommunications services' and 'information services.'"). For example, a telecommunications service transmits information "between points" and "without change in the form or content of the information as sent and received." *Computer II Rules* ¶ 96. That is similar to how a basic service "transmits an ordinary-language message to another point" without any processing other than that needed to ensure it arrives "back into ordinary language." 47 U.S.C. § 153(50). By contrast, an information service offers the capability to "process . . . information via telecommunications," *Computer II Rules* ¶ 97, just as an enhanced service is one in which "computer processing applications" are used on the "subscriber's information," 47 U.S.C. § 153(24).

It is not unusual for Congress to look to regulatory background when deciding whether and how to enact legislation. For example, in *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 155–56, (2000), the Supreme Court considered FDA's claims that it had been granted statutory authority to regulate tobacco. In rejecting FDA's claims, the Court looked to Congress's tobacco-specific legislation and the fact that it was "enacted . . . against the background of the FDA repeatedly and consistently asserting that it lacks jurisdiction . . . to regulate tobacco products." *Id.* at 1313. *See also id.* ("Under these circumstances, it is clear that Congress' tobacco-specific

legislation has effectively ratified the FDA's previous position that it lacks jurisdiction to regulate tobacco."). There, as here, the agency's prior stated positions informed and were incorporated into the legislation Congress passed.

The necessary conclusion, of course, is that Congress considered broadband providers to be providing "information services," given the clear objective to have that term incorporate the Computer II rule's definition of enhanced services.

## III.    The 1996 Act's Goal Of Keeping the Internet Unregulated Makes Clear That Broadband Internet Access Is An "Information Service."

Finally, Congress's own stated policy goals in enacting the 1996 Act make clear that it did not provide for broadband access to be regulated as a telecommunications service. Congress acknowledged that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens," while recognizing that these services "have flourished, to the benefit of all Americans, **with a minimum of government regulation.**" 47 U.S.C. §§ 230(a)(1), (a)(4). Congress then continued and noted, "[i]t is the policy of the United States . . . to promote the continued development of the Internet and other interactive computer services" and "***to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.***" *Id.* §§ 230(b)(1), b(2).

That understanding was confirmed two years after the passage of the Act. Five Senators—John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden—wrote the Commission and explained that "[n]othing in the 1996 Act or its legislative history suggests that Congress intended to alter the current classification of Internet and other information services or to expand traditional telephone regulation to new and advanced services." Letter from Senators John Ashcroft, Wendell Ford, John Kerry, Spencer Abraham, and Ron Wyden to the Honorable William E. Kennard, Chairman, FCC, at 1 (Mar. 23, 1998) (Five Senators Letter), http://apps.fcc.gov/ecfs/document/view?id=2038710001. These five Senators further warned that if the Commission "subject[ed] some or all information service providers to telephone regulation, it seriously would chill the growth and development of advanced services to the detriment of our economic and educational well-being." *Id.*

Regulating broadband internet access as a "telecommunications service" would fly in the face of Congress's objective in passing the law. Far from "unfettering" the free market, 47 U.S.C. § 230(b)(2), it would give *the Commission* unfettered power to impose onerous restrictions, including rate regulations, tariffing requirements, unbundling obligations, entry and exit regulations, and other taxation of broadband. For these very reasons, Congress has repeatedly *declined* to give the FCC such power in any of the numerous legislative enactments regarding broadband over the past two

decades.[3]  To the contrary, Congress has repeatedly considered **_but rejected_** efforts to treat broadband providers as offering telecommunications services.[4]  In so doing, Congress recognized the significant harm that would befall consumers from stifling further development that the current free-market approach makes possible.  The FCC's contrary approach lacks statutory authority, is inconsistent with the regulatory background leading up to 1996, and is flatly contrary to Congress's objective of keeping the internet unregulated to spur innovation.

---

[3] _See, e.g.,_ Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021); Broadband Deployment Accuracy and Technological Availability Act, Pub. L. No. 116-130, 134 Stat. 228 (2020); Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 133 Stat. 158 (2020); Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010).

[4] _See, e.g.,_ Net Neutrality and Broadband Justice Act of 2022, H.R. 8573, 117th Cong. § 2 (2022) (proposing to amend the Communications Act's definition of telecommunications service to "include[] the offering of broadband internet access service"); Save the Internet Act of 2019, H.R. 1644, 116th Cong. § 2(b)–(c) (2019) (proposing to reinstate the FCC's 2015 Title II Order, which classified broadband as a telecommunications service).

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful, vacate, enjoin, and set aside the Order.

Respectfully Submitted,

By: /s/ *William P. Barr*
William P. Barr
Paul M. Cappuccio
John V. Coghlan
Justin M. Romeo
TORRIDON LAW PLLC
801 17th Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
ecf@torridonlaw.com

August 19, 2024

*Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,461 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: August 19, 2024                    By: _/s/ *William P. Barr*_____

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the Court's CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and service was accomplished by the Court's CM/ECF system.


Dated: August 19, 2024              By: _/s/ William P. Barr_____