**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3504, 24-3507, 24-3508, 24-3510, 24-3511, 24-3517, 24-3519, 24-3538**

# In the United States Court of Appeals for the Sixth Circuit

———————————

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

———————————

On Petitions for Review

———————————

**BRIEF FOR AMICUS CURIAE CHRISTOPHER S. YOO IN SUPPORT OF INDUSTRY PETITIONERS**

———————————

CHRISTOPHER S. YOO
University of Pennsylvania Carey Law School
3501 Sansom Street
Philadelphia, PA 19104-6204
Telephone: (215) 746-8772
Email: csyoo@law.upenn.edu

*Counsel for Amicus Curiae*

TABLE OF CONTENTS

STATEMENT OF IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE AS AMICUS CURIAE ....................... vi

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ......................................................... vii

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................. 1

ARGUMENT .................................................................. 2

I.    Reclassifying Broadband Internet Access as a Telecommunications Service Conflicts with the Plain Language of the Communications Act ............................................. 2

      A.    As the Supreme Court Recognized in *Brand X*, Broadband Internet Access Services' Reliance on the Domain Name System (DNS) and Caching Requires Finding that Their Transmissions Are Not Telecommunications .............................................. 6

            1.    DNS ............................................................... 8

            2.    Caching ........................................................ 14

      B.    The FCC's Attempts to Refute This Argument Are Invalid. ................................................................ 15

II.   The Open Internet Order Violates The First Amendment. .......... 19

      A.    The Judicial Decisions Reviewing the 2015 Open Internet Order Implicitly Recognize ISPs' First Amendment Right Not to Carry Traffic. ............................ 19

      B.    Courts Have Recognized that the First Amendment Protects Carriers' Rights to Offer Services Over Which They Exercise Editorial Discretion. .......................... 23

CONCLUSION .................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameritech Corp. v. United States*, 867 F. Supp. 721 (N.D. Ill. 1994) ........................................................................................... 24

*BellSouth Corp. v. United States*, 868 F. Supp. 1335 (N.D. Ala. 1994) ........................................................................................... 24

*Charter Advanced Serv. (MN), LLC v. Lange*, 903 F.3d 715 (8th Cir. 2018) ....................................................................................... 17

*Chesapeake & Potomac Tel. Co. of Va. v. United States*, 42 F.3d 181 (4th Cir. 1994), *vacated and remanded for consideration of mootness*, 516 U.S. 415 (1996) ........................................................ 24

*Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) ...................................................................................... 26

*The Express Package Cases*, 117 U.S. 1 (1885) ...................................... 22

*In re MCP No. 185*, No. 24-7000, 2024 WL 3650468 (6th Cir. Aug. 1, 2024) ............................................................................................ 3

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ................ 2, 3

*NYNEX Corp. v. United States*, No. Civ. 93-323-P-C, 1994 WL 779761, at *2 (D. Me. Dec. 8, 1994) .................................................. 24

*S. New England Tel. Co. v. United States*, 886 F. Supp. 211 (D. Conn. 1995) ...................................................................................... 24

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994) ........... 21

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) .... 3, 19, 20, 21

*U.S. Telecom Ass'n v. FCC*, 855 F.3d 381 (D.C. Cir. 2017) .. 20, 21, 22, 23

*US West, Inc. v. United States*, 48 F.3d 1092, 1098 (9th Cir. 1994), *vacated and remanded for consideration of mootness*, 516 U.S. 1155 (1996) ...................................................................................... 24

*Verizon v. FCC*, 740 F.3d 623, 653 (D.C. Cir. 2014) .............................. 22

**Statutes**

47 U.S.C. § 153(24) ................................................................................... 16

47 U.S.C. § 153(50) ..................................................................................... 4

47 U.S.C. § 153(53) ..................................................................................... 4

Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98
Stat. 2779 ....................................................................................24
Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ....25

**Regulatory Materials**

*Application of Telephone Cos. for Section 214 Certificates for
Channel Facilities Furnished to Affiliated Community Antenna
Television Systems*, Final Report and Order, 21 F.C.C.2d 307
(1970), *aff'd sub nom. Gen. Tel. Co. of Sw. v. United States*, 449
F.2d 846 (5th Cir. 1971) ..................................................................24
*Implementation of the Non-Accounting Safeguards of Sections 271
and 272 of the Communications Act of 1934, as Amended*, First
Report and Order and Further Notice of Proposed Rulemaking,
11 FCC Rcd. 21905 (1996), *remanded sub nom. Bell Atl. Tel. Cos.
v. FCC*, No. 97-1067, 1997 WL 307161 (D.C. Cir. Mar. 31, 1997).......17
*Protecting and Promoting the Open Internet*, Report and Order on
Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601 (2015),
*aff'd sub nom. U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir.
2016) ........................................................................  1, 3, 5, 19, 20, 21

**Other Authorities**

Muhammad Abdullah et al., *Caching and Neutrality*, PROC. 22D
ACM WORKSHOP ON HOT TOPICS IN NETWORKS (HOTNETS'23) 63
(2023) ............................................................................................15
*Akamai Solution Brief: Global Scale Delivers the Intelligence for
Effective Security*, AKAMAI (May 2024), https://www.akamai.com/
site/en/documents/solution-brief/2024intelligence-for-effective-
security.pdf ....................................................................................10
PAUL ALBITZ & CRICKET LIU, DNS AND BIND (4th ed. 2001) .....................9
THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) .................4
Tassos Antoniou, *Next-Level Web Performance with Akamai
Enterprise CDN*, PRESSIDIUM (July 3, 2024), https://
pressidium.com/blog/partnership-akamai-enterprise-cdn/ .................10
Vinton G. Cerf & Robert E. Kahn, *A Protocol for Packet Network
Interconnection*, 22 IEEE TRANSACTIONS ON COMM. 637 (1974)....6, 7, 8

iii

*How Many Servers in the World?*, SYSRACKS (Mar. 17, 2022), https://sysracks.com/blog/how-many-servers-do-famous-companies-have/ ................................................................... 11

*How to Filter Internet Content with Parental Control DNS*, BEST REVS. (July 14, 2024), https://bestreviews.net/how-to-filter-internet-content-with-parental-control-dns/ ....................................... 12

PETER W. HUBER ET AL., FEDERAL TELECOMMUNICATIONS LAW (2d ed. 1999) ........................................................................... 22

Geoff Huston, *Web Caching*, INTERNET PROTOCOL J., Sept. 1999, at 2, *available at* http://www.cisco.com/web/about/ac123/ac147/archived_issues/ipj_2-3/ipj_2-3.pdf ..................................... 14

Hermaniño C. Lagunzad & Mikee V. Gonzaga, *Tracking and Blocking Adware Using DNS Sinkholing Algorithm*, PROC. 16TH INT'L CONF. ON COMPUT. & AUTOMATION ENG'G (ICCAE) 30 (2024) .... 13

Sun Bae Lim et al., *Development of the Home Location Register / Authentication Center in the CDMA Mobile System*, 19 ETRI J. 186 (1997) ............................................................................ 16

Mingxuan Liu et al., *Understanding the Implementation and Security Implications of Protective DNS Services*, *in* PROC. NETWORKED & DISTRIB. SYS. SEC. (NDSS) SYMP. 2024 (2024), https://www.ndss-symposium.org/wp-content/uploads/2024-782-paper.pdf/ ....................................................................... 12

Allison McDonald et al., *403 Forbidden: A Global View of CDN Geoblocking*, PROC. INTERNET MEASUREMENT CONF. (IMC'18) 218 (2018) ................................................................................ 13

2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY (rev. 3d ed. 1993) ..................................................................................... 5

Erik Nygren et al., *The Akamai Network: A Platform for High-Performance Internet Applications*, 44 ACM SIGOPS OPERATING SYS. REV. 2 (2011) .................................................................. 10

LARRY L. PETERSON & BRUCE S. DAVIE, COMPUTER NETWORKS: A SYSTEMS APPROACH (6th ed. 2020) ........................................ 6

Vicente Quezada et al., *Real-Time Bot Infection Detection System Using DNS Fingerprinting and Machine-Learning*, 228 COMPUT. NETWORKS 109725 (2023) ................................................... 12

Filipa Reis et al., *Controlling Digital Piracy via Domain Name System Blocks: A Natural Experiment*, 218 J. ECON. BEHAV. & ORG. 89 (2024) ........................................................................ 13

ANDREW S. TANENBAUM, NICK FEAMSTER, & DAVID WEATHERALL, COMPUTER NETWORKS (6th ed., global ed. 2021)............................6, 7, 8

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1991)..........................4

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) ....................4

*What Is a CDN? A Guide to Speeding Up and Securing Your Site*, KINSTA (Aug. 13, 2024), https://kinsta.com/knowledgebase/what-is-a-cdn/ ..............................................................................................10

Christopher S. Yoo, *Protocol Layering and Internet Policy*, 161 U. PA. L. REV. 1707 (2013) ................................................................6, 7

Christopher S. Yoo, *The First Amendment, Common Carriers, and Public Accommodations: Net Neutrality, Digital Platforms, and Privacy*, 1 J. FREE SPEECH L. 463 (2021).............................................19

Christopher S. Yoo, Wickard *for the Internet?: Network Neutrality after* Verizon v. FCC, 66 FED. COMM. L.J. 415 (2014) .......................10

Christopher S. Yoo, *Wireless Net Neutrality: Technological Challenges and Policy Implications*, 31 BERKELEY TECH. L.J. 1409 (2016) ........................................................................................7

Lixia Zhang et al., *Named Data Networking*, 44 ACM SIGCOMM COMPUTER COMM. REV. 66 (2014).......................................................12

## STATEMENT OF IDENTITY, INTEREST IN CASE,
## AND SOURCE OF AUTHORITY TO FILE
## AS AMICUS CURIAE

Amicus curiae is the Imasogie Professor in Law and Technology at the University of Pennsylvania, where he also serves as Professor of Communication, Professor of Computer and Information Science, and the Founding Director of the Center for Technology, Innovation & Competition. His institutional affiliations are provided for identification purposes only.

He has researched Internet law and policy since joining the academy in 1999. His scholarship has examined the issues surrounding the *Order* under review since 2004, when he authored the response to the article in which Tim Wu first coined the phrase network neutrality (and to which Professor Wu published a reply). He has published more than 120 scholarly works, roughly half of which have addressed net neutrality in whole. He participated in the agency proceedings below.

All parties have consented to the brief's being filed.

/s/ *Christopher S. Yoo*
Christopher S. Yoo

August 19, 2024

## STATEMENT OF AUTHORSHIP
## AND FINANCIAL CONTRIBUTIONS

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund the preparation or submission of this brief, and no person other than Amicus contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Federal Communications Commission's (FCC's) determination in the 2024 Open Internet Order that broadband Internet access constitutes a telecommunications service cannot be squared with the statute. The definition of "telecommunications" requires that the user be the actor who specifies the points between or among which the information is to be transmitted. An examination of the technologies underlying the Domain Name System (DNS) and caching reveals that it is typically the Internet service provider (ISP) or the DNS provider that decides to which point to direct a request, not the user. The advent of Smart DNS services further establishes that DNS provides the type of functionality associated with information service rather than telecommunications service.

The 2024 Open Internet Order also conflicts with the First Amendment. The court reviewing the 2015 Open Internet Order on which the 2024 Open Internet Order is based acknowledged that any services over which ISPs exercise editorial discretion enjoy full First Amendment protection. This acknowledgement necessarily also recognized ISPs' First Amendment rights over bandwidth that previously had been

unmanaged. Simply put, the existence of a person's First Amendment rights does not depend on whether or not they choose to exercise those rights. Moreover, courts have recognized that providers of common carriage services retain the First Amendment right to offer additional services over which they do exercise editorial discretion. These precedents imply that ISPs have the constitutional right to offer specialized services. Any attempt to prevent providers from reallocating bandwidth from the traditional Internet to specialized services would represent an impermissible limit on those rights.

## ARGUMENT

## I.  RECLASSIFYING BROADBAND INTERNET ACCESS AS A TELECOMMUNICATIONS SERVICE CONFLICTS WITH THE PLAIN LANGUAGE OF THE COMMUNICATIONS ACT

The Supreme Court's *Brand X* decision unanimously held that broadband Internet access provided by cable companies constituted an information service. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974, 987 (2005) (*Brand X*); *id.* at 1010 (Scalia, J., dissenting); *accord In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *5 (6th Cir. Aug. 1, 2024) (Sutton, C.J., concurring). The Court also

held the term "offering" in the definition of "telecommunications service" to be ambiguous and applied the Court's then-binding decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), to uphold the FCC's ruling that broadband Internet access was not a telecommunications service. *Brand X*, 545 U.S. 997–1000. The D.C. Circuit invoked *Chevron* and *Brand X* to reject statutory challenges to the FCC's 2015 Open Internet Order reclassifying broadband Internet access as a telecommunications service. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 701–02, 704–06 (D.C. Cir. 2016) (*USTA I*).

This case presents the first chance since the Supreme Court's landmark decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), for a court to assess whether reclassifying broadband Internet access service as a "telecommunications service" conflicts with the statutory text. *Loper Bright*'s overruling of *Chevron* invalidated the doctrine that the finding of a statutory ambiguity requires courts to forego consideration of what constitutes the best reading of the statute. Courts must now fully consider any arguments based on the statutory text and make their own assessment of a statute's proper interpretation.

The statute defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(53). "Telecommunications" is in turn defined as "the transmission, *between or among points specified by the user*, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50) (emphasis added). Unless Internet access service falls within this definition, reclassification of Internet access service as a telecommunications service would violate the statute and would be illegal.

The plain meaning of "point" is a discrete physical location. *See* THE AMERICAN HERITAGE COLLEGE DICTIONARY 1055 (3d ed. 1993) (defining "point" as "a. A place or locality considered with regard to its position. b. A narrowly particularized and localized position or place; a spot."); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 908 (1991) (defining "point" as "(1) a narrowly localized place having a precisely indicated position . . . (2) a particularized place: locality"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1749 (1986) (defining "point" as "a particularly narrowly limited part of a surface or of space that is singled out as occupying a usu[ally] precisely indicated spot and that has

usu[ally] minimum extension or no relevant extension: a specific narrowly localized place having no relevant size or shape: a definitely precisely indicated placement or position of something"); 2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 2266–67 (rev. 3d ed. 1993) (defining "point" as "a thing having a definite position, without extension, a position in space, time, succession, degree, order, etc."). The unity of these definitions contradicts claims asserted in previous reclassification efforts that the term "point" is ambiguous. *Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601, 5761 ¶ 361 (2015), *aff'd sub nom. U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) (2015 Open Internet Order).

An examination of the technology underlying the Internet and the reasoning of the Supreme Court's decision in *Brand X* both underscore that end users do not specify the points between or among which the information is transmitted.

A.    **As the Supreme Court Recognized in *Brand X*, Broadband Internet Access Services' Reliance on the Domain Name System (DNS) and Caching Requires Finding that Their Transmissions Are Not Telecommunications.**

Computer networking textbooks universally recognize that "[t]he glue that holds the whole Internet together" is the *Internet Protocol* (IP) that all networks connected to the Internet must operate. ANDREW S. TANENBAUM, NICK FEAMSTER, & DAVID WEATHERALL, COMPUTER NETWORKS § 5.7, p. 443 (6th ed., global ed. 2021) (TANENBAUM ET AL.); *accord* LARRY L. PETERSON & BRUCE S. DAVIE, COMPUTER NETWORKS: A SYSTEMS APPROACH § 1.3, p. 31 (6th ed. 2020) ("IP serves as the focal point for the architecture—it defines a common method for exchanging packets among a wide collection of networks."). First conceived by Vinton G. Cerf & Robert E. Kahn, *A Protocol for Packet Network Interconnection*, 22 IEEE TRANSACTIONS ON COMM. 637, 638 (1974), the IP protocol requires that each computer attached to the edge of the Internet (called a *host*) have a unique address (called an *IP address*). *Id.* at 637, 641; Christopher S. Yoo, *Protocol Layering and Internet Policy*, 161 U. PA. L. REV. 1707,

1736 (2013) (Yoo, *Protocol Layering*).[1] In the case of version of IP currently in the most widespread use, known as IP version 4 (IPv4), IP addresses are represented as 32-bit numbers, commonly expressed as a quartet of numbers ranging from 0 to 255. TANENBAUM ET AL. § 5.7.2, p. 448. For example, the University of Pennsylvania currently has two IP addresses assigned to it: 128.91.34.233 and 128.91.34.234. Christopher S. Yoo, *Wireless Net Neutrality: Technological Challenges and Policy Implications*, 31 BERKELEY TECH. L.J. 1409, 1453 (2016) (Yoo, *Wireless Net Neutrality*).[2]

The Internet Protocol stores all the information needed to route an IP packet in the IP header and then requires that all routers forward packets solely based on that information. Cerf & Kahn 638–39; Yoo, *Protocol Layering* 1722, 1736. Notably for purposes of these cases, the IP header of every packet must contain the IP address assigned to the host

---

[1] Cerf and Kahn recognized that providers may use a pool of IP addresses and dynamically assign them to individual hosts on a temporary basis. Cerf & Kahn 645–46. The temporary nature of this assignment does not undercut the fact that at any particular moment, each address identifies a unique host.

[2] The more recent version of the Internet (known as IP version 6 or IPv6) follows the same principle with a greatly expanded address space.

from which the transmission was sent (called the "source address") as well as the one assigned to the host to which the transmission is directed (called the "destination address"), and all routers that make up the Internet must route traffic based on the destination address contained in the IP header. Cerf & Kahn 637, 638–39; TANENBAUM ET AL. § 1.5.3, p. 54; § 5.1.2, p. 361; § 5.7.2, p. 451.

The Internet's architectural design makes clear that the destination address represents the point to which the transmission is directed. Whether broadband Internet access comports with the statutory definition of telecommunications service thus depends on whether the end user specifies the destination address or whether some other actor makes that decision.[3]

## 1.    DNS

The Supreme Court has recognized that Internet users typically do not specify IP addresses when using the Internet. Instead, users browsing the web specify a website's address in the form of a domain

---

[3] Amicus curiae raised these arguments during the proceedings that led to the 2015 Open Internet Order. 2015 Open Internet Order 5761–62 ¶ 361 & nn.996 & 1001. Other parties raised the same arguments during the current proceeding. App. 65 ¶ 113 & n.424.

name and depend on a service known as the Domain Name System (DNS) to "match[] the Web site address the end user types into his browser (or 'clicks' on with his mouse) with the IP address of the Web page's host server." *Brand X*, 545 U.S. at 999. The Court further cited with approval a textbook's conclusion, "For an Internet user, 'DNS is a must. . . . [N]early all of the Internet's network services use DNS. That includes the World Wide Web, electronic mail, remote terminal access, and file transfer.'" *Id.* (quoting PAUL ALBITZ & CRICKET LIU, DNS AND BIND 10 (4th ed. 2001)). DNS's importance explains why all ISPs offer it as part of their broadband Internet access service.

The Supreme Court properly rejected contentions that the DNS was nothing more than a database of routing information. *Id.* at 999 n.3. As an initial matter, there is simply not a one-to-one correspondence between domain addresses and IP addresses. To cite one example, the University of Pennsylvania maintains two distinct IPv4 addresses and depends on DNS to determine which of these addresses to route any particular request.

Content delivery networks (CDNs) provide a more general example. CDNs give content providers the opportunity to store multiple copies of

content in thousands of locations around the world and determine from which location to fulfill specific requests for that content. Christopher S. Yoo, Wickard *for the Internet?: Network Neutrality after* Verizon v. FCC, 66 FED. COMM. L.J. 415, 441–42 (2014). Estimates suggest that CDNs currently deliver around half of the world's web traffic. *What Is a CDN? A Guide to Speeding Up and Securing Your Site*, KINSTA (Aug. 13, 2024), https://kinsta.com/knowledgebase/what-is-a-cdn/ (reporting that 46% of the top million websites use CDNs). Market leader Akamai reportedly maintains approximately 365,000 servers in 135 countries, Tassos Antoniou, *Next-Level Web Performance with Akamai Enterprise CDN*, PRESSIDIUM (July 3, 2024), https://pressidium.com/blog/partnership-akamai-enterprise-cdn/, and uses DNS to determine the optimal location from which to respond to requests in terms of performance, user experience, resource utilization, and reliability. Erik Nygren et al., *The Akamai Network: A Platform for High-Performance Internet Applications*, 44 ACM SIGOPS OPERATING SYS. REV. 2 (2011); *Akamai Solution Brief: Global Scale Delivers the Intelligence for Effective Security*, AKAMAI (May 2024), https://www.akamai.com/site/en/documents/solution-brief/2024intelligence-for-effective-security.pdf.

Other companies with sufficient scale follow the same practices with large numbers of servers in their proprietary data centers. *How Many Servers in the World?*, SYSRACKS (Mar. 17, 2022), https://sysracks.com/blog/how-many-servers-do-famous-companies-have/.

For the vast majority of web content, DNS rather than users specifies the point to which requests are directed. This fact takes broadband Internet access outside the statutory definition of telecommunications service.

The fact that a web address may be associated with multiple IP addresses either because the content provider possess more than one address or because it is using a CDN and relies on DNS to determine from which location to serve particular content eviscerates the FCC's belief that specifying a web address is tantamount to specifying the location of the server that will deliver the requested content. App. 65 ¶ 113. Any suggestion that specifying a website's name is tantamount to specifying its location is further contradicted by the fact that proposals to redesign the Internet to route traffic based on content names rather than IP addresses, *see, e.g.*, Lixia Zhang et al., *Named Data Networking*,

44 ACM SIGCOMM Computer Comm. Rev. 66 (2014), have never been adopted.

Any suggestion that DNS represents nothing more than a file lookup service is further belied by the advent of Smart DNS, which enables DNS to perform a wide range of additional functions. For example, Smart DNS plays a key role in network security by, among other things, blocking access to malicious websites and examining patterns of DNS lookups to identify computers that might be infected with malware, *see, e.g.*, Mingxuan Liu et al., *Understanding the Implementation and Security Implications of Protective DNS Services*, *in* Proc. Networked & Distrib. Sys. Sec. (NDSS) Symp. 2024 (2024), https://www.ndss-symposium.org/wp-content/uploads/2024-782-paper.pdf/ (malicious websites); Vicente Quezada et al., *Real-Time Bot Infection Detection System Using DNS Fingerprinting and Machine-Learning*, 228 Comput. Networks 109725 (2023) (malware infection detection). Smart DNS can also enable content filtering, including parental controls. *See, e.g.*, *How to Filter Internet Content with Parental Control DNS*, Best Revs. (July 14, 2024), https://bestreviews.net/how-to-filter-internet-content-with-parental-control-dns/. It can also support ad

blocking, geoblocking, and copyright infringement. *See, e.g.*, Hermaniño C. Lagunzad & Mikee V. Gonzaga, *Tracking and Blocking Adware Using DNS Sinkholing Algorithm*, PROC. 16TH INT'L CONF. ON COMPUT. & AUTOMATION ENG'G (ICCAE) 30 (2024) (ad blocking); Allison McDonald et al., *403 Forbidden: A Global View of CDN Geoblocking*, PROC. INTERNET MEASUREMENT CONF. (IMC'18) 218 (2018) (geoblocking); Filipa Reis et al., *Controlling Digital Piracy via Domain Name System Blocks: A Natural Experiment*, 218 J. ECON. BEHAV. & ORG. 89 (2024) (copyright infringement). All these aspects of Smart DNS represent deviations from the points connected by the Internet transmission specified by the user and provide a further reason that broadband Internet access falls outside the definition of telecommunications service.

The vast majority of broadband subscribers use the DNS provided by their ISP. App. 1561 (reporting survey evidence that 92% of subscribers use the DNS provided by their ISP). The fact that some end users may choose to change DNS providers does not change the analysis. Shifting from one DNS provider to another simply transfers who gets to decide the destination of Internet traffic from one third party to another. It does not put the end user in the position of determining the destination

IP address. Unless the end user operates a private DNS service or invokes IP addresses by number instead of relying on domain names, it is the third-party DNS provider that specifies the endpoint of the transmission, not the end user.

## 2.    Caching

Another functionality that the Supreme Court recognized as supporting the conclusion that broadband Internet access is not a telecommunications service is caching. *Brand X*, 545 U.S. at 999–1000, As the Court noted, caching occurs when an Internet service provider (ISP) chooses "to store . . . popular content on local computer servers" rather than retrieving it from the content provider every time a user requests it. *Id.* at 999; Geoff Huston, *Web Caching*, INTERNET PROTOCOL J., Sept. 1999, at 2, *available at* http://www.cisco.com/web/about/ac123/ac147/archived_issues/ipj_2-3/ipj_2-3.pdf.

Like DNS, caching cannot be squared with the requirement in the statutory definition of telecommunications that the user specify the point to which its information will be transmitted. ISPs that cache content that receive requests for content first check to see if that content has been cached and, if so, redirect that request to the cache. Muhammad

Abdullah et al., *Caching and Neutrality*, PROC. 22D ACM WORKSHOP ON HOT TOPICS IN NETWORKS (HOTNETS'23) 63, 65 (2023). Only after determining that the requested content is not in the cache does the ISP obtain the content from the location identified by DNS. *Id.*

Decisions about from where to serve requests for content when content is cached thus reside with the ISP and not the user. As such, caching provides another way in which broadband Internet access falls outside the definition of telecommunications service.

### B.    The FCC's Attempts to Refute This Argument Are Invalid.

The three arguments on which the FCC relied to refute these statutory arguments are invalid. First, the FCC's claim that mobile voice calls represent an example of a service where the user does not specify the point to which its transmission is directed, App. 66 ¶ 114, is based on a fundamental misunderstanding of the technology. When dialing a mobile telephone number, users do in fact select the particular mobile terminal they are trying to reach. The fact that the location may change does not alter the fact that the call is directed at a clear target at any one time. Moreover, placing a voice call to a mobile device sends a query to a

fixed location known as the Home Location Register, which tracks the location of a network's mobile terminals. Sun Bae Lim et al., *Development of the Home Location Register/Authentication Center in the CDMA Mobile System*, 19 ETRI J. 186 (1997). Initiating a mobile voice call thus requires users to communicate with a fixed location and involves the desire to connect to a device chosen by the user even if its location is dynamic.

Second, the FCC's claim that the additional storage and processing functions associated with DNS do not make broadband Internet access an information service because DNS falls within the telecommunications management exception to the definition of information service, App. 85–86 ¶¶ 137–138,[4] is inconsistent with the FCC's prior decisions. The FCC has ruled that as a general matter "protocol processing services constitute information services under the 1996 Act." *Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as Amended*, First Report and Order and

---

[4] Specifically, the definition of "information service" excludes "capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(24).

Further Notice of Proposed Rulemaking, 11 FCC Rcd. 21905, 21956 ¶ 104 (1996), *remanded sub nom. Bell Atl. Tel. Cos. v. FCC*, No. 97-1067, 1997 WL 307161 (D.C. Cir. Mar. 31, 1997), *cited with approval by Charter Advanced Serv. (MN), LLC v. Lange*, 903 F.3d 715, 720 (8th Cir. 2018). The Commission did recognize three exceptions under which protocol processing would be considered telecommunications services: protocol processing (1) involving communications between an end-user and the network itself, (2) in connection with the introduction of a new basic network technology, and (3) involving internetworking (conversions taking place solely within the carrier's network to facilitate provision of a basic network service, that result in no net conversion to the end-user). *Id.* at 21957–58 ¶ 106.

These exceptions are inapplicable to DNS. Regarding the first exception, the fact that DNS may be provided by third parties undercuts any claims that DNS queries are between the user and the network. Courts have interpreted the second exception as being aimed at maintaining backwards compatibility, *Charter Advanced Serv.*, 903 F.3d at 720, which is a consideration inapplicable to DNS. The third exception also does not apply as the fact that DNS can be provided by third-party

providers means that the conversions do not take place solely within the carrier's network. In addition, the advent of smart DNS necessarily means that DNS will make changes that result in net conversions to the end user. Third, the FCC has pointed to the fact that it has long regarded toll-free 800 service to be a telecommunications service even though the end user does not specify the location of the office where the call will terminate. App. 66 ¶ 114. Courts have not had the occasion to evaluate the propriety of treating toll-free 800 service as a telecommunications service. Moreover, toll-free calling represents a narrow exception to the rule with voice calls, where the calling party know the location they are contacting in every other case. This contrasts with the Internet usage, in which the party initiating the communication almost never has a clear idea of the location to which their transmission is directed.

## II.  THE OPEN INTERNET ORDER VIOLATES THE FIRST AMENDMENT.

Not only is the 2024 Open Internet Order inconsistent with the statutory definition of telecommunications service. It also conflicts with the First Amendment.[5]

### A.  The Judicial Decisions Reviewing the 2015 Open Internet Order Implicitly Recognize ISPs' First Amendment Right Not to Carry Traffic.

The court that relied on *Chevron* to uphold the 2015 Open Internet Order on which the 2024 Open Internet Order was based acknowledged that broadband providers enjoy full First Amendment protection should they decide to provide their own content. *USTA I*, 825 F.3d at 741–42 ("Of course, insofar as a broadband provider might offer its own *content*—such as a news or weather site—separate from its internet access service, the provider would receive the same protection under the First Amendment as other producers of internet content."). It further noted that the First Amendment might also protect broadband providers'

---

[5] The discussion in this section draws on Christopher S. Yoo, *The First Amendment, Common Carriers, and Public Accommodations: Net Neutrality, Digital Platforms, and Privacy*, 1 J. FREE SPEECH L. 463, 487–94 (2021).

decisions to filter the content accessible through their networks. *Id.* at 743 ("If a broadband provider nonetheless were to *choose* to exercise editorial discretion—for instance, by picking a limited set of websites to carry and offering that service as a curated internet experience—it might then qualify as a First Amendment speaker."). The court believed that the FCC's representation that services over which an ISP exercised editorial discretion fell outside of the 2015 Open Internet Order obviated the need for it to consider those possibilities any further. *Id.*

The two members of the panel majority advanced the same reasoning in their concurrence in the denial of rehearing en banc. *USTA II*, 855 F.3d at 388–91 (Srinivasan, J., joined by Tatel, J., concurring in the denial of rehearing en banc). According to the panel majority's concurrence, "[t]he key to understanding why" the net neutrality rule complies with the First Amendment "lies in perceiving when a broadband provider falls within the rule's coverage." *Id.* at 388. It applies only to broadband Internet service providers ("ISPs") that "represent that their services allow Internet end users to access all or substantially all content on the Internet, *without alteration, blocking, or editorial intervention*." *Id.* (quoting 2015 Open Internet Order 5869 ¶ 549). As such, "the net

neutrality rule applies only to 'those broadband providers that hold themselves out as neutral, indiscriminate conduits for transmission of speech of any and all users.'" *Id.* at 389 (quoting *USTA I*, 825 F.3d at 743). The net neutrality mandate simply "requires the ISP to abide by its representation and honor its customers' ensuing expectations." *Id.* The concurrence distinguished the Supreme Court's decision *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), on the grounds that the cable operators at issue in that case engaged in editorial discretion over the content they carry, whereas "ISPs subject to the net neutrality rule represent that they do not." *Id.* at 391.

At the same time, the 2015 Open Internet Order "specifies that an ISP remains 'free to offer "edited" services' without becoming subject to the rule's requirements." *Id.* at 389 (quoting 2015 Open Internet Order 5872 ¶ 556). Thus, ISPs that choose to offer a "curated experience," such as one limited to family friendly websites, or to "filter[] . . . content into fast (and slow) lanes based on the ISP's commercial interest," would fall outside the net neutrality rules so long as the ISP clearly disclosed its intentions to do so. *Id.* at 389–90. The fact that no ISP had yet expressed

interest in doing so made it unnecessary for the panel to further analyze that possibility. *Id.* at 390.

The D.C. Circuit thus placed dispositive weight on the distinction between providers that hold themselves out as serving the public indiscriminately and those exercising editorial discretion over the content they carry. The former may be treated as common carriers for First Amendment purposes and be forced to carry speech only if doing so does not affect their own expression or force them to become associated with ideas with which they disagree. The court implicitly followed its prior decision striking down the 2010 Open Internet Order, which accepted that common carriage duties could apply to edge providers as well as residential customers. *Verizon v. FCC*, 740 F.3d 623, 653 (D.C. Cir. 2014). In so doing, it ignored the precedent that common carriage duties apply only to services provided to consumers and do not apply to competitors or other service providers. *The Express Package Cases*, 117 U.S. 1 (1885); PETER W. HUBER ET AL., FEDERAL TELECOMMUNICATIONS LAW § 1.3.1, at 13–16; § 5.1.1, 407–08 (2d ed. 1999).

The panel majority that upheld the 2015 Open Internet Order failed to appreciate that its recognition that the First Amendment protects

ISPs' right to exclude people from bandwidth over which they exercise editorial discretion also necessarily recognized ISPs' First Amendment rights over bandwidth that up until now had been unmanaged. As then-Judge Kavanaugh emphasized, the existence of a person's First Amendment rights does not depend on whether or not they choose to exercise those rights. *USTA II*, 855 F.3d at 429 (Kavanaugh, J., dissenting from the denial of the petition for rehearing en banc). The fact that a person may choose not to assert her First Amendment rights at this time does not prevent her from asserting them in the future. *Id*. Any other rule risked subjecting the First Amendment into a de facto "use it or lose it" principle that has no place in our civil liberties. *Id*.

> **B.    Courts Have Recognized that the First Amendment Protects Carriers' Rights to Offer Services Over Which They Exercise Editorial Discretion.**

In addition, courts have held that the fact that a firm offers a service over which it does not exercise editorial discretion does not deprive that firm of the constitutional right to offer other services over which it does exercise editorial discretion. The clearest example is the line of cases overturning the FCC's then-extant rule prohibiting telephone companies from offering cable television services. The FCC

imposed this rule in 1970, justified by the need to promote competition in the burgeoning cable television industry. *Application of Telephone Cos. for Section 214 Certificates for Channel Facilities Furnished to Affiliated Community Antenna Television Systems*, Final Report and Order, 21 F.C.C.2d 307, 325 ¶ 49 (1970), *aff'd sub nom. Gen. Tel. Co. of Sw. v. United States*, 449 F.2d 846 (5th Cir. 1971). Congress codified the rule in 1984. Cable Communications Policy Act of 1984, Pub. L. No. 98-549, § 2, 98 Stat. 2779, 2785 (previously codified at 47 U.S.C. § 533(b) (1994)).

In a series of cases, courts uniformly held that preventing telephone companies from offering video services violated the phone companies' constitutional rights. *See US West, Inc. v. United States*, 48 F.3d 1092, 1098 (9th Cir. 1994), *vacated and remanded for consideration of mootness*, 516 U.S. 1155 (1996); *Chesapeake & Potomac Tel. Co. of Va. v. United States*, 42 F.3d 181, 190 (4th Cir. 1994), *vacated and remanded for consideration of mootness*, 516 U.S. 415 (1996); *S. New England Tel. Co. v. United States*, 886 F. Supp. 211, 217 (D. Conn. 1995); *NYNEX Corp. v. United States*, No. Civ. 93-323-P-C, 1994 WL 779761, at *2 (D. Me. Dec. 8, 1994); *BellSouth Corp. v. United States*, 868 F. Supp. 1335 (N.D. Ala. 1994); *Ameritech Corp. v. United States*, 867 F. Supp. 721 (N.D. Ill. 1994).

Two months after the Supreme Court heard oral argument on these cases on December 6, 1995, Congress rendered them moot by repealing the cable-telco cross-ownership ban as part of the Telecommunications Act of 1996, Pub. L. No. 104-104, § 302(b), 110 Stat. 56, 124 (repealing 47 U.S.C. § 533). with the support of both the FCC and Department of Justice Antitrust Division. *See U.S. West*, 48 F.3d at 1097; *Chesapeake & Potomac*, 42 F.3d at 187–88.

The fact that the Supreme Court did not reach the merits of this argument takes nothing away from the uniform conclusion from the lower courts that the First Amendment protects common carriers' right to provide services over which they exercise editorial discretion. These precedents support according strong First Amendment protection to services over which common carriers exercise editorial discretion. These cases embrace the idea that common carriers have the First Amendment right to offer these services. When they choose to do so, they enjoy the same level of First Amendment protection as newspapers, broadcasters, and publishers. As Justice Thomas observed, "Common carriers are private entities and may, consistent with the First Amendment, exercise editorial discretion in the absence of a specific statutory prohibition."

*Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 825 (1996) (Thomas, J., concurring in judgment in part and dissenting in part).

These precedents have strong implications for net neutrality. As an initial matter, the cases defending telephone companies' rights to offer video service strongly suggest that ISPs may have the constitutional right to offer specialized services (of what have been re-termed non-BIAS services).

Moreover, suppose that an ISP wished to leave the business of providing traditional broadband Internet access service and instead to convert its entire bandwidth to managed services. This would arguably run afoul of the 2024 Open Internet Order's concern that fostering specialized services may deprive over-the-top services and other providers who depend on traditional broadband Internet access service to reach their comers. App. 130 ¶ 197. Should the FCC change the scope of forbearance, it could also require common carriers to obtain permission from regulators before exiting the business. 47 U.S.C. § 214. These restrictions would represent substantial impingements on ISPs' First Amendment rights.

## CONCLUSION

For the foregoing reasons, the Court should grant the petitions for review and set aside the Commission's Order.

Respectfully submitted,

*/s/ Christopher S. Yoo*

CHRISTOPHER S. YOO
University of Pennsylvania Carey
    Law School
3501 Sansom Street
Philadelphia, PA 19104-6204
Telephone: (215) 746-8772
Email: csyoo@law.upenn.edu

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(g)(1) because it contains 5,225 words excluding the material exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Christopher S. Yoo*
CHRISTOPHER S. YOO

August 19, 2024

# CERTIFICATE OF SERVICE

I certify that on August 19, 2024, I filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. Per this Court's rules, filing with CM/ECF constitutes service of process on all participants in the case.

*/s/ Christopher S. Yoo*

CHRISTOPHER S. YOO

August 19, 2024