Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, 24-3538

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

**IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024.**

---

On Petitions for Review

---

## BRIEF OF ROSLYN LAYTON AS *AMICUS CURIAE*
## IN SUPPORT OF INDUSTRY PETITIONERS

Jennifer Tatel
Daniel H. Kahn
Tyler Dillon
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
dkahn@wbklaw.com
tdillon@wbklaw.com
*Counsel for Amicus Curiae*

August 19, 2024

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-7000 (continued on next page)    Case Name: In Re: MCP No. 185, FCC 24-52

Name of counsel: Jennifer Tatel

Pursuant to 6th Cir. R. 26.1, Roslyn Layton
*Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

### CERTIFICATE OF SERVICE

I certify that on _____ August 19, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Jennifer Tatel

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

**Continued Disclosure of Corporate Affiliations and Financial Interest**

**Case Numbers:**

24-7000 (lead)
24-3449
24-3450
24-3497
24-3508
24-3510
24-3511
24-3519
24-3538

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................ii

INTEREST OF AMICUS CURIAE ........................................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ...........................................................................................4

I.     THE *2024 OPEN INTERNET ORDER* WOULD OVERHAUL THE LIGHT-TOUCH REGULATORY FRAMEWORK THAT PROMOTES BROADBAND INVESTMENT AND INNOVATION. ................................4

     A.    In Contrast to Some Jurisdictions, the United States is Among Those Nations That Have Traditionally Employed Light-Touch Regulation of BIAS Providers................................................................5

     B.    U.S. Broadband Networks Have Flourished Under Light-Touch Regulation, While Networks in Heavy-Handed Regulation Jurisdictions Have Faltered. ...............................................9

     C.    Light-Touch Regulation Facilitates BIAS Innovation. ......................15

II.    JURISDICTIONS WITHOUT HEAVY-HANDED NET NEUTRALITY RULES LEAD THE DIGITAL ECONOMY...............................................20

CONCLUSION ......................................................................................30

CERTIFICATE OF COMPLIANCE.......................................................31

CERTIFICATE OF FILING AND SERVICE ........................................32

i

# TABLE OF AUTHORITIES

CASES

*NCTA v. Brand X*, 545 U.S. 967 (2005) ...................................................................8

STATUTES

15 U.S.C. § 45 ...................................................................................................9

47 U.S.C. § 152 .................................................................................................9

47 U.S.C. § 230 .................................................................................................8

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429 (2021).11

*Marco Civil Law of the Internet in Brazil* (Apr. 3, 2014),
  https://www.cgi.br/pagina/marco-civil-law-of-the-internet-in-
  brazil/180.............................................................................................................6

Regulation (EU) 2015/2120 and Regulation (EU) No 531/2012, 2015 (L 310/1),
  https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32015R2120.............6

Sherman Antitrust Act, 51 Cong. Ch. 647, 26 Stat. 209 (1890)................................6

Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 143....................9

ADMINISTRATIVE MATERIALS

*Appropriate Framework for Broadband Access to the Internet over Wireline
  Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd
  14853 (2005)........................................................................................................8

*Appropriate Regulatory Treatment for Broadband Access to the Internet Over
  Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901 (2007) .......................8

European Commission Press Release QANDA/24/942, *Questions & Answers:
  Connectivity Packages* (Feb. 21, 2024),
  https://ec.europa.eu/commission/presscorner/detail/en/QANDA_24_942 ...........14

European Commission, *Communication from the Commission to the European
  Parliament, the Council, the European Economic and Social Committee and the
  Committee of the Regions* (Sept. 27, 2023), https://eur-lex.europa.eu/legal-
  content/EN/TXT/HTML/?uri=CELEX:52023DC0570.........................................14

FCC, Open Data, Average download/upload speeds by State,
  https://opendata.fcc.gov/Wireline/Average-download-upload-speeds-by-
  State/5wh3-ti7w...................................................................................................10

*Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd
  11501 (1998)........................................................................................................8

Government of India, Ministry of Communications, Department of Telecommunications, Net Neutrality, https://dot.gov.in/search/content/net%20 neutrality..........................................................................................................6

India Telecom Regulatory Authority of India, Prohibition of Discriminatory Tariffs for Data Services Regulations, 2016, https://web.archive.org/web/20160209062517/http://www.trai.gov.in/WriteReadD ata/WhatsNew/Documents/Regulation_Data_Service.pdf......................................6

*Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798 (2002)..........................................................................................................8

IRS, *Yearly Average Currency Exchange Rates, Internal Revenue Service* (updated May 3, 2023), https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates...........................................................................13

*Net Neutrality Review*, Ofcom (Oct. 2023), https://www.ofcom.org.uk/internet-based-services/network-neutrality/net-neutrality-review/......................................18

Ofcom, Internet-based services, Network neutrality, Statement: Net Neutrality Review (Oct. 26, 2023), https://www.ofcom.org.uk/internet-based-services/network-neutrality/net-neutrality-review/.................................................24

Press Release, U.S. Census Bureau, *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic* (Dec. 22, 2022), https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html...................................................................................................13

*Protecting and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601 (2015) .............................16, 17

*Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52 (rel. May 7, 2024) ...passim

The Caribbean Community (CARICOM), *Code of Practice on Safeguarding The Open Internet Signed At Canto 2016* (Aug. 4, 2016), https://caricom.org/code-of-practice-on-safeguarding-the-open-internet-signed-at-canto-2016/.......................22

*Twelfth Measuring Broadband America Fixed Broadband Report*, FCC (Jan. 6, 2023)........................................................................................................10

OTHER AUTHORITIES

*2023 Annual Survey Highlights*, CTIA (2023), https://api.ctia.org/wp-content/uploads/2023/11/2023-Annual-Survey-Highlights.pdf................11, 12, 13

Aaron O'Neill, *The European Union – Statistics & Facts*, Statista (July 3, 2024), https://www.statista.com/topics/921/european-union/ ..........................................25

Akihiro Ota, *Japan's SoftBank and KDDI to pump $38bn into 5G* (Nov. 4, 2020), https://asia.nikkei.com/Spotlight/5G-networks/Japan-s-SoftBank-and-KDDI-to-pump-38bn-into-5G ...............................................................................13

Alex Dubin & Dan Lips, *Satellite Internet Technology: Opportunities to Close the Digital Divide and Promote Internet Freedom*, Foundation for American Innovation (Oct. 26, 2023), https://www.thefai.org/posts/satellite-internet-technology-opportunities-to-close-the-digital-divide-and-promote-internet ........10

Anne Helmond, *The Platformization of the Web: Making Web Data Platform Ready*, Social Media + Society 1(2) (2015), https://journals.sagepub.com/doi/epub/10.1177/2056305115603080 ..................26

Arthur Menko, *2020 Broadband Pricing Index*, USTelecom–The Broadband Association (2020), https://www.ustelecom.org/wp-content/uploads/2020/09/USTelecom-2020-Broadband-Pricing-Index.pdf .........11

Arthur Menko, *2023 Broadband Pricing Index Broadband Prices Continue to Decline*, USTelecom–The Broadband Association (2023), https://ustelecom.org/wp-content/uploads/2023/10/USTelecom-2023-BPI-Report-final.pdf..................................................................................................11

*Australian Game Development Industry Records Job Boom*, Interactive Games & Entertainment Association (Dec. 19, 2022), https://igea.net/2022/12/australian-game-development-industry-records-job-boom/...................................................29

Backlinko Team, *Most Popular Apps*, Backlinko (Aug. 14, 2024), https://backlinko.com/most-popular-apps ...........................................................22

Bronwyn E. Howell & Roslyn Layton, *Evaluating the Consequences of Zero-Rating: Guidance for Regulators and Adjudicators* (last revised Aug. 18, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2757391 .............................2

Bronwyn Howell & Petrus Potgieter, *Saved by the Cell: How South Africa Is Bridging the Digital Divide*, American Enterprise Institute (Oct. 27, 2022), https://www.aei.org/technology-and-innovation/saved-by-the-cell-how-south-africa-is-bridging-the-digital-divide/....................................................16

Bronwyn Howell & Roslyn Layton, Strategic Use of Zero-rating of Mobile Data (*Strategy and Behaviors in the Digital Economy* (Beatrice Orlando ed. 2019)), https://www.intechopen.com/chapters/68310 ........................................................7

iv

CANTO, *Code of Practice on Safeguarding the Open Internet* (May 23, 2016), http://canto.org/wp-content/uploads/2014/12/20160523-Code-of-Practice-on-Safeguarding-the-Open-Internet-002.pdf ............................................................ 22

CB Insights, The Complete List of Unicorn Companies, https://www.cbinsights.com/research-unicorn-companies .................................... 28

Comments of Roslyn Layton & Mark Jamison, WC Docket No. 23-320 (Dec. 13, 2023) ..................................................................................................... 2, 5, 20

CompaniesMarketCap, Largest internet companies by market cap, https://companiesmarketcap.com/internet/largest-internet-companies-by-market-cap/ ..................................................................................................... 23, 24

D. Clark, *United Kingdom – Statistics & Facts*, Statista (July 3, 2024), https://www.statista.com/topics/755/uk/ ............................................................. 26

Dae-Keun Cho, Demystifying Interconnection and Cost Recovery in South Korea, Strand Consult Blog (Jan. 23, 2023), https://strandconsult.dk/blog/demystifying-interconnection-and-cost-recovery-in-south-korea/ ................................................ 6

David J. Teece, *Profiting from Innovation in the Digital Economy Standards, Complementary Assets, and Business Models In the Wireless World*, (Tusher Center for the Management of Intellectual Capital, Working Paper No. 16, Aug. 23, 2016), https://businessinnovation.berkeley.edu/wp-content/uploads/2014/07/Tusher-Center-Working-Paper-No.-16.pdf ................. 21

Doug Mohney, *Fiber Passes Over 50% of U.S. Households*, Fiber Broadband Association Blog (Dec. 13, 2023), https://fiberbroadband.org/2023Fiber/12/13/fiber-passes-over-50-of-u-s-households/ ...................................................................................................... 10

*Esports Market Size, Share & Trends Analysis Report By Revenue Source (Sponsorship, Advertising, Merchandise & Tickets, Media Rights), By Region (APAC, CSA, Europe), And Segment Forecasts, 2023 – 2030*, Grandview Research (Sept. 13, 2023), https://www.grandviewresearch.com/industry-analysis/esports-market .......................................................................................... 28

*European Union: total population from 2010 to 2022*, Statista, https://www.statista.com/statistics/253372/total-population-of-the-european-union-eu/ .............................................................................................................. 13

Freedom House, South Africa, https://freedomhouse.org/country/south-africa/freedom-net/2022 ............................................................................................ 7

Grace Wang, *In brief: telecoms regulation in China*, Lexology (June 24, 2022), https://www.lexology.com/library/detail.aspx?g=c8e8fd3d-4989-4db0-8887-45fd7a86f1a5 ................................................................................................ 7

Hamidreza Hosseini, *Platform Economy 2023: U.S. leads; Europe lags*, Ecodynamics (Oct. 15, 2023), https://www.platformeconomy.io/blog/platform-economy-2023-u-s-leads-europe-lags ................................................................ 27

International Trade Administration, Japan's 5G Networks (May 26, 2020), https://www.trade.gov/market-intelligence/japans-5g-networks ......................... 13

*Japan Gaming Market Report*, IMARC Group (May 2024), https://www.imarcgroup.com/japan-gaming-market ........................................... 29

Leichtman Research Group, 1Q 2024 Research Notes (2024), https://leichtmanresearch.com/wp-content/uploads/2024/03/LRG-Research-Notes-1Q-2024.pdf ........................................................................................................ 10

L. Yoon, *South Korea - Statistics & Facts*, Statista (Apr. 12, 2024), https://www.statista.com/topics/4944/south-korea/ .............................................. 25

Luisa Colón, *Spotify*, Britannica (last updated Aug. 16, 2024), https://www.britannica.com/topic/Spotify ........................................................... 22

*Media Technologies for Work and Play in East Asia: Critical Perspectives on Japan and the Two Koreas* (Micky Lee & Peichi Chung eds., 1st ed. 2021) ....... 28

Melanie Mingas, *Korean operators unveil $22 billion 5G investment strategy*, Capacity Media (July 21, 2020), https://www.capacitymedia.com/article/29otcfa1zpmeiit1cdce8/news/korean-operators-unveil-22-billion-5g-investment-strategy ............................................. 13

MobileUK, *Mobile Operators Extend Educational Assistance by Zero-Rating Oak National Academy Website* (Feb. 9, 2021), https://www.mobileuk.org/news/mobile-operators-extend-educational-assistance-by-zero-rating-oak-national-academy-website ...................................................... 17

Netflix, Help Center, Plans and Pricing, https://help.netflix.com/en/node/24926 ... 19

Oak National Academy, About Us, https://www.thenational.academy/about-us/who-we-are ................................................................................................... 17

Roslyn Layton & Mark Jamison, Net Neutrality in the USA During COVID-19 195-214 (*Beyond the Pandemic? Exploring the Impact of COVID-19 on Telecommunications and the Internet*, (Jason Whalley, Volker Stocker & William Lehr eds. 2023), https://doi.org/10.1108/978-1-80262-049-820231009 ................ 1

Roslyn Layton & Silvia Elaluf-Calderwood, *Zero Rating: Do Hard Rules Protect or Harm Consumers and Competition? Evidence from Chile, Netherlands and Slovenia* (last revised Oct. 15, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2587542 .............................2

Roslyn Layton, *When Net Neutrality Blocks End Users From Freely Learning Online*, Roslyn Layton Blog (Dec. 12, 2022), https://roslynlayton.com/when-net-neutrality-blocks-end-users-from-freely-learning-online/ .............................17, 18

Roslyn Layton, *Which Open Internet Framework is Best for Mobile App innovation? An empirical inquiry of net neutrality rules around the world* (2017) (Ph.D. dissertation, Aalborg University Denmark), https://vbn.aau.dk/ws/portalfiles/portal/549544008/PHD_Roslyn_Layton_E_pdf_rettet.pdf .................................................................................1, 5, 6, 21

*Size of the South Korea Gaming Market 2006-2023*, Statista, https://www.statista.com/statistics/825058/south-korea-gaming-industry-size/ ..29

Spotify, About Us, https://www.spotify.com/us/about-us/contact/ .........................22

Staff of the Wall Street Journal, *How Big Tech Got Even Bigger*, Wall St. J., Feb. 6, 2021, https://www.wsj.com/articles/how-big-tech-got-even-bigger-11612587632 .................................................................................................28

Statista Research Department, *Australia – Statistics & Facts*, Statista (Apr. 9, 2024), https://www.statista.com/topics/752/australia/ .........................................26

Statista Research Department, *Japan – Statistics & Facts*, Statista (June 24, 2024), https://www.statista.com/topics/2505/japan/...................................................25, 26

Stefano De Luca, *A future-proof network for the EU: Full fibre and 5G*, European Parliamentary Research Service (Apr. 2024), https://www.europarl.europa.eu/RegData/etudes/BRIE/2024/762298/EPRS_BRI(2024)762298_EN.pdf ...............................................................................14, 15

Steven Lee Myers, *China's Search Engines Have More Than 66,000 Rules Controlling Content, Report Says*, N.Y. Times, Apr. 26, 2023, https://www.nytimes.com/2023/04/26/business/china-censored-search-engine.html ............................................................................................................7

Strand Consult, *Net Neutrality (NN) regulation is failing UK consumers, innovators and investors* (Jan. 2023), https://strandconsult.dk/net-neutrality-regulation-is-failing-uk-consumers-innovators-and-investors/ .................................................15

*The Investment Gap to Full 5G Rollout*, Frontier Economics, (Sept. 7, 2022), https://www.connectivityuk.org/wp-content/uploads/2022/09/The-Investment-Gap-to-Full-5G-Rollout.pdf ...................................................................................14

*The State of Digital Communications 2024*, European Telecommunications
Network Operators' Association (Jan. 22, 2024),
https://etno.eu/library/reports/117-state-of-digital-2024.html .............................13

Toshiya Jitsuzumi, *Japan's New Framework for Net Neutrality: The Journey So
Far and Future Challenges*, TPRC48: The 48th Research Conference on
Communication, Information and Internet Policy (2020),
http://dx.doi.org/10.2139/ssrn.3749196……………………... ..........................7

Val Elbert et al., *Accelerating the 5G Economy in the US*, Boston Consulting Group
(Apr. 17, 2023), https://www.bcg.com/publications/2023/accelerating-the-5g-
economy-in-the-us .................................................................................................10

Vodacom South Africa, Social Bundles Terms and Conditions,
https://www.vodacom.co.za/vodacom/terms/social-bundles .................................16

Vodacom South Africa, Video Streaming Bundles,
https://www.vodacom.co.za/vodacom/terms/video-streaming-bundles ...............16

Vodacom South Africa, WhatsApp Ticket,
https://www.vodacom.co.za/vodacom/terms/promotions/whatsapp-ticket ..........16

Wolfgang Briglauer, Efficiency and Effectiveness of Net Neutrality Rules in the
Mobile Sector: Recent Developments and State of the Empirical Literature (Jan.
2024), https://www.wu.ac.at/fileadmin/wu/d/ri/regulation/Reporte_Studien/Brigla
uer_NN_paper_final_2024.pdf..............................................................................12

Wolfgang Briglauer et al., Net Neutrality and High-Speed Broadband Networks:
Evidence From OECD Countries, 55 European Journal of Law and Economics
533–571 (2022), https://link.springer.com/content/pdf/10.1007/s10657-022-
09754-5.pdf............................................................................................................12

Wolfgang Briglauer, *Wolfgang Briglaurer: For the FCC, a Cautionary Tale of EU
'Open Internet' Rules*, Broadband Breakfast (Mar. 29, 2024),
https://broadbandbreakfast.com/wolfgang-briglauer-for-the-fcc-a-cautionary-tale-
of-eu-open-internet-rules/......................................................................................12

## INTEREST OF AMICUS CURIAE[1]

Roslyn Layton is a scholar of regulatory economics who has written extensively about Internet regulation. She performed and published research on net neutrality rules around the world as part of a requirement to earn a doctorate at the Centre for Communication, Media and Information Technology at Aalborg University School of Information Technology and Design.[2] Her thesis has been publicly available for more than seven years and provides an empirical analysis of net neutrality policy by investigating 53 nations before and after adopting net neutrality rules over five years. It offers a methodology that any person can use to evaluate net neutrality regulation.[3] She also has published research on the lack of net neutrality violations in the United States during the COVID-19 pandemic,[4] on the formulation of an economics-based approach to evaluate the potential

---

[1] Counsel for all parties consented in writing to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person or entity other than amicus curiae made a monetary contribution that was intended to fund the preparation or submission of this brief.

[2] *See* Roslyn Layton, *Which Open Internet Framework is Best for Mobile App innovation? An empirical inquiry of net neutrality rules around the world* (2017) (Ph.D. dissertation, Aalborg University Denmark) ("Layton Dissertation"), https://vbn.aau.dk/ws/portalfiles/portal/549544008/PHD_Roslyn_Layton_E_pdf_r ettet.pdf.

[3] The specific steps are provided in section 3.3. *Id.* at 122–26.

[4] Roslyn Layton & Mark Jamison, Net Neutrality in the USA During COVID-19 195-214 (*Beyond the Pandemic? Exploring the Impact of COVID-19 on Telecommunications and the Internet* (Jason Whalley, Volker Stocker & William Lehr eds. 2023)), https://doi.org/10.1108/978-1-80262-049-820231009.

1

enhancements and harms of a particular zero-rating practice,[5] and evaluating the results for consumers of zero-rating practices in certain foreign countries.[6] She co-authored and submitted comments in the underlying proceeding in this case. *See* Comments of Roslyn Layton & Mark Jamison, WC Docket No. 23-320 (Dec. 13, 2023) ("Layton et al. Comments").

---

[5] Bronwyn E. Howell & Roslyn Layton, *Evaluating the Consequences of Zero-Rating: Guidance for Regulators and Adjudicators* (last revised Aug. 18, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2757391.

[6] Roslyn Layton & Silvia Elaluf-Calderwood, *Zero Rating: Do Hard Rules Protect or Harm Consumers and Competition? Evidence from Chile, Netherlands and Slovenia* (last revised Oct. 15, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2587542.

## SUMMARY OF ARGUMENT

The United States has historically regulated broadband Internet access service ("BIAS") through a light-touch regulatory approach.  Except for a brief period in which the Federal Communications Commission ("FCC") experimented with Title II regulation, the United States has allowed the Internet economy to grow and develop under the light-touch Title I regulatory framework.  This approach mirrors that of certain other countries around the world, while some other jurisdictions such as the European Union ("E.U."), Brazil, and India have imposed heavy-handed regulatory regimes on BIAS.  Comparing these groups ("light-touch" regimes vs. "heavy-handed" regimes), it is clear that light-touch regimes improve outcomes for consumers in terms of innovation and investment in broadband and the digital economy.  Yet the rules adopted in the *2024 Open Internet Order* would break with U.S. tradition and impose a top-down, heavy-handed Title II regulatory regime on BIAS, thereby stifling innovation and investment.  *See Safeguarding and Securing the Open Internet*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52 (rel. May 7, 2024) ("*2024 Open Internet Order*"); Petitioners' Appendix ("A") 1–512.

In the United States, the light-touch regulatory approach to BIAS has led to a thriving Internet economy.  The performance, availability, and affordability of U.S. broadband networks have greatly improved under this approach.  Further, the United

3

States has outstripped jurisdictions that impose heavy-handed net neutrality regulations in terms of investment in broadband networks. For example, while the E.U. faces a daunting investment gap to reach its broadband goals, the United States leads the world in deploying 5G. The United States also dominates the global digital economy. U.S.-based companies and companies based in other light-touch regulation jurisdictions have disproportionate global market shares of digital applications downloaded and disproportionate shares of the number of leading Internet companies, the value of those companies, and the market capitalization of those companies.

Amicus curiae supports Industry Petitioners' arguments that the *2024 Open Internet Order* is unlawful for the reasons discussed in their brief. This amicus brief shows why and how the rules adopted in the *2024 Open Internet Order* would, if allowed to become effective, stifle the U.S. digital economy.

## ARGUMENT

I. **THE *2024 OPEN INTERNET ORDER* WOULD OVERHAUL THE LIGHT-TOUCH REGULATORY FRAMEWORK THAT PROMOTES BROADBAND INVESTMENT AND INNOVATION.**

The extent to which a government regulates BIAS impacts broadband deployment and innovation and, as a result, impacts consumers. As discussed below, jurisdictions that employ a light-touch net neutrality regime enjoy greater investment in their broadband networks and more innovative service options than those that

4

employ a heavy-handed regime.  Traditionally, the United States has regulated BIAS using a light-touch regulatory approach.  However, the *2024 Open Internet Order*, if effective, would impose a heavy-handed Title II regulatory approach despite the lack of evidence of a problem to solve.  *See* Layton et al. Comments at Appendix § 9.4.  The FCC's rules would undermine the light-touch regulatory approach under which consumers benefit from flourishing network investment and innovation.

A. **In Contrast to Some Jurisdictions, the United States is Among Those Nations That Have Traditionally Employed Light-Touch Regulation of BIAS Providers.**

Net neutrality regulation of BIAS providers generally can be grouped in three different categories:  heavy-handed regulation; light-touch regulation; and regulation of BIAS solely through competition law.  *See* Layton Dissertation at 127. A heavy-handed regulatory regime includes legislation or regulation to create punitive net neutrality rules with specific provisions, such as prohibitions against blocking, throttling, or paid prioritization.  Light-touch regimes tend to focus on disclosures, transparency, and multistakeholder discussions and may include voluntary policy instruments such as self-regulation and publications of best practices.  Light-touch regulation jurisdictions typically have some types of regulation of broadband services but not heavy-handed rules akin to those the FCC

5

adopted in the *2024 Open Internet Order*.[7]    Competition law may include

prohibitions on exclusionary conduct and anticompetitive conspiracies or

agreements, merger and acquisition restrictions, and other restrictions to promote

competition. *See*, *e.g.*, Sherman Antitrust Act, 51 Cong. Ch. 647, 26 Stat. 209 (1890)

(codified at 15 U.S.C. § 1 et seq.).

Jurisdictions such as the E.U., India, and Brazil have imposed heavy-handed,

punitive net neutrality regulation.[8]    South Korea has used light-touch non-punitive

---

[7] Amicus curiae's dissertation provides specific elements of heavy-handed regulation (i.e., "hard" regulation, which is the term used in the dissertation) and light-touch regulation (i.e., "soft" regulation) for net neutrality.    See Layton Dissertation § 3.4.    Heavy-handed net neutrality regulation also may include, among other provisions, restrictions on pricing and zero rating; requirements to monitor, enforce, and report on net neutrality rule violations; and specific fines and punishments.    Light-touch net neutrality regulation also may provide for, among other provisions, transparency into network traffic management and contracts; users' rights to access content, applications, and services of their choice; and monitoring of the quality of networks by regulators. *Id.*

[8] *See Marco Civil Law of the Internet in Brazil* (Apr. 3, 2014), https://www.cgi.br/pagina/marco-civil-law-of-the-internet-in-brazil/180; Regulation (EU) 2015/2120 and Regulation (EU) No 531/2012, 2015 (L 310/1), https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex:32015R2120; India Telecom Regulatory Authority of India, Prohibition of Discriminatory Tariffs for Data Services Regulations, 2016, https://web.archive.org/web/20160209062517/http://www.trai.gov.in/WriteReadDa ta/WhatsNew/Documents/Regulation_Data_Service.pdf; Government of India, Ministry of Communications, Department of Telecommunications, Net Neutrality, https://dot.gov.in/search/content/net%20neutrality (last visited Aug. 18, 2024).

net neutrality "guidelines" for more than a decade,[9] and Japan implemented its light-touch net neutrality regulatory regime in 2007.  *See* Toshiya Jitsuzumi, *Japan's New Framework for Net Neutrality: The Journey So Far and Future Challenges*, TPRC48:  The 48th Research Conference on Communication, Information and Internet Policy (2020), http://dx.doi.org/10.2139/ssrn.3749196.  South Africa also uses light-touch net neutrality regulation.  *See* Freedom House, South Africa, https://freedomhouse.org/country/south-africa/freedom-net/2022  (last visited Aug. 18, 2024).  In contrast, countries such as Australia and New Zealand have no such rules—companies that provide broadband services are policed by generally applicable competition law.  *See* Bronwyn Howell & Roslyn Layton, Strategic Use of Zero-rating of Mobile Data (*Strategy and Behaviors in the Digital Economy* (Beatrice Orlando ed. 2019)), https://www.intechopen.com/chapters/68310.  China also has no net neutrality regulation.[10]

---

[9] *See* Dae-Keun Cho, Demystifying Interconnection and Cost Recovery in South Korea, Strand Consult Blog (Jan. 23, 2023), https://strandconsult.dk/blog/demystifying-interconnection-and-cost-recovery-in-south-korea/.

[10] *See* Grace Wang, *In brief: telecoms regulation in China*, Lexology (June 24, 2022), https://www.lexology.com/library/detail.aspx?g=c8e8fd3d-4989-4db0-8887-45fd7a86f1a5.  Of course, China heavily regulates Internet usage in other respects, and its Internet regime—while innovative—stands out as being distinctly "closed."  *See, e.g.*, Steven Lee Myers, *China's Search Engines Have More Than 66,000 Rules Controlling Content, Report Says*, N.Y. Times, Apr. 26, 2023, https://www.nytimes.com/2023/04/26/business/china-censored-search-engine.html.

In the United States, the FCC traditionally has regulated BIAS under the light-touch Title I regulatory framework.  In the Telecommunications Act of 1996, Congress declared that "[i]t is the Policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*."  47 U.S.C. § 230(b)(2) (emphasis added).  Just a few years later, the FCC submitted a report to Congress explaining that "Title II constraints[] could seriously curtail the regulatory freedom . . . important to the healthy and competitive development of the enhanced-services industry."  *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501, 11526 ¶ 46 (1998).  Consistent with this recognition and congressional policy, in 2002 the FCC classified cable broadband as a Title I service, which the Supreme Court affirmed.  *See Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities*, Declaratory Ruling and Notice of Proposed Rulemaking, 17 FCC Rcd 4798, 4802 ¶ 7 (2002); *NCTA v. Brand X*, 545 U.S. 967, 974 (2005).  Soon thereafter, the FCC classified other forms of BIAS as Title I services.  *See Appropriate Framework for Broadband Access to the Internet Over Wireline Facilities*, Report and Order and Notice of Proposed Rulemaking, 20 FCC Rcd 14853, 14862 ¶ 12 (2005); *Appropriate Regulatory Treatment for Broadband Access to the Internet Over Wireless Networks*, Declaratory Ruling, 22 FCC Rcd 5901, 5909–11 ¶¶ 22–28, 5916–21 ¶¶ 41–56

(2007).  Since then, except for a short period from 2015–2018 during which the FCC regulated broadband under the heavy-handed Title II regime, the United States has employed the light-touch Title I regulatory framework for broadband.  The United States also regulates BIAS through competition law and, so long as BIAS is subject to Title I, consumer protection law.[11]

### B.     U.S. Broadband Networks Have Flourished Under Light-Touch Regulation, While Networks in Heavy-Handed Jurisdictions Have Faltered.

Under the light-touch Title I regulatory framework, the performance, availability, and affordability of U.S. broadband networks have greatly improved. Fixed broadband speeds in the United States have increased almost six-fold, from an average advertised download speed in a state of 47 Mbps in 2017 to a weighted

---

[11] The Communications Act does not impact the applicability of antitrust laws on entities the FCC regulates.  *See* Pub. L. No. 104–104, title VI, § 601, 110 Stat. 143 (1996); 47 U.S.C. § 152, note ("[N]othing in [the Communications Act] . . . shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws.").  Under Section 5 of the Federal Trade Commission Act, the Federal Trade Commission ("FTC") also has authority to enforce prohibitions against "unfair or deceptive acts or practices."  15 U.S.C. § 45(a)(1).  Notably, the FTC cannot exercise this authority over common carrier services.  *See* 15 U.S.C. § 45(a)(2).

average of 307.73 Mbps in 2023.[12]    The United States is the world leader in deployment of 5G,[13] and fiber now passes over 50 percent of U.S. households.[14]

Additionally, U.S. consumers continue to have a greater number of options for BIAS, which is increasingly affordable.  Fixed wireless access has emerged as a true disruptor to fixed wireline broadband, as fixed wireless access services accounted for 104 percent of net broadband customer additions in 2023.[15]  Satellite also is helping to close the digital divide.[16]  Since 2020, real fixed broadband prices

---

[12] *Compare* FCC, Open Data, Average download/upload speeds by State, https://opendata.fcc.gov/Wireline/Average-download-upload-speeds-by-State/5wh3-ti7w (last visited Aug. 18, 2024), *with Twelfth Measuring Broadband America Fixed Broadband Report*, FCC, at 7 (Jan. 6, 2023), https://data.fcc.gov/download/measuring-broadband-america/2022/2022-Fixed-Measuring-Broadband-America-Report.pdf.

[13] *See* Val Elbert et al., *Accelerating the 5G Economy in the US*, Boston Consulting Group (Apr. 17, 2023), https://www.bcg.com/publications/2023/accelerating-the-5g-economy-in-the-us.

[14] Doug Mohney, *Fiber Passes Over 50% of U.S. Households*, Fiber Broadband Association Blog (Dec. 13, 2023), https://fiberbroadband.org/2023Fiber/12/13/fiber-passes-over-50-of-u-s-households/.

[15] Leichtman Research Group, 1Q 2024 Research Notes, at 4 (2024), https://leichtmanresearch.com/wp-content/uploads/2024/03/LRG-Research-Notes-1Q-2024.pdf.

[16] *See* Alex Dubin & Dan Lips, *Satellite Internet Technology: Opportunities to Close the Digital Divide and Promote Internet Freedom*, Foundation for American Innovation (Oct. 26, 2023), https://www.thefai.org/posts/satellite-internet-technology-opportunities-to-close-the-digital-divide-and-promote-internet.

per Mbps for the highest speeds have fallen by over 50 percent,[17] and wireless data prices per Mbps have decreased by 98 percent from 2012 to 2022.[18]  In the United States, broadband has never been a better value for the price.

In contrast to the United States, no jurisdiction that takes a heavy-handed regulatory approach to BIAS is a leader in broadband network investment.  Net neutrality rules that regulate the practices of Internet service providers ("ISPs") reduce the value of networks to their owners.  Hence, shareholders look for other investments where they can improve their returns.  At a time when the United States seeks to close the digital divide, partly by boosting investment by tens of billions of dollars in broadband networks, *see*, *e.g.*, Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, § 60102, 135 Stat. 429, 1182–1205 (2021), implementing heavy-handed net neutrality regulations that curb investment makes no sense.

Comparing jurisdictions with heavy-handed net neutrality regulation to those with light-touch regulation shows that light-touch regulation of BIAS supports

---

[17] *Compare* Arthur Menko, *2023 Broadband Pricing Index Broadband Prices Continue to Decline*, USTelecom–The Broadband Association, at 4 (2023), https://ustelecom.org/wp-content/uploads/2023/10/USTelecom-2023-BPI-Report-final.pdf, *with* Arthur Menko, *2020 Broadband Pricing Index*, USTelecom–The Broadband Association, at 5 (2020), https://www.ustelecom.org/wp-content/uploads/2020/09/USTelecom-2020-Broadband-Pricing-Index.pdf.

[18] *2023 Annual Survey Highlights*, CTIA, at 8 (2023) ("CTIA 2023 Highlights"), https://api.ctia.org/wp-content/uploads/2023/11/2023-Annual-Survey-Highlights.pdf.

investment in broadband networks.  Econometric analysis of 32 Organisation for Economic Co-operation and Development nations over two decades demonstrates that light-touch regulation of BIAS is superior in supporting investment in both wireline and mobile broadband networks.[19]  As the study's authors explain, "imposing strict net neutrality regulations clearly slow down the deployment of new fiber-based broadband connections."  *Id.* at 533.  This pattern extends to wireless networks as well—countries that impose heavy-handed net neutrality regulations also tend to experience a subsequent slowing of 5G broadband deployment.[20]

South Korea, China, the U.S., and Japan—none of which have heavy-handed net neutrality regulations—historically have led the E.U. in terms of investment in 5G.  The U.S. wireless industry invested $39 billion in 2022, and a total of $160 billion since 2018.  *See* CTIA 2023 Highlights at 4.  South Korea reported that its three major mobile operators would invest $20 billion to boost 5G infrastructure

---

[19] *See* Wolfgang Briglauer et al., Net Neutrality and High-Speed Broadband Networks: Evidence From OECD Countries, 55 European Journal of Law and Economics 533–571 (2022), https://link.springer.com/content/pdf/10.1007/s10657-022-09754-5.pdf; Wolfgang Briglauer, *Efficiency and Effectiveness of Net Neutrality Rules in the Mobile Sector:  Recent Developments and State of the Empirical Literature* (Jan. 2024), https://www.wu.ac.at/fileadmin/wu/d/ri/regulation/Reporte_Studien/Briglauer_NN_paper_final_2024.pdf.

[20] Wolfgang Briglauer, *Wolfgang Briglaurer: For the FCC, a Cautionary Tale of EU 'Open Internet' Rules*, Broadband Breakfast (Mar. 29, 2024), https://broadbandbreakfast.com/wolfgang-briglauer-for-the-fcc-a-cautionary-tale-of-eu-open-internet-rules/.

from 2020–2022.[21]    Japanese mobile providers pledged $14 billion in capital

expenditures alone from 2020–2025,[22] and two Japanese mobile providers—

Softbank and KDDI—have announced plans to invest $38 billion over the next

decade.[23]  On a per capita basis, U.S. mobile operators invested more than four times

as much as E.U. mobile operators did in 2022.[24]

---

[21] Melanie Mingas, *Korean operators unveil $22 billion 5G investment strategy*, Capacity Media (July 21, 2020), https://www.capacitymedia.com/article/29otcfa1zpmeiit1cdce8/news/korean-operators-unveil-22-billion-5g-investment-strategy.

[22] *See* International Trade Administration, Japan's 5G Networks (May 26, 2020), https://www.trade.gov/market-intelligence/japans-5g-networks.

[23] Akihiro Ota, *Japan's SoftBank and KDDI to pump $38bn into 5G* (Nov. 4, 2020), https://asia.nikkei.com/Spotlight/5G-networks/Japan-s-SoftBank-and-KDDI-to-pump-38bn-into-5G.

[24] This calculation is determined by dividing the 2022 U.S. wireless investment per capita by the 2022 E.U. wireless investment per capita.  The respective 2022 wireless investments per capita equal the specific jurisdiction's 2022 wireless investment divided by the 2022 population.  The 2022 U.S. wireless investment per capita equals $39 billion divided by 333 million people, or approximately $117.12 per person.  *See* CTIA 2023 Highlights at 4; Press Release, U.S. Census Bureau, *Growth in U.S. Population Shows Early Indication of Recovery Amid COVID-19 Pandemic* (Dec. 22, 2022), https://www.census.gov/newsroom/press-releases/2022/2022-population-estimates.html.  The 2022 E.U. wireless investment per capita equals €11.82 billion divided by 447 million, or, after applying the 2022 yearly average exchange rate to convert euros to dollars of 0.951, approximately $27.81 per person.  *See The State of Digital Communications 2024*, European Telecommunications Network Operators' Association (Jan. 22, 2024), https://etno.eu/library/reports/117-state-of-digital-2024.html; *European Union: Total Population from 2010 to 2022*, Statista, https://www.statista.com/statistics/253372/total-population-of-the-european-union-eu/ (last visited Aug. 18, 2024); IRS, *Yearly Average Currency Exchange Rates, Internal Revenue Service* (updated May 3, 2023), https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-

Inadequate investment in broadband networks leads to inadequate deployment of broadband networks. The E.U. faces a €200 billion (approximately $220 billion) investment gap in broadband networks that it must cover to reach its 2030 broadband goals. European Commission Press Release QANDA/24/942, *Questions & Answers: Connectivity Packages* (Feb. 21, 2024), https://ec.europa.eu/commission/presscorner/detail/en/QANDA_24_942. The United Kingdom ("U.K.") also faces substantial investment gaps.[25] Consequently, Europe is behind on rolling out 5G networks. The European Commission's 2024 State of the Digital Decade report states that 65 percent of populated rural areas do not have 5G and that rollout of 5G networks has been slow.[26] 5G coverage reaches

---

exchange-rates. $117.12 per person divided by $27.81 per person equals approximately 4.2.

[25] In June 2022, the Digital Connectivity Forum, the multi-stakeholder group that serves as the U.K. government's key advisor on connectivity, observed that U.K. mobile operators can invest approximately £9 billion in new network infrastructure by 2030, but this amount falls short of the cost of delivering full 5G—estimated to be an additional £22–25 billion, which would achieve 95 percent population coverage, connection for semi-rural areas, and the enablement of advanced 5G for innovations such as driverless cars. *See The Investment Gap to Full 5G Rollout,* Frontier Economics, at 20, 29 (Sept. 7, 2022), https://www.connectivityuk.org/wp-content/uploads/2022/09/The-Investment-Gap-to-Full-5G-Rollout.pdf.

[26] European Commission, *Communication from the Commission to the European Parliament, the Council, the European Economic and Social Committee and the Committee of the Regions,* § 3.1 (Sept. 27, 2023), https://eur-lex.europa.eu/legal-content/EN/TXT/HTML/?uri=CELEX:52023DC0570; *see also* Stefano De Luca, *A future-proof network for the EU: Full fibre and 5G,* European Parliamentary Research Service, at 2 (Apr. 2024) ("EPRS Report"),

only 81 percent of the E.U.'s population, which is less than the U.S. (98%), South Korea (98%), Japan (94%), and China (89%), all of which take a light-touch regulatory approach to net neutrality.  EPRS Report at 3.  Indeed, merely removing heavy-handed net neutrality regulation would provide about $3 billion *annually* for Europe's broadband network ecosystem alone.[27]

### C.    Light-Touch Regulation Facilitates BIAS Innovation.

A diversity of consumer-centric subscription models by BIAS providers can flourish under light-touch regulation.  For instance, South Africa's mobile network market shows how, without heavy-handed net neutrality regulation, BIAS providers can explore and offer innovative, consumer-centric service models.  In contrast to the E.U., South Africa enjoys far greater innovation, diversity, and consumer choice for mobile subscriptions.  South African mobile network operators offer several types of subscription packages defined by volume (25 MB–100+ GB), time (night packages are offered at steep discounts to take advantage of off-peak capacity), duration of usage (data can be purchased for use within the hour, day, week, month,

---

https://www.europarl.europa.eu/RegData/etudes/BRIE/2024/762298/EPRS_BRI(2024)762298_EN.pdf.

[27] *See* Strand Consult, *Net Neutrality (NN) regulation is failing UK consumers, innovators and investors*, at 23 (Jan. 2023), https://strandconsult.dk/net-neutrality-regulation-is-failing-uk-consumers-innovators-and-investors/.

90 days, and so on), content, and service.[28]   Mobile data packages can include

discounted data costs for specific, popular applications such as WhatsApp, Amazon

Prime, video applications, and Pinterest.   *See* Vodacom South Africa, WhatsApp

Ticket,    https://www.vodacom.co.za/vodacom/terms/promotions/whatsapp-ticket

(last visited Aug. 18, 2024); Vodacom South Africa, Social Bundles Terms and

Conditions, https://www.vodacom.co.za/vodacom/terms/social-bundles (last visited

Aug. 18, 2024); Vodacom South Africa, Video Streaming Bundles,

https://www.vodacom.co.za/vodacom/terms/video-streaming-bundles (last visited

Aug. 18, 2024).   This range of diverse consumer-centric offerings addresses the

connectivity needs of people of all income levels.

Notably, these consumer-centric models designed to empower lower-income

consumers likely would be constrained by the FCC's rules.   Offering discounted data

rates for particular applications may run afoul of the FCC's paid prioritization rule.

*See* A304–09 (*2024 Open Internet Order* ¶¶ 502–12).   Additionally, the *2024 Open

Internet Order* departs even from the *2015 Open Internet Order* by declaring that

speeding up specific content can violate the no-throttling rule.   *Compare* A302 (*2024

Open Internet Order* ¶ 499), *with Protecting and Promoting the Open Internet*,

---

[28] *See* Bronwyn Howell & Petrus Potgieter, *Saved by the Cell: How South Africa Is
Bridging the Digital Divide*, American Enterprise Institute (Oct. 27, 2022)
https://www.aei.org/technology-and-innovation/saved-by-the-cell-how-south-
africa-is-bridging-the-digital-divide/.

Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd 5601, 5653–58 ¶¶ 125–32 (2015) ("*2015 Open Internet Order*").   And many of these practices may violate the general conduct standard, which the FCC plans to use as a "catch-all backstop" to regulate broadband.   A309–10 (*2024 Open Internet Order* ¶ 514).   If South Africa had implemented the heavy-handed rules found in the *2024 Open Internet Order*, its consumers may not have access to these flexible and beneficial service offerings as described above.

The U.K.'s experience during the COVID-19 pandemic demonstrates how relaxing or waiving heavy-handed net neutrality regulations can benefit consumers. During the pandemic, the U.K. temporarily waived its net neutrality rules to allow BIAS providers to provide offerings and services, such as zero rating, previously outlawed under the U.K.'s heavy-handed regulatory approach.[29]   One example of how consumers benefited from the relaxed rules came from Oak National Academy, an independent public body that during the pandemic recorded and uploaded

---

[29] Roslyn Layton, *When Net Neutrality Blocks End Users From Freely Learning Online*, Roslyn Layton Blog (Dec. 12, 2022) ("Learning Online"), https://roslynlayton.com/when-net-neutrality-blocks-end-users-from-freely-learning-online/; *see also* MobileUK, *Mobile Operators Extend Educational Assistance by Zero-Rating Oak National Academy Website* (Feb. 9, 2021), https://www.mobileuk.org/news/mobile-operators-extend-educational-assistance-by-zero-rating-oak-national-academy-website; Oak National Academy, About Us, https://www.thenational.academy/about-us/who-we-are (last visited Aug. 19, 2024).

educational lessons for students aged 4–16 to an online platform.[30]  Oak National

Academy partnered with 11 U.K.-based BIAS providers to zero rate its educational

content so that downloading or streaming the lessons would not count against

consumers' data allowances.[31]  This practice improved the availability of online

education for U.K. students.[32]

On the other hand, heavy-handed net neutrality regulations can impede

innovation by increasing regulatory uncertainty for ISPs.  ISPs are less likely to

invest in developing or offering new services if there is concern that new service

offerings may violate the net neutrality rules.  This concern may be particularly

salient when the rules fail to clearly delineate the contours of the restrictions that

apply.[33]  While the *2024 Open Internet Order* carves out an exemption to the no

---

[30] Learning Online.

[31] *Id.*

[32] Notably, Ofcom revised its guidance on how to comply with the U.K.'s net neutrality rules to allow most zero-rating practices, among other guidance to "enable ISPs to innovate . . . to improve consumer outcome[s]."  Ofcom, Internet-based services, Network neutrality, Statement: Net Neutrality Review (Oct. 26, 2023), https://www.ofcom.org.uk/internet-based-services/network-neutrality/net-neutrality-review/.  However, Ofcom's authority to change the UK's net neutrality regulatory practices is limited because it cannot change the U.K.'s underlying net neutrality rules.  *Id.*

[33] *See, e.g.*, *Net Neutrality Review*, Ofcom, at 129–30 (Oct. 2023), https://www.ofcom.org.uk/siteassets/resources/documents/consultations/category-1-10-weeks/245902-net-neutrality-review/associated-documents/statement-net-neutrality-review/ (explaining that ISPs' uncertainty about how to interpret Ofcom's former net neutrality guidance may restrict innovation and investment).

blocking, no throttling, and general conduct rules for "reasonable network management," the definition of "network management practice" is limiting and vague. *See* A344–45 (*2024 Open Internet Order* ¶¶ 568–69) (explaining that ISPs must show that a practice is *primarily* motivated by "a technical network management justification rather than other business justifications"). The FCC's insistence on evaluating network management practices on a case-by-case approach forces ISPs to attempt to guess whether the FCC would consider the provider's own motivations to be grounded in technical network management or other justifications, a near-impossible task. *See* A347–48 (*2024 Open Internet Order* ¶ 573). The FCC also set forth a vague series of threats and admonitions regarding non-BIAS data services, grasping beyond even the service it purports to regulate. *See* A129–136 (*2024 Open Internet Order* ¶¶ 195–203).

The risk is compounded by the fact that BIAS providers cannot control many factors that affect the amount of traffic on their networks. Indeed, edge providers may have economic incentives to profit by driving up their consumers' bandwidth consumption. For instance, Netflix's premium subscription tier uses greater bandwidth to increase resolution. Netflix, Help Center, Plans and Pricing, https://help.netflix.com/en/node/24926 (last visited Aug. 18, 2024). Under a heavy-handed net neutrality regulatory regime, a high-speed BIAS provider that enables high-quality video may not charge Netflix to cover the cost of the greater use of its

network.  *See*, *e.g.*, A304–09 (*2024 Open Internet Order* ¶¶ 502–12) (prohibiting paid prioritization network practices).  The broadband provider's only recourse to recover increased costs is to raise prices on subscribers, regardless of whether they use Netflix.  Thus, heavy-handed net neutrality regulation distorts valuable price information and feedback.  Without price signals to guide investment decisions, it is difficult to invest and deliver networks and services.  This limitation on recouping costs through BIAS except by increasing prices on *all* customers, instead of through offerings that are customized for users' situations and needs, inhibits broadband providers' ability to provide innovative BIAS offerings like those found in South Africa.

## II.    JURISDICTIONS WITHOUT HEAVY-HANDED NET NEUTRALITY RULES LEAD THE DIGITAL ECONOMY.

Heavy-handed regulatory rules governing BIAS harm edge innovation, though the FCC claims otherwise.  *See* A178–79 (*2024 Open Internet Order* ¶ 282).  *But see* Layton et al. Comments at 2 ("[N]et neutrality results in fewer edge providers.").  The network investment and innovation promoted by light-touch net neutrality regulation creates an environment conducive to innovation in digital content and services.  In other words, what drives Internet innovation is not regulatory fiat but rather economic policy in which local actors enjoy commercial freedom to join complementary assets among firms, including partnerships with

service providers, and to price their offerings flexibly.[34]  Light-touch regulation promotes, while heavy-handed regulation obstructs, this commercial freedom.

Comparisons of jurisdictions across the globe with heavy-handed net neutrality regulation to jurisdictions with light-touch net neutrality regulation show that the latter enjoy greater edge innovation.  Moreover, as discussed below, jurisdictions with a light-touch regulatory approach to net neutrality outperform jurisdictions that employ a heavy-handed regulatory approach when measuring the performance of applications based in those jurisdictions on app stores.  If heavy-handed net neutrality regulation truly provides greater edge innovation, as the FCC asserts, then the leading Internet applications and services would come from countries and regions with heavy-handed net neutrality regulation such as Brazil, the E.U., and India.

Instead, however, the opposite occurs.  The leading Internet applications and services can be measured by their popularity, number of downloads, revenue, number of users, and other metrics.  For the second quarter of 2024, the top ten most downloaded apps worldwide were developed by companies founded outside of

---

[34] *See generally* David J. Teece, *Profiting from Innovation in the Digital Economy: Standards, Complementary Assets, and Business Models In the Wireless World*, (Tusher Center for the Management of Intellectual Capital, Working Paper No. 16, Aug. 23, 2016), https://businessinnovation.berkeley.edu/wp-content/uploads/2014/07/Tusher-Center-Working-Paper-No.-16.pdf; Layton Dissertation.

heavy-handed net neutrality regulation jurisdictions, including Meta's suite of Facebook, Instagram, WhatsApp, WhatsApp for Business, and Messenger; China's TikTok, which is often downloaded in tandem with the CapCut editing software, and Temu; and Telegram, a privately-owned encrypted messaging service headquartered in British Virgin Islands.[35]  *See* Backlinko Team, *Most Popular Apps*, Backlinko (Aug. 14, 2024), https://backlinko.com/most-popular-apps.  Notably, Spotify was founded in Sweden in 2006 before the E.U. implemented its heavy-handed net neutrality regulations.   Spotify, About Us, https://www.spotify.com/us/about-us/contact/ (last visited Aug. 18, 2024); Luisa Colón, *Spotify*, Britannica (last updated Aug. 16, 2024), https://www.britannica.com/topic/Spotify.

Considering the global dominance of light-touch regulatory jurisdictions among the top apps, it is unsurprising that the market capitalization of major Internet companies in jurisdictions that have heavy-handed net neutrality regulation pale in comparison to the global powerhouses of the U.S. and China and that light-touch net neutrality regulation states perform stronger than heavy-handed jurisdictions.  The

---

[35] Telecom operators in British Virgin Islands uphold the Caribbean operators voluntary self-regulatory code for net neutrality, called the CANTO Code, adopted in 2016.  *See* CANTO, *Code of Practice on Safeguarding the Open Internet* (May 23, 2016), http://canto.org/wp-content/uploads/2014/12/20160523-Code-of-Practice-on-Safeguarding-the-Open-Internet-002.pdf; *see also* The Caribbean Community, *Code of Practice on Safeguarding The Open Internet Signed At Canto 2016* (Aug. 4, 2016), https://caricom.org/code-of-practice-on-safeguarding-the-open-internet-signed-at-canto-2016/.

below table shows the market capitalization of the largest public Internet companies,

as identified by CompaniesMarketCap, and their country of origin.[36]

---

[36] In correspondence with amicus curiae, representatives from CompaniesMarketCap clarified that "Internet companies," within its terminology, are those companies that generate their revenue from online activities through their website or apps, such as for e-Commerce, social networks, online advertising, ride sharing, online dating, online gambling, and similar activities.

*Table 1: Market Capitalization of Largest Internet Companies, by Country*[37]

| | Total Market Capitalization | Percent of Global Market Cap. | Number of Major Internet Companies | Percent of Global # of Leading Companies | Average Market Cap. Value Per Firm |
|---|---|---|---|---|---|
| U.S. | $6,696,575,121,901 | 78.5% | 134 | 43.9% | $49,974,441,208 |
| China | $1,109,436,416,217 | 13.0% | 39 | 12.8% | $28,447,087,595 |
| Others | $334,276,309,621 | 3.9% | 37 | 12.1% | $9,034,494,855 |
| E.U. | $126,479,693,011 | 1.5% | 42 | 13.8% | $3,011,421,262 |
| South Korea | $72,542,256,160 | 0.9% | 6 | 2.0% | $12,090,376,027 |
| India | $68,313,771,589 | 0.8% | 11 | 3.6% | $6,210,342,872 |
| Japan | $59,886,049,721 | 0.7% | 13 | 4.3% | $4,606,619,209 |
| Australia | $31,029,716,418 | 0.4% | 9 | 3.0% | $3,447,746,269 |
| U.K. | $29,495,936,579 | 0.3% | 11 | 3.6% | $2,681,448,780 |
| Brazil | $708,866,327 | 0.0% | 3 | 1.0% | $236,288,776 |
| **Total** | **$8,528,744,137,544** | **100.0%** | **305** | **100.0%** | |

---

[37] The table was prepared by amicus curiae on August 12, 2024, using information from CompaniesMarketCap. The jurisdictions reviewed include those with heavy-handed and light-touch net neutrality regulations as well as those that regulate BIAS through competition laws. *See* CompaniesMarketCap, Largest internet companies by market cap, https://companiesmarketcap.com/internet/largest-internet-companies-by-market-cap/ (last visited Aug. 18, 2024).

As seen in *Table 1*, the U.S. dominates the rankings with 134 of the 305 largest Internet companies in the world, which amounts to a 79 percent share of the total market capitalization valued at about $6.7 trillion.  China follows with 39 companies and 13 percent of the global share.  In contrast, the E.U. has 42 companies but just 1.5 percent of the global value of Internet companies.  India has more than 1 billion people and 11 major companies but holds just 0.3 percent of the global market capitalization.  Brazil, with its three firms, has less than 1 percent of the global market value.

Even the smaller light-touch net neutrality regulation jurisdictions perform better per capita than those with heavy-handed regulation.  The E.U. has over eight times the population of South Korea, yet South Korea's six major Internet companies have a market capitalization more than half of the market capitalization of the 42 major Internet companies based in the E.U., and the average market capitalization per South Korean company is four times that of the E.U.  *See* L. Yoon, *South Korea - Statistics & Facts*, Statista (Apr. 12, 2024), https://www.statista.com/topics/4944/south-korea/ (approximating South Korea's population as 52 million); Aaron O'Neill, *The European Union – Statistics & Facts*, Statista (July 3, 2024), https://www.statista.com/topics/921/european-union/ (approximating the E.U.'s population as 447 million).  Japan has a population less than a third of the E.U.'s population, and yet its major Internet companies have just

shy of half of the E.U. market capitalization. *See* Statista Research Department, *Japan – Statistics & Facts*, Statista (June 24, 2024), https://www.statista.com/topics/2505/japan/ (approximating Japan's population as 125 million). Further, even though the U.K. has approximately 2.5 times the population of Australia, Australia boasts a higher total market capitalization and market capitalization per company. *See* Statista Research Department, *Australia – Statistics & Facts*, Statista (Apr. 9, 2024), https://www.statista.com/topics/752/australia/ (approximating Australia's population as 26 million); D. Clark, *United Kingdom – Statistics & Facts*, Statista (July 3, 2024), https://www.statista.com/topics/755/uk/ (approximating the United Kingdom's population as 68 million).

Jurisdictions with heavy-handed net neutrality regulation also have limited presence in the "platform economy." "Platformization" is a trend within the digital economy where economic and social transactions take place within proprietary software systems of platforms, with an increasing domination of the Internet by large companies whose products work as markets between users and other sellers. *See generally* Anne Helmond, *The Platformization of the Web: Making Web Data Platform Ready*, Social Media + Society 1(2) (2015), https://journals.sagepub.com/doi/epub/10.1177/2056305115603080. Popular

digital platforms include Alphabet, Amazon, Apple, AirBNB, Uber, Baidu, Tencent, and Alibaba, among others.[38]

An overview of the top 100 Internet platforms worldwide in 2023 shows that the U.S. dominates, with more than half of the total platforms and, with a total value of more than $11 trillion, a whopping 80 percent of the total value of all top 100 platforms. *See* Hosseini Article. Notably, companies based in the E.U., Brazil, and India, which all have heavy-handed net neutrality regulation, have not produced the largest Internet platforms under this metric. *See id*.

While several factors may contribute to U.S. dominance in global digital markets, the above analysis demonstrates that light-touch net neutrality regulation likely facilitated (and certainly did not impede) the rise of these companies. Additionally, most of the largest U.S. Internet firms were founded before heavy-handed net neutrality regulation rules were promulgated, and none of the largest U.S. Internet firms were founded during the brief period when the FCC regulated the Internet under Title II. Further, new artificial intelligence firms and various tech unicorns in the United States have been founded since the FCC's *2018 Restoring Internet Freedom Order* ended the Title II heavy-handed regulatory framework for

---

[38] *See* Hamidreza Hosseini, *Platform Economy 2023: U.S. leads; Europe lags*, Ecodynamics (Oct. 15, 2023) ("Hosseini Article"), https://www.platformeconomy.io/blog/platform-economy-2023-u-s-leads-europe-lags.

BIAS, proving that these firms did not need Title II to get their startups off the ground.  *See* CB Insights, The Complete List of Unicorn Companies, https://www.cbinsights.com/research-unicorn-companies (last visited Aug. 18, 2024).  Leading U.S. edge providers continue to enjoy stratospheric financial gains in recent years under Title I light-touch regulation.  *See* Staff of the Wall Street Journal, *How Big Tech Got Even Bigger*, Wall St. J., Feb. 6, 2021, https://www.wsj.com/articles/how-big-tech-got-even-bigger-11612587632.

Important digital economy and Internet advancements in South Korea, Japan, Australia, and New Zealand include the development of video, games, electronic sports (esports or competitive video gaming), and associated products and services, all without heavy-handed net neutrality regulation.[39]  The esports industry is expected to grow by more than 25 percent annually in the current decade with increasing professionalization, events, sponsorships, and career opportunities.  *See Esports Market Size, Share & Trends Analysis Report By Revenue Source (Sponsorship, Advertising, Merchandise & Tickets, Media Rights), By Region (APAC, CSA, Europe), And Segment Forecasts, 2023 – 2030*, Grandview Research

---

[39] While video games were often considered entertainment for children, this has changed significantly with the emergence of esports, in which players are professionals, many trained and sponsored by national governments to participate in international events.  Playing video games has now become a "public spectacle that ignites a sense of community and national belonging."  *See Media Technologies for Work and Play in East Asia: Critical Perspectives on Japan and the Two Koreas*, 1 (Micky Lee & Peichi Chung eds., 1st ed. 2021).

(Sept. 13, 2023), https://www.grandviewresearch.com/industry-analysis/esports-market. Japan and South Korea, widely considered epicenters of the gaming world, enjoyed approximately $23.9 billion and $15 billion respectively in gaming-related revenues in 2022. *Size of the South Korea Gaming Market 2006-2023*, Statista, https://www.statista.com/statistics/825058/south-korea-gaming-industry-size/ (last visited Aug. 18, 2024); *Japan Gaming Market Report*, IMARC Group (May 2024), https://www.imarcgroup.com/japan-gaming-market. The Australian video game industry has more than doubled in revenue in the last six years and experienced a record job boom in 2022. *Australian Game Development Industry Records Job Boom*, Interactive Games & Entertainment Association (Dec. 19, 2022), https://igea.net/2022/12/australian-game-development-industry-records-job-boom/. Clearly, heavy-handed net neutrality regulation is not needed to promote innovation in these countries.

Simply put, there is no reason to hinder U.S. investment in broadband networks and the broader digital economy by imposing the rules adopted in the *2024 Open Internet Order*. The evidence demonstrates that heavy-handed net neutrality regulation will harm investment and innovation. At a time when closing the digital divide and advancing American competitiveness in the digital economy are more important than ever, actions should be taken to *further* access to broadband, not impede it.

## CONCLUSION

For the reasons stated herein and in the Industry Petitioners Brief, the Court

should hold unlawful and set aside the FCC's *2024 Open Internet Order*.

Respectfully submitted,

*/s/ Jennifer Tatel*
Jennifer Tatel
Daniel H. Kahn
Tyler Dillon
Wilkinson Barker Knauer, LLP
1800 M Street NW, Suite 800N
Washington, DC 20036
(202) 783-4141
jtatel@wbklaw.com
dkahn@wbklaw.com
tdillon@wbklaw.com
*Counsel for Amicus Curiae*

August 19, 2024

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,019 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

*/s/ Jennifer Tatel*
Jennifer Tatel

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 19, 2024, I filed the foregoing Amicus Brief of Roslyn Layton with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Jennifer Tatel*
Jennifer Tatel