Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

IN RE: MCP No. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET,
DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON
RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

On Petitions for Review

## BRIEF OF AMICI UNITED STATES CHAMBER OF COMMERCE,
## NATIONAL ASSOCIATION OF MANUFACTURERS, AND THE
## BUSINESS ROUNDTABLE IN SUPPORT OF INDUSTRY PETITIONERS

Paul W. Hughes
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, D.C. 20006
(202) 756-8000

Erica Klenicki
Michael A. Tilghman II
National Association of Manufacturers
733 10th Street, N.W., Suite 700
Washington D.C. 20001

*Counsel for National Association
of Manufacturers*

Liz Dougherty
Business Roundtable
1000 Maine Avenue, SW
Suite 500
Washington, D.C. 20024

*Counsel for the Business Roundtable*

August 21, 2024

Jeffrey M. Harris
Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
tiffany@consovoymccarthy.com

*Counsel for Chamber of Commerce of the United
States of America and the Business Roundtable*

Tyler S. Badgley
Mariel A. Brookins
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington D.C. 20062

*Counsel for Chamber of Commerce
of the United States of America*

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................ii

Statement of Interest.............................................................................................. vi

Introduction ..............................................................................................................1

Argument...................................................................................................................3

  I.  The Commission's reclassification of broadband violates the major-questions
     doctrine.........................................................................................................................3

     A.  The Commission's Order reclassifying broadband is a major rule....................4

     B.  Congress has not clearly authorized such a reclassification............................. 10

  II.  Regulating broadband as a common carrier will discourage investment and
     stifle technological advances in broadband. .......................................................... 14

     A. Heavy-handed regulations will increase costs and discourage investment...... 14

     B. The Order will stifle technological advances in broadband and undermine
     American business's ability to compete in a global economy............................ 20

Conclusion............................................................................................................... 22

Certificate of Compliance....................................................................................... 24

Certificate of Service .............................................................................................. 25

# TABLE OF AUTHORITIES

**CASES**

*Ala. Ass'n of Realtors v. Dept. of Health & Hum. Serv.*,
594 U.S. 758 (2021) ................................................................. 4, 5, 10, 11

*Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ................................................................................ 12

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ........................................................................... 10

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) .................................................................9

*Dep't of Transp. v. Ass'n of Am. R.R.*,
575 U.S. 43 (2015) .................................................................................. 13

*Gundy v. United States*,
588 U.S. 128 (2019) ................................................................................ 13

*NFIB v. OSHA*,
595 U.S. 109 (2022) ..........................................................................4, 5, 10

*United States Telecom Ass'n v. FCC*,
855 F.3d 381 (D.C. Cir. 2017) .................................1, 3, 5, 6, 7, 12, 13

*Util. Air Reg. Grp. v. EPA*,
573 U.S. 302 (2014) ..........................................................................4, 8, 10

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) .......................................................... 6, 9

*Wayman v. Southard*,
23 U.S. 1 (1825) ...................................................................................... 13

*West Virginia v. EPA*,
597 U.S. 697 (2022) ..............................................1, 2, 3, 4, 6, 7, 10, 11, 14

# OTHER AUTHORITIES

47 U.S.C. § 201 ................................................................................................ 11

80 Fed. Reg. 19737 ............................................................................................9

83 Fed. Reg. 7852 ...................................................................................... 8, 10

83 Fed. Reg. 7872 .......................................................................................... 17

86 Fed. Reg. 36987 ...........................................................................................6

89 Fed. Reg. 45404 ...........................................................................................1

2023 Annual Survey Highlights, CTIA (July 25, 2023)................................... 17

Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic* (June 2020) ...................................................... 18

Ashley Schulte, *Fiber Broadband Deployment Accelerate in 2022 Ahead of BEAD Funding Infusion, Setting New Homes Passed Record*, Fiber Broadband Association (Dec. 21, 2022) ..................................................................... 20, 21

Bernard Marr, *6G Is Coming: What Will Be the Business Impact?*, Forbes (Mar. 17, 2023)21

*Broadband Competition is Thriving Across America: An ACA Connects White Paper*, ACA Connects (June 23, 2022)............................................................ 17

Communications Act of 2006, H.R. 5252, 109th Cong ....................................7

Communications Marketplace Report, 33 FCC Rcd 12558, 12654 (2018) ................... 16

Communications, Consumer's Choice, and Broadband Deployment Act of 2006, S. 2686, 109th Cong..............................................................................7

*Companies Have Gone Above and Beyond the Call to Keep Americans Connected During Pandemic*, FCC (Jan. 25, 2021) ................................................. 19

Consumer Action for a Stronger Economy, Comments on Restoring Internet Freedom (Mar. 30, 2020) ............................................................................ 17

Dan Littman et al., *5G: The Chance to Lead for a Decade*, Deloitte (2018) ........................ 22

Data Cap Integrity Act of 2012, S. 3703, 112th Cong. ........................................................ 7

George S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis*, Phoenix Ctr. for Adv. Legal & Econ. Pub. Pol'y Studies (Apr. 25, 2017) ............ 15

IBISWorld, *Internet Service Providers in the US – Market Size (2005-2030)*, (June 9, 2024) ........................................................................................................................... 4

Internet Freedom and Nondiscrimination Act of 2006, H.R. 5417, 109th Cong ........... 7

Internet Freedom and Nondiscrimination Act of 2008, H.R. 5994, 110th Cong ........... 7

Internet Freedom Preservation Act of 2008, H.R. 5353, 110th Cong. ........................... 7

Internet Freedom Preservation Act of 2009, H.R. 3458, 111th Cong ............................ 7

Internet Freedom Preservation Act, S. 215, 110th Cong. (2007) .................................... 7

Internet Freedom Preservation Act, S. 2917, 109th Cong. (2006) .................................. 7

Internet Freedom, Broadband Promotion, and Consumer Protection Act of 2011, S. 74, 112th Cong. ........................................................................................................ 7

Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong .................................... 7

Jeff Jacoby, *A Year After Net-Neutrality's Repeal, the Internet Is Alive and Well — And Faster Than Ever*, Bos. Globe (Dec. 28, 2018) ........................................................... 18

Kendall Swenson & Robin Ghertner, *People in Low-Income Households Have Less Access to Internet Services—2019 Update*, Office of the Assistant Secretary for Planning & Evaluation—U.S. Dep't of Health & Human Servs. (Mar. 2021) .................... 18

Kevin A. Hassett & Robert J. Shapiro, *The Impact of Title II Regulation of Internet Providers on Their Capital Investments*, Georgetown McDonough School of Business, Research Paper No. 2540563 (Dec. 19, 2014) ......................................... 15

Lexi Pelchen, *Internet Usage Statistics in 2024*, Forbes (Aug. 16, 2024) ................................ 6

Matthew Kandrach, *Letting DC Bureaucrats Micromanage the Internet Hurts Consumers and Threatens Freedom*, Real Clear Policy (Nov. 14, 2023) ............................................9

*Median Country Speeds September 2023*, Ookla ................................................... 18

Mfg. Leadership Council, *Manufacturing In 2030 Project: The Next Phase of Digital Evolution* (2022)...................................................................... 21

Network Neutrality Act of 2006, H.R. 5273, 109th Cong ..................................................7

No Rate Regulation of Broadband Internet Access Act, H.R. 2666, 114th Cong. (2015) ..............................................................................7

Patrick Brogan, *USTelecom, U.S. Broadband Investment Continued Upswing in 2018* (July 31, 2019)........................................................................ 16

Preserving the Open Internet, Report and Order, 25 FCC Rcd 17905 (2010)...............9

Protecting and Promoting the Open Internet, Notice of Proposed Rulemaking, 29 FCC Rcd 5561 ..................................................................9

Save the Internet Act of 2019, H.R. 1644, 116th Cong ................................................7

Seth Cooper, *FCC Report Shows Broadband Success Under Pro-Market Policies, Persps. from FSF Scholars* (May 11, 2020) ...................................................... 19

Simon Kemp, *Digital 2023: The United States of America: The Essential Guide to the Latest Connected Behaviors*, We Are Social (Feb. 9, 2023) ......................................... 16

Statement on Internet Neutrality, 2014 Daily Comp. Pres. Doc. 841 (Nov. 10, 2014) ..............................................................................6

*The State of 5G: Evaluating Progress and Charting the Path Forward*, CTIA (July 2023) ....... 21

# STATEMENT OF INTEREST[1]

The United States Chamber of Commerce is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The National Association of Manufacturers is the largest manufacturing association in the United States, representing small and large manufacturers in all 50 states and in every industrial sector. Manufacturing employs nearly 13 million men and women nationally, contributes $2.87 trillion annually to the United States economy, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States. Because an important function of the NAM is to represent its members' interests before

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* certifies that no other person or entity, other than *amici curiae,* their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties have consented to the filing of this brief.

the courts, the NAM regularly files briefs in cases presenting issues of importance to manufacturers.

Business Roundtable is an association of chief executive officers of America's leading companies representing every sector of the U.S. economy and with employees in every state. Business Roundtable works to promote a thriving United States economy and economic opportunity for all Americans by advocating for sound public policies.

As preeminent national business and trades associations, *amici* have a significant interest in, and can offer a unique perspective on, the issues here. American businesses are primary beneficiaries of a nationally and globally deployed broadband infrastructure, which has transformed how they operate, and provides many opportunities to create and market innovative products and services. *Amici* believe that their perspective will help the Court resolve this case.

# INTRODUCTION

The Federal Communications Commission has once again used a 90-year-old law to assert plenary authority over a $140 billion industry. "The FCC's net neutrality rule is a major rule, but Congress has not clearly authorized the FCC to issue the rule. For that reason alone, the rule is unlawful." *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 418 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). That was true of the Commission's 2015 net neutrality rule. And it's true of the "Open Internet" Order at issue here. As two of the former top lawyers in the Obama Administration have recently explained, the Supreme Court's recent major-questions decisions have only further confirmed the correctness of this view. *See* Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, 76 Fed. Commc'ns L.J. 321, 330-35 (2024).

This case presents a classic major question. Broadband access is a critical part of every facet of "modern day life." Stay Op., App. 549. It "facilitate[es] employment, education, healthcare, commerce, community-building, communication, and free expression," among other things. *Id.* And it affects "'a significant portion of the American economy,'" *West Virginia v. EPA*, 597 U.S. 697, 722 (2022). Yet the Commission's attempt to reclassify broadband as a Title II telecommunications service will "fundamentally transform[] the Internet," *United States Telecom Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting), and upend an entire industry. That unquestionably "implicates a major

1

question." Stay Op., App. 548. The Commission admitted as much during the rulemaking process, stating that Internet access "has become even more essential to consumers for work, health, education, community, and everyday life" over the last four years. App. 368. "While internet access has long been important to daily life," it explained, "the COVID-19 pandemic and the subsequent rapid shift of work, education, and health care online" has shown "how essential" broadband is "for consumers' participation in our society and economy." *Id.*

Because the major-questions doctrine applies, the Commission must show "clear congressional authorization" to issue its Order. *West Virginia*, 597 U.S. at 723. While the Commission claims that it is operating under a broad grant of rulemaking authority under the Communications Act of 1934 and the Telecommunications Act of 1996, it fails to identify a clear statement from Congress granting it the broad authority to reclassify broadband as a common carrier. It simply cannot do so under a law designed for the rotary phone.

In addition to violating the major-questions doctrine, the Commission's Order will discourage investment and hinder technological advances in broadband. Replacing the current light-touch regime with the Order's heavy-handed regulation will harm the broadband industry by stifling investment and innovation. That, in turn, will leave American businesses at a competitive disadvantage in the global economy. As the history of so-called net neutrality shows, only a more tailored regulatory regime will spur broadband investment, expand access, support innovation, facilitate higher Internet

speeds, and reduce consumer prices. Conversely, reclassifying broadband as a telecom-

munications service and subjecting it to Title II regulation—which was not designed or

intended to apply to such a technology—will not bring about the Internet that Ameri-

can businesses and consumers want and need.

*Amici* have long supported a free and open Internet. They support a legislative

solution that protects consumers, promotes innovation and investment, and provides

regulatory certainty. But they oppose regulating broadband service providers under the

heavy-handed legacy framework of Title II.

The Court should hold unlawful and set aside the Commission's Order.

## ARGUMENT

### I. The Commission's reclassification of broadband violates the major-questions doctrine.

The Supreme Court "applies[] the major questions doctrine … to ensure that the

government does not inadvertently cross constitutional lines." *West Virginia*, 597 U.S.

at 742 (Gorsuch, J., concurring) (internal quotations omitted). But the Commission

bulldozes that line here. Broadband is "absolutely essential to modern day life, facilitat-

ing employment, education, healthcare, commerce, community-building, communica-

tion, and free expression." Stay Op., App. 549. Yet the Commission's Order would

"fundamentally transform[] the Internet," affecting "every Internet service provider,

every Internet content provider, and every Internet consumer." *United States Telecom*

*Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting). And it would upend a nearly $140

billion industry. On top of that, the Order's reclassification opens the door to a host of

new rulemaking on Internet service providers that implicate privacy, national security, cybersecurity and public safety. Indeed, it opens a whole new regulatory regime to fit a wide range of policy goals that Congress has not authorized. The Order thus unquestionably "implicates a major question." Stay Op., App. 548. The Supreme Court "typically greet[s] assertions of extravagant statutory power over the national economy with skepticism." *West Virginia,* 597 U.S. at 724 (internal quotations omitted). In such "extraordinary cases," the agency must "point to clear congressional authorization to regulate" in a given area. *Id.* at 723, 732 (internal quotations omitted). The Commission cannot do so here.

### A. The Commission's Order reclassifying broadband is a major rule.

The Commission's Order reclassifying broadband as a Title II telecommunications service has all the hallmarks of a major-questions case. To start, the Order has "vast economic and political significance." *Ala. Ass'n of Realtors v. Dept. of Health & Hum. Serv.*, 594 U.S. 758, 764 (2021) (internal quotations omitted). Fundamentally overhauling the treatment of a major industry will have impacts economy wide. *See* IBISWorld, *Internet Service Providers in the US – Market Size (2005-2030)*, (June 9, 2024), perma.cc/44V4-T6TB (broadband is a $140 billion industry). A rule that affects such "a significant portion of the American economy," *West Virginia*, 597 U.S. at 722 (citing *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014)), is no "'everyday exercise of federal power.'" *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). A recent study estimated "[t]he persistent prospect of Title II policy reduced investment by approximately 10% on average, between 2011

and 2020, about $8.1 billion annually, with a total loss of investment over a ten-year period of about $81.5 billion." George S. Ford, *Investment in the Virtuous Circle: Theory and Empirics, Phoenix Center Perspectives*, at 5-6 (Dec. 2023). That would mean a $145 billion annual losses in gross domestic product, amounting to "$1.45 trillion over ten years." *Id.* Such financial impact is "staggering." *United States Telecom Ass'n*, 855 F.3d at 423 (Kavanaugh, J., dissenting).

While these staggering figures are not necessary for the court to find this a major question, the "size [and] scope" of the Commission's Order here are similar to or larger than other cases applying the major-questions doctrine. *E.g., Ala. Ass'n of Realtors*, 594 U.S. at 764-65 (eviction moratorium would affect "between 6 and 17 million tenants" and have an "economic impact" of $50 billion); *NFIB*, 595 U.S. at 120 (OSHA's mandate would have imposed "billions of dollars in unrecoverable compliance costs").

On top of the massive costs, regulating broadband "remains[] a hotly debated matter." *United States Telecom Ass'n*, 855 F.3d at 383 (Srinivasan, J., concurring in denial of rehearing en banc). For good reason. Treating broadband as a common carrier raises a host of contentious issues. It affects "every Internet service provider, every Internet content provider, and every Internet consumer." *Id.* at 423 (Kavanaugh, J., dissenting). And the "availability of reliable, effective broadband service" became all the more important during the Covid-19 pandemic. Verrilli & Gershengorn, *supra,* at 330. During that time "[b]roadband services provided the indispensable link that allowed hundreds of millions of Americans to do their jobs, go to school, and maintain vitally important

personal and family relationships." *Id.* And the amount of broadband usage is only expected to grow in the coming years. Lexi Pelchen, *Internet Usage Statistics in 2024*, Forbes (Aug. 16, 2024), perma.cc/F4X5-6RGD. Yet the Commission's Order imposing common carrier regulation on Internet service providers would "wrest[] control of the Internet" from consumers and providers and give it "to the Government" instead. *United States Telecom Ass'n,* 855 F.3d at 423 (Kavanaugh, J., dissenting). Upholding such a sweeping exercise of authority would "end an earnest and profound debate" about net neutrality regulations that is happening across the country. *West Virginia*, 597 U.S. at 743 (Gorsuch, J., concurring) (internal quotations omitted).

This debate has "engaged lawmakers, regulators, businesses, and other members of the public for years." *Verizon v. FCC*, 740 F.3d 623, 634 (D.C. Cir. 2014). Millions of individuals and organizations have commented on the Commission's proposed net neutrality rules over the last three administrations. *See, e.g.*, *United States Telecom Ass'n*, 855 F.3d at 383 (Srinivasan, J., concurring); *id.* at 423 (Kavanaugh, J., dissenting). And even U.S. presidents have "publicly weighed in on the net neutrality issue." *Id.* at 423 (Kavanaugh, J., dissenting). In 2015, President Obama issued a statement urging the Commission to "create a new set of rules protecting net neutrality." *Statement on Internet Neutrality*, 2014 Daily Comp. Pres. Doc. 841 (Nov. 10, 2014). And in 2021, President Biden issued an executive order openly calling for the Commission to reclassify broadband as a Title II telecommunications service. *See* Exec. Order No. 14036, 86 Fed. Reg. 36987, §5(l)(i) (July 14, 2021). Such "unusual" presidential "intervention only underscores the

enormous significance of the net neutrality issue." *United States Telecom Ass'n*, 855 F.3d at 423-24 (Kavanaugh, J., dissenting). Congress has declined to grant the Commission this authority.

Despite all this engagement by various stakeholders, "Congress ha[s] conspicuously and repeatedly declined" to act itself, only further implicating the major-questions doctrine. *West Virginia*, 597 U.S. at 724. Congress has considered and "consistently rejected" proposals to reclassify broadband as a Title II service. *Id.* at 731. *See* Communications Act of 2006, H.R. 5252, 109th Cong.; Network Neutrality Act of 2006, H.R. 5273, 109th Cong.; Internet Freedom and Nondiscrimination Act of 2006, H.R. 5417, 109th Cong.; Internet Non-Discrimination Act of 2006, S. 2360, 109th Cong.; Communications, Consumer's Choice, and Broadband Deployment Act of 2006, S. 2686, 109th Cong.; Internet Freedom Preservation Act, S. 2917, 109th Cong. (2006); Internet Freedom Preservation Act, S. 215, 110th Cong. (2007); Internet Freedom Preservation Act of 2008, H.R. 5353, 110th Cong.; Internet Freedom and Nondiscrimination Act of 2008, H.R. 5994, 110th Cong.; Internet Freedom Preservation Act of 2009, H.R. 3458, 111th Cong.; Internet Freedom, Broadband Promotion, and Consumer Protection Act of 2011, S. 74, 112th Cong.; Data Cap Integrity Act of 2012, S. 3703, 112th Cong.; No Rate Regulation of Broadband Internet Access Act, H.R. 2666, 114th Cong. (2015); Save the Internet Act of 2019, H.R. 1644, 116th Cong. Yet it has not passed a single one. That makes the Commission's assertion of regulatory power here "'all the more

suspect.'" *West Virginia*, 597 U.S. at 732. Congress's decision not to amend the Tele-communications Act to classify broadband as a Title II service is "telling." *Id.* at 743 (Gorsuch, J., concurring). Indeed, it is "a sign that an agency is attempting to work around the legislative process to resolve for itself a question of great political signifi-cance." *Id.* (cleaned up).

Finally, the major-questions doctrine applies when an agency "claims to dis-cover" broad power to regulate an entire sector of the American economy "in a long-extant statute." *Util. Air Reg. Grp.*, 573 U.S. at 324. That is exactly what the Commission has done here. *United States Telecom Ass'n*, 855 F.3d at 424 (Kavanaugh, J., dissenting) (noting the Commission's reliance "on a long-extant statute"). It has asserted plenary authority under the Telecommunications Act of 1996 and the Communications Act of 1934 to regulate broadband as a Title II service—statutes that do not authorize such "'extravagant'" power. *West Virginia,* 597 U.S. at 724.

From the start, the Commission employed a "light-touch regulatory scheme that enabled the internet to develop and thrive for nearly two decades." Restoring Internet Freedom, 83 Fed. Reg. 7852 (2018). Until 2015, the Commission "respected the Act's deregulatory policy," and consistently concluded that Internet access services should not be subject to common-carriage regulation. *United States Telecom Ass'n*, 855 F.3d at 394 (Brown, J., dissenting from denial of rehearing en banc). Even when it attempted to adopt open internet principles, it did so under the framework of Title I. In 2005, for

example, the Commission issued a policy statement attempting to regulate certain Internet service provider's management practices under the rubric of its Title I ancillary authority. *See Comcast Corp. v. FCC*, 600 F.3d 642, 644 (D.C. Cir. 2010). When the D.C. Circuit held that the FCC lacked authority to do so, it then relied on Section 706 of the Telecommunications act (another non-Title II provision) to promulgate anti-blocking and anti-discrimination rules. *See* Preserving the Open Internet, Report and Order, 25 FCC Rcd 17905 (2010). In a challenge to that rule, the D.C. Circuit held that the Commission had discretion to use Section 706 to adopt Internet conduct rules, but the court determined that the specific rules adopted by the Commission improperly imposed common carriage requirements on broadband providers. *Verizon v. FCC*, 740 F.3d at 623. In response, the Commission stated that it would treat the *Verizon* decision as a "blueprint" for restoring open internet protections while still preserving broadband's "information service" classification. Protecting and Promoting the Open Internet, Notice of Proposed Rulemaking, 29 FCC Rcd 5561, ¶¶ 4, 89, 93 (2014).

Then in 2015, the Commission reversed course and reclassified broadband internet access service as a telecommunications service. *See* Protecting and Promoting the Open Internet, 80 Fed. Reg. 19737 (2010). It attempted to regulate the Internet as a common carrier subject to Title II, "an ancient regulatory framework" that in the Commission's view, gave it "authority to micromanage almost every aspect of the broadband marketplace." Matthew Kandrach, *Letting DC Bureaucrats Micromanage the Internet Hurts Consumers and Threatens Freedom*, Real Clear Policy (Nov. 14, 2023).

In 2018, the Commission replaced that regime with an open, transparent, and competition-based rule. *See* Restoring Internet Freedom, 83 Fed. Reg. 7852 (2018). The 2018 Order once again classified broadband internet as an information service and mobile broadband as a private mobile service. It returned to the "regulatory framework that for decades … enabled the investment and innovation that powers the global Internet economy." USTelecom, Reply Comments on Restoring Internet Freedom, at 2 (Apr. 20, 2020).

Now the Commission proposes to reclassify broadband services once again. In doing so, the Commission has reverse-engineered its interpretive position to "suit its own sense of how the statute should operate." *Util. Air Reg. Grp.*, 573 U.S. at 328. But because the Commission's interpretation "would effect a fundamental revision of the statute, changing it from one sort of scheme of . . . regulation into an entirely different kind," it runs afoul of the major-questions doctrine. *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). Indeed, the Supreme Court has previously struck down agency rules under the major-questions doctrine in similar contexts. E.g., *Ala. Ass'n of Realtors*, 594 U.S. at 758; *NFIB,* 595 U.S. at 109; *Nebraska*, 143 S. Ct. at 2355. This Court should follow suit.

**B. Congress has not clearly authorized such a reclassification.**

Because the major-questions doctrine applies, the Commission must show "clear congressional authorization" to issue its Order. *West Virginia*, 597 U.S. at 723. While the agency claims that it is operating under a broad grant of rulemaking authority under

the Communications Act, it fails to identify a clear statement from Congress granting it the broad authority to reclassify broadband as a common carrier. And that is because there is no such statement. As the stay panel noted, "[n]owhere does Congress clearly grant the Commission the discretion to classify broadband providers as common carriers." Stay Op., App. 549-550. The Communications Act's open-ended directives to "prescribe such rules and regulations as may be necessary in the public interest to carry out" the law are silent about the classification of broadband. 47 U.S.C. §201.

Nor does the Commission justify its Order with new evidence of open Internet violations. Instead, it asserts that the reclassifying broadband is necessary for a host of unrelated policy reasons, including privacy, national security, cybersecurity, network resiliency, and public safety—areas that have nothing to do with net neutrality. *See* Order at ¶¶ 26-105; App. 12-60. For example, the Commission asserts that reclassification will "significantly bolster the Commission's ability" to "safeguard national security and law enforcement." App. 15. And it claims that the Order will "promote cybersecurity" by enhancing "existing authority to take regulatory actions" to "address cybersecurity risks and vulnerabilities." App. 26. But the Commission fails to adequately explain how classifying broadband as a Title II service would advance these goals.

Even if the Commission could conjure a "plausible textual basis" for the Order, *West Virginia*, 597 U.S. at 723, it simply "strains credulity to believe that this statute grants the [FCC] the sweeping authority that [it] asserts" here. *Ala. Ass'n of Realtors*, 594 U.S. at 760. As Chief Judge Sutton recognized during the stay proceedings, the Supreme

Court "has already resolved this question of classification." Stay Op., App. 553 (Sutton, C.J., concurring). In *Brand X,* "[a]ll nine justices" agreed that broadband service "provides an information service as the Act defines that term under Title I." *Id.*; *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 974 (2005) ("[C]able companies that sell broadband Internet service do not provide 'telecommunications servic[e]'. . . under Title II."); *id.* at 987 ("Cable modem service is an information service . . . because it provides consumers with a comprehensive capability for manipulating information using the internet via high-speed telecommunications. That service enables users, for example, to browse the World Wide Web, to transfer files . . . and to access email."); *id.* at 1010 (Scalia, J., dissenting).

But even if there were any ambiguity, that alone would doom the Order under the major-questions doctrine. "[B]y definition," a finding of ambiguity "means that Congress has not clearly authorized" the Commission to act. *United States Telecom Ass'n*, 855 F.3d at 426 (Kavanaugh, J., dissenting). The Commission admitted as much in 2015, arguing before the D.C. Circuit that Communications Act does "not clearly resolve the question of how broadband should be classified." *Id.* at 425 (citing FCC's Brief in Opposition at 9). And in the Order itself, the Commission stated that it does "not think any inference can be drawn from Congress's failure to clarify the regulatory status" of broadband Internet access service "one way or the other." App. 165. That acknowledgment is simply "the end of the game" under the major-questions doctrine. *United States Telecom Ass'n*, 855 F.3d at 425 (Kavanaugh, J., dissenting).

In any event, the Commission's position conflicts with the Communications Act itself. The "best reading of the statute" is that Congress "did not view broadband providers as common carriers under Title II of the Telecommunications Act." Stay Op., App. 553 (Sutton, C.J., concurring). The Commission must "show a textual assignment of authority before it can reclassify broadband Internet access as common carriage." *United States Telecom Ass'n*, 855 F.3d at 404 (Kavanaugh, J., dissenting). Considering the "statutory context and backdrop against which Congress passed the 1996 Act," it cannot do so here. *Id.*

While an agency may be given authority to "fill up the details" on certain regulatory matters, Congress did not simply hand over the power to regulate the Internet to the Commission. Nor could it. There are some "important subjects, which must be entirely regulated by the legislature itself." *Wayman v. Southard*, 23 U.S. 1, 43 (1825) (Marshall, C.J.). It "would frustrate 'the system of government ordained by the Constitution' if Congress could merely announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals.'" *Gundy v. United States*, 588 U.S. 128, 153 (2019) (Gorsuch, J., dissenting). Indeed, "[i]t would dash the whole scheme if Congress could give its power away to an entity" constrained only by the Administrative Procedure Act, rather than the Constitution's demanding legislative design. *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring).

At bottom, the Commission lacks the broad power it asserts to reclassify the Internet as a Title II service. And given the vast economic and political consequences

of the Commission's Order, this is "a relatively easy case for the doctrine's application." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

## II. Regulating broadband as a common carrier will discourage investment and stifle technological advances in broadband.

Replacing the current light-touch regime with the Order's heavy-handed regulation will harm the broadband industry at a time when open access to the Internet is more critical than ever. The light-touch regulatory regime has spurred broadband investment, expanded access, supported innovation, facilitated higher internet speeds, and reduced consumer prices. But reclassifying broadband as a common carrier will generate uncertainty about regulatory requirements and increase the cost of compliance. That, in turn, will deter investment in the broadband industry. As a result, the industry will see a decrease in technological advances in broadband, hampering businesses' ability to compete in the global economy. The investment- and innovation-dampening effects of Title II regulation will not bring about the Internet American businesses and consumers need.

### A. Heavy-handed regulations will increase costs and discourage investment.

Broadband service has remained fast, efficient, and competitive in the absence of heavy-handed federal mandates. As the history of net neutrality shows, such heavy-handed regulation only raises costs for internet service providers and increases uncertainty for broadband investors. In 2018, the Commission replaced the uncertain and investment-deterring Title II regulatory regime it had adopted in 2015 with a new set

of rules that sought to neutralize the 2015 Order's deleterious effects on investment and restore broadband investment to pre-2015 levels. Five years in, net neutrality's repeal has rejuvenated investment in broadband service.

Comparing the economic effects of the Title II-era and post-Title II-era regimes is telling. Between 2000 and 2014, when broadband was classified as an "information service," capital expenditures ranged between $64 billion and $118 billion annually. USTelecom, Comments on Restoring Internet Freedom, at 6 (Apr. 20, 2020). Investment began to decline, however, in 2015, when the FCC issued its heavy-handed federal net neutrality mandates. *Id.* That is undoubtedly due in large part to uncertainty and the threat of regulatory creep. "[U]ncertainty . . . lead[ing] to delays or suspensions of investments in innovations that could be affected by the new regulation" and "diver[sion] [of] resources to compliance efforts before-the-fact," have been shown to impact broadband providers facing Title II regulation. Kevin A. Hassett & Robert J. Shapiro, *The Impact of Title II Regulation of Internet Providers on Their Capital Investment*s, Georgetown McDonough School of Business, Research Paper No. 2540563, at 17 (Dec. 19, 2014). According to one study, "no negative investment consequences [were] found for the period [from 2005-2009] where Net Neutrality was enforced via the FCC's 'Four Principles' to promote an Open Internet" under Title I. George S. Ford, *Net Neutrality, Reclassification and Investment: A Counterfactual Analysis*, Phoenix Ctr. for Adv. Legal & Econ. Pub. Pol'y Studies, at 2, 10 (Apr. 25, 2017). That "suggest[s] it is reclassification—and not the principles of Net Neutrality—that is reducing investment." *Id.* And a recent

study found that even the "prospect of Title II policy reduced investment" in the broadband industry by $8 billion annually from 2011 to 2020. Ford, *Investment in the Virtuous Circle*, *supra*, at 5-6; *see* Israel Decl. ¶¶ 20-22, App. 939-940.

But capital expenditures have been shown to increase with a light-touch regulatory regime. In 2017—the year the FCC announced its proposal to repeal the 2015 Order—investment in broadband infrastructure "reversed what had been a multi-year decline, rising from $74.8 billion in 2016 to $76.9 billion in 2017." Telecommunications Industry Association, Comments on Restoring Internet Freedom (TIA Comments), at 4 (Apr. 20, 2020). Then, in 2018, broadband investment reached $80 billion—the highest amount since 2001. *Id.*; Patrick Brogan, USTelecom, *U.S. Broadband Investment Continued Upswing in 2018*, at 1-2 (July 31, 2019), perma.cc/5PWL-94VS. And in 2023, broadband revenue in the U.S. skyrocketed to nearly $140 billion. *See* IBISWorld, *supra*.

Those investment increases are not merely numbers on a page; they directly contribute to real-world improvements in broadband infrastructure. Last year, the United States had 311.3 million Internet users and 383.4 million cellular mobile connections. Simon Kemp, *Digital 2023: The United States of America: The Essential Guide to the Latest Connected Behaviors*, We Are Social (Feb. 9, 2023). About 295 million Americans had access to two or more high-speed, fixed ISPs in 2022—a 30 percent increase since 2017. *See* Communications Marketplace Report, 33 FCC Rcd 12558, 12654 (2018). And researchers estimate that by December 2025, over 90 percent of U.S. households could have access to one broadband provider offering 100/20+ Mbps service (high download

and upload speeds)—while 74 percent could have access to two. *Broadband Competition is Thriving Across America: An ACA Connects White Paper*, ACA Connects, at 4 (June 23, 2022).

Access to mobile broadband has also increased in the last five years, as providers relied on the "light-touch" framework. The 2018 surge in mobile broadband investment reversed "historic declines." TIA Comments at 4. And new wireless infrastructure investment has hit historic highs each year, reaching $39 billion in 2022. *See* 2023 Annual Survey Highlights, CTIA, at 4 (July 25, 2023). Those investments were especially critical to national economic growth as more Americans work and learn from home—a trend that notably accelerated during the COVID-19 pandemic.

The light-touch regime has also fostered competition and innovation that better serves low-income consumers by reducing prices. It allowed Internet services providers to "experiment with services and business arrangements" to "best serve their customers, without excessive regulatory and compliance burdens" and thus increased expansion into rural and low-income areas. Restoring Internet Freedom, 83 Fed. Reg. 7872 (Jan. 7, 2021). "[P]rices for consumers fell by 11% according to common benchmarks for industry pricing." TIA Comments, *supra*, at 4; *see also* Consumer Action for a Stronger Economy, Comments on Restoring Internet Freedom, at 2 (Mar. 30, 2020); *see id.* ("Broadband access for low-income consumers is another area where the Restoring Internet Freedom Order advances the public interest."). And in 2019, "the percent of people in poverty without internet access dropped from 24 percent to 17 percent,

and the percent with broadband access increased from 51 percent to 57 percent." Kendall Swenson & Robin Ghertner, *People in Low-Income Households Have Less Access to Internet Services—2019 Update*, Office of the Assistant Secretary for Planning & Evaluation—U.S. Dep't of Health & Human Servs. (Mar. 2021), perma.cc/9CXN-SR9Z.

Internet speeds have also vastly improved since the FCC issued the 2018 Order. In 2018 alone, U.S. internet speeds increased by 40%. Jeff Jacoby, *A Year After Net-Neutrality's Repeal, the Internet Is Alive and Well — And Faster Than Ever*, Bos. Globe (Dec. 28, 2018). According to Ookla, a web analytics company, the United States is ranked in the top 10 globally for fixed Internet speed and has the fastest mobile broadband speed in North America. *See* Median Country Speeds September 2023, Ookla, perma.cc/PK7W-2SLP. By all accounts, the FCC's repeal of the 2015 Order (which the Commission now seeks to reimplement) has benefitted consumers by expanding access to fixed and mobile broadband, encouraging investment and innovation, promoting faster service, and reducing prices.

The COVID-19 global pandemic also highlights the resilience of the U.S. broadband infrastructure—a product of light-touch regulation and years of investment. *See* Anna-Maria Kovacs, *U.S. Broadband Networks Rise to the Challenge of Surging Traffic During the Pandemic* (June 2020), perma.cc/NQ8B-RSSQ. Despite an extraordinary 20 to 30 percent pandemic-induced surge in internet traffic, "the U.S. broadband networks were able to accommodate these changes with virtually no drop in performance." Doug Brake, *Lessons From the Pandemic: Broadband Policy After COVID-19*,

Info. Tech. & Innovation Found. at 1 (July 12, 2020); *see also* Seth Cooper, *FCC Report Shows Broadband Success Under Pro-Market Policies*, Persps. from FSF Scholars (May 11, 2020), perma.cc/EH28-N4PL ("Strong investment in 2017 and especially 2018 has enabled broadband networks to handle, without any material degradation, traffic increases occasioned by the COVID-19 pandemic."). And the Commission praised the performance of ISPs during this time. *See Companies Have Gone Above and Beyond the Call to Keep Americans Connected During Pandemic*, FCC (Jan. 25, 2021), perma.cc/6P9U-URL2.

While other countries had to ration internet usage, "because speeds and network capacity were significantly higher in the United States, such rationing steps were not necessary for U.S. broadband users." Brake, *supra*, at 4. For example, in the European Union, some countries "faced more difficulty accommodating the fluctuation in traffic," leading officials in those countries to ask content providers to reduce the resolution of video streams. *Id.* And in Australia, one leading ISP "urged users to download movies overnight, during off-peak usage times, or for families with multiple children to try not to 'all use the Internet all at the same time.'" *Id.* The 2018 Order restored an environment conducive to investment, which, in turn, contributed to exceptional U.S. broadband performance notwithstanding the extraordinary challenges posed by the pandemic.

But the Commission's efforts to reclassify broadband services will produce the same economic result as before: broadband investment will plummet and innovation will stall. While the Commission has forbore (for now) from some of its more aggressive

Title II powers, like the power to regulate rates, because of this reclassification, the Commission may easily change course later and take a more aggressive stance on broadband regulation. Indeed, any Title II designation carries with it the possibility that the Commission could reverse those rulings in the future. The Commission's uncertainty-laden forbearance regime only heightens the risks of investing in broadband—investments that (as shown above) are critical to an open and flourishing Internet.

### B. The Order will stifle technological advances in broadband and undermine American business's ability to compete in a global economy.

Increased investments—a direct result of a light-touch regulatory regime—have allowed Internet service providers to build out infrastructure, expand Internet coverage, and keep pace with technological advancements. Due to increased investment and technological expansion, wireless networks currently support over 73.7 trillion megabytes of traffic: "the greatest increase in mobile data traffic ever and nearly double the year-over-year increase from 2020 to 2021." CTIA 2023 Annual Survey Highlights, *supra*, at 3. In 2022, more than 142,000 small cell deployments were operational across the U.S., helping to power 5th generation (5G) wireless networks and the high-speed, low-latency communications that 5G enables. *Id.* at 7. And fiber deployment "passed 7.9 million additional homes in the U.S. in 2022—the highest annual deployment ever, even with challenges in materials supply chain and labor availability." Ashley Schulte, *Fiber Broadband Deployment Accelerate in 2022 Ahead of BEAD Funding Infusion, Setting New Homes Passed Record*, Fiber Broadband Association (Dec. 21, 2022), perma.cc/7CZJ-X3WL.

Those developments are critical for American businesses. American manufacturers rely on fast, reliable, and widely available broadband networks to compete on the global stage. Fiber broadband "exceeds all other types of delivery in every single measurement of broadband quality, including speeds, uptime, latency, jitter, and power consumption." *Id.* And 5G networks are rapidly becoming the new standard, offering higher bandwidth and lower latency than older forms of technology. *See* Mfg. Leadership Council, *Manufacturing In 2030 Project: The Next Phase of Digital Evolution* 12-15 (2022). More than 94 million homes and businesses use 5G fixed broadband services. 2023 CTIA Survey Highlights, *supra*, at 6. And by 2028, 5G will likely comprise approximately 91 percent of U.S. wireless connections. *See* The State of 5G: Evaluating Progress and Charting the Path Forward, CTIA, at 28 (July 2023). 6G technology is also underway. *See* Bernard Marr, *6G Is Coming: What Will Be the Business Impact?*, Forbes (Mar. 17, 2023), perma.cc/B8ZW-93NG. It "will likely be 100 times faster than 5G, and it "allows for instantaneous communications between devices, consumers, and the surrounding environment." *Id.* That technology "will transform the way companies process information, communicate, make decisions, and train employees." *Id.* But these advancements are possible only with significant broadband investment and innovation.

Without such fast and reliable broadband technology, American manufacturers will be disadvantaged in the global market. Greater availability of fiber broadband, with its top tier speed and quality, leads to "more productivity" and "entrepreneurism." Schulte, *supra*. And an increased number of 5G networks results in higher speeds and

better coverage. As more devices connect to a 5G network, it produces a "data-network effect": "a powerful economic engine … using data to attract more users, who then generate more data, which help to improve services, which attracts more users." *See* Dan Littman et al., *5G: The Chance to Lead for a Decade*, Deloitte (2018), perma.cc/SB45-U5YQ. Today, China has nearly triple the number of 5G sites as the United States. *Id.* (showing China has 14.1 5G sites per 10,000 people, while the United States has only 4.7). That means that American's 5G network may be slower and less reliable than their international competitors. *Id.* American manufacturers will be at a massive disadvantage if they are not able to process and use their data at the same rates or faster than other nations. The Commission's Order—which will stifle investment and innovation—will harm American manufacturers and may make it nearly "impossible to catch up." *Id.* The Court should not allow that to happen.

## CONCLUSION

For these reasons, *amici* urge the Court to hold unlawful and set aside the Commission's Order.

/s/ Paul W. Hughes
Paul W. Hughes
McDermott Will & Emery LLP
500 North Capitol Street, NW
Washington, D.C. 20006
(202) 756-8000

Erica Klenicki
Michael A. Tilghman II
National Association of Manufacturers
733 10th Street, N.W., Suite 700
Washington D.C. 20001

*Counsel for National Association*
*of Manufacturers*

Liz Dougherty
Business Roundtable
1000 Maine Avenue, SW
Suite 500
Washington, D.C. 20024

*Counsel for the Business Roundtable*

August 21, 2024

/s/ Jeffrey M. Harris
Jeffrey M. Harris
Tiffany H. Bates
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
tiffany@consovoymccarthy.com

*Counsel for Chamber of Commerce of the*
*United States of America and the Business*
*Roundtable*

Tyler S. Badgley
Mariel A. Brookins
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington D.C. 20062

*Counsel for Chamber of Commerce of the*
*United States of America*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7) because it contains 5,864 words excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

Dated: August 21, 2024 _/s/ Jeffrey M. Harris_

## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: August 21, 2024          _/s/ Jeffrey M. Harris_____