Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET,
DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON
RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

On Petitions for Review of an Order of the Federal Communications Commission

BRIEF OF FORMER FCC COMMISSIONER MICHAEL O'RIELLY AS
*AMICUS CURIAE* IN SUPPORT OF PETITIONERS

David P. Murray
Michael D. Hurwitz
Eric Schmidt
Matthew Johnson
Serena Lau
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC  20006
(202) 303-1000
dmurray@willkie.com
mhurwitz@willkie.com
eschmidt@willkie.com
mjohnson@willkie.com
slau@willkie.com

AUGUST 23, 2024                    *Counsel for Amicus Curiae*

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-7000 (Lead) (continued on next page)    Case Name: In re: MCP No. 185 et al. (continued on next page)

Name of counsel: David P. Murray

Pursuant to 6th Cir. R. 26.1, Michael O'Rielly

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

CERTIFICATE OF SERVICE

I certify that on August 23, 2024 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David P. Murray
David P. Murray
Counsel for Michael O'Rielly

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

## Continued Disclosure of Corporate Affiliations and Financial Interest

No. 24-7000 (Lead)   *MCP No. 185 Open Internet Rule*

No. 24-3449          *Ohio Telecom Association, et al. v. FCC, et al.*

No. 24-3450          *Ohio Cable Telecommunications Association v. FCC, et al.*

No. 24-3497          *MCTA - The Missouri Internet & Television Association v. FCC, et al.*

No. 24-3508          *CTIA – The Wireless Association v. FCC, et al.*

No. 24-3510          *Wireless Internet Service Providers Association v. FCC, et al.*

No. 24-3511          *ACA Connects v. FCC, et al.*

No. 24-3519          *Florida Internet & Television Association v. FCC, et al.*

No. 24-3538          *Texas Cable Association, et al. v. FCC, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................1

SUMMARY OF ARGUMENT ................................................................3

ARGUMENT .........................................................................................3

    I.    Congress Has Not Authorized the Commission to Classify Broadband as a Telecommunications Service Subject to Title II Regulation...................3

        A.    The Act's History Establishes that Broadband is an Information Service. ............................................................................4

        B.    The Act's Deregulatory Aims for Broadband Further Confirm that Congress Did Not Authorize the FCC to Regulate the Service Under Title II....................................................................9

        C.    Contemporaneously With Its Enactment and Consistently Thereafter, the Commission Has Interpreted the Act to Classify Broadband as an Information Service. ...........................................11

    II.    Subsequent Congressional Activity Confirms that the FCC Lacks Title II Authority Over Broadband. ....................................................14

CONCLUSION ...................................................................................18

CERTIFICATE OF COMPLIANCE .....................................................19

CERTIFICATE OF SERVICE ..............................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Nebraska,*
    600 U.S. 477 (2023).............................................................................15

*Detroit Receiving Hosp. & Univ. Health Ctr. v. Sebelius,*
    575 F.3d 609 (6th Cir. 2009) .............................................................17

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)...............................................................8, 16, 17

*FTC v. Bunte Bros., Inc.,*
    312 U.S. 349 (1941).............................................................................13

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005)...............................................................................7

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944).............................................................................13

*United States v. American Telephone & Telegraph Co.,*
    552 F. Supp. 131 (D.D.C. 1982).............................................5, 6, 7, 8

*West Virginia v. Env't Prot. Agency,*
    597 U.S. 697 (2022).............................................................................13

**FCC Orders**

*Appropriate Framework for Broadband Access to the Internet over
    Wireline Facilities,*
    20 FCC Rcd. 14853 (2005)................................................................12

*Appropriate Regul. Treatment for Broadband Access to the Internet
    over Wireless Networks,*
    22 FCC Rcd. 5901 (2007)..................................................................13

*Fed.-State Joint Bd. on Universal Serv.,*
    13 FCC Rcd. 11501 (1998).................................................10, 11, 12

*Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities,*
  17 FCC Rcd. 4798 (2002).....................................................................12

*Protecting and Promoting the Open Internet,*
  30 FCC Rcd. 5601 (2015)..........................................................2, 11, 13

*Regul. & Pol'y Probs. Presented by the Interdependence of Computer & Commc'n Servs. & Facilities,*
  28 F.C.C.2d 291 (1970) ...............................................................4, 5, 8

*Restoring Internet Freedom,*
  33 FCC Rcd. 311 (2018) ............................................................................2

*Safeguarding and Securing the Open Internet,*
  WC Docket Nos. 23-230 & 17-108, FCC 24-52 (May 7, 2024)..............2, 11, 13

*Second Computer Inquiry,*
  77 F.C.C.2d 384 (1980) ...................................................................5, 8

*United Power Line Council's Petition for Declaratory Ruling,*
  21 FCC Rcd. 13281 (2006) ....................................................................13

**Statutes**

47 U.S.C. § 153(24) .......................................................................3, 6, 8

47 U.S.C. § 153(50) .........................................................................7, 8

47 U.S.C. § 153(53) .........................................................................3, 7

47 U.S.C. § 201(a) ............................................................................17

47 U.S.C. § 201(b) ............................................................................17

47 U.S.C. § 202(a) ............................................................................17

47 U.S.C. § 214(d) ............................................................................17

47 U.S.C. § 230(a)(1) ..........................................................................9

47 U.S.C. § 230(a)(4) ..........................................................................9

47 U.S.C. § 230(b)(2)........................................................................9, 11

47 U.S.C. § 230(f)(2) ..............................................................8

47 U.S.C. § 257(b) ...............................................................10

47 U.S.C. § 1302(a) ...............................................................9

47 U.S.C. § 1702(h)(5)(D) ....................................................18

47 U.S.C. § 1754(b) .............................................................17

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 23 Stat. 115 ..............................................................15

Broadband Data Improvement Act, Pub. L. No. 110-385, 122 Stat. 4096 (2008) ...................................................................15

Children's Online Privacy Protection Act, Pub. L. No. 105-277, 112 Stat. 2681 (1998) ...............................................................15

Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, 134 Stat. 158 (2019) ....................................16

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) ...................................................................................1

Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 275 (2010) .........................15

**Other Authorities**

H.R. 3458, 111th Cong. (2009) .................................................14

H.R. 4585, 115th Cong. (2017) .................................................14

H.R. 5353, 110th Cong. (2008) .................................................14

H.R. 6393, 115th Cong. (2018) .................................................14

H.R. Rep. No. 104-458 (1996), *as reprinted in* 1996 U.S.C.C.A.N. 10 ....................7

H.R. Res. 353, 104th Cong., Cong. Rec. H1146 (1996) .........................10

S. 215, 110th Cong. (2007) .......................................................14

S. 2360, 109th Cong. (2006) .....................................................14

S. 3703, 112th Cong. (2012) ........................................................14

S. 682, 116th Cong. (2019) ..........................................................14

S. 74, 112th Cong. (2011) ............................................................14

## INTEREST OF *AMICUS CURIAE* [1]

Michael O'Rielly is a widely respected expert, advisor, and advocate on issues related to federal communications law and policy. He served as a commissioner of the Federal Communications Commission ("FCC" or "Commission") from 2013 through 2020. Before his appointment to the FCC, Mr. O'Rielly held a variety of leading staff positions and worked extensively on telecommunications issues during twenty years on Capitol Hill in both the U.S. Senate and the House of Representatives. At the time Congress passed the Telecommunications Act of 1996 ("Act"),[2] Mr. O'Rielly was a Telecommunications Policy Analyst for the House Committee on Energy and Commerce, which played a leading role in shaping the legislation. Mr. O'Rielly is currently principal at MPORielly Consulting Inc., an Adjunct Senior Fellow with the Free State Foundation, a member of APCO's International Advisory Council, a visiting fellow at the Hudson Institute's Center for the Economics of the Internet, and a senior fellow at the Media Institute.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus* certifies that no other person or entity, other than *amicus* or its counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or part. All parties consented to the filing of this brief. *See id*. 29(a)(2).

[2] The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), amended the Communications Act of 1934.

Through his many years of public service and thereafter, Mr. O'Rielly has championed sound public policy grounded in the laws duly adopted by the people's elected representatives in Congress. The Order on review, *Safeguarding and Securing the Open Internet*, WC Docket Nos. 23-230 & 17-108, FCC 24-52 (May 7, 2024) ("*Safeguarding Order*" or "*Order*"), represents the antithesis of such policy. By classifying broadband Internet access service ("broadband") as a "telecommunications service" subject to common-carrier regulation under Title II of the Communications Act, the Commission has wrongly asserted regulatory authority that Congress never granted.

Mr. O'Rielly brings a unique and useful perspective to this case. He had a seat at the table in crafting and debating the statutes at issue in Congress. He also had a vote at the Commission during two proceedings addressing broadband's regulatory classification. One of these proceedings culminated in the short-lived 2015 *Open Internet Order,* which, for the first time, classified broadband as a telecommunications service. The other culminated in the 2018 *Restoring Internet Freedom Order*, which returned broadband to its original and longstanding classification as an information service. *See generally Protecting and Promoting the Open Internet*, 30 FCC Rcd. 5601 (2015) ("*Open Internet Order*"); *Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) ("*Restoring Internet Freedom Order*").

**SUMMARY OF ARGUMENT**

The Commission's latest attempt to classify broadband as a telecommunications service subject to common-carrier regulation cannot be squared with the Act. Broadband is an information service under the Act's definitions. In adopting the Act, Congress did not intend to subject the then-emerging market for broadband to common-carrier Title II regulation. This conclusion follows from the clear terms of the Act itself, and it is confirmed by the Act's legislative history, the earlier FCC rulings upon which the relevant statutory terms were modeled, and subsequent congressional actions.

For nearly two decades following the Act's passage, the FCC consistently interpreted the Act to treat broadband as an information service. The Court should reject the *Order*'s unsupported application of Title II regulation to broadband, which contravenes the Act and exceeds the authority granted to the Commission by Congress.

**ARGUMENT**

**I.      Congress Has Not Authorized the Commission to Classify Broadband as a Telecommunications Service Subject to Title II Regulation.**

There has been significant public policy debate over whether broadband should be classified as an "information service" or a "telecommunications service" under the Act. *See* 47 U.S.C. §§ 153(24), 153(53). But the lineage of these statutory terms, as well as the Act's text, its legislative history, and the policy

objectives that motivated its passage all establish that Congress never intended to authorize the Commission to subject broadband to Title II common-carrier regulation.

### A. The Act's History Establishes that Broadband is an Information Service.

The Act did not coin the terms "information service" and "telecommunications service." Instead, these terms and their statutory definitions originated in a decades-old dichotomy that the FCC first recognized in the 1970s, as it grappled with the regulatory and policy implications of then-new technologies that were the progenitors of what today we call broadband.

In the first of its *Computer Inquiries* proceedings, the FCC distinguished nascent communications services that provided "data processing" capabilities, which it determined were best left unregulated, from other services that provided "message-switching" functions equivalent to the "point-to-point services offered by conventional communications common carriers"—i.e., traditional telephone service. *Regul. & Pol'y Probs. Presented by the Interdependence of Computer & Commc'n Servs. & Facilities*, 28 F.C.C.2d 291, 304-05, ¶¶ 39-42 (1970) ("*Computer I*"); *see also id.* at 297, ¶ 20 (finding that "there is no public interest requirement for regulation by government of [data processing] activities"). The FCC defined "data processing" as the "processing of information as distinguished from . . . message-switching," and it defined "message-switching" as the

"transmission of messages, between two or more points . . . wherein the content of the message remains unaltered." *Id.* at 295-96, ¶ 15.

The FCC subsequently revisited this regulatory dichotomy to accommodate the "phenomenon of distributed processing." *Second Computer Inquiry*, 77 F.C.C.2d 384, 391, ¶ 19 (1980) ("*Computer II*"). In the Commission's words, these and other "enhanced service[s] combine[] basic service with computer processing applications that act on the format, content, code, protocol, or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information." *Id.* at 387, ¶ 5. The Commission distinguished these "enhanced services" from the "basic transmission services" regulated under "traditional Title II concepts." *Id.* at 387, ¶¶ 5, 7. After considering the capabilities of enhanced services and how governmental regulation would impact them, *id.* at 418-23, ¶¶ 92-101, the Commission determined that "the *absence* of traditional public utility regulation" for enhanced services "offers the greatest potential for efficient utilization and full exploitation of the interstate telecommunications network." *Id.* at 387, ¶ 7 (emphasis added).

In *United States v. American Telephone & Telegraph Co.*, the D.C. Circuit recognized and reaffirmed this same distinction in its Modification of Final Judgment breaking up AT&T pursuant to the Sherman Act—except that it

introduced the term "information services" to refer to enhanced services, and it used the term "telecommunications services" to refer to basic services. *See* 552 F. Supp. 131, 178-79, 224, 227-28 (D.D.C. 1982) ("*MFJ*") (limiting the Bell operating companies ("BOCs") to providing only "telecommunications and exchange access service[s]," out of concern that the BOCs would use their monopoly of those services "to thwart the growth of their own competitors" in the burgeoning new "information services" markets).

The *MFJ* defined "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information which may be conveyed via telecommunications," *id.* at 179, and it identified "data processing services" and "electronic publishing services" as examples of information services, *id*. at 180, 229. The *MFJ* defined "telecommunications service" as an "offering for hire" of "telecommunications," and it defined "telecommunications" as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id*. at 229.

If these definitions sound familiar, that is because Congress adopted nearly identical definitions just over a decade later in the 1996 Act. *See* 47 U.S.C. § 153(24) ("The term 'information service' means the offering of a capability for generating, storing, transforming, processing, retrieving, utilizing, or making

available information via telecommunications, and includes electronic publishing . . . ."); *id*. § 153(53) (defining "telecommunications service" as "the offering of telecommunications for a fee directly to the public"); *id*. § 153(50) (defining "telecommunications" as "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received").

The Act's legislative history confirms that these terms are "defined based on the definition[s] used in the [*MFJ*]." H.R. Rep. No. 104-458, at 115 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. 10, 126. The *MFJ*, in turn, cited the *Computer Inquiries* as its source material, characterizing "enhanced services" as "essentially the equivalent of the 'information services' described in the [*MFJ*]." *MFJ*, 552 F. Supp. at 178 n.198.

Congress thus adopted the distinctions between "information service" and "telecommunications service" knowing that the Commission had determined that traditional Title II common-carrier regulation should apply *only* to services offering pure transmission, and *not* those also offering data processing, retrieving, and similar services. The fact that the FCC treated the proto-broadband services discussed above as what are now known as information services demonstrates that Congress likewise intended to treat broadband as an information service shielded from Title II regulation. *See, e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X*

*Internet Servs.*, 545 U.S. 967, 992 (2005) ("Congress passed the definitions in the Communications Act against the background of this regulatory history, and we may assume that the parallel terms 'telecommunications service' and 'information service' substantially incorporated their meaning, as the Commission has held."); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (finding that Congress did not authorize the FDA to regulate tobacco products because Congress had legislated "against the backdrop of the FDA's consistent and repeated statements that it lacked authority under the FDCA to regulate tobacco").

Given this lineage, it is not surprising that the same conclusion follows from the plain text of the Act. Broadband offers users the capability to generate, store, transform, process, retrieve, utilize, and make available information—precisely the functional capabilities that define an information service. 47 U.S.C. § 153(24); *MFJ*, 552 F. Supp. at 179; *Computer II*, 77 F.C.C.2d at 387, ¶ 5. Broadband is not limited to "pure transmission[s]" that leave "the content of the message . . . unaltered." *Computer II*, 77 F.C.C.2d at 420, ¶ 96; *Computer I*, 28 F.C.C.2d at 296, ¶ 15; 47 U.S.C. § 153(50). That is why the Act itself explicitly refers to "a service . . . that provides access to the Internet"—i.e., broadband—as an "information service." 47 U.S.C. § 230(f)(2).

**B.  The Act's Deregulatory Aims for Broadband Further Confirm that Congress Did Not Authorize the FCC to Regulate the Service Under Title II.**

Other provisions of the Act demonstrate that Congress sought to keep broadband largely unregulated, consistent with the status quo at the time and the FCC's rejection of a common-carrier regulatory regime for proto-broadband enhanced services.  Section 230 observes that "[t]he rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens," *id*. § 230(a)(1), and that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with *a minimum of government regulation*," *id*. § 230(a)(4) (emphasis added).  The Act therefore provides that "[i]t is the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*." *Id.* § 230(b)(2) (emphasis added).  Section 706 echoes these free-market, deregulatory policy objectives, directing the FCC to promote the deployment of broadband through "regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment." *Id.* § 1302(a); *see also id.*

§ 257(b) (directing the FCC to identify and eliminate market entry barriers to promote "vigorous economic competition").

Policymakers' statements during and shortly after the Act's passage evince the same deregulatory intent. *See, e.g.*, H.R. Res. 353, 104th Cong., Cong. Rec. H1146 (1996) (statement of Rep. Linder) (characterizing the 1996 Act as a "good bipartisan bill" that "will be remembered as the most deregulatory telecommunications legislation in history"). And, in one of the first FCC proceedings applying the 1996 Act's definitions of information service and telecommunications service, then-Senate Commerce Committee Chairman Senator John McCain affirmed that "[n]othing in the [] Act or the legislative history supports the view that Congress intended to subject information services providers to the current regulatory scheme applicable to common carriers which is, if anything, too intrusive and burdensome." *Fed.-State Joint Bd. on Universal Serv.*, 13 FCC Rcd. 11501, 11519, ¶ 37 (1998) ("*Universal Service Report*"); *see also id.* ("It certainly was not Congress's intent in enacting the supposedly pro-competitive, deregulatory 1996 Act to *extend* the burdens of current Title II regulation to Internet services, which historically have been excluded from regulation.") (emphasis in original). A contemporaneous letter to the FCC from a bipartisan group of Senators likewise confirmed that, rather than "expand traditional telephone regulation to new and advanced services," "a critical goal of

the 1996 Act was to diminish regulatory burdens as competition grew." *Id*. at 11520, ¶ 38.

The Commission's recent attempts to reclassify broadband as a telecommunications service subject to Title II common-carrier regulation are starkly at odds with the historical deregulatory objectives of Congress for the communications services marketplace, including the Act's express policy of "preserv[ing] the . . . free market" for broadband, "unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). To be sure, in both the *Open Internet Order* and the *Safeguarding Order*, the FCC implicitly concedes Title II's poor fit for broadband by resorting to using its forbearance authority to forestall for the time being the statute's greatest impacts—a futile attempt to retrofit a round hole to accommodate a square peg. *See Open Internet Order* at 5804-64, ¶¶ 434-536; *Safeguarding Order* ¶¶ 303-442.

###### C. Contemporaneously With Its Enactment and Consistently Thereafter, the Commission Has Interpreted the Act to Classify Broadband as an Information Service.

The FCC's early and longstanding bipartisan interpretations of the Act reinforce that Congress did not authorize the FCC to regulate broadband as a telecommunications service. In its 1998 *Universal Service Report* to Congress, the FCC's analysis mirrored its prior evaluation of proto-broadband data processing and electronic publishing services in the *Computer Inquiries*, concluding:

> We find that Internet access services are appropriately classified as information, rather than telecommunications, services. Internet access providers do not offer a pure transmission path; they combine computer processing, information provision, and other computer-mediated offerings with data transport.

*Universal Service Report* at 11536, ¶ 73; *see also id.* at 11530, ¶ 59 ("[I]f the user can receive nothing more than pure transmission, the service is a telecommunications service. If the user can receive enhanced functionality, such as manipulation of information and interaction with stored data, the service is an information service.").

The Commission subsequently considered this regulatory distinction in the context of cable modem service, which it likewise concluded was an information service:

> Consistent with the analysis in the *Universal Service Report*, we conclude that the classification of cable modem service turns on the nature of the functions that the end user is offered. We find that cable modem service is an offering of Internet access service, which combines the transmission of data with computer processing, information provision, and computer interactivity, enabling end users to run a variety of applications . . . . Accordingly, we find that cable modem service, an Internet access service, is an information service.

*Inquiry Concerning High-Speed Access to Internet Over Cable and Other Facilities*, 17 FCC Rcd. 4798, 4822, ¶ 38 (2002).

In the years that followed, the Commission considered various other emerging types of broadband, and it consistently held that each was an information service. *See Appropriate Framework for Broadband Access to the Internet over*

*Wireline Facilities*, 20 FCC Rcd. 14853, 14858, ¶ 5 (2005) (digital subscriber line ("DSL") broadband); *United Power Line Council's Petition for Declaratory Ruling*, 21 FCC Rcd. 13281, 13285, ¶ 7 (2006) (broadband delivered over power lines); *Appropriate Regul. Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd. 5901, 5908, ¶ 18 (2007) (wireless broadband).

The Commission's consistent interpretation of the Act to classify broadband as an information service—including contemporaneously with the Act itself—weighs heavily against the Commission's recent, about-face attempts to reclassify broadband as subject to Title II regulation. *Open Internet Order* at 5734, ¶ 308; *Safeguarding Order* ¶ 25; *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that the weight given to agency interpretations depends upon "those factors which give it power to persuade," including "consistency with earlier and later pronouncements"); *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 725 (2022) ("[A]s Justice Frankfurter has noted, 'just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.'") (quoting *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941)).

**II.      Subsequent Congressional Activity Confirms that the FCC Lacks Title II Authority Over Broadband.**

Over the years, Congress itself has had multiple opportunities to object to or repudiate the FCC's repeated determinations that broadband is an information service rather than a telecommunications service. But it has never done so. To the contrary, as *amicus* saw firsthand, in the years following the Act's adoption and the FCC's determination that broadband is an information service, Congress has considered *and repeatedly rejected* numerous bills that would have provided the FCC authority to impose various forms of common-carrier regulation on broadband. *See, e.g.*, S. 2360, 109th Cong. (2006); S. 215, 110th Cong. (2007); H.R. 5353, 110th Cong. (2008); H.R. 3458, 111th Cong. (2009); S. 74, 112th Cong. (2011); S. 3703, 112th Cong. (2012); H.R. 4585, 115th Cong. (2017); H.R. 6393, 115th Cong. (2018); S. 682, 116th Cong. (2019).

If Congress believed the Act already mandated—or even authorized—the FCC's classification of broadband as a Title II telecommunications service, new legislation would not have been needed to authorize common-carrier regulation of broadband. Instead, Congress consistently chose to leave intact the FCC's longstanding classification of broadband as an information service, signaling that the FCC had faithfully applied the law. Against this backdrop, the FCC's recent attempts to classify broadband as a Title II telecommunications service amount to an impermissible "assertion of administrative authority" to enact a regulatory

regime that Congress itself has chosen *not* to enact. *See Biden v. Nebraska*, 600 U.S. 477, 503 (2023) (holding that the Secretary of Education impermissibly seized from Congress the power to enact a student loan forgiveness program where Congress was "not unaware of the challenges facing student borrowers" and had chosen not to enact such a program).

Since 1996, Congress has also enacted several statutes giving the FCC (and other agencies) only targeted grants of authority over certain specific aspects of broadband and the Internet. *See, e.g.,* Children's Online Privacy Protection Act, Pub. L. No. 105-277, §§ 1303, 1306, 112 Stat. 2681, 2681-730-32, 2681-734-35 (1998) (authorizing the Federal Trade Commission to regulate the online collection of personal information from and about children); Broadband Data Improvement Act, Pub. L. No. 110-385, §§ 103, 106(h), 106(j), 122 Stat. 4096, 4096-98, 4101-102 (2008) (requiring the FCC to annually report on the availability and capabilities of broadband, and authorizing it to work with states on sharing data for broadband mapping, while making clear that the statute was *not* granting any public or private entity "any regulatory jurisdiction or oversight authority over providers of broadband services or information technology"); American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 6001, 123 Stat. 115, 512-16 (2009) (requiring the FCC to submit a national broadband plan to Congress); Twenty-First Century Communications and Video Accessibility Act of 2010, Pub.

L. No. 111-260, §§ 104, 202, 124 Stat. 2751, 2755-758, 2767-771 (2010) (authorizing the FCC to promulgate accessibility rules for certain communications services and products); Secure and Trusted Communications Networks Act of 2019, Pub. L. No. 116-124, § 2, 134 Stat. 158, 158-59 (2019) (directing the FCC to maintain a list of communications equipment or services that pose an "unacceptable risk" to national security).  Here, yet again, Congress had the opportunity to correct any difference of view with respect to the FCC's classification of broadband as an information service.  Its silence on this issue shows there is none.  And these narrow grants of circumscribed regulatory authority refute any notion that the FCC already had sweeping authority over broadband under Title II.

Taken together, Congress's repeated rejection of bills that would have granted the FCC expansive regulatory authority over broadband, and its enactment instead of a "distinct regulatory scheme" comprised of only targeted grants of authority, create a "plain implication" that Congress did *not* intend for the FCC to exercise Title II authority over broadband.  *See Brown & Williamson*, 529 U.S. at 144 (holding that "Congress' tobacco-specific statutes" and rejection of proposals to grant the FDA greater regulatory authority "have effectively ratified the FDA's long-held position that it lacks jurisdiction under the FDCA to regulate tobacco products," and that the "distinct regulatory scheme" Congress adopted "to address

the problem of tobacco and health . . . precludes any role for the FDA"); *id*. at 160-61 (holding that, for the same reasons, "Congress has directly spoken to the question at issue and precluded the FDA from regulating tobacco products"); *see also Detroit Receiving Hosp. & Univ. Health Ctr. v. Sebelius*, 575 F.3d 609, 615 (6th Cir. 2009) (recognizing that "subsequent acts can shape or focus [the statute's] meanings") (citing *Brown & Williamson*, 529 U.S. at 143).

More recent congressional actions confirm this analysis. In section 60506 of the 2021 Infrastructure and Investment Act ("IIJA"), for example, Congress directed the FCC "to facilitate equal access to broadband internet access service." 47 U.S.C. § 1754(b). Putting aside how the FCC and courts ultimately construe this directive, such a targeted grant of rulemaking authority would have made little sense if Congress viewed broadband as already subject to the Commission's existing authority to address gaps in access to telecommunications services. *See, e.g.*, *id*. §§ 201(a) (requiring providers to "furnish . . . service upon reasonable request"), 201(b) (prohibiting "unjust or unreasonable" practices), 202(a) (prohibiting "unjust or unreasonable discrimination" or "giv[ing] any undue or unreasonable preference or advantage to any particular . . . class of persons"), 214(d) (authorizing the Commission to order the provision of "adequate facilities" and line extensions). And the IIJA's requirement that the federal administrator of certain federal broadband grants may not engage in rate regulation, *id*.

§ 1702(h)(5)(D), confirms that Congress intended that even publicly-funded broadband networks be free of classic Title II-type obligations, consistent with broadband's information service status under the Act.

The historical actions and positions of Congress and the FCC strongly refute any authority of the agency to reclassify broadband as a Title II telecommunications service.  The current FCC's attempt to assert and exercise such sweeping authority over broadband should be rejected.

## CONCLUSION

For the foregoing reasons, *amicus curiae* Michael O'Rielly respectfully urges this Court to grant the petitions for review and vacate the *Order*.

Respectfully submitted,

/s/ David P. Murray
David P. Murray
Michael D. Hurwitz
Eric Schmidt
Matthew Johnson
Serena Lau
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC  20006
(202) 303-1000
dmurray@willkie.com
mhurwitz@willkie.com
eschmidt@willkie.com
mjohnson@willkie.com
slau@willkie.com

AUGUST 23, 2024                    *Counsel for* Amicus Curiae

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b) and 29(a)(5) because it contains 3,872 words, excluding portions exempted by Fed. R. App. P. 32(f).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P 32(a)(6) because it has been prepared in proportionally spaced typeface using Times New Roman, 14-point font, in Microsoft Word.

/s/ David P. Murray

David P. Murray

*Counsel for* Amicus Curiae

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 23, 2024, true and correct copies of the foregoing corrected brief were filed with the Clerk for the United States Court of Appeals for the Sixth Circuit and served on the parties through the Court's electronic CM/ECF filing system.

/s/ David P. Murray

David P. Murray

*Counsel for* Amicus Curiae