Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

# In the United States Court of Appeals for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN
INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER,
AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG.
45404, PUBLISHED MAY 22, 2024

On Petitions for Review

## BRIEF OF INTERVENORS FREE PRESS, NEW AMERICA'S OPEN TECHNOLOGY INSTITUTE, PUBLIC KNOWLEDGE, BENTON INSTITUTE FOR BROADBAND & SOCIETY, AND NARUC

YANNI CHEN
MATTHEW F. WOOD
FREE PRESS
1025 Connecticut Ave. NW, #1110
Washington, DC 20036
(202) 265-1490
*Counsel for Free Press*

RAZA PANJWANI
OPEN TECHNOLOGY INSTITUTE
NEW AMERICA
740 15th Street NW, #900
Washington, DC 20005
(202) 986-2700
*Counsel for OTI*

*(Additional counsel on next page)*

DANIEL WOOFTER
  *Counsel of Record*
KEVIN RUSSELL
GOLDSTEIN, RUSSELL &
  WOOFTER LLC
1701 Pennsylvania Ave. NW, #200
Washington, DC 20006
(202) 240-8433
*Counsel for Free Press, OTI, and
Public Knowledge*

JOHN BERGMAYER
HAROLD FELD
PUBLIC KNOWLEDGE
1818 N Street NW, #410
Washington, DC 20036
(202) 861-0020
*Counsel for Public Knowledge*

ANDREW JAY SCHWARTZMAN
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
*Counsel for Benton Institute for*
*Broadband & Society*

JAMES BRADFORD RAMSAY
ROBERT CAIN
NATIONAL ASSOCIATION OF
  REGULATORY UTILITY
  COMMISSIONERS
1101 Vermont Ave. NW, #400
Washington, DC 20005
(202) 257-0568
*Counsel for NARUC*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Sixth Circuit Rule 26.1, Intervenors make the following disclosures:

**Free Press:** Free Press is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Open Technology Institute:** The Open Technology Institute is a program within the New America Foundation, d/b/a New America. New America is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Public Knowledge:** Public Knowledge is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Benton Institute for Broadband & Society:** Benton Institute for Broadband & Society is a nonprofit corporation with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**National Association of Regulatory Utility Commissioners:**
NARUC is a quasi-governmental nonprofit corporation with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ....................................................... v

STATEMENT REGARDING ORAL ARGUMENT ................................... ix

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE .................................................... 1

    I.    Factual And Regulatory Background ........................................ 1

        A.   How The Internet Works .................................................. 2

        B.   Initial Regulatory Framework ........................................... 4

        C.   Early History Of Consumer Access To The Internet ........ 5

        D.   Telecommunications Act Of 1996 ..................................... 7

        E.   The Supreme Court's *Brand X* Decision .......................... 9

        F.   Broadband's Evolution And The Rise Of Threats To Internet Openness .......................................................... 13

            1.   Development Of The Edge And The Virtuous Circle ........................................................................ 13

            2.   Developing Threats To The Open Internet .............. 14

        G.   The FCC's Decade-Long Effort To Develop Light-Touch Open Internet Rules ............................................. 15

            1.   *Comcast v. FCC* And *Verizon v. FCC* ........................ 15

            2.   *USTA v. FCC* ............................................................ 16

            3.   *Mozilla v. FCC* ......................................................... 18

    II.   The *Order* On Review ...................................................... 19

        A.   Title II Classification ...................................................... 19

        B.   Light-Touch Regulations ................................................ 21

    III.   Procedural History ............................................................ 21

SUMMARY OF ARGUMENT .................................................... 22

STANDARD OF REVIEW ..........................................................27

ARGUMENT .........................................................................27

   I.   The Major-Questions Doctrine Does Not Apply........................27

        A.   Development Of The Major-Questions Doctrine .............28

        B.   *Brand X* Precludes Applying The Doctrine Here. ...........37

        C.   Reclassification Does Not Qualify As A Major Question. ...............................................................41

            1.   History.....................................................42

            2.   Breadth Of Authority Claimed................................43

            3.   "Modest Words" And "Vague Terms" ........................45

            4.   Economic And Political Significance ........................46

            5.   Common Sense.............................................55

        D.   In All Events, The Major-Questions Doctrine Is Not A Clear Statement Rule. ...................................56

   II.   The FCC's Interpretation And Application Of The Communications Act Is Lawful. .................................57

        A.   The FCC's Order Embodies The Best Interpretation Of The Statute And Facts. .................................58

        B.   The FCC's Interpretation Is Entitled To Deference Because It Is Reasonable. .................................63

        C.   *Brand X* Does Not Preclude The FCC's Interpretation As A Matter Of Statutory *Stare Decisis*. .........................65

CONCLUSION .....................................................................68

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021).......................................................... passim

*AT&T Corp. v. City of Portland*,
216 F.3d 871 (9th Cir. 2000)................................................. 10

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ....................................................... passim

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984), *overruled in part by Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ................................................. passim

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) .............................................. 16

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................... passim

*Gonzales v. Oregon*,
546 U.S. 243 (2006)........................................................... passim

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ....................................................... passim

*MCI Telecomms. Corp. v. AT&T*,
512 U.S. 218 (1994)........................................................... passim

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) (per curiam)................................ passim

*NARUC v. FCC*,
851 F.3d 1324 (D.C. Cir. 2017) ............................................. 9

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)........................................................... passim

*Nat'l Federation of Independent Businesses v. OSHA*,
595 U.S. 109 (2022) (per curiam) ............................... 33, 34, 44

*U.S. Telecom Ass'n v. FCC* (*USTA*),
825 F.3d 674 (D.C. Cir. 2016) ............................................. passim

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)................................................... 32, 33, 34

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ...................................... passim

*West Virginia v. EPA*,
597 U.S. 697 (2022)...................................................... passim

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)...................................................... passim

## Statutes

Omnibus Budget Reconciliation Act of 1993,
Pub. L. No. 103-66, 107 Stat. 312 ................................ 8

Telecommunications Act of 1996,
Pub. L. 104-104, 110 Stat. 153 .................................... 7

5 U.S.C. § 706(2)(A)................................................... 27, 65

5 U.S.C. § 706(2)(C)........................................................ 27

5 U.S.C. § 706(2)(E)................................................... 53, 65

20 U.S.C. § 1098bb(a)(1)................................................ 35

21 U.S.C. § 823(f)........................................................ 32

28 U.S.C. § 2342(1)........................................................ 1

42 U.S.C. § 264(a)...................................................... 33, 45

42 U.S.C. § 7409(b)(1) ................................................... 31

42 U.S.C. § 7411(a)(1) ................................................... 34

42 U.S.C. § 7411(b)(1) ................................................... 34

47 U.S.C. § 151 .................................................. 27, 39, 40, 63

47 U.S.C. § 153(24)............................................... 8, 10, 61

47 U.S.C. § 153(50).......................................................... 7

47 U.S.C. § 153(51)...................................................... 7, 43

47 U.S.C. § 153(53)..................................................... 10, 20

47 U.S.C. § 201(b)............................................... 27, 39, 40, 63

47 U.S.C. § 202 ...................................................................... 44

47 U.S.C. § 203(b)(2) ............................................................. 29

47 U.S.C. § 210 ...................................................................... 44

47 U.S.C. § 212 ...................................................................... 44

47 U.S.C. § 217 ...................................................................... 44

47 U.S.C. § 222 ...................................................................... 44

47 U.S.C. § 224 ...................................................................... 44

47 U.S.C. § 229 ...................................................................... 44

47 U.S.C. § 332 ............................................................... 17, 20

47 U.S.C. § 332(c)(1)(A) ..................................................... 8, 43

47 U.S.C. § 332(c)(2) ............................................................... 8

47 U.S.C. § 332(d)(1) ............................................................... 9

47 U.S.C. § 332(d)(2) ........................................... 9, 17, 46, 64

47 U.S.C. § 332(d)(3) ............................................................... 8

47 U.S.C. § 402(a) ................................................................... 1

47 U.S.C. § 1302(a) ................................................................. 7

## Rules

Fed. R. App. P. 26.1 ................................................................. i

Sixth Circuit Rule 26.1 ............................................................ i

## Regulations

*In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*,
20 FCC Rcd. 14986, 14988 ¶ 4 (2005) ................................... 15

*In re Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities*,
17 FCC Rcd. 4798, 4824 ¶ 41 (2002) ................................... 10

*In re Promoting the Open Internet, Report and Order On Remand, Declaratory Ruling, and Order*,
30 FCC Rcd. 5601 (2015) ................................. 14, 16, 18, 51

*In re Restoring Internet Freedom*,
  33 FCC Rcd. 311 (2018) .......................................................... 18

*In re Second Computer Inquiry*,
  77 F.C.C.2d 384 (1980) ........................................................... 4

### Other Authorities

John Fletcher, *The History of US Broadband*,
  S&P Global Market Intelligence (May 11, 2023),
  https://tinyurl.com/mu97btjm............................................... 47

Google, *From the garage to the Googleplex*,
  https://about.google/intl/ALL_us/our-story/ (last visited Sept. 11, 2024)
  .................................................................................................. 6

Joe Manna, *Lessons Learned from AOL & Facebook on Unbundling*,
  JOE MANNA BLOG (July 9, 2014),
  https://blog.joemanna.com/unbundling-aol-facebook/ ........................... 6

Nat'l Science & Media Museum, *A Short History of the Internet*,
  https://tinyurl.com/yc4z9jk7 (last visited Sept. 11, 2024) .................... 5

Brief for Respondent States and Consumer Groups,
  *Brand X*, 2005 WL 435899 .................................................... 38

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Intervenor Public Interest Groups Public Knowledge, Free Press, OTI, Benton Institute for Broadband & Society, and NARUC agree that oral argument should be heard, as the Court has already ordered.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The *Order* was published on May 22, 2024 (89 Fed. Reg. 45404). Petitions were timely filed. *See* Industry Petitioners' Brief (Br.) 5.

## STATEMENT OF THE ISSUES

1. Whether the FCC lawfully classified broadband internet access service as a Title II "telecommunications service" under the Communications Act.

2. Whether the FCC lawfully classified mobile broadband internet access service as a common carriage "commercial mobile service."

## STATEMENT OF THE CASE

### I. FACTUAL AND REGULATORY BACKGROUND

This case concerns the proper regulatory classification of broadband internet access service (BIAS), which provides high-speed internet access using wired and wireless connections. The nature of that service, and its regulatory status, have evolved in ways that are important to understand.

## A.   How The Internet Works

The basic unit of internet communication is the "packet," which is much like an envelope containing a letter. *See Verizon v. FCC*, 740 F.3d 623, 629 (D.C. Cir. 2014). Like envelopes, data packets contain information generated by a user and directed for delivery to a recipient selected by the user. To reach the recipient, the packet must also contain routing information, akin to the address on an envelope. An email or video created on a user's computer is divided into multiple packets, given appropriate routing information, and sent through the internet to a destination, where the packets are reassembled without change in the form or content of the information as sent. *Ibid.*

Ordinarily, the first step into the internet is the connection between a consumer's device and a BIAS provider. The BIAS provider operates a network consisting of connections between customers and its own computers, then interconnects its network to other networks that, in turn, ultimately connect to substantially every destination on the internet. To facilitate this service, providers generally run Domain Name System (DNS) servers that translate the easier-to-remember text of an email or web address into the numerical Internet Protocol (IP) address

used for internet routing (for example, translating "Google.com" to "142.251.46.206"). *See U.S. Telecom Ass'n v. FCC* (*USTA*), 825 F.3d 674, 699 (D.C. Cir. 2016). Providers may also save copies of a frequently accessed web page (for example, the home page of the Wall Street Journal) on their own servers, a process called "caching," which allows them to provide faster service to that site. *Ibid*.

Under this architecture, responsibility for generating and manipulating data is assigned to the computers at the edges of the network—the consumer's computer on one end and the computers of various "edge providers" on the other. Consumers might request a music file from Spotify, for instance. That request is transported to Spotify's computers, which then send the file through the internet to that customer. The network's only job is to transport those data packets unchanged to the destinations designated by the users. *See Verizon*, 740 F.3d at 629. Assigning intelligence to the edges of the network in this way allows rapid innovation, as computers at the network's edge are simply reprogrammed to provide new services, without the need for fundamental alterations to the network itself. *See, e.g.*, A1655-A1661 (Free Press Comments).

## B. Initial Regulatory Framework

Early data communications services were regulated under the Commission's *Computer Inquiries* orders. *See USTA*, 825 F.3d at 690-91. In 1980, the FCC declared that Title II applied to carriers' provision of "basic" service, defined as "a pure transmission capability" that included "analog or digital transmission of voice, data, video, etc." *In re Second Computer Inquiry* (*Computer II Order*), 77 F.C.C.2d 384, 419-20 ¶¶ 93, 96 (1980). The fact that computers might be involved—for example, to apply "bandwidth compression techniques, circuit switching, message or packet switching, error control techniques, etc. that facilitate economical, reliable movement of information"—did "not alter the nature of the basic service." *Id.* at 420 ¶ 95. The FCC called such computer operations that assist the basic service "adjunct-to-basic." *See USTA*, 825 F.3d at 691. "[E]nhanced services," on the other hand, were defined as "any offering over the telecommunications network which is more than a basic transmission service," including voicemail and email. *Computer II Order* 420-21 ¶ 97 & n.34.

### C.  Early History Of Consumer Access To The Internet

Early consumer internet access developed under this regime. Consumers reached the internet through dial-up modems connecting to Internet Service Providers (ISPs) such as America Online (AOL), Prodigy, and CompuServe through telephone lines provided by the customer's phone company and regulated as common carriage under Title II. *Verizon*, 740 F.3d at 629. These early ISPs offered their customers a portal that provided proprietary email, chatrooms, news, software downloads, and other content. At first, the ISPs used the internet to provide access only to their closed proprietary information services. After several years, companies like AOL began providing access to the broader internet, such that consumers could reach the few other internet sites. But that function was largely secondary, due in part to the relative dearth of useful destinations on the broader internet (there were only 130 websites in 1993) and the lack of powerful search engines to identify them (Google launched in 1998).[1] And even as late as 2001, for example, subscribers

---

[1] *See* Nat'l Science & Media Museum, *A Short History of the Internet*, SCIENCE & MEDIA MUSEUM, https://tinyurl.com/yc4z9jk7 (last visited Sept. 11, 2024); Google, *From the garage to the Googleplex*,

were forced to search AOL's portal for a link to the broader internet (the tiny globe on a tab near the upper middle in the image reproduced below):



*See* Joe Manna, *Lessons Learned from AOL & Facebook on Unbundling*, JOE MANNA BLOG (July 9, 2014), https://blog.joemanna.com/unbundling-aol-facebook/ (AOL Welcome Screen, circa 2001).

---

GOOGLE, https://about.google/intl/ALL_us/our-story/ (last visited Sept. 11, 2024).

### D. Telecommunications Act Of 1996

It was in this context that Congress enacted the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 153. Congress recognized the importance of fostering internet development. *See* 47 U.S.C. § 1302(a). But it did not respond by declaring internet access pipelines off-limits to federal regulation, as it easily could have done. Instead, Congress determined the level of regulation of specific services (including internet access) through a set of statutory definitions it charged the FCC with applying. Congress thus declared, "a telecommunications carrier *shall be* treated as a common carrier ... to the extent it is engaged in providing telecommunications services." 47 U.S.C. § 153(51) (emphasis added). It defined "telecommunications carrier" to mean a "provider of telecommunications services," which is "an offering of telecommunications for a fee directly to the public." *Ibid.* "Telecommunications," in turn, is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." *Id.* § 153(50).

Consumers can use telecommunications services to reach an "information service," defined as an "offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(24). The so-called "telecommunications management exception" to the definition excludes from this definition "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Ibid*.

The 1996 amendments retained an earlier set of provisions governing mobile services. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312. In 1993, Congress amended the Act to require that every "commercial mobile service" (as defined in Title III) be treated as common carriage governed by Title II, 47 U.S.C. § 332(c)(1)(A), while a provider of "private mobile service"—defined as any mobile service "that is not a commercial mobile service" or its "functional equivalent," *id*. § 332(d)(3)—"shall not … be treated as a common carrier." *Id*. § 332(c)(2). A "commercial mobile service" is defined as a mobile service "interconnected with the public switched network (as

such terms are defined by regulation by the Commission)." *Id.* § 332(d)(1)-(2). Thus, cellular voice is a "commercial mobile service," while taxi dispatch systems are an example of a "private mobile service." *See USTA*, 825 F.3d at 714-15.

Accordingly, as amended, the Communications Act treats a "provider of telecommunications services" or "commercial mobile service" as a Title II common carrier, while a provider of "information services" or "private mobile service" is governed by Title I. The categories are "mutually exclusive." *See NARUC v. FCC*, 851 F.3d 1324, 1325 (D.C. Cir. 2017).

### E.    The Supreme Court's *Brand X* Decision

After 1996, consumers began to have access to forms of "broadband" internet access as an alternative to dial-up modems. Broadband is an "always on," dramatically faster service. In 1998, the Commission classified broadband via Digital Subscriber Lines (DSL) as a telecommunications service. *USTA*, 825 F.3d at 691-92. Two years later, the Ninth Circuit decided that under the best reading of the statutory text, another form of broadband, cable modem service, likewise fell within

the definition of "telecommunications service." *AT&T Corp. v. City of Portland*, 216 F.3d 871, 876-80 (9th Cir. 2000).

In 2002, however, the Commission switched gears, declaring that cable modem service was a "single, integrated information service." *In re Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities* (*Cable Modem Order*), 17 FCC Rcd. 4798, 4824 ¶ 41 (2002). A divided Supreme Court upheld the *Cable Modem Order* in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 993-96 (2005). The Court recognized that cable modem service included a telecommunications component. *See, e.g.*, *id*. at 988. But at the time, this service was bundled with various other services offered by the cable modem service broadband provider, like email, user newsgroups, file-transfer service, DNS, and caching. *Id*. at 987. The question was whether this bundle should be treated as separate "offering[s]" under the statutory definitions, *see* 47 U.S.C. § 153(24), (53), subject to independent classifications, or a single offering with a single classification. *See id*. at 987. The Court held that the word "offer" was ambiguous and that the Commission had discretion under *Chevron* to treat "functionally

integrated" services as comprising a single "offer." *Id*. at 991; *see id*. at 989-91.

The Court also held that given the contemporaneous record, the Commission reasonably decided that "the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering." *Brand X*, 545 U.S. at 990; *see also id*. at 992. And the Court held the Commission reasonably decided that the single, integrated offering that included email services, webhosting, newsgroups, DNS, caching, and so on, supplied by the cable-modem service provider could be viewed as an information service. *See id*. at 997, 1000, 1003. The Court made clear, though, that these classifications were not "carved in stone," and the Commission "must consider varying interpretations and the wisdom of its policy on a continuing basis," including "in response to changed factual circumstances." *Id*. at 981 (quotation marks omitted).

Justice Breyer concurred on the ground that the FCC's interpretation was reasonable, "though perhaps just barely." *Brand X*, 545 U.S. at 1003. Justice Scalia dissented, joined by Justices Souter and Ginsberg. *Id.* at 1005. ISPs, Justice Scalia noted, indisputably "offer" a

telecommunications service, even if they also offer other services along with it. *Ibid*. He observed that "cable-modem service is popular precisely because of the high-speed access it provides, and ... once connected with the Internet, cable-modem subscribers often use Internet applications and functions from providers other than the cable company." *Ibid*. Given this, the dissent explained, the "relevant question is whether the individual components in a package being offered still possess sufficient identity to be described as separate objects of the offer, or whether they have been so changed by their combination with the other components that it is no longer reasonable to describe them in that way." *Id*. at 1006-07. A "pet store may have a policy of selling puppies only with leashes," for example, "but any customer will say that it *does* offer puppies—because a leashed puppy is still a puppy, even though it is not offered on a 'stand-alone' basis." *Id*. at 1008. In the context of internet service, Justice Scalia explained, "any reasonable consumer would perceive" their ISP as offering "two separate things"— telecommunications service, as well as information services like email. *See ibid.*

The dissent acknowledged that ISPs used some information services, like DNS and caching, to facilitate the telecommunications service. *Brand X*, 545 U.S. at 1012-13. But in "the context of telephone services, the Court recognizes a *de minimis* exception to contamination of a telecommunications service by an information service." *Id*. at 1012. And "DNS, in particular, is scarcely more than routing information, which is expressly excluded from the definition of 'information service.'" *Id*. at 1012-13 (citation omitted). "After all is said and done," the dissenters concluded, "it remains perfectly clear that someone who sells cable-modem service is 'offering' telecommunications." *Id*. at 1014.

## F. Broadband's Evolution And The Rise Of Threats To Internet Openness

In the years after *Brand X*, internet access was transformed again and with it, the nature of what ISPs offer.

### 1. Development Of The Edge And The Virtuous Circle

Starting around the turn of this century, broader availability of broadband led to a massive expansion in internet edge services, such as online sales, music and video streaming, internet telephony and videoconferencing, virtual private networks, and "cloud" computing and storage. *See In re Promoting the Open Internet, Report and Order On*

*Remand, Declaratory Ruling, and Order* (*Open Internet Order*), 30 FCC Rcd. 5601, ¶¶ 347-48 (2015). Although BIAS providers sometimes offered some of these services themselves (such as cloud storage), more were supplied by third-party innovators (like Apple's iCloud and Dropbox).

These new services, in turn, became a driving force in the rapid development and deployment of both broadband and the internet itself. Users' open access to edge-provider services drove demand for BIAS, which in turn led to increased network investment, which drove further innovation at the edge—what the Commission dubbed a "virtuous circle" of innovation. *See USTA*, 825 F.3d at 694 (quoting *Verizon*, 740 F.3d at 628, 634).

### 2. *Developing Threats To The Open Internet*

Over time, broadband providers like Comcast, AT&T, and Verizon started to compete with edge providers in lucrative markets, even while they controlled the connection those competitors needed to reach consumers. *Verizon*, 740 F.3d at 645. For example, AT&T sold on-demand video services that competed directly with Netflix and Hulu. *See ibid.* Verizon and AT&T also sold voice services and text messaging that competed with internet-based telephony services like Vonage and

independent messaging services like Apple iMessage, WhatsApp, and Signal. *See ibid.* Accordingly, the Commission has long recognized that broadband providers have the economic incentive, and the technical means, to interfere with their customers' access to competitors' services, and have done so in the past. *See USTA*, 825 F.3d at 694 (D.C. Circuit confirming reasonableness of that finding); *Verizon*, 740 F.3d at 646-49 (same).

## G. The FCC's Decade-Long Effort To Develop Light-Touch Open Internet Rules

Recognizing this reality, within months of the Court's decision in *Brand X*, the Commission published an *Internet Policy Statement* promising to act should broadband providers interfere with consumers' "access [to] the lawful Internet content of their choice." *In re Appropriate Framework for Broadband Access to the Internet over Wireline Facilities*, 20 FCC Rcd. 14986, 14988 ¶ 4 (2005). It was not long before that risk materialized and the FCC began a decade-long effort to establish reasonable measures to protect the open internet.

### 1. *Comcast v. FCC* And *Verizon v. FCC*

The FCC initially attempted to enact modest open internet rules under its Title I authority, but the D.C. Circuit twice rebuffed those

attempts, in part because it viewed such regulation as imposing common-carriage-type rules that could be applied only under Title II. *See Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010); *Verizon*, 740 F.3d at 650.

### 2. *USTA v. FCC*

In response, the Commission revisited BIAS classification. Taking into account the dramatic changes in internet services since the *Brand X* decision, the FCC found that BIAS, as now offered, met the definition of a telecommunications service under Title II. *See Open Internet Order*, *supra*.

The D.C. Circuit upheld the *Open Internet Order* in all respects. The Court found "extensive support in the record" for the conclusion that consumers have come to "perceive broadband service both as a standalone offering and as providing telecommunications." *USTA*, 825 F.3d at 697. "Even the most limited examination of contemporary broadband usage reveals that consumers rely on the service primarily to access third-party content." *Id*. at 698. The Court also held that the Commission reasonably found that DNS and caching fell within the "telecommunications management" exception to the definition of an "information service," "because both services facilitate use of the network

without altering the fundamental character of the telecommunications service." *Id*. at 705.

Finally, the court upheld the Commission's reclassification of mobile broadband, finding the decision "reasonable and supported by the record." *USTA*, 825 F.3d at 714. Whether mobile BIAS was a "commercial mobile service" subject to common carrier treatment, 47 U.S.C. § 332, turned on whether mobile BIAS was an "interconnected service," defined as "service that is interconnected with the public switched network (*as such terms are defined by regulation by the Commission*)." *Id.* § 332(d)(2) (emphasis added); *see supra* pp. 8-9. The D.C. Circuit held that the FCC permissibly found that mobile broadband is an "interconnected service" under the Act because it gives users the capability to communicate with all users of the public switched network, which the FCC reasonably redefined under its delegated authority to include both telephone numbers and IP addresses. *USTA*, 825 F.3d at 717-23. The FCC's conclusion that changes in how mobile BIAS was offered was supported by substantial evidence and justified the reclassification. *Id.* at 720-21, 723-24.

### 3. *Mozilla v. FCC*

After a change in administrations, the FCC repealed the *Open Internet Order* in 2018, reclassifying BIAS as a Title I information service. *In re Restoring Internet Freedom* (*RIFO*), 33 FCC Rcd. 311 (2018). Viewing itself bound by the Supreme Court's decision in *Brand X*, the D.C. Circuit deferred to the FCC's interpretation under *Chevron*, but held that certain aspects of the order were arbitrary and capricious under the APA. *Mozilla Corp. v. FCC*, 940 F.3d 1, 18-21 (D.C. Cir. 2019) (per curiam).

Judge Millett wrote separately to explain that "[i]f we were writing on a clean slate," whether BIAS was an information service "would seem to have only one answer given the current state of technology: No." *Mozilla*, 940 F.3d at 90. The FCC's reliance on DNS and caching alone to justify the information service classification, she reasoned, "blinks technological reality." *Id.* at 87; *id.* at 90 (explaining that "cable companies providing Internet service *do not 'offer' consumers DNS*, even though DNS is essential to providing Internet access" (quoting *Brand X*, 545 U.S. at 990 (first alteration omitted)). Under "any natural reading of the statute," she explained, "the technological mechanism for accessing third-party content is what broadband providers 'offer.'" *Id.* at 87. She

nonetheless agreed that the court was "bound to uphold the Commission's classification" under *Chevron*, because "*Brand X* allows that approach." *Id.* at 89. Judge Wilkins agreed. *Id.* at 94-95 (Wilkins, J., concurring).

The panel nonetheless remanded because the Commission acted arbitrarily and capriciously in violation of the APA. *Mozilla*, 940 F.3d at 59-66. First, the court held, the Commission failed "to consider the implications for public safety of its changed regulatory posture." *Id.* at 59. Second, "the Commission did not adequately address how the reclassification of broadband would affect the regulation of pole attachments," a means by which new entrants could gain access to existing telephone pole infrastructure to bring new competition to incumbent ISPs. *Id.* at 65. Third, the court held that the FCC failed to adequately consider reclassification's impact on the Lifeline Program, which uses fees from common carriers to "subsidize[] low-income consumers' access" to BIAS. *Id.* at 68; *see id.* at 68-70.

## II. THE *ORDER* ON REVIEW

### A. Title II Classification

In the *Order* now on review, the FCC reinstated broadband's classification as a Title II service. Respondents' brief describes the order

in detail, but at its core, the Commission concluded that this classification "represents the best reading of the text of the Act in light of the marketplace reality of how BIAS is offered and perceived today, as well as the factual and technical realities of how BIAS functions." A4 ¶ 6. Consistent with the views of Justice Scalia and Judge Millett, the Commission found that as offered today, BIAS provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." A63 ¶ 109 (quoting 47 U.S.C. § 153(53)). It further found that "DNS, caching, and other information-processing capabilities, when used with BIAS, either fall within the telecommunications systems management exception to the definition of 'information service,' or are separable information services not inextricably intertwined with BIAS, or both." A77 ¶ 128, *see* A77-A102 ¶¶ 129-153.

The FCC also returned to its prior understanding that mobile BIAS meets the statutory definition of "commercial mobile service," 47 U.S.C. § 332, subject to common carrier treatment. *See* A144. In reaching that conclusion, the Commission exercised its express authority under the statute to define the relevant terms in a way that best "reflects today's

technological landscape for mobile communications technology and the widespread use of mobile broadband services." A148 ¶ 223.

## B.    Light-Touch Regulations

The *Order* reinstated several open internet rules, which the FCC found "necessary to help ensure the health, vitality, and security of the entire Internet ecosystem." A411 ¶ 2; *see* A361 ¶ 599 (no blocking or throttling); A361-A364 ¶¶ 600-02 (no paid prioritization or practices that unreasonably interfere with or disadvantage consumers or edge providers); A381-A382 ¶ 647 (transparency requirement). However, the Commission exercised its statutory forbearance authority to preclude, among other things, ex ante rate regulation, A241-A242 ¶ 386, tariffing, A241-A244 ¶¶ 387-93, and certain interconnection and unbundling obligations, A247-A255 ¶¶ 398-420. It also provided temporary exemptions from certain reporting requirements for providers with 100,000 or fewer subscribers so as not to unduly impact small businesses. A343 ¶ 567; *see* A338-A339 ¶ 559.

## III.    PROCEDURAL HISTORY

ISPs filed petitions for review of the *Order* and sought a stay, which a motions panel granted. *See* A544. The panel reasoned the ISPs were

likely to succeed under the so-called "major-questions doctrine" because the Commission's *Order* "decides a question of vast economic and political significance," and because the panel thought the statute lacked "a clear mandate to treat broadband as a common carrier." A549-A550.

Chief Judge Sutton wrote separately to argue that the best reading of the statute "shows that Congress likely did not view broadband providers as common carriers under Title II," a reading with which, he suggested, "[a]ll nine justices in *Brand X* agreed." A553 (Sutton, J., concurring) (citing *Brand X*, 545 U.S. at 974, 987, and 1010 (Scalia, J., dissenting)); *but see Brand X*, 545 U.S. at 974, 987 (Court describing FCC's position, not Justices' views).

## SUMMARY OF ARGUMENT

**I.**     The major-questions doctrine does not apply to this case and, even if it did, it would not require invalidation of the *Order*.

The major-questions doctrine applies in extraordinary cases where there are compelling reasons to believe Congress would not have intended to authorize an agency's action. *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022) (citing *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 229 (1994), as early example). It considers the economic and political

significance of the agency action, its history, and whether the agency asserts extraordinarily broad authority based on "'modest words,' 'vague terms,' or 'subtle devices.'" *Id.* at 721-24 (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)) (cleaned up). The doctrine does not apply to this case for two main reasons.

*First*, the Supreme Court did not apply a major-questions analysis to the FCC's classification decision in *Brand X*, despite the doctrine being well-established at the time. To the contrary, the Court specifically found that Congress delegated the classification decision to the FCC, rather than reserving the question to itself. *Brand X*, 545 U.S. at 980; *see Gonzales v. Oregon*, 546 U.S. 243, 265 (2006) (major-question decision contrasting case before it and *Brand X*, in which "Congress cho[se] to delegate a power of this extent" to the agency).

*Second*, whether BIAS is properly classified as a Title I or a Title II service is not a major question under the doctrine.

Unlike typical major-questions cases, the statute clearly charges the FCC with making the classification decision by applying a statutory definition that Congress created based on the Commission's own pre-1996 Act regulatory regime. Congress thus made the major policy decisions

itself (*i.e.*, that services falling within the definition of a "telecommunications service" should be regulated under Title II) and delegated the FCC express authority to apply that definition based on the agency's expert fact-finding and technical expertise.

The classification undoubtably affects an important industry that has vocally resisted reclassification. But this alone is insufficient to trigger the doctrine, which is reserved for truly "extraordinary cases," not every instance in which a large industry opposes regulation. *West Virginia*, 597 U.S. at 723. Here, the political controversy surrounding net neutrality and BIAS classification is not comparable to the controversy in previous major-questions doctrine cases, such as tobacco regulation, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), assisted suicide, *Gonzales*, 546 U.S. at 267, COVID restrictions, *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764-65 (2021), student loan forgiveness, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023), or nationwide carbon regulation, *West Virginia*, 597 U.S. at 728-29. And no one can argue that the nascent broadband industry was considered so important to the economy in 1996 that Congress would deprive the FCC of authority to apply the statutory definitions to the facts on the ground,

especially since Congress had already empowered the FCC to regulate services far more widespread at the time as common carriage. Moreover, the question is not the size of the industry, but the economic consequences of the challenged regulation. And here, extensive financial data show that Title II classification and the possibility of reclassification have not significantly affected ISPs' investments or business decisions.

Finally, even when it applies, the major-questions doctrine is not a clear statement rule. It is a tool for discerning congressional intent, not resisting it. *Biden v. Nebraska*, 143 S. Ct. at 2378-79 (Barrett, J., concurring).

**II**.     The FCC's interpretation represents the best view of the statute and facts. As Justices Scalia, Ginsberg, and Souter, Judge Millett, and the FCC have all concluded, BIAS is a telecommunications service under the statute. *Brand X*, 545 U.S. at 1008-09 (Scalia, J., dissenting); *Mozilla Corp. v. FCC*, 940 F.3d 1, 86-94 (D.C. Cir. 2019) (Millett, J., concurring).

That said, because Congress expressly delegated the classification decision to the Commission, its conclusion need only be reasonable. Even though the Supreme Court overruled *Chevron* in some respects in *Loper*

*Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), it reaffirmed that courts must respect actual congressional delegations of authority to agencies. *Id.* at 2263. The Court thus retained the portion of *Brand X* recognizing that when Congress delegates such responsibility to an agency, the agency is permitted to change its interpretation so long as it acknowledges the change and provides an explanation that withstands APA review, as the FCC's decision does here. *Loper Bright*, 144 S. Ct. at 2263. And *Loper Bright* reaffirmed that agency fact-finding is entitled to deference under the APA, *id.* at 2261, a requirement that looms large here because the classification question turns in substantial part on "the factual particulars of how Internet technology works and how it is provided," *Brand X*, 545 U.S. at 991.

Deference is particularly due with respect to the Commission's classification of mobile BIAS because Congress expressly delegated the agency responsibility for defining the critical statutory terms. When "statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," then "the agency is authorized to exercise a degree of discretion." *Loper Bright*, 144 S. Ct. at 2263 & n.5 (providing parallel examples); *see* Br. 52-53 (ISPs do not argue otherwise).

Finally, petitioners' contrary claim that *Brand X* froze BIAS's classification in place for all time is meritless.

## STANDARD OF REVIEW

The Court evaluates whether the Commission's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C).

## ARGUMENT

### I.    THE MAJOR-QUESTIONS DOCTRINE DOES NOT APPLY.

Petitioners don't dispute that BIAS is subject to regulation under the Act; they simply argue that it must be regulated under Title I rather than Title II. The ISPs also don't dispute that Congress itself made the principal decisions about what kinds of services are subject to Title II regulation—if BIAS meets the definition of a "telecommunications service," it *must* be classified under Title II. Nor do they contest that Congress unambiguously delegated to the FCC the authority to determine whether BIAS has the *features* that qualify it as a telecommunications service as defined by the statute. *See Brand X*, 545 U.S. at 980 (quoting 47 U.S.C. §§ 151, 201(b)); *id*. at 991.

The ISPs nonetheless argue that the question before the Court is not whether the FCC's factual determinations are permissible, or whether its application of law to fact is reasonable, or even fully correct. Instead, they contend that the proper classification of BIAS is a "major question" and, therefore, the best reading of the statute and the facts is irrelevant—Title I classification is mandatory unless Congress clearly provided otherwise. *See* Br. 31-32. That position misconceives what constitutes a major question and how the doctrine works when it applies.

## A.  Development Of The Major-Questions Doctrine

The major-questions doctrine developed for extraordinary cases when "common sense" strongly suggests Congress did not intend to confer upon an agency a newly asserted, previously unrecognized authority to decide questions of enormous significance. *See West Virginia v. EPA*, 597 U.S. 697, 722 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

The Supreme Court has identified *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218 (1994), as the first application of the doctrine. *See West Virginia*, 597 U.S. at 723; *see also* A549 (Stay Op. citing same). In that case, the FCC attempted to deregulate a portion of the long-distance

telephone industry by exempting non-dominant carriers from tariff filing requirements, invoking its statutory power to "modify any requirement" under Title II "for good cause shown." *See MCI*, 512 U.S. at 224 (quoting 47 U.S.C. § 203(b)(2)). Invoking the principles of what would become known as the major-questions doctrine, the Court rejected the FCC's attempt to find the power to make a "'radical or fundamental change'" to a statutory scheme in such "oblique or elliptical language." *West Virginia*, 597 U.S. at 723 (quoting *MCI*, 512 U.S. at 229).

Notably, while the ISPs describe the doctrine as requiring clear statutory authority before an agency can impose onerous regulation (like rate regulation) on its industry, as Justice Gorsuch has explained, the first application of the doctrine in *MCI* had the opposite effect. The Court "rejected the [FCC]'s attempt to eliminate rate regulation for the telecommunications industry based on a 'subtle' provision that empowered the FCC to 'modify' rates." *West Virginia*, 597 U.S. at 746-47 (Gorsuch, J., concurring) (quoting *MCI*, 512 U.S. at 231).

In *FDA v. Brown & Williamson Tobacco Corp.*, the Court applied the doctrine to reject the FDA's attempt to regulate tobacco products under its authority over "drugs" and "devices." 529 U.S. at 126-27. The question

before the Court was, as always, "whether Congress *in fact* meant to confer the power the agency has asserted." *West Virginia*, 597 U.S. at 721 (emphasis added). The Court recognized that, at the time, *Chevron* directed that "a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Brown & Williamson*, 529 U.S. at 159. "In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation." *Ibid.* And the Court concluded that the case before it was such an "extraordinary case[]," given "the 'history and breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion," which "provide[d] a 'reason to hesitate before concluding that Congress' meant to confer such authority." *See West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159-60) (cleaned up).

One year later, the Supreme Court held that the Clean Air Act does not allow the EPA to consider implementation costs when setting national ambient air quality standards. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). Similar to *MCI*, the question was whether the agency had the authority to reduce a regulatory burden, this time by

considering implementation costs. *See id.* at 467-68. The Court rejected the argument that the statute's requirement to set standards "'requisite to protect the public health' with 'an adequate margin of safety,'" *id.* at 465 (quoting 42 U.S.C. § 7409(b)(1)), implicitly allowed cost considerations, *id.* at 468-69. "Just as" the Court "found it 'highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion— and even more unlikely that it would achieve that through such a subtle device as permission to "modify" rate-filing requirements,' *MCI* [512 U.S.] at 231," the Court found "it implausible that Congress would give to the EPA through these modest words the power to determine whether implementation costs should moderate national air quality standards." *Id.* at 468.

The doctrine was also applied in *Gonzales v. Oregon*, 546 U.S. 243 (2006), where the Court rejected the U.S. Attorney General's claim of authority to "rescind the license of any physician who prescribed a controlled substance for assisted suicide, even in a State where such action was legal." *West Virginia*, 597 U.S. at 722. "The Attorney General argued that this came within his statutory power to revoke licenses

where he found them 'inconsistent with the public interest.'" *Ibid.* (quoting 21 U.S.C. § 823(f)). But the Court "considered the 'idea that Congress gave him such broad and unusual authority through an implicit delegation not sustainable.'" *Ibid.* (quoting *Gonzales*, 546 U.S. at 267) (cleaned up). Critically, the Supreme Court contrasted the case before it with the statute in *Brand X*, explaining that "[w]hen Congress chooses to delegate a power of this extent, it does so not by referring back to the administrator's functions but by giving authority over the provisions of the statute he is to interpret. *See, e.g.*, [*Brand X*], 545 U.S. 967." *Gonzales*, 546 U.S. at 265.

The Court applied the same principles in *Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014), to assess the validity of the EPA's novel interpretation of the "term 'air pollutant'" as including "greenhouse gases," from which the Administrator claimed authority to regulate such emissions. *See id*. at 316. Surveying the cases just discussed, the Court explained that "in certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed

to be lurking there." *West Virginia*, 597 U.S. at 723 (quoting *Utility Air*, 573 U.S. at 324).

More recent cases have continued to apply the doctrine to discern congressional intent in cases involving surprising claims of extraordinary agency authority based on obscure or ambiguous statutory sources. In *Alabama Ass'n of Realtors v. Dep't of Health and Human Services*, 594 U.S. 758 (2021) (per curiam), the Court rejected the CDC's attempt to impose a nationwide eviction moratorium during the COVID-19 pandemic citing its authority to adopt measures "necessary to prevent" the spread of disease. *Id*. at 761, 764-65 (quoting 42 U.S.C. § 264(a)). The Court emphasized the "unprecedented" nature of the agency's action and "the sheer scope of the CDC's claimed authority," finding the statute's language a "wafer-thin reed on which to rest such sweeping power." *Id*. at 764-65.

And in *National Federation of Independent Businesses v. OSHA*, 595 U.S. 109 (2022) (per curiam), the Court invalidated the Administration's COVID-19 vaccine mandate for large employers, which "ordered 84 million Americans to either obtain a COVID-19 vaccine or undergo weekly medical testing at their own expense." *Id*. at 117. The Court found

it "telling that OSHA, in its half century of existence," had never before relied on its authority to regulate occupational hazards to impose "a broad public health regulation of this kind." *Id.* at 119.

In *West Virginia*, the EPA sought to implement a plan to reduce carbon dioxide emissions from existing coal- and natural-gas-fired power plants in a manner that required a significant shift in the nation's electricity generation mix. 597 U.S. at 713-15. The EPA relied on Section 111 of the Clean Air Act, which authorized the Administrator to approve "standards of performance" to regulate certain pollutants from existing sources as submitted by each State, 42 U.S.C. § 7411(b)(1), and defined "standard of performance" as "the best system of emission reduction," *id.* § 7411(a)(1). *West Virginia*, 597 U.S. at 709, 732. The EPA claimed to have discovered "'unheralded power'" in a rarely used statute, allowing it to adopt a regulatory program that Congress had repeatedly declined to enact. *Id.* at 724 (quoting *Utility Air*, 573 U.S. at 324). This newfound power, according to the Court, was highly consequential, beyond the EPA's core expertise, and significantly affected the American economy. *Id.* at 724-32. The Court thus determined that Section 111(d) of the Clean Air Act did not grant the EPA the authority to devise emissions caps

based on the generation shifting approach proposed in the Clean Power Plan. *Id.* at 732-35.

While some of the major-questions doctrine cases involved agency attempts to impose new burdens, the most recent, like the very first, rejected an agency's attempt to remove a burden Congress had imposed. In *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), the Supreme Court rejected the Secretary of Education's attempt to entirely cancel about $430 billion in student loan debt for 43 million borrowers. Like the FCC in *MCI*, the Secretary asserted power to eliminate that burden under a vague provision the Court viewed as an unlikely repository for a previously unrecognized power. That provision authorized the Secretary to "'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Education Act as the Secretary deems necessary in connection with a war or other military operation or national emergency.'" *Id.* at 2368 (quoting 20 U.S.C. § 1098bb(a)(1)) (cleaned up). The Secretary argued that the cancellation was warranted as a response to the financial harms of the COVID-19 pandemic. *Id.* at 2364. Particularly given the enormous fiscal consequences of that decision—amounting to "nearly one-third of the

Government's $1.7 trillion in annual discretionary spending"—the Court concluded that "'the basic and consequential tradeoffs' inherent in a mass debt cancellation program 'are ones that Congress would likely have intended for itself.'" *Id.* at 2373, 2375 (quoting *West Virginia*, 597 U.S. at 730).

Justice Barrett concurred. The major-questions doctrine, she explained, is an interpretive tool that emphasizes the importance of context when construing delegations to administrative agencies, rather than a substantive canon or clear statement rule. *See Biden v. Nebraska*, 143 S. Ct. at 2378-79. Applying the doctrine in this manner, Justice Barrett explained, situates the statutory text within its full context, including constitutional structure and reasonable expectations about how Congress delegates authority. *Id.* at 2379-81. And while the doctrine leads courts to be skeptical of broad agency claims of authority, especially on major issues, it "does not mean that courts have an obligation (or even permission) to choose an inferior-but-tenable alternative that curbs the agency's authority" when text and context truly support the agency's view. *Id.* at 2381.

\*     \*     \*

The major-questions doctrine thus applies only in genuinely extraordinary cases, when an agency claims an unheralded power based on thin statutory support on questions of such unusual significance that common sense suggests Congress would have made the key decisions itself or made its delegation of that question to an agency especially clear. It is not, as the ISPs portray it, a new clear-statement rule based on a judicial deregulatory preference to be applied whenever a large industry chafes under an agency's performance of its ordinary duty to apply statutory definitions that have regulatory consequences ordained by Congress itself.

## B.  *Brand X* Precludes Applying The Doctrine Here.

The Supreme Court has already decided not to apply the major-questions doctrine to the very same agency determination presented by the order on review here. Had the doctrine applied to FCC classification decisions, the Supreme Court would have applied it in *Brand X*, just as it applied the doctrine to the FCC's de-tariffing decision in *MCI* a decade earlier. A few years later in *Gonzales*, the Supreme Court pointed to *Brand X* as an example of a case properly *not* applying the major questions doctrine because Congress had "cho[sen] to delegate" the

classification decision to the agency rather than make the decision itself. *Gonzales*, 546 U.S. at 265 (citing *Brand X*, 545 U.S. 967). This Court is not free to disagree.

Petitioners simply ignore this obvious and important point. They do not, and cannot, claim that the Supreme Court applied the major-questions doctrine in *Brand X*. It is no answer that the doctrine had not yet been developed—the Supreme Court has explained that although the *label* may have come later, the doctrine itself was applied in cases like *MCI* (1994), *Brown & Williamson* (2000), and *Whitman* (2001), well before *Brand X* in 2005. *See West Virginia*, 597 U.S. at 722-23. Nor did the Court simply overlook the doctrine in *Brand X*—the respondents expressly invoked *MCI* and *Brown & Williamson*. *See* Brief for Respondent States and Consumer Groups, *Brand X*, 2005 WL 435899. Nor can the ISPs contend that the doctrine did not apply in *Brand X* because the FCC had chosen a less onerous form of regulation in that case; as discussed, the very first major-questions doctrine case was a challenge to the FCC's attempt to reduce regulatory burdens. And the Court applied the same principles to reject a deregulatory push in *Whitman* (as it would do later in *Biden v. Nebraska* as well).

38

Moreover, even were we to engage in the fiction that the major-questions doctrine was developed after *Brand X*, nothing in that decision shows that the Court regarded it as presenting the kind of "extraordinary case" to which the doctrine applies. No member of the Court suggested that classifying BIAS as a Title II service would be a question that Congress presumably would make itself and withhold from the FCC. On the contrary, the Court concluded that Congress intended the Commission to decide the classification question by applying the statutory definition of "telecommunications service" drawn from prior FCC orders, based on its factual findings about the nature of the service. *Brand X*, 545 U.S. at 980 (citing 47 U.S.C. §§ 151, 201(b)); *id.* at 991 (question turns on "the factual particulars of how Internet technology works and how it is provided"); *id.* at 1002-03 (determination involves a "subject matter that is technical, complex, and dynamic" (cleaned up)).

To be sure, the Supreme Court has recently modified the *Chevron* framework that was applied in *Brand X*, but not in any way that makes any difference to the major-questions issue. "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court under the APA" continues to be "recognizing

constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (cleaned up). In *Brand X*, the Supreme Court concluded that Congress had delegated to the FCC the authority to classify broadband by applying the statute's "telecommunications service" definition because that delegation was clear from the best reading of the statute, not because the statute was simply silent or ambiguous. *See* 545 U.S. at 980 (citing 47 U.S.C. §§ 151, 201(b)); *see also Gonzales*, 546 U.S. at 265.

As discussed below, that has consequences for the *degree* of deference due the FCC's decision here. *See infra* pp. 63-65. But the more important point for the present discussion is that the clear delegation takes this case outside the purview of the major-questions doctrine, which only applies when there is reason to believe that Congress "intended" to reserve the question "for itself." *See West Virginia*, 597 U.S. at 730. When the Supreme Court determines that Congress *has* delegated a question to an agency, it makes no difference whether a later court might think the delegated question economically or politically important. And

*Brand X*'s conclusion that Congress delegated such authority in this case is binding on this Court as a matter of *stare decisis*. *See Loper Bright*, 144 S. Ct. at 2272-73.[2]

### C. Reclassification Does Not Qualify As A Major Question.

Even setting *Brand X* aside, whether BIAS is subject to regulation under Title I instead of Title II is not a major question.

At its core, the major-questions doctrine is an application of "common sense," requiring strong evidence of congressional authorization in "certain extraordinary cases," having truly unusual economic and political significance, when considerations of the "history" and "breadth" of the authority asserted by the agency contrasts with the "modest words" or "vague terms" supposedly conveying that authority. *See West Virginia*, 597 U.S. at 720-25 (quotation marks omitted). Those considerations preclude applying the major-questions doctrine to the FCC's classification decision here.

---

[2] Petitioners' separate argument that *Brand X* affirmatively *prohibits* classification of BIAS as a Title II service as a matter of *stare decisis* is wrong for the reasons discussed below. *See infra* pp. 65-67.

### 1.    *History*

In typical major-questions doctrine cases, the asserted authority is discovered for the first time long after the authorizing statute was enacted, following years of common understanding that the power was lacking. Examples include the FDA's attempt to regulate tobacco as a "drug" or "device," *Brown & Williamson*, 597 U.S. at 126-27, and the EPA's claim of authority to regulate electricity generation under the Clean Air Act, *West Virginia*, 597 U.S. at 728-29.

In contrast, it was understood from the beginning that broadband was potentially subject to classification under Title II and that its regulatory status would depend on whether the service as it evolved met the statutory definition of "telecommunications service." That the FCC would make classification decisions based on the statutory criteria is particularly unsurprising given that the statute itself largely codified the regulatory regime the Commission had developed on its own starting in the late 1970s. *See Brand X*, 545 U.S. at 976-77. And petitioners point to no evidence that anyone complained the FCC was making a decision Congress had reserved for itself when the Commission concluded in 1998

that DSL met the definition of a Title II telecommunications service. *See USTA*, 825 F.3d at 691-92.

### 2. *Breadth Of Authority Claimed*

Major-questions doctrine cases typically involve an agency claiming broad, unbounded authority to make rules largely free from statutory constraints. The Supreme Court has applied the doctrine when it has perceived, for example, that an agency attempted to "rewrite the Education Act" through student loan forgiveness, *Biden v. Nebraska*, 143 S. Ct. at 2373, develop its own regulatory regime for carbon emissions, *West Virginia*, 597 U.S. at 728-29, or impose a nationwide eviction moratorium, *Realtors*, 594 U.S. at 764-65 ("It is hard to see what measures this interpretation would place outside the CDC's reach, and the Government has identified no limit … .").

Here, Congress made the major policy decisions itself, defining the characteristics of a service subject to mandatory common carriage regulation under Title II. *See* 47 U.S.C. § 153(51) (mandating Title II classification for "telecommunications services" of a "telecommunications carrier" as defined in the statute); *id.* § 332(c)(1)(A) (same for a "commercial mobile service"). Congress then unambiguously delegated to

the FCC responsibility for classifying services by applying these statutory definitions, expecting the agency to use its expertise to determine relevant facts about a service at the time of the classification. *See Brand X*, 545 U.S. at 980, 991, 1002. Congress further dictated many of the consequences flowing from the classification rather than giving the FCC open-ended power to enact whatever regulations it sees fit. *See, e.g.*, 47 U.S.C. §§ 202, 210, 212, 217, 222, 224, 229.

This case is also different from the typical major-questions doctrine case in which the agency's assertion of authority was surprising because the subject matter had traditionally been regulated by another agency, by the States, or left unregulated. *Compare OSHA*, 595 U.S. at 113 (OSHA regulating vaccines); *Realtors*, 594 U.S. at 764-65 (CDC regulating housing markets); *Gonzales*, 546 U.S. at 249 (Attorney General regulating physician-assisted suicide); *Brown & Williamson*, 529 U.S. at 125 (FDA regulating cigarettes). Unlike those cases, there is no question that BIAS is subject to regulation by the FCC. The question is *which Title* of the Act provides the relevant regulation. The major-questions doctrine does not apply to disputes about the degree of regulation when Congress intended a service to be regulated, made the principal decisions about which types

of service should be subject to which regimes, and left to an agency only the responsibility for applying those statutory standards to the facts of each service. Any other rule would open the door to routine invocation of the major-questions doctrine in a multitude of ordinary administrative law cases, displacing the APA's standards for judicial review with a judge-made doctrine expressly reserved for extraordinary cases.

### 3. *"Modest Words" And "Vague Terms"*

Major-questions cases are also typified by agencies making belated claims to have found surprising authority in "modest words," "vague terms," or "oblique or elliptical language." *West Virginia*, 597 U.S. at 723 (cleaned up). For example, the Court rejected the Surgeon General's attempt to impose an eviction moratorium during the pandemic premised on his authority to "enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases." *Realtors*, 594 U.S. at 761, 765 (quoting 42 U.S.C. § 264(a)).

In contrast, Congress expressly directed the FCC to apply specific statutory definitions, as it has done routinely since passage of the 1996 Act. *See Brand X*, 545 U.S. at 980. Although it may not be free from

ambiguity, the definition of "telecommunications service" is not the kind of "oblique or elliptical language" one might think incapable of being used to determine BIAS's regulatory classification. *See, e.g.*, *Tennessee v. Becerra*, --- F.4th ----, 2024 WL 3934560, at *8 (6th Cir. Aug. 26, 2024) (major-questions doctrine did not apply in case where statute "set[] forth a sufficiently intelligible principle supporting Congress's delegation") (citing *Whitman*, 531 U.S. at 474). And in the context of mobile BIAS, Congress expressly delegated to the FCC the power to resolve any statutory ambiguity in the relevant terms. *See* 47 U.S.C. § 332(d)(2); *infra* p.64.

### 4.    *Economic And Political Significance*

The ISPs nonetheless insist that the economic and political significance of the classification alone invokes the major-questions doctrine. But that claim misconceives the inquiry and mischaracterizes the relevant facts.

*First*, while the classification decision no doubt applies to a large industry and affects a significant portion of the economy, that itself does not give rise to a major question. If it did, every regulation affecting banking, aviation, agriculture, or other major industries would be subject

to the doctrine, not just "extraordinary cases." The question instead must be whether the *substance* of the regulation is of such *extraordinary and unexpected* economic significance as to evoke the strong conviction that Congress would have decided for itself whether to impose it. *E.g.*, *Biden v. Nebraska*, 143 S. Ct. at 2375 (applying major-questions doctrine to decision whether to cancel $430 billion in student debt).

Moreover, that question must be asked from the perspective of the time of the statute's enactment. *See West Virginia*, 597 U.S. at 721 (question is "whether Congress in fact meant to confer the power the agency has asserted"). How the industry subsequently developed cannot amend the statute to take away authority Congress conferred upon the FCC in 1996. And the ISPs point to no evidence that the nascent broadband industry was considered so important to the economy when the 1996 Act was passed that Congress would not leave its regulatory status to the FCC's application of statutory definitions to the facts on the ground, as Congress had done with far more widespread services at the time.[3] Nor, again, do the ISPs point to any huge political outcry when

---

[3] "In 1998 just 0.6% (608k) of US homes had broadband" of any kind. John Fletcher, *The History of US Broadband*, S&P Global Market Intelligence (May 11, 2023), https://tinyurl.com/mu97btjm.

DSL, the first form of broadband, was classified as a Title II service in 1998.

*Second*, even looking at the industry today, the ISPs overstate the significance of classifying BIAS under Title II. Major-question status cannot turn on the size of the regulated industry, lest ordinary statutory interpretation be applied only to the little guys. Instead, the Court has always considered the economic consequences of the *regulation at issue*. *E.g.*, *Biden v. Nebraska*, 143 S. Ct. at 2375. And here, the consequence of Title II classification is that BIAS providers are prohibited from (a) blocking lawful content, applications, services, or non-harmful devices, A361 ¶ 599; (b) impairing or degrading lawful internet traffic, *ibid*; (c) favoring certain traffic for payment or to benefit affiliates, A361-A362 ¶ 600; (d) engaging in practices that unreasonably interfere with or disadvantage consumers or edge providers, A362-A364 ¶¶ 601-02; and (e) they also must disclose network practices, performance characteristics, and commercial terms, A381-A382 ¶ 647. And in addition to forbearing from *many* of the regulations applied to other Title II telecommunications services, the Order addresses potential impacts of the regulations on small businesses, providing temporary exemptions from certain reporting

requirements for providers with 100,000 or fewer subscribers. A343 ¶ 567; A338-A339 ¶ 559.

The ISPs fail to describe any way in which these rules will seriously affect their businesses or how they provide internet access. Indeed, they have long insisted that the rules principally forbid them from doing things they have no intention of doing. For example, in describing regulatory trends under the header "**Broadband**" in its most recent Annual Report, Verizon wrote to investors: "In 2023, the FCC proposed to return to regulation of broadband services under Title II of the Communications Act," which "would revive and expand the FCC's 2015 approach ... to regulating broadband internet access services as telecommunications services subject to utilities-style common carriage regulation." Verizon Communications Inc., Annual Report (Form 10-K) 10 (Feb. 9, 2024). "Regardless of the regulation," the ISP told its shareholders, "Verizon remains committed to the open internet." *Ibid.*

Indeed, "not a single ISP representative raised the issue of Title II on their full-year 2023 results calls," despite full awareness of the likelihood of reclassification. A2204 (Free Press *Ex Parte* Letter). And "not one analyst asked a question about the issue on any of these calls." *Ibid.*

Instead, these ISPs' own statements to shareholders and securities regulators reveal that companies represented by Petitioners remain focused on investing in technology upgrades, competition, and meeting consumer demand for high-speed broadband. *Ibid.* The absence of discussion about Title II in investor communications is strong evidence that the regulatory classification is not a significant factor in ISPs' investment decisions. *Ibid.*

This "should come as no surprise to anyone who takes the time to understand the industry." A2204. Intervenor Free Press comprehensively analyzed recent financial data, investor communications, and public statements from major ISPs, as well as financial data from the U.S. Census Bureau. *See* A2169-A2238 (analyzing financial reporting by AT&T, Verizon, Comcast, Charter, Altice, Cable One, Shentel, Lumen, Frontier, T-Mobile, and US Cellular). The "lessons and the ISPs' own data from the past decade make it very clear that FCC regulation generally, and its Title II-based Net Neutrality rules specifically, have little to no impact on ISP network deployment decisions." A2204 (underlining removed). Contrary to the ISPs' claims in the rulemaking and here, the industry elsewhere admits that capital expenditures often fluctuate due

to technology cycles, not regulation. *See, e.g.*, A2196 (AT&T "itself told the Commission in 2010 that 'there is no reason to expect capital expenditures to increase by the same amount year after year. Capital expenditures tend to be 'lumpy.'" (citation omitted)). All these leading ISPs reported steady performance under the *Open Internet Order*, and they did not experience significant boosts after the FCC reversed course in 2017. A2198.

Thus, contrary to their claims in litigation, ISPs are committed to investing heavily in fiber, 5G wireless technology, and DOCSIS 4.0 cable system upgrades in the next several years. A2214-A2215. And the ISPs are bullish about future demand for high-speed broadband. According to Comcast Cable's President, "'broadband is still a very large, healthy and profitable market'" because "'the consumption trends are encouraging for the future.'" A2216 (cleaned up). ISPs are becoming more efficient in their deployments too. Frontier's CEO explained to investors that the company's "'fiber build spend will actually be lower with the same number of passings because we will consume inventory and pre-work,'" for example. A2221 (citation omitted).

Moreover, in recent years, ISPs consistently generated strong cash flows and returns for shareholders. A2199. This consistent profitability allows ISPs to invest in network improvements while also returning value to shareholders. Given this, even large external economic factors had no significant effect on the ISPs' investment decisions. *See* A2206-A2214 (data show that neither the 2017 tax cuts nor recent interest rate increases significantly altered ISPs' deployment plans).

"The record is clear: ISPs are strongly committed to deploying and upgrading their networks ahead of consumer demand, because they are confident that doing so is key to future financial prosperity in the face of increasing competition." A2238. The "ISPs' own words to their shareholders, and to industry analysts through channels governed by the SEC, should be afforded significantly more weight than evidence-free tropes, vague threats, dubious aggregate capital expenditure tallies, or nonsensical math jargon" offered to the FCC and to this Court. A2171 (footnote omitted).

The ISPs rely heavily on a substantially revised study by Dr. George Ford to argue "that reclassification under Title II would massively depress investment in ISPs." *See* Br. 21-22 & n.2, 57. But that report

contradicts the economic data just described, and the FCC has identified significant flaws in Dr. Ford's original conclusions and methodology. The Commission addressed Dr. Ford's follow-on response, concluding that his additional critiques were based on changing criteria for choosing control groups, the level of aggregation, and the standard error procedure—none of which should change merely because the underlying data had been corrected. *See* A184-A186 ¶¶ 293-95.

Ordinarily, the ISPs' challenge to the FCC's rejection of such a factual claim would be reviewed for "substantial evidence." *See* 5 U.S.C. § 706(2)(E). There is no basis for affording the agency any less deference just because the issue is raised in the context of invoking the major-questions doctrine. In either setting, the "Commission is in a far better position to address these questions than" any court. *Brand X*, 545 U.S. at 1003.

*Third*, as for "political significance," the ISP classification question is nothing like the issues to which the major-questions doctrine has been applied, such as tobacco regulation, assisted suicide, COVID restrictions, across-the-board loan forgiveness, or nationwide carbon regulation. To be sure, it has been controversial in the way that every attempt to regulate

a well-heeled industry is—the ISPs have made a fuss. But that is true of virtually every material federal regulation. Petitioners cannot lobby their way into the major-questions doctrine.

In addition, considerations of political and economic significance do not support a default rule *against* regulation in this case. In *MCI* and *Whitman*, the Supreme Court made clear that the major-questions doctrine is not a one-way deregulatory ratchet: it can apply to prevent the FCC from reducing regulatory supervision as well. Deregulating BIAS has at least as much economic and political significance as regulating it. Since first classifying DSL as a Title II service in 1998, the FCC has been working to impose reasonable restrictions on BIAS providers that might otherwise discriminate based on the content or source of the transmissions they carry from edge providers to consumers. *Supra* pp. 9-19. The economic effects of conclusively declaring that ISPs are empowered to engage in that discrimination are more substantial than the consequences of forbidding it, given the potential effects on the multitude of edge providers large and small (from Google to Etsy retailers) and on ISP customers who rely on unfettered access to all

points on the internet. Accordingly, the major-questions doctrine is a poor fit for the question the Court must decide in this case.

### 5. *Common Sense*

At bottom, the major-questions doctrine asks the "common sense" question of whether it would be so surprising that Congress authorized the challenged regulation that courts should "hesitate before concluding that Congress meant to confer on [the FCC] the authority it claims under" the Act. *See West Virginia*, 597 U.S. at 721-22, 725 (cleaned up).

Again, the relevant timeframe for answering that question is the time of enactment of the relevant legislation. *West Virginia*, 597 U.S. at 721. So the specific question here is whether the Congress that enacted the 1996 Act would have delegated application of the statutory definition to the FCC given the technological, economic, and regulatory background at the time; it's not whether someone with over a quarter century of hindsight thinks Congress would be unlikely to make that same decision today. If later events call the wisdom of the original delegation into question, it is for Congress, not the courts, to revisit that decision.

There is nothing remotely surprising about Congress deciding in 1996 to establish different regulatory regimes for different

communications services, provide a rule for which services fall within which categories, and then leave it to an expert agency to apply those rules based on its understanding of the technical facts of how each service is offered. *See Brand X*, 545 U.S. at 1002-03 (noting the "order under review involve[s] a subject matter that is technical, complex, and dynamic") (cleaned up).

### D. In All Events, The Major-Questions Doctrine Is Not A Clear Statement Rule.

Finally, as Justice Barrett has explained, even when it applies, the major-questions doctrine is a tool for discerning congressional intent, not resisting it. *Biden v. Nebraska*, 143 S. Ct. at 2376-77 (Barrett, J., concurring). ("'clear statement' requirement means that the better interpretation of a statute will not necessarily prevail" under substantive cannons "including constitutional avoidance," which are different from major-questions doctrine (citation omitted)). Treating it as a clear statement rule, as the motions panel suggested, would raise separation-of-powers problems of its own. Congress either has the constitutional authority to delegate the classification decision to the FCC or it doesn't. It either has delegated that power to the agency or it has not. Nothing in the Constitution provides that Congress could have such power but

*shouldn't* use it. Nor does anything in the Constitution allow courts to decide that Congress *did* delegate a question to an agency, but refuse to respect the delegation. Certainly nothing in the Constitution authorizes courts to decline to enforce the evident will of the People's representatives whenever it results in a degree of regulation that the judiciary disfavors. How much regulation is too much is a question for the political branches, not the courts. When Congress in fact "delegates discretionary authority to an agency, the role of the reviewing court" is merely to "interpret the statute and effectuate the will of Congress subject to constitutional limits, .... ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Loper Bright*, 144 S. Ct. at 2263 (citation omitted). The major-questions doctrine does not authorize courts to disregard the limits of their own role in the constitutional scheme.

## II. THE FCC's INTERPRETATION AND APPLICATION OF THE COMMUNICATIONS ACT IS LAWFUL.

The FCC's order should be affirmed because it clearly represents the best understanding of the statute and the facts and because it is, at the very least, a reasonable decision entitled to deference under *Loper Bright*.

## A. The FCC's Order Embodies The Best Interpretation Of The Statute And Facts.

For the reasons given by respondents, the *Order* embodies the best view of the facts and the law, particularly accounting for the deference due the agency's expertise.

The Communications Act differentiates between telecommunications services and information services, distinguishing services that generate or process information—like websites, search engines, and email—from the telecommunication conduits that deliver the information. The question here, as in *Brand X*, is how to classify a service that includes both telecommunications and some information service capabilities. In the words of the statute, does BIAS no longer "offer" telecommunications service when ISPs also provide information services as part of the bundle? *Supra* pp. 7-9. That question was at the heart of *Brand X* because early BIAS providers had created their own portals and bolted their own add-on information services onto their transmission path. *Supra* pp. 5-6. Today, this business model is largely extinct. ISPs must now resort to claiming that BIAS is an information service because, although it is overwhelmingly used for telecommunications, it is accompanied by the alleged information

services of DNS and caching that merely serve to manage the telecommunications service. *See supra* pp. 18-19.

If the Supreme Court had decided *Brand X* in *this* factual context, and outside the constraints of the now-overruled *Chevron* framework, the case surely would have come out the other way. Whether today's BIAS is an information service "would seem to have only one answer given the current state of technology: No." *Mozilla*, 940 F.3d at 90 (Millett, J., concurring).

As Justice Scalia explained in 2005, "cable-modem service is popular precisely because of the high-speed access it provides" to other companies' information services. *Brand X*, 545 U.S. at 1005 (Scalia, J.). Even then, it was true "that, once connected with the Internet, cable-modem subscribers often use Internet applications and functions from providers *other than* the cable company." *Ibid.* (emphasis added). The FCC had characterized the broadband service that customers purchase from Verizon as an information service based on consumers' option, for example, to use the in-house @verizon.net email rather than @gmail.com or @yahoo.com. *See id.* at 987. Even if calling that bundle of services an "information service" was "just barely" a reasonable interpretation of the

statute, *see id.* at 1003 (Breyer, J., concurring), it surely was not the best one even then. From a consumer's perspective, cable modem service has always been seen as mainly providing "high-speed access to the Internet" with other "applications and functions" playing a minor role that does not alter the essential feature of the offering. *Id.* at 1008 (Scalia, J., dissenting). Even more so today, consumers rarely, if ever, use the kinds of bundled information services that used to be seen as part-and-parcel of early BIAS offerings. *See Mozilla*, 940 F.3d at 90 (Millett, J., concurring).

Accordingly, even if the best reading of the statute *required* considering the nature of a single, integrated BIAS "offering"—a reading *Brand X* found merely permissible—that integrated offering today would most appropriately be classified as a "telecommunications service." To use Justice Scalia's example, a pet store could not avoid a law regulating companies that sell pets by bundling puppies with leashes. *See Brand X*, 545 U.S. at 1008-09 (Scalia, J., dissenting). Likewise, ISPs cannot avoid common carrier treatment of their telecommunications service by

bundling BIAS with in-house email and other information services that play, at best, a minor supporting role.[4]

The FCC's, Justice Scalia's, and Judge Millett's reading also best reflects the statute's purposes. Without the FCC's modest rules, ISPs might interfere with or discriminate against certain types of internet traffic and customers, with the FCC powerless to respond. A1692-A1697 (Free Press Comments). An ISP could, for example, slow down or even block websites conveying content the ISP disfavors for political or other reasons (*e.g.*, Fox News or MSNBC, the CDC or anti-vax sites) or to suppress competition with its own edge services (*e.g.*, slowing or blocking Netflix or Disney Plus). These concerns are well-founded. The FCC has found for decades that broadband providers have the incentive and capability to interfere with their customers' access to the internet. *See USTA*, 825 F.3d at 694-95. Courts have repeatedly upheld those findings as supported by substantial evidence. *See ibid.*; *Verizon*, 740 F.3d at 645-

---

[4] Moreover, as the FCC explains, DNS and caching are not even "information services" properly understood, but fall within the statutory "telecommunications management" exception. *See* A77-A102 ¶¶ 128-153; 47 U.S.C. § 153(24). Notably, the Court in *Brand X* did not consider this question, although Justice Scalia suggested DNS fell within the exception. *Compare* 545 U.S. at 990-91, 999-1000, *with id.* at 1012-13 (Scalia, J., dissenting)

49. And ISPs have, in fact, attempted to refuse to accept certain kinds of traffic, leading to quality issues for streaming services. *See* A289-A291 ¶¶ 479-81; *Verizon*, 740 F.3d at 648-49.

In addition, without Title II authority, the FCC may also lack power to enforce pole attachment rights crucial for promoting competition and facilitating faster and more cost-effective broadband deployment. A1686-A1688 (Free Press Comments); A1968-A1969 (Public Knowledge Comments); *see Mozilla*, 940 F.3d at 66-67. So too, the FCC may be unable to require ISPs to transmit emergency alerts or implement cohesive public safety strategies, for example. A1688-A1690 (Free Press Comments); A1983-A1986 (Public Knowledge Comments); *see Mozilla*, 940 F.3d at 59-66. And the ISPs' position calls into question the authority for supporting BIAS with the FCC's Lifeline program, which provides subsidies to low-income consumers for access to essential telecommunications services but only when provided by a Title II telecommunications carrier. A1681-A1686 (Free Press Comments); A1932 (Public Knowledge Comments); *see Mozilla*, 940 F.3d at 68-70.

## B. The FCC's Interpretation Is Entitled To Deference Because It Is Reasonable.

Although the FCC's order should be sustained under any standard of review, in the end, it is enough that the Commission's interpretation of the statute is reasonable and its factual findings are supported by substantial evidence.

Although *Loper Bright* overruled *Chevron*'s presumption that Congress *implicitly* delegates interpretative authority to an agency by writing an ambiguous statute, the Court made clear that "[w]hen the best reading of a statute is that it delegates discretionary authority to an agency," courts perform their assigned role by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." 144 S. Ct. at 2263 (cleaned up). Here, "Congress has delegated to the Commission the authority to 'execute and enforce' the Communications Act, § 151, and to 'prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions' of the Act, § 201(b)." *Brand X*, 545 U.S. at 980. In doing so, Congress delegated to the FCC authority to interpret and apply the definition of "telecommunications service" in executing its statutory classification

responsibility. *See Loper Bright*, 144 S. Ct. at 2263 (Congress may delegate discretionary authority by "empower[ing] an agency to prescribe rules" or "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility'") (citation omitted); *see also Gonzales*, 546 U.S. at 265 (citing *Brand X* as example of statute giving agency "authority over the provisions of the statute [it] is to interpret").

The delegation is particularly clear with respect to mobile BIAS. There, classification turns on whether mobile BIAS is an "'interconnected service,'" which is defined as a "service that is interconnected with the public switched network (*as such terms are defined by regulation by the Commission*)." 47 U.S.C. § 332(d)(2) (emphasis added). When "statutes expressly delegate to an agency the authority to give meaning to a particular statutory term," then "the agency is authorized to exercise a degree of discretion" and a court's review is deferential. *Loper Bright*, 144 S. Ct. at 2263 (cleaned up).

Finally, *Loper Bright* reaffirmed that although courts decide questions of law in the absence of delegation of that responsibility to an agency, the APA "*does* mandate that judicial review of agency policymaking and factfinding be deferential." 144 S. Ct. at 2261 (citing 5

U.S.C. §§ 706(2)(A) (permitting agency action to be set aside only if "arbitrary, capricious, [or] and abuse of discretion"), 706(2)(E) (permitting review only for "substantial evidence")). And here, *Brand X* reminds us, the principal classification questions "turn[] not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided." 545 U.S. at 991.

For the reasons given above, and in the *Order*, the FCC's classification of wired and mobile BIAS is, at the very least, reasonable and supported by substantial evidence.

### C. *Brand X* Does Not Preclude The FCC's Interpretation As A Matter Of Statutory *Stare Decisis*.

Finally, the ISPs are wrong that *Brand X* ties the agency's hands as a matter of statutory *stare decisis*. *Contra* Br. 31 n.4 (citing ECF No. 70 at 7-14). *Loper Bright* recognized that courts have upheld a multitude of agency interpretations under *Chevron* deference. It stressed that "[t]he holdings of those cases that specific agency actions *are lawful* … are still subject to statutory *stare decisis* despite our change in interpretive methodology." 144 S. Ct. at 2273 (first italicization added). The Court thus made clear that the holding entitled to *stare decisis* effect is that a

particular interpretation "is lawful," and thus may be maintained by the agency even if a court now thinks it was not the best one.

Here, all *Brand X* held was that the Commission's classification decision was "a reasonable policy choice for the Commission to make." 545 U.S. at 997 (cleaned up). *Loper Bright* does not bind an agency to such an interpretation in perpetuity, even if the agency reasonably changes its mind and even if the new interpretation adopts the better view of the statute. It would be perverse to set in stone an erroneous construction of a statute that not even the agency believes appropriate anymore. *See Loper Bright*, 144 S. Ct. at 2265 (criticizing majority's holding in *Brand X* that under *Chevron*, courts must "mechanically afford *binding* deference to agency interpretations .... even when a pre-existing judicial precedent holds that the statute means something else—unless the prior court happened to also say that the statute is 'unambiguous.' *Brand X*, 545 U.S. at 982.").

Accordingly, nothing in *Loper Bright* calls into question *Brand X*'s holding that when an agency is exercising properly delegated interpretative authority, it is permitted to change its interpretation so long as it acknowledges the change and provides an explanation that

withstands APA review. *See Brand X*, 545 U.S. at 981 ("An initial agency interpretation is not instantly carved in stone.") (quotation marks omitted). That is particularly so in a case like this in which Congress expressly delegated interpretative authority to the agency. Overruling *Chevron* did not somehow repeal that express delegation.

Accordingly, even if *stare decisis* precluded this Court from declaring that classification of BIAS under Title I unlawful, it does not prevent the FCC from exercising its delegated authority to interpret the Act differently and conclude that the better view of the statute and the facts is that BIAS is a telecommunications service.

# CONCLUSION

The Court should affirm the FCC's Title II classification of BIAS and mobile BIAS under the Communications Act.

Respectfully submitted,

/s/ *Daniel Woofter*

YANNI CHEN
MATTHEW F. WOOD
FREE PRESS
1025 Connecticut Ave. NW, #1110
Washington, DC 20036
(202) 265-1490
*Counsel for Free Press*

RAZA PANJWANI
OPEN TECHNOLOGY INSTITUTE
NEW AMERICA
740 15th Street NW, #900
Washington, DC 20005
(202) 986-2700
*Counsel for OTI*

ANDREW JAY SCHWARTZMAN
525 Ninth Street, NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
*Counsel for Benton Institute for Broadband & Society*

DANIEL WOOFTER
  *Counsel of Record*
KEVIN RUSSELL
GOLDSTEIN, RUSSELL &
  WOOFTER LLC
1701 Pennsylvania Ave. NW, #200
Washington, DC 20006
(202) 240-8433
*Counsel for Free Press, OTI, and Public Knowledge*

JOHN BERGMAYER
HAROLD FELD
PUBLIC KNOWLEDGE
1818 N Street NW, #410
Washington, DC 20036
(202) 861-0020
*Counsel for Public Knowledge*

JAMES BRADFORD RAMSAY
ROBERT CAIN
NATIONAL ASSOCIATION OF
  REGULATORY UTILITY
  COMMISSIONERS
1101 Vermont Ave. NW, #400
Washington, DC 20005
(202) 257-0568
*Counsel for NARUC*

September 11, 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with Fed. R. App. P. 32(a) because it contains 12,659 words.

This brief further complies with the requirements of Fed. R. App. P. 32(a) because it was prepared in a 14-point font using a proportionally spaced typeface.

/s/ *Daniel Woofter*
Daniel Woofter

September 11, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/    *Daniel Woofter*
Daniel Woofter

September 11, 2024