Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, and 24-3538

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

IN RE: MCP NO. 185; OPEN INTERNET RULE (FCC 24-52),

OHIO TELECOM ASSOCIATION, et al.,

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents.*

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

Jonathan S. Kanter
  *Assistant Attorney General*
Daniel E. Haar
Nickolai G. Levin
Robert B. Nicholson
Andrew W. Chang
  *Attorneys*
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
  *General Counsel*
Jacob M. Lewis
  *Deputy General Counsel*
Sarah E. Citrin
  *Deputy Associate General Counsel*
Scott M. Noveck
  *Counsel*
FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................viii

STATEMENT OF THE ISSUES.................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

    A.    Pre-1996 Regulatory Treatment of ISPs ................................. 3

    B.    The Telecommunications Act of 1996 ..................................... 9

    C.    Regulation of Broadband Providers Under the 1996 Act....... 10

        1.    The *Stevens Report* and the *Advanced Services Order* ..................................................................... 10

        2.    The *Cable Broadband Order* and *Brand X* ................. 13

        3.    The *Internet Policy Statement* and the development of Open Internet rules............................ 15

        4.    The *2015 Order* and *U.S. Telecom* ............................ 19

        5.    The *2018 Order* and *Mozilla* ...................................... 20

    D.    The *Order* Under Review ....................................................... 22

STANDARD OF REVIEW.......................................................................... 23

SUMMARY OF THE ARGUMENT ........................................................... 24

ARGUMENT ............................................................................................... 27

I.    THE COMMISSION PROPERLY CONCLUDED THAT FIXED AND MOBILE BROADBAND OFFER TELECOMMUNICATIONS SERVICE... 27

    A.    Broadband Offers Telecommunications Service Under The Best Reading Of The Act. ............................................. 27

        1.    Broadband most naturally fits the statutory definition of telecommunications service. .................. 27

        2.    Broadband does not fit the statutory definition of information service. .................................................... 31

        3.    Statutory history and context support treating broadband as telecommunications service. ................. 42

# TABLE OF CONTENTS
## (continued)

**Page**

4. Petitioners' remaining arguments do not command a different result.......................... 43

B. The Commission Lawfully Classified Mobile Broadband As A Commercial Mobile Service....................... 47

II. THE MAJOR-QUESTIONS DOCTRINE DOES NOT FORECLOSE THE BEST READING OF THE STATUTE....................... 52

III. PETITIONERS' OBJECTIONS TO THE COMMISSION'S POLICY JUDGMENTS ARE UNAVAILING. .................................. 61

CONCLUSION ......................................................... 69

CERTIFICATE OF COMPLIANCE........................................ 70

CERTIFICATE OF FILING AND SERVICE ........................... 71

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*AT&T Corp. v. City of Portland*,
216 F.3d 871 (9th Cir. 2000) ........................................................ *passim*

*Biden v. Nebraska*,
600 U.S. 477 (2023) ........................................................................ 53

*China Telecom (Ams.) Corp. v. FCC*,
57 F.4th 256 (D.C. Cir. 2022) ...................................................... 65

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ..................................................... 16

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ........................................................................ 60

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) .................................................... *passim*

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994) ........................................................................ 55

*Moody v. NetChoice, LLC*,
144 S.Ct. 2383 (2024) .................................................................... 46

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) (per curiam) .................................. *passim*

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ........................................................ *passim*

*Pac. Networks Corp. v. FCC*,
77 F.4th 1160 (D.C. Cir. 2023) .................................................... 65

*U.S. Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) .................................................... *passim*
*reh'g denied*, 855 F.3d 381 (D.C. Cir. 2017) .................... 15, 20, 60, 63
*cert. denied*, 139 S.Ct. 475 (2018) ...................................... 20

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Gen. Dynamics Corp.*,
  415 U.S. 486 (1974)................................................................64

*United States v. Western Elec. Co.*,
  907 F.2d 160 (D.C. Cir. 1990) ................................................5

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)................................................................46

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) ....................................*passim*

*West Virginia v. EPA*,
  597 U.S. 697 (2022)..........................................................53, 57

## Administrative Materials:

*2010 Open Internet Order*,
  25 FCC Rcd. 17905 (2010) ......................................................16

*2015 Order*,
  30 FCC Rcd. 5601 (2015) ..................................................19, 52

*2018 Order*,
  33 FCC Rcd. 311 (2018) ..........................................................20

*2024 Section 706 Report*,
  39 FCC Rcd. ---, 2024 WL 1192504 (2024) ...........................42

*Advanced Services Order*,
  13 FCC Rcd. 24011 (1998) ............................................*passim*

*Cable Broadband Order*,
  17 FCC Rcd. 4798 (2002) ..............................................*passim*

*Comcast Order*,
  23 FCC Rcd. 13028 (2008) ......................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Computer II*,
    77 F.C.C.2d 384 (1980) ..................................................................... 5, 6

*Computer III*,
    104 F.C.C.2d 958 (1986) ........................................................................ 5

*Internet Policy Statement*,
    20 FCC Rcd. 14986 (2005) ..................................................................... 15

*NATA Centrex Order*,
    101 F.C.C.2d 349 (1985) ..................................................................... 5, 10

*Non-Accounting Safeguards Order*,
    11 FCC Rcd. 21905 (1996) ..................................................................... 10

*Remand Order*,
    35 FCC Rcd. 12328 (2020) ..................................................................... 21

*Stevens Report*,
    13 FCC Rcd. 11501 (1998) ............................................................. 6, 7, 8, 11

*Sw. Bell Tel. Co.*,
    5 FCC Rcd. 3792 (CCB 1995) .................................................................. 5

*US West Commc'ns, Inc.*,
    11 FCC Rcd. 1195 (CCB 1995) .................................................................. 5

## Statutes And Regulations:

5 U.S.C. §706(2) ....................................................................................... 23

Communications Act of 1934, *as amended*,
    47 U.S.C. §§151 *et seq.* ................................................................. *passim*

    47 U.S.C. §153(24) ..................................................................... 9, 37, 40

    47 U.S.C. §153(50) ..................................................................... 9, 27, 35

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

47 U.S.C. §153(51) ................................................................. 10, 60

47 U.S.C. §153(53) ................................................................... 9, 27

47 U.S.C. §160 ........................................................................ 10, 23

47 U.S.C. §160(c) .......................................................................... 54

47 U.S.C. §223(e)(6) ...................................................................... 44

47 U.S.C. §224 ............................................................................... 66

47 U.S.C. §230(b)(2) ...................................................................... 45

47 U.S.C. §230(f) ........................................................................... 44

47 U.S.C. §230(f)(2) ....................................................................... 44

47 U.S.C. §253 .......................................................................... 54, 66

47 U.S.C. §332(c)(1) ...................................................................... 60

47 U.S.C. §332(c)(1)-(2) .......................................................... 10, 47

47 U.S.C. §332(c)(7) ...................................................................... 66

47 U.S.C. §332(d)(1) ................................................................ 47, 48

47 U.S.C. §332(d)(2) ............................................................ 47, 48, 49

47 U.S.C. §332(d)(3) ................................................................ 48, 51

47 U.S.C. §401(b) ........................................................................... 45

Telecommunications Act of 1996,
Pub L. No. 104-104, 110 Stat. 56 ............................................ *passim*

Section 706(a), 47 U.S.C. §1302(a) ...................................... 41, 42, 43

Section 706(b), 47 U.S.C. §1302(b) ...................................................... 42

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

47 C.F.R. §9.3 ........................................................................... 50

## Other Authorities:

John R. Levine & Carol Baroudi,
 *The Internet for Dummies* (2d ed. 1994) ................................. 7

*Newton's Telecom Dictionary* (6th ed. 1993) ........................... 49

Peter H. Lewis, *The New York Times Introduces a Web Site*,
 N.Y. Times, Jan. 22, 1996, at D1 ........................................... 8

Scott Jordan, *Broadband Internet Access Service is a
 Telecommunications Service*,
 71 Fed. Commc'ns L.J. 155 (2019) ...................................... 42

Scott Jordan, *Mobile Broadband Internet Access Service is a
 Commercial Mobile Service*,
 27 Info. & Commc'ns Tech. L. 304 (2018) .................... 50, 51

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Court has scheduled this case for oral argument on October 31, 2024.

**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, and 24-3538**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

IN RE: MCP NO. 185; OPEN INTERNET RULE (FCC 24-52)

OHIO TELECOM ASSOCIATION, et al.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

---

On Petitions for Review of an Order of
the Federal Communications Commission

---

## BRIEF FOR RESPONDENTS

---

## STATEMENT OF THE ISSUES

In the *Order* under review (A1-512), the Federal Communications Commission determined that broadband internet access, as offered and used today, is best understood under the Communications Act as offering telecommunications service, *Order* ¶¶106-153 (A60-102), and that mobile broadband should likewise be considered a commercial mobile service, *id.* ¶¶214-236 (A144-154). The Commission then adopted rules to prevent

harmful conduct by broadband providers, *id.* ¶¶443-648 (A271-382), while exercising its statutory forbearance authority to minimize unnecessary regulation, *id.* ¶¶303-442 (A188-271).  The issues presented are:

1. Whether the Commission correctly found that broadband service, as offered and used today, is best understood as offering telecommunications service.

2. Whether the Commission permissibly classified mobile broadband as a commercial mobile service.

3. Whether the major-questions doctrine nonetheless countermands the best reading of the Act.

4. Whether the Commission articulated valid policy reasons for the *Order*.

## STATEMENT OF THE CASE

Ever since the Commission first grappled with the emergence of remote computer services, through passage of the Telecommunications Act of 1996 ("1996 Act"), Pub L. No. 104-104, 110 Stat. 56, and the initial classification of broadband in 1998, the underlying transmission function was regulated under Title II of the Communications Act of 1934 (the "Act"), 47 U.S.C. §§151 *et seq.*  The agency reversed course in 2002, and

changed course again several times thereafter.  The *Order* under review reinstates the original Title II regulatory treatment, consistent with the prevailing view when the 1996 Act was enacted and with the best reading of the Act as applied to how broadband is offered and used today.

### A.    Pre-1996 Regulatory Treatment of ISPs

**1.**    Under the Communications Act of 1934, companies operating telecommunications networks were regulated as common carriers under Title II of the Act.  Telecommunications technology enabled users to transmit information from one place to another—originally through telegrams and telephone calls, and later other forms of data using a modem.

Telecommunications took on a new role with the advent of computers.  Data-processing companies developed services that use computers to process, store, and retrieve electronic information.  Customers accessed early data-processing services remotely through the telephone network.  For example, lawyers accessed Westlaw through terminals that connected over phone lines to Westlaw's computer systems to search and retrieve cases and other legal authority.

These data-processing services thus had two components: (1) a transmission component connecting the user to a remote computer

system and (2) a data-processing component operating on those computers. These components were provided by different companies under different regulatory regimes. Transmission came from the telephone network and required purchasing telephone service, which was regulated by the FCC under Title II of the Act. Data processing came from the company operating the remote computer system, which generally was not subject to FCC regulation.

**2.** This dichotomy came under pressure when telephone companies produced their own data-processing services, for which the phone company would supply *both* transmission *and* data-processing. If left unregulated, the telephone company could leverage its control over transmission to discriminate against unaffiliated data-processing services. But if the entire service were regulated as the transmission component had been, it could be at a disadvantage against standalone data-processing services.

The FCC addressed this problem in a series of orders known as the *Computer Inquiries*. It distinguished between *basic service*, which provides "a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information," and *enhanced services*, which involve "computer processing applications that act on the format, content, code, protocol or similar

aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information." *Computer II*, 77 F.C.C.2d 384, ¶5, ¶¶93-97 (1980).[1]

"[A]djunct" uses of computer processing that "facilitate communications and do not change the information content of a subscriber's message or data" were considered basic service. *Computer III*, 104 F.C.C.2d 958, ¶266 (1986); *see Order* ¶¶159-161 (A104-06). These "adjunct-to-basic" services included data compression, packet switching, and other features "that facilitate economical, reliable movement of information." *Computer II* ¶95. They likewise included routing features, like "[c]omputer-provided directory assistance." *NATA Centrex Order*, 101 F.C.C.2d 349, ¶¶25-26 (1985); *see Sw. Bell Tel. Co.*, 5 FCC Rcd. 3792, ¶¶12-13 (CCB 1995); *US West Commc'ns, Inc.*, 11 FCC Rcd. 1195, ¶¶27-30 (CCB 1995).

---

[1] A similar distinction applied under the decree governing the breakup of AT&T. *United States v. Western Elec. Co.*, 907 F.2d 160, 162-63 (D.C. Cir. 1990) (holding that, for "gateway" services, transmission between the user and the gateway was distinct from the gateway's homepage and searchable databases, "even though [transmission] is bundled in the overall gateway service").

Basic transmission was regulated by the FCC as common carriage under Title II of the Communications Act, while enhanced services were largely exempt from FCC regulation. *Computer II* ¶¶114&119. For a telephone company to offer enhanced services, it had to unbundle the underlying transmission from the enhanced services, make that basic transmission available to other providers under Title II, and acquire the transmission capacity used for its own enhanced services on the same terms offered to other providers. *Id.* ¶231; *see Order* ¶162 (A106).[2]

**3.** Early retail internet service embodied this distinction between transmission and data-processing. Early dial-up internet service providers (ISPs) were "non-facilities-based," meaning they did not provide the physical transmission facilities connecting customers to the ISP. *See Stevens Report*, 13 FCC Rcd. 11501, ¶60 (1998) (distinguishing "non-facilities-based providers" from later "facilities-based providers"). Instead, consumers and ISPs purchased phone service from telephone companies to provide the underlying transmission. *See id.* ¶66. That

---

[2] Additional restrictions applied to carriers possessing market power, but the requirement to unbundle basic transmission service from enhanced services applied to all carriers. *Compare Computer II* ¶¶222&228 *with id.* ¶231.

"provision of transmission capacity to Internet access providers" was a basic service regulated under Title II. *Id.* ¶15.

Once customers connected to an ISP over a phone line, the ISP provided a suite of applications operating on the ISP's computers:

- "[T]he most widely used Internet service" in this era was "[e]lectronic mail." John R. Levine & Carol Baroudi, *The Internet for Dummies* 75 (2d ed. 1994). Before third-party email providers were commonplace, early internet users generally relied on their ISP for an email account, which relied on the ISP's computer systems.

- Early ISPs also provided a curated selection of discussion forums known as "newsgroups." *Id.* 129-60. Unlike third-party discussion forums today, these newsgroups required ISPs to operate a "local news system" on their computers. *Id.* at 129; *see Stevens Report* ¶77.

- Major ISPs hosted popular news and content sources. But unlike today's public internet, this content was hosted by each ISP on its own computer systems and available only to its customers. ISPs were thus said to each operate their own "walled gardens." *Order* ¶175&n.718 (A115-16).

These ISP-provided applications were enhanced services, because they involved data-processing on the ISP's computers. By contrast, the transmission between the user and the ISP was provided by the phone company and regulated as basic service under Title II.

When the 1996 Act was enacted, consumer "Internet access" was still defined by an ISP's computing applications and hosted content. Access to third-party content and applications on the World Wide Web was still nascent.[3] And to reach "beyond the edges of its network" for Web content, an ISP had to "make[] arrangements to interconnect with one or more Internet backbone providers." *Stevens Report* ¶66. So just as transmission between a customer and an ISP came from third-party telephone companies, transmission between an ISP and a website essentially came from other third-party providers. Retail ISPs' role in this era was defined by the ISPs' computing applications, not the underlying transmission that was supplied by other entities.

---

[3] The New York Times, for example, did not have a website until January 22, 1996—just days before the 1996 Act was signed into law on February 8. Peter H. Lewis, *The New York Times Introduces a Web Site*, N.Y. Times, Jan. 22, 1996, at D1. Before 1996, it was available only on America Online, hosted within its walled garden. *Ibid.*

### B.    The Telecommunications Act of 1996

When Congress updated the Communications Act in 1996, it acted "against the background of this regulatory history" and "substantially incorporated" the basic/enhanced dichotomy under the labels of "telecommunications service" and "information service." *Order* ¶172 (A111-12); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 977, 992-93 (2005).

The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public … regardless of the facilities used." 47 U.S.C. §153(53). "Telecommunications," in turn, is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information." *Id.* §153(50).

The Act defines "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. §153(24). But it excludes "any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." *Ibid.* That exclusion, known as the "telecommunications-management exception," mirrors the

*Computer Inquiries* "adjunct-to-basic" doctrine. *See Non-Accounting Safeguards Order*, 11 FCC Rcd. 21905, ¶107 (1996) (citing *NATA Centrex Order* ¶¶24-28).

Telecommunications service is regulated as common carriage under Title II, while information service is not. 47 U.S.C. §153(51). But the Act directs the Commission to "forbear from applying … any provision" that is unnecessary for a particular service. *Id.* §160. Through this forbearance authority, Congress empowered the Commission to tailor the Title II framework to the needs of new communications technologies.

Title III of the Act contains a similar dichotomy for mobile service. "Commercial mobile service" is regulated as common carriage under Title II, while "private mobile service" is not. 47 U.S.C. §332(c)(1)-(2).

## C. Regulation of Broadband Providers Under the 1996 Act

### 1. The *Stevens Report* and the *Advanced Services Order*

The Commission first considered the 1996 Act's application to existing and emerging internet providers in two back-to-back items: a report to Congress known as the *Stevens Report* and a classification order known as the *Advanced Services Order*.

**a.** The *Stevens Report*, 13 FCC Rcd. 11501 (1998), considered how the 1996 Act applied to the non-facilities-based ISPs that had been governed by the *Computer Inquiries*. *See id.* ¶¶73-82. It recognized that these ISPs "typically[] own no transmission facilities," instead relying on telephone connections to provide transmission. *Id.* ¶66. It described how consumers subscribed to the ISPs for a suite of ISP-provided applications, including email accounts, newsgroups, and personal website hosting. *Id.* ¶¶75-82. Because these non-facilities-based ISPs offered applications, not transmission, the *Stevens Report* found that they offered information services, not telecommunications service. *Id.* ¶¶73-74.

However, the Commission determined it "appropriate to reexamine that result" for the emerging set of "cases where an Internet service provider owns transmission facilities, and engages in data transport over those facilities." *Id.* ¶69; *see also id.* ¶60 (classification of "facilities-based providers" is "more complicated"). For those facilities-based providers, "'[t]he issue is whether, functionally, the consumer is receiving two separate and distinct services'"—transmission service *and* ISP-operated applications. *Id.* ¶60. The *Stevens Report* did not address facilities-based providers, deeming it inappropriate "to make any definitive pronouncements in the absence of a more complete record." *Id.* ¶3.

**b.** Four months later, the Commission addressed the Act's application to facilities-based broadband providers in the *Advanced Services Order*, 13 FCC Rcd. 24011 (1998), which classified various forms of digital subscriber line (DSL) broadband—*i.e.*, broadband over telephone lines—as Title II telecommunications services. These "advanced services are telecommunications services" because they "transport information of the user's choosing between or among user-specified points, without change in the form or content of the information as sent and received, [as] 'telecommunications' [is] defined." *Id.* ¶35. When a user is provided "a telecommunications service together with an information service"—*e.g.*, by a facilities-based broadband provider that provides *both* transmission *and* the applications (email, newsgroups, and so on) marketed in that era as "Internet access"—the Commission held that it would "treat the two services separately: the first service is a telecommunications service … and the second service is an information service." *Ibid.* ¶36.  Broadband transmission was thus a telecommunications service, while the provider's bundled applications were treated as separate information services.

**c.**  In the first appellate decision applying the Act to broadband, the Ninth Circuit held in *AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000), that cable broadband likewise "consists of two elements": broadband transmission and a separate suite of provider-operated applications.  *Id.* at 878.  Like the *Advanced Services Order*, *Portland* concluded that in "provid[ing] its subscribers Internet transmission over its cable broadband facility," a broadband provider "is providing a tele-communications service."  *Ibid.*

## 2.  The *Cable Broadband Order* and *Brand X*

Six years after the 1996 Act, the Commission reversed course and, for the first time, declared cable broadband solely an information service. *Cable Broadband Order*, 17 FCC Rcd. 4798 (2002); *see Brand X*, 545 U.S. at 981-82, 1000-02 (recognizing the FCC's change in position).

Cable companies offered facilities-based broadband, supplying both the cable transmission facilities and a suite of applications—either by integrating with an affiliated ISP or by "self-provisioning" those applications.  *See Cable Broadband Order* ¶¶20-23.  The Commission recognized that cable broadband has two components: "high-speed access to the Internet, as well as many applications or functions that can be used with that access."  *Id.* ¶1; *see id.* ¶¶17-18.  But instead of continuing to

treat these components separately, the Commission declared them a single integrated offering covered only by Title I. *Id.* ¶¶34-41.

In *Brand X*, the Supreme Court held that this Title I approach was "a permissible reading of the Communications Act under the *Chevron* framework," 545 U.S. at 986-1000, applying *Chevron*'s rule that courts must defer to the agency's reasonable construction "to fill statutory gaps," *id.* at 980-86, 1002-03.

*Brand X* instructs that the proper statutory classification of broadband turns on the word "offering": whether the underlying transmission and any applications offered with or through it are separate bundled offerings or a single integrated offering. *Id.* at 991. That question "turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided," *ibid.*—an issue that calls for "use of [the Commission's] expert policy judgment to resolve these difficult questions," *see id.* at 1002-03.

In deferring to the Commission's then-prevailing view, however, *Brand X* cautioned that its "conclusion that it is *reasonable* … to classify cable modem service solely as an 'information service' leaves untouched [prior decisions] holding that the Commission's [Title I] interpretation is not the *best* reading of the statute," *id.* at 985-86, as the Ninth Circuit

held in *Portland* and as the FCC originally reasoned in the *Advanced Services Order*. Three dissenting justices who *did* reach that question opined that broadband is most naturally understood as offering telecommunications service. *Id.* at 1005-14 (Scalia, J., dissenting). Indeed, "[a]ll nine Justices recognized the agency's statutory authority to institute 'common-carrier regulation of all ISPs,' with some Justices even concluding that the Act left the agency with no other choice." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 385 (D.C. Cir. 2017) (*U.S. Telecom II*) (Srinivasan, J., concurring in denial of rehearing).

### 3. The *Internet Policy Statement* and the development of Open Internet rules

**a.** *Brand X* assumed that the Commission could "impose special regulatory duties on" broadband providers even under Title I. 545 U.S. at 996; *see id.* at 976. The Commission thereafter unanimously adopted its *Internet Policy Statement*, 20 FCC Rcd. 14986 (2005), "to ensure that broadband networks are widely deployed, open, affordable, and accessible to all consumers." *Id.* ¶4. It recognized that consumers are entitled "to access … lawful Internet content" and to "run applications and use services of their choice," and "to [enjoy] competition among network providers, application and service providers, and content providers." *Ibid.*

**b.**  In 2008, the FCC found that Comcast was secretly interfering with subscribers' use of certain file-sharing applications, depriving consumers of their right to use lawful applications and services of their choice.  *Comcast Order*, 23 FCC Rcd. 13028 (2008).  And in view of evidence that these applications had "become a competitive threat" to Comcast because they could be used "to view high-quality video … that [consumers] might otherwise watch (and pay for) on cable television," the Commission determined that Comcast's behavior deprived consumers of the fruits of a competitive marketplace.  *Id.* ¶1, ¶5, ¶16, ¶43n.201

The Commission ordered Comcast to terminate the offending practices.  The D.C. Circuit vacated that order, however, because the Commission had not tied its action sufficiently to the agency's statutory authority.  *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010).

**c.**  The Commission remedied that deficiency and codified three "Open Internet" rules in the *2010 Open Internet Order*, 25 FCC Rcd. 17905 (2010).  These rules prohibited broadband providers from blocking lawful internet content or applications and from unreasonably discriminating in their treatment of internet traffic, *id.* ¶¶62-79, and required providers to disclose information about their network management practices and terms, *id.* ¶¶53-61.

In *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014), the D.C. Circuit affirmed the *2010 Order* in part and vacated it in part.

*Verizon* affirmed that the Commission "adequately supported and explained its conclusion" that broadband providers "have the technical and economic ability" and "powerful incentives" to "discriminate against and among edge providers"—that is, producers of internet content and services. *Id.* at 645-46. "[B]roadband providers' position in the market gives them the economic power … to act as a 'gatekeeper' with respect to edge providers that might seek to reach [their] end-user subscribers," including by "restrict[ing] edge-provider traffic [or] charg[ing] for the services they furnish edge providers." *Id.* at 646. And broadband providers "have powerful incentives to accept fees from edge providers, either in return for excluding their competitors or for granting them prioritized access to end users." *Id.* at 645-46. For example, a broadband provider "might degrade the quality of the connection to a search website like Bing if a competitor like Google paid for prioritized access." *Id.* at 629; *see also id.* at 646 ("Verizon's counsel announced that 'but for [Open Internet] rules we would be exploring those commercial arrangements.'").

The court also found that "the threat that broadband providers would utilize their gatekeeper ability to restrict edge-provider traffic" is "not … 'merely theoretical.'" *Id.* at 648.  It identified "four prior instances in which they had done just that," including "blocking online payment services after entering into a contract with a competing service," "restricting the availability of competing VoIP and streaming video services," and "Comcast's impairment of peer-to-peer file sharing." *Id.* at 648.

Despite affirming the Commission's "conclusion that broadband providers' incentives and ability to restrict Internet traffic could produce '[w]idespread interference with the Internet's openness' in the absence of Commission action," *id.* at 649, the *Verizon* court nonetheless invalidated the no-blocking and anti-discrimination rules, holding that the Commission could not enforce such common-carrier rules "[g]iven the Commission's [then-prevailing] decision to classify broadband" as an information service rather than telecommunications service, *id.* at 650; *see id.* at 649-59.

### 4.    The *2015 Order* and *U.S. Telecom*

Responding to *Verizon*'s "implicit invitation," the Commission in 2015 "revisit[ed]" its analysis of broadband and, "[b]ased on [an] updated record, … conclude[d] that retail broadband Internet access service is best understood today as an offering of a 'telecommunications service'" subject to Title II.  *2015 Order*, 30 FCC Rcd. 5601, ¶308 (2015); *see id.* ¶¶306-433.    The *2015 Order* then adopted updated Open Internet rules. These rules prohibited certain categorically harmful practices (like blocking or throttling lawful content and applications), *id.* ¶¶110-132, and provided for case-by-case analysis of practices that can have either benefits or drawbacks (like sponsored data plans), *id.* ¶¶133-153.    The Commission also updated its "transparency rule" requiring broadband providers to disclose accurate information about their terms, practices, and service characteristics.  *Id.* ¶¶154-185.

In *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016), the D.C. Circuit upheld the *2015 Order* in full.  The Commission's "conclu[sion] that consumers perceive broadband service … as providing telecommunications" had "extensive support in the record," and the Commission had "justif[ied] [the] decision to reclassify broadband as a telecommunications service."  *Id.* at 697-99.  The court later denied rehearing en banc, 855

F.3d 381 (D.C. Cir. 2017), and the Supreme Court denied review, 139 S.Ct. 475 (2018).

### 5.    The *2018 Order* and *Mozilla*

In 2018, following a change in administration, the Commission reversed the *2015 Order*, repealed the Open Internet rules (except for the transparency rule), and reverted to treating broadband as an information service. *2018 Order*, 33 FCC Rcd. 311 (2018).

In *Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam), the D.C. Circuit held that the Commission could lawfully reclassify broadband as a Title I information service given *Brand X*. *Id.* at 18-19. Two of the judges on the panel wrote separately, however, to express doubts about the Commission's conclusion in view of how broadband service operates and is offered today. *See id.* at 86-95.

The *Mozilla* court also found that, while the agency had in large measure adequately explained its decision to restore a Title I classification and repeal the Commission's earlier rules, the *2018 Order* fell short in three important respects:

- The court faulted the Commission for having "fail[ed] to consider the implications for public safety of [the] changed regulatory posture." *Id.* at 59. "[P]ublic safety officials explained

at some length" how the repudiation of FCC oversight "could imperil the ability … to communicate during a crisis." *Id.* at 60.

- The court opined that the Commission had, "without reasoned consideration, [taken] broadband outside the current statutory scheme governing [utility] pole attachments" needed for deployment of broadband infrastructure. *Id.* at 65-67.

- The court rebuked the Commission for inappropriately "brush[ing] off the concern" that its actions "would eliminate the statutory basis for broadband's inclusion in" the Lifeline subsidy program. *Id.* at 68-70.

The court accordingly remanded for further proceedings. *Id.* at 86.

The Commission initially responded in a 2020 *Remand Order*, 35 FCC Rcd. 12328 (2020). Several parties sought reconsideration of alleged deficiencies in the *Remand Order*, prompting additional agency proceedings. Others sought judicial review, and those continuing legal challenges to the *Remand Order* and the underlying *2018 Order* remain before the D.C. Circuit, which is holding them in abeyance pending a decision in this case. *See Cal. Pub. Utils. Comm'n v. FCC*, No. 21-1016 (D.C. Cir.).

### D.    The *Order* Under Review

In the *Order* challenged here, the Commission completed its reassessment of the regulatory classification of broadband in response to *Mozilla*. Informed by full notice-and-comment and an updated record, it determined that the best reading of the Communications Act, given how broadband operates and is offered today, is that broadband offers tele-communications service subject to Title II. *Order* ¶¶106-153 (A60-102). The *Order* further found that Title II will better enable the Commission "to ensure Internet openness, defend national security, promote cybersecurity, safeguard public safety, monitor network resiliency and reliability, protect consumer privacy and data security, support consumer access to [broadband service], and improve disability access." *Id.* ¶27 (A13-14); *see id.* ¶¶25-105 (A12-60), ¶¶444-481 (A271-91).

The Commission then reinstated the Open Internet rules previously adopted in the *2015 Order* and upheld by the D.C. Circuit in *U.S. Telecom*. *See id.* ¶¶443-592 (A271-359). These include "bright-line" rules against (1) blocking of lawful content or applications; (2) throttling (*i.e.*, impairing or degrading) particular internet content or applications; or (3) engaging in "paid prioritization"—that is, "favor[ing] some traffic over other traffic ... either (a) in exchange for consideration (monetary or

otherwise) from a third party, or (b) to benefit an affiliated entity." *Id.* ¶¶492-512 (A297-309). Those bright-line rules are supplemented by a case-by-case general conduct standard requiring that broadband providers shall not "unreasonably interfere" with the ability of consumers and edge-providers "to reach one another." *Id.* ¶¶513-542 (A309-28). The *Order* also reaffirmed the transparency rule. *Id.* ¶¶543-567 (A328-344). The Commission otherwise forbore from the bulk of Title II's requirements, *id.* ¶¶303-442 (A188-271), pursuant to its authority under 47 U.S.C. §160.

On August 1, the Court stayed the *Order* pending review, reasoning that it likely "implicates a major question" without showing adequate statutory support. A548; *see* A544-56. The motions panel did not have the benefit of the full briefing presented here.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, a court may overturn agency action only if it is arbitrary, capricious, or otherwise contrary to law. *See* 5 U.S.C. §706(2). As part of that inquiry, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2273 (2024). "In exercising such judgment, though," courts may appropriately "seek aid from the interpretations of" the

implementing agency. *Id.* at 2262; *see also id.* at 2273. The agency's views "may be especially informative 'to the extent [they] rest[] on factual premises within [the agency's] expertise.'" *Id.* at 2267.

When Congress "'expressly delegate[s]' to an agency the authority to give meaning to a particular statutory term," moreover, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. So too when a statute "empower[s] an agency to prescribe rules to fill up the details of a statutory scheme, or [uses] a term or phrase that leaves agencies with flexibility." *Ibid.* (internal quotation marks and citations omitted). In such cases, "courts must respect the delegation." *Id.* at 2273.

## SUMMARY OF THE ARGUMENT

In the *Order* under review, the Commission found that broadband service "is best classified as [offering] telecommunications service based on the ordinary meaning of the statutory definitions" in the Communications Act, "applying basic principles of textual analysis to the text, structure, and context of the Act." *Order* ¶106 (A60-61). That approach comports with *Brand X*'s instruction that this determination turns on the factual particulars of how broadband operates and is used by consumers. Petitioners invoke the major-questions doctrine, but that

doctrine offers no basis to disregard or countermand what Congress provided in the statute. And Petitioners' objections to the Commission's policy judgments are unavailing.

**I.** The most natural reading of the text of the Act, applied to how broadband operates and is used today, is that broadband offers telecommunications service. Broadband offers indiscriminate transmission to internet content and services of a user's choosing, and broadband providers do not change the content of the information that users send and receive.

By contrast, broadband does not comfortably fit the statutory definition of information service. Broadband offers *access to* websites and applications that offer information-processing functions, but it does not *itself* offer those functions. Adjunct features like DNS and caching are functionally separate from the underlying transmission service, do not change the character of that service or the content of users' transmissions, and fall within the statutory telecommunications-management exception.

The Commission also lawfully classified mobile broadband as a commercial mobile service. The internet, like the telephone network, has become an interconnected part of the public switched network; it is not in any sense a private mobile service.

**II.** The major-questions doctrine, which seeks to preserve Congress's prerogative to set the law, offers no basis to contravene the best reading of the statute. The doctrine applies to extraordinary cases involving "transformative" and "unheralded" assertions of authority beyond what Congress could reasonably be thought to have conferred, but there is nothing remarkable about the FCC regulating communications services in accordance with the Act. In any event, agencies may act on major questions when so authorized, and the Communications Act supplies that authority here, as the Supreme Court already held in *Brand X*.

**III.** The Commission identified an array of important policy interests supporting the *Order*—particularly the need to address broadband providers' incentive and ability to discriminate, as recognized by the D.C. Circuit in *Verizon* and *U.S. Telecom*, and the public safety and other policy concerns raised in *Mozilla*. The Commission meticulously examined claims that the *Order* would have unjustified costs and found those claims unsupported. And Petitioners' separate challenge to the general-conduct standard misunderstands its role and effect.

## ARGUMENT

Any analysis of federal agency authority must begin with the words of the governing statute.  No one disputes that the Communications Act gives the Commission clear authority to regulate telecommunications services under Title II.  The only question here is whether broadband falls within that statutory definition.  Based on the record, the Commission found that it does, and the major-questions doctrine presents no basis to hold otherwise.

## I.    THE COMMISSION PROPERLY CONCLUDED THAT FIXED AND MOBILE BROADBAND OFFER TELECOMMUNICATIONS SERVICE.

### A.    Broadband Offers Telecommunications Service Under The Best Reading Of The Act.

#### 1.    Broadband most naturally fits the statutory definition of telecommunications service.

The most natural reading of the Communications Act, as applied to how broadband operates and is offered today, is that broadband offers telecommunications service.    "[T]elecommunications service" is "the offering of telecommunications"—defined as "transmission, between or among points specified by the user, of information of the user's choosing, without change in [its] form or content"—"for a fee to the public."  47 U.S.C. §153(50)&(53); *see Order* ¶¶116-122 (A68-72).  Broadband neatly fits that description.  Broadband provides transmission to internet

endpoints of the user's choosing and "do[es] not change the content" that users seek to communicate. *Order* ¶121 (A72). Broadband providers "do not change the substance of" news articles, websites, social-media posts, images and photos, streaming media, or the like. *Ibid.*

Construing the very statutory definitions at issue here, *Brand X* held that the proper treatment of broadband under the Act hinges on the term "offering": whether the underlying transmission service and any applications offered with or through it are separate offerings or a single integrated offering. *See* 545 U.S. at 989-92. *Brand X* further instructs that this requires close examination of how consumers use and perceive broadband in the marketplace, because "it is common usage to describe what a company 'offers' to a consumer as what the consumer perceives" the product to be. *Id.* at 990. "That question turns not on the language of the Act, but on the factual particulars of how Internet technology works and how it is provided[.]" *Id.* at 991.

Undertaking that examination here, the *Order* found abundant evidence that "consumers today perceive [broadband] to be … primarily a transmission conduit"—"a 'dumb pipe'"—"through which they may transmit information of their choosing." *Order* ¶123 (A72-74); *accord U.S. Telecom*, 825 F.3d at 698. "[U]sers expect that their information will

be sent and received without change"; consumers neither expect nor want broadband providers to alter the information they send and receive. *Order* ¶116 (A68). The record further shows that broadband providers "market [their product] 'primarily as a conduit for the transmission of data across the Internet'"—that is, "for accessing third-party services." *Id.* ¶124 (A74); *accord U.S. Telecom*, 825 F.3d at 699. Petitioners concede that "a dumb pipe" (Br. 8) is a telecommunications service, not an information service, and that is what the record shows here.

The Commission thus concluded that broadband offers "'telecommunications service' because consumers perceive it—and [broadband] providers market it—as a standalone 'offering' of telecommunications that is separate and distinct from the applications, content, and services to which [it] provides access." *Order* ¶122 (A72). The D.C. Circuit affirmed an identical finding in 2016 on a materially similar record. *U.S. Telecom*, 825 F.3d at 697-99. And "[s]ince that time, th[e] consumer perception of [broadband] as a gateway to third-party services has only become more pronounced." *Order* ¶123 (A73); *see also id.* ¶124 (A74) (same as to broadband marketing).

The role of today's facilities-based broadband providers is thus in relevant respects the *inverse* of the early non-facilities-based dial-up

ISPs.  *See Order* ¶144 (A90-92), ¶177n.729 (A117).  Those non-facilities-based ISPs were not subject to Title II because they did not provide the underlying transmission; they instead provided a suite of applications like email and newsgroups.  Transmission had to be purchased separately from a phone company and was regulated under Title II.  By contrast, today's broadband providers supply the underlying transmission service, while users overwhelmingly look to third-party edge providers—not their broadband provider—for internet content and applications.  Indeed, many of today's broadband providers (including many of Petitioners' members) *are* the telephone companies who once provided the dial-up transmission under Title II.  Because today's broadband providers supply customers with that underlying transmission, broadband is best understood as offering telecommunications service and subject to Title II—just as that same functionality was treated in the years before and after the 1996 Act, until the *Cable Broadband Order* reversed course.

To use an analogy from *Brand X*, today's broadband providers are not like a pizzeria that delivers its own pizza to customers; they are akin to DoorDash or GrubHub, the delivery companies that deliver food from third-party restaurants.  Just as those companies pick up and deliver customers' orders from restaurants, broadband providers offer

transmission to and from user-selected websites and applications. These companies do not make or alter the food they deliver. And even if they provide other adjunct features to support and operate their delivery service, like processing payment from the customer and remitting it to the restaurant, they are still offering delivery, not themselves operating as restaurants.[4]

### 2. Broadband does not fit the statutory definition of information service.

By contrast, broadband does not comfortably fit the statutory definition of information service.

**a.** Petitioners principally contend (Br. 32) that broadband provides information-processing capabilities because it can be used "to engage with information on websites and applications" where these

---

[4] Broadband providers differ from food-delivery services in one important respect. Consumers can use multiple food-delivery services, so if a delivery service tries to discriminate against certain restaurants, those restaurants can still reach customers through others. But consumers "generally access the Internet through a single broadband provider," and face various costs and impediments to switching providers. *Verizon*, 740 F.3d at 646-47. So when an edge provider seeks to reach consumers who subscribe to a given broadband provider, "that provider functions as a 'terminating monopolist' with the power to act as a 'gatekeeper'"—which gives broadband providers leverage to engage in harmful conduct if left unregulated. *Id.* at 646; *see Order* ¶469 (A284); Lumen Comments 5-13 (A1787-95).

capabilities are provided by third parties. *Cf. Order* ¶130 (A78-79). That argument proves too much: By that logic, traditional telephone service would be an information service because customers can, for example, call a restaurant to ask about its hours or make a reservation. *Id.* ¶131 (A79-80); *Mozilla*, 940 F.3d at 93 (concurring opinion). Even traditional telephone service enables callers "to make information available to others (*e.g.*, public service announcements), retrieve information from others (*e.g.*, through a simple phone call with another person), and utilize stored information from others (*e.g.*, by interacting with a call menu or accessing voice mailbox services)." *Order* ¶131 (A80). To "impute[] the capabilities of … third-party information services to the telecommunications services that provide access to them" would destroy the statutory dichotomy between telecommunications service and information service. *Id.* ¶¶131-132 (A79-82); *Mozilla*, 940 F.3d at 93-94 (concurring opinion).

Accepting Petitioners' argument "would imperil the one proposition on which everyone has so far been able to agree: traditional telephony belongs within Title II." *Mozilla*, 940 F.3d at 93 (concurring opinion). Attempting to resist this, Petitioners say (Br. 35-36) that a telephone can merely "incidentally be used to access information," whereas broadband "*always* entails doing that." That response makes little sense. The whole

point of a phone conversation is to obtain or share information, just as broadband is used to access or share information.

The *Cable Broadband Order* in *Brand X* relied on a different argument. The Commission reasoned that consumers in that era purchased broadband for the provider-operated applications that "providers typically include[d] in their service, including e-mail, newsgroups, and the ability to create a web page." *Cable Broadband Order* ¶37; *cf. Mozilla*, 940 F.3d at 87, 89-90 (concurring opinion). If consumers today continued to purchase broadband essentially for a provider's own applications, that conclusion might still be possible. Today, however, consumers principally rely on third-party edge providers, not their broadband provider, for these applications. *See Order* ¶129 (A78). Consumers understand the difference between the third-party applications they use to "post on social media[] or store photos in the cloud" (Br. 34) and the broadband provider they employ to take them to whichever third-party services they prefer. *Order* ¶132 (A80-81), ¶144 (A90-91).[5]

---

[5] Petitioners' claim that a USTelecom-commissioned survey supports their position (Br. 34) rests on a similar conflation. Consumers certainly use broadband to access "information on websites," to post on "social media," or to "[s]tore photos and files in the cloud." A1567
(cont'd)

Turning to inapt analogies, Petitioners contend (Br. 35) that a library "offers the capability to learn a new subject" by lending books written by others, and that "[a] travel agency offers the capability to see the world, even if a third-party airline transports the passenger."  In those situations, however, the intermediary is involved in the offering because it curates, procures, organizes, or arranges third-party content for others.  A library selects and procures books to make them available to patrons; a travel agent helps to prepare and book an itinerary for her client.  None of that applies to broadband, which is a pure transmission conduit offering indiscriminate access to the entire internet.  Unlike libraries or travel agencies, broadband providers "do not select, alter, arrange, annotate, or contextualize the content that their users request or that edge providers deliver in response."  *Order* ¶652 (A384).

---

(survey question).  But the key question is whether those features should be ascribed to the edge providers that furnish them or instead to the broadband provider used to reach them—a question that Petitioners' survey was not designed to answer.  USTelecom later commissioned a second survey, yet that second survey "shows that more consumers perceive [broadband] as providing the capabilities of a telecommunications service than providing the capabilities of an information service"—supporting *the Commission's position*, not Petitioners'.  *Order* ¶144n.577 (A93); *but see id.* (A92-93) (identifying various flaws and shortcomings in both surveys).

In this respect, broadband is like a highway. It would be odd to say that a highway offers the capability to go on a tropical cruise, even though someone could take the highway to the coast and then board a cruise ship there; highways simply offer the ability to get to potential destinations. Broadband likewise offers *access to* third-party services that might offer various information-processing functions, but does not *itself* offer those functions.

**b.** Petitioners also err in their fallback argument (Br. 36-39) that two adjunct features often offered by broadband providers, DNS (domain name system) and caching, somehow transform broadband into an information service. DNS and caching do not serve an integral role in today's broadband and do not change the character of the core transmission service. *Order* ¶¶146-151 (A91-99); *see Mozilla*, 940 F.3d at 90-91 (concurring opinion). Nor do DNS or caching effect any "change in the form or content of the [underlying] information as sent and received," 47 U.S.C. §153(50); instead, Petitioners' claimed uses of these features fall within the statutory telecommunications-management exception. *Order* ¶¶133-139 (A81-88).

***DNS.*** DNS translates domain names into corresponding numerical addresses, similar to how a phonebook associates names with phone numbers. *Order* ¶137 (A85). But just as phone listings are available from sources other than the phone company—ask an average person when they last used the Yellow Pages or dialed 411—DNS service is available today from a host of free third-party providers (including from Google, Cloudflare, and OpenDNS). *Id.* ¶147 (A94-96); *Mozilla*, 940 F.3d at 90-91 (concurring opinion); Peha Comments 4-5 (A1781-82). Customers can and do use broadband without using their broadband provider's DNS service, using a third-party DNS service instead, just as customers needn't use an email account from their broadband provider and can use a third-party email provider instead. Indeed, "[t]he record presents evidence that third-party DNS services may now make up a significant portion of all DNS services today." *Order* ¶147 (A95).

DNS is therefore separate from the underlying broadband transmission service. Petitioners observe (Br. 36-37) that many consumers find it convenient to use the DNS service preselected for them by their broadband provider, but that does not make a provider's DNS service an integral and inseparable part of the broadband transmission service. On

the contrary, "if [broadband] providers were to stop offering DNS, their DNS functionality would quickly be replaced by alternatives." *Order* ¶147 (A96).

Because DNS is separate from the broadband transmission service, it "does not convert [broadband] into an information service." *Order* ¶146 (A94). Instead, DNS "is a separable, application-layer" add-on service that is often bundled with broadband. *Id.* ¶148 (A96-97). Bundling an information service with telecommunications service does not exempt the telecommunications service from Title II. *Id.* ¶153 (A100-02); *Brand X* 545 U.S. at 997-98 ("a local telephone company 'cannot escape Title II'" by bundling voicemail with each phone line).

In any event, if Petitioners were right that provider-operated DNS service is an essential component of broadband, their argument would still fail under the statutory "telecommunications-management exception" (an issue on which *Brand X* "t[ook] no view" and deferred to the Commission, 545 U.S. at 999n.3). This exception provides that information service "does not include any use of any [information-processing] capability for the management, control, or operation of" a telecommunications system. 47 U.S.C. §153(24); *see Order* ¶¶133-136

(A82-85).  If providers offer DNS in order to identify and route traffic to the desired address, then it is being used to manage or control the transmission functionality; it is not changing the form or content of the underlying information.

The telecommunications-management exception naturally "encompasses those services that would have qualified as 'adjunct-to-basic under the [*Computer Inquiries*] regime," and DNS "satif[ies] this test because [it] facilitate[s] use of the network without altering the fundamental character of the telecommunications service." *U.S. Telecom*, 825 F.3d at 705.  As Justice Scalia put it, DNS "is scarcely more than routing information, which [under the telecommunications-management exception] is expressly excluded from the definition of 'information service.'" *Brand X*, 545 U.S. at 1012-13 (Scalia, J., dissenting).

In its stay order, the Court likened DNS to a computerized "phonebook" or directory (A545), but that comparison undercuts Petitioners here.  *See Order* ¶137&n.535 (A85).  "Computer-provided directory assistance" was understood to be an adjunct-to-basic service, not an enhanced service.  *See supra* p. 5.  DNS-like address translation was also used in other adjunct-to-basic services like call forwarding and

800-number service.[6]  These database lookups are used to transparently

route communications, not to change the form or content of the

underlying information, and are invisible to users.    Such

telecommunications-management features do not make traditional

telephone service an information service, and neither does DNS make

broadband an information service.[7]

*Caching.*  Caching likewise falls within the telecommunications-

management exception.  Caching seeks "to facilitate the transmission of

information … by enabling the user to obtain more rapid retrieval of

information through the network"—that is, to make the transmission

service faster and more efficient.  *Order* ¶139 (A87) (internal quotation

marks omitted); *U.S. Telecom*, 825 F.3d at 705.  If a provider integrates

---

[6]  When calling an 800 number (like 1-800-TAXICAB), the phone system accesses a database to determine a destination number to route the call to; that destination number may vary based on the caller's location and other factors.  *Order* ¶114&n.435 (A66-67).

[7]  Petitioners offer no authority for their contention (Br. 38) that the exception requires "*inward-facing*" functionality.    Regardless, providers *do* offer their own DNS service for its inward-facing benefit: Steering customers to a provider's own DNS servers reduces the amount of traffic a provider must transmit through and beyond its network.  DNS thus benefits a provider by "allow[ing] more efficient use of [its] network."  *Order* ¶137 (A86) (quoting *U.S. Telecom*, 825 F.3d at 705).

caching into its service, it does so "for the management, control, or operation of [its] telecommunications system."  47 U.S.C. §153(24); *see U.S. Telecom*, 825 F.3d at 705.[8]

Even if the telecommunications-management exception did not apply, caching "does not convert [broadband] into an information service" because "caching is not necessary for [broadband] to work"; it is instead an optional add-on feature separate from the underlying broadband transmission service.  *Order* ¶150 (A98).  In fact, the provider-operated caching considered in *Brand X* has become largely vestigial today.  *Id.* ¶151 (A98) (discussing "the drastic reduction in its use and relevance").  Broadband-provider caching is incompatible with now-common features like encryption.  *Ibid.*; *Mozilla*, 940 F.3d at 91 (concurring opinion).  And consumers do not want to see outdated news or content that their provider cached from a previous user's visit.  Today, provider-operated caching has been replaced by third-party content delivery networks

---

[8]  Petitioners are also wrong (Br. 38-39) that caching is a user-facing function with no inward-facing benefits.  Providers "use[] caching for a number of internal benefits," including to reduce "strain of subscribers' traffic on certain network segments or equipment" and "to 'reduce [the provider's] transit costs.'"  *Order* ¶139 (A87-88).

(CDNs) that, due to technical differences, do not have these limitations. *Order* ¶151 (A98-99).[9]

    **c.**   Petitioners' position that broadband can only be an information service also cannot be squared with Section 706(a) of the 1996 Act, which directs the Commission to encourage deployment of broadband ("advanced telecommunications capability") by "utilizing … price cap regulation, regulatory forbearance," and certain other tools. 47 U.S.C. §1302(a). Those tools apply only to telecommunications services, so Section 706 presupposes that broadband can be telecommunications service. *Order* ¶245 (A158-59). "Price cap regulation," for example, pertains only to common carriers, so Section 706's directive to consider promoting broadband through price-cap regulation contradicts Petitioners' position that broadband by definition is *never* common carriage. Tellingly, Petitioners nowhere address Section 706 or attempt to reconcile their position with it.[10]

---

[9]   Petitioners and their amici often confuse the first-party caching that broadband providers claim to offer with third-party CDNs. *See Order* ¶139n.546 (A87), ¶151n.620 (A99-100) (distinguishing between provider-operated caching and third-party CDNs); Peha Reply Comments 3-4 (A2071-72); Jordan/Peha Ex Parte 3 (A2167).

[10]  The stay order suggested (A551) that Section 706 applies only "when the Commission determines that broadband telecommunications are

(cont'd)

### 3. Statutory history and context support treating broadband as telecommunications service.

Treating broadband as offering telecommunications service is most consistent with the pre-1996 framework that Congress incorporated in the 1996 Act. That framework distinguished between the underlying transmission service and the data-processing applications offered over that service. *See supra* pp. 3-8. The internet's technical architecture "guarantees that the [transmission] service … is separable from the applications (such as webpage hosting, caching of newsgroup articles, and email) riding over it." Scott Jordan, *Broadband Internet Access Service is a Telecommunications Service*, 71 Fed. Commc'ns L.J. 155, 192 (2019); *see id.* at 184-92; Jordan Reply Comments 19-22 (A2143-46).

Contemporaneous understandings of the 1996 Act also support this view. Soon after the 1996 Act was enacted, the *Advanced Services Order* classified broadband as providing telecommunications service. The court

---

not 'being deployed to all Americans in a reasonable and timely fashion,'" quoting 47 U.S.C. §1302(b). That is incorrect: Subsection (b) of Section 706 requires such a finding, but subsection (a) applies "[i]n [g]eneral," as its title states. 47 U.S.C. §1302(a). Regardless, the Commission *has* made the determination under Section 706(b) that broadband "is not being deployed to all Americans in a reasonable and timely fashion." *2024 Section 706 Report*, 39 FCC Rcd. ---, 2024 WL 1192504, ¶222 (2024).

in *Portland* read the Act the same way.  216 F.3d at 878.  (The *Brand X* majority expressly "le[ft] untouched *Portland*'s holding" in this respect.  545 U.S. at 985-86.)    Not until several years later, in the *Cable Broadband Order*, did the Commission reverse course and, for the first time, seek to treat broadband as solely an information service.

Against this backdrop, the Congress that passed the 1996 Act would not find it surprising for broadband to be regulated as telecommunications service.  As the D.C. Circuit put it, "one might [think], as the Commission originally concluded [in the] *Advanced Services Order*, that Congress clearly contemplated that the Commission would continue regulating Internet providers in the manner it had previously."  *Verizon*, 740 F.3d at 638-39 (citation omitted).

### 4. Petitioners' remaining arguments do not command a different result.

Petitioners raise other arguments that they say compel an information-service classification.  Those arguments are foreclosed by *Brand X*'s holding that the proper classification depends on how the "offering" is understood by consumers, 545 U.S. at 989-92, and likewise cannot be reconciled with Section 706, *see supra* Part I.A.2.c.  Regardless, the arguments are unpersuasive.

**a.** Petitioners contend (Br. 43-44) that Sections 223(e)(6) and 230(f)(2) define broadband to be an information service, but those definitions do nothing of the sort. Section 230(f)(2) considers a "service or system that provides access to the Internet" to be an "interactive computer service," which in turn is a composite category that includes "any information service, *system, or access software provider*." 47 U.S.C. §230(f)(2) (emphasis added). Internet access may be an *interactive computer service*, but an interactive computer service is not necessarily *an information service*, as Petitioners would have it. As significantly, this definition applies only "[a]s used in this section"—*i.e.*, Section 230—and thereby disclaims any application beyond that narrow section. *Id.* §230(f). Section 223(e)(6) likewise uses the term interactive computer service, not information service, and likewise speaks only to how "this section"—*i.e.*, Section 223—"shall be construed." *Id.* §223(e)(6). By their terms, neither of those "narrow-purpose statutory provisions" bears on the separate parts of the Act at issue here. *Order* ¶249 (A160-61). As the D.C. Circuit held in *U.S. Telecom*, it is implausible that Congress would "attempt to settle the regulatory status of [broadband] in such an oblique and indirect manner." 825 F.3d at 703; *see Order*

- 44 -

¶249 (A161).[11]

Even less persuasive is Petitioners' claim (Br. 44) that Section 230(c)(2) shows broadband to be an information service. Section 230(c)(2) "merely immunizes providers [of interactive computer services] against civil liability, such as damages, for [certain] content-moderation decisions" made in good faith. *Order* ¶248 (A160). The broadband providers covered by the *Order*, which offer customers indiscriminate access to the whole internet, are not engaged in content moderation. *See id.* ¶¶651-653 (A383-84), ¶¶657-658 (A386-87). And the Commission's rules are enforceable through means other than civil damages actions. *Order* ¶248 (A160); *see*, *e.g.*, 47 U.S.C. §401(b).

**b.** The Commission's exercise of its statutory forbearance authority does not cast doubt on the conclusion that broadband offers telecommunications service. Petitioners rely (Br. 45) on *Utility Air*

---

[11]  Petitioners also cite (Br. 44-45) Section 230(b)(2)'s statement of policy "to preserve the vibrant and competitive free market that presently exists for the Internet." 47 U.S.C. §230(b)(2). That policy seeks to preserve unfettered competition among providers of internet *content and applications*, consistent with Section 230's overarching focus on internet content; it does not speak to transmission. The *Order* preserves unfettered competition among edge providers by preventing broadband providers from discriminating against or among them. *Cf. Verizon*, 740 F.3d at 645-46; *Order* ¶¶446-449 (A273-76).

*Regulatory Group v. EPA*, 573 U.S. 302 (2014), in which the EPA's greenhouse gas rule sought to tailor other statutory provisions in ways the statute did not contemplate or permit. *Id.* at 325-28. But here, by contrast, Congress specifically provided for such tailoring when it vested the Commission with statutory forbearance authority to adapt Title II to new technologies and circumstances. *Order* ¶319&n.1275 (A196-97); *see U.S. Telecom*, 825 F.3d at 706 (explaining why "[t]his case is nothing like *Utility Air*"). Rather than subvert the statutory scheme, the forbearance here is an *exercise* of authority that Congress directly envisioned.

**c.** Petitioners briefly gesture (Br. 47-48) at the First Amendment and constitutional avoidance. Tellingly, however, no Petitioner actually asserts any constitutional challenge to the *Order*, which does not pose First Amendment concerns. As the *Order* explains, "when [broadband] providers are carrying their users' communications, they are not themselves acting as speakers or engaged in any expressive activity … but instead are acting as mere conduits for the speech of others." *Order* ¶649 (A382); *see id.* ¶¶649-658 (A382-387); *Moody v. NetChoice, LLC*, 144 S.Ct. 2383, 2399-400 (2024) (the First Amendment is "implicate[d] … only if[] the regulated party is engaged in its own expressive activity").

And even if the First Amendment were implicated, the *Order* would easily withstand scrutiny.  *See Order* ¶¶659-664 (A387-389).

## B. The Commission Lawfully Classified Mobile Broadband As A Commercial Mobile Service.

An overlapping classification issue is whether mobile broadband is a "private mobile service," which may not be treated as common carriage, or instead a "commercial mobile service," which "shall … be treated as a common carrier" under any Title II requirements that the Commission has not forborne from.  *See* 47 U.S.C. §332(c)(1)-(2).

The Act thrice delegates to the Commission to delineate these categories:

- Commercial mobile service is "any mobile service" that "makes interconnected service available … to the public … *as specified by regulation by the Commission*."  *Id.* §332(d)(1) (emphasis added).

- "Interconnected service" means "service that is interconnected with the public switched network (*as such terms are defined by regulation by the Commission*)."  *Id.* §332(d)(2) (same).

- Private mobile service is any mobile service "that is not a commercial mobile service or the functional equivalent of a

commercial mobile service, *as specified by regulation by the Commission*." *Id.* §332(d)(3) (same).

When Congress "'expressly delegate[s]' to an agency the authority to give meaning to a particular statutory term," as here, "courts must respect the delegation." *Loper Bright*, 144 S.Ct. at 2263, 2273; *see also U.S. Telecom*, 825 F.3d at 717.

The public switched network was originally the telephone network, and devices connected to the network using ten-digit phone numbers. Today, devices can also connect to the global public network using another addressing system, internet protocol (IP) addresses. The Commission therefore updated its regulation defining the "public switched network" to encompass both ways that devices now connect to the network. *Order* ¶219 (A145); *see id.* ¶217 (A145) (this update "'embodies the current technological landscape'").

In doing so, the Commission determined that mobile broadband "makes interconnected service available … to the public," and thereby classified it as a "commercial mobile service" rather than a "private mobile service." *See* 47 U.S.C. §332(d)(1)-(3). Petitioners' objections to that commonsense conclusion are meritless.

Petitioners first contend (Br. 49-50) that "public switched network" is "a term of art with a clear meaning: the 10-digit telephone number network." But the term Petitioners have in mind is "public switched *telephone* network." In the Act, Congress eschewed that narrow, technology-specific term for the broader, technology-agnostic term "public switched network." 47 U.S.C. §332(d)(2); *see Order* ¶220 (A146); *U.S. Telecom*, 825 F.3d at 717-18. The difference between these terms was understood at the time. *Order* ¶221&n.927 (A146) (citing *Newton's Telecom Dictionary* 799 (6th ed. 1993) ("The term [public switched network] is usually applied to the public telephone network but it could be applied more generally to other switched networks")). And Congress confirmed that it did not mean to adopt any single, static meaning when it provided for "such term[] [to be] defined by regulation by the Commission," 47 U.S.C. §332(d)(2), which "would have been unnecessary if Congress had intended the term to refer only to the public switched telephone network." *Order* ¶220 (A146); *accord U.S. Telecom*, 825 F.3d at 718.

Petitioners contend (Br. 50) that this network is not "interconnected" because, they say, "[t]here are no internal connections between" the internet and the telephone network. That is false. The

telephone network and the internet are "a physically connected network … not two physically separate networks." Scott Jordan, *Mobile Broadband Internet Access Service is a Commercial Mobile Service*, 27 Info. & Commc'ns Tech. L. 304, 355-56 (2018). "They share network elements," *ibid.*, with internet communications transmitted over phone lines and cell towers, and phone calls frequently transmitted as IP packets. Telephone and internet communications are commingled over the same facilities.

The Commission reasonably found, moreover, that the telephone network and the internet are interconnected because devices can communicate with one another via now-ubiquitous Voice over Internet Protocol (VoIP) technology. *Order* ¶¶226-227 (A150-51); *U.S. Telecom*, 825 F.3d at 719-23; *see* 47 C.F.R. §9.3 (addressing "Interconnected VoIP Service"). Broadband users can make calls to and receive calls from ten-digit phone numbers by using VoIP applications, like Skype and Google Voice. *Ibid.* Likewise, traditional telephone users can dial into an online Zoom or Webex meeting by calling a ten-digit phone number.

In view of these connections, Petitioners are incorrect (Br. 51-52) that the telephone network and the internet cannot be part of a single public switched network. Telecommunications networks are often "a

composite of networks." *Order* ¶224 (A149). The traditional telephone network itself is a composite of local exchange carriers' networks, interexchange (long-distance) networks, and each wireless carrier's mobile network. *Ibid.*; *see* Jordan, *Mobile Broadband*, at 353-54, 355-56. And the internet is a network of networks. Both of these networks are now connected in the form of the public switched network.

Petitioners also object (Br. 50, 53) that a traditional telephone cannot call a website or a smart appliance. But nothing in the statute requires that every device on a network be equipped to communicate with every other device. *Order* ¶229 (A152). A traditional telephone cannot send or receive a fax, but no one denies that telephones and fax machines are connected to a single telephone network. *See* Jordan, *Mobile Broadband*, at 360, 362; Jordan Reply Comments 31-33 (A2155-57). An internet-connected thermostat may not be able to communicate with an internet-connected heart monitor, but both are connected to the internet.

Finally, the alternative option—to classify mobile broadband as a "private mobile service," 47 U.S.C. §332(d)(3)—makes little sense. "[M]obile broadband stands in marked contrast to 'the private mobile service[s] of 1994, such as a private taxi dispatch service, services that offered users access to a discrete and limited set of endpoints.'" *U.S.*

*Telecom*, 825 F.3d at 715 (quoting *2015 Order* ¶404); *see Order* ¶225n.950 (A149-50); *2015 Order* ¶389n.1102.  Mobile access to the internet—the largest public network ever devised—cannot readily be described as a *private* mobile service.

## II.    THE MAJOR-QUESTIONS DOCTRINE DOES NOT FORECLOSE THE BEST READING OF THE STATUTE.

The major-questions doctrine is no basis to depart from the best reading of the Act.  That doctrine has been applied when an agency asserts authority to do something different in kind from what it has done in the past or that greatly diverges from its statutory mission.  That is not the case here.  When the Commission weighs how to regulate a communications service, it must ascertain how that service is categorized under the Act.  Determining whether broadband is a telecommunications service or an information service is just one variant of a familiar task squarely within the FCC's expertise.  *See Order* ¶240 (A155-56).  And there is no support for Petitioners' apparent view that, if the interpretive question is arguable and the answer has substantial economic consequences, the agency and the courts must adopt the interpretation that imposes the least regulatory burden even if that is the inferior reading of the statute.

**A.** The major-questions doctrine seeks to preserve Congress's prerogative to set the law; it is not a license to ignore or defy what Congress has directed. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (the doctrine serves "a practical understanding of legislative intent"); *Biden v. Nebraska*, 600 U.S. 477, 508 (2023) (Barrett, J., concurring) ("[T]he major questions doctrine is a tool for discerning—not departing from—the text's most natural interpretation."); *Order* ¶253&n.1058 (A164).

Because the *Order* "simply follow[s] the best reading of the Communications Act, as demonstrated by the statute's plain text, structure, and historical context," the major-questions doctrine offers no basis for the Court to reach a different result. *Order* ¶253 (A164). The Supreme Court has never suggested that the doctrine permits a court to adopt an interpretation that *contravenes* the best reading of the statute. That radical approach would improperly supplant the best-reading analysis required by *Loper Bright*. *See* 144 S.Ct. 2244, 2266 (2024).

**B.** The major-questions doctrine also cannot preclude the Commission from ruling on the proper classification of broadband in the first instance. The Communications Act is replete with provisions the Commission must administer that turn on how a service is classified.

*Order* ¶241 (A156-57), ¶264 (A170).  To fulfill its duties, the Commission must know—and if the answer is unclear, must *decide*—whether that service is a telecommunications service or an information service.  *Ibid.* If a party petitions the Commission under Section 253(d) to preempt an impediment to broadband service, for example, the Commission must decide the classification issue because its preemption authority applies only to telecommunications service.  47 U.S.C. §253; *see Order* ¶72 (A42). So too when a party petitions the Commission for forbearance under Section 10(c), a request the Commission must act on within one year.  47 U.S.C. §160(c).

Because the Act necessarily requires the Commission to confront this issue, the major-questions doctrine cannot preclude it from acting. A court may independently review whether the Commission's decision was correct, but the major-questions doctrine does not preclude it from deciding the classification issue in the first instance.  To carry out its duties, the agency *must* decide this question.  *See Order* ¶264&nn.1107-1109 (A170).

**C.**  The major-questions doctrine also does not readily resolve the interpretive issue presented here.  Petitioners contend that a Title II classification would be a major question because of the alleged economic

and political consequences. But if so, the alternative of selecting a Title I classification rather than Title II would *also* be a major question. "[A]dopt[ing] a Title I classification would simply be the obverse of a decision to adopt a Title II classification, with the same economic and political stakes (but in the opposite direction)." *Order* ¶254&n.1062 (A164). The Act does not identify a baseline position; a choice must be made. "[T]he major-questions doctrine does not resolve this issue or place a thumb on the scale in favor of one interpretation over the other." *Ibid.*

Petitioners contend (Br. 30) that "disclaiming … regulatory authority" with a Title I reading would "not implicate the major-questions doctrine," whereas a Title II reading carries more regulatory obligations. That position is foreclosed by Supreme Court precedent. In *MCI v. AT&T*—identified as a major-questions case by *West Virginia*—the Court overturned an FCC order adopting a *deregulatory* interpretation of the Act. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 224-34 (1994) (holding that authority to "modify" tariff-filing requirements did not permit eliminating tariff-filing for nondominant carriers altogether). That decision makes clear "that the major-questions doctrine applies equally to agency actions that are regulatory or deregulatory" and "does not … place a thumb on the scale."

*Order* ¶254&n.1062 (A164).  Petitioners' contrary view—that the agency and the courts must always adopt the reading that imposes the least regulatory burden—is inconsistent with that precedent and, again, would improperly supplant the best-reading analysis required by *Loper Bright*.

Petitioners also contend (Br. 24-27) that Title I should be the default classification because, they assert, that was the initial regulatory status under the 1996 Act and for years after.  But Petitioners have their history backwards.   In fact, the facilities-based transmission that broadband offers today was regulated under Title II at the time of the 1996 Act, and the roughly contemporaneous interpretations by the Commission in the *Advanced Services Order* and by the court in *Portland* confirmed that broadband offers telecommunications service.  Not until several years later, in the *Cable Broadband Order*, did the Commission seek to classify broadband as a Title I information service—which *Brand X* recognized was a change from the original Title II treatment, *see* 545 U.S. at 981-82, 1000-02.   If the major-questions doctrine limits departures from the original, contemporaneous understanding, then it favors a Title II classification, not Title I.

**D.** Petitioners also fail to show that the *Order* is "major" in the sense used by the Supreme Court's major-questions cases. The major-questions doctrine applies to "extraordinary cases" involving "'transformative'" and "'unheralded'" assertions of authority "beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 721-24. The Court has looked to a constellation of factors to identify such extraordinary cases, and those factors make a poor case for applying the doctrine here. *See id.* ¶¶256-263 (A165-69).

For starters, the issues here "fall[] squarely within the Commission's wheelhouse" and its "technical and policy expertise." *Id.* ¶¶260-261 (A168); *see Brand X*, 545 U.S. at 1003 (recognizing "the Commission's … expert policy judgment"). Indeed, "[r]egulating communications networks 'is what [the Commission] *does*.'" *Order* ¶260 (A168) (emphasis added). The FCC regulating communications is not like the CDC regulating evictions. *Ibid.* Nor does the *Order* claim to discover any "novel," "unheralded," or "surprising" power, given the Commission's history of regulating transmission providers under Title II. *Id.* ¶259 (A167-68). The *Order* comports with the treatment of transmission providers at the time of the 1996 Act and the roughly contemporaneous interpretations in the *Advanced Services Order* and

*Portland. Ibid.* In all these respects, "the situation here is the antithesis of the Supreme Court's major-questions cases." *Id.* ¶258 (A167).

Petitioners instead look to the *Order*'s economic impact, but economic impact alone has never meant that agency action is a transformative and unheralded expansion of the agency's legal authority. And Petitioners' claims are in any event exaggerated and unsubstantiated. *Order* ¶257 (A166), ¶¶276-302 (A175-88), ¶¶635-640 (A376-78); *see infra* Part III.B. Petitioners say that broadband "generates about $150 billion in annual revenue" (Br. 21), but the fact that the broadband industry is large does not automatically mean that any regulation is major, or even detrimental.[12] After all, the Commission has long exercised power to regulate the telephone, broadcast, and cable industries. There is nothing unusual about the FCC regulating large communications industries.

---

[12] In fact, the economics literature reflects that telecommunications regulation can foster market conditions that *promote* growth and investment. *Order* ¶¶279-282 (A176-79), ¶¶448-449 (A273-76), ¶636 (A376); *U.S. Telecom*, 825 F.3d at 707. The D.C. Circuit has already upheld the Commission's finding that Open Internet rules will stimulate broadband investment and competition through a virtuous cycle of innovation. *Verizon*, 740 F.3d at 642-45; *see Order* ¶¶446-449 (A273-76). Broadband was subject to a near-identical regulatory regime from 2015 to 2018, and before that was previously subject to Title II until 2002, and the internet "continued to flourish" during those times. *Order* ¶257 (A166).

Petitioners also offer no indication that the Congress that passed the 1996 Act would have thought it controversial to apply Title II to facilities-based transmission, since that would have continued to "regulat[e] Internet providers in the manner [they] had [been] previously." *See Verizon*, 740 F.3d at 638-39. Any "recent stalemate" in Congress decades later does not "cast[] doubt on [the] regulatory authority" that Congress conferred in 1996. *Order* ¶262 (A168-69); *see also id.* ¶255 (A165).

Petitioners also seek to invoke (Br. 1, 6, 21) policies that the Commission did *not* impose, like rate regulation, and in fact has affirmatively forborne from. *See Order* ¶¶303-442 (A188-271). As Justice Scalia put it, however, forbearance makes Title II "not a worry." *Brand X*, 545 U.S. at 1011 (Scalia, J., dissenting). "[A]ny changes to this framework or future rules" would require a new proceeding and be subject to judicial review. *Order* ¶641 (A379). Petitioners cannot invoke the major-questions doctrine based on the imagined burdens of obligations the *Order* does not impose.

**E.** Finally, an agency may act on major questions if clearly authorized by Congress. On this, *Brand X* is clear and controlling: The Communications Act "leaves federal telecommunications policy in this

technical and complex area to be set by the Commission." 545 U.S. at 992. "[W]e know Congress vested the agency with [this] authority … because the Supreme Court has specifically told us so," and that answer is "authoritative[] for [the] purposes [of] an inferior court." *U.S. Telecom II*, 855 F.3d at 383, 385 (Srinivasan, J., concurring in denial of rehearing); *see Order* ¶264&n.1104 (A169-70). Indeed, the Court found the Commission's authority clear "even though several parties expressly raised the [major-questions] issue" in that case. *Order* ¶254 (A164-65). And the following year, in a case invalidating other federal action under the major-questions doctrine, the Supreme Court distinguished *Brand X* because it is "clear" that the Communications Act "gives [the Commission] broad power to enforce all provisions of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 258-59 (2006).

That conclusion was well-founded. The Communications Act *expressly* provides that a provider "shall be treated as a common carrier … to the extent that it is engaged in providing telecommunications services," 47 U.S.C. §153(51); *see also id.* §332(c)(1) (same for commercial mobile services), and Title II vests the Commission with broad regulatory authority over such services. The issue here thus is not whether the Commission has authority to regulate telecommunications service under

Title II, but the largely factual question whether broadband falls within the statutory definition of telecommunications service. If it does—as the record here shows—then the Communications Act clearly vests the Commission with authority for the *Order*.

The stay order recognized that the Act separately "specifically empower[s]" the Commission to classify mobile broadband (A550), yet appears to have misapprehended the import of that delegation. Everyone agrees that, to avoid a statutory contradiction, the Commission's delegated power to classify mobile broadband as a commercial mobile service also requires that broadband be classified as a telecommunications service. *Order* ¶230 (A152); *U.S. Telecom*, 825 F.3d at 724. The Commission's express authority to resolve the classification of mobile broadband necessarily implies that it has authority to decide the Title II question as well.

## III. PETITIONERS' OBJECTIONS TO THE COMMISSION'S POLICY JUDGMENTS ARE UNAVAILING.

**A.** The APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright*, 144 S.Ct. at 2261. Here, the Commission identified an array of important public policy interests that "each independently … support" the actions taken

in the *Order*.  *Order* ¶27 (A14); *see id.* ¶¶26-105 (A12-60), ¶¶444-491 (A271-296).   Petitioners challenge certain interests, but do not truly engage with the key rationales that the D.C. Circuit previously emphasized: the need to address broadband providers' incentive and ability to discriminate, to protect public safety, and to provide fair access to essential infrastructure and universal service support.

**Need for Open Internet Rules.**   The D.C. Circuit in *Verizon* and *U.S. Telecom* affirmed the Commission's judgment that, without Open Internet rules, broadband providers would have "technical and economic ability" and "powerful incentives" to "discriminate against and among edge providers."  *Verizon*, 740 F.3d at 645-46; *U.S. Telecom*, 825 F.3d at 694; *see Order* ¶446 (A273), ¶472 (A285).   Broadband providers have "the economic power … to act as a 'gatekeeper' with respect to edge providers that might seek to reach [their] end-user subscribers" and "to [extract] fees from edge providers, either in return for excluding their competitors or for granting them prioritized access to end users."  *Verizon*, 740 F.3d at 645-46.

The Commission found that Open Internet rules are still "necessary to enable the Commission to prevent and address [such] conduct."  *Order* ¶444 (A271-72).   Broadband providers have "the ability to act as

gatekeepers" because a broadband provider "is typically an edge-provider's only option for reaching a particular end-user." *Order* ¶469 (A284). This gives broadband providers the ability "to charge … edge providers for access or prioritized access to [their] end users," *ibid.*, and to engage in other harmful practices, *see id.* ¶470 (A284). Providers "have engaged in such practices in the past," *id.* ¶464 (A282); *see id.* ¶479 (A289); *Verizon*, 740 F.3d at 648, and "continue to have the incentive and ability to harm Internet openness" today, *Order* ¶444 (A272).

Petitioners seek to dismiss these concerns as "guesswork" or "speculation" (Br. 59-60), but they rest on well-grounded findings as to broadband providers' technical abilities and their economic incentives that the D.C. Circuit found "based firmly in common sense and economic reality." *Verizon*, 740 F.3d at 646. And Petitioners' insistence that customer pressure will restrain harmful conduct (Br. 58-59) neglects that a customer "may have no reason to suppose that [problems with] a particular application … derive[] from her ISP's choices rather than from some deficiency in the application"—that is, a customer might not "suspect the fault lies with her ISP rather than with Netflix itself." *U.S. Telecom II*, 855 F.3d at 389 (Srinivasan, J., concurring in denial of rehearing); *see Order* ¶476 (A288).

Petitioners maintain (Br. 58) that the rules are unnecessary because "ISPs across the board voluntarily ensure internet openness and have made public commitments to continue doing so." But in the absence of enforceable rules, voluntary commitments could be rescinded at any time. Nor does Petitioners' purported voluntary restraint show the Commission's concerns to be unfounded. For one thing, there *have* been well-documented attempts to engage in harmful conduct, including in recent years. *Order* ¶478-479 (A289) ; *Verizon*, 740 F.3d at 648; *see also* A1630-31, A1937-43, A2160-63 (comments of EFF, Public Knowledge, and Prof. Narechania). For another, Petitioners' ostensible good behavior has occurred only under the prospect that the Open Internet rules could otherwise be reinstated—either by the Commission (as here) or by the D.C. Circuit (in still-pending litigation over the *Mozilla* remand). This behavior does not speak to what will happen if the prospect of Commission oversight is removed entirely, as Petitioners seek. *Cf. United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504-05 (1974).

**Other Significant Policy Concerns.** Petitioners also ignore the significant policy concerns raised by the *Mozilla* court about public safety, access to essential infrastructure, and universal service support.

*Mozilla* held that the Commission's repeal of the previous Open Internet rules failed to address how allowing broadband providers "to prioritize Internet traffic as they see fit, or to demand payment" could "imperil the ability … to communicate during a crisis," and how "blocking or throttling … during a public safety crisis could have dire, irreversible results." 940 F.3d at 60-61. Addressing such conduct only "'later … on a post-hoc basis'" is inadequate because "the harm to the public 'cannot be undone.'" *Id.* at 61. Upon examination, the Commission "agree[d]" with the *Mozilla* court that Title II and the associated rules are necessary "as proactive actions to protect life and property by preventing potential harms from occurring, as opposed to … act[ing] after the harms have already occurred." *Order* ¶456 (A278-79); *see also id.* ¶57 (A35). It also found that Title II will safeguard national security by allowing the government to bar dangerous entities from operating broadband in the United States. *Order* ¶¶30-41 (A14-24); *see China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022); *Pac. Networks Corp. v. FCC*, 77 F.4th 1160 (D.C. Cir. 2023).

The Commission also agreed with *Mozilla* that the Title I regime disregarded the needs of standalone broadband providers, like Google Fiber. "[M]ore and more providers" will seek to deploy standalone

broadband networks in the coming years. *Order* ¶77 (A44), ¶81 (A48). To compete in the broadband market, they need access to utility poles and other essential infrastructure. Yet under a Title I regime, standalone broadband providers would not have the same rights of access to essential infrastructure under Sections 224, 253, and 332(c)(7) as providers who furnish both telephone (or cable) and broadband service. *Order* ¶¶70-82 (A40-49); *Mozilla*, 940 F.3d at 65-67. Similarly, under Title I, standalone broadband providers could not receive universal-service subsidies for service to high-cost areas and to low-income households. *Order* ¶¶91-101 (A51-58); *Mozilla*, 940 F.3d at 68-70. Standalone broadband providers will not be able to enter the market and compete on a level playing field unless broadband is classified as a Title II telecommunications service.

**B.** Petitioners' contention that the Commission failed to consider alleged harms of reclassification (Br. 56-57) is meritless. The Commission closely examined claims that the *Order* would reduce broadband investment and found them unsupported. *Order* ¶¶276-302 (A175-188), ¶¶635-638 (A376-77). It meticulously engaged with the "Ford Paper," on which Petitioners principally rely (Br. 21-22, 57), and

found it so gravely flawed as to have "no probative value."[13]  *Id.* ¶¶289-295 (A182-86).  The *Order* likewise found that any compliance costs are likely to be modest and that "the benefits of Title II reclassification and the proposed open Internet rules outweigh the costs."  *Id.* ¶633 (A375); *see id.* ¶¶638-646 (A377-81).

**C.**  Petitioners separately challenge the *Order*'s general-conduct standard (Br. 63-64), but appear to misunderstand its role and effect. Some potentially harmful practices are impossible to address through *per se* rules and require closer case-by-case examination.  *Order* ¶517 (A311), ¶520 (A313); *see, e.g., id.* ¶¶533-542 (A320-28).  Absent the general-conduct standard, the Commission would need to adjudicate provider conduct on a case-by-case basis directly under Sections 201 and 202's

---

[13] Among other things, Dr. Ford mistakenly relied on projected data rather than actual measurements; when his regression model was replicated using the correct data, it showed only a very small and statistically insignificant effect, "very likely due to random noise" rather than any actual negative impact.  *Order* ¶292&n.1196 (A183-84).  Dr. Ford did not "refute[] the Commission's methodological criticisms" concerning his use of erroneous data (Br.22n.2), but instead responded by constructing an entirely new model that is methodologically flawed and unreliable.  *See id.* ¶¶293-295 (A184-86). That new model "lacks rigor," is "not in line with recommended best practices from the empirical economics literature," and uses "a process [that] is known to be theoretically dubious and statistically problematic."  *Id.* ¶294 (A185).

"just and reasonable" requirement. *Id.* ¶516&n.2051 (A310), ¶¶528-529 (A318-20), ¶¶596-597 (A360); *see also id.* ¶¶323-325 (A200-201).

Compared to "proceeding purely under the text of sections 201 and 202 alone," the general-conduct standard offers "advantages" of "more clarity to consumers, edge providers, and [broadband] providers" and "more flexibility … to innovate." *Order* ¶528 (A319). Just as the D.C. Circuit found in *U.S. Telecom*, 825 F.3d at 736-38, the Commission reasoned that the general-conduct standard mitigates uncertainty and costs via the *Order*'s extensive guidance and the opportunity to seek advisory opinions. *Order* ¶532 (A320), ¶645 (A380-81). The general-conduct standard thus provides "more clarity—not less—than [under] sections 201 and 202 of the Act alone." *Id.* ¶529 (A319-20).

## CONCLUSION

The petitions for review should be denied.

Dated:  September 11, 2024

Respectfully submitted,

/s/  *Andrew W. Chang*

Jonathan S. Kanter
  *Assistant Attorney General*

Daniel E. Haar
Nickolai G. Levin
Robert B. Nicholson
Andrew W. Chang
  *Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

*Counsel for Respondent*
  *United States of America*

/s/  *Scott M. Noveck*

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Scott M. Noveck
  *Counsel*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent Federal*
  *Communications Commission*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒   this document contains <u>12,988</u> words, *or*

    ☐   this document uses a monospaced typeface and contains <u>    </u> lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word for Office 365</u> in <u>14-point Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced typeface using <u>      </u> with <u>      </u>.


<u>*/s/  Scott M. Noveck*      </u>
Scott M. Noveck
*Counsel for Respondents*

- 70 -

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on September 11, 2024, I caused the foregoing

Brief for Respondents to be filed with the Clerk of Court for the United

States Court of Appeals for the Sixth Circuit using the electronic

CM/ECF system.  I further certify that all participants in the case are

registered CM/ECF users and will be served electronically by the

CM/ECF system.

/s/  Scott M. Noveck
Scott M. Noveck
*Counsel for Respondents*

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM CONTENTS

**Page**

Communications Act of 1934, *as amended*, 47 U.S.C. §§151 *et seq.*:

47 U.S.C. §151................................................................. Add. 2

47 U.S.C. §153................................................................. Add. 2

47 U.S.C. §154................................................................. Add. 3

47 U.S.C. §160................................................................. Add. 3

47 U.S.C. §201................................................................. Add. 5

47 U.S.C. §202................................................................. Add. 6

47 U.S.C. §224................................................................. Add. 6

47 U.S.C. §253................................................................. Add. 7

47 U.S.C. §303................................................................. Add. 8

47 U.S.C. §332................................................................. Add. 8

Section 706 of the Telecommunications Act of 1996,
47 U.S.C. §1302........................................................... Add. 11

47 C.F.R. §9.3 ............................................................... Add. 12

Section 1 of the Communications Act, 47 U.S.C. §151, provides:

### Sec. 1 [47 U.S.C. §151]. Purposes of act; creation of Federal Communications Commission.[*]

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is hereby created a commission to be known as the "Federal Communications Commission," which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of [this Act].

Section 3 of the Communications Act, 47 U.S.C. §153, provides in pertinent part:

### Sec. 3 [47 U.S.C. §153]. Definitions.

*        *        *

(24) **Information service.**—The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

---

* Where headings in the U.S. Code differ from headings in the session laws enacted by Congress, this addendum uses the congressionally enacted headings. Where the text varies, the congressionally enacted text appears in brackets.

Add. 2

\*     \*     \*

(50) **Telecommunications.**—The term "telecommunications" means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

(51) **Telecommunications carrier.**—The term "telecommunications carrier" means any provider of telecommunications services \* \* \*.  A telecommunications carrier shall be treated as a common carrier under [this Act] only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

\*     \*     \*

(53) **Telecommunications service.**—The term "telecommunications service" means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

\*     \*     \*

Section 4 of the Communications Act, 47 U.S.C. §154, provides in pertinent part:

### Sec. 4 [47 U.S.C. §154]. Provisions relating to the Commission.

\*     \*     \*

(i) The Commission may perform any and all acts, make such rules and regulations, and issue such orders, not inconsistent with [this Act], as may be necessary in the execution of its functions.

\*     \*     \*

Section 10 of the Communications Act, 47 U.S.C. §160, provides:

### Sec. 10 [47 U.S.C. §160]. Competition in provision of telecommunications service.

(a) **Regulatory flexibility.**—Notwithstanding section 332(c)(1)(A) of [this Act], the Commission shall forbear from applying

any regulation or any provision of [this Act] to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

(b) **Competitive effect to be weighed.**—In making the determination under subsection (a)(3), the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

(c) **Petition for forbearance.**—Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a). The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing

(d) **Limitation.**—Except as provided in [section 251(f)], the Commission may not forbear from applying the requirements of [section 251(c) or 271] under subsection (a) of this section until it determines that those requirements have been fully implemented.

(e) **State enforcement after Commission forbearance.**— A State commission may not continue to apply or enforce any provision of this Act that the Commission has determined to forbear from applying under subsection (a).

Section 201 of the Communications Act, 47 U.S.C. §201, provides:

**Sec. 201 [47 U.S.C. §201] Service and charges.**

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is hereby declared to be unlawful: *Provided*, That communications by wire or radio subject to this Act may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in [this Act] or in any other provision of law shall be construed to prevent a common carrier subject to [this Act] from entering into or operating under any contract with any common carrier not subject to [this Act], for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in [this Act] or in any other provision of law shall prevent a common

Add. 5

carrier subject to [this Act] from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports.  The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of [this Act].

Section 202 of the Communications Act, 47 U.S.C. §202, provides:

### Sec. 202 [47 U.S.C. §202]. Discrimination and preferences.

(a) It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

(b) Charges or services, whenever referred to in this Act, include charges for, or services in connection with, the use of common carrier lines of communication, whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind.

(c) Any carrier who knowingly violates the provisions of this section shall forfeit to the United States the sum of $6,000 for each such offense and $300 for each and every day of the continuance of such offense.

Section 224 of the Communications Act, 47 U.S.C. §224, provides in pertinent part:

### Sec. 224 [47 U.S.C. §224]. Regulation of pole attachments.

(a) As used in this section: * * *

(4) The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

\*    \*    \*

(b)(1) Subject to the provisions of subsection (c) of this section, the Commission shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable, and shall adopt procedures necessary and appropriate to hear and resolve complaints concerning such rates, terms, and conditions. For purposes of enforcing any determinations resulting from complaint procedures established pursuant to this subsection, the Commission shall take such action as it deems appropriate and necessary, including issuing cease and desist orders, as authorized by section 312(b) of [title III of the Communications Act of 1934, as amended].

(2) The Commission shall prescribe by rule regulations to carry out the provisions of this section.

\*    \*    \*

Section 253 of the Communications Act, 47 U.S.C. §253, provides in pertinent part:

### Sec. 253 [47 U.S.C. 253]. Removal of barriers to entry.

(a) **In General.**—No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) **State Regulatory Authority.**—Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) **State and Local Government Authority.**—Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) **Preemption.**—If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

*    *    *

Section 303 of the Communications Act, 47 U.S.C. §303, provides in pertinent part:

### Sec. 303 [47 U.S.C. §303]. General powers of Commission.

Except as otherwise provided in this Act, the Commission from time to time, as public convenience, interest, or necessity requires shall—

*    *    *

(r) Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of [this Act] * * *.

*    *    *

Section 332 of the Communications Act, 47 U.S.C. §332, provides in pertinent part:

### Sec. 332 [47 U.S.C. §332]. Mobile services.

(a) In taking actions to manage the spectrum to be made available for use by the private mobile services, the Commission shall consider, consistent with [section 1 of this Act], whether such actions will—

(1) promote the safety of life and property;

*    *    *

(c) **Regulatory Treatment of Mobile Services.**—

(1) **Common carrier treatment of commercial mobile services.**—(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person

Add. 8

is so engaged, be treated as a common carrier for purposes of this Act, except for such provisions of [title II] as the Commission may specify by regulation as inapplicable to that service or person. * * *

(2) **Non-common carrier treatment of private mobile services.**—A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under [this Act]. * * *

\*　　\*　　\*

(7) **Preservation of local zoning authority.**—

\*　　\*　　\*

(B) **Limitations.**—

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

(v) Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction.  The court shall hear and decide such action on an expedited basis.  Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

(C) **Definitions.**—For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; * * *

\*       \*       \*

(d) **Definitions.**—For purposes of this section—

(1) the term "commercial mobile service" means any mobile service (as defined in [section 3]) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B); and

(3) the term "private mobile service" means any mobile service (as defined in [section 3]) that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

Section 706 of the Telecommunications Act of 1996, 47 U.S.C. §1302, provides in pertinent part:

### Sec. 706 [47 U.S.C. §1302]. Advanced telecommunications incentives.

(a) **In General.**—The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) **Inquiry.**—The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

\*    \*    \*

(d) **Definitions.**—For purposes of this subsection:

(1) **Advanced telecommunications capability.**—The term "advanced telecommunications capability" is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) **Elementary and secondary schools.**—The term "elementary and secondary schools" means elementary and secondary schools, as defined in section 7801 of title 20.

47 C.F.R. §9.3 provides in pertinent part:

## § 9.3 Definitions.

\*    \*    \*

*Interconnected VoIP service.*   (1) An interconnected Voice over Internet Protocol (VoIP) service is a service that:

(i) Enables real-time, two-way voice communications;

(ii) Requires a broadband connection from the user's location;

(iii) Requires internet protocol-compatible customer premises equipment (CPE); and

(iv) Permits users generally to receive calls that originate on the public switched telephone network and to terminate calls to the public switched telephone network.

\*    \*    \*