ORAL ARGUMENT SCHEDULED FOR OCTOBER 31, 2024

Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3504, 24-3507, 24-3508, 24-3510, 24-3511, 24-3519, and 24-3538

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

IN RE: MCP NO. 185; OPEN INTERNET RULE (FCC 24-52)
OHIO TELECOM ASSOCIATION, et al.,
*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,
*Respondents*.

On Petitions for Review of an Order of
the Federal Communications Commission

## BRIEF OF *AMICUS CURIAE* CALIFORNIA PUBLIC UTILITIES
## COMMISSION FOR AFFIRMANCE IN SUPPORT OF RESPONDENTS

CHRISTINE J. HAMMOND, *General Counsel*
JONATHAN C. KOLTZ, *Assistant General Counsel*
KIMBERLY J. LIPPI, *Counsel*
ATTORNEYS FOR *AMICUS CURIAE*

CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
kimberly.lippi@cpuc.ca.gov
(415) 703-5822

September 18, 2024

## STATEMENT REGARDING IDENTITY OF *AMICUS CURIAE*, ITS INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE

Pursuant to Fed. R. App. P. Rule 29(a)(4)(D), *amicus curiae* is the California Public Utilities Commission (CPUC), a California state agency responsible for regulating privately owned electric, natural gas, telecommunications, water, railroad, rail transit, and passenger transportation companies in the State of California. Among other duties, the CPUC is responsible for ensuring utility pole safety in the State of California, ensuring the safety and reliability of California's electric grid and telecommunications network, and administering the California LifeLine program, which provides discounted communications services to qualified low-income households. The CPUC also created and administers California's Deaf and Disabled Telecommunications Program, a program that provides telecommunication access and specialized telecommunications equipment to individuals with functional limitations of hearing, vision, movement, manipulation, speech, and interpretation of information. In submitting this brief, the CPUC draws upon its regulatory expertise to articulate and defend the position that the Federal Communications Commission's *Safeguarding and Securing the Open Internet Order* is lawful and should be upheld in its entirety. This brief discusses the impact of the Commission's *Order* on public safety, and its implication on regulatory issues in California, including the safety of utility pole attachments, the provision of communications services to low-income and deaf and

i

disabled communities, and the safety and reliability of the energy grid and telecommunications network in California.  The CPUC participated in the Federal Communications Commission's underlying proceeding for the *Order* on review and, therefore, has an established interest in the outcome of this proceeding and believes that its perspective will assist the Court in resolving this case.

In accordance with Fed. R. App. P. Rule 29(a)(2), all petitioners, respondents, and proposed intervenors in this proceeding have consented to the filing of this brief.  In accordance with Fed. R. App. Rule 29(a)(4)(E), no party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money intended to fund the preparation or submission of this brief, and no person other than *amicus* contributed money intended to fund the preparation or submission of this brief.

/s/ *Kimberly J. Lippi*
Kimberly J. Lippi
September 18, 2024                                      *Counsel for Amicus Curiae*

ii

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

STATEMENT REGARDING IDENTITY OF *AMICUS CURIAE*, ITS INTEREST IN THE CASE, AND SOURCE OF AUTHORITY TO FILE ..................................i

TABLE OF AUTHORITIES ......................................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT ..........................................................................................2

I.    THE CLASSIFIACTION OF BIAS AS A TITLE II TELECOMMUNICATIONS SERVICE HAS IMPORTANT POLICY IMPLICATIONS FOR THE PROTECTION OF PUBLIC SAFETY AND THE PROVISION OF UNIVERSAL SERVICE SUPPORT .........................2

    A.    Title II Better Protects Pole Attachment Access and Safety.................3

    B.    Title II Better Protects Access and Preservation of Universal Services for Low-Income Communities ...........................................................10

    C.    Title II Preserves Access to Communications Services for Deaf and Disabled Persons ...............................................................................12

    D.    Title II Better Protects the Safety and Reliability of the Communications Network and Energy Grid ...................................................................17

    E.    Voluntary Commitments Are Not Enough to Protect Public Safety and Network Reliability ...........................................................................23

II.    IF INTERNET SERVICE PROVIDERS ARE SUCCESSFUL IN THEIR CHALLENGES, BIAS WILL BE IN A REGULATORY VACUUM ........26

CONCLUSION ......................................................................................29

CERTIFICATE OF COMPLIANCE .........................................................30

CERTIFICATE OF FILING AND SERVICE ............................................31

# TABLE OF AUTHORITIES

**Page (s)**

## Federal Cases

*Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019).................................................10

*New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135 (2d Cir. 2024) ......26

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009)................................10

## Federal Statutes

Americans with Disabilities Act of 1990, Pub. L. 101-336, 104 Stat. 327 .............12

Communications Act of 1934, Pub. L. 101-336, 101 Stat. 327................................3

47 U.S.C. §§ 151 *et seq*.....................................................................................*passim*

47 U.S.C. § 151 .........................................................................................................10

47 U.S.C. § 214(e) .....................................................................................................10

47 U.S.C. § 224............................................................................................................3

47 U.S.C. § 224(b) .......................................................................................................5

47 U.S.C. § 224(b)(1)...................................................................................................6

47 U.S.C. § 224(c)-(f) ..................................................................................................6

47 U.S.C. § 224(f)(1) ...................................................................................................5

47 U.S.C. § 224(f)(2) ...................................................................................................6

47 U.S.C. § 225.....................................................................................................12, 13

47 U.S.C. § 225(b)(2)..................................................................................................15

47 U.S.C. § 225(c) ......................................................................................................12

47 U.S.C. § 225(f)........................................................................................................16

47 U.S.C. § 251 ...........................................................................................................12

47 U.S.C. § 251(a)(2) ..................................................................................................14

47 U.S.C. § 253(b) ................................................................................................10, 11

47 U.S.C. § 254(b) ......................................................................................................11

47 U.S.C. § 254(c) ................................................................................................ 10-11

47 U.S.C. § 254(e)-(f) ........................................................................................... 10-11

47 U.S.C. § 255 ........................................................................ 12, 14

47 U.S.C. § 1302(a) ........................................................................ 11

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ............ *passim*

Twenty-First Century Communications and Video Accessibility Act of 2010, Pub. L. No. 111-260, 124 Stat. 2751 (2010) (codified in various sections of 47 U.S.C.), *amended by* Pub. L. No. 111-265, 124 Stat. 2795 (2010) ...................................... 13

## FCC Orders and Regulations

*Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) ..................................... 26-27

*Safeguarding and Securing the Open Internet*, 89 Fed. Reg. 45404 (May 22, 2024) ........................................................................ *passim*

*States That Have Certified That They Regulate Pole* Attachments, 25 FCC Rcd. 5541 (May 19, 2010) ........................................................................ 6

*Structure and Practices of the Video Relay Service Program*, 25 FCC Rcd. 6012 (2010) ........................................................................ 15

47 C.F.R. § 67.1(g) ........................................................................ 22

## California State Statutes

Cal. Civ. Code §§ 3100-3104 ........................................................................ 17

Cal. Pub. Util. Code § 451 ........................................................................ 7

Cal. Pub. Util. Code § 2881 ........................................................................ 16

## CPUC Decisions

Decision No. 00-10-028 ........................................................................ 14

Decision No. 05-01-056 ........................................................................ 19

Decision No. 06-11-049 ........................................................................ 18

Decision No. 10-04-047 ........................................................................ 8

Decision No. 12-09-019 ........................................................................ 8

Decision No. 13-02-023 ........................................................................ 24

Decision No. 13-09-026 ........................................................................ 8

Decision No. 15-08-044 ........................................................................24

Decision No. 16-12-025 ...................................................................4, 28

Decision No. 17-11-033 ........................................................................8

Decision No. 18-08-004 ........................................................................4

Decision No. 20-07-011 ........................................................................4

**<u>Other Authorities</u>**

Andrea Thompson, *Twitter Chaos Endangers Public Safety, Emergency Managers Warn*, SCIENTIFIC AMERICAN (Nov. 18, 2022) ........................................21

## INTRODUCTION AND SUMMARY OF ARGUMENT

The CPUC agrees with the Federal Communications Commission (FCC or Commission) and the proposed intervenors-in-support that the FCC has authority to classify broadband internet access service (BIAS) as either a Title I or Title II service. For the reasons presented in those briefs, the CPUC agrees that this case does not present any major questions –there is nothing unusual about the FCC determining the correct classification of communications traffic. However, rather than reiterate what those parties have written, the CPUC chooses instead to focus on the affect this case has on ordinary Californians.

Classifying BIAS as a Title II telecommunications service furthers the FCC's mission to ensure that the American people have access to safe, efficient, reliable, and affordable communication services across the country. The cornerstone driving regulatory oversight is voice services. Increasingly, telephony is becoming internet protocol (IP) based: our nation's telecommunications networks have evolved from circuit-switched facilities to IP-based technologies. The CPUC has found that a decreasing proportion of Californians rely on traditional wireline telephone service, while an increasing proportion rely on Voice over Internet Protocol (VoIP) services, wireless, and/or broadband for their voice communication needs. Californians rely on their phones and the internet, whether wireline or wireless, to receive emergency notifications, access evacuation and

outage maps, contact family and friends, and reach emergency responders. Title II's protections are important tools in regulating voice communications and maintaining network reliability and resiliency.

Title II classification of BIAS does a better job of protecting California's citizens than Title I. It ensures the just, reasonable, and nondiscriminatory treatment of internet service. It provides BIAS-only providers a legal right to attach their equipment to utility poles, rather than forcing them to negotiate access pole-by-pole. It ensures that deaf and disabled persons have fair and equal access to communications services. And it better protects network resiliency and quality of service. These are important policy concerns that vindicate the FCC's classification order.

## ARGUMENT

## I.    THE CLASSIFIACTION OF BIAS AS A TITLE II TELECOMMUNICATIONS SERVICE HAS IMPORTANT POLICY IMPLICATIONS FOR THE PROTECTION OF PUBLIC SAFETY AND THE PROVISION OF UNIVERSAL SERVICE SUPPORT

A Title II classification of BIAS is not just about net neutrality rules; it has practical consequences on areas the CPUC regulates, including the safety of and access to utility poles, the advancement of universal service, access to essential communications by deaf and disabled persons, and the safety and reliability of critical infrastructure such as the telecommunications network and energy grid.

Title II classification of BIAS enhances both the FCC and the states' ability to perform core regulatory functions in these areas.

### A.    Title II Better Protects Pole Attachment Access and Safety

Classifying BIAS as a Title II service both promotes commercial access to utility poles and makes those poles safer.  The Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 (Act) obligates both the FCC and the states to provide nondiscriminatory utility pole access to telecommunications service providers.  47 U.S.C. § 224.  The classification of BIAS matters here because the Act defines the "pole attachment[s]" it subjects to regulation by reference to "telecommunications service[s]" under Title II, not information services under Title I.  47 U.S.C. § 224(a)(4).  This has particular implications on public safety, given that unauthorized and sometimes hazardous attachments to poles are a regular occurrence.  In California, poorly maintained poles and attachments have caused devastating wildfires, resulting in loss of life and injuries, substantial property damage, and destruction of portions of the state's electric supply and communications networks, as well as some community water sources.  Our concern here is that broadband providers might invoke an information services

classification to ignore, avoid, deny or undercut our authority to impose and enforce pole-attachment safety regulations.[1]

To promote the deployment and availability of internet service, BIAS providers must receive nondiscriminatory access to utility support structures, including poles and conduits, at just and reasonable rates, terms, and conditions. Competitive bottlenecks and barriers to entry limit new network entrants and may raise prices for some services above efficiently competitive levels.[2]  Access to

---

[1] This is not an academic concern.  Communications providers consistently attempt to use the "information services" classification as a shield from CPUC actions. After several recent wildfires, for example, the CPUC adopted measures to support residential and small business customers of utilities affected by disasters to ensure they did not lose access to vital communications services.  *See* CPUC Decision No. 18-08-004.  The CPUC also adopted decisions requiring facilities-based wireline and wireless providers to develop comprehensive resiliency strategies to prepare for catastrophic disasters and power outages.  *See* CPUC Decision No. 20-07-011. However, a coalition of communications providers, including AT&T, CTIA, Charter, Comcast, and other providers, actively opposed the CPUC's effort to impose post-disaster requirements on them. Their objections were driven, in part, by claims that states are preempted from regulating information services.  *See* VoIP Coalition Application for Rehearing of Decision 19-08-025, available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M315/K278/315278705.PDF; AT&T California and AT&T Corp. Application for Rehearing of D.19-08-025, available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M313/K955/313955439.PDF; Application of CTIA and AT&T Mobility for Rehearing of D.19-08-025, available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M313/K974/313974080.PDF; Joint Application for Rehearing of Decision 20-07-011 filed by CTIA, AT&T Mobility, CELLCO Partnership and T-Mobile, available at https://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M345/K151/345151556.PDF.

[2] CPUC Decision No.16-12-025, Investigation 15-11-007, *Investigation into the*

utility poles is one of these bottlenecks. All forms of communications, however they are classified and including broadband, require access to rights-of-way generally, and specifically to poles and conduits, which are controlled by incumbent local exchange carriers and other entities. Access to poles, conduits, and rights-of-way may affect cost, feasibility, and timing of constructing and offering broadband services. Accordingly, access to poles at nondiscriminatory, just, and reasonable terms and conditions promotes broadband deployment and supports universal service goals.

Thus the FCC recognized in its *Order* that the access to poles and other infrastructure afforded to companies by the Title II classification of their services is crucial to the efficient deployment of communications networks. *See Order* ¶¶ 71, 74. Section 224(b) of the Act grants the FCC authority to regulate the rates, terms, and conditions of pole attachments by a cable television system or provider of telecommunications services. 47 U.S.C. § 224(b). The Act further requires that utilities extend nondiscriminatory access to poles and rights-of-way *only* to "cable television systems or telecommunications carriers." 47 U.S.C. § 224(f)(1). If BIAS is classified as information service, BIAS-only providers lose the statutory right to access utility infrastructure. They further lose the benefits of other

---

*State of Competition Among Telecommunications Providers in California*, 2016 Cal. PUC LEXIS 683, at *3 (2016).

measures the FCC adopts to level the playing field and eliminate barriers to deployment, as well as rules governing pole attachment dispute resolution processes.  47 U.S.C. § 224(b)(1).

Classification of BIAS also has implications on the states' abilities to ensure nondiscriminatory pole access and to adopt regulations to promote BIAS deployment.  Pursuant to Section 224 of the Act, states can elect to regulate the rates, terms, and conditions for pole attachments under state law, and certify to the FCC that they will do so.  More than twenty states, including California, have so certified, and thus have reverse-preempted the FCC from exercising jurisdiction over pole attachments in those states.[3]  This reverse-preemption, however, applies to nondiscriminatory access by *telecommunications carriers*.  47 U.S.C. §§ 224(c), (f).  If BIAS is an information service, it is unclear how states can ensure that BIAS providers are subject to the same fair and nondiscriminatory rates, terms, and conditions that apply to other providers of communications services.

The classification of BIAS has serious and real-world implications for public safety as well.  Under the Communications Act, pole owners may deny—and the states may enforce—requests to attach for "safety, reliability and generally applicable engineering purposes", but only when the prospective attacher is a cable

---

[3] *See States That Have Certified That They Regulate Pole Attachments*, 25 FCC Rcd. 5541, 5541–5542 (May 19, 2010).

television system or telecommunications carrier.  47 U.S.C. § 224(f)(2).  There is no similar provision for information services.  A Title II classification for BIAS thus allows the states to enforce safety regulations pursuant to this statute for pole attachments by standalone BIAS providers.

The CPUC and California utilities have an obligation under state law to protect the safety and health of the public.  *See, e.g.*, Cal. Pub. Util. Code § 451.  The ability to enforce safety regulations for pole attachments is paramount in California, which has suffered unprecedented wildfires and windstorms that have wreaked havoc on utility infrastructure.  In 2007, strong Santa Ana winds swept across Southern California and caused dozens of wildfires.  Several of the worst wildfires were ignited by downed power lines or other pole attachment failures.  One such fire, the Malibu Canyon Fire, started in the service territory of Southern California Edison Company (SCE), a California electric utility, when three utility poles fell to the ground and ignited a fire.  A communications provider, NextG Networks of California, Inc., admitted to attaching its equipment to one of the poles even though SCE denied its request because it would cause the pole to be overloaded.[4]  The resulting fire burned 3,836 acres, destroyed 14 structures and 36

[4] *See* CPUC Decision No. 13-09-026, Investigation 09-01-018, *Investigation into the Operations and Practices of Southern California Edison Company, Cellco Partnership LLP d/b/a Verizon Wireless, Sprint Communications Company LP, NextG Networks of California, Inc. and Pacific Bell Telephone Company d/b/a*

vehicles, and damaged 19 other structures.  Ultimately, the CPUC adopted

settlements imposing over $63 million in fines and penalties on SCE, NextG, and

other involved communications providers to resolve violations of pole safety

regulations.[5]

That same year, three other fires, the Witch, Guejito, and Rice Fires, tore

through the service territory of another California electric utility, San Diego Gas &

Electric Company (SDG&E).  The ignition of the Guejito Fire, which merged with

the Witch Fire, was attributed to poorly maintained Cox Communications'

equipment coming into contact with an SDG&E power line.[6]  Ultimately, the Witch

Fire led to the destruction of 1,141 homes, 509 outbuildings, and 239 vehicles.

Once combined with the Guejito Fire, the Witch Fire burned a total of 197,990

acres.  The CPUC adopted settlements imposing over $14 million in fines and

penalties on SDG&E and Cox regarding alleged violations pertaining to their

involvement with these fires.[7]  The combination of the Witch and Guejito Fires led

---

*AT&T California and AT&T Mobility LLC, Regarding the Utility Facilities and the Canyon Fire in Malibu of October 2007*, 2009 Cal. PUC LEXIS 7 (2009).

[5] *See* CPUC Decision Nos. 12-09-019, 13-09-026, and 13-09-028 issued in above investigation.

[6] *See* CPUC Decision No. 17-11-033, Application 15-09-010, *Application of SDG&E to Recover Costs Related to the 2007 Southern California Wildfires*, 2017 Cal. PUC LEXIS 513, *42 (2017).

[7] *See* CPUC Decision No. 10-04-047, Investigation 08-11-006, 08-11-007, *Investigation into the Operations and Practices of SDG&E and Cox re Utility Facilities Linked to the Witch and Rice Fires of October 2007*.

to two fatalities, injured forty firefighters, and caused SDG&E to incur $2.4 billion in costs and legal fees to resolve third party damage claims arising from the fires.[8]

These fires are harrowing examples of what can go wrong when pole owners and pole attachers act with disregard for public safety. In a state like California with some 4.2 million poles, effective policing of pole attachments is a constant challenge. Our concern here is that, untethered to Title II's protections, a BIAS provider may ignore, avoid, deny, or undercut the CPUC's safety authority. A standalone BIAS provider might pledge compliance with the CPUC's safety regulations to obtain access to utility infrastructure, yet subsequently commit a major safety violation with impunity. A BIAS provider may attempt to argue that, as a provider of information services, it is exempt from a the CPUC's authority to investigate the incident or impose fines, sanctions, or other remedies. Although California has authority to address safety issues in rights-of-way, the classification of BIAS as a telecommunications service eliminates this potential argument and the commensurate delay in responding to safety violations, with which the CPUC will have to contend if BIAS is classified as a Title I service.

---

[8] *See id*. at *2, 20.

**B.     Title II Better Protects Access and Preservation of Universal Services for Low-Income Communities**

The classification of BIAS as a Title II telecommunications service strengthens policy initiatives to support the availability, accessibility, and affordability of BIAS through universal service programs, both at the federal and state level.  Universal service is the principle that all Americans should have access to telecommunications services and advanced communications services at just, reasonable, and affordable rates in all regions of the nation.  *See* 47 U.S.C. § 151; *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1098 (D.C. Cir. 2009).  The Act thus obligates the FCC and the states to ensure the affordability and widespread availability of safe, reliable, high-quality communications services.  47 U.S.C. §§ 253(b), 254(c), (e)-(f).  As the FCC recognized, allowing BIAS-only providers to participate in universal service programs furthers this goal, particularly in rural areas.  *Order* at ¶¶ 96-97.

Under a Title I regime, BIAS cannot be a supported service because Section 254(c) of the Act defines universal service as an "evolving level of *telecommunications services.*"  47 U.S.C. § 254(c) (emphasis added); *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 68-69 (D.C. Cir. 2019).  Section 214(e) similarly limits providers receiving universal service fund support to common carriers providing telecommunications services and designated as eligible telecommunications carriers after undergoing FCC or state commission approval

processes.  47 U.S.C. § 214(e).  Under these statutory provisions, the FCC uses

universal service support mechanisms to fund both the voice telephony service

itself, and the underlying facilities used to offer the supported service.  Classifying

BIAS as a telecommunications service puts the FCC on firm legal ground to

include BIAS as a federal Lifeline service under Section 254 and allows BIAS-

only providers to participate in the program.  Classifying BIAS under the Title II

thus supports the availability and affordability of BIAS through universal service

programs.  *See* 47 U.S.C. §§ 254(b) and 1302(a); *see also*, *Order* ¶¶ 97, 367.

It is critical for low-income households to have access to BIAS to

meaningfully participate in our society.  Adding BIAS as a component of the

federal universal service program expands California's offerings of universal

service offerings as well: the Act obligates the FCC as well as the states to ensure

the affordability and widespread availability of safe, reliable, high-quality

telecommunications services.  47 U.S.C. §§ 253(b), 254(c), (e)-(f).  The Act

preserves state authority to implement the "requirements necessary to preserve and

advance universal service [and] ensure the continued quality of

*telecommunications services*."  47 U.S.C. § 253(b) (emphasis added); *see also* 47

U.S.C. § 254(f).  The classification of BIAS as a telecommunications service

supports the inclusion of standalone BIAS in state universal service programs:

consistent with such classification, the CPUC can mandate that eligible

telecommunications carriers provide stand-alone broadband as a service offering, and set service obligations.

### C.    Title II Preserves Access to Communications Services for Deaf and Disabled Persons

The classification of BIAS as a Title II service further enhances essential communications for deaf and disabled individuals during emergencies by providing regulators with tools to improve emergency services and response times, to develop minimum standards for communications services for deaf and disabled persons, and to enforce the rules they adopt.

In the Americans with Disabilities Act of 1990, Pub. Law 101-336, 104 Stat. 327, Congress created the Telecommunications Relay Services (TRS) program, which ensures that people with hearing and speech disabilities have access to a communications system that is functionally equivalent to the ability of a hearing individual with no speech disability.  47 U.S.C. § 225.  The program applies to common carriers providing telephone voice transmission services.  47 U.S.C. § 225(c).

Sections 225, 251, and 255 of the Act mandate the availability of interstate and intrastate TRS to the extent possible and in the most efficient manner to deaf and disabled individuals in the United States.  In particular, the FCC must ensure that individuals who are deaf, hard-of-hearing, deaf-blind, and who have speech disabilities can engage in service that is functionally equivalent to the ability of a

hearing individual with no speech disability to use voice communication services. 47 U.S.C. § 225.  These statutory provisions support the provision of TRS and require providers of broadband internet access service, as telecommunications carriers, to ensure that the service is accessible to and usable by individuals with disabilities, if readily achievable.  Classification as a Title II service provides the FCC with the tools needed, for example, to promote broadband in rural areas lacking sufficient access to BIAS where there is no substitute or functional equivalent for copper wires which carry 911, closed captioning, and teletype services.

The protections offered by a Title II classification of BIAS are in addition to and strengthen otherwise applicable accessibility requirements, such as those in the Twenty-First Century Communications and Video Accessibility Act of 2010 (CVAA).   Pub. L. No. 111-260, 124 Stat. 2751 (2010) (codified in various sections of 47 U.S.C.), *amended by* Pub. L. No. 111-265, 124 Stat. 2795 (2010).  As the Commission noted in its *Order*:

> While the CVAA permits the Commission to adopt
> certain regulations concerning "advanced
> communications services," BIAS itself is not an
> advanced communications service, as specifically
> defined in the CVAA.  Accordingly, reclassifying BIAS
> allows us to regulate that service under Title II in ways
> that complements our authority over advanced
> communications services under the CVAA.  For example,
> under Title II, providers of BIAS and manufacturers of

13

> BIAS equipment and BIAS customer premises
> equipment must ensure that such equipment and services
> are accessible to and usable by individuals with
> disabilities, if readily achievable.

*Order* ¶ 105 (fn. omitted).

As deaf and disabled individuals increasingly rely upon internet-based video and VoIP communications, the classification of BIAS as a telecommunications service places obligations specific to Sections 225, 251(a)(2), and 255 on BIAS providers, and enables individuals with disabilities to realize the benefits of internet service. A Title II classification furthers the goals of universal service and safeguards the interests of the disabled community by establishing nondiscriminatory access, minimum standards of service and enforcement mechanisms for communications services that affect people with disabilities.

Classification of BIAS as a Title II telecommunications service also improves the accessibility of BIAS to deaf and disabled persons. BIAS providers will need to ensure equitable access and nondiscriminatory treatment for the deaf and persons with disabilities. Data usage for some disability groups, especially those with hearing impairment, exceeds that of the general population. For example, deaf people often use video to communicate with one another since it enables them to communicate using American Sign Language. *Order* at ¶ 373.[2]

---

[2] The CPUC has made similar findings. *See, e.g.*, CPUC Decision No. 00-10-028, Rulemaking 98-09-005, *Order Instituting Rulemaking on the Commission's Own*

Video usage consumes a substantial amount of data and requires high-speed broadband connectivity to minimize buffering.[10]  But, affordable internet service plans may include data caps, and may impose charges for overages.  The presence of a data usage cap and the absence of affordable high-speed internet can curtail access to, or degrade the quality of, video communication.  Data caps and bandwidth limits can negatively affect the deaf and disabled communities as users may feel pressured to keep calls to a minimum due to the risk of exceeding data limits and incurring overage charges.  *See Order* at ¶ 104.  Classifying BIAS as a Title II service brings BIAS providers under the same nondiscriminatory standards as common carriers.  It permits the FCC to apply the appropriate oversight, including expanded authority to develop reporting and enforcement standards to ensure communications services are not degraded for persons with disabilities. Title II classification for BIAS also enhances the FCC's authority to develop

---

*Motion to Consider Modifications to the Universal Lifeline Telephone Service Program and General Order 153***,** 2000 Cal. PUC LEXIS 838, *202 (2000) ("Through the use of VRI [video-relay interpreting] service, deaf customers can telephonically communicate with hearing persons in their first language, ASL, instead of typing their message on a TTY device. VRI service, because of the large bandwidth requirements of video communications, requires two lines to work effectively.").

[10] *See, e.g.*, *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51, Declaratory Ruling, Order and Notice of Proposed Rulemaking, 25 FCC Rcd. 6012, 6014, ¶ 3 (2010).

service quality metrics for TRS services or other captioning services to improve essential communications for disabled individuals during emergencies.

A Title II classification for BIAS has implications on the states' programs for deaf and disabled persons as well. Section 225's requirements apply to interstate as well as intrastate telecommunications. 47 U.S.C. § 225(b)(2). States wishing to operate their own TRS program under Section 225 of the Act must be certified by the FCC to do so, provided states follow the mandatory minimum standards set forth by the FCC. 47 U.S.C. § 225(f). To this end, the FCC certified the CPUC to administer California's dual-party relay system, called California Relay Service. The CPUC operates this system as part of its Deaf and Disabled Telecommunications Program (DDTP), which also provides specialized telecommunications equipment to persons with disabilities. *See* Cal. Pub. Util. Code § 2881. The DDTP's goal is to provide equal access to communication services and make it easier for every deaf and disabled Californian to connect with the world around them. As the protections of Section 225 apply only to common carriers, Title II classification of BIAS is essential to both the FCC and the states in developing reporting, service quality, and enforcement standards to ensure IP-enabled communication services and devices are not degraded for people with disabilities.

16

**D.    Title II Better Protects the Safety and Reliability of the Communications Network and Energy Grid**

Title II classification is critical to the safe and reliable operations of critical infrastructure such as water, gas, the energy grid, and the communications network. Infrastructure such as the energy grid and water systems have become increasingly interdependent with communications services, including access to the internet, over the last twenty-five years. Allowing internet service providers to force individualized negotiations for differentiated internet access undercuts the ability of the CPUC and other regulatory agencies to carry out their duties with regard to the safety and reliability of various critical infrastructure sectors, including electric, natural gas, water and sewer utilities. Strong conduct rules prevent potential harms from occurring, thereby protecting life and property.

California acknowledged these concerns by enacting the California Internet Consumer Protection and Net Neutrality Act of 2018, Cal. Civ. Code §§ 3100-3104, after the FCC repealed federal net neutrality protections in its *2018 Restoring Internet Freedom Order.* In doing so, the California Legislature found that vital functions regulated under the police power of the state, including but not

limited to emergency services and utility services and infrastructure, depend on the open and neutral internet.  Cal. Stats. 2018, ch. 976, § 2 (Senate Bill 822).[11]

The safe and efficient operation of California's energy grid, for example, depends on nondiscriminatory internet access rules.  Allowing internet service providers to engage in paid prioritization deals with energy suppliers undercuts the ability of regulatory agencies such as the CPUC, working in conjunction with the California Independent System Operator,[12] to ensure oversight and compliance with California's wholesale electric power markets.  For example, bidders that negotiate "better than typical" broadband service may gain a nontransparent advantage in California's real-time markets, raising market manipulation concerns.

Programs that affect the safety and reliability of the energy grid also depend on an open internet.  Following several heat waves that stressed the electric system and threatened reliability, for example, the CPUC expanded the electric utilities' demand response programs.[13]  Demand response is a tool where customers

---

[11] Available at https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB822.

[12] Operating under the regulatory authority of the Federal Energy Regulatory Commission, the California Independent System Operator manages the flow of electricity across high-voltage, long-distance power lines, operates a competitive wholesale energy market, and oversees transmission planning in California.

[13] *See* CPUC Decision No. 06-11-049, Applications 05-06-006, 05-06-008, 05-06-017, *Applications for Approval of Demand Response Programs 2006-2008*, 2006 Cal. PUC LEXIS 467 (2008).

voluntarily shed load during times of peak demand, usually in return for a financial incentive.  During high temperatures, or when fire or other emergencies make conservation urgent, utilities can send real-time communications to their customers that opt-in to such communications to achieve immediate load reduction.

Electric customers are also able to grant permission to third-party demand response aggregators, also known as Demand Response Providers, for direct access to their energy usage information or appliances like air conditioners.  The demand response program events are controlled by the utility (or other third-party provider) which then sends communications over mass-market BIAS to participating customers.[14]  For example, internet-enabled smart thermostats permit access to a wide array of features such as remote control and automation of temperature settings in homes or commercial spaces.  These smart thermostats—often discounted or offered for free to residential customers willing to participate— receive communications to either raise or lower the temperature, or shut off the unit.[15]  Asking enrolled customers to conserve power is generally a recurring

---

[14] *See, e.g.*, CPUC Res. E-4868, *Approves with Modifications the Utilities' Click-Through Authorization Process Which Releases Customer Data to Third-Party Demand Response Providers*, 2017 Cal. PUC LEXIS 375 (2017).
[15] *See, e.g.*, CPUC Decision No. 05-01-056, Rulemaking 02-06-001, *Rulemaking on Policies and Practices for Advanced Metering, Demand Response, and Dynamic Pricing*, 2005 Cal. PUC LEXIS 573, * 64.

phenomenon during times when electric demand or energy prices are high statewide.

Demand response programs are increasingly important in California's efforts to protect consumers affected by de-energization events. California's electric utilities have employed rotating outages, or pre-emptive de-energization actions, to help protect the reliability of the power grid. Rotating outages are called by the California Independent System Operator as a last resort when supply is inadequate relative to demand. Although rotating outages are a critical tool in maintaining reliability, there are public harms to shutting off the power, including to customers that rely on electricity to maintain necessary life functions for durable medical equipment and assistive technology. Demand response is vital in the effort to reduce rotating outage events. Accordingly, it is critical to energy safety and reliability that internet communications—whether initiated by customers, suppliers, energy generators, contractors, regulators, public officials or safety officers, local communities in the utility service territory, or at the utility's headquarters—not be subject to paid prioritization delays, payment demands, or service degradation due to priority accorded to other users who pay extra.

Communications systems, too, are an essential component of critical infrastructure and public safety. As the recent years' devastating wildfires have taught all Californians, having a resilient and dependable communications grid that

20

aids first responders and communicates with the public in a timely manner is a matter of life and death, especially for our most vulnerable residents. First responders need fast and reliable communications tools to respond to life-threatening situations. The public also needs to know in minutes, if not seconds, about threats that could affect them. Although first responders can send time-sensitive, geographically specific notifications to residents and businesses by mobile phone, text message, and email, those methods all have significant limitations and social media is increasingly the tool of choice.[16] Strong, non-discriminatory rules are necessary to ensure that providers of emergency services or public safety agencies are not impaired in providing comprehensive, timely information to the public in a crisis.

A Title II classification of BIAS further supports improved emergency response times. With reclassification, the public will gain reliable access to and improved response by emergency services with the transition to Next Generation 911 (NG911). NG911, as an IP-based system, will allow Public Safety Answering Points to accept and process a broader range of information from responders and the public, including text, images, video, voice calls, and real-time texting. NG911

---

[16] *See, e.g.*, Andrea Thompson, *Twitter Chaos Endangers Public Safety, Emergency Managers Warn*, SCIENTIFIC AMERICAN (Nov. 18, 2022), available at https://www.scientificamerican.com/article/twitter-chaos-endangers-public-safety-emergency-managers-warn/ ("'Twitter is, for better or for worse, one of our best ways to get information out during an emergency . . . .'").

increases location accuracy: about 50% of all legacy 911 calls arrive without location information.  Legacy 911 depends on carriers to report outage information, whereas NG911 permits real time system monitoring and supports improved call routing.  However, the benefits of NG911 cannot be fully realized if certain types of enhanced communications technologies, such as real-time texting,[17] are not mandated by the FCC as an essential TRS service.

Deaf and disabled communities will also benefit from improved emergency response times.  Both parties to a real-time text call can send and receive text in real time simultaneously, unlike teletypwriters, which require turn-taking.  In instances like this, a Title II classification gives the FCC the authority to require these services to be functionally equivalent to their voice counterparts.

As these examples demonstrate, there is a need for proper and balanced regulation of this communications traffic.  Title II classification of BIAS does a better job of protecting citizens in areas affecting public safety, universal service, communication services for the deaf and disabled, and the safety and reliability of the communications network.

---

[17] Real-time text—or RTT—is a technology that allows text to be sent immediately as it is created through wireless handsets that use IP-based technology on networks that support RTT.  With RTT, there is no need to press a "send" key as there generally is for SMS, chat, or other types of texting.  A recipient can read a message as the sender types it.  *See* 47 C.F.R. § 67.1(g).

### E.    Voluntary Commitments Are Not Enough to Protect Public Safety and Network Reliability

The CPUC believes it has demonstrated why, as a policy matter, Title II classification better serves the interests of California's citizens. To hear the Petitioners tell it, though, how BIAS is classified is essentially irrelevant to these public policy concerns: they claim instead that, even in the absence of regulatory oversight, "voluntary commitments" and "strong competitive incentives" will maintain reliable networks. Pet. Br. at 61. As the FCC found, however, reliance on competitive incentives and voluntary commitments are insufficient in the areas of public safety, service quality and outage reduction. *Order* ¶¶ 54, 459. Reclassification and the conduct rules enable the FCC "to deal with public safety issues before a public safety situation arises—not afterwards." *Order* ¶ 57. Voluntary commitments are not only insufficient, they are unenforceable. California has ample experience with this too.

While economic incentives may lead to reliable networks in higher-income communities, they do not necessarily result in reliable networks in lower-income communities. Recently, the CPUC initiated a rulemaking to consider revisions to its rules setting minimum service quality standards for telecommunications

services.[18]  These standards include, among other things, network outage reporting,

service restoration, customer trouble reports, and out-of-service repair intervals.

In a prior review of service quality standards, the CPUC ordered its

Communications Division to conduct a Network Exam, evaluating the condition of

Pacific Bell Telephone Company, dba AT&T California (AT&T), and Frontier

California (Frontier)'s wired network infrastructure, facility, services, and best

practices to deliver consistent service quality to their customers.[19]  The Network

Exam found, among other things, that both AT&T and Frontier have failed to adapt

their infrastructure to withstand adverse weather and climate conditions in the

state.  The Network Exam also found that AT&T wire centers that have been

upgraded with fiber optic facilities and other broadband related investments

disproportionately serve higher-income communities.[20]  Communities with the

---

[18] CPUC Rulemaking 22-03-016, *Order Instituting Rulemaking Proceeding to Consider Amendments to General Order 133* (Mar. 23, 2022).

[19] The Network Exam was divided into two reports. Examination of the Local Telecommunications Networks and Related Policies and Practices of AT&T California and Frontier California, study conducted pursuant to the CPUC Service Quality Rulemaking 11-12-001, Decision Nos. 13-02-023 and 15-08-041 (Phase 1 report). A public version of the Phase 1 report is available at https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/network-exam-documents/network-exam-ch-1-exec-sum.pdf. Network Exam Report, Phase 2 Report available at https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/network-exam-documents/phase-ii/ph2ch1network-exam-2execsummary-final-report-072721redacted.pdf.

[20] Network Exam, Phase I Report, *id*. at 1-3.

lowest household incomes tend to exhibit the highest trouble report rates, the

longest out-of-service durations, and the lowest percentage of outages cleared

within 24 hours.[21]  This examination also found that AT&T and Frontier have

focused investments in areas that attract greater competition, which are higher-

income communities, resulting in poorer service quality and fewer alternatives for

lower-income communities and communities of color.[22]  Low-income areas that

have not been targeted for broadband upgrades have the potential to lose high

quality wireline voice services.[23]

Economic and competitive incentives alone simply do not ensure network

reliability and high quality of service for all, including those in low-income

communities and communities of color.  This failure to maintain network facilities

and provide adequate service quality to all Californians has real-world safety

implications.  In recent years, the State of California and the CPUC grappled with

the failures and shortcomings of the communications grid highlighted by

catastrophic wildfires.  Strong, enforceable, protective measures are necessary to

protect consumers and ensure reliability of the communications network.  In the

---

[21] *Id*., at 2.

[22] *Id*.

[23] *See* CPUC Rulemaking 22-03-016, *Order Instituting Rulemaking to Consider Amendments to General Order 133*, at 6-8 (2022), available at https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M461/K661/461661140.PDF.

face of severe disasters like wildfires, Californians should not have to rely on

"voluntary commitments" to ensure public safety.

## II.    IF INTERNET SERVICE PROVIDERS ARE SUCCESSFUL IN THEIR CHALLENGES, BIAS WILL BE IN A REGULATORY VACUUM

In addition to challenging the FCC's authority to regulate BIAS, ISPs are

concurrently attacking the ability of the states to regulate BIAS.  Just last month,

the ISPs filed a petition for writ of certiorari with the U.S. Supreme Court seeking

to overturn New York's Affordable Broadband Act, which requires broadband

providers to offer broadband to qualifying low-income households at $15 per

month.  Petition for Writ of Certiorari, *New York State Telecomms. Ass'n, Inc. v.*

*James*, No. 24-161 (Aug. 14, 2024).  The ISPs had previously challenged the New

York law in the Second Circuit, which held that (1) the Communications Act does

not establish a framework of rate regulation that is sufficiently comprehensive to

imply that Congress intended to exclude the states from entering this field; and (2)

the Affordable Broadband Act is not conflict-preempted by the FCC's *2018*

*Restoring Internet Freedom Order* classifying BIAS as an information service

because the FCC cannot exclude states from regulating in an area which the agency

itself lacks regulatory authority.[24]  *See generally New York State Telecomms. Ass'n, Inc. v. James*, 101 F.4th 135 (2d Cir. 2024).

In their petition for writ of certiorari, the ISPs claim that as a result of this Court's stay of the *2024 Safeguarding and Securing the Open Internet Order*, broadband remains a non-common-carrier interstate information service while this appeal goes forward.  Pet. for Writ of Cert., *New York State Telecomms. Ass'n*, at 3.  As such, the ISPs argue that the states are preempted from regulating BIAS.

The ISPs claim they want a "uniform, national regulation" of BIAS.  Pet. for Writ of Cert., *New York State Telecomms. Ass'n*, at 4, 24.  Their actions bely that, though: it seems they want no regulation of BIAS.  If the ISPs were to get their way, neither the FCC nor the states would have regulatory authority over BIAS, resulting in a regulatory vacuum.  Such a scenario would leave the public exposed to potentially harmful practices with no protections in place and no agency able to grapple with the issues identified above.

---

[24] The ISPs had challenged New York's Affordable Broadband Act when the Commission's prior order in *Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018) (which classified BIAS as an information service) was in effect, so the Second Circuit's decision relies on this prior order.  Given the interrelationship between the Second Circuit case and this Court's review of the current *Safeguarding and Securing the Open Internet* order, the ISPs have asked the Supreme Court to hold off addressing their petition until after this Court resolves the current petitions for review.  Pet. for Writ of Cert., *New York State Telecomms. Ass'n*, at 4.

Having no regulatory agency with authority over BIAS is simply untenable. Our nation's telecommunications networks have evolved from circuit-switched facilities to IP-based technologies. The CPUC has found that a decreasing proportion of Californians rely on traditional wireline telephone service, while an increasing proportion rely on VoIP, wireless, and/or broadband for their voice communication needs.[25] Californians rely on their phones and the internet, whether wireline or wireless, to receive emergency notifications, access evacuation and outage maps, contact family and friends, and reach emergency responders. Without access to these resources, Californians cannot receive and act on vital information that can keep them safe in an emergency.

The CPUC is well-versed in the resistance of the ISPs to any exercise of state authority over broadband and IP-based communications services. As discussed above, the CPUC is considering revisions to service quality standards for telecommunications services, including network outage report and service restoration standards, has implemented emergency disaster measures applicable to communications service provider customers, and is considering revisions to its Deaf and Disabled Telecommunications Program. The CPUC has time and time

---

[25] CPUC Decision No.16-12-025, Investigation 15-11-007, *Investigation into the State of Competition Among Telecommunications Providers in California*, 2016 Cal. PUC LEXIS 683, at *294 (2016).

again met with ISP objections that their broadband services are beyond reach of state jurisdiction, in part because they argue they are considered "information services". This puts the state's communications network at risk.

Increasingly, critical communications services are being delivered over internet-based networks: there simply must be a cop on the beat in order to protect consumers and ensure universal availability of high-quality, safe and reliable communications services. This Court should reject the ISPs attempts to evade any type of regulation over BIAS.

## CONCLUSION

The Court should uphold the FCC's Order in its entirety and affirm the FCC's Title II classification of BIAS and mobile BIAS.

Respectfully submitted,

CHRISTINE J. HAMMOND
JONATHAN C. KOLTZ
KIMBERLY J. LIPPI

/s/    *Kimberly J. Lippi*
        Kimberly J. Lippi

CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
kimberly.lippi@cpuc.ca.gov
(415) 703-5822
ATTORNEYS FOR *AMICUS CURIAE*

September 18, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 32(a)(7)(B) because it contains 6,284 words, excluding parts exempted by Fed. R. App. P. 32(f), according to the word count feature in Microsoft Word.

This brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style of Fed. R. App. P. 32(a)(6) because it was prepared in a 14-point font in a proportionally spaced typeface using Microsoft Word Times New Roman font.

Dated: September 18, 2024            _/s/    Kimberly J. Lippi_
                                     Kimberly J. Lippi

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on September 18, 2024, I filed the foregoing *Amicus*

Brief of the California Public Utilities Commission with the Clerk of the Court for

the United States Court of Appeals for the Sixth Circuit using the electronic

CM/ECF system.  Participants in the case who are registered CM/ECF users will

be served by the CM/ECF system.


*/s/     Kimberly J. Lippi*
                    Kimberly J. Lippi