Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, and 24-3538

# In the United States Court of Appeals for the Sixth Circuit

In re: MCP No. 185; OPEN INTERNET RULE (FCC 24-52),

OHIO TELECOM ASSOCIATION, et al.,

*Petitioners*,

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Respondents*.

*On Petitions for Review of an Order
of the Federal Communications Commission*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF RESPONDENTS

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.  Pursuant to Sixth Circuit Rule 26.1, *amicus* makes the following disclosures:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

Dated: September 18, 2024                         */s/ Brianne J. Gorod*
                                                   Brianne J. Gorod

                                                   *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF *AMICUS CURIAE* ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................ 1

ARGUMENT ................................................................................... 6

I.     The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Did Not Likely Intend .......................................................... 6

II.    The Classification of Modern Broadband as a Telecommunications Service Does Not Trigger the Major Questions Doctrine ................. 10

     A.    Economic and Political Significance ....................................... 11

     B.    Adherence to Congressional Intent .......................................... 14

III.    Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles ................................................. 22

     A.    Textualism .......................................................................... 22

     B.    Original Meaning ................................................................ 24

     C.    Separation of Powers ........................................................... 27

CONCLUSION ............................................................................... 29

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021) ............................................................. 3, 11-13, 17

*Biden v. Missouri*,
    595 U.S. 87 (2022) .............................................................. 8, 15, 19, 24

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ............................................ 2-4, 7, 8, 10-15, 17, 23-25, 28

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ............................................................. 23, 24

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024) ............................................................. 27

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................... 2, 9, 13, 18, 21, 22

*Gamble v. United States*,
    587 U.S. 678 (2019) ............................................................. 23

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) ............................................................. 20

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
    448 U.S. 607 (1980) ............................................................. 9

*King v. Burwell*,
    576 U.S. 473 (2015) ............................................................. 20

*Little Sisters of the Poor v. Pennsylvania*,
    591 U.S. 657 (2020) ............................................................. 24

*Loper Bright Enter. v. Raimondo*,
    144 S. Ct. 2244 (2024) ......................................................... 14

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Margaretta*,
    16 F. Cas. 719 (C.C.D. Mass. 1815) .................................................... 26

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ........................................................................... 8

*Mayfield v. U.S. Dep't of Labor*,
    --- F.4th ----, 2024 WL 4142760 (5th Cir. Sept. 11, 2024) ................ 14

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994) ............................................................. 13, 14, 19

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ............................................................. 14, 18, 20

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) ...................................................... 9, 12, 15, 17, 22

*New Prime Inc. v. Oliveira*,
    586 U.S. 105 (2019) ........................................................................... 28

*Pension Benefit Gaur. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ........................................................................... 21

*United States v. Craft*,
    535 U.S. 274 (2002) ........................................................................... 21

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) .................................................... 2, 3, 9, 13, 17, 18

*Verizon v. FCC*,
    740 F.3d 623, 632 (D.C. Cir. 2014) ................................................... 19

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ............................................. 2-12, 15, 17-21, 24, 25, 27, 29

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)................................................................ 14

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018)................................................................ 23

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  594 U.S. 338 (2021)................................................................. 21

## STATUTES, LEGISLATIVE MATERIALS, AND CONSTITUTIONAL PROVISIONS

Act of Apr. 10, 1790, ch. 7, 1 Stat. 109 ................................... 27

Act of May 26, 1790, ch. 12, 1 Stat. 122 ................................. 26

Act of July 22, 1790, ch. 33, 1 Stat. 137.................................. 26

Act of Aug. 4, 1790, ch. 34, 1 Stat. 138 .................................. 26

Communications Act of 1934, Pub. L. No. 73-416, 48 Stat. 1064 ........ 19

H.R. 2136, 116th Cong. (2020)................................................. 22

H.R. 2666, 114th Cong. (2016)................................................. 22

S. 993, 115th Cong., § 2(a) (2017) .......................................... 21

S. 2602, 114th Cong., § 2(a) (2016) ........................................ 21

S. 2853, 115th Cong. § 13(e) (2018) ....................................... 21

5 U.S.C. § 801 ......................................................................... 29

5 U.S.C. § 804 ......................................................................... 29

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

47 U.S.C. § 151 .......................................................................... 20

47 U.S.C. § 153 .......................................................................... 13, 15, 16

47 U.S.C. § 160 .......................................................................... 18

47 U.S.C. § 201 .......................................................................... 15, 19

U.S. Const. art. I, § 1.................................................................. 27

## <u>EXECUTIVE MATERIALS</u>

Fed. Comms. Comm'n, Emergency Broadcast System, 59 Fed. Reg. 248
(1994) ................................................................................. 20

Fed. Comms. Comm'n, In re Amendment of Section 64.702 of the
Commission's Rules and Regulations (Second Computer Inquiry),
77 F.C.C.2d 384 (1980) ....................................................... 16

Fed. Comms. Comm'n, In re Deployment of Wireline Services Offering
Advanced Telecommunications Capability, 13 FCC Rcd. 24012
(1998) ................................................................................. 16, 17

Fed. Comms. Comm'n, In the Matter of Safeguarding and Securing the
Open Internet, 89 Fed. Reg. 45,404 (May 22, 2024)......................... 4, 12, 16

Fed. Comms. Comm'n, National Defense and the Federal Communications
Commission (1940)................................................................... 20

## <u>BOOKS, ARTICLES, AND OTHER AUTHORITIES</u>

Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96
Notre Dame L. Rev. 243 (2021) ........................................... 26

Christine Kexel Chabot, *The Lost History of Delegation at the
Founding*, 56 Ga. L. Rev. 81 (2021).................................... 26

vi

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379 (2021) ................................................................................. 28

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118 (2016) ......................................................................... 28

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277 (2021)........................................ 26

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J. 1288 (2021) .................................................................................. 27

Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174 (2022)...... 28

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* (1997) ........................................................................... 23

Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262 (2022) .................................................................................. 28

Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022) ....................................................................... 29

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to the progressive promise of the Constitution's text and history.  CAC has studied the development and scope of the major questions doctrine, along with its implications for the separation of powers, and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The major questions doctrine does not apply to the Federal Communications Commission's classification of modern broadband as a telecommunications service.  The Supreme Court has made clear that this doctrine applies only rarely, when an agency belatedly asserts "breathtaking," "staggering," or "extraordinary" new regulatory power that goes beyond what Congress likely intended.  The doctrine prevents agencies from stepping outside their lanes by using vague, ancillary provisions to fundamentally transform their authority.  Stretching the doctrine beyond that limited role would defy precedent and run roughshod over textualism, the original understanding of the Constitution, and the separation of powers.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission.  All parties have consented to the filing of this brief.

In a series of cases beginning in the late twentieth century, the Supreme Court concluded that agencies were claiming enormous and surprising new authority despite indications that Congress did not mean to grant that authority. Taking stock of this case law, *West Virginia v. EPA* explicitly recognized a "major questions doctrine," explaining that "there are 'extraordinary cases' that call for a different approach" from "routine statutory interpretation." 597 U.S. 697, 721-24 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).

In these "extraordinary" cases, courts take an extraordinary approach. Rather than simply determining the original public meaning of a statute's text, courts instead weigh various factors outside of the text—including legislative history, contemporary political controversy, projected economic implications, and prior agency practice—to help decide whether a "major question" is implicated. If so, courts require "clear congressional authorization" for the agency's action. *Id.* at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The major questions doctrine thus differs sharply from "the ordinary tools of statutory interpretation." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). Accordingly, the Supreme Court has limited its application to "extraordinary" claims of authority, *id.* at 503, that amount to a "fundamental revision of the

statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at 728).

The doctrine thus has two separate and highly demanding requirements. First, an agency must claim "breathtaking" new powers, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), with "staggering" economic and political significance, *Nebraska*, 600 U.S. at 502. Second, the agency's claim must represent a "transformative expansion in [its] regulatory authority," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324), reaching "beyond what Congress could reasonably be understood to have granted," *id.*

The second requirement is satisfied when agencies assert "unheralded" new power by twisting the "vague language" of "ancillary" provisions to "make a radical or fundamental change to a statutory scheme," particularly where the agency "has no comparative expertise" in the area it seeks to regulate and where Congress has "conspicuously and repeatedly" denied that same power to the agency. *Id.* at 723-24, 748 (quotation marks omitted). It does not suffice that an agency's action is "unprecedented." *Id.* at 728. Instead, that action must transform the statute "from one sort of scheme of . . . regulation into an entirely different kind." *Id.* (brackets and quotation marks omitted).

Here, however, the Federal Communications Commission ("FCC") has not exploited an "obscure, never-used section of the law" to assert a new type of power

outside its "comparative expertise." *Id.* at 711, 729 (quotation marks omitted). The FCC's open internet rule, *see* In the Matter of Safeguarding and Securing the Open Internet, 89 Fed. Reg. 45,404 (May 22, 2024) [hereinafter "Open Internet Rule"], rests on its core authority under the Telecommunications Act of 1996 and represents precisely the kind of regulatory decision Congress ordered the agency to make. Under the Act, the FCC must classify each communications service as either a "telecommunications service" or an "information service" and regulate it accordingly. Applying its technical expertise to evolving technology, the FCC has long done just that, and its classification of broadband as a telecommunications service is not novel. In short, the new rule reflects no "change to [the] statutory scheme" at all, much less a "radical or fundamental change." *West Virginia*, 597 U.S. at 723 (quotation marks omitted).

Extending the major questions doctrine to cases like this would not only conflict with Supreme Court precedent but would also undermine textualism. Unlike "the ordinary tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, the major questions doctrine emphasizes factors outside of a statute's text and structure, including the subjective expectations of the legislators who passed it and the practical ramifications of agency action. *See id.* at 500-07. Some of these factors require judges to venture beyond their expertise into non-legal evaluations of politics or economics, and many of these factors have no possible bearing on a

statute's original public meaning. Precisely because the major questions doctrine is "distinct" from "routine statutory interpretation," *West Virginia*, 597 U.S. at 724, it is reserved for the most extraordinary cases, in which staggering new assertions of power—despite their "textual plausibility," *id.* at 722—are at odds with other evidence of congressional intent.

The major questions doctrine should also be applied sparingly because it is in tension with the original understanding of the Constitution. The doctrine presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (quotation marks omitted). But Congress has tasked the executive branch with resolving major policy decisions since the Founding, when it routinely granted the executive vast discretion over the nation's most pressing challenges. Nothing in the Constitution forecloses that choice, and history does not suggest that Congress must speak in any particularly clear manner to exercise it. On the contrary, the major questions doctrine is the modern innovation, originating more than two centuries after the Founding.

Finally, an overly permissive use of the major questions doctrine would erode critical limits on the judiciary's role. The doctrine aims to promote "separation of powers principles" by preventing agencies from exceeding Congress's "legislative intent." *Id.* at 723. But in the process, the doctrine constrains Congress too—blocking it from authorizing agency action whenever

courts decide that a major question is implicated, unless Congress used language that courts deem sufficiently clear.  The doctrine thus tells Congress how it must draft certain types of laws, based on new categories and concepts devised by the one branch of government not directly accountable to the people.  This risk of judicial aggrandizement is further exacerbated by the subjective and political nature of some of the factors that trigger the doctrine.

These tensions make clear why the Supreme Court has confined the major questions doctrine to the most extraordinary cases, involving stark attempts to disregard an agency's limited mandate.  When an agency claims stunning new powers that appear incongruous with the relevant statutory scheme, the history of its implementation, the agency's own expertise, and Congress's conspicuous withholding of such power from the agency, then "a practical understanding of legislative intent" may call for hesitation.  *Id*.  But when radical and dubious innovation of that sort is absent, artificially narrowing the meaning of a statute's text would undermine, not vindicate, Congress's authority.

## ARGUMENT

### I.  The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Did Not Likely Intend.

"[W]hile the major questions 'label' may be relatively recent, it refers to 'an identifiable body of law that has developed over a series of significant cases.'"

*Nebraska*, 600 U.S. at 504-05 (quoting *West Virginia*, 597 U.S. at 724). Under those cases, a major question arises only when agencies try to achieve "a radical or fundamental change to a statutory scheme" by claiming "an unheralded power representing a transformative expansion in [their] regulatory authority." *West Virginia*, 597 U.S. at 724 (quotation marks omitted). The issue is not whether agencies are asserting "highly consequential power," but rather whether they are asserting "highly consequential power *beyond what Congress could reasonably be understood to have granted*." *Id.* (emphasis added).

Two requirements must therefore be met. First, an agency must be claiming an "[e]xtraordinary grant[] of regulatory authority" by asserting "extravagant statutory power over the national economy." *Id.* at 723-24 (quotation marks omitted). Second, this claim must reflect "a fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind." *Nebraska*, 600 U.S. at 502 (quoting *West Virginia*, 597 U.S. at 728).

Importantly, therefore, the economic and political significance of an agency action cannot alone trigger the major questions doctrine, so long as the action "fits neatly within the language of the statute" and aligns with the agency's established role. *Biden v. Missouri*, 595 U.S. 87, 93-94 (2022) (per curiam). For example, the Court refused to apply the doctrine to a vaccination mandate that allegedly "put more than 10 million healthcare workers to the choice of their jobs or an

irreversible medical treatment." *Id.* at 108 (Alito, J., dissenting).  The Court

explained that the mandate, despite its wide-ranging impact, was not "surprising"

because "addressing infection problems in Medicare and Medicaid facilities is

what [the Health and Human Services Secretary] does." *Id.* at 95 (majority

opinion).  Likewise, the Court found no major question in *Massachusetts v. EPA*,

549 U.S. 497 (2007), despite the immense stakes of the EPA's decision to regulate

greenhouse gas emissions, because that decision involved no "counterintuitive"

departure from the agency's "pre-existing mandate." *Id.* at 530-31.

Only when extraordinary economic and political significance is paired with

a dubious transformation of an agency's role does the doctrine come into play.

*See West Virginia*, 597 U.S. at 724-29 ("unheralded" and "transformative" use of

"ancillary provision[s]" reaching beyond the agency's "comparative expertise");

*Nebraska*, 600 U.S. at 501-03 (use of "never previously claimed powers" to work a

"fundamental revision of the statute" and claim "virtually unlimited power to

rewrite [it]"); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 112, 118 (2022)

(per curiam) ("*NFIB*") (a type of mandate "never before imposed" that regulated

beyond the agency's "sphere of expertise" despite Congress's choice to deny the

agency this power); *Util. Air*, 573 U.S. at 324 ("unheralded" and "transformative"

power that "the statute [was] not designed to grant"); *Brown & Williamson*, 529

U.S. at 126, 160 (new reliance on "cryptic" provisions to assert power "inconsistent with the . . . overall regulatory scheme").

In short, the major questions doctrine is triggered only when both "the history and the breadth of the authority that [the agency] has asserted, *and* the economic and political significance of that assertion" together "provide a reason to hesitate." *West Virginia*, 597 U.S. at 721 (emphasis added) (quotation marks omitted).

In *West Virginia*, for instance, the Court described the EPA's attempt to "substantially restructure the American energy market" through the Clean Power Plan as giving the agency "'unprecedented power over American industry.'" *Id.* at 724, 728 (quoting *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion)). But the agency's plan was not merely significant in scope—in the Court's view, it changed the entire "paradigm" of the EPA's role, effecting a "transformative expansion" based on an "unheralded" power that converted the statutory scheme "into an entirely different kind." *Id.* at 724, 728 (quotation marks omitted). This "newfound power" was based on "the vague language of an ancillary provision[]," required technical and policy expertise not traditionally held by the EPA, and was an approach that Congress "repeatedly declined to enact itself." *Id.* at 724 (quotation marks omitted).

*Biden v. Nebraska* confirmed these demanding standards in applying the major questions doctrine to a student debt relief plan. The plan satisfied the doctrine's "economic and political significance" requirement because it affected "[p]ractically every student borrower" in the nation and amounted to "nearly one-third of the Government's $1.7 trillion in annual discretionary spending." 600 U.S. at 502-03 (quotation marks omitted). This "extraordinary program," moreover, was judged to be completely unlike prior exercises of the same statutory authority. *Id.* Indeed, the executive branch was claiming "virtually unlimited power to rewrite the Education Act" and "unilaterally define every aspect of federal student financial aid." *Id.* at 502. This was "a fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation into an entirely different kind." *Id.* (quoting *West Virginia*, 597 U.S. at 728).

Notably, *Nebraska* first concluded that the agency was asserting a new type of authority that Congress likely did not intend, *id.* at 500-02, and only then determined that this assertion had "staggering" economic and political significance, *id.* at 502. Unless both criteria are met, the major questions doctrine does not apply. *Accord West Virginia*, 597 U.S. at 724-32.

## II. The Classification of Modern Broadband as a Telecommunications Service Does Not Trigger the Major Questions Doctrine.

The major questions doctrine requires a "radical or fundamental change to a statutory scheme" going beyond "what Congress could reasonably be understood

to have granted," in cases with vast "economic and political significance." *West Virginia*, 723-24, 721 (quotation marks omitted). None of that is true here. The classification of broadband does not carry the requisite economic and political significance, nor does it transform the authority Congress conferred on the FCC.

## A. Economic and Political Significance

Much of what federal agencies do is economically and politically significant. Indeed, regulating "the Nation's largest and most essential industries," Pet. Br. 15, is what agencies have routinely been tasked with doing since the nineteenth century. To implicate the major questions doctrine, the scope of an agency's newly claimed authority must be "staggering," *Nebraska*, 600 U.S. at 502, "[e]xtraordinary," *West Virginia*, 597 U.S. at 723, or "breathtaking," *Realtors*, 594 U.S. at 764.

Petitioners, however, simply cite the size of the broadband industry as a whole, along with a speculative estimate of how market forces might respond to the FCC's classification. Pet. Br. 21-22. That estimate is based on a single study that "lacks rigor and is not in line with recommended best practices from the empirical economics literature." Open Internet Rule ¶ 278. And regardless, the possible indirect economics effects here do not come close to the direct, immediate economic effects in major questions cases—such as the "nearly $50 billion" in costs of the eviction moratorium, *Realtors*, 594 U.S. at 764, or the much higher

price tag ("between $469 billion and $519 billion") of the student debt program, *Nebraska*, 600 U.S. at 502 (quotation marks omitted).

The FCC's broadband classification is likewise a far cry from the "unprecedented power over American industry" reflected in the EPA's climate plan, which, according to the Court, attempted to "decid[e] how Americans will get their energy," *West Virginia*, 597 U.S. at 729 (quotation marks omitted), and from OSHA's "broad public health measure[]" that "ordered 84 million Americans" to receive a COVID vaccine or test weekly, *NFIB*, 595 U.S. at 117. Nor does this classification resemble the unbounded power claimed in support of the eviction moratorium, which the Court found could justify measures such as "mandat[ing] free grocery delivery." *Realtors*, 594 U.S. at 765.

In contrast with these forays into new and unlimited spheres of regulatory power, shifting a type of communications service, even a critically important one, from one preexisting regulatory regime to another is simply not the kind of power grab with which major questions cases are concerned—particularly when the agency *must* choose one regime or the other. *See* 47 U.S.C. § 153(51); *cf. Realtors*, 594 U.S. at 764-65 ("It is hard to see what measures this interpretation would place outside the CDC's reach, and the Government has identified no limit . . . beyond the requirement that the CDC deem a measure 'necessary.'"); *Nebraska*, 600 U.S. at 501 (the agency's position "would grant unlimited power to the Secretary").

Notably, too, when assessing economic and political significance, the
Supreme Court focuses more on the range of entities newly swept into or out of
regulatory schemes, *see Brown & Williamson*, 529 U.S. at 159; *MCI Telecomms.
Corp. v. AT&T*, 512 U.S. 218, 231 (1994), than on new costs for already-regulated
entities. *E.g.*, *Util. Air*, 573 U.S. at 332 ("We are not talking about extending EPA
jurisdiction" but about increasing demands for "entities already subject to its
regulation."). There is no newly regulated entity here.

Petitioners urge this Court to overlook the rule's limited scope because the
FCC might, in the future, try to impose more onerous regulations on broadband.
But courts cannot measure the economic and political significance of rules that do
not exist. And major questions cases look to "the impact of the rule that [the
agency] actually promulgated," not "the economic impact that could result from
the broadest possible rule that is consistent with [the agency's] asserted authority."
*Mayfield v. U.S. Dep't of Labor*, --- F.4th ----, 2024 WL 4142760, at *3 n.3 (5th Cir.
Sept. 11, 2024).

Finally, Petitioners never explain why classifying broadband under Title II is
economically and politically significant enough to implicate a major question but
classifying broadband under Title I is not. Statutory ambiguity is not resolved by
selecting the reading that leads to less regulation or maintains the status quo.
Instead, courts must "use every tool at their disposal to determine the best reading

13

of the statute and resolve the ambiguity."  *Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).  That holds true whether an agency is "attempt[ing] to concoct 'a whole new regime of regulation'" or "a whole new regime of *non*-regulation."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1005 (2005) (Scalia, J., dissenting) (quotation marks omitted); *accord MCI*, 512 U.S. at 223 (holding that a deregulatory decision "exceeds the limited authority granted" to an agency); *Nebraska*, 600 U.S. at 506 (applying the major questions doctrine to a non-regulatory action).

## B. Adherence to Congressional Intent

The major questions doctrine does not look for elephants—it looks for elephants hidden in mouseholes.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  No matter how great the economic and political significance of an agency action, it does not trigger the doctrine unless it transforms the agency's authority in a way that Congress is "very unlikely" to have intended.  *West Virginia*, 597 U.S. at 723; *e.g.*, *Nebraska*, 600 U.S. at 504 ("Congress did not unanimously pass the HEROES Act with such power in mind").  To identify such dubious transformations, the Supreme Court looks for eyebrow-raising novelty, conflict with the statutory scheme, reliance on cryptic or ancillary provisions, mismatch with agency expertise, and congressional activity suggesting the agency lacks the authority it asserts.  Those telltale signs are absent here.

14

### 1. Belated assertions of novel authority

The major questions doctrine is skeptical of "unprecedented" claims of "unheralded power" newly discovered in "a long-extant statute." *West Virginia,* 597 U.S. at 728, 724 (quotation marks omitted). It is not enough, however, that agency actions merely go "further than what [the agency] has done in the past." *Missouri*, 595 U.S. at 95 (declining to apply the doctrine). They must instead be "strikingly unlike" past efforts. *NFIB*, 595 U.S. at 118.

That is not the case here. Far from venturing into uncharted territory, the FCC is using its technological and market expertise to determine which forms of communication qualify as a "telecommunications service," 47 U.S.C. § 153(53), as it has long done, and then regulating those services under Title II, *see id.* §§ 201 *et seq.*, as it has also long done. Neither activity is novel, and indeed both are statutorily required. "To carry out its duties, the agency *must* decide" whether a particular service "is a telecommunications service or an information service," Resp. Br. 54, and regulate that service accordingly. *See* 47 U.S.C. § 153(51).

With respect to broadband and similar technologies that link telecommunications with data processing, the FCC has been carrying out this classification work "for almost half a century," Open Internet Rule ¶ 137, 89 Fed. Reg. at 45,434, ever since these technologies were in their infancy—first by formulating a distinction between "basic" and "enhanced" services, *see* In re

Amendment of Section 64.702 of the Commission's Rules and Regulations
(Second Computer Inquiry), 77 F.C.C.2d 384, 387 (1980), and then, after Congress
embraced that framework in the 1996 Act, by classifying technologies under the
new definitions of "information service" and "telecommunications service," 47
U.S.C. § 153(24), (53); *see* In re Deployment of Wireline Services Offering
Advanced Telecommunications Capability, 13 FCC Rcd. 24012 (1998) [hereinafter
"DSL Rule"].

In short, the FCC has long been required to place broadband, like other
technologies, in one of two buckets—an information service or a
telecommunications service—and regulate it accordingly.  The Open Internet Rule
thus breaks no new ground.  However significant the question of how to classify
broadband may be, the FCC has historically answered it.

In major questions cases, by contrast, an agency tries to regulate behavior
previously outside its ambit, *see Realtors*, 594 U.S. at 764 (CDC regulating
housing); *NFIB*, 595 U.S. at 118 (OSHA regulating vaccines), or uses modest
terms to upend a statutory scheme, *see Nebraska*, 600 U.S. at 502-03; *MCI*, 512
U.S. at 221, or exploits linguistic ambiguity to claim an entirely new type of
power, *see West Virginia*, 597 U.S. at 725 (imposing cap-and-trade system instead
of requiring onsite emission reductions).

Petitioners cry "novelty" because they say the FCC's *answer* to the question of how to classify broadband is unprecedented.  Even if true, that would not represent a "transformative expansion in [the FCC's] regulatory authority."  *Id.* at 724 (quoting *Util. Air*, 573 U.S. at 324).  And it is not true: the FCC recognized that broadband could be a telecommunications service as soon as it began implementing the 1996 Act.  *See* DSL Rule ¶ 35, 13 FCC Rcd. at 24029.

### 2. Incongruence with statutory scheme

An assertion of authority that fits poorly within a statute's overall regulatory structure signals a "fundamental revision of the statute" that supports applying the doctrine.  *West Virginia*, 597 U.S. at 728 (quotation marks omitted).  But the FCC's new classification does not transform its authority "into an entirely different kind," *Nebraska*, 600 U.S. at 502 (quotation marks omitted), or "render the statute unrecognizable to the Congress that designed it," *Util. Air*, 573 U.S. at 324 (quotation marks omitted).  The FCC "just barely" skirted within the bounds of reasonable statutory interpretation when it classified broadband as an information service.  *Brand X*, 545 U.S. at 1003 (Breyer, J., concurring).  Classifying broadband as a telecommunications service, therefore, could hardly be inconsistent with the statutory scheme.

Petitioners argue that the FCC's interpretation is undermined by the agency's use of its forbearance authority to exercise less than its full Title II power over

broadband. But this analogy to *Utility Air* is unpersuasive. There, the EPA advanced an expansive new interpretation of its authority while admitting that applying this interpretation "would be inconsistent with—in fact, would overthrow—the Act's structure and design." 573 U.S. at 321. To avoid that result, the EPA tried "rewriting" certain statutory standards that, "in no uncertain terms," did not allow such rewriting. *Id.* at 325. Here, by contrast, Congress expressly empowered the FCC to selectively forbear from applying all of its Title II authority, recognizing that doing so might not always serve "the public interest." 47 U.S.C. § 160(a)(3). The agency's exercise of that forbearance authority does not, therefore, suggest anything amiss in its classification of broadband.

### 3. Reliance on obscure and ancillary provisions

The Supreme Court is wary of newly claimed authority resting on "'subtle device[s]'" or "cryptic" delegations. *Brown & Williamson*, 529 U.S. at 160 (quoting *MCI*, 512 U.S. at 231). *West Virginia*, for instance, emphasized that the EPA was using an "obscure," "ancillary," "little-used backwater" of the statute for its far-reaching new policy. 597 U.S. at 711, 724, 730 (quotation marks omitted).

Here, the FCC did not resort to a "little-used backwater" to claim a sweeping new power, but rather applied its core statutory authority: classifying and regulating communications services under the two primary titles of the Telecommunications Act. *See* 47 U.S.C. § 201(b). Everyone agrees that the FCC

must classify broadband *somehow* and regulate it accordingly.  *See Verizon v. FCC*, 740 F.3d 623, 632 (D.C. Cir. 2014) (the FCC chooses how to classify a service and is bound by that classification).

### 4.  *Mismatch between asserted power and agency expertise*

The scope of an agency's expertise sheds light on whether it is claiming a new type of power that Congress is unlikely to have intended.  *See West Virginia*, 597 U.S. at 729 ("when [an] agency has no comparative expertise in making certain policy judgments . . . Congress presumably would not task it with doing so" (quotation marks omitted)).

The FCC was created to regulate communications services for the public good and has done so for 90 years.  *See* Communications Act of 1934, Pub. L. No. 73-416, § 1, 48 Stat. 1064, 1064.  Simply put, this "is what [the FCC] does." *Missouri*, 595 U.S. at 95.  And the question of how to classify broadband "turns . . . on . . . the factual particulars of how Internet technology works and how it is provided," *Brand X*, 545 U.S. at 991, something the FCC is uniquely situated to evaluate.  It thus does not "raise[] an eyebrow," *West Virginia*, 597 U.S. at 730 (quotation marks omitted), that the FCC would classify and regulate broadband, based on its expertise and a detailed record of changing technological and market conditions.  *Cf. Gonzales v. Oregon*, 546 U.S. 243, 266 (2006) (an official "who

lacks medical expertise" making "medical judgments"); *King v. Burwell*, 576 U.S. 473, 486 (2015) (the IRS "crafting health insurance policy").

Petitioners claim the FCC has strayed beyond its expertise by citing national security as a motivation for its rule. But that exaggerates the importance of this consideration in the agency's decision. And the FCC has long considered national security in its policymaking. *E.g.*, Emergency Broadcast System, 59 Fed. Reg. 248 (1994); FCC, National Defense and the Federal Communications Commission (1940), https://docs.fcc.gov/public/attachments/DOC-335613A1.pdf. Indeed, national security was a primary motivation for the agency's creation. *See* 47 U.S.C. § 151 ("for the purpose of the national defense," among other purposes, "there is created a commission to be known as the 'Federal Communications Commission'").

### 5. *Subsequent legislative activity*

The Supreme Court has sometimes considered congressional activity occurring after a statute's enactment, such as failed bills addressing related topics, as part of its major questions analysis. *E.g.*, *West Virginia*, 597 U.S. at 731-32 (failure of legislation adopting cap-and-trade program suggested EPA's similar approach was not authorized by existing legislation). But other cases have downplayed such evidence. *E.g.*, *Brown & Williamson*, 529 U.S. at 155-56 (disclaiming reliance "on Congress' failure to act").

The Court's usual guidance is that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Gaur. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation marks omitted), and that failed bills are "a particularly dangerous ground" for doing so, *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 362 n.9 (2021), because "several equally tenable inferences may be drawn from such inaction," *United States v. Craft*, 535 U.S. 274, 287 (2002) (quotation marks omitted).

This case illustrates the caution required when considering post-enactment history. To be sure, Congress has considered bills classifying broadband as a Title II telecommunications service or codifying some version of net neutrality. But Congress has *also* considered bills classifying broadband as a Title I information service or prohibiting the enforcement of net neutrality. *See, e.g.*, S. 2853, 115th Cong. § 13(e) (2018); S. 993, 115th Cong., § 2(a) (2017); S. 2602, 114th Cong., § 2(a) (2016); H.R. 2666, 114th Cong., § 2 (2016). Many of these bills assume that the FCC currently has the authority to classify broadband as a telecommunications service. *E.g.*, H.R. 2136, 116th Cong. (2020) (a goal of the bill is to "limit the authority" of the FCC by fixing the classification of broadband); H.R. 2666, 114th Cong. (2016) (the bill will "prohibit" the FCC "from regulating the rates charged for broadband").

In any event, Petitioners have shown no evidence of "Congress' consistent judgment to deny [the FCC] this power." *Brown & Williamson*, 529 U.S. at 160. Indeed, Petitioners identify no action Congress has actually taken to limit the FCC's ability to classify broadband under Title II. *Cf. NFIB*, 595 U.S. at 119 (citing "a majority vote of the Senate disapproving the regulation").

## III. Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles.

As shown above, the Supreme Court has limited the major questions doctrine to "extraordinary" cases in which a rigorous two-part standard is met. Following that precedent helps ameliorate serious tensions between the doctrine and textualism, the Constitution's original meaning, and the separation of powers.

### A. Textualism

"The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020). Courts should therefore "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quotation marks omitted); *cf.* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22-23, 29-30 (1997) (discounting legislative history, pragmatic concerns, and Congress's perceived goals).

Departing from these principles, however, the major questions doctrine emphasizes factors outside of a statute's text and structure, including economic fallout, political controversy, legislators' subjective expectations, and how an agency has previously implemented the statute. Many of these factors post-date the statute's enactment and therefore cannot have informed its original public meaning. And because the doctrine requires sifting through various extratextual considerations with undetermined relative weights, it resembles the type of multi-factor balancing test that textualists typically disparage. *E.g.*, *Gamble v. United States*, 587 U.S. 678, 724 (2019) (Thomas, J., concurring).

Accordingly, Justices across the ideological spectrum have recognized that the major questions doctrine poses problems for textualists. *See Nebraska*, 600 U.S. at 507-08 (Barrett, J., concurring) ("[S]ome articulations of the major questions doctrine on offer . . . should give a textualist pause."); *West Virginia,* 597 U.S. at 751 (Kagan, J., dissenting) (calling the doctrine a "get-out-of-text free card[]"). The Court itself has acknowledged that the doctrine is "distinct" from "routine statutory interpretation." *Id.* at 724 (majority opinion).

After all, when the text of a statute gives agencies broadly worded authority, "imposing limits on an agency's discretion" based on extratextual considerations is to "alter, rather than to interpret," the statute. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020). Statutory language should not be

artificially constrained due to "undesirable policy consequences," *Bostock*, 590

U.S. at 680, or because a policy "goes further than what the [agency] has done in

the past," *Missouri*, 595 U.S. at 95.

Precisely because the major questions doctrine departs from "the ordinary

tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, the doctrine is

reserved for "extraordinary" cases in which an agency tries to transform a statute

"into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at

728). That is not remotely the case here.

### B. Original Meaning

Imposing a heightened clarity requirement on Congress when it authorizes

economically and politically significant agency actions is also in tension with the

Constitution's original meaning.

No detailed justification for the major questions doctrine has been endorsed

by a majority of the Supreme Court, which has only gestured at "separation of

powers principles and a practical understanding of legislative intent." *West

Virginia*, 597 U.S. at 723.[2] But the Court has stated that "Congress intends to

make major policy decisions itself, not leave those decisions to agencies." *Id.*

---

[2] The Justices who have offered more thorough explanations for the doctrine
disagree about its basis. *Compare West Virginia*, 597 U.S. at 735-39 (Gorsuch, J.,
concurring), *with Nebraska*, 600 U.S. at 510-12 (Barrett, J., concurring).

Contrary to this presumption, the Constitution embodies no skepticism toward agency resolution of major policy decisions.  Indeed, the earliest Congresses repeatedly granted the executive branch vast discretion over the era's most pressing economic and political choices.  The Founders had no qualms about authorizing the executive branch to resolve critically important policy questions, and they did not require Congress to speak in any particular manner to do so.

For example, because trade with Indian tribes was financially vital but politically fraught, the First Congress required a license for such trading.  But far from making the major policy decisions itself, Congress gave the President total discretion over the licensing scheme's "rules, regulations, and restrictions."  Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137, 137; *see* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 341 (2021).

The First Congress granted similarly broad authority to address "arguably the greatest problem facing our fledgling Republic: a potentially insurmountable national debt."  Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021).  Legislation authorized the President to borrow about $1.3 trillion in new loans (in today's dollars) and to make other contracts to refinance the debt "as shall be found for the interest of the [United] States," Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139; *see* Chabot, *supra*, at

123-24, leaving implementation of this broad mandate largely to the President's discretion.  *See id.*

These statutes were not unusual.  To cite just three more examples, Congress granted the Treasury Secretary "authority to effectively rewrite the statutory penalties for customs violations," Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96 Notre Dame L. Rev. 243, 306 (2021); *see* Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122-23, handing him "one of the most important and extensive powers" of the government, *The Margaretta*, 16 F. Cas. 719, 721 (C.C.D. Mass. 1815) (Story, J.).  Congress authorized an executive board to formulate its own standards for granting exclusive patents that would deny other Americans the "right and liberty" of offering the same products.  Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 110.  And Congress gave federal commissioners nearly unguided power over the politically charged question of how to appraise property values for the first direct tax.  *See* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power*, 130 Yale L.J. 1288, 1391-1401 (2021).

Nothing in the Constitution's text or history prohibits Congress from using its "legislative Powers," U.S. Const. art. I, § 1, to assign major policy questions to agencies, which helps explain why Congress has done so from the start.  *Cf. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (early legislation

"provides contemporaneous and weighty evidence of the Constitution's meaning" (quotation marks omitted)).  Simply put, the premise underlying the major questions doctrine was not shared by the Founders—yet another reason to reserve the doctrine for the most "extraordinary" cases.  *West Virginia*, 597 U.S. at 724.

### C.  Separation of Powers

The major questions doctrine is meant to promote "separation of powers principles."  *West Virginia*, 597 U.S. at 723.  But an aggressively applied doctrine raises its own separation-of-powers concerns, shifting authority from the elected branches to the courts.  Because the doctrine is a judicial creation that "directs how Congress must draft statutes," Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 276 (2022), it risks becoming "a license for judicial aggrandizement," Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174, 175, 200 (2022).

At bottom, the major questions doctrine disallows plausible readings of a statute's text based on concerns about the real-world implications of an agency's reading and how the legislators who enacted the statute might have regarded that reading.  *E.g.*, *Nebraska*, 600 U.S. at 503-05.  But distorting a statute's original public meaning because of cost, political controversy, or other post-enactment developments risks "amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands."  *New Prime Inc.*

*v. Oliveira*, 586 U.S. 105, 113 (2019) (quotation marks omitted).  "When courts apply doctrines that allow them to rewrite the laws (in effect), they are encroaching on the legislature's Article I power."  Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2120 (2016).

This potential for encroachment underscores the need to employ the doctrine only in truly extraordinary cases.  If the judiciary "starts to reject Congress's legislation on important matters precisely because it is important," it risks eroding the courts' status as non-political arbiters of the law.  Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379, 391 (2021).

Far from reflecting "a practical understanding of legislative intent," *West Virginia*, 597 U.S. at 723, applying the doctrine too broadly would also be at odds with Congress's explicit choice to allow agencies to make decisions with significant economic consequences.  Under the Congressional Review Act, agencies must identify "major" rules (defined by economic impact, *see* 5 U.S.C. § 804) when reporting new regulations to Congress—and these major rules "shall take effect" unless Congress acts to disapprove them, *id.* § 801.  Applying the doctrine to all economically and politically significant actions would invert this statute, making such actions presumptively invalid instead of valid.  *See* Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022), https://lawliberty.org/major-problems-with-major-questions/.

In sum, stretching the major questions doctrine beyond "extraordinary" cases in which an agency seeks a "transformative expansion" of its power, *West Virginia*, 597 U.S. at 724, would not serve the separation of powers but instead would severely undermine it.

## CONCLUSION

For the foregoing reasons, this Court should hold that the major questions doctrine does not apply here.

Respectfully submitted,

Dated: September 18, 2024

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL
   ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised by principals of the firm

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,372 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: September 18, 2024

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: September 18, 2024

/s/ Brianne J. Gorod
Brianne J. Gorod

*Counsel for Amicus Curiae*