Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————————

In Re: MCP No. 185: Federal Communications Commission, In the Matter of
Safeguarding and Securing the Open Internet, Declaratory Ruling, Order, Report
and Order, and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404,
Published May 22, 2024

———————————————

BRIEF OF AMICI CURIAE COUNTY OF SANTA
CLARA, CALIFORNIA AND THE SANTA CLARA
COUNTY CENTRAL FIRE PROTECTION DISTRICT IN
SUPPORT OF RESPONDENTS

———————————————

INTELLECTUAL PROPERTY
& TECHNOLOGY LAW CLINIC
JEFFREY T. PEARLMAN
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089-0071
(213) 740-7613
jef@law.usc.edu

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
TONY LOPRESTI
County Counsel
RAPHAEL N. RAJENDRA
Deputy County Counsel
TAYRYN EDWARDS
Fellow
70 West Hedding Street, East Wing, 9th Fl.
San Jose, California  95110-1770
Telephone:   (408) 299-5900
Facsimile:    (408) 292-7240

*Attorneys for* Amici Curiae *County of Santa Clara, California and the Santa Clara County Central Fire Protection District*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae are governmental entities for which no corporate disclosure is required.


Dated:  September 18, 2024          By:  */s/ Jeffrey T. Pearlman*
                                        Jeffrey T. Pearlman

                                        *Attorney for* Amici Curiae
                                        *County of Santa Clara, California and*
                                        *the Santa Clara County Central Fire*
                                        *Protection District*

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................... i

TABLE OF CONTENTS .......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT ............... 1

ARGUMENT ......................................................................................... 5

    I.    Congress Requires the FCC to Consider Public Safety in All Its Decisions, and the *2024 Order* Arises out of a Judicial Mandate to Do So. ............................................................................... 5

    II.    The Factual Record Before the FCC Demonstrates That Public Safety Systems Throughout the Nation Depend on a Neutral Internet. .............................................................................. 10

    III.    The *2024 Order* Will Prevent Irreparable Harm to Public Health and Safety, Justifies Reversal of the Prior Rule in Part due to Public Safety Concerns, and is Not Arbitrary and Capricious. ........................................................................... 17

CONCLUSION .................................................................................. 21

CERTIFICATE OF COMPLIANCE .................................................... 23

CERTIFICATE OF SERVICE ............................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*COMPTEL v. FCC*,
978 F.3d 1325 (D.C. Cir. 2020) ............................................................5

*FCC v. Pottsville Broad. Co.*,
309 U.S. 134 (1940) ..............................................................................9

*Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*,
550 U.S. 45 (2007) ................................................................................9

*Keller Commc'ns, Inc. v. FCC*,
130 F.3d 1073 (D.C. Cir. 1997) ...........................................................5

*Medtronic, Inc. v. Lohr*,
518 U.S. 470 (1996) ............................................................................10

*Mozilla v. FCC*,
940 F.3d 1 (D.C. Cir. 2019)........................................................ *passim*

*Nat'l Ass'n of Broads. v. FCC*,
740 F.2d 1190 (D.C. Cir. 1984) ...........................................................5

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943) ..............................................................................9

*Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*,
534 U.S. 327 (2002) ............................................................................16

*Nuvio Corp. v. FCC*,
473 F.3d 302 (D.C. Cir. 2006) ...................................................... 5, 6, 9

*Telocator Network of Am. v. FCC*,
691 F.2d 525 (D.C. Cir. 1982) ...........................................................19

*United States v. Sw. Cable Co.*,
392 U.S. 157 (1968) .........................................................................9, 10

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ...........................................................19

**Statutes**

47 U.S.C. § 151 .......................................................................... 5, 8, 21

47 U.S.C. § 332 ................................................................................................6

47 U.S.C. § 1701 ............................................................................................10

**Regulatory Orders**

FCC, *Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, FCC No. 24-52, 89 Fed. Reg. 45404 (May 7, 2024) (A1-A512) ................ *passim*

**Administrative Materials**

Comment of INCOMPAS (Dec. 14, 2023),
    https://www.fcc.gov/ecfs/document/1214097190544/1 ......................................11

Comment of Public Knowledge (Dec. 14, 2023),
    https://www.fcc.gov/ecfs/document/12141254615295/1 ...................................18

Comments of Cal. Public Utils. Comm'n (Dec. 14, 2023),
    https://www.fcc.gov/ecfs/document/1214142323252/1 ......................................16

Comments of County of Santa Clara and Santa Clara County Central Fire
    Protection District (Dec. 14, 2023),
    https://www.fcc.gov/ecfs/document/12141751009386/1 ........................... *passim*

Comments of National Public Radio, Inc. (Dec. 14, 2023),
    https://www.fcc.gov/ecfs/document/1214283774508/1 ......................................15

Petition for Reconsideration of County of Santa Clara and Santa Clara County
    Central Fire Protection District (Feb. 8, 2021),
    https://www.fcc.gov/ecfs/document/10209224471190/1 ........................... *passim*

Petition for Reconsideration of INCOMPAS (Feb. 4, 2021),
    https://www.fcc.gov/ecfs/document/10204032497271/1 ............................ 11, 17

**INTEREST OF AMICI CURIAE AND SUMMARY OF ARGUMENT**[1]

In a world increasingly dependent on near-instant communications over broadband internet, local governments, including the County of Santa Clara, California and the Santa Clara County Central Fire Protection District (together, "Santa Clara" or "Amici"), depend on their own and their residents' reliable and unimpaired internet access to perform many of their core functions. They have invested millions of dollars in modern, broadband-based communications systems, which they use for critical, time-sensitive, and information-intensive operations, both internally and to connect with the public. Interference with these systems impairs—in profound, sometimes life-endangering ways—local governments' ability to respond to and recover from emergencies and natural disasters, conduct public health operations, provide healthcare, and perform effective law enforcement and other public safety functions.

Local governments are responsible for protecting the health and wellbeing of the residents they serve. Nationwide, they do this in a wide variety of ways, including by operating sheriffs' offices and police departments, fire departments, jails, emergency operations centers, public health departments, and health and hospital systems. And they have made—and will continue to make—enormous investments in broadband-based communications systems to exchange information with the public. These investments underscore their reliance on a *neutral* internet—that is, an internet through which the public can reliably access critical information from the governments that serve and protect them.

---

[1] All parties have consented to the filing of this amicus brief. No party's counsel authored this brief in whole or in part, and no person or entity other than Amici or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

In the decision under review, the Federal Communications Commission (FCC or the "Commission") identified and prohibited one particularly harmful set of practices that interfere with these systems and that are, as a result, of special concern to Amici and other governmental agencies responsible for public safety. FCC, *Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, FCC No. 24-52, 89 Fed. Reg. 45404 (May 7, 2024) (A1-A512) ("*2024 Order*"). The *2024 Order* protects the neutrality of the internet through what it calls conduct rules. These rules, referred to herein as the "net neutrality rules," prohibit internet service providers (ISPs) providing mass-market broadband internet access service (BIAS) from blocking, throttling, impairing, or degrading lawful internet traffic based on that traffic's source or content, engaging in pay-to-play schemes such as paid prioritization (requiring payment for favorable treatment), or otherwise unreasonably interfering with lawful internet traffic. The *2024 Order*'s proper classification of BIAS as a telecommunications service under Title II of the Communications Act of 1934, rather than as an information service under Title I of the Act (herein referred to as "reclassification"), also enhances public safety in other ways that are less direct but no less essential.

The *2024 Order* is correct that record evidence demonstrates unambiguously that reclassification and net neutrality rules are essential to public safety in the 21st Century. As an initial matter, the FCC was statutorily obligated to consider public safety when making its decisions. And the *2024 Order*'s fulsome consideration of this issue resulted in rules that ensure that local governments can speak to and hear from the residents they are charged with protecting; maintain situational awareness during emergencies; activate and deploy first responders based on real-time information in the field; collaborate effectively to plan for and respond to emergencies; and take advantage of innovative and effective private-sector websites, apps, and other "edge" systems to deliver services and programs. Local

governments cannot reliably *protect* the public from danger unless they can reliably *reach* the public—so the mass-market BIAS plans that residents use to access the internet are central to government's public safety functions. The FCC considered all of these points in the *2024 Order*, and in fact found that its duty to consider and enhance public safety may well be irreconcilable with any approach *other than* Title II reclassification. *2024 Order* at ¶ 691 (A400-401).

The Commission's conclusion that public safety considerations weigh in favor of—and may even *demand*—classifying BIAS under Title II is entirely predictable. In fact, since *Mozilla v. FCC*, 940 F.3d 1 (D.C. Cir. 2019), it has been doubtful that *any* reasonable basis could exist to believe Title I classification is compatible with the FCC's duty to consider public safety. As demonstrated below, the *2024 Order* explained at length why the Commission was changing the position it had taken in its 2018 rollback order—including that the *2024 Order*'s *ex ante* net neutrality rules "will provide better public safety protections than the *ex post* enforcement framework established by the" 2018 order, better account for the irreparability of public safety harms, and ensure the Commission is not "force[d] . . . to rely on voluntary industry commitments to protect public safety." *2024 Order* at ¶ 57 (A35); *see also id.* at ¶ 691 (A400-401) (granting reconsideration petitions and agreeing that 2018 order had inadequately protected public safety).

Amici have long recognized and sought to protect their own and other local governments' reliance on an open and neutral internet, including in the rulemaking under review and prior FCC rulemakings. Amici offered extensive comments in the rulemaking process for the *2024 Order*. *See* Comments of County of Santa Clara and Santa Clara County Central Fire Protection District (Dec. 14, 2023), https://www.fcc.gov/ecfs/document/12141751009386/1 ("Santa Clara Comment"). This is only the latest in a long line of efforts Amici have undertaken to advocate for open internet principles because of their centrality to public safety. In 2017,

when the FCC was considering rolling back its open internet regime in favor of deregulating the profit-seeking behavior of incumbent ISPs, Amici submitted comments explaining how the rollback would undermine public safety, make it harder for local governments to protect their residents, and could lead to loss of life, limb, and property. Then, when the FCC nonetheless classified BIAS under Title I of the Communications Act of 1934 and rolled back the net neutrality rules, Amici (among others) challenged the FCC's 2018 rollback order. That litigation culminated in *Mozilla*, in which the D.C. Circuit agreed with Amici that the FCC was statutorily obligated to consider public safety; that the 2018 order's disregard of this duty was arbitrary and capricious; that "wherever public safety is involved, lives are at stake"; and that the 2018 rule required remand to the FCC for consideration of public safety. *Mozilla*, 940 F.3d at 59-63.

In essential ways, the *2024 Order* itself arises out of *Mozilla*, and Amici have been actively involved in all of the relevant proceedings. Amici submitted comments in the FCC's remand proceedings, and then petitioned for reconsideration when the FCC concluded that net neutrality rules were unnecessary because ISPs' unregulated market behavior and a generic theory of deceptive-practice enforcement would adequately protect public safety despite *Mozilla*'s deep skepticism of that point's reasonableness. *See* Petition for Reconsideration of County of Santa Clara and Santa Clara County Central Fire Protection District (Feb. 8, 2021), https://www.fcc.gov/ecfs/document/10209224471190/1 ("Santa Clara Recon. Pet."). The *2024 Order* grants Amici's (and others') petitions for the FCC to reconsider and reject its superficial assessment on remand from *Mozilla* that unregulated free-market forces suffice to protect common goods like the protection of life and limb, especially given evidence of ISP behavior to the contrary and the FTC's disclaimer of intent to monitor BIAS. *2024 Order* at ¶¶ 683-691 (A396-A401); *id.* at ¶ 689 (A398-A399) (describing Amici's petition).

## ARGUMENT

I.  **Congress Requires the FCC to Consider Public Safety in All Its Decisions, and the *2024 Order* Arises out of a Judicial Mandate to Do So.**

The very first sentence of the Communications Act of 1934 says that Congress created the FCC, in part, "for the purpose of promoting safety of life and property through the use of wire and radio communications." Act § 1, 47 U.S.C. § 151. It is by now black-letter law that this statutory phrase means that "the Commission is required to consider public safety by its enabling act." *Mozilla*, 940 F.3d at 59-60 (cleaned up; quoting *Nuvio Corp. v. FCC*, 473 F.3d 302, 307 (D.C. Cir. 2006) ); *accord Nuvio*, 473 F.3d at 312 (Kavanaugh, J., concurring) (recognizing "[t]he broad public safety . . . authority Congress has granted the FCC"); *COMPTEL v. FCC*, 978 F.3d 1325, 1334 (D.C. Cir. 2020) (echoing *Mozilla*); *Keller Commc'ns, Inc. v. FCC*, 130 F.3d 1073, 1076-77 (D.C. Cir. 1997) (47 U.S.C. § 151 demonstrates that "Congress directed the Commission to consider public safety needs when exercising its discretion").

Indeed, courts have long recognized that section 1 of the 1934 Act, 47 U.S.C. § 151, "mandate[s]" on "[t]he Commission . . . a special statutory obligation with respect to" entities—including "local governments"—"which use [wire and radio communications] for vital public safety purposes." *Nat'l Ass'n of Broads. v. FCC*, 740 F.2d 1190, 1213 (D.C. Cir. 1984). Of course, "this mandate does not grant public safety [users] an absolute right" to their preferred regulatory approach, but it *does* "require[] the FCC to give their needs priority." *Id.*

Even forty years ago the D.C. Circuit could identify quite a few examples of "Congress' reaffirmation and elaboration of [Section 1's public safety] mandate." *Id.* Congress's embrace of this interpretation has continued unabated in the 30-year lifespan of the Telecommunications Act of 1996. *E.g.*, *Nuvio*, 473 F.3d at

310-11 (Kavanaugh, J., concurring) (explaining how Wireless Communications and Public Safety Act of 1999 is consistent with and furthers Section 1's public safety mandate); 47 U.S.C. § 332 (recognizing that statutory direction that Commission consider public safety with respect to private land mobile services is "consistent with section 1 of this Act"). In fact, the 1934 Act's public safety mandate dovetails precisely with the *2024 Order*'s approach to BIAS because "Congress has . . . "*repeatedly* deemed [the telecommunications industry] important to protecting public safety." *Mozilla*, 940 F.3d at 60 (emphasis added; quoting *Nuvio*, 473 F.3d at 309).

The *2024 Order* arises in substantial part out of the FCC's efforts to satisfy this congressional directive and to respond to *Mozilla*. *See, e.g.*, *Order* at ¶ 244 (A158) ("Our classification of BIAS flows in significant part from concerns with the [2018 rule] highlighted in *Mozilla*—to 'bring the law into harmony with the realities of the modern broadband marketplace.' . . . Given the *Mozilla* court's palpable criticism of the [2018 rule's] regulatory approach to BIAS, and that the merits of this approach were never brought to a final resolution, we find it especially appropriate for the Commission to resolve these lingering disputes now."); *see generally id.* at ¶¶ 20-23, 51, 70, 187, 244-246, 451, 456, 483, 487, 490 (A10-A11, A30, A40, A123, A158-A160, A277, A278-A279, A291-A292, A293-A294, A295-A296). The *2024 Order* takes pains to acknowledge and address the D.C. Circuit's conclusion that "[t]he Commission's disregard of its duty to analyze the impact . . . on public safety" of the 2018 order that had rescinded open internet rules was "arbitrary and capricious." *Mozilla*, 940 F.3d at 63; *see id.* at 59-60, 61; *Order* at ¶ 51 (A30). The D.C. Circuit remanded the 2018 rollback order to the FCC "with direction to address the issues raised" regarding public safety, *Mozilla*, 940 F.3d at 63, and described those issues in detail. It emphasized that without the net neutrality rules, ISPs could block, throttle, or prioritize for profit-seeking

purposes, which "could imperil the ability of first responders, providers of critical infrastructure, and members of the public to communicate during a crisis"; that Santa Clara's "new, Internet-based services . . . depend on community members' speedy and unimpeded access to broadband Internet"; that the California Public Utilities Commission had "warned that the 2018 Order could 'profoundly impair[ ]' the ability of state and local governments 'to provide comprehensive, timely information to the public in a crisis'"; and that

> [W]henever public safety is involved, lives are at stake.  As noted by Santa Clara County, unlike most harms to edge providers incurred because of discriminatory practices by broadband providers, the harms from blocking and throttling during a public safety emergency are irreparable.  People could be injured or die.

*Mozilla*, 940 F.3d at 60-62 (internal citations omitted).  Beyond these impacts to life and limb, it is also important to note that when a public safety response is hampered or impeded, property can suffer significant or total loss, and the environmental and public-health impacts can be devastating.

Yet despite the centrality of public safety to the FCC's post-*Mozilla* consideration of BIAS, and how prominently public safety features in Section 1 of the Act and the analysis underpinning the *2024 Order*, public safety barely registers in Petitioners' arguments.

Petitioners' omission is unsurprising because they have no substantive answer to two fundamental conclusions that flow inexorably from the *2024 Order*'s consideration of public safety: (1) public safety is promoted by Title II reclassification and net neutrality rules and hindered by their absence, and (2) the statutory mandate itself underscores just how obvious it was to Congress that the FCC would continually exercise regulatory authority in ways that would directly, materially, and even dramatically affect all manner of major industries that play central roles in American political and economic life.

First, as the remainder of this brief demonstrates, the *2024 Order* establishes how and why public safety considerations counsel strongly and exclusively in favor of precisely what the FCC has done: grant Santa Clara's petition for reconsideration, restore Title II classification, and reinstate net neutrality rules. The *2024 Order* correctly concludes that the 2018 rule's approach—classifying BIAS under Title I and all but abandoning regulation—"is inconsistent with the best interpretation of the statute and cannot be reconciled with our responsibilities with regard to public safety[.]" *2024 Order* at ¶ 691 (A400-A401).

Second, the very statutory language that animates the public safety mandate establishes Congress's expectation that the FCC will continually make regulatory decisions with substantial, even enormous, political and economic effects on major industries and millions of Americans. Section 1's recognition that the FCC's regulatory actions would implicate a core function of government—protection of life and property—demonstrates Congress's understanding that the FCC would routinely tackle questions of national importance. Indeed, the FCC regulates all manner of communications industries *precisely because* their size and scale mean they have important and consequential effects on the "safety of life and property." 47 U.S.C. § 151.

Petitioners have no answer to the Supreme Court's repeated recognition that Congress knew that the FCC *must* determine how best to regulate a whole host of important industries based on ever-evolving technologies and applications. The statute contemplates the FCC's regulatory authority over *many* industries with enormous social and economic import and of vital importance to public safety, such as interstate copper-line telephone service, which for the first time connected Americans (including their law enforcement agencies) to one another in real time; broadcast and then cable television, which each upended how Americans received and consumed information, including emergency alerts; and questions such as

whether and how particular systems and technologies would interface with 9-1-1, which is how Americans seek help in their hours of need.[2]

From the FCC's very beginning, the Supreme Court has said Congress designed the FCC's statutory authorizations to give it "broad authority" over communications technologies and industries that emerge, or become newly important or transformative, well after enactment of the 1934 Act itself. *United States v. Sw. Cable Co.*, 392 U.S. 157, 167-73 (1968); *accord Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219-220 (1943) (Congress gave the FCC "expansive powers" over a "field of enterprise the dominant characteristic of which was the rapid pace of its unfolding"); *see also FCC v. Pottsville Broad. Co.*, 309 U.S. 134 (1940). This is the essential backdrop for Congress's command in the Telecommunications Act of 1996 that the FCC regulate telecommunications services.[3]

---

[2] *E.g.*, *Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007) (recognizing FCC's "broad authority to regulate interstate telephone communications"); *United States v. Sw. Cable Co.*, 392 U.S. 157, 167 (1968) (1934 Act is basis for "Commission's authority to regulate broadcasting and other communications" and empowers Commission to regulate cable television systems); *Nuvio*, 473 F.3d at 311 (Kavanaugh, J., concurring) (noting FCC's authority to regulate 9-1-1 under 1934 Act, Wireless Communications and Public Safety Act of 1999, and ENHANCE 911 Act of 2004).

[3] *Southwestern Cable*—decided before the advent and subsequent fall of the *Chevron* regime—emphasizes Congress's expectation that the FCC would regulate new and newly important technologies because wire and radio communications was (and remains) "a field that was demonstrably 'both new and dynamic.'" 392 U.S. at 173 (quoting *National Broad. Co.*, 319 U.S. at 219). In *Southwestern Cable*, the Supreme Court held that the 1934 Act authorized FCC regulation of the burgeoning technology of cable television (CATV) despite many features of CATV that Petitioners now ascribe to BIAS. *Southwestern Cable* upheld FCC regulation of CATV *even though* the CATV industry post-dated the 1934 Act and had in recent years experienced "growth [that] is clearly explosive in nature"; *even*

## II.    The Factual Record Before the FCC Demonstrates That Public Safety Systems Throughout the Nation Depend on a Neutral Internet.

Governments must be able to reach their residents to serve them.  In the 21st Century, just as in prior centuries, local governments must meet residents where they are to effectively carry out their responsibilities, paramount among them "the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (internal quotations omitted). Now that broadband internet access has become "an unquestionable necessity," *2024 Order* at ¶ 1 (A3), and "essential to full participation in modern life in the United States," 47 U.S.C. § 1701(1), governments must be prepared to meet their residents on the internet.

Thus, to fulfill their missions, local public safety agencies use the internet to communicate with, and receive information from, the residents they serve and protect.  Timely communication with the public is central to effective emergency and public safety management.  This communication takes many forms; perhaps most critically, public safety agencies and officials operate as edge providers—that is, they produce and share content with residents.  And agencies and officials, including Santa Clara, are constantly increasing their investment in and reliance on technology to communicate with community members, among first responders, and with neighboring partner and state agencies during local, statewide and national emergency situations.  Yet governments' internet-based services and activities are only as effective as community members' access to the internet on nondiscriminatory terms.

---

*though* Congress had at that point repeatedly debated but never enacted legislation explicitly granting regulatory authority over CATV; and *even though* the FCC previously said CATV fell outside "the principal regulatory categories created by the Communications Act."  392 U.S. at 167-73; *compare* Pet. Br. at 15-17, 19-27.

This is why it is not enough for local governments themselves to have reliable internet access.  Instead, as the *2024 Order* calls out expressly, local governments' public safety operations *also* rely heavily on *community members*' unimpaired access to broadband internet on nondiscriminatory terms.  *2024 Order* at ¶ 51-55, 457 (A30-A34, A279) (recognizing and explaining relevance of record evidence of the ways that consumer use of mass-market BIAS affects public safety operations); *see* Santa Clara Comment at 3-5, 6 n.21; Comment of INCOMPAS (Dec. 14, 2023) at 25, https://www.fcc.gov/ecfs/document/1214097190544/1; Santa Clara Recon. Pet. at 3, 6-7; Petition for Reconsideration of INCOMPAS (Feb. 4, 2021) at 8-14, https://www.fcc.gov/ecfs/document/10204032497271/1. This is precisely what the *2024 Order* ensures.  It regulates the plans through which community members generally access the internet—that is, "service[s] marketed and sold on a standardized basis to residential customers, small businesses, and other end-user customers, such as schools and libraries." *2024 Order* at ¶¶ 189, 192 (A124-A125, A126-A127) (defining BIAS and "mass-market service").

Without the *2024 Order*'s net neutrality rules, ISPs are generally free to block or slow down public safety information—whether directly from governments or from third-party sites like social media platforms—and thus leave community members unable to learn how to stay safe in emergencies.  *See Order* at ¶¶ 23, 51 (A11, A30).  The FCC was correct to recognize these risks and conclude that reclassification and net neutrality rules for mass-market BIAS *directly* advance and protect public safety even though governments themselves are frequently connected to the internet through enterprise-grade or specially negotiated governmental access plans, and even though public safety officials sometimes also use dedicated emergency response networks.  For the very same reasons, the FCC was correct to grant Santa Clara's petition for reconsideration of the Commission's

response to the *Mozilla* remand that barely acknowledged and did not meaningfully respond to public safety concerns.

The *2024 Order* grappled with the substantial factual record that demonstrates many of the ways that public safety agencies and officials rely on a neutral and open internet to advance and protect public health and welfare. The record is replete with data that fully support the FCC's assessment that "[p]ublic safety officials' reliance on broadband service has become integral to their essential functions and services, even aside from their use of enterprise-level broadband services, including how they communicate with each other and how they convey information to and receive information from the public." *Order* at ¶ 52 (A30-A32); *see* Santa Clara Comment at 5-6 & n.21.[4]  The FCC's detailed recitation of relevant facts from the record concerning public safety officials' reliance on mass-market BIAS both "to communicate during emergency situations" and "outside the emergency context," *Order* at ¶ 52 (A30-A32); *see generally id.* at ¶¶ 51-58, 59-61, 689-691 (A30-A35, A35-A37, A398-A401), accords with the "lived reality of public safety agencies and first responders," Santa Clara Recon. Pet. at 12.

Mass-market BIAS is critical to effective operation of the federal, state, regional, and local operational areas by which emergency management is organized, including these areas' web-based emergency operations centers that aggregate and disseminate data to and from internet-connected endpoints

---

[4] The FCC specifically *considered and rejected* the supposition that Petitioners and their amici asserted during rulemaking that "reclassification will not enhance public safety communications on the basis that public safety entities heavily rely on enterprise-level dedicated networks that fall outside the scope of reclassification." *2024 Order* at ¶ 52 (A20-A32) (describing and rejecting this argument in comments from CTIA, NCTA, U.S. Telecom, TechFreedom, U.S. Chamber of Commerce, and International Center for Law and Economics).

regardless of the ISP, internet connection, or data system those endpoints operate and where officials connect from. Santa Clara Comment at 5-6. Like other emergency-response agencies nationwide, Santa Clara also operates information systems and centers to inform residents of emergencies, natural disasters, weather patterns that could cause death or injury, wildfires, active shooter scenarios, and other hazards during which residents can act to protect themselves and others if they have accurate and up-to-date information. *Id.* at 5-7. And like their counterparts across the nation, Santa Clara agencies and emergency response officials rely on mass-market BIAS to build redundancies into their communications systems, which is a best practice that enables them to lead and coordinate emergency response even if one form of communication is forced offline. *Id.* at 6. Indeed, public officials themselves also use mass-market BIAS to access these emergency management systems when they are working from home or from the field. *Id.*

Local governments and public safety agencies, like their federal counterparts, have long recognized that social media and other internet-connected communications systems are central to effective public safety management. *Id.* at 8. For years now "Facebook has [been] a critical communications tool for police and fire departments as well as local governments across the United States. The social media platform is used to distribute and gather information about public safety and form a productive relationship with the public." *Id.* at 8 n.25 (quoting H. Kozlowska, *Facebook's algorithm change could affect how cops speak to citizens*, Quartz (Feb. 1, 2018), https://perma.cc/3LHG-HNVQ). As far back as 2013, the U.S. Department of Homeland Security recognized that, "[t]hrough the use of social media, members of the public who witness incidents can provide public safety organizations with timely, geographic-based information. This information can be used by decision-makers in planning response strategies,

deploying resources in the field, and, in turn, providing updated and accurate information to the public." Santa Clara Recon. Pet. at 18 (quoting U.S. Dep't of Homeland Security, *Innovative Uses of Social Media in Emergency Management* (Sept. 2013), https://perma.cc/WL3B-4JCP).[5]

The record demonstrates real-world application of these best practices. "[L]ocal governments rely heavily on private-sector social media platforms and a wide variety of edge content providers to disseminate and collect time-sensitive public safety information—not only for COVID-related orders and information, but also police announcements during active shooter scenarios, adverse weather events, wildfires and other firefighter response, and other emergencies." Santa Clara Comment at 6. Public safety agencies rely on residents' access to social media platforms to communicate with community members about "large mass gatherings," incident notifications, shelter-in-place orders, and disease outbreaks, as well as "inclement weather events, including high winds and fire risk, rain and floods, temperatures so cold that residents may need access to warming centers, and temperatures so hot that they may need to get to cooling centers; invasive insects detection and response . . . ; preparation and common hazards associated with specific holidays; response to fires; and traffic alerts associated with preparation of evacuation routes." Santa Clara Comment at 10-11 (citing dozens of social media posts).

---

[5] Other public safety agencies and academic studies reach the same conclusion. Santa Clara Recon. Pet. at 6 n.17 (citing publications from the U.S. National Library of Medicine and United Nations Office for the Coordination of Humanitarian Affairs as well as J. Bonnan-White et al., *Snow Tweets: Emergency Information Dissemination in a US County During 2014 Winter Storms*, PLoS Currents (Dec. 2014)); Santa Clara Comment at 8 & nn.25-26 (citing, among others, publications from the Cybersecurity & Information Security Agency (CISA) and the New England Journal of Medicine, as well as regulations from Titles 23, 28, and 40 of the Code of Federal Regulations).

Internet communications through social media and residents' internet-enabled security devices, systems, cameras, and microphones also help law enforcement officials communicate about incidents in progress, solve crimes, identify victims, apprehend suspects, and find missing persons. *Id.* at 17-18. To take another example, public radio stations are part of at least 20 states' emergency plans, including their emergency alert systems. Because many millions of Americans access public radio content over the internet, "[t]he internet has become a critical vehicle for public media to delivery on its universal access mission" and provide, among other things, "life-saving public safety and emergency alerting." Comments of National Public Radio, Inc. (Dec. 14, 2023), at 2, 5-6, https://www.fcc.gov/ecfs/document/1214283774508/1; *2024 Order* at ¶¶ 52, 457 (A30-A32, A279).

Residents' unimpeded access to the internet over mass-market BIAS directly affects public safety operations in other ways, too. For example, Americans depend on internet-enabled devices like mobile phones, electronic watches and other wearables, cars, and do-it-yourself home security systems to detect, record, and transmit information about emergency situations to public safety officials. But these systems are only as reliable and effective as their communication link—which is usually residents' mass-market BIAS plans. Santa Clara Comment 14-17.

The record also strongly supports the FCC's conclusion that returning BIAS to its Title II classification benefits public safety because it restores health, balance, and reasonable competition to the markets for edge content and BIAS, and thus enhances resilience, redundancy, and innovation. *2024 Order* at ¶¶ 81, 361, 443, 691 (A47-A48, A224-A225, A271, A400-A401). Public safety agencies rely on a variety of edge providers, including new market entrants that offer new services and generate competition. Those providers are part of a virtuous cycle of innovation that incumbents can—and do—stifle in the absence of regulatory

restrictions. As Santa Clara's comments explained, "[t]here is an entire ecosystem of ISPs and edge providers that can continue to grow in the fertile soil of a reliably open Internet but may be stymied if incumbent ISPs can engage in discrimination, paid prioritization, and other unreasonable interference with Internet traffic." Santa Clara Comment at 21.[6] Reclassifying BIAS under Title II "la[ys] the groundwork for a healthy market of ISPs to emerge" because it "enable[s] BIAS-only providers to gain access on nondiscriminatory terms to infrastructure like utility poles that incumbent ISPs and other utilities have otherwise jealously guarded." *Id.*[7] In short, Title II classification and net neutrality "balance[] ISPs and edge content providers, allowing both to innovate, invest, and expand while preventing ISPs from erecting unaffordable or unscalable barriers to entry in the form of discrimination, paid prioritization, or other unreasonable interference." Santa Clara Comment at 21; *accord* Santa Clara Recon. Pet. at 11-12; *Order* at ¶¶ 464-472 (A282-A285); *see also id.* at ¶¶ 473-481 (A285-A291) (explaining why ISPs' arguments and factual assertions to the contrary are unpersuasive).

---

[6] For example, "[l]ocal governments around the country rely on public safety-focused startup edge providers including Carbyne, a 911 call-handling platform; OpenALPR, a license-plate recognition tool; SOMA Global, a cloud-based platform of public safety tools; Synapse, a threat-detection system for X-rays and CT scans; and First Due, a pre-incident planning and response platform. When those startup edge providers' Internet traffic is blocked, throttle, or deprioritized, public safety suffers." Santa Clara Recon. Pet. at 12.

[7] Absent reclassification, BIAS-only providers find no refuge under the Pole Attachments Act, forcing them to shut down or pay the "monopoly rents" utilities would otherwise charge providers to access utility poles. *See Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330 (2002) ; *Mozilla*, 940 F.3d at 65-67 (explaining this consequence of Title I classification); Comments of Cal. Public Utils. Comm'n (Dec. 14, 2023), at 14-16 https://www.fcc.gov/ecfs/document/1214142323252/1 (explaining how reclassification of BIAS under Title II has beneficial legal consequences, effects on safety regulation enforcement, and "real-world implications for public safety").

### III. The *2024 Order* Will Prevent Irreparable Harm to Public Health and Safety, Justifies Reversal of the Prior Rule in Part due to Public Safety Concerns, and is Not Arbitrary and Capricious.

None of the systems or operations that local governments use to manage and respond to emergencies and manage public health and safety can work if residents—including officials working from home—cannot access them. The consequence is not mere inconvenience; it can be the difference between life and death. "Any blocking or throttling of these Internet communications during a public safety crisis could have dire, irreversible results." *Mozilla*, 940 F.3d at 61. It is no exaggeration to say that when an ISP blocks, deprioritizes, or otherwise hinders residents' access to the internet, "lives are at stake" and "[p]eople could be injured or die." *Id.* at 62.

This public safety risk is *precisely* what the FCC failed to understand when it terminated federal net neutrality protections in 2018, *Mozilla*, 940 F.3d at 63; *precisely* what the FCC failed to take seriously on remand from *Mozilla*, *see generally* Santa Clara Recon. Pet. at 1-7; INCOMPAS Recon. Pet. at 5-18; and *precisely* what the FCC has finally accounted for in the *2024 Open Internet Order*, *see Order* at ¶¶ 51-58, 576, 689-691 (A30-A35, A349-A350, A398-A401).

The need to prohibit such conduct is not speculative, hypothetical, or mere agency guesswork. The *2024 Order* discusses record evidence that ISPs took advantage of the FCC's 2018 termination of federal net neutrality rules to block internet traffic on discriminatory terms. *Order* at ¶¶ 479, 493 (A289-A290, A297-A299). Perhaps most alarmingly, an ISP that provides BIAS in northern Idaho and parts of Washington State, responding to Twitter's and Facebook's bans of former President Trump in early 2021, decided unilaterally that it would block its customers from Twitter, Facebook, "and any other website that may also be [c]ensoring whether it be through their algorithm they use for their site or any other

means."  The ISP backtracked only when faced with public outcry and potential liability under Washington State's net neutrality law.  *See Order* at ¶ 493 (A297-A299); Santa Clara Comment at 22; Comment of Public Knowledge (Dec. 14, 2023) at 6, 16-17, https://www.fcc.gov/ecfs/document/12141254615295/1 (A1927, A1937-38).  There are many other examples in the record of discriminatory—and potentially dangerous—behavior by ISPs, including Madison River Communications blocking Vonage VoIP services; RCN, Comcast, and Cox throttling and blocking peer-to-peer traffic; AT&T blocking Apple FaceTime calling; and other forms of manipulation, redirection, and decryption of internet traffic.  *Order* at ¶¶ 479 & n.1898-1905, 493 & nn.1961-1966 (A289-A290, A297-A298).  Plus, in the last few years customers have filed many complaints with the FCC that demonstrate a likelihood that ISPs have been engaging in blocking, throttling, and prioritizing paid content in other ways, too.  *Id.* at ¶ 493 n.1962 (A297-A298).

     If an ISP serving Amici's residents or other Americans were to take the same action, it would hinder local governments' ability to protect their communities.  Moreover, if an ISP is willing to block major edge providers like Facebook and Twitter for political reasons, it may well also decide to block communications from local governments themselves or from smaller, niche edge content providers whose blocked traffic would not generate public outcry—but which local governments use for emergency alerts, to communicate with health providers, and for myriad other functions.  Such blocking could be disastrous to public safety, and the FCC was correct to reject the argument that Petitioner NCTA made during rulemaking that "consumers should have to rely on public outcry alone to be able to reach all content of their choosing."  *Order* at ¶ 493 n.1961 (A297-A298).

     These practices can have an outsized impact on local governments and

public safety agencies and officials, who often face situations where immediacy matters.

The Facebook-blocking incident also demonstrates the correctness of the *2024 Order*'s underlying view that free-market forces alone do not effectively constrain private-sector ISP behavior in a manner that protects public safety. Indeed, the D.C. Circuit has observed that it is entirely reasonable to expect that, in the absence of regulation, mass-market broadband Internet providers will follow their economic interests—and that the practices now prohibited by the *2024 Order* are strongly in the providers' economic interests. *Verizon v. FCC,* 740 F.3d 623, 645-46 (D.C. Cir. 2014) ("[b]roadband providers also have powerful incentives" to engage in the prohibited practices and "at oral argument Verizon's counsel announced that 'but for [the open internet rules then under ISP attack] we would be exploring those commercial arrangements'"); *see generally Telocator Network of Am. v. FCC*, 691 F.2d 525, 549 (D.C. Cir. 1982) ("One of the fundamental premises of a regulatory scheme such as that established by the Communications Act is that the free market cannot always be trusted to avoid [actions that are] contrary to the public good."). And, as the FCC analyzed in some detail, economic analysis underscores the common-sense point that corporate ISPs have incentives to engage in profit-seeking behavior, including behavior the net neutrality rules render unlawful. *Order* at ¶¶ 494, 501, 502, 504, 505, 517, 522, 536 (A299-A300, A303-A304, A305, A306-A307, A211, A315-A316, A322-A323); *accord* Santa Clara Comment at 22-24. The *2024 Order* takes the entirely reasonable view, confirmed by record evidence, that without federal regulation, private-sector ISPs will maximize profit and shareholder value, extract rents, and reduce competition, even at the expense of public safety. *See id.*

Restoring BIAS to its Title II classification also enables the FCC to institute the net neutrality rules on an *ex ante* basis, rather than relying on after-the-fact

remedies and unenforceable voluntary pledges by ISPs.  Whatever value after-the-fact remedies might offer to market actors, those remedies are *by definition* inadequate to address the irreparable harm—that "[p]eople could be injured or die," *Mozilla*, 940 F.3d at 62—that results when blocking, throttling, paid prioritization, and other discriminatory practices impede public safety communications.  As Santa Clara explained:

> [S]uch practices could interfere with the communications about the existence of a fire line or evacuation zone, the location of flooding, or the location of criminal suspects or missing individuals, among many other critical and time-sensitive communications.  The harm caused by blocking and throttling these types of communications simply cannot be remedied after the fact.

Santa Clara Comment at 20.  The FCC recognized as much, concluding based on the record that "*ex ante* regulations will provide better public safety protections than the [2018 rules'] *ex post* enforcement framework."  *2024 Order* at ¶ 57 (A35); *id.* ¶¶ 456, 458, 482-490 (A278-A279, A279-A280, A291-A296).

Despite the *2024 Order*'s careful assessment of public safety concerns, Petitioners claim the *Order* is arbitrary and capricious because it supposedly failed to justify restoring BIAS's Title II classification and reinstating net neutrality rules.  Pet. Br. at 55-56.  The record belies this absurd contention.  The *2024 Order* grants Amici's and others' petitions for reconsideration and embraces their detailed rationales for rejecting the 2018 rules.  And, as noted above, the *2024 Order* takes *Mozilla* seriously and reflects a fulsome and careful assessment of the public safety implications of reclassification and the net neutrality rules.  This alone substantiates and explains why the *2024 Order* reaches the opposite conclusion

from the 2018 rollback order.[8]  Petitioners' argument is based on a distorted misrepresentation of the record and recommits the FCC's 2018 mistake of failing to understand and appropriately weigh the irreparable, life-and-death consequences that can result from discriminatory impedance of internet access.  Indeed, as the FCC recognized, Title I classification "cannot be reconciled with our responsibilities with regard to public safety[.]" *Order* at ¶ 691 (A400-A401).

## CONCLUSION

The *2024 Open Internet Order* provides critical protections without which local governments cannot fulfill their core mission of protecting the public health and safety, and it is based on careful assessment of the ways reclassification and the net neutrality rules "promote safety of life and property," 47 U.S.C. § 151.  For these reasons, Amici Curiae respectfully request that this Court reject Petitioners' request to set aside the *2024 Order*.

DATED: September 18, 2024          Respectfully submitted,

**COUNTY OF SANTA CLARA and SANTA CLARA COUNTY CENTRAL FIRE PROTECTION DISTRICT**

By:  /s/ *Jeffrey T. Pearlman*
     JEFFREY T. PEARLMAN

     *Attorney for* Amici Curiae *County of Santa Clara, California and the Santa Clara County Central Fire Protection District*

---

[8] The *2024 Order* also responds to *Mozilla*'s conclusion that the FCC's 2018 statutory interpretation that BIAS can be classified under Title I just barely survived judicial review, and did so only because of the then-existing *Chevron* framework.  940 F.3d at 87; *see also id.* at 90, 94.  The *2024 Order*'s painstaking statutory interpretation explains in detail the flaws in the 2018 interpretation and why BIAS is more appropriately classified under Title II.

## COUNSEL FOR AMICI CURIAE

TONY LOPRESTI
County Counsel
RAPHAEL N. RAJENDRA
Deputy County Counsel
TAYRYN EDWARDS
Fellow
Office of the County Counsel
County of Santa Clara
70 West Hedding Street
San José, CA 95110
(408) 299-5900
Raphael.Rajendra@cco.sccgov.org
Tayryn.Edwards@cco.sccgov.org

JEFFREY T. PEARLMAN
Intellectual Property &
Technology Law Clinic
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90089-0071
(213) 740-7613
jef@law.usc.edu

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,365 words, exclusive of the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).  I certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Dated:  September 18, 2024

By:  */s/ Jeffrey T. Pearlman*
JEFFREY T. PEARLMAN

*Attorney for* Amici Curiae
*County of Santa Clara, California and the Santa Clara County Central Fire Protection District*

## CERTIFICATE OF SERVICE

I, Jeffrey T. Pearlman, hereby certify that I electronically filed this **Brief of Amici Curiae County of Santa Clara, California and the Santa Clara County Central Fire Protection District in Support of Respondents** with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on September 18, 2024. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed September 18, 2024, at Los Angeles, California.

*/s/ Jeffrey T. Pearlman*