Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

―――――――――――――――――――――――――――

IN RE: MCP No. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN
INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER,
AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404,
PUBLISHED MAY 22, 2024

―――――――――――――――――――――――――――

Petitions for Review of an Order of the
Federal Communications Commission

―――――――――――――――――――――――――――

**BRIEF OF *AMICI CURIAE***
**COMPTEL d/b/a INCOMPAS AND ENGINE ADVOCACY**
**IN SUPPORT OF RESPONDENTS**

―――――――――――――――――――――――――――

John T. Nakahata
HWG LLP
1919 M Street, NW
8th Floor
Washington, D.C.  20036
(202) 730-1300
jnakahata@hwglaw.com

September 18, 2024                *Counsel for COMPTEL d/b/a*
                                 *INCOMPAS and Engine Advocacy*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-7000 (Lead) see next page    Case Name: In re MCP No. 185 et al.    see next page

Name of counsel: John T. Nakahata

Pursuant to 6th Cir. R. 26.1, COMPTEL d/b/a INCOMPAS
                                    *Name of Party*

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

    No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

    No

---

## CERTIFICATE OF SERVICE

I certify that on _____ September 18, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ John T. Nakahata
John T. Nakahata
Counsel for COMPTEL d/b/a INCOMPAS

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## <u>Continued Disclosure of Corporate Affiliations and Financial Interest</u>

No. 24-7000 (Lead) *MCP No. 185 Open Internet Rule*

No. 24-3449          *Ohio Telecom Association, et al. v. FCC, et al.*

No. 23-3450          *Ohio Cable Telecommunications Association v. FCC, et al.*

No. 24-3497          *MCTA – The Missouri Internet & Television Association v. FCC, et al.*

No. 24-3508          *CTIA – The Wireless Association v. FCC, et al.*

No. 24-3510          *Wireless Internet Service Providers Association v. FCC, et al.*

No. 24-3511          *ACA Connects v. FCC, et al.*

No. 24-3519          *Florida Internet & Television Association v. FCC, et al.*

No. 24-3538          *Texas Cable Association, et al. v. FCC, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-7000 (Lead) see next page     Case Name: In re MCP No. 185 et al.    see next page

Name of counsel: John T. Nakahata

Pursuant to 6th Cir. R. 26.1, Engine Advocacy
_Name of Party_

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ September 18, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ John T. Nakahata
John T. Nakahata
Counsel for Engine Advocacy

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

## <u>Continued Disclosure of Corporate Affiliations and Financial Interest</u>

No. 24-7000 (Lead) *MCP No. 185 Open Internet Rule*

No. 24-3449          *Ohio Telecom Association, et al. v. FCC, et al.*

No. 23-3450          *Ohio Cable Telecommunications Association v. FCC, et al.*

No. 24-3497          *MCTA – The Missouri Internet & Television Association v. FCC, et al.*

No. 24-3508          *CTIA – The Wireless Association v. FCC, et al.*

No. 24-3510          *Wireless Internet Service Providers Association v. FCC, et al.*

No. 24-3511          *ACA Connects v. FCC, et al.*

No. 24-3519          *Florida Internet & Television Association v. FCC, et al.*

No. 24-3538          *Texas Cable Association, et al. v. FCC, et al.*

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ..................................................................1

ARGUMENT ..........................................................................................2

I.     A FEDERAL NET NEUTRALITY POLICY IS NEEDED TO
PROTECT BIAS CUSTOMERS' ABILITY TO ACCESS THE
ONLINE CONTENT SERVICES AND APPLICATIONS
OF THEIR CHOICE. ........................................................................4

II.    FCC OVERSIGHT OF INTERNET TRAFFIC EXCHANGE IS
CRITICAL FOR ENSURING BIAS PROVIDERS DO NOT
VIOLATE NET NEUTRALITY....................................................9

III.   CLASSIFYING BIAS AS A TITLE II TELECOMMUNICATIONS
SERVICE PROMOTES COMPETITION IN THE BIAS
MARKETPLACE............................................................................14

CONCLUSION .....................................................................................19

# TABLE OF AUTHORITIES

**CASES**

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016)................................10

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014)......................................................7

**STATUTES**

47 U.S.C. § 224.........................................................................................................14

47 U.S.C. § 253.........................................................................................................15

**ADMINISTRATIVE MATERIALS**

*Applications of AT&T and DIRECTV For Consent to Assign or
    Transfer Control of Licenses and Authorizations*, Memorandum
    Opinion and Order, 30 FCC Rcd. 9131 (2015) ..................................13

*Applications of Charter Communications, Inc., Time Warner Cable
    Inc., and Advance/Newhouse Partnership For Consent to Assign or
    Transfer Control of Licenses and Authorizations*, Memorandum
    Opinion and Order, 31 FCC Rcd. 6327 (2016) ..................................13

*Protecting and Promoting the Open Internet*, Report and Order on Remand,
    Declaratory Ruling, and Order, 30 FCC Rcd. 5601 (2015)...............5, 8, 10, 11

*Verizon Communications Inc. and MCI, Inc. Applications for
    Approval of Transfer of Control*, Memorandum Opinion and
    Order, 20 FCC Rcd. 18433 (2005) ...................................................13

**OTHER AUTHORITIES**

Barbara van Schewick, *How to Strengthen the Open Internet NPRM
    by Closing Loopholes and Matching the 2015 Open Internet
    Protections* (Mar. 13, 2024)...............................................................12

Comments of Engine, WC Docket No. 23-320 (filed Dec. 14, 2023).....................3

Comments of INCOMPAS, WC Docket No. 23-320
    (filed Dec. 14, 2023) .............................................................3, 13, 15

Comments of Tejas N. Narechania, WC Docket No. 23-320
    (filed Dec. 14, 2023) ...........................................................................6

Reply Comments of Netflix, Inc., WC Docket No. 23-320 (filed Jan.
    17, 2024) .........................................................................................8, 9

## STATEMENT OF INTEREST[1]

COMPTEL d/b/a INCOMPAS, the Internet and competitive networks association ("INCOMPAS") is the preeminent national industry association representing Internet content companies and competitive communications networks, including providers in the broadband Internet access service ("BIAS") marketplace using wired and wireless networks. INCOMPAS also represents companies that are providing business broadband services to schools, libraries, hospitals and clinics, and businesses of all sizes; regional fiber providers; transit and backbone providers that carry Internet traffic; and online content companies that offer video programming over BIAS to consumers in addition to other online content such as social media, cloud services, and voice and messaging services (also known as "edge providers").

INCOMPAS has long supported the Federal Communications Commission's ("FCC" or "Commission") federal framework for open Internet rules in the United States so that consumers can access the lawful online content and services of their choice without interference from their BIAS provider. INCOMPAS members' services often rely on BIAS so that their online content, services, and applications

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* certify that no other person or entity, other than *amici* or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. All parties consent to the filing of this brief.

can reach their consumers, including small businesses and individuals. In addition, INCOMPAS members compete with established incumbents for both the provision of BIAS providers and the offering of online services and content. These members depend on an open Internet so that their customers can access their content without interruption, even on the networks of the incumbents against whom they compete. INCOMPAS members' experiences show how the availability of BIAS connectivity and access to an open Internet throughout the United States are critical for the Nation's economic development and global competitive edge.

Engine Advocacy ("Engine") is a non-profit technology policy, research, and advocacy organization that bridges the gap between policymakers and startups. Engine works with the government and a community of thousands of high-technology, growth-oriented startups across the nation to support a policy environment conducive to technology entrepreneurship. Engine has weighed in on the need for strong net neutrality protections repeatedly in the past and supports the Commission's reinstatement of the protections found in the 2015 *Open Internet* order, including the prohibitions on blocking, throttling, and paid prioritization.

## ARGUMENT

INCOMPAS and Engine are longstanding supporters of net neutrality principles and the FCC's work to adopt federal net neutrality rules. We thus fully support the FCC's restoration of a net neutrality policy in the 2024 *Safeguarding*

*the Open Internet* Order (the "2024 Order" or "Order"), as it will help ensure a level playing field for the broad range of Internet content companies, competitive communications networks, and technology startups our organizations work with.[2]

INCOMPAS and Engine file this brief to describe three important ways in which the open Internet framework under the Order expands competitive online options that enable more investment and innovation for business and consumers of all kinds. First, the Order restores critical net neutrality rules that protect consumers' ability to use their BIAS connections to access the lawful online content services and applications of their choice from edge providers, without blocking, throttling, or other interference from BIAS providers. Second, the Order reestablishes necessary oversight of BIAS providers' Internet traffic exchange and interconnection practices, helping ensure that BIAS providers do not use those agreements to disadvantage unaffiliated edge providers. Third, the Order entitles BIAS-only service providers to important protections under Title II of the Communications Act, while eschewing unnecessary requirements, to help them deploy their networks and compete with established providers of BIAS and other services in a highly concentrated market.

---

[2]   *See generally* Comments of INCOMPAS, WC Docket No. 23-320 (filed Dec. 14, 2023) ("INCOMPAS Comments"); Comments of Engine, WC Docket No. 23-320 (filed Dec. 14, 2023).

I.    **A FEDERAL NET NEUTRALITY POLICY IS NEEDED TO PROTECT BIAS CUSTOMERS' ABILITY TO ACCESS THE ONLINE CONTENT SERVICES AND APPLICATIONS OF THEIR CHOICE.**

BIAS is an essential service that consumers and small businesses need to access the online content, services, and applications of their choice. Consumers use fixed BIAS at home to work, access education and health care services, entertain themselves, shop, and stay connected to friends and family, among many other uses. *See Safeguarding and Securing the Open Internet; Restoring Internet Freedom*, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC No. 24-52, WC Docket Nos. 23-320, 17-108, ¶ 1 (rel. May 7, 2024) ("Order"). Even as our society has reopened after the height of the COVID-19 pandemic, more employees are working from home and rely on BIAS to do their jobs. Moreover, because of the proliferation of connected devices, multiple family members use BIAS simultaneously at home through laptops, tablets, gaming devices, smartphones, televisions, and more.

The proliferation of applications and services that reach consumers through BIAS has made it "essential to full participation in modern life in the United States." *See id.* Take home entertainment, for example. When the Commission issued net neutrality rules in 2015, it noted Netflix's growth and announcements of plans from Disney and many other content companies to deliver "over-the-top" video services to take advantage of the spread of high-speed BIAS. *See Protecting*

*and Promoting the Open Internet*, Report and Order on Remand, Declaratory Ruling, and Order, 30 FCC Rcd. 5601, ¶ 3 (2015) ("2015 *Open Internet* Order"). Today, those online video services have grown very large and compete directly with legacy video and television services (including their online affiliates) for residential consumer subscriptions, offering unique content and competitive pricing. Or take the growth of cloud storage services, which (among other things) allow consumers and businesses to access information, applications, and services regardless of physical proximity. All of these services that consumers use on a daily basis rely on an open Internet, including through BIAS connections.

Reliable BIAS thus provides enormous benefits to consumers and supports economic growth and opportunity throughout the economy. And as these examples illustrate, "reliable" BIAS means not only speed and high bandwidth, but openness. Consumers and businesses take for granted that they can use their BIAS connections to reach video streaming, cloud storage, and countless other services and applications of their choice, without disruption. Companies that provide these services and applications (often referred to as "edge providers") likewise rely on an open Internet to reach consumers and businesses.

Yet, the Commission reasonably concluded based on the record that BIAS providers continue to have the "economic incentive and technical ability to engage in practices that pose a threat to Internet openness." Order ¶ 464. The Commission

cited comments from INCOMPAS and others explaining how BIAS providers had

done so in the past and continued to have the ability to do so absent net neutrality

requirements. *See id.* ¶ 465 n.1857 (citing comments in support).[3] Another set of

comments collected numerous specific instances of non-neutral behavior over

years, including AT&T's blocking of Apple's FaceTime app and a BIAS

provider's blocking of voice-over-IP or "VoIP" applications. *See* Comments of

Tejas N. Narechania at 3 n.1, WC Docket No. 23-320 (filed Dec. 14, 2023).

As those comments illustrated, BIAS providers are in the position to block,

throttle, and engage in paid prioritization and other harmful conduct such as

requiring payment from edge providers like streaming video providers, gaming

providers, and cloud computing companies, especially but not exclusively when

the BIAS provider also competes with those other online providers. *See* Order

¶¶ 465, 467-70. These edge providers include startups that are most at risk if they

are unable to pay for preferential treatment from BIAS providers. Edge providers,

specifically startups, possess limited resources for operating costs and are therefore

ill-equipped to pay BIAS providers to have their services reach users. But without

an open Internet, including BIAS connections delivered without interference by

---

[3]   Indeed, in the separate mergers of Comcast and NBC/Universal and Charter and
     Time Warner Cable, the Commission addressed the incentives and abilities of
     the companies to violate net neutrality policy as conditions to approving those
     mergers. *See, e.g.*, Order ¶¶ 13, 505 & n.2007.

BIAS providers, edge providers' services are much less likely to reach interested consumers and thrive.[4]

In addition to the record support regarding the problem itself, the Order explains why a regulatory solution is required to address these issues. For example, while BIAS providers have argued that competition should reduce the incentive to block, throttle, or disadvantage certain traffic, the Order explains that "many consumers still lack a choice of BIAS providers" and "where they do have a choice, they have a choice of only two providers" that may or may not be comparable to one another. *Id.* ¶ 473.[5] Likewise, even where there are options, switching costs are high. *See id.* ¶ 475. On top of that, consumers affected by practices like throttling may be unable to determine whether the issue is "due to the BIAS provider or to the edge provider." *Id.* ¶ 476. This kind of uncertainty "reduces consumers' willingness to switch, solidifying the gatekeeper position of BIAS providers, and weakening the checks provided by competing providers." *Id.*

---

[4]    The D.C. Circuit concluded that the Commission had "convincingly detailed how broadband providers' position in the market gives them the economic power to restrict edge-provider traffic and charge for the services they furnish edge providers" in the *Verizon v. FCC* challenge to the 2010 *Open Internet* order. *Verizon v. FCC*, 740 F.3d 623, 646 (D.C. Cir. 2014).

[5]    This analysis focuses on fixed BIAS, as the Commission has properly found that "fixed and mobile broadband services are not full substitutes to each other and both services are necessary to ensure that all Americans have access to advanced telecommunications capability." Order ¶ 473.

These concerns are not new: the Commission explained in its 2015 *Open Internet* order that the record showed that Internet providers "have a variety of strong incentives to limit Internet openness." 2015 *Open Internet* Order ¶ 79. In this proceeding, BIAS providers argued that the lack of widespread use of non-neutral practices since the FCC's 2018 *Restoring Internet Freedom* order lifted the previous restrictions demonstrated that open-Internet rules are not necessary now. *See* Order ¶ 478. The Commission rightly found, however, that "various states began enacting their own open Internet rules" after the Commission's 2018 decision, which provided "at least some constraint" on BIAS providers. *Id.*

Indeed, as Netflix commented in this proceeding, there are good reasons why BIAS providers' conduct since the 2018 *Restoring Internet Freedom* order does not undermine the need for federal net neutrality rules: "Almost immediately after the Commission rescinded its network neutrality rules, Hawaii, Montana, New Jersey, New York, Rhode Island, and Vermont issued executive orders requiring companies seeking to contract with those states to confirm that they would meet the FCC's pre-2018 network neutrality rules. Additionally, in 2018, California and Washington adopted their own open Internet protections, which have remained in place throughout this period." Reply Comments of Netflix, Inc. at 9, WC Docket No. 23-320 (filed Jan. 17, 2024) (footnote omitted). "Given this environment, it would have been against ISPs' interests to exercise market power

and engage in easy-to-detect, non-neutral behavior because doing so would have dramatically increased the likelihood that they would face enforcement in California and Washington, and that, in response, the Commission and additional states would adopt strong new rules. But while the combination of individual state laws and a pending regulatory proceeding disincentivized ISPs from undermining the open Internet, only federal rules can protect consumers nationwide into the future and provide businesses with regulatory certainty." *Id.* at 9-10.

Recent examples discussed in Section II below also show how BIAS providers have previously disadvantaged edge providers at their interconnection points based on their terminating monopoly for their BIAS customers. The Commission thus rightly concluded in the Order that net neutrality rules remain necessary today to protect the openness of the Internet for consumers, small businesses, edge providers, startups, and others.

## II.    FCC OVERSIGHT OF INTERNET TRAFFIC EXCHANGE IS CRITICAL FOR ENSURING BIAS PROVIDERS DO NOT VIOLATE NET NEUTRALITY.

The Commission also correctly determined that BIAS "includes the exchange of Internet traffic by an edge provider or an intermediary with the BIAS provider's network (i.e., Internet peering, traffic exchange, or interconnection)," to the extent the exchange supports the offering of BIAS. Order ¶ 204. Accordingly, in addition to the net neutrality rules focused on blocking or throttling particular

content, the Commission has the ability to review Internet traffic exchange practices to ensure BIAS providers do not engage in unjust und unreasonable practices. *Id.* ¶ 578. This aspect of the Order is important to edge providers, alongside the other rules the Commission adopted: the record demonstrated that interconnection oversight is necessary so that net neutrality requirements cannot be evaded at interconnection.

The Commission's conclusion in the present Order is consistent with the FCC's previous conclusion in the 2015 *Open Internet* order. Now, as then, "BIAS providers hold themselves out to carry the traffic desired by the BIAS provider's end-user customers regardless of source and regardless of whether an edge provider has a specific arrangement with the BIAS provider." Order ¶ 207 (citing 2015 *Open Internet* Order ¶ 364). That representation "necessarily includes the promise to make the interconnection arrangements necessary to allow that access." 2015 *Open Internet* Order ¶ 204. The D.C. Circuit upheld the Commission's judgment in the 2015 *Open Internet* order, holding that the reclassification of broadband services under Title II gave the Commission jurisdiction over "the interconnection arrangements necessary to provide" the broadband service. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 713 (D.C. Cir. 2016). Interconnection is indeed an essential part of providing BIAS service, and Commission oversight

over interconnection and Internet exchange practices of BIAS providers is therefore proper and necessary.

In 2015, the Commission concluded that the record demonstrated that BIAS providers "have the ability to use terms of interconnection to disadvantage edge providers" and that "consumers' ability to respond to unjust or unreasonable broadband provider practices are limited by switching costs." 2015 *Open Internet* Order ¶ 205. The Commission discussed the increased frequency and intensity of Internet traffic exchange disputes, *id.* ¶ 199, which mattered not only because it reflected an exercise of BIAS providers' gatekeeper power, but also because the congestion and poor quality of Internet service caused by such disputes directly impaired the Internet access offered by the BIAS providers. The 2015 *Open Internet* order rightly understood that such behavior would permit a BIAS provider to do at the point of interconnection with the Internet what it would be prohibited from doing once the content had entered the BIAS provider's network.

Here, too, the record supports the FCC's reasonable determination that "anticompetitive and discriminatory practices" in the context of interconnection "could have a deleterious effect on the open Internet." Order ¶ 576. As one commenter explained, "[f]rom at least 2013 to 2015," before the Commission's intervention, "major ISPs serving more than 75 percent of American broadband customers deliberately let connections into their networks congest to extract fees

from the Internet companies delivering data to the ISPs' Internet service customers." Barbara van Schewick, *How to Strengthen the Open Internet NPRM by Closing Loopholes and Matching the 2015 Open Internet Protections* 8 (Mar. 13, 2024), *attached to* Letter from Barbara van Schewick to Marlene H. Dortch, Sec'y, FCC, WC Docket No. 23-320 (filed Mar. 13, 2024). Indeed, since the 2018 *Restoring Internet Freedom* order lifted the oversight of interconnection agreements, "parties looking to connect to the nation's largest ISPs are facing actual congestion or threats of congestion (e.g. throttling) if they do not pay access fees to the ISP." *Id.* at 9 (citing comments from Lumen, a large BIAS provider, and a declaration from the Chief Executive Officer of Cogent Communications regarding BIAS provider behavior and incentives).

Thus, without net neutrality rules and oversight over BIAS providers' Internet traffic exchange practices under Title II of the federal Communications Act, edge providers may again encounter discriminatory and harmful behavior—undermining their ability to deliver their content to consumers. The largest incumbent home BIAS providers are cable operators, who are losing video subscribers (and thus revenue) to competition from edge providers' online video services. It is thus in the interest of BIAS providers to make up for that lost revenue or to increase their competitors' costs. Moreover, the Department of Justice and the Commission also have investigated interconnection issues

12

extensively in several large BIAS provider mergers, resulting in conditions imposed on those merged entities to ensure that they would not be able to use interconnection disputes to harm consumers or edge providers.[6] The same fundamental incentives that animated those requirements still exist today.

*Amici* were among many commenters raising significant concerns in the record regarding the history of BIAS providers' charging certain online content companies fees for interconnection and traffic exchange. INCOMPAS, for example, submitted a recent Analysys Mason study demonstrating the harms if regulators permit such behavior. *See* INCOMPAS Comments at 46 & n.110. The Commission thus has both legal authority under Title II and a strong basis in the record for exercising oversight over BIAS providers' Internet traffic exchange practices to ensure they are just and reasonable.

---

[6] *See, e.g.*, *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership For Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 31 FCC Rcd. 6327, ¶ 131 (2016) (imposing a "mandatory interconnection condition" on Charter in particular conditions); *Applications of AT&T and DIRECTV For Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd. 9131, ¶ 219 (2015) (requiring AT&T to submit interconnection agreements to the Commission for review); *Verizon Communications Inc. and MCI, Inc. Applications for Approval of Transfer of Control*, Memorandum Opinion and Order, 20 FCC Rcd. 18433 (2005).

III.    **CLASSIFYING BIAS AS A TITLE II TELECOMMUNICATIONS SERVICE PROMOTES COMPETITION IN THE BIAS MARKETPLACE.**

INCOMPAS and Engine also support the Commission's reclassification of BIAS as a Title II service because it will help ensure that BIAS-only providers (*i.e.*, providers of BIAS, but not other telecommunications services like voice service) can exercise their rights to deploy broadband infrastructure, under the protections afforded by Title II of the Communications Act.

There are significant barriers to deploy broadband network infrastructure, including access to poles, ducts, and conduit and commercial and residential multi-tenant environments. Providers also encounter significant permitting costs and delays from government—federal, state and local agencies—as well as from railroads. Title II contains measures to address some of these issues for telecommunications providers. For example, Section 224 "authorizes the Commission to prescribe rules to ensure that the rates, terms, and conditions of pole attachments are just and reasonable," among other measures. Order ¶ 71; *see* 47 U.S.C. § 224. Section 253 "seeks to further facilitate deployment of communications services by enabling the Commission (or a court) to intervene when a state or local regulation or legal requirement 'may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate

telecommunications service.'" Order ¶ 72 (quoting 47 U.S.C. § 253(a), (d)) (emphasis omitted).

Many incumbent BIAS providers already enjoy these protections because of their provision of other telecommunications services. As the Commission reasonably concluded in the Order, "reclassifying BIAS as a Title II service levels the playing field by ensuring that BIAS-only providers enjoy the same regulatory protections … as their competitors who offered services already classified as telecommunications services in addition to BIAS." *Id.* ¶ 74. With the protections of Section 224, "BIAS-only providers … will no longer be forced to negotiate for the right of pole access directly with each set of pole owners, which will not only ensure they pay the same rates as their competitors but will also ensure that deployment of their networks is not unnecessarily bogged down by the negotiation process." *Id.* ¶ 75; *see, e.g.*, INCOMPAS Comments at 18 (describing this "significant" barrier). Likewise, reclassification of BIAS service opens an avenue for additional protections for BIAS-only providers who may need Commission intervention under Section 253 to address state and local policies that restrict competitive deployment.

The Commission appropriately recognized that the Title I regime for BIAS "favor[ed] large incumbents at the expense of BIAS-only providers" and that the reclassification to Title II would provide "very real" competitive benefits. Order

¶¶ 75, 82. INCOMPAS members' experience bears that out. Many of
INCOMPAS' providers only offer BIAS service and thus cannot exercise any
rights afforded by Title II to speed their deployment. Because BIAS-only members
must negotiate commercial agreements to access poles, for example, they face
delays getting access and higher costs, which impedes effective competition.
BIAS-only providers, many of which are smaller competitive companies, do not
enjoy the competitive advantages of larger enterprises like many of their
competitors and thus struggle to break into markets with entrenched incumbents.

These Title II protections enable more competition in the BIAS marketplace.
As the Commission noted in the Order, "many consumers still lack a choice of
BIAS providers or, where they do have a choice, they have a choice of only two
providers and/or the services offered by competing providers are often not close
substitutes." *Id.* ¶ 473. Reclassifying BIAS as a telecommunications service
increases competition by allowing BIAS-only providers to exercise the same rights
as the telephone and cable television systems that they compete with.

Ensuring this level playing field for BIAS-only providers is particularly
important given the large shift of consumers away from fixed residential voice and
video services and toward over-the-top video and voice-over-IP (or "VoIP")
options. This phenomenon is often referred to as "cord cutting." Since 2015, a
significant number of INCOMPAS members that offer residential fixed BIAS have

ceased offering voice and video options to their residential customers as cord cutting has resulted in those options' being less popular and less profitable. Those customers have been able to take advantage of online streaming options' growth in number and quality. As a result, more INCOMPAS members are BIAS-only providers now than a decade ago. For those BIAS-only providers to be able to compete with other BIAS providers in their service areas, Title II protections are more important now than ever. *See, e.g.*, *id.* ¶ 81 (because of the shift to BIAS-only business models, "we find that restoring the section 224 rights and easing the burdens of pole access is likely to ensure that the number of BIAS-only providers does not artificially shrink due to inequitable treatment under the law.").

The number and proportion of BIAS-only providers also is likely to grow because of the Broadband Equity Access and Deployment ("BEAD") program under the 2021 Infrastructure Investment and Jobs Act. Among other things, the BEAD program provides billions of dollars in funding to expand access to BIAS to areas with no or inadequate BIAS. Many entities that will be competing for BEAD funding will be BIAS-only providers, rather than providers of BIAS alongside voice or traditional video service. Affording those BIAS-only providers Title II protections will ensure that this important federal funding has the maximum possible impact for Americans who need reliable access to BIAS.

Finally, reclassifying BIAS as a Title II service also supports the effective and fair application of the FCC's rules regarding access to multi-tenant environments ("MTEs"). FCC rules prohibit agreements between providers of telecommunications or video service and MTE owners that grant the provider exclusive access and rights to provide service to the MTE. Those rules are limited to telecommunications service providers, cable operators, and multi-channel video providers—not BIAS-only providers under Title I. Reclassification of BIAS as a Title II telecommunications service thus affords BIAS-only providers much-needed protections to seek to compete with other providers in MTEs *and* ensures that BIAS-only providers are subject to the same FCC rules.

\*    \*    \*

## CONCLUSION

INCOMPAS and Engine urge the court to uphold the FCC's Order to ensure that consumers, startups, and small businesses are protected and that competitive BIAS-only providers can exercise the protections that Title II affords in Sections 224 and 253 and the FCC's accompanying rules.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ John T. Nakahata

John T. Nakahata
HWG LLP
1919 M Street, NW
8th Floor
Washington, D.C.  20036
(202) 730-1300
jnakahata@hwglaw.com

</div>

September 18, 2024                    *Counsel for COMPTEL d/b/a*
                                     *INCOMPAS and Engine Advocacy*

19

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Times New Roman font.

I further certify that the foregoing document complies with the requirements of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 4,011 words according to the word-count feature of Microsoft Word.

<div align="right">
/s/ John T. Nakahata
John T. Nakahata
</div>

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of September 2024, the foregoing document was filed via CM/ECF.  Service was accomplished on all parties or their counsel of record via CM/ECF.

/s/ John T. Nakahata
John T. Nakahata