**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497,
24-3508, 24-3510, 24-3511, 24-3519, 24-3538**

# In the United States Court of Appeals for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION,
IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN
INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER,
AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404,
PUBLISHED MAY 22, 2024

On Petitions for Review

**REPLY BRIEF OF PETITIONERS OHIO TELECOM ASSOCIATION,
USTELECOM – THE BROADBAND ASSOCIATION, OHIO CABLE
TELECOMMUNICATIONS ASSOCIATION, NCTA – THE INTERNET &
TELEVISION ASSOCIATION, CTIA – THE WIRELESS ASSOCIATION,
WIRELESS INTERNET SERVICE PROVIDERS ASSOCIATION, ACA
CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, FLORIDA
INTERNET & TELEVISION ASSOCIATION, MCTA – THE MISSOURI
INTERNET & TELEVISION ASSOCIATION, AND
TEXAS CABLE ASSOCIATION**

HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

*(Additional counsel on next page)*

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable
Telecommunications Association,
NCTA – The Internet & Television
Association, Florida Internet &
Television Association, MCTA – The
Missouri Internet & Television
Association, and Texas Cable
Association*

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW,
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's
Communications Association*

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association,
USTelecom – The Broadband
Association, and NCTA – The Internet
& Television Association*

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association
for Broadband Without Boundaries*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................1

ARGUMENT ......................................................................................3

I.    THE COMMISSION LACKS STATUTORY AUTHORITY
      TO RECLASSIFY BROADBAND ........................................................3

      A.    The Order Is Unlawful Under The Major-Questions
            Doctrine...........................................................................3

            1.    The major-questions doctrine applies .....................................3

            2.    Reclassifying broadband under Title II is a major
                  question ......................................................................6

            3.    The Commission lacks clear congressional
                  authorization.................................................................9

      B.    The Best Reading Of The Statute Is That Broadband Is An
            Information Service .........................................................10

            1.    Under the plain text, broadband is an information
                  service.......................................................................10

            2.    The relevant history confirms that broadband is an
                  information service .......................................................16

            3.    Other interpretive tools confirm that Congress saw
                  broadband as an information service...................................22

II.   THE COMMISSION LACKS STATUTORY AUTHORITY TO
      CLASSIFY MOBILE BROADBAND AS A COMMERCIAL
      MOBILE SERVICE SUBJECT TO TITLE II ......................................24

III.   THE ORDER IS ARBITRARY AND CAPRICIOUS...........................29

    A.   The Commission Fails To Justify Its Truncated Cost-
        Benefit Analysis ................................................................29

    B.   At A Minimum, The Commission Fails To Justify The
        General Conduct Standard ............................................32

CONCLUSION.............................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biden* v. *Nebraska*,
 143 S. Ct. 2355 (2023) ..............................................................5

*MCI Telecommunications Corp.* v. *AT&T Co.*,
 512 U.S. 218 (1994).................................................................5

*National Cable & Telecommunications Ass'n* v. *Brand X
 Internet Services*,
 545 U.S. 967 (2005).........................................................*passim*

*NFIB* v. *OSHA*,
 595 U.S. 109 (2022)..............................................................5, 7

*Ohio* v. *EPA*,
 144 S. Ct. 2040 (2022) ............................................................30

*U.S. Telecom Ass'n* v. *FCC*,
 825 F.3d 674 (D.C. Cir. 2016)................................................9, 29

*U.S. Telecom Ass'n* v. *FCC*,
 855 F.3d 381 (D.C. Cir. 2017)................................................5, 9

*United States* v. *Home Concrete & Supply, LLC*,
 566 U.S. 478 (2012)...............................................................25

*United States* v. *Western Elec. Co.*,
 1989 WL 119060 (D.D.C. Sept. 11, 1989)................................15

*Utility Air Regul. Grp.* v. *EPA*,
 573 U.S. 302 (2014).........................................................4, 6, 23

*West Virginia* v. *EPA*,
 597 U.S. 697 (2022).....................................................4, 5, 8, 10

**Statutes**

42 U.S.C. § 7411 ................................................................................................10

47 U.S.C.
  § 153 .................................................................................................... *passim*
  § 160 ...............................................................................................................23
  § 230 ...............................................................................................................22
  § 332 ...............................................................................................................25
  § 1302 .............................................................................................................23
  § 1422 .............................................................................................................26

**Regulatory Materials**

47 C.F.R. § 9.3 ................................................................................................28

*Appropriate Regulatory Treatment for Broadband Access to the
  Internet over Wireless Networks,*
  22 FCC Rcd. 5901 (2007)................................................................................27

*Deployment of Wireline Services Offering Advanced
  Telecommunications Capability,*
  13 FCC Rcd. 24011 (1998)..............................................................................21

*Federal-State Joint Board on Universal Service,*
  13 FCC Rcd. 11501 (1998)................................................................17, 20, 21

*Implementation of Sections 3(n) and 332 of the
  Communications Act,*
  9 FCC Rcd. 1411 (1994)..................................................................................27

*Inquiry Concerning High-Speed Access to Internet over
  Cable & Other Facilities,*
  17 FCC Rcd. 4798 (2002)................................................................................18

*Restoring Internet Freedom,*
  33 FCC Rcd. 311 (2018)..................................................................................16

**Other Authorities**

Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, 76 Fed. Commc'ns L.J. 321 (2024) ...................................................................8

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1993) ..............................27

*Newton's Telecom Dictionary* (6th ed. 1993) ......................................................26

**INTRODUCTION**

The major-questions doctrine should make this case straightforward. Although a previous panel granted a stay on that ground, the Commission ignores the major-questions doctrine until late in its brief. When it finally engages, the Commission suggests that treating internet providers as public utilities is nothing new and nothing significant. As the unanimous stay panel and at least one Supreme Court Justice have already recognized, neither is true. The Commission in 2015 broke from two decades of agency precedent, and its double-reversal since then further highlights the issue's political salience.

On the statutory text, the Commission largely avoids the language Congress used and focuses instead on revisionist history. It accepts that internet access providers offered an "information service" when the Telecommunications Act of 1996 was enacted, and continued to do so at least through the Supreme Court's *Brand X* decision in 2005. But in the Commission's telling, what mattered was that those providers offered email and news applications in addition to internet access. Now that users mainly access the internet to interact with third-party content and applications, the

Commission says, all that is left is a "telecommunications service" regulated under Title II.

The problem is that the Commission's history is fiction. The provision of internet access has always been the core driver of the information-service classification, and that function remains unchanged today. Email, news applications, and other add-ons may have provided an additional basis for the information-service classification, but they were the supporting cast, not the lead. What mattered in 1996 and 2005, and what matters today, is that broadband offers users the "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information" on websites and applications. 47 U.S.C. § 153(24). The Commission offers little more than its say-so to support its contrary view. And its forced forbearance and strained reclassification of mobile broadband—under which phones and the internet are all one big, amorphous "network"—underscore how poorly broadband fits into the Title II scheme.

Finally, the Commission's arbitrary-and-capricious defense is most notable for what it does *not* say. In response to petitioners' repeated challenge to identify any recent real-world problem that the Order purports to solve, the Commission offers nothing—literally zero. The best it can do is gesture at

broadband providers' "abilities" and "incentives" and one court's decade-old findings, without a single concrete example of harm over the last six years of light-touch regulation.  The Commission lacks any good explanation for departing from its prior view that the costs of reclassification far outweigh any benefits.  The Commission's Order should be set aside.

## ARGUMENT

### I. THE COMMISSION LACKS STATUTORY AUTHORITY TO RECLASSIFY BROADBAND.

A panel of this Court unanimously concluded that "petitioners are likely to succeed on the merits because the final rule implicates a major question, and the Commission has failed to satisfy the high bar for imposing such regulations." Stay Op., App. 548.  The Commission has no persuasive response to the stay panel's reasoning.

#### A. The Order Is Unlawful Under The Major-Questions Doctrine.

##### 1. The major-questions doctrine applies.

The Commission mostly argues (at 53-59) that the major-questions doctrine does not apply.  Its three reasons lack merit.

First, the Commission maintains (at 53) that applying the major-questions doctrine would "improperly supplant the best-reading analysis required by *Loper Bright*."  But *Loper Bright* did not eliminate the major-

questions doctrine or create any exception to it.  To the contrary, the Supreme Court approvingly quoted *West Virginia* v. *EPA* in explaining that it "expect[s] Congress to delegate . . . expressly, if at all," authority of "deep economic and political significance."  144 S. Ct. at 2269 (internal quotation marks omitted).  Thus, when an agency claims that kind of power, "a practical understanding of legislative intent" requires the agency to "point to 'clear congressional authorization.'"  *West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022) (quoting *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014)).

Second, the Commission says (at 53-54) that the major-questions doctrine cannot preclude it from classifying broadband.  That is true but irrelevant.  Petitioners do not dispute that the Commission may classify interstate communications services, including broadband.  Petitioners' point is that the Commission made the *wrong* classification, including because it incorrectly believed that the major-questions doctrine did not apply.

Third, the Commission contends (at 54-56) that because any classification involves "the same economic and political stakes," the major-questions doctrine does not weigh in either direction.  That too-clever-by-half contention would render the doctrine meaningless.  *Every* major-questions case has carried economic and political consequences, whatever the choice:

whether to mandate vaccination, *NFIB* v. *OSHA*, 595 U.S. 109 (2022); whether to switch from fossil fuels to renewables, *West Virginia*, 597 U.S. at 697; or whether to forgive large amounts of student debt, *Biden* v. *Nebraska*, 143 S. Ct. 2355 (2023). The question in each case was whether the agency "claim[ed] the authority to exercise control" over an issue of "economic and political consequence." *Id.* at 2373. Here, the Commission seeks to subject internet access—which enables most Americans to communicate, work, learn, and entertain themselves—to vast regulatory oversight. That is "indisputabl[y]" a major question. *U.S. Telecom Ass'n* v. *FCC*, 855 F.3d 381, 422 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc).

The Commission says (at 55) that it does not matter for major-question purposes whether an agency action is regulatory or deregulatory. Again, true but irrelevant. The relevant inquiry is whether the agency seeks a new and important power. In *MCI Telecommunications Corp.* v. *AT&T Co.*, 512 U.S. 218 (1994), for example, the statute required tariffs while giving the Commission a modification authority, and the agency tried to expand that modest delegation to completely waive the tariff provisions. Likewise in *Biden* v. *Nebraska*, the agency tried to vastly expand its authority to cancel student

loans—even though that would have lessened the obligations of debt-holders. 143 S. Ct. at 2372. The Supreme Court explained that the key inquiry is not more or less regulation, but rather more agency control over a question "central to the statutory scheme." *Id.* at 2375 (citations omitted). Here, it is plain which way that cuts: Title I gives the agency a limited role; Title II makes it a public-utility commission for broadband.

### 2. Reclassifying broadband under Title II is a major question.

At long last, the Commission turns (at 57) to whether reclassifying broadband is "'major' in the sense used by the Supreme Court[]." The stay panel unanimously recognized that, "[a]s the Commission's rule itself explains, broadband services are absolutely essential to modern day life, facilitating employment, education, healthcare, [and] commerce." Stay Op., App. 549 (internal quotation marks omitted). Moreover, "Congress and state legislatures have engaged in decades of debates over whether and how to require net neutrality." *Id.* For those reasons, the panel concluded that reclassification is "a question of 'vast political and economic significance'" and thus presents a major question. *Id.* (quoting *Utility Air*, 573 U.S. at 324). Tellingly, the Commission does not directly respond to any of that.

The Commission asserts (at 58) that "economic impact alone" does not make a question major, but petitioners have never rested on economic impact alone.  The Commission does not address the question's obvious political salience, nor the agency's own finding that broadband is "absolutely essential" across *all* facets of "modern day life."  Order ¶ 26.  The Commission also tries (at 58) to diminish the Order's economic effects as "exaggerated and unsubstantiated."  But the Commission never says precisely what it believes the economic impact will be, and it defies logic (and the record evidence) to believe that massive new regulation will not dampen investment and reshape the broadband industry.  *See infra*, p. 30.  The Commission argues (at 58) that there is "nothing unusual" about regulating large communications industries, but there is something very unusual about subjecting a huge and largely unregulated industry to "one of the most comprehensive suites of regulatory authority known to any agency in this country."  Simington Dissent, App. 508.

For the same reasons, the Commission is wrong (at 57) to claim that, because regulating this industry is "what [it] does," it is not claiming a "novel" or "transformative" power.  At that level of generality, EPA could have said the same thing in *West Virginia* (it oversees power plants), or OSHA in *NFIB* (it oversees workplaces), or the Department of Education in *Nebraska* (it

oversees student loans). The stay panel correctly saw through that maneuver. There is a world of difference between the current light-touch regime of Title I and the heavy hand of Title II, which authorizes the Commission to dictate prices, forbid any practice it finds "unjust" or "unreasonable," order deployment of new infrastructure, and require preclearance to stop or start services. *See* Pet. Br. 21; Donald B. Verrilli, Jr. & Ian Heath Gershengorn, *Title II "Net Neutrality" Broadband Rules Would Breach Major Questions Doctrine*, 76 Fed. Commc'ns L.J. 321, 332 (2024) (explaining that Title II classification "vastly expand[s] the Commission's authority").

The Commission contends (at 59) that its newly claimed power to regulate rates should be irrelevant because the agency has, for now, forborne from exercising it. For starters, it appears that the Commission intends to indirectly regulate rates without calling it that, using the general conduct standard. *See* Pet. Br. 13, 23-24. The agency never denies that point. In any event, what matters is the full scope of the Title II authority that the Order unlocks. In *West Virginia*, for example, it did not matter that EPA was decreasing coal's market share by only 11% over 16 years. *See* 597 U.S. at 714. The point was that EPA claimed the authority to set coal's market share anywhere, even at zero. *See id.* at 728. The Supreme Court thus recognized

that the power to control an entire critical industry—whether energy or broadband—is a major question, regardless of how much of the camel's nose an agency has shoved under the tent so far.

### 3. The Commission lacks clear congressional authorization.

As the stay panel observed, the Communications Act nowhere "clearly grant[s] the Commission the discretion to classify broadband providers as common carriers." Stay Op., App. 549-550. The Commission says that *Brand X* "leaves federal telecommunications policy in this technical and complex area to be set by the Commission." Br. 59-60. But *Brand X* deferred under *Chevron* to the Commission's answer to a different question, *see* Pet. Br. 28-29, and the D.C. Circuit likewise upheld the 2015 Order under *Chevron*, *see U.S. Telecom Ass'n* v. *FCC*, 825 F.3d 674, 704-706 (D.C. Cir. 2016). Post-*Loper Bright*, those "finding[s] of ambiguity by definition mean[] that Congress has not clearly authorized the FCC" to treat broadband providers as common carriers. *U.S. Telecom*, 855 F. 3d at 426 (Kavanaugh, J., dissenting).

The Commission also observes (at 60-61) that the Act clearly grants it the power to classify broadband and mobile broadband. But the question is whether Congress has clearly authorized the Commission to exercise that

classification function *to reach a particular outcome*.  In *West Virginia*, for instance, the question was not whether EPA had the power to require "the best system of emission reduction," 597 U.S. at 732 (quoting 42 U.S.C. § 7411(a)(1)), but whether EPA could treat a different method of electricity generation as such a system.  Here too, the major question is whether Congress has clearly authorized the FCC to classify broadband as a "telecommunications service."  It has not.

## B.   The Best Reading Of The Statute Is That Broadband Is An Information Service.

### 1.   Under the plain text, broadband is an information service.

The statutory definition of "information service" covers broadband for two independent reasons.  First, what broadband providers "offer" to consumers is most naturally described as the "capability" to access, store, and utilize information.  Second, broadband service includes two integral components that indisputably process information:  DNS and caching.  The Commission disputes the first and dismisses the importance of the second; it is wrong about both.

**a. Broadband is an information service because it enables users to access, store, and utilize information.**

First, broadband fits the statutory definition of an information service because it is an "offering of a capability" to engage with information online. 47 U.S.C. § 153(24); *see* Pet. Br. 32-36. On the important question of how consumers perceive this offering, the parties do not actually disagree. Although the Commission claims (at 28-29) that consumers see broadband as a "transmission conduit," it admits that subscribers perceive that "conduit" as "a gateway to third-party" applications and content. And it cannot deny that, by functioning as such a "gateway," broadband provides subscribers with the capability to access, store, and utilize information—albeit often in conjunction with those third-party services.

The only dispute here, then, is whether broadband qualifies as the "offering of a capability" to, say, access news or store photos, even if the broadband provider itself does not operate CNN's website or Google Photos. The answer is yes. Simply put, consumers purchase broadband so that they can use the internet—that is the "capability" on "offer." That is why any ordinary person, if asked whether purchasing broadband gives her the "capability" to "acquir[e]" or "retriev[e]" "information," would unhesitatingly

say that it does.  47 U.S.C. § 153(24); *see* USTelecom Letter, App. 1611.  The fact that surfing the internet involves using *both* the broadband internet-access service *and* a website or app operated by a third party is irrelevant under the statutory text.

The Commission fights uphill against that basic textual point.  It concedes that petitioners' examples of libraries and travel agencies offer certain capabilities, even in conjunction with third parties—but says (at 34) that is so because libraries and travel agencies "curate[], procure[], organize[], or arrange[] third-party content for others."  Curating, procuring, organizing, and arranging content are all irrelevant under the definition of an "information service."  Whether a library curates books has nothing to do with whether it would be described, in ordinary parlance, as offering the capability to acquire knowledge.  The library offers that capability regardless of whether it carries one book or every book ever written.

The Commission also claims (at 32) that petitioners' argument "proves too much" because traditional telephone service can be used to acquire or utilize information.[1]  Petitioners already explained (at 35-36) why that is

---

[1] To be clear, petitioners have never contended that the only "telecommunications service" is telephone service.  Jordan Amicus Br. 19.  For

wrong.  Unlike broadband, consumers do not see telephone service as offering the "capability" to retrieve or utilize information; they buy it to acquire "telecommunications," *i.e.*, "the transmission . . . without change in the form or content" of voices from one person to another.  47 U.S.C. § 153(50), (53).  The Commission's only response (at 32-33) is that the "whole point of a phone conversation is to obtain or share information," but that is facile.  When Congress spoke of "acquiring" and "generating" "information," it did not mean chatting with friends; it meant interacting with computer-stored data.

> ### b.    Broadband is an information service because it includes necessary components that process and manipulate information.

Broadband is also an information service because it includes at least two integral information-processing components: DNS and caching.  *See* Pet. Br. 36-39.  *Brand X* recognized that both were part of "the Internet service provided by cable companies," 545 U.S. at 999-1000, and that remains true of broadband today.

Starting with DNS, the Commission argues (at 36-37) that it is merely a separate information service "often bundled with broadband," since

---

example, a number of companies offer high-speed "dumb pipe" data-transmission services that allow businesses to transmit data between offices.  Those data services are properly classified as telecommunications services.

subscribers can "us[e] a third-party DNS service instead." But DNS is a critical component of the service on offer; it is not an "add-on" like voicemail or email. The fact that sophisticated parties *can* replace an integral component does not mean that consumers perceive that component as a separately offered or "bundled" add-on, rather than part and parcel of the "offering." At the car dealership, all-weather floor mats may be a separate "offering," but the engine is not. *See Brand X*, 545 U.S. at 990.

As for whether consumers perceive DNS as part of the broadband offering, the Commission has no real response to the clear survey evidence that the answer is yes. After all, 92% of broadband subscribers continue to use their providers' pre-configured DNS services. *See* Pet. Br. 36-37. The Commission gestures at "evidence that third-party DNS services *may* now" play a greater role, Br. 36 (emphasis added), but it does not elaborate. And with good reason. One of the two cited studies took place in Europe; the other included internet-enabled devices, which manufacturers hard-code to ping third-party DNS servers, and so says nothing about *consumer* perception. *See* USTelecom & CTIA Letter, App. 1572-1575.

The Commission next argues (at 37-39) that even if DNS is integrated with broadband, it falls within the telecommunications-management

exception.  That is not what the Commission told the Supreme Court in *Brand X*.  *See* Federal Pet. Reply Brief 5 n.2, *Brand X*, 545 U.S. 967.  And the Commission ignores the fundamental problem with its new position:  DNS cannot be a tool that *providers* "use" to "manage[]" their system or service, 47 U.S.C. § 153(24), if users can freely replace it with a substitute operated by a third party.  *See* Pet. Br. 39.  The Commission disputes (at 39 n.7) the notion that the telecommunications-management exception is limited to internal tools.  But that is inherent in what it means to "manage[], control, or operat[e]" a system.  47 U.S.C. § 153(24).  It was also the defining feature of the exception's direct precursor.  *See United States* v. *Western Elec. Co.*, 1989 WL 119060, at *1 (D.D.C. Sept. 11, 1989) (discussing "exception for internal management functions" "directed at internal operations, not at services for customers or end users").

As for caching, the Commission is wrong to contend (at 40) that it is "an optional add-on feature" of broadband, rather than another integral component of the offered service.  Unlike DNS, consumers do not even have the option of choosing a third-party caching provider.  And ISP caching still plays a significant role in the user experience—especially in conjunction with the ISP-provided DNS service.  *See* Rysavy Decl. ¶¶ 18-21, App. 774-775.  Nor

can caching fall within the telecommunications-management exception. Whatever additional benefits caching may have for an ISP's operations, it undoubtedly "enables and enhances consumers' access to and use of information online," and thus is quite "useful to the consumer." *Restoring Internet Freedom*, 33 FCC Rcd. 311, 333 (2018).

### 2. The relevant history confirms that broadband is an information service.

To be clear, petitioners' reading of the statute is the same one the Commission had from 1996 until 2015: broadband is an information service because it enables subscribers to access, store, and utilize information, regardless of whether that involves third-party websites and applications. The Commission now claims that "Internet access service" once meant something different from what "broadband Internet access service" means today. In the Commission's telling, ISPs were previously the equivalent of third-party website and application providers—they offered "a suite of applications" and "hosted content," Br. 8, rather than connecting users to third-party applications and content. *See* Br. 7-8, 11-12, 29-30; *see also* Peha Amicus Br. 6-7; Jordan Amicus Br. 32-34. And now that ISPs are no longer significant providers of content or applications, the Commission asserts that they have

become mere "transmission services."  That narrative is wrong in at least two critical ways.

a.    First, internet-access service providers were never just content providers; they have always offered users the capability to access third-party applications and websites.  The Stevens Report says that repeatedly:  ISPs "typically provide[d] their subscribers with the ability to run a variety of applications, including World Wide Web browsers" (used to access third-party webpages) and "FTP clients" (used to download files from third parties). *Federal-State Joint Board on Universal Service*, 13 FCC Rcd. 11501, 11537 (1998); *see id.* at 11537-11538 ("[S]ubscribers utilize their Internet service provider's facilities to retrieve files from the World Wide Web."); *id.* at 11539 (Subscribers could engage in "Web browsing" "precisely because of the enhanced functionality that Internet access service gives them.").[2]  This exact functionality made internet-access service an information service: "Subscribers can retrieve files from the World Wide Web, and browse their

---

[2]  The Commission claims (at 8) that "third-party content and applications on the World Wide Web [were] still nascent" in 1996.  But the Stevens Report found the opposite.  "As of April 1995," "[m]ost of the data transport on the Internet relate[d] to the World Wide Web and file transfer."  13 FCC Rcd. at 11538.  Meanwhile, "Electronic mail and Usenet news"—the main applications the Commission points to—"amounted to less than 15% of Internet data traffic, and that proportion was falling."  13 FCC Rcd. at 11538.

contents, because their service provider offers the 'capability for . . . acquiring, retrieving [and] utilizing . . . information.'"  *Id.* at 11538.  The Commission's selective quoting cannot overcome that clear conclusion, which applies equally to ISPs today.

The Commission's 2002 classification of cable broadband as an information service—upheld in *Brand X*—likewise made clear that the core internet-access functionality is what mattered.  The Commission now says (at 33) that cable broadband was an information service because "consumers in that era purchased broadband for the provider-operated applications."  But the order stated that cable broadband offered "a number of specific functions," including *both* "Internet connectivity" *and* "enhanced applications."  *Inquiry Concerning High-Speed Access to Internet over Cable & Other Facilities*, 17 FCC Rcd. 4798, 4809 (2002).  "Internet connectivity" gave subscribers "'click-through' access," meaning the ability to "obtain many functions from companies with whom the cable operator ha[d] not even a contractual relationship"—that is, third parties.  *Id.* at 4809, 4815.  The Commission then explained that "*[c]omplementing* the Internet access functions [were] Internet applications" "such as email" and "access to online newsgroups."  *Id.*

18

at 4811 (emphasis added). Again, internet access was key; additional applications were merely "complement[ary]."

The Commission then reiterated its position before the Supreme Court, *see* Federal Pet. Reply Brief 5, *Brand X*, 545 U.S. 967, and the Court picked up on the point. Rejecting the very proposition the Commission asserts here, the Court approvingly cited the 2002 Commission's view: when "an end user accesses a third-party's Web site," "he is equally using the information service provided by the cable company that offers him Internet access as when he accesses the company's own Web site." 545 U.S. at 998-999.

b.    Second, the Commission is wrong (at 11-12) that the Stevens Report classified only "non-facilities-based ISPs" as providing an information service, while the 1998 DSL Order (what the Commission calls the "Advanced Services Order") classified "facilities-based ISPs" as providing a telecommunications service.

The Commission first misstates the dichotomy between the two types of ISPs. It asserts (at 11) that, in the Stevens Report, "non-facilities-based" service meant ISP service without any included data transmission—in other words, just a bundle of applications. *See* Jordan Amicus Br. 28-29. That is incorrect. Non-facilities-based service included data transmission as an "input

in the provision of [the] information service." 13 FCC Rcd. at 11534 n.138; *see id.* at 11539 ("[A]n Internet access provider must enable the movement of information between customers' own computers and the distant computers with which those customers seek to interact."). So did facilities-based service, which was identical to end-user consumers. The only distinction was that a "facilities-based" ISP owned some of the telephone wires itself, whereas a "non-facilities-based" ISP had to lease access to those wires. *Id.* at 11532, 11540.

Contrary to the Commission's argument (at 11), the Stevens Report did not suggest that this distinction made facilities-based service a Title II telecommunications service. The Commission said the opposite: "services in which a provider offers a capability for generating, acquiring, [etc.] information . . . *and* as an inseparable part of that service transmits information supplied or requested by the user" "are information services, and are not telecommunications services." 13 FCC Rcd. at 11529. That made sense: whether an ISP owned or leased the telephone wires did "not affect the relationship between the [ISP] and its subscribers." *Id.* at 11534 n.138. And

the "classification of a service under the 1996 Act depends on the functional nature of the end-user offering." *Id.* at 11543.[3]

Likewise, the 1998 DSL Order did not declare that DSL broadband providers offered a telecommunications service to end users. *See* Pet. Br. 25-27. Instead, the Commission determined that telephone companies were required "to make the telephone lines used to transmit DSL service available *to competing ISPs* on nondiscriminatory, common-carrier terms." *Brand X*, 545 U.S. at 1000 (emphasis added); *see Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd. 24011, 24031 (1998). That is not remotely equivalent to declaring that *consumer-facing* DSL-based internet access is a telecommunications service, which is what the Commission now says. To the contrary, the 1998 DSL Order described that "internet access" service as an "information service." *Id.* at 24030.

---

[3] The Commission's argument rests on misleading quotations. The reference to not making a "definitive pronouncement" was about "forms of 'phone-to-phone' IP telephony services," not facilities-based ISPs. 13 FCC Rcd. at 11503. And the plans to "reexamine" facilities-based ISPs concerned requiring them to "contribute to the universal service fund," despite their "*not* generally be[ing] subject to Title II." *Id.* at 11534 (emphasis added).

### 3.    Other interpretive tools confirm that Congress saw broadband as an information service.

a.    Petitioners pointed out (at 43) that "numerous other provisions in the 1996 Act . . . presuppose that internet-access services are information services." The Commission responds (at 44) that the definitions in several of those provisions have no "application beyond [their] narrow section." That is a strawman. The point is not that those definitions literally apply here; the point is that Congress would not have treated internet-access services as information services in one part of the statute and as the polar opposite in another.

As for Congress's repeated policy and factual findings extolling the "vibrant and competitive free market" for the internet, *see* Pet. Br. 44-45, the Commission responds (at 45 n.11) that they refer only to content and applications, not the market for internet access. That is clearly wrong. In Section 230, Congress specifically noted that "interactive computer services" were "unfettered by Federal or State regulation," 47 U.S.C. § 230(b)(2), and defined "interactive computer services" to include services "that provide[] access to the Internet," *id.* § 230(f)(2).

The Commission likewise has no good defense of its need to engage in mass forbearance to "tailor the Title II framework" to fit broadband. Br. 10.

To be sure, Congress "specifically provided" forbearance authority here, *id.* at 46, unlike in *Utility Air*.  But forbearance is a tool for when a provision that *could* be enforced is "not necessary for the protection of consumers" or to ensure "just and reasonable" practices.  47 U.S.C. § 160(a).  It is not a tool to blue-pencil huge swathes of the statute that literally could not be applied to a given technology the Commission now wants to regulate.

Finally, the Commission tries to sidestep petitioners' constitutional-avoidance argument by observing (at 46) that "no [p]etitioner actually asserts any constitutional challenge to the Order."  But the avoidance canon does not require a standalone First Amendment challenge—the point of the doctrine is to *avoid* such challenges in the first place.

b.    The Commission offers one competing structural argument.  It contends (at 41) that Section 706 assumes that broadband is a telecommunications service because it directs the Commission to use certain Title II tools to "encourage the deployment" of "advanced telecommunications capability."  *See* 47 U.S.C. § 1302(a).  But the Commission merely assumes, without explanation, that broadband internet-access service is always an "advanced telecommunications capability."  And even if it were, other services regulated by Title II are classified as "advanced telecommunications

23

capabilit[ies]," meaning that Title II tools can properly encourage their deployment. *See supra*, p. 12 n.1. The Commission's inference about broadband internet-access service is thus unwarranted.

Even if Section 706 covered *only* broadband internet-access service, the Commission's argument still would not work. In 1996, broadband was offered using DSL lines, and the telephone companies that owned those lines were still common carriers insofar as they leased them to competing ISPs. *See supra*, p. 21. Title II tools therefore had a role to play in advancing the deployment of "one component" of broadband internet infrastructure. *See* Stay Op., App. 554 (Sutton, C.J., concurring). That does not mean that Congress thought broadband internet-access service itself was a telecommunications service. *See* FCC, *2015 Broadband Progress Report* 2 n.1, available at https://docs.fcc.gov/public/attachments/FCC-15-10A1.pdf.

## II. THE COMMISSION LACKS STATUTORY AUTHORITY TO CLASSIFY MOBILE BROADBAND AS A COMMERCIAL MOBILE SERVICE SUBJECT TO TITLE II.

The Commission's defense of its separate reclassification of mobile broadband—which it concedes (at 61) must be correct to avoid a "statutory contradiction" with its larger reclassification of all broadband—fares no better. Here too, the Commission had it right the first time in 2007. Mobile

broadband is not a "commercial mobile service" because it is not "interconnected with the public switched network."  47 U.S.C. § 332(d)(2); *see* Pet. Br. 48-55.

Quoting *Loper Bright*, the Commission argues (at 48) that because Section 332 allows "the public switched network" to be "defined by regulation," courts must "respect th[at] delegation."  But that omits critical language: when an agency is given definitional authority, "courts must respect the delegation, *while ensuring that the agency acts within it*."  144 S. Ct. at 2273 (emphasis added).  That is, courts must still "independently interpret the statute" and "fix[] the boundaries of [the] delegated authority."  *Id.* at 2263 (citations omitted); *cf. United States* v. *Home Concrete & Supply, LLC*, 566 U.S. 478, 493 n.1 (2012) (Scalia, J., concurring in part and dissenting in part) (explaining that even under *Chevron*, it does "not matter whether the word 'yellow' is ambiguous when the agency has interpreted it to mean 'purple'").  Here, the Commission's redefinition of "the public switched network"—as a single super-network encompassing both the telephone network and the internet—exceeds the boundaries of the Commission's authority.

First, "the public switched network" is a term of art meaning the ten-digit telephone network, as distinct from the "public Internet."  *See* Pet. Br.

49-50; *see, e.g.*, 47 U.S.C. § 1422(b)(1).  The Commission resists that conclusion by citing one definition of the phrase "public switched network."  *See* Br. 49 (quoting *Newton's Telecom Dictionary* 799 (6th ed. 1993)).  But that definition lacks a key word found in the statute:  "*the* public switched network."  The phrase "public switched network," without the definite article, can refer to "other switched networks such as Telex"—Telex was *a* public switched network.  *Newton's Telecom Dictionary* 799 (6th ed. 1993).  When Congress used the phrase "*the* public switched network," however, it presumably intended the most typical meaning.  And on that, even the Commission's preferred dictionary agrees that the phrase "public switched network" "*usually* applied to the public telephone network."  *Id.* (emphasis added).

Indeed, petitioners cited (at 49-50) numerous contemporaneous statutes, regulations, and judicial decisions using the terms "the public telephone network," "the public switched network," and "the public switched telephone network" interchangeably.  The Commission ignores all of those.  In historical context, Section 332's omission of the word "telephone" from "the public switched network" had no substantive significance, but was instead akin to saying "microwave" instead of "microwave oven," or "United States" instead of "United States of America."

26

The Commission also argues (at 49) that Congress would not have authorized it to define "the public switched network" if Congress meant only the telephone network. That does not follow. As the Commission later notes (at 51), the "traditional telephone network itself is a composite" of different networks, including smaller local, long-distance, and wireless phone networks. In 1993, the elements of that composite network were "growing and changing because of new technology and increasing demand," including the advent of mobile phones. *Implementation of Sections 3(n) and 332 of the Communications Act*, 9 FCC Rcd. 1411, 1436-1437 (1994). Congress gave the Commission definitional flexibility to keep up with those changes, not to eliminate "use of the North American Numbering Plan" (*i.e.*, ten-digit telephone numbers) as the "key element in defining" the network. *Appropriate Regulatory Treatment for Broadband Access to the Internet over Wireless Networks*, 22 FCC Rcd. 5901, 5917 (2007).

Second, the Commission's approach disregards the ordinary meaning of "network," which is a system "having internal connections between the parts and elements." Pet. Br. 50-52 (citing *Merriam-Webster's Collegiate Dictionary* 609, 780 (10th ed. 1993)). The Commission accepts that requirement, but argues that the "telephone network and the internet *are* a

27

physically connected network" because "internet communications" are "transmitted over phone lines and cell towers." Br. 50 (emphasis added). By that logic, mobile broadband is also interconnected with cable television networks. The physical facilities used are irrelevant; the key is that the internet and telephone *networks* cannot exchange any information, because their architectures are "completely incompatible with each other." Rysavy Decl. ¶¶ 39, 41, App. 784-785.

The Commission falls back (at 50) on the argument that even if the telephone network and internet are separate, the two are now "interconnected because devices can communicate with one another via now-ubiquitous Voice over Internet Protocol (VoIP) technology." But that does not work either. As its name indicates, "Interconnected VoIP Service" is its own distinct service that has been around for decades. *Id.* (citing 47 C.F.R. § 9.3). The fact that a mobile broadband subscriber can (indeed, must) use a separate service to communicate with telephones does not make *mobile broadband* an interconnected service—at most, it makes VoIP an interconnected service. *See* Pet. Br. 52-53. The Commission offers no response to that point.

Finally, the Commission claims (at 51-52) that "[m]obile access to the internet—the largest public network ever devised—cannot readily be

described as a *private* mobile service." But "private mobile service is a residual category defined in relation to commercial mobile service," so "the definition of commercial mobile service is the operative one." *U.S. Telecom*, 825 F.3d at 714; *see* Pet. Br. 49. Try as it might, the Commission cannot make mobile broadband fit that definition.

## III. THE ORDER IS ARBITRARY AND CAPRICIOUS.

Even if the Order were consistent with the statute, it still fails the basic APA requirement of reasoned decision-making. *See* Pet. Br. 55-64. Since 2017, the broadband market has featured "lower prices, faster speeds, broader and deeper coverage, increased competition, and accelerated Internet builds." Carr Dissent, App. 453. Given that real-world evidence, the Commission cannot identify any actual benefit of public-utility regulation that is worth the inevitable heavy costs. Nor can it justify its amorphous general conduct standard.

### A. The Commission Fails To Justify Its Truncated Cost-Benefit Analysis.

Recent experience tells us—and plenty of commenters affirmed—that there is no need for Title II reclassification and that its significant costs plainly outweigh any potential public benefit. The Commission "offered no reasoned

response" to that basic point in the Order, *Ohio* v. *EPA*, 144 S. Ct. 2040, 2054 (2024), and it does no better in its brief.

1.    On costs, the Commission focuses entirely (at 66) on the Ford Paper.  But the record is replete with unrebutted concerns from ISPs about how Title II classification will negatively impact investment.  *See, e.g.*, AT&T Comments, App. 637-646; Verizon Comments, App. 1218; USTelecom Comments, App. 1457-1467; WISPA Comments, App. 1299-1304.    Those concerns rest on basic economics:  "regulation is costly and can deter investment" because it "can limit expected future revenues" and "increase risk because of uncertain interpretation and enforcement and the possibility of regulatory creep."  Israel Decl. ¶ 74, App. 970-971.  The Commission's pot shots at the Ford Paper (at 66-67) cannot substitute for compelling empirical evidence that utility-style regulation will somehow *not* reduce investment.

2.    On benefits, the Commission makes clear that the Order is a solution for problems that do not exist.

*Internet Openness*.    The Commission claims (at 62) that its "net neutrality" rules are "necessary" to address concerns about blocking, throttling, and the like.  But the Commission lacks "*any* evidence of actual 'net neutrality'-related misconduct."  Pet. Br. 58.  It repeatedly points (at 62-63) to

the D.C. Circuit's 2014 *Verizon* decision.  Since *Verizon*, the Nation has had nearly seven years of experience without the heavy hand of Title II; surely, the Commission should be able to identify at least one example of misconduct during that time.  All it can do is vaguely gesture (at 64) toward what it calls "well-documented attempts to engage in harmful conduct"—without highlighting a single one, because they have all been debunked.  *See* Pet. Br. 58-59.

Even the Commission's hypotheticals (at 62-63) rely on stale data.  The Commission treats ISPs (at 31 n.4 and 62) as monopolists free to manipulate access at whim, relying again on *Verizon*.  But a decade later, the broadband industry is more competitive than ever.  The Commission's own data indicate that 80% of areas in 2023 had access to multiple providers of at least 25 Mbps broadband, up from 23% in 2014, and 65% had access to multiple providers of at least 100 Mbps.  *See* FCC, *Internet Access Service Reports*, https://www.fcc.gov/internet-access-services-reports.  Numerous unrefuted studies confirm that ISPs lack market power, *see, e.g.*, App. 881-882, 1484-1489, and the Order acknowledges as much, *see* App. 284-285, 294.

*Other Policy Objectives*.  The Commission barely defends its other justifications for reclassification.  First, the Commission refers (at 65) to the

31

potential for "blocking or throttling" during a public-safety crisis, which is simply a repackaged—and again, evidence-free—version of its debunked argument about the need for "net neutrality" rules.  Second, the Commission contends in a single sentence (at 65) that Title II will allow it to respond to national-security and law-enforcement risks, yet fails to explain why Congress would have entrusted it to tackle such threats without any specific direction. Third, the Commission asserts that "[s]tandalone broadband providers"— specifically Google—"will not be able to enter the market and compete" absent Title II, ignoring again the intense competition in broadband that occurred without public-utility regulation.  *See, e.g.*, App. 880, 1141, 1151, 1155, 1356; *see also* App. 1470-1471.  Notably, the Commission says nothing about the Order's remaining grab-bag of policy justifications:  network resilience and reliability, cybersecurity, privacy, and accessibility.  *See* Pet. Br. 60-62.

### B.    At A Minimum, The Commission Fails To Justify The General Conduct Standard.

The Commission maintains (at 67-68) that its amorphous general conduct standard reduces uncertainty and costs by providing "extensive guidance" and supplanting case-by-case review under Sections 201 and 202. But the Commission's "extensive guidance" amounts to six non-exhaustive factors ranging from "whether a practice has anticompetitive effects," to

"whether a practice threatens free expression," to "whether a practice conforms to best practices" as deemed by the Commission. Order ¶ 519. This mashup of antitrust law, free-speech jurisprudence, and policy guesswork—each of which could be used to prove a violation—replaces one standard with at least six. Far from clarity, that "guidance" guarantees substantial ongoing uncertainty. *See* Carr Dissent, App. 484.

## CONCLUSION

The Court should hold unlawful and set aside the Commission's Order.

Respectfully submitted,

 s/ Helgi C. Walker
HELGI C. WALKER
JONATHAN C. BOND
RUSSELL B. BALIKIAN
GIBSON DUNN & CRUTCHER LLP
1050 Connecticut Avenue NW
Washington, DC 20036
(202) 955-8500

*Counsel for CTIA – The Wireless Association*

 s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500

MAXWELL F. GOTTSCHALL
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Counsel for Ohio Telecom Association, USTelecom – The Broadband Association, and NCTA – The Internet & Television Association*

s/ Matthew A. Brill

MATTHEW A. BRILL
ROMAN MARTINEZ
MATTHEW T. MURCHISON
CHARLES S. DAMERON
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Ohio Cable Telecommunications Association, NCTA – The Internet & Television Association, Florida Internet & Television Association, MCTA – The Missouri Internet & Television Association, and Texas Cable Association*

s/ Jeffrey A. Lamken

JEFFREY A. LAMKEN
RAYINER I. HASHEM
JENNIFER E. FISCHELL
JACKSON A. MYERS
MOLOLAMKEN LLP
600 New Hampshire Avenue NW
Suite 500
Washington, DC 20037
(202) 556-2000

*Counsel for ACA Connects – America's Communications Association*

s/ Thomas M. Johnson, Jr.

THOMAS M. JOHNSON, JR.
JOSHUA S. TURNER
JEREMY J. BROGGI
BOYD GARRIOTT
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
(202) 719-7000

STEPHEN E. CORAN
LERMAN SENTER PLLC
2001 L Street NW, Suite 400
Washington, DC 20036
(202) 429-8970

*Counsel for WISPA – The Association for Broadband Without Boundaries*

OCTOBER 2, 2024

## CERTIFICATE OF COMPLIANCE

This reply brief complies with Federal Rule of Appellate Procedure 32(a) because it contains 6,498 words.

This brief further complies with the requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

OCTOBER 2, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2024, I electronically filed the foregoing reply brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Jeffrey B. Wall
JEFFREY B. WALL

OCTOBER 2, 2024