**Nos. 24-7000 (lead), 24-3449, 24-3450, 24-3497, 24-3508, 24-3510, 24-3511, 24-3519, 24-3538**

# In the United States Court of Appeals for the Sixth Circuit

IN RE: MCP NO. 185: FEDERAL COMMUNICATIONS COMMISSION, IN THE MATTER OF SAFEGUARDING AND SECURING THE OPEN INTERNET, DECLARATORY RULING, ORDER, REPORT AND ORDER, AND ORDER ON RECONSIDERATION, FCC 24-52, 89 FED. REG. 45404, PUBLISHED MAY 22, 2024

On Petitions for Review

## INTERVENORS' PETITION FOR REHEARING EN BANC

YANNI CHEN
MATTHEW F. WOOD
FREE PRESS
1025 Connecticut Ave. NW
Suite 1110
Washington, DC 20036
(202) 265-1490
*Counsel for Free Press*

RAZA PANJWANI
OPEN TECHNOLOGY INSTITUTE
NEW AMERICA
740 15th Street NW
Suite 900
Washington, DC 20005
(202) 986-2700
*Counsel for OTI*

KEVIN K. RUSSELL
　*Counsel of Record*
DANIEL WOOFTER
RUSSELL & WOOFTER LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
*Counsel for Free Press, OTI, and Public Knowledge*

JOHN BERGMAYER
HAROLD FELD
PUBLIC KNOWLEDGE
1818 N Street NW
Suite 410
Washington, DC 20036
(202) 861-0020
*Counsel for Public Knowledge*

*(Additional counsel on next page)*

ANDREW JAY SCHWARTZMAN
525 Ninth Street NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
*Counsel for Benton Institute for*
*Broadband & Society*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Intervenors make the following disclosures:

**Free Press:** Free Press is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Public Knowledge:** Public Knowledge is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Open Technology Institute:** The Open Technology Institute is a program within the New America Foundation, d/b/a New America. New America is a national, nonpartisan, nonprofit organization with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

**Benton Institute for Broadband & Society:** Benton Institute for Broadband & Society is a nonprofit corporation with no parent corporation and no publicly held corporation owning 10% or more of its stock or other interest in the organization.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

TABLE OF AUTHORITIES ........................................................ iii

INTRODUCTION AND RULE 40(b)(2) STATEMENT ...........................1

STATEMENT OF THE CASE ....................................................3

    I.   Factual And Regulatory Background.........................................3

    II.  Procedural History.......................................................10

ARGUMENT ...................................................................11

    I.   The panel decision conflicts with decisions from the
        Ninth and D.C. Circuits. ............................................11

    II.  The panel decision wrongly resolved a question of
         exceptional importance.................................................12

CONCLUSION ................................................................22

# TABLE OF AUTHORITIES

## Cases

*AT&T Corp. v. City of Portland*,
216 F.3d 871 (9th Cir. 2000)..................................................... 3, 5, 9, 11

*Comcast Corp. v. FCC*,
600 F.3d 642 (D.C. Cir. 2010) ................................................................8

*Fed. Power Comm'n v. Louisiana Power & Light Co.*,
406 U.S. 621 (1972)............................................................................15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024).............................................................................19

*Mozilla Corp. v. FCC*,
940 F.3d 1 (D.C. Cir. 2019) (per curiam)....................9, 13, 15, 16, 17, 18

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005)............................ 5, 6, 7, 9, 11, 13, 14, 16, 17, 18, 20

*U.S. Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) ......... 2, 4, 7, 8, 9, 12, 13, 14, 16, 17, 18, 19

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) ................................................................8

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)..............................................................................19

## Statutes

Telecommunications Act of 1996,
Pub. L. No. 104-104, 110 Stat. 56 ............................................. 1, 3, 4, 11

47 U.S.C. § 153(24)................................................................... 2, 4, 11, 12

47 U.S.C. § 153(50)..................................................................... 1, 4, 13

47 U.S.C. § 153(51)..................................................................................4

47 U.S.C. § 153(53)................................................................ 1, 4, 10, 13

47 U.S.C. § 332(c)(2) ...........................................................................10

47 U.S.C. § 332(d)(1) ...........................................................................20

47 U.S.C. § 332(d)(2) ........................................................20

47 U.S.C. § 332(d)(3) ........................................................21

## Regulations

*Deployment of Wireline Services Offering Advanced Telecommunications Capability*,
13 FCC Rcd. 24,012 (1998) ....................................................5

*Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities*,
17 FCC Rcd. 4798 (2002) ......................................................5

*Protecting & Promoting the Open Internet*,
30 FCC Rcd. 5601 (2015) ......................................................12

*Restoring Internet Freedom*,
33 FCC Rcd. 311 (2018) ........................................................9

*Second Computer Inquiry*,
77 F.C.C.2d 384 (1980) ...................................................3, 16

## Rules

6th Cir. R. 26.1 ..............................................................i

Fed. R. App. P. 26.1 .........................................................i

Fed. R. App. P. 40(b)(2).......................................................1

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

Broadband internet access service (BIAS) provides high-speed internet access using wired and wireless connections. This case concerns the FCC's decades-long efforts to prevent BIAS providers from abusing their gatekeeping power, in furtherance of the providers' economic or political interests, to constrain their users' access to third-party websites and services. There is no dispute that BIAS is subject to regulation under the Telecommunications Act. The question here is whether it falls under the common-carriage regime of Title II (and, therefore, can be subject to nondiscrimination rules) or more limited supervision under Title I.

The statutory text provides a straightforward answer. Congress required that a "telecommunications service" be regulated under Title II and defined that term to include a service offering "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. §§ 153(50), (53). BIAS fits perfectly within that definition, enabling computer users to communicate with third-party websites and services of their choice, without any alteration of the traffic by the BIAS provider. The panel nonetheless held that precisely *because*

consumers use BIAS to send and retrieve data stored elsewhere, it therefore is not a telecommunications service, but rather an "information service," which the panel believed must fall outside the scope of Title II. Panel Opinion (Op.) 11 (citing 47 U.S.C. § 153(24)).

As the D.C. Circuit recognized in rejecting this interpretation, an "information service" is defined as being offered "via telecommunications," 47 U.S.C. § 153(24), ruling out the possibility that a bare telecommunications service can qualify as an information service itself simply because it provides access to third-party information services. *See U.S. Telecom Ass'n v. FCC* (*USTA*), 825 F.3d 674, 702 (D.C. Cir. 2016). On the panel's interpretation, an ordinary telephone line—the canonical example of a Title II telecommunications service—would be an information service outside the scope of Title II given that such lines were regularly used to connect to dial-up services like Westlaw and America Online at the time Congress enacted these definitions in 1996.

The panel's contrary holding conflicts not only with the D.C. Circuit's interpretation of the relevant statutory provisions but also with the Ninth Circuit's holding in *AT&T Corp. v. City of Portland*, 216 F.3d

871 (9th Cir. 2000), that BIAS is a telecommunications service under the best interpretation of the statute.

En banc review is thus warranted because the panel's incorrect interpretation of the Act creates a circuit conflict on a question of exceptional national importance: whether BIAS is a telecommunications service subject to regulation under Title II of the Telecommunications Act of 1996.

## STATEMENT OF THE CASE

### I.    FACTUAL AND REGULATORY BACKGROUND

1.  The relevant statutory categories arise from the FCC's early Computer Inquiries orders, which distinguished between "basic," pure transmission services (*e.g.*, telephone lines) and "enhanced" services that were accessed via basic services to retrieve or modify information (*e.g.*, data processing on a main frame computer).  *See Second Computer Inquiry* (*Computer II Order*), 77 F.C.C.2d 384, 419-20 ¶¶ 93, 97 (1980). Basic services were regulated as common carriage and subject to nondiscrimination requirements; enhanced services were not.  *See ibid.*

At the dawn of the modern internet, Congress largely codified this regime in the Telecommunications Act of 1996, Pub. L. No. 104-104, 110

Stat. 56.  The Act required that a "telecommunications carrier shall be treated as a common carrier . . . to the extent that it is engaged in providing telecommunications services," 47 U.S.C. § 153(51), and defined "telecommunications services" as an "offering" of "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received," *id*. §§ 153(50), (53).  In contrast, Congress defined an "information service" as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications," unless used "for the management, control, or operation of a telecommunications system or the management of a telecommunications service."  *Id.* § 153(24).

In the years that followed, "broadband" internet services began to emerge as an "always on," dramatically faster alternative to dial-up modems.  "The Commission first applied [the 1996 Act's] statutory framework to broadband in 1998 when it classified a portion of DSL service—broadband internet service furnished over telephone lines—as a telecommunications service."  *USTA*, 825 F.3d at 691-92 (citing

*Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 FCC Rcd. 24,012, 24,014 ¶ 3, 24,029-30 ¶¶ 35-36 (1998)).

Two years later, the Ninth Circuit decided that under the best reading of the statutory text, cable modem service, another form of broadband, was likewise a "telecommunications service" subject to Title II. *City of Portland*, 216 F.3d at 876-80.

In 2002, the Commission switched course and declared that unlike DSL, cable modem service was a "single, integrated information service" subject to regulation only under Title I. *Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities*, 17 FCC Rcd. 4798, 4822-23 ¶ 38 (2002). The Supreme Court eventually upheld this classification as reasonable under the now-defunct *Chevron* doctrine, given how the service was offered at the time. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 989-92 (2005); *see also id.* at 1003 (Breyer, J., concurring) (agreeing FCC's interpretation was reasonable, "though perhaps just barely"). The *Brand X* majority recognized that cable modem service, like DSL service, included a pure transmission component. *Id.* at 988. But at the time, this service was bundled with various other information services like email, newsgroups,

and file-transfer services. *Id.* at 987. Applying *Chevron*, the majority ruled that the FCC had reasonably found based on the contemporaneous record that "the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering." *Id.* at 990-92.

Justice Scalia dissented, joined by Justices Souter and Ginsburg. 545 U.S. at 1005. To the dissenters, it was "perfectly clear that someone who sells cable-modem service is 'offering' telecommunications" that must be regulated under Title II. *See id.* at 1014. Justice Scalia explained that "any reasonable consumer would perceive" their BIAS provider as offering "two separate things"—high-speed data transmission as well as information services like email. *See id.* at 1008. It was thus unreasonable for the FCC to treat the core telecommunications service as subsumed within a single, integrated offering of an information service. A "pet store may have a policy of selling puppies only with leashes," he explained, "but any customer will say that it *does* offer puppies—because a leashed puppy is still a puppy, even though it is not offered on a 'stand-alone' basis." *Ibid.*

In the years since *Brand X*, the internet evolved significantly. Third-party providers of information services at the "edge" of the network (like Spotify and Dropbox) proliferated, while the information services BIAS providers bundled with high-speed data transmission atrophied, often supplanted by better, third-party alternatives (like Gmail). These new services, in turn, became a driving force in the rapid development and deployment of both broadband and the internet itself. *See USTA*, 825 F.3d at 694.

Over time, BIAS providers started to compete with edge providers in lucrative markets (for example, AT&T began competing with Netflix and Hulu to provide video content). *See USTA*, 825 F.3d at 694. The Commission recognized that broadband providers had the economic incentive and technical means to interfere with their customers' access to competitors' services, and confirmed that some BIAS providers had done so in the past. *See ibid.*; *Order* ¶ 467.[1]

---

[1] The *Order* on review is reproduced in the Appendix at A1-A512.

After the D.C. Circuit twice rebuffed the Commission's attempts to protect against such discrimination using its Title I authority,[2] the FCC reclassified wired and mobile BIAS as "telecommunications services" in 2015. *See USTA*, 825 F.3d at 697. Using its broader Title II powers, the Commission enacted net neutrality rules prohibiting BIAS providers from, among other things, blocking or throttling transmission based on the content or destination of a user's communications, while forbearing from certain Title II requirements, such as rate regulation. *See* Intervenor Br.15-16, 21.

The D.C. Circuit upheld the reclassification in all respects, finding "extensive support in the record" for the conclusion that consumers have come to "perceive broadband service both as a standalone offering and as providing telecommunications." *USTA*, 825 F.3d at 697-98*; see also id.* at 714 (upholding Commission classification of mobile broadband as common carriage). In doing so, the court rejected challengers' arguments that BIAS is an information service simply because it provides users a

---

[2] *See Verizon v. FCC*, 740 F.3d 623, 650 (D.C. Cir. 2014); *Comcast Corp. v. FCC*, 600 F.3d 642, 661 (D.C. Cir. 2010).

telecommunications pathway to third-party information services. *Id*. at 702.

In 2017, after a change in administrations, the FCC reversed course, classifying BIAS as an information service. *See Restoring Internet Freedom*, 33 FCC Rcd. 311 (2018). The D.C. Circuit concluded that *Brand X* required it to defer to the FCC's decision. *Mozilla Corp. v. FCC*, 940 F.3d 1, 18-21 (D.C. Cir. 2019) (per curiam). The court did not rely on the argument that simply providing a data pathway to edge providers rendered BIAS an information service. Instead, although it acknowledged that users no longer rely on BIAS providers for information services like email, the court upheld the classification as reasonable given that users' access to third-party websites is facilitated by BIAS providers' DNS and caching services. *Id*. at 21-35.

2. In the *Order* on review in this case, the FCC returned BIAS to its classification as a telecommunications service. Consistent with the Ninth Circuit's decision in *City of Portland* and Justice Scalia's opinion in *Brand X*, the Commission reasoned that BIAS provides "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent

9

and received." *Order* ¶ 109 (quoting 47 U.S.C. § 153(53)).  It further found that "DNS, caching, and other information-processing capabilities, when used with BIAS, either fall within the telecommunications systems management exception to the definition of 'information service,' or are separable information services not inextricably intertwined with BIAS, or both."  *Id.* ¶ 128; *see id*. ¶¶ 129-53.  The FCC also determined that mobile BIAS meets the statutory definition of a common-carriage "commercial mobile service."  *See id*. ¶ 214 (quoting 47 U.S.C. § 332(c)(2)).  And it again forbore from many of Title II's requirements, including rate regulation, tariffing, and market-opening provisions.  *See id.* ¶¶ 386-93, 398-421.

## II.  PROCEDURAL HISTORY

On review, the panel held that the statute excludes BIAS from regulation under Title II.

The panel did not doubt that BIAS offers telecommunications, *i.e.*, the transmission of data of users' choice between their computers and points on the internet (such as Google.com or Netflix) without change by the BIAS provider.   But it nonetheless concluded that this telecommunications service is rendered an information service by the fact

10

that consumers can use it to access information services offered by third parties (like Google or Netflix). Specifically, the panel held that BIAS is an information service because it "allows users, at minimum, to 'retrieve' information stored elsewhere." Op.11 (quoting 47 U.S.C. § 153(24)).

## ARGUMENT

Rehearing en banc is warranted because the panel decision conflicts with the statute and the decisions of two other circuits on a question of exceptional importance.

## I.    THE PANEL DECISION CONFLICTS WITH DECISIONS FROM THE NINTH AND D.C. CIRCUITS.

The panel's interpretation squarely conflicts with the Ninth Circuit's decision in *AT&T Corp. v. City of Portland*, 216 F.3d 871 (9th Cir. 2000), which held that BIAS is a "telecommunications service" subject to Title II regulation under the text and "overall structure of the Communications Act as amended by the Telecommunications Act of 1996." *See id*. at 876-80. Although the Supreme Court later held that the FCC was entitled to adopt a different view under *Chevron*, that decision "leaves untouched *Portland*'s holding that the Commission's interpretation is not the *best* reading of the statute." *Brand X*, 545 U.S. at 985-86.

11

The panel's contrary conclusion that BIAS is an information service because it offers a telecommunications pathway to third-party information services also conflicts with the D.C. Circuit's rejection of that same theory in *USTA*. That court explained that the interpretation adopted by the panel "ignores that under the statute's definition of 'information service,' such services are provided 'via telecommunications.'" *See* 825 F.3d at 702 (quoting 47 U.S.C. § 153(24)). While the court reached that conclusion in the course of applying the *Chevron* framework, this portion of the opinion was not premised on any deference to the FCC's views. *See ibid*.

## II.    THE PANEL DECISION WRONGLY RESOLVED A QUESTION OF EXCEPTIONAL IMPORTANCE.

Everyone agrees that the proper classification of wired and mobile BIAS under the Communications Act is a question of exceptional importance. *See* Pet'rs Br.22 (classification implicates industry "absolutely essential to modern day life"); Op.4 ("The 'Internet drives the American economy and serves, every day, as a critical tool for America's citizens to conduct commerce, communicate, educate, entertain, and engage in the world around them.'") (quoting *Protecting & Promoting the Open Internet*, 30 FCC Rcd. 5601, 5603 (2015)). The panel's resolution of

12

that question warrants en banc review because it conflicts with the text, history, and purposes of the Communications Act.

1. The panel erred in finding that BIAS is an information service because it provides a telecommunications pathway to third-party websites and services.

The panel did not dispute that the principal service BIAS provides is conveying packets of information of the user's choosing to and from destinations on the internet specified by the user, the very definition of a telecommunications service. *See* 47 U.S.C. §§ 153(50), (53); Peha Amicus Br.9-13. Moreover, the panel declined to adopt the challengers' position that this pure transmission service is transformed into an information service merely because it is facilitated by auxiliary services like DNS and caching. *Cf. USTA*, 825 F.3d at 706 ("Once a carrier uses a service that would ordinarily be an information service—such as DNS or caching—to manage a telecommunications service, that service no longer qualifies as an information service under the Communications Act."); *Mozilla*, 940 F.3d at 87, 89-91 (Millett, J., concurring) (reliance on DNS and caching to justify classifying BIAS as information service "blinks technological reality"); *see also Brand X*, 545 U.S. at 1000 n.3 (taking "no view" on the

status of DNS because the inclusion of other information services, like email, in the bundled offerings of the time rendered cable modem service an information service regardless); *id.* at 1012-13 (Scalia, J., dissenting) (rejecting reliance on DNS and caching).

Instead, the panel put the definition of "telecommunications service" to the side and based its ruling exclusively on its view that BIAS qualifies as an "information service" because, by permitting users to communicate with third-party internet sources, BIAS's telecommunications service "allows users, at minimum, to 'retrieve' information stored elsewhere." Op.11.

But as the D.C. Circuit observed, this theory "ignores that under the statute's definition of 'information service,' such services are provided 'via telecommunications.'" *USTA*, 825 F.3d at 702. The requirement that an information service be provided "via telecommunications" makes clear that a bare telecommunications service cannot itself be an information service, even if it might otherwise meet the rest of the definition (*e.g.*, by offering users the capability to retrieve information). Moreover, as Judge Millett explained, the "novel and utterly capacious definition of information services" the panel adopted would sweep in every

telecommunications service, including the ordinary telephone lines that everyone agrees provide a Title II telecommunications service. *Mozilla*, 940 F.3d at 93 (Millett, J., concurring). [3]

The panel's response to this critical observation was to explain why a phone conversation between friends would not qualify as conveying "information" under the Act. Op.18. But that ignores that telephone lines in 1996 were also pervasively used to interact with *computers*—including to obtain information about movie times, make train reservations, and access dial-up information services like Westlaw and America Online (AOL). *See* Intervenor Br.5-6; FCC Br.6-8. That a phone line in 1996 could be used to retrieve and interact with information on AOL in the same ways users use BIAS to interact with information on the internet today—*e.g.*, to send emails, join chat groups, or search an on-line encyclopedia, *see* Intervenor Br.5-6—did not convert the common-carriage phone service into an information service. *See Order* ¶ 132 (this interpretation would "largely eliminate the category of

---

[3] *Cf. Fed. Power Comm'n v. Louisiana Power & Light Co.*, 406 U.S. 621, 637-38 (1972) (under analogous provisions of Natural Gas Act, company could not avoid regulation of transportation component of service by bunding offer to transport with unregulated direct sales).

'telecommunications services' established in the Act, which Congress could not have intended"). To the contrary, the whole point of the distinction between "enhanced" and "basic" services that Congress carried over into the 1996 Act was to ensure that providers of the telecommunications pathway could not leverage their control over transmission facilities to dominate the nascent market for computer-based information services. *See id.* ¶ 132 & n.513; *Computer II Order* ¶¶ 228-30; *Brand X*, 545 U.S. at 996.

The closest the panel came to addressing the use of phone lines to interact with computerized information was to state that accessing "voicemail and call menus" via telephone "do[es] not transform the categorization of telephone service because its *core standalone offering* is the transparent transmission of telecommunications." Op.19 (emphasis added). But the panel offered no reason why BIAS is any different. Providing a transparent transmission pathway is no less the "core" "offering" of Verizon's broadband today than it was the core offering of AT&T's telephone lines in 1996. *See USTA*, 825 F.3d at 702-06; *Mozilla*, 940 F.3d at 89-92 (Millett, J., concurring).

16

*Brand X* does not support the panel's contrary conclusion. As the panel itself emphasized, the only question before the Supreme Court was whether the FCC's classification was reasonable, as applied to a technological context that no longer exists. Op.10; *see also Mozilla*, 940 F.3d at 89-90 (Millett, J., concurring). The Court upheld that earlier order because: (1) at the time, the service bundled pure transmission with provider-based email, chatrooms, news reporting, and other information services, along with DNS and caching; and (2) it was reasonable for the FCC to view this package as a single integrated offering. *USTA*, 825 F.3d at 692, 701-04.

None of that analysis would have been necessary if the Supreme Court believed it sufficient that the pure transmission component of cable modem service provided access to third-party information services. Accordingly, the panel's claim that no one in *Brand X* "challenged the [FCC]'s conclusion that Internet access service constitutes an information service when considered apart from last mile transmission," Op.16, is both wrong and beside the point. It is wrong because, as the D.C. Circuit has explained, "the Court focused on the nature of the functions broadband providers offered to end users, not the length of the

transmission pathway." *USTA*, 825 F.3d at 702. It is beside the point because to the extent anyone viewed accessing third-party websites as involving an information service offered by the ISP, it was because that access involved DNS and caching—not because offering a telecommunications pathway to someone else's information service converted that pathway into an information service itself. *See Mozilla*, 940 F.3d at 20-21.[4]

The panel's reliance on other indirect indicia of statutory meaning cannot overcome the basic deficiencies in its interpretation of the operative text. The invocation of Section 230's reference to "interactive computer service" as an "information service" is unpersuasive. Op.13-14. As the D.C. Circuit and Commission have explained, Section 230's definition is expressly limited to "'this section'" of the Communications Decency Act, and it is "'unlikely that Congress would attempt to settle

---

[4] Again, *Brand X* did not address whether using DNS or caching to facilitate communication with third-party websites fell within the telecommunications-management exception to the information-services definition. *See Mozilla*, 940 F.3d at 23; *USTA*, 825 F.3d at 701-02. While the panel likewise did not reach this question, the FCC cogently explained why these services do fall within the exception. *Order* ¶¶ 133-51; FCC Br.35-41; *see also Brand X*, 545 U.S. at 1012-13 & n.6 (Scalia, J., dissenting); *Mozilla*, 940 F.3d at 89-90 (Millett, J., concurring).

the regulatory status of broadband Internet access services in such an oblique and indirect manner.'"  *USTA*, 825 F.3d at 702-03 (citation omitted); *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

The panel's selective reliance on the FCC's interpretation of the statute over the years—refusing to defer to its present position while relying on some (but not other) of the agency's interpretations in the past, *see* Op.14-17—is misplaced as well.  To start, the panel's interpretation of that history is wrong.  *See* FCC Br.10-15; Jordan Amicus Br.11-19.  But more importantly, those post-enactment orders shed little light on what Congress meant in 1996, which is the only relevant question now.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("[E]very statute's meaning is fixed at the time of enactment.") (quotation marks omitted).

The panel also expressed disbelief that Congress would have intended to subject BIAS to a "heavy-handed regulatory regime."  Op.3. But Congress specifically gave the FCC the tools necessary to calibrate the degree of regulation to the specific context.  *Brand X*, 545 U.S. at

19

1011-12 (Scalia, J., dissenting) (noting that even if the Commission does not believe that BIAS should be regulated like other Title II services, the "same result can be achieved today under the Commission's statutory authority to forbear from imposing most Title II regulations"). It would be much more surprising if Congress had disabled the FCC from preventing BIAS providers from discriminating against third-party content to further their own economic or political interests. *See, e.g.*, CPUC Amicus Br.2-26.

2. The panel similarly erred in holding that mobile BIAS is a "private mobile service" rather than a common-carriage "commercial mobile service" because it does not interconnect with "the public switched network." Op.23 (citing 47 U.S.C. § 332(d)(1)–(2)). The panel did not dispute that the internet is both a "public" and a "switched" network. Its conclusion that Congress nonetheless intended these terms to refer to the public switched *telephone* network is belied by Congress's delegation to the FCC of the authority to define the term, 47 U.S.C. § 332(d)(2), which would serve no point if the phrase could only bear one meaning.

The panel further erred because Congress defined a "private mobile service" as including any mobile service that "is not a commercial mobile

service or *the functional equivalent* of a commercial mobile service," 47 U.S.C. § 332(d)(3) (emphasis added). The Commission correctly concluded that mobile BIAS is, at minimum, the "functional equivalent" of a service interconnected with the public switched network. It serves the same essential function—allowing ubiquitous public access to a communications network—as the cellular voice network, which everyone agrees (see Op.11) is a commercial mobile service. The panel offered no persuasive reason why Congress would have intended to preclude this common-sense understanding of functional equivalence.

## CONCLUSION

The petition should be granted.

Respectfully submitted,

/s/ Kevin Russell

YANNI CHEN
MATTHEW F. WOOD
FREE PRESS
1025 Connecticut Ave. NW
Suite 1110
Washington, DC 20036
(202) 265-1490
*Counsel for Free Press*

RAZA PANJWANI
OPEN TECHNOLOGY INSTITUTE
NEW AMERICA
740 15th Street NW
Suite 900
Washington, DC 20005
(202) 986-2700
*Counsel for OTI*

ANDREW JAY SCHWARTZMAN
525 Ninth Street NW
Seventh Floor
Washington, DC 20004
(202) 241-2408
*Counsel for Benton Institute for Broadband & Society*

February 18, 2025

KEVIN K. RUSSELL
　*Counsel of Record*
DANIEL WOOFTER
RUSSELL & WOOFTER LLC
1701 Pennsylvania Ave. NW
Suite 200
Washington, DC 20006
(202) 240-8433
*Counsel for Free Press, OTI, and Public Knowledge*

JOHN BERGMAYER
HAROLD FELD
PUBLIC KNOWLEDGE
1818 N Street NW
Suite 410
Washington, DC 20036
(202) 861-0020
*Counsel for Public Knowledge*

## CERTIFICATE OF COMPLIANCE

This brief complies with Fed. R. App. P. 40(d)(3)(A) because it contains 3,900 words.

This brief complies with the requirements of Fed. R. App. P. 32(a) because it was prepared in a 14-point font using a proportionally spaced typeface.

This brief complies with 6th Cir. R. 40(c) because a copy of the opinion sought to be reviewed accompanies the petition.

/s/    *Kevin K. Russell*
Kevin K. Russell

February 18, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/    *Kevin K. Russell*
Kevin K. Russell

February 18, 2025

**PANEL OPINION**

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In re: MCP No. 185; Federal Communications Commission, In the Matter of Safeguarding and Securing the Open Internet, Declaratory Ruling, Order, Report and Order, and Order on Reconsideration, FCC 24-52, 89 Fed. Reg. 45404, Published May 22, 2024.

Ohio Telecom Association, et al.,

*Petitioners*,

*v.*

Federal Communications Commission; United States of America,

*Respondents*.

Nos.  24-7000/3449/3450/3497/
3504/3507/3508/3510/3511/
3519/3538

---

Upon Multi-Circuit Petitions for Review of the Federal Communications Commission's Safegaurding and Securing the Open Internet Order, FCC 24-52.

Argued:  October 31, 2024

Decided and Filed:  January 2, 2025

Before:  GRIFFIN, KETHLEDGE, and BUSH, Circuit Judges.

---

### COUNSEL

**ARGUED:**  Jeffrey B. Wall, SULLIVAN & CROMWELL LLP, Washington, D.C., for Petitioners.  Daniel Woofter, GOLDSTEIN, RUSSELL & WOOFTER LLC, Washington, D.C., for Intervenors.  Jacob M. Lewis, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents.  **ON BRIEF:**  Jeffrey B. Wall, Morgan L. Ratner, Zoe A. Jacoby, SULLIVAN & CROMWELL LLP, Washington, D.C., Helgi C. Walker, Jonathan C. Bond, Russell B. Balikian, GIBSON DUNN & CRUTCHER LLP, Washington, D.C., Matthew A. Brill, Roman Martinez, Matthew T. Murchison, Charles S. Dameron, LATHAM & WATKINS LLP, Washington, D.C., Jeffrey A. Lamken, Jennifer E. Fischell, Jackson A. Myers,

Nos. 24-7000, et al.    *In re MCP No. 185: FCC*    Page 2
*In the Matter of Safeguarding and
Securing the Open Internet*

MOLOLAMKEN LLP, Washington, D.C., Maxwell F. Gottschall, SULLIVAN & CROMWELL LLP, New York, New York, Thomas M. Johnson, Jr., Joshua S. Turner, Jeremy J. Broggi, Boyd Garriott, WILEY REIN LLP, Washington, D.C., for Petitioners.  Daniel Woofter, Kevin Russell, GOLDSTEIN, RUSSELL & WOOFTER LLC, Washington, D.C., Andrew Jay Schwartzman, Washington, D.C., Albert H. Kramer, PUBLIC KNOWLEDGE, Washington, D.C., James Bradford Ramsay, NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS, Washington, D.C., for Intervenors.  Jacob M. Lewis, Scott M. Noveck, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., Robert B. Nicholson, Andrew W. Chang, UNITED STATES DEPARTMENT OF JUSTICE, for Respondents. Thomas R. McCarthy, Jeffrey M. Harris, CONSOVOY MCCARTHY PLLC, Arlington, Virginia, Corbin K. Barthold, TECHFREEDOM, Washington, D.C., Tara M. Corvo, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Washington, D.C., Philip D. Williamson, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, Jennifer Tatel, WILKINSON BARKER KNAUER, LLP, Washington, D.C., William P. Barr, TORRIDON LAW PLLC, Washington, D.C., Lawrence J. Spiwak, PHOENIX CENTER FOR ADVANCED LEGAL AND ECONOMIC PUBLIC POLICY STUDIES, Washington, D.C., Paul W. Hughes, MCDERMOTT WILL & EMERY LLP, Washington, D.C., Christopher S. Yoo, UNIVERSITY OF PENNSYLVANIA, Philadelphia, Pennsylvania, David P. Murray, WILLKIE FARR & GALLAGHER LLP, Washington, D.C., Jason Harrow, GERSTEIN HARROW LLP, Los Angeles, California, Kimberly J. Lippi, CALIFORNIA PUBLIC UTILITIES COMMISSION, San Francisco, California, Brianne J. Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., Sarah R. Goetz, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., Jeffrey T. Pearlman, UNIVERSITY OF SOUTHERN CALIFORNIA, Los Angeles, California, John T. Nakahata, HWG LLP, Washington, D.C., for Amici Curiae.

—————————

**OPINION**

—————————

GRIFFIN, Circuit Judge.

As Congress has said, the Internet has "flourished, to the benefit of all Americans, with a minimum of government regulation."  47 U.S.C. § 230(a)(4).  The Federal Communications Commission largely followed this command from the Telecommunications Act of 1996 by regulating the Internet with a light touch for nearly 15 years after enactment.  But since, the FCC's approach has been anything but consistent.

Beginning in the late 2000s, the FCC undertook several attempts to impose so-called "net neutrality policies," which prohibit Broadband Internet Service Providers from controlling users'

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 3
*In the Matter of Safeguarding and
Securing the Open Internet*

Internet access—by varying speeds or blocking connections to third-party websites, for example—based on content, commercial agreements, and other reasons a provider might want to manage a user's Internet experience. Those efforts culminated in 2015, when the FCC concluded for the first time that Broadband Internet Service Providers offer to consumers a "telecommunications service" and thus are common carriers—and subject to extensive regulation (including net-neutrality restrictions)—under Title II of the Communications Act. *Id.* § 153(51).

Corresponding with a change in administrations, in 2018, the FCC rescinded its 2015 determination and instead reverted to its historical hands-off approach to Internet regulation by concluding that Broadband Internet Service Providers offered only "information service." *Id.* § 153(24). That change lifted the net-neutrality requirements.

The D.C. Circuit heard substantial challenges to the 2015 and 2018 orders. It applied the now-overruled *Chevron* doctrine in each case and upheld both wholly inconsistent regulations as "permissible" under the Act.

Today we consider the latest FCC order, issued in 2024, which resurrected the FCC's heavy-handed regulatory regime. Under the present Safeguarding and Securing the Open Internet Order, Broadband Internet Service Providers are again deemed to offer a "telecommunications service" under Title II and therefore must abide by net-neutrality principles. 89 Fed. Reg. 45404 (May 22, 2024) (to be codified at 47 C.F.R. pts. 8, 20) [hereinafter Safeguarding Order]. But unlike past challenges that the D.C. Circuit considered under *Chevron*, we no longer afford deference to the FCC's reading of the statute. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024) (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Instead, our task is to determine "the best reading of the statute" in the first instance. *Id.*

Using "the traditional tools of statutory construction," *id.*, we hold that Broadband Internet Service Providers offer only an "information service" under 47 U.S.C. § 153(24), and therefore, the FCC lacks the statutory authority to impose its desired net-neutrality policies through the "telecommunications service" provision of the Communications Act, *id.* § 153(51).

Nos. 24-7000, et al.                    *In re MCP No. 185: FCC*                    Page 4
*In the Matter of Safeguarding and*
*Securing the Open Internet*

Nor does the Act permit the FCC to classify mobile broadband—a subset of broadband Internet services—as a "commercial mobile service" under Title III of the Act (and then similarly impose net-neutrality restrictions on those services). *Id.* § 332(c)(1)(A). We therefore grant the petitions for review and set aside the FCC's Safeguarding Order.

I.

A.

The "Internet drives the American economy and serves, every day, as a critical tool for America's citizens to conduct commerce, communicate, educate, entertain, and engage in the world around them." In re Protecting and Promoting the Open Internet, 30 FCC Rcd. 5601, 5603 ¶ 1. (2015) [hereinafter Open Internet Order]; *see also* Safeguarding Order, 89 Fed. Reg. at 45405, ¶ 2. Broadband is the Internet's lynchpin. It enables our access to and usage of the Internet, acting as an international superhighway that rapidly transports requests for and receipt of electronic data from one point to another and back again. Whether from a push of a button on a computer, a smart TV remote, or a virtual keyboard on a mobile device, consumers instantly, reliably, and seamlessly experience the Internet thanks to Broadband Internet Service Providers like Spectrum, Xfinity, and AT&T Internet.[1]

In Internet parlance, Broadband Internet Service Providers connect "end users" (consumers) to "edge providers" (websites that generate their own content, such as video streaming services (Netflix), commercial marketplaces (Amazon), social media (Facebook), and search engines (Google)) via an interconnected network of fiber optic cables, high-speed routers, and other equipment. *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 690 (D.C. Cir. 2016) [hereinafter *Telecom (panel)*]. Broadband is ubiquitous, with over 90% of all households in the

---

[1] The term Broadband Internet Service Providers refers to providers of what the FCC calls "broadband internet access service." In the Safeguarding Order, the FCC defined that phrase as "a mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all Internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up Internet access service." *See* 89 Fed. Reg. at 45441, ¶ 173. Notably, the FCC also includes providers within that definition "regardless of whether the . . . provider leases or owns the facilities used to provide the service." *Id.* at 45442, ¶ 174.

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*         Page 5
*In the Matter of Safeguarding and
Securing the Open Internet*

United States having a broadband Internet subscription.  Daniela Mejia, *Computer and Internet Use in the United States: 2021*, U.S. Census Bureau (June 18, 2024).

### B.

Today's dispute concerns the degree to which the FCC can regulate Broadband Internet Service Providers under the authority granted to it by the Communications Act of 1934, as amended by the Telecommunications Act of 1996.  Taking cues from other regulatory schemes concerning the transportation of goods or persons for a fee (like railroads and public utilities), the Federal Communications Act extends similar oversight to wire and radio communications.  *See Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 49 (2007).  It empowers the FCC with regulatory authority that depends on the type of service the regulated entity provides.  Communications Act of 1934, Pub. L. 73-416, 48 Stat. 1064 (1934).  Generally, the Act favors light regulation under Title I, 47 U.S.C. §§ 154(i), 161, unless a provider qualifies as a "common carrier" under Title II of the Act, *id.* §§ 201–03.  With the common-carrier designation comes significant regulatory oversight, such as requirements to "charge just and reasonable, nondiscriminatory rates to their customers, design . . . systems so that other carriers can interconnect with their communications networks, and contribute to the federal 'universal service' fund."  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 975 (2005) (citing 47 U.S.C. §§ 201–09, 251(a)(1), and 254(d)).

The emergence of the Internet brought an update to this scheme, the Telecommunications Act of 1996.  Pub. L. 101-104, 110 Stat. 56 (1996).  Significant for our purpose is its specification of two new services that the FCC may regulate:  "information service," 47 U.S.C. § 153(24), and "telecommunications service," *id.* § 153(53).  In short, an "information service" manipulates data, while a "telecommunications service" does not.  The core of the dispute here is whether Broadband Internet Service Providers offer the former or the latter, which is important because the Act instructs that a telecommunications carrier "shall be treated as a common carrier . . . to the extent that it is engaged in providing telecommunications services."  *Id.* § 153(51).  And it is through this designation that the FCC has inconsistently pushed its net-neutrality

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 6
*In the Matter of Safeguarding and*
*Securing the Open Internet*

policies.  If, however, Broadband Internet Service Providers offer an "information service," they are not subject to common-carrier regulations.

## C.

For almost 20 years after Congress enacted the Telecommunications Act, the FCC's position was that companies providing access to the Internet offered information—not telecommunications—services, and thus, Title II's common-carrier regulations did not apply. *See* In the Matter of Appropriate Regul. Treatment for Broadband Access to the Internet over Wireless Networks, 22 FCC Rcd. 5901, 5908–14, ¶¶ 18–34 (2007); In the Matter of United Power Line Council's Petition for Declaratory Ruling, 21 FCC Rcd. 13281, 13285–90, ¶¶ 7–15 (2006); In the Matters of Appropriate Framework for Broadband Access to the Internet over Wireline Facilities, 20 FCC Rcd. 14853, 14858, ¶ 5 (2005); In re Inquiry Concerning High-Speed Access to Internet Over Cable & Other Facilities, 17 FCC Rcd. 4798, 4823, ¶¶ 38–40 (2002) [hereinafter 2002 Internet Over Cable Declaratory Ruling]; In re Deployment of Wireline Services Offering Advanced Telecommunications Capability, 13 FCC Rcd. 24012, 24030, ¶ 36 (1998) [hereinafter Advanced Services Order]; *see also* In the Matter of Fed.-State Joint Bd. on Universal Serv., 13 FCC Rcd. 11501, 11536 (1998) [hereinafter Stevens Report] ("Internet access services are appropriately classed as information, rather than telecommunications, services.").  Applying the now-defunct *Chevron* framework, the Supreme Court upheld one of these determinations, in which the FCC found that cable companies providing cable modem service—a precursor to the service that Broadband Internet Access Providers provide—offered only an information service and thus could not be regulated as Title II common carriers.  *Brand X*, 545 U.S. at 986 (upholding the 2002 Internet Over Cable Declaratory Ruling).

Changes in the FCC's composition, with a new administration, upset the FCC's then-consistent interpretation.  During President Obama's tenure, the FCC undertook several efforts to impose net-neutrality policies.  Relevant here is the FCC's 2015 Open Internet Order, which reclassified Broadband Internet Service Providers as offering a telecommunications service subject to common-carrier regulation under Title II and then imposed net-neutrality regulations

Nos. 24-7000, et al.        *In re MCP No. 185: FCC*        Page 7
*In the Matter of Safeguarding and
Securing the Open Internet*

on them.  30 FCC Rcd. 5601.**²**  The D.C. Circuit found this interpretation permissible under *Chevron*.  *Telecom (panel)*, 825 F.3d at 689.  It then, with several notable writings, denied en banc review.  *See U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 382 (D.C. Cir. 2017) [hereinafter *Telecom (en banc)*]; *id.* at 382–93 (Srinivasan, J., concurring in the denial of rehearing en banc); *id.* at 393–417 (Brown, J., dissenting from the denial of rehearing en banc); *id.* at 417–35 (Kavanaugh, J., dissenting from the denial of rehearing en banc).  And over the dissent of Justices Thomas, Alito, and Gorsuch, the Supreme Court denied certiorari.  586 U.S. 994 (2018).

During the *Telecom* litigation and after President Trump first took office, the FCC changed course.  With its In re Restoring Internet Freedom Order, the FCC returned to its view that broadband Internet is an information service.  33 FCC Rcd. 311 (2018) [hereinafter RIF Order].  The D.C. Circuit yet again upheld this determination under *Chevron*.  *See Mozilla Corp. v. FCC*, 940 F.3d 1 (D.C. Cir. 2019) (per curiam).

That brings us to today.  The Safeguarding Order once more imposes net-neutrality policies on Broadband Internet Service Providers by reclassifying broadband Internet as a telecommunications service subject to common-carrier regulation under Title II.  89 Fed. Reg. at 45404.**³**  This order—issued during the Biden administration—undoes the order issued during the first Trump administration, which undid the order issued during the Obama administration, which undid orders issued during the Bush and Clinton administrations.  *Cf. Loper Bright*, 144 S. Ct. at 2288 (Gorsuch, J., concurring) (lamenting that "*Chevron* deference engender[ed] constant uncertainty and convulsive change even when the statute at issue itself remains unchanged").  Applying *Loper Bright* means we can end the FCC's vacillations.

---

**²**This order followed earlier endeavors by the FCC to impose net-neutrality policies similar to those at issue today, including one in 2010 that attempted to rely on Title I.  *See* In re Preserving the Open Internet, 25 FCC Rcd. 17905 (2010). The D.C. Circuit rejected this approach, holding the FCC could only impose such regulations on Title II common carriers.  *See Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014); *accord Comcast Corp. v. FCC*, 600 F.3d 642 (D.C. Cir. 2010) (vacating In re Formal Compl. of Free Press & Public Knowledge Against Comcast Corp. for Secretly Degrading Peer–to–Peer Applications, 23 FCC Rcd. 13028 (2008)).

**³**Yet it declines to enforce, through the FCC's forbearance power, several traditional Title II requirements (like rate regulation, tariffing, and certain enforcement and information collection and reporting mandates) because, in the FCC's view, such regulatory powers were unnecessary, and that forbearance was in the public interest under 47 U.S.C. § 160.  89 Fed. Reg. at 45468–99.  In the government's own words, the Safeguarding Order forbears "the bulk" of Title II's requirements.

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 8
*In the Matter of Safeguarding and
Securing the Open Internet*

Various Broadband Internet Service Provider associations filed petitions across the circuits challenging the Safeguarding Order. The Judicial Panel on Multidistrict Litigation thereafter chose the Sixth Circuit to hear these consolidated petitions for review. *See* 28 U.S.C. § 2112(a)(1), (3). A panel of this court denied motions by the FCC and one petitioner to transfer these petitions to the D.C. Circuit. It then stayed the Order pending review. *In re MCP No. 185*, 2024 WL 3650468, at *1, *5 (6th Cir. Aug. 1, 2024) (per curiam). In the panel's view, whether Broadband Internet Service Providers are Title II common carriers and subject to net-neutrality policies is "likely a major question requiring clear congressional authorization," and the Communications Act "likely does not plainly authorize the Commission to resolve this signal question." *Id.* at *3; *see, e.g.*, *West Virginia v. E.P.A.*, 597 U.S. 697, 724–32 (2022) (reviewing the major questions doctrine). Chief Judge Sutton, writing separately, would have granted the stay for the additional reason that "[t]he best reading of the statute, and the one in place for all but three of the last twenty-eight years, shows that Congress likely did not view broadband providers as common carriers under Title II of the Telecommunications Act." *In re MCP No. 185*, 2024 WL 3650468, at *5 (Sutton, C.J., concurring).

## II.

With the Order stayed, we now consider the merits of petitioners' challenges. The Administrative Procedure Act mandates that courts "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). And through that lens, we conclude that the Safeguarding Order misreads the text of the Communications Act as it applies to Broadband Internet Service Providers and mobile broadband services. For the reasons that follow, we hold that Broadband Internet Service Providers offer an information service and that mobile broadband is a private mobile service. Therefore, the FCC exceeded its statutory authority by issuing the Safeguarding Order.

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 9
*In the Matter of Safeguarding and
Securing the Open Internet*

### A.

"[T]he very core of the Internet and its associated services is the ability to 'retrieve' and 'utilize' information."  Stevens Report, 13 FCC Rcd. at 11540 n.165, ¶ 80 (citation omitted). Broadband Internet Service Providers, of course, "offer to members of the public . . . Internet access."  *Brand X*, 545 U.S. at 1000 (quoting Stevens Report, 13 FCC Rcd. at 11539, ¶ 79).  The question is whether, in so doing, they are merely a conduit for data transmission (a so-called "dumb pipe") and thus offer consumers a telecommunications service (as the Safeguarding Order concludes); or whether, instead, Broadband Internet Service Providers offer consumers the capability to acquire, store, and utilize data—and thus offer consumers an information service. In our view, the latter is the best reading of the Act.

### 1.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted).  We give the text its "ordinary meaning at the time Congress adopted" the statute, *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021), reading it not in isolation but rather "in context," *Loper Bright*, 144 S. Ct. at 2261 n.4 (citation omitted).

A series of interdependent definitions frame our inquiry here.  Title II provides that a "telecommunications carrier shall be treated as a common carrier . . . only to the extent that it is engaged in providing telecommunications services."  47 U.S.C. § 153(51).  A "'telecommunications carrier' means any provider of telecommunications services."  *Id.*  "The term 'telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  *Id.* § 153(53).  "Telecommunications," in turn, "means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received."  *Id.* § 153(50).

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 10
*In the Matter of Safeguarding and*
*Securing the Open Internet*

By contrast, "[t]he term 'information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." *Id.* § 153(24). A provider that offers information service may not be classified as a common carrier. *See id.* § 153(11), (51).

2.

Preliminarily, we must consider if *Brand X* binds our statutory-interpretation analysis, given that the Supreme Court overruled *Chevron* in *Loper Bright*. Noted above, *Brand X* involved a challenge to an FCC ruling determining that cable companies that owned cable lines used to provide broadband Internet service offered only an information service, not a telecommunications service as well. 545 U.S. at 978. Applying *Chevron*, the Court held that the Act's use of the term "offering of telecommunications" as used in § 153(53) was ambiguous and that the FCC's construction was therefore permissible. *Id.* at 986–1000. In the Court's view, the FCC reasonably chose to define "offering" to mean offering "consumers an information service in the form of Internet access . . . via telecommunications" instead of more broadly construing it as offering "consumers the high-speed data transmission (telecommunications) that is an input used to provide this service." *Id.* at 989 (citations omitted).

But *Loper Bright* ended *Chevron*'s mandated deference to an agency's statutory interpretation upon a finding of ambiguity. In overruling *Chevron*, the Court found such a view of implicit delegation inconsistent with the Administrative Procedure Act's command that courts "decide *all* relevant questions of law and interpret statutory provisions." *Loper Bright*, 144 S. Ct. at 2255 (internal quotation marks and ellipsis omitted). Now, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" by "us[ing] every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 2266, 2273.

Although the Court discarded the decades-old *Chevron* approach, it assured that "we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that *specific agency actions are lawful* . . . are still subject to statutory *stare decisis* despite

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 11
*In the Matter of Safeguarding and
Securing the Open Internet*

our change in interpretive methodology." *Id.* at 2273 (citations omitted and emphasis added). In other words, *Chevron* did not invalidate "specific agency actions" that the Supreme Court has already found lawful.

Following *Loper Bright*, we cannot agree with petitioners that *Brand X* expressly bars the FCC's order at issue. The "specific agency action" that the Court approved in *Brand X* was the FCC's 2002 Internet Over Cable Declaratory Ruling. The specific action before us here is the FCC's 2024 Safeguarding Order, which came 22 years later. The Safeguarding Order therefore is not the "specific agency action" that the Court approved in *Brand X*. And that means we are not bound by *Brand X*'s holding as a matter of statutory *stare decisis*.

3.

a.

We now turn to the merits, which the parties have argued here in exemplary fashion. But the key flaw in the FCC's arguments throughout is that the FCC elides the phrase "offering of a capability" as used in § 153(24). That phrase makes plain that a provider need not *itself* generate, process, retrieve, or otherwise manipulate information in order to provide an "information service" as defined in § 153(24). Instead, a provider need only offer the "*capability*" of manipulating information (in the ways recited in that subsection) to offer an "information service" under § 153(24). Even under the FCC's narrower interpretation of "capability," Broadband Internet Access Providers allow users, at minimum, to "retrieve" information stored elsewhere. And we think it equally plain, for the reasons recited below, that Broadband Internet Service Providers offer at least that capability.

Start with "offering" as used in § 153(24). "It is common usage to describe what a company 'offers' to a consumer as what the consumer perceives to be the integrated finished product." *Brand X*, 545 U.S. at 990. As for "capability," "contemporaneous dictionaries are the best place to start." *Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019). And they define "capability" as "having traits conducive to or features permitting," Merriam-Webster's Collegiate Dictionary 168 (10th ed. 1997), the "power or ability in general" and "the quality of

Nos. 24-7000, et al.            *In re MCP No. 185: FCC*            Page 12
*In the Matter of Safeguarding and
Securing the Open Internet*

being susceptible of," A Dictionary of Modern Legal Usage 129 (2d ed. 1995), or "having the ability or capacity for," Random House Unabridged Dictionary 308 (2d ed. 1993); *see also Spectrum Five LLC v. FCC*, 758 F.3d 254, 261 (D.C. Cir. 2014) (defining "capability" as "power or ability"); RIF Order, 33 FCC Rcd. at 322, ¶ 30 ("[T]he Commission has looked to dictionary definitions and found the term 'capability' to be 'broad and expansive,' including the concepts of 'potential ability' and 'the capacity to be used, treated, or developed for a particular purpose.'" (citation omitted)).

In the view of the current Commission, Broadband Internet Service Providers offer a telecommunications service that merely connects consumers to edge providers (like Netflix, Amazon, Facebook, and Google). Safeguarding Order, 89 Fed. Reg. at 45425, ¶ 99 ("[C]onsumers today perceive [Broadband Internet Service Providers to offer] . . . a telecommunications service that is primarily a transmission conduit used as a means to send and receive information to and from third-party services."). In essence, the FCC contends that edge providers offer an "information service" but that Broadband Internet Service Providers do not.

Everyone agrees with the Commission's classification of edge providers as offering an information service. Those providers indisputably "'generate' and 'make available' information to others through email and blogs; 'acquire' and 'retrieve' information from sources such as websites, online streaming services, and file sharing tools; 'store' information in the cloud; 'transform' and 'process' information through image and document manipulation tools, online gaming, cloud computing, and machine learning capabilities; 'utilize' information by interacting with stored data; and publish information on social media sites." *Id.* at 45426, ¶ 105.

Yet, by connecting consumers to edge providers' information, Broadband Internet Service Providers plainly provide a user with the "capability" to, at minimum, "retrieve" third-party content. 47 U.S.C. § 153(24); *see also Telecom (en banc)*, 855 F.3d at 395 (Brown, J., dissenting from the denial of rehearing en banc) ("The 'offering of a capability' for engaging in all [Internet] activities is exactly what is provided by broadband Internet access."). That is, they offer a "feature[] permitting" consumers to stream videos stored on Netflix's servers, Merriam-Webster's Collegiate Dictionary 168 (10th ed. 1997), the "ability" to purchase gifts from

Nos. 24-7000, et al.              *In re MCP No. 185: FCC*              Page 13
*In the Matter of Safeguarding and
Securing the Open Internet*

information stored on Amazon's servers, Random House Unabridged Dictionary 308 (2d ed. 1993), the "capacity" to view posts stored on Facebook's servers, *id.*, and the "power" to conduct a search using Google's servers, A Dictionary of Modern Legal Usage 129 (2d ed. 1995).  By utilizing high-speed Internet offered by Broadband Internet Service Providers, consumers are *capable* of obtaining edge providers' information.  In our view, then, the Safeguarding Order reads out the key phrase—"offering of a capability"—that precedes the gerunds ("generating," "acquiring," "storing," "transforming," "processing," "retrieving," "utilizing," and "making available information") set forth in § 153(24).**4**

   "While the statute's language spells trouble for the Government's position, a wider look at the statute's structure gives us even more reason for pause."  *Van Buren v. United States*, 593 U.S. 374, 389 (2021) (internal quotation marks omitted).  Specifically, Congress emphasized the importance of deregulating the "Internet and other interactive computer systems," finding in the Telecommunications Act of 1996 that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." 47 U.S.C. § 230(a)(4).  Thus, the policy of the United States is "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."  *Id.* § 230(b)(2).  It would be strange for Congress to enact this policy while, in the same bill, shackling Internet access providers with onerous Title II regulation.

   Further, Congress defined "interactive computer service" as an "information service . . . that provides access to the Internet," *id.* § 230(f)(2), and specified that "[n]othing in th[at] section shall be construed to treat interactive computer services as common carriers or telecommunications carriers," *id.* § 223(e)(6).  True, as the FCC points out, the definition of

---

**4**Ironically, the Commission used this very view of "capability" when it first imposed common-carrier regulation on mobile broadband services.  We discuss that issue in detail below but highlight here the FCC's finding in the Open Internet Order "that mobile broadband . . . gives its users the *capability* to send and receive communications from all other users of the Internet."  30 FCC Rcd. at 5785, ¶ 398 (emphasis added); *see also Telecom (panel)*, 825 F.3d at 719 (accepting this assertion as "undisputed").  Its Safeguarding Order readopts this reading.  89 Fed. Reg. at 45449, ¶ 209 ("Mobile [broadband] . . . is a broadly available mobile service that gives users the *ability* to send and receive communications to and from all other users of the internet.") (emphasis added).

Nos. 24-7000, et al.                *In re MCP No. 185: FCC*                Page 14
*In the Matter of Safeguarding and
Securing the Open Internet*

"interactive computer service" applies to that term as it is "used in" § 230 itself.  *Id.* § 230(f).  But that means the definition of "interactive computer service" *as a whole* is limited to § 230—not that the meaning of every word or phrase within that definition likewise has a meaning peculiar to that subsection.  (In that case, § 230 itself would have to define every word used within it.)  And the usage of the term "information service" in §230(f)(2) takes for granted that "information service" includes Internet providers.  We see no reason why that usage should be understood as peculiar to § 230—any more than its usage of, say, "transmit" or "receive" is.  *Id.* § 230(f)(4)(C).  The Act's structure thus favors petitioners' position, not the FCC's.

So too does history.  *Brand X* persuasively posits that we should view the definitions of "telecommunications service" and "information service" "against the background of" the FCC's pre-Telecommunications Act's regulatory efforts.  545 U.S. at 992–93.  In its 1980 Computer II decision, the FCC "distinguished between 'basic' service (like telephone service) and 'enhanced' service (computer-processing service offered over telephone lines)."  *Id.* at 976.  It noted that "in an enhanced service the content of the information need not be changed and may simply involve subscriber interaction with stored information."  *See* In re Amendment of Section 64.702 of the Comm'rs Rules and Regs. (Second Computer Inquiry), 77 F.C.C.2d 384, 421, ¶ 97 (1980) [hereinafter Computer II].  The Telecommunications Act of 1996 codified these distinctions: "telecommunications service" is "the analog to basic service," and "information service" is "the analog to enhanced service."  *Brand X*, 545 U.S. at 977 (quotation marks omitted).  When Congress borrows long-existing regulatory history, "it brings the old soil with it."  *George v. McDonough*, 596 U.S. 740, 746 (2022) (citation omitted).  And when Congress approvingly adopted the FCC's prior regulatory approach, it "placed Internet access on the 'enhanced service' side, and thus prohibited the FCC from construing the 'offering' of 'telecommunications service' to be the 'information service' of Internet access."  *Telecom (en banc)*, 855 F.3d at 405 (Brown, J., dissenting) (ellipsis and internal citations omitted).

Following enactment, various historical datapoints indicate that treating broadband Internet as a telecommunications service under Title II contradicts the Act.  The FCC has hewed

Nos. 24-7000, et al.             *In re MCP No. 185: FCC*                    Page 15
*In the Matter of Safeguarding and
Securing the Open Internet*

to this view from enactment until recent administration changes, which is "especially useful in determining the statute's meaning." *Loper Bright*, 144 S. Ct. at 2262.

Begin in 1998 with the Commission's Stevens Report, which stated that "Internet access services are appropriately classed as information, rather than telecommunications, services." 13 FCC Rcd. at 11536, ¶ 73. In the late 1990s, the companies providing Internet access service were usually not the ones providing data transmission. "Most" Internet access providers offered Internet access through dial-up calls sent via the local telephone company to the provider. Barbara Esbin, *Internet Over Cable: Defining the Future in Terms of the Past*, FCC OPP Working Paper No. 30, 1998 WL 567433, at *71 (Aug. 1, 1998). The dial-up telephone call from the consumer's house to the Internet access provider was known as the "last mile" of transmission. Advanced Services Order, 13 FCC Rcd. at 24016, ¶ 8. The provider, in turn, "rout[ed] the call to the Internet." Esbin, 1998 WL 567433, at *71; *see also* In re Fed-State Joint Bd. on Universal Serv., 12 FCC Rcd. 8776, 8822, ¶ 83 (1997) [hereinafter Universal Service Order] ("[W]e recognize that Internet access includes . . . the connection over a [telephone company's] network from a subscriber to an Internet Service Provider . . . . [V]oice grade access to the public switched network usually enables customers to secure access to an Internet Service Provider, and, thus, to the Internet."). "Internet access providers, typically, own[ed] no telecommunications facilities." Stevens Report, 13 FCC Rcd. at 11540, ¶ 81. The FCC concluded that Internet access providers offered information services because "the very core of the Internet and its associated services is the ability to 'retrieve' and 'utilize' information." *Id.* at 11539–40, ¶ 80 n.165. "Subscribers can retrieve files from the World Wide Web, and browse their contents, because their service provider offers the 'capability for acquiring, retrieving and utilizing information.'" *Id.* at 11537–38, ¶ 76 (ellipses and brackets omitted).

In the same year, the FCC's Advanced Services Order classified the first type of broadband transmission, Digital Subscriber Lines (DSL) (a faster method for transmitting data across last mile phone lines) as a "telecommunications service." 13 FCC Rcd. at 24029–30, ¶ 35. That did not strike the industry as odd in an era when different companies usually provided Internet access and last mile transmission. *See id.* at 24030, ¶ 36 ("Neither the petitioners, nor

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 16
*In the Matter of Safeguarding and
Securing the Open Internet*

any commenter, disagree with our conclusion that a carrier offering such a service is offering a 'telecommunications service.'"). In that context, the FCC noted that DSL is "simply [a] transmission technolog[y]" because it transported user-chosen information between or among user-specified points "without change in the form or content of the information as sent and received." *Id*., ¶ 35 (referencing the "telecommunications" definition in 47 U.S.C. § 153(50)). More specifically, the FCC explained that "two []DSL modems are attached to each telephone loop: one at the subscriber's premises, and one at the telephone company's central office . . . . [The DSL provider] sends the customer's data traffic . . . to a packet-switched data network. Once on the packet-switched network, the data traffic is routed to the location selected by the customer, for example . . . an Internet service provider. That location may itself be a gateway to a new packet-switched network or set of networks, like the Internet." *Id.* at 24027, ¶¶ 30–31. The important upshot is that a phone company's DSL service, as described in the Advanced Services Order, did not provide Internet access itself, just high-speed last mile transmission. The FCC therefore did not take a position on how to classify providers who offered Internet access, let alone those who combined Internet access with last mile transmission.

The FCC addressed that latter scenario in its 2002 Internet Over Cable Declaratory Ruling, which the Court upheld in *Brand X*. That Ruling extended the Stevens Report's information-service conclusion to cable companies providing an Internet access service despite their ownership of the cable lines used to provide data transmission across the "last mile" from a consumer's home to the site where Internet access occurred. 2002 Internet Over Cable Declaratory Ruling, 17 FCC Rcd. at 4821–24, ¶¶ 36-41. There was no basis, in the FCC's view, to distinguish the two: Together they form a "single, integrated service that enables the subscriber to utilize Internet access service . . . and to realize the benefits of a comprehensive service offering." *Id.* at 4822, ¶ 38. Nobody challenged the Ruling's conclusion that Internet access service constitutes an information service when considered apart from last mile transmission. *Brand X*, 545 U.S. at 987; *see also In re MCP No. 185*, 2024 WL 3650468, at *5 (Sutton, C.J., concurring) ("All nine justices in *Brand X* agreed that broadband internet access— the same issue in front of us—provides an information service as the Act defines that term under Title I."); *Telecom (en banc)*, 855 F.3d at 399 (Brown, J., dissenting) ("*No* member of the *Brand*

Nos. 24-7000, et al.                    *In re MCP No. 185: FCC*                    Page 17
*In the Matter of Safeguarding and
Securing the Open Internet*

*X* Court disputed that what occurred at the Internet Service Providers' computer-processing facilities constituted an 'information service.'"). The Court considered only whether a service's integration of last mile transmission constituted "a stand-alone, transparent offering of telecommunications," *Brand X*, 545 U.S. at 988 (internal quotation omitted), and upheld the Ruling's determination that it did not and that the integrated service offered by cable companies was an information service only, *id.* at 990.

For these reasons, then, it makes sense to exclusively classify integrated services, including those offered by Broadband Internet Service Providers, as information services because the definition expressly contemplates telecommunications usage, tying the "offering of a capability" to utilize (for example) information "*via telecommunications.*" 47 U.S.C. § 153(24) (emphasis added); *see also Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1241 (D.C. Cir. 2007) ("Indeed, the Act clearly contemplates that 'telecommunications' may be a component of an 'information service.'"); Stevens Report, 13 FCC Rcd. at 11529, ¶ 57 ("Because information services are offered 'via telecommunications,' they necessarily require a transmission component in order for users to access information."); *United States v. W. Elec. Co.*, 552 F. Supp. 131, 189 (D.D.C. 1982) [hereinafter AT&T Consent Decree] ("All information services are provided directly via the telecommunications network."). The key here is not whether Broadband Internet Service Providers utilize telecommunications; it is instead whether they do so while offering to consumers the capability to do more. *See* Computer II, 77 F.C.C.2d at 420, ¶ 97 ("An enhanced service is any offering over the telecommunications network which is more than a basic transmission service."). And as set forth above, they do. *See Brand X*, 545 U.S. at 1000. The *Brand X* Court made an observation that remains apposite here: "Cable modem service"—a precursor to the service that Broadband Internet Access Providers offer—"is an information service . . . because it provides consumers with a comprehensive capability for manipulating information using the Internet via high-speed telecommunications." *Id.* at 987.

b.

In the face of the statutory text, context, and history, the FCC largely resists our reading of what "offering of a capability" means because of how that reading would affect telephone

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 18
*In the Matter of Safeguarding and*
*Securing the Open Internet*

services—the paradigmatic example of telecommunications service.  If Broadband Internet Service Providers fall within "information services" given their facilitation of access to third-party content, the argument goes, so too would telephone services.  *See also Mozilla*, 940 F.3d at 93 (Millett, J., concurring).  It is true, in one sense, that a telephone user retrieves information from a third-party in a phone conversation with a friend or customer-service agent.  But that is not the sense meant by the statute.

The existence of a fact or a thought in one's mind is not "information" like 0s and 1s used by computers.  The former implies knowledge qua knowledge, while the latter is knowledge reduced to a tangible medium.  Consider the acts of speaking and writing.  Speaking reduces a thought to sound, and writing reduces a thought to text.  Both sound and text can be stored:  a cassette tape for audio information, a journal for written information, or a computer for both.  But during a phone call, one creates audio information by speaking, which the telephone service transmits to an interlocutor, who responds in turn.  Crucially, the telephone service merely transmits that which a speaker creates; it does not access information.

The Act's text and its pre-enactment history demonstrate that the definition of information service incorporates the narrower sense of "information."  Computer II defined basic service in part as "limited to the common carrier offering of . . . the analog or digital transmission of voice, data, video, etc., *information*."  77 F.C.C.2d at 419, ¶ 93 (emphasis added).  The AT&T Consent Decree, which defined information service in language almost identical to the Act, said "'[i]nformation' means knowledge or intelligence represented by any form of writing, signs, signals, pictures, sounds, or other symbols."  552 F. Supp. at 229.  Reducing knowledge to a tangible medium explains how an information service "generates" information, but computers themselves do not "generate" ideas or thoughts as such.  Further, this understanding of "information" permeates other sections of the Act, where it would be absurd to interpret information as equivalent to intangible thoughts or ideas.  *See* 47 U.S.C. § 153(50) ("'telecommunications' means the transmission . . . of information of the user's choosing without change in the form or content of the information as sent and received"); *id.* § 256(a)(2) ("ensure the ability of users and information providers to seamlessly and transparently transmit and

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 19
*In the Matter of Safeguarding and*
*Securing the Open Internet*

receive information between and across telecommunications networks"); *id.* § 256(d) ("exchange information without degeneration"); *id.* § 271(g)(4) ("retrieve stored information from, or file information for storage in, information storage facilities"); *id.* § 274(h)(2)(C) ("the transmission of information as part of a gateway to an information service that does not involve the generation or alteration of the content of information"). In sum, the "capability" of "retrieving" "information" does not refer to a phone call with a friend; it refers to an interaction with data stored on a computer. *Id.* § 153(24).

The FCC counters that telephone service enables users to interact with stored data, citing voicemail and call menus. Computer II considered this argument for answering machines in 1980 and the Stevens Report did the same for voicemail in 1998. Computer II, 77 F.C.C.2d at 421, ¶ 98; Stevens Report, 13 FCC Rcd. at 11530, ¶ 60. The answer remains the same. These ancillary services may themselves be information services. But they do not transform the categorization of telephone service because its core standalone offering is the transparent transmission of telecommunications.

Nor do the FCC's other counterarguments hit the mark. The FCC points to the Act's "advanced telecommunications incentives" section. Known as Section 706(a), it "encourage[s]" the FCC and its state analogues to "deploy[] . . . advanced telecommunications capability to all Americans . . . by utilizing" certain regulatory measures, including "price cap regulation" and "regulatory forbearance." 47 U.S.C. § 1302(a). In the FCC's view, this section's mention of those terms—which are associated with common-carrier regulation under Title II—demonstrate that broadband can be a telecommunications service. That is too sweeping of a reading of the statute. *In re MCP No. 185*, 2024 WL 3650468, at *6 (Sutton, C.J., concurring) ("[T]his authorization under Title VII to impose some regulations on broadband providers does not provide the Commission with the power to regulate all broadband providers as common carriers under Title II.").

Moreover, in the late 1990s, when greater than 90% of households accessed the Internet through dial-up, Universal Service Order, 12 FCC Rcd. at 8823, ¶83 n.154, there was a distinct possibility that advanced services would improve the last mile of transmission, which

Nos. 24-7000, et al.                    *In re MCP No. 185: FCC*                    Page 20
*In the Matter of Safeguarding and*
*Securing the Open Internet*

telecommunications carriers provided across notoriously slow copper phone lines, Advanced Services Order, 13 FCC Rcd. at 24016, ¶ 8.  Indeed, the Advanced Services Order shows that this possibility came to fruition with the introduction of DSL.  And in line with Section 706(a), the FCC categorized this improvement over dial-up as a telecommunications service when offered for a fee directly to the public.  *Id.* at 24029–30, ¶ 35.  But that tells us nothing about how to treat Broadband Internet Service Providers, which offer a service integrating the last mile of transmission in addition to Internet access.  And to be clear, the Advanced Services Order reiterated that Internet access is an information service.  *See id.* at 24030, ¶ 36.

One final response.  We acknowledge that the workings of the Internet are complicated and dynamic, and that the FCC has significant expertise in overseeing "this technical and complex area."  *Brand X*, 545 U.S. at 992.  Yet, post-*Loper Bright*, that "capability," if you will, cannot be used to overwrite the plain meaning of the statute.

4.

In sum, applying the plain meaning of § 153(24) to the interconnected nature of the Internet, we conclude that Broadband Internet Service Providers at the very least "offer[]" consumers the "capability" of "retrieving" "information via telecommunications."  Accordingly, the FCC's contrary conclusion is unlawful.

Given our conclusion that the FCC's reading is inconsistent with the plain language of the Communications Act, we see no need to address whether the major questions doctrine also bars the FCC's action here.  *See In re MCP No. 185*, 2024 WL 3650468, at *1, *5.  Nor do we consider petitioners' additional arguments, including that their provision of Domain Name Services and caching—which they contend are integrated products to the offering of Internet access services—further (or independently) demonstrate that they qualify as offering an information service to end users, *cf. Brand X*, 545 U.S. at 987, and that the Safeguarding Order is arbitrary and capricious.

Nos. 24-7000, et al.         *In re MCP No. 185: FCC*         Page 21
*In the Matter of Safeguarding and*
*Securing the Open Internet*

## B.

Finally, we turn to the Safeguarding Order's related provisions concerning mobile broadband. Because users can access broadband Internet when using mobile devices connected to cellular networks like 5G, separate from wired (or Wi-Fi) connections, the Safeguarding Order similarly imposes net-neutrality policies on those so-called "mobile broadband services" through the Act's "commercial mobile service" provision. 47 U.S.C. § 332(c)(1)(A). Although comparable, our conclusion that Broadband Internet Service Providers offer only an "information service" under § 153(24) does not govern our resolution of this related issue, for we deal here with separate statutory provisions that do not automatically operate in tandem. As explained below, the plain text of the statute forecloses the FCC's position on mobile broadband as well.

## 1.

In 1993, Congress added a "mobile services" provision to the radio-transmission part of the Communications Act (Title III). Pub. L. No. 103-66, § 60001, 107 Stat. 379. Three definitions are pertinent:

> (1) the term "commercial mobile service" means any mobile service . . . that is provided for profit and *makes interconnected service available* (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

> (2) the term "interconnected service" means service that is *interconnected with the public switched network* (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B); and

> (3) the term "private mobile service" means any mobile service . . . that is not a commercial mobile service or the functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

47 U.S.C. § 332(d) (emphases added). A commercial mobile service (think today's cellular telephone networks like AT&T, Verizon, or T-Mobile) is subject to Title II common-carrier regulation, *id.* § 332(c)(1)(A), while a private mobile service (such as a trucking company's private dispatch radio system) is not, *id.* § 332(c)(2). The dispute here lies in the language

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 22
*In the Matter of Safeguarding and*
*Securing the Open Internet*

emphasized above—whether mobile broadband is "interconnected with the public switched network." *Id.* § 332(d)(2).

Mobile-broadband services emerged in the mid-2000s. At that time (when BlackBerry dominated the market and Apple had just introduced its iPhone), the FCC classified mobile broadband as a private mobile service not subject to common-carrier regulation. In the Matter of Appropriate Regul. Treatment for Broadband Access to the Internet over Wireless Networks, 22 FCC Rcd. 5901, 5901 (2007).

That changed with the FCC's 2015 Open Internet Order, which "classif[ied] mobile broadband Internet access as a commercial mobile service." 30 FCC Rcd. at 5786, ¶ 399. As it did with broadband, the D.C. Circuit in *Telecom* approved this reclassification. *Telecom (panel)*, 825 F.3d at 713–24.

After an administration change, the FCC flipped its position in 2018 back to its original understanding. That is, "mobile broadband Internet access should not be classified as a commercial mobile service." RIF Order, 33 FCC Rcd. at 352, ¶ 65. The D.C. Circuit again upheld this determination under *Chevron*. *Mozilla*, 940 F.3d at 35–45.

Corresponding with another change in administration, today's Safeguarding Order again attempts to regulate mobile broadband as a "commercial mobile service." 89 Fed. Reg. at 45447–52, ¶¶ 198–220.

2.

There is no disputing that mobile broadband is a "mobile service" "provided for profit" "to the public" (or a "substantial portion of the public."). 47 U.S.C. § 332(d)(1). Instead, whether mobile broadband is a "commercial mobile service" that is subject to Title II common-carrier regulation depends on if mobile broadband is an "interconnected service," which in turn means a "service that is interconnected with the public switched network." *Id.* § 332(d)(1), (2). Mobile broadband does not satisfy this definition.

Nos. 24-7000, et al.                    *In re MCP No. 185: FCC*                    Page 23
*In the Matter of Safeguarding and*
*Securing the Open Internet*

We start with the text's use of a definite article. It would be one thing if the statute said, "interconnected with *a* public switched network," for that would connote *multiple* networks. But § 332(d)(2) does not do so; it uses "the," a fixed, singular reference. *See Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (explaining that the "use of the definite article . . . indicates that there is generally only one" noun covered); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) ("[T]he statute's use of the definite article 'the' takes precedence" over an indefinite reading to the contrary.); *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023) (a statute's use of a definite article signals "particular[ity]").

So what is "*the* public switched network"? In basic terms, it is the patchwork of telecommunication services that consumers use to place and receive calls from their telephone. More technically, it is "[a]ny common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use the North American Numbering Plan [(NANP)] in connection with the provision of switched services." In the Matter of Implementation of Sections 3(n) & 332 of the Commc'ns Act, 9 FCC. Rcd. 1411, 1517 (1994); *see also* Newton's Telecom Dictionary 799 (6th ed. 1993) (defining "public switched network" as "Any common carrier network that provides circuit switching between public users. The term is usually applied to the public telephone network but it could be applied more generally to other switched networks such as Telex, MCI's Executnet, etc."). Importantly, then, "the public switched network" means a network interconnected to the NANP's 10-digit system of telephone switching. *Cf. Mozilla*, 940 F.3d at 37–38 (approving the RIF Order's similar reasoning under *Chevron* deference).

History supports this reading. When Congress added "the public switched network" to Title III in 1993, it legislated against a backdrop that included "contemporaneous understandings of 'public switched network' by the Commission and the courts suggesting that it was commonly understood to refer to the 'public switched telephone network.'" *Id.* at 38; *see also Telecom (en banc)*, 855 F.3d at 396 (Brown, J., dissenting). As the RIF Order cogently summarizes, "[o]n multiple occasions before 332(d)(2) was enacted, the [FCC and the courts] used the term 'public switched network' to refer to the traditional public switched telephone network." 33 FCC Rcd.

Nos. 24-7000, et al.                    *In re MCP No. 185: FCC*                    Page 24
*In the Matter of Safeguarding and
Securing the Open Internet*

at 356, ¶ 75 (citing *Ad Hoc Telecomms. Users Comm. v. FCC*, 680 F.2d 790, 793 (D.C. Cir. 1982); *Pub. Util. Comm'n v. FCC*, 886 F.2d 1325, 1327, 1330 (D.C. Cir. 1989)).  And the FCC's contemporaneous interpretations—which *Loper Bright* says "may be especially useful in determining the statute's meaning," 144 S. Ct. at 2262—track this original understanding, *see, e.g.*, In the Matter of Implementation of Sections 3(n) & 332 of the Commc'ns Act, 9 FCC Rcd. at 1517; In the Matter of Appropriate Regul. Treatment for Broadband Access to the Internet over Wireless Networks, 22 FCC Rcd. at 5916–17, ¶¶ 43–45.

To its credit, the FCC concedes that the public switched network means the 10-digit telephone system, but the FCC argues that the public switched network also encompasses Internet Protocol (IP) addresses.  In support, it points to the statute's delegation provision to assert that Congress intentionally drafted a dynamic statute.  In its view, § 332(d)(2) permits the FCC to say again what it said in the 2015 Open Internet Order:  "the network that includes any common carrier switched network, whether by wire or radio, including local exchange carriers, interexchange carriers, and mobile service providers, that use[s] the North American Numbering Plan, *or public IP addresses*, in connection with the provision of switched services." Safeguarding Order, 89 Fed. Reg. at 45448, ¶ 203 (emphasis added).  By adding IP addresses, the FCC says, it permissibly updated the definition of public switched network to account for technological changes—e.g., Voice over Internet Protocol (VoIP) services like Skype, Google Voice, and Apple Facetime, which allow mobile broadband users to effectively connect with the 10-digit system by placing and receiving phone calls.  The D.C. Circuit accepted this argument strain when, in *Telecom*, it found for the FCC's position in its 2015 Open Internet Order that "mobile broadband is a commercial mobile service."  *Telecom (panel)*, 825 F.3d at 718.

But delegation is not unfettered, and it is still our task to "fix the boundaries of the delegated authority." *Loper Bright*, 144 S. Ct. at 2263 (brackets and internal quotation marks omitted).  And we see nothing in the statute that permits the FCC to effectively change the statute's original meaning of "the public switched network" as set forth above by adding "public

Nos. 24-7000, et al.          *In re MCP No. 185: FCC*          Page 25
*In the Matter of Safeguarding and*
*Securing the Open Internet*

IP addresses" to adapt to new technology.[5]   Nor can we agree with our colleagues on the D.C. Circuit, who apparently did not consider the contemporaneous meaning or the definite-versus-indefinite-article analysis set forth above.

With this understanding of "the public switched network," we cannot agree with the FCC's assertion that the telephone network and the Internet are "interconnected" due to commingling of facilities and the use of VoIP technology.[6]   This is for the simple reason that the definition of "commercial mobile service" focuses on the whole (mobile broadband) and not the part (a third-party provided service, VoIP).   *See Mozilla*, 940 F.3d at 43 ("The gap in [this] theory is shown most clearly in the obvious inability of a would-be caller from a NANP number who seeks to reach a person with mobile broadband but no form of VoIP (or mobile voice service)."); *see also Telecom (en banc)*, 855 F.3d at 407 (Brown, J., dissenting) ("Nothing about the increase of consumers accessing mobile broadband Internet service via smart phones, the speed of Internet connection, or the 'bundling' of VoIP applications with smart phones, undermines the . . . distinction between the *transmission* of VoIP traffic and the VoIP *service* to the end user.   Mobile broadband Internet access simply does not constitute a service interconnected with '*the* public switched network.'" (internal citations omitted)).   *But see Telecom (panel)*, 825 F.3d at 722–23 (coming to the opposite conclusion under *Chevron*).

Finally, the FCC says it "makes little sense" to classify mobile broadband as a "private mobile service," which "stands in marked contrast to 'the private mobile services of 1994, such as a private taxi dispatch service, services that offered users access to a discrete and limited set of endpoints.'"   *See id.* at 715 (brackets omitted).   But that point is lost because the definitions of

---

[5]Indeed, Congress subsequently demonstrated it knows how to differentiate between "the public Internet" and "the public switched network" when it created the First Responder Network Authority in 2012.  Spectrum Act of 2012, Pub L. 112-96, § 6202.   That statute set forth a "public safety broadband network" that provided "connectivity between . . . (i) the radio access network; and (ii) the public Internet or the public switched network, or both."   47 U.S.C. § 1422(b)(1)(B)(i–ii); *see also Telecom (en banc)*, 855 F.3d at 406–07 (Brown, J., dissenting) ("This subsequent, specific distinction can inform what 'the public switched network' meant to Congress in 1996.").

[6]The FCC does not otherwise claim mobile broadband is "interconnected" with the 10-digit telephone plan.  Nor could it, for there are no internal connections between the Internet and the telephone network.   *See* Merriam-Webster's Collegiate Dictionary 609 (10th ed. 1993) (defining "interconnected" as "having internal connections between the parts and elements").

Nos. 24-7000, et al.              *In re MCP No. 185: FCC*              Page 26
*In the Matter of Safeguarding and
Securing the Open Internet*

"commercial" and "private" mobile services are mutually exclusive, with "the latter [being] defined negatively, as 'any mobile service that is not a commercial service.'"  *Mozilla*, 940 F.3d at 35 (emphasis and ellipsis omitted, quoting 47 U.S.C. § 332(d)(3)).  Because mobile broadband is not a commercial mobile service, it necessarily is a private mobile service.[7]

### 3.

In sum, mobile broadband does not qualify as "commercial mobile service" under § 332(d)(1) and therefore may not be regulated as a common carrier.

### III.

For these reasons, we grant the petitions for review and set aside the FCC's Safeguarding Order.

---

[7]We likewise reject the FCC's fallback position that mobile broadband is a "functional equivalent" of a commercial mobile service under 47 U.S.C. § 332(d)(3) given the significant service disparity offered by broadband and mobile services.  *Cf. Mozilla*, 940 F.3d at 44–45 ("[M]obile voice and mobile broadband 'have different service characteristics and intended uses and are not closely substitutable for each other.'") (quoting RIF Order, 33 FCC Rcd. at 361–62, ¶ 85); *Aegerter v. City of Delafield*, 174 F.3d 886, 891 (7th Cir. 1999) ("functionally equivalent" means "services (or products) [that] are direct substitutes for one another").

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 24-7000/3449/3450/3497/3504/3507/3508/3510/3511/3519/3538

IN RE: MCP No. 185; FEDERAL
COMMUNICATIONS COMMISSION, IN THE
MATTER OF SAFEGUARDING AND SECURING
THE OPEN INTERNET, DECLARATORY RULING,
ORDER, REPORT AND ORDER, AND ORDER ON
RECONSIDERATION, FCC 24-52, 89 FED. REG.
45404, PUBLISHED MAY 22, 2024

```
┌─────────────────────────────┐
│           FILED             │
│        Jan 02, 2025         │
│   KELLY L. STEPHENS, Clerk  │
└─────────────────────────────┘
```

_____

OHIO TELECOM ASSOCIATION, et al.,

    Petitioners,

    v.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

    Respondents.


Before: GRIFFIN, KETHLEDGE, and BUSH, Circuit Judges.

# JUDGMENT

THIS MATTER came before the court upon Multi-Circuit Petitions for Review of the Federal Communications Commission's Safeguarding and Securing the Open Internet Order.

UPON FULL REVIEW of the record and the briefs and arguments of counsel,

IT IS ORDERED that the petitions for review are GRANTED, and the FCC's order is set aside.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk